DAVID B. FARKAS (SBN 257137)
david.farkas@us.dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel: (310) 595-3000
Fax: (310) 595-3300

JOHN K. LYONS (*Pro Hac Vice*)
john.lyons@dlapiper.com
JEFFREY S. TOROSIAN (*Pro Hac Vice*)
jeffrey.torosian@dlapiper.com
JOSEPH A. ROSELIUS (*Pro Hac Vice*)
joseph.roselius@dlapiper.com
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel: (312) 368-4000
Fax: (312) 236-7516

Attorneys for Jonathan D. King as Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>ZETTA JET USA, INC., a California corporation,<br><br>    Debtor. | Lead Case No.: 2:17-bk-21386-SK<br>Chapter 7<br>Jointly Administered With:<br>Case No.: 2:17-bk-21387-SK<br><br>Adv. Proc. No. 2:19-AP-1982-SK |
| In re:<br><br>ZETTA JET PTE, LTD., a Singaporean corporation,<br><br>    Debtor. | **FIRST AMENDED ADVERSARY COMPLAINT**<br><br>**JURY DEMAND[1]**<br><br><u>Hearing</u>:<br>Date:  September 15, 2021<br>Time:  9:00 a.m. (PDT)<br>Place:  Courtroom 1575<br>       255 East Temple Street<br>       Los Angeles, CA 90012 |
| JONATHAN D. KING, solely in his capacity as Chapter 7 Trustee of Zetta Jet USA, Inc. and Zetta Jet PTE, Ltd.,<br><br>    Plaintiff,<br><br>v.<br><br>JETCRAFT CORPORATION, JETCRAFT GLOBAL, INC., JETCOAST 5000-5 LLC, ORION AIRCRAFT HOLDINGS LTD., JETCRAFT ASIA LIMITED, FK GROUP LTD, FK PARTNERS LIMITED, JAHID | |

---

[1] The Trustee has filed a *Notice of Jury Demand* contemporaneously herewith.

1  | FAZAL-KARIM, BOMBARDIER
2  | AEROSPACE CORPORATION,
   | BOMBARDIER, INC., and LEARJET, INC.,
3  |
   |    Defendants.

4      Plaintiff Jonathan D. King, solely in his capacity as the Chapter 7 Trustee (and the

5  former Chapter 11 Trustee) (the "Trustee") appointed in these cases (the "Chapter 7

6  Cases"), on behalf of the above-captioned debtors, Zetta Jet USA, Inc. ("Zetta USA") and

7  Zetta Jet PTE, Ltd. ("Zetta PTE," and together with Zetta USA and the Zetta BVI

8  Subsidiaries defined below, the "Debtors"), by and through his undersigned counsel, DLA

9  Piper LLP (US), brings this First Amended Adversary Complaint (the "Complaint") against

10 defendants Jetcraft Corporation ("Jetcraft Corp."); Jetcraft Global, Inc. ("Jetcraft Global");

11 Jetcoast 5000-5, LLC ("Jetcoast"); Orion Aircraft Holdings Ltd. ("Orion"); Jetcraft Asia

12 Limited ("Jetcraft Asia," and together with Jetcraft, Jetcraft Global, Jetcoast, and Orion,

13 "Jetcraft"); FK Group Ltd. ("FK Group"); FK Partners Ltd. ("FK Partners"); Jahid Fazal-

14 Karim ("Fazal-Karim," and together with Jetcraft, FK Group, and FK Partners, the "Fazal-

15 Karim Defendants"); Bombardier Aerospace Corporation ("BAC"); Bombardier, Inc.

16 ("BI," and together with BAC, "Bombardier"); and Learjet, Inc. ("Learjet," and

17 collectively, the "Defendants")[2], and, reserving and not waiving any right to amend this

18 Complaint as appropriate and allowed:

19                    **PRELIMINARY STATEMENT**

20     1.     This is a case about rampant fraud, bribery, and corruption in the high-priced

21 luxury private jet market. At the core of the case is a conspiracy between Bombardier,

22 Jetcraft, and Geoff Cassidy ("Cassidy"). Cassidy was the Managing Director of Zetta PTE

23 and a director of Zetta PTE from July 2015 until the other directors removed and terminated

24 him in August 2017. Through this conspiracy and numerous wrongful acts involving bribery

25 and other misconduct, Cassidy misappropriated millions of dollars from Zetta PTE while

26 _____

27 [2] ECN Aviation Inc. f/k/a Element Aviation Inc. ("Element Aviation"); and ECN Capital
   Corporation, as successor to Element Financial Corporation ("ECN" and together with
28 Element Aviation, "Element") were previously named as defendants, but Element has
   settled all claims with the Debtors.

Bombardier and Jetcraft earned tens of millions of dollars in commissions and profits by selling fraudulently overpriced planes to the company. By the time Zetta PTE filed for Chapter 11 protection along with Zetta USA in September 2017, the wrongful acts and misconduct of Bombardier, Jetcraft, and Cassidy had crippled the Debtors and left their creditors with almost nothing.

2.    Bombardier and Jetcraft did not participate in this conspiracy with Cassidy through isolated acts of low-level rogue employees, but rather through the concerted and pervasive misconduct of senior executives, in the case of Bombardier, and the principal of the company, in the case of Jetcraft. Nor does this misconduct appear to be aberrational; Bombardier has recently been under investigation by the Swedish police authorities, the World Bank Group, and the US Department of Justice regarding "collusion, corruption, fraud and obstruction" related to contracts in Azerbaijan; has recently been under investigation by a judicial commission in South Africa for "irregularities with respect to multiple procurements"; has recently been under investigation by the Spanish Competition Authority for "irregularities in public tenders"; was fined $4 million by governmental authorities in Brazil for anti-competitive activity; and is the subject of a U.K Serious Fraud Office bribery probe for suspected bribery in Indonesia.[3]

3.    The Trustee seeks redress here for the wrongful acts orchestrated against the Debtors by these Defendants.

4.    For the convenience of the Court, and without waiving any right to rely on any allegations in the Complaint for any purpose, the Trustee has organized this Complaint into the following sections:

**Introduction** ........................................................................................................ 4

**Jurisdiction and Venue** ...................................................................................... 7

**Parties and Relevant Non-Parties** ...................................................................... 8

---

[3]  BI 2020 Annual Report at 205-209, available at https://bombardier.com/system/files/financial-reports/2021-02/Bombardier-Financial-Report-2020-en.pdf, relevant excerpts attached as Exhibit 1.

**Allegations Common to All Counts** ..................................................... 16

**Allegations Relating to Alter Ego** ..................................................... 75

**Allegations Relating to Agency** ..................................................... 79

**Allegations Relating to Actual Intent Fraudulent Transfer** ........................... 84

**Allegations Relating to Constructive Fraudulent Transfer** ........................... 97

**Allegations Relating to Preference Transfer** .................................................. 100

**Allegations Relating to Stay Violation** .................................................. 101

**Allegations Relating to Choice of Law** ......................................................... 104

**Claims** .................................................................................................... 112

**Reservation of Rights** ................................................................................ 151

**Prayer for Relief** ....................................................................................... 151

## INTRODUCTION

5.     Zetta PTE was a private jet company formed and run by Cassidy, a serial con artist and fraudster. Cassidy conspired with Bombardier and Fazal-Karim to cause the Debtors to enter into a single purchasing program to purchase almost half a billion dollars of aircraft from Jetcraft and Bombardier rather than their competitors in return for more than $1 million in commercial bribes[4] and kickbacks[5] paid by Jetcraft Corp. (through Jetcraft Global) at Fazal-Karim's direction and paid by Bombardier directly. At the same time, Cassidy embezzled at least $8 million from the Debtors. Cassidy was also operating the Debtors as a Ponzi-like scheme, using a fraudulent business plan to convince initial investors and financiers to lend the Debtors funds, then using new financiers to pay off old debt in exchange for new debt (including duplicative debt) that the Debtors were unable to pay. Cassidy knew from the beginning that his schemes were unsustainable and that the

---

[4] Commercial bribery is defined as "corrupt dealing with the agents or employees of prospective buyers . . . ." COMMERCIAL BRIBERY, Black's Law Dictionary (11th ed. 2019).

[5] A kickback is a species of bribe defined as a "sum of money illegally paid to someone in authority . . . for arranging for a company to receive a lucrative contract" and is often "a return of a portion of a monetary sum received" by the briber. KICKBACK, Black's Law Dictionary (11th ed. 2019).

1    Debtors were doomed to fail, yet he acted to line his own pockets at the expense of the

2    Debtors and their creditors.

3    　　　　6.　　　Fazal-Karim is Bombardier's sales agent and also runs a private luxury jet

4    broker, Jetcraft. Fazal-Karim directed Jetcraft Corp. (through Jetcraft Global) to pay

5    Cassidy at least $1 million in kickbacks to induce Cassidy to cause the Debtors to run their

6    purchasing program through Jetcraft and Bombardier. Fazal-Karim directed Jetcraft Corp.'s

7    CFO to have Jetcraft Global pay Cassidy a $500,000 kickback to induce Cassidy to cause

8    the Debtors to enter into agreements to purchase one Bombardier plane from Jetcraft and

9    six additional planes directly from Bombardier in three linked transactions. Fazal-Karim

10   later directed Jetcraft Corp.'s CFO to have Jetcraft Global pay Cassidy a second $500,000

11   kickback to induce Cassidy to cause the Debtors to acquire an additional Bombardier plane

12   from Jetcraft and an additional four planes directly from Bombardier, as well as to ensure

13   that Cassidy took delivery of earlier planes (thereby ensuring that Bombardier would not

14   lose the sales and the vast majority of the remaining contract payments, which were not due

15   until closing and delivery).

16   　　　　7.　　　Bombardier not only knew of and agreed to the kickbacks that Fazal-Karim

17   had Jetcraft Global pay to Cassidy, it worked in concert with Fazal-Karim by paying bribes

18   directly to Cassidy as well. Two Bombardier executives, Khader Mattar and Yubin Yu, had

19   Bombardier pay Cassidy a $43,890 bribe and agreed to have Bombardier pay Cassidy

20   another $42,569 bribe (that Fazal-Karim ultimately paid through FK Partners after a later

21   agreement with Mattar), to ensure that the Debtors would not terminate agreements for four

22   planes from Bombardier, as Cassidy expressly threatened to do.

23   　　　　8.　　　As a direct result of the bribes and kickbacks to Cassidy, Fazal-Karim,

24   Jetcraft, and various related entities received or were entitled to receive at least ██████

25   ██████ in commissions from Bombardier, profits, and other payments, while Bombardier

26   received sales and future orders that Bombardier valued at more than half a billion dollars

27   (and transfers of loan proceeds from obligations incurred by the Debtors of at least $200

28   million and direct payments from the Debtors of at least $47.9 million). As a direct result

of the bribes that Bombardier paid or agreed to pay, Cassidy agreed not to cancel contracts

worth more than ███████ to Bombardier (which would also have forced Bombardier

to have to return more than ███████ in prepayments), and Cassidy further induced the

Debtors to acquire four additional planes worth more than $129.4 million to Bombardier.

These payments, sales, and future orders occurred while the private jet industry was, in the

words of Fazal-Karim, in its "most difficult period."

9.      At the same time as he was taking bribes in exchange for planes, Cassidy

used the Debtors as his personal piggy bank, knowing full well that the Debtors and their

creditors would be left with nothing. Cassidy stole at least $8 million from the Debtors: (a)

he embezzled at least $2.66 million out of the proceeds of a single aircraft closing; (b) he

stole approximately $3.4 million to purchase a 70-foot luxury yacht; and (c) he spent

millions more of the Debtors' funds on extravagant purchases for his own personal benefit,

including among other things a high-end apartment in Singapore, Bentley and BMW luxury

automobiles, Richard Mille watches, luxury goods from Hermes, and lavish vacations.

10.      Even without Cassidy's embezzlement, the Debtors never had enough

operating income to pay off trade creditors or the debt service on the planes. Simply put,

the Debtors could not charge rates sufficient to service their debts and were consistently

earning a net *loss* for every hour the planes were in the air with no hope of improvement.

Instead, Cassidy kept Zetta afloat by using investor, financier, and customer funds in a

Ponzi-like scheme. For example, Cassidy induced Li Qi ("Li")—a Hong Kong-based

businessman and investor—and several aircraft financiers to invest or loan funds by

promising significantly above-market rates of return based on a fraudulent business plan.

11.      When the Debtors had only "breathing room of 1.5 months" and the

"wolves" were at the door, Cassidy engineered a cash out refinance transaction with new

financiers to pay off in part his initial investor and financiers so that he could continue his

Ponzi-like scheme and take advantage of an opportunity to steal millions of dollars from

the proceeds. Cassidy planned to use a revised business plan with even more inflated

numbers to bring in new investors, but his fraud was discovered by his business partners

1  before he could continue his scheme.

2       12.    The Trustee now brings claims against the Fazal-Karim Defendants and

3  Bombardier for aiding and abetting Cassidy's breaches of fiduciary duty, civil conspiracy,

4  violating California Business and Professions Code § 17200 (including specifically the

5  unlawful payment of commercial bribes under the California commercial bribery law), civil

6  fraudulent misrepresentation, and fraudulent concealment or omission. On these tort claims,

7  the Trustee seeks to recover damages of at minimum the amount of the bribes, plus the

8  amounts that each of the aircraft sold was overpriced, and any additional amounts by which

9  the Debtors were damaged by the corrupt transactions, or in the alternative for restitution

10  of the Defendants' ill-gotten gains.

11       13.    The Trustee also seeks to avoid actually or constructively fraudulent

12  transfers and obligations between the Debtors and the Defendants, and to avoid preference

13  transfers to Bombardier and Learjet. The Trustee seeks to avoid and recover all actively or

14  constructively fraudulent transfers and preference transfers from the Defendants.

15       14.    The Trustee further brings claims against Bombardier for violating the

16  automatic stay.

17       15.    Finally, the Trustee objects to proofs of claims that have been filed by certain

18  Defendants in these cases, seeks disallowance of all the Defendants' claims, and

19  affirmatively asserts counterclaims against these Defendants on the basis of the counts

20  raised in this Complaint.

21                     **JURISDICTION AND VENUE**

22       16.    This Court has jurisdiction over this Adversary Proceeding under 28 U.S.C.

23  §§ 157 and 1334. This Adversary Proceeding is a core proceeding under 28 U.S.C.

24  § 157(b)(2)(A), (B), (C), (E), (F), (K), (H), and (O).

25       17.    Venue of this Adversary Proceeding is proper under 28 U.S.C. §§ 1408 and

26  1409 because it arises in these Chapter 7 Cases, which are currently pending before this

27  Court.

28       18.    The statutory authority for the relief sought is 11 U.S.C. §§ 105(a), 362, 502,

542, 544, 547, 548, and 550 and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

19.     The Trustee does not consent to the entry by the Bankruptcy Court of final orders on any issues that are triable by jury, related thereto, or otherwise tried in conjunction therewith. The Trustee does not consent to the Bankruptcy Court conducting a jury trial under 28 U.S.C. § 157(e).

<strong><u>PARTIES AND RELEVANT NON-PARTIES</u></strong>

**A.  <u>The Trustee</u>**

20.     The Trustee is the duly appointed Chapter 7 trustee of the Debtors' bankruptcy estates. The Trustee has the authority and power to bring this Adversary Proceeding on behalf of the Debtors' estates pursuant to 11 U.S.C. § 704.

**B.  <u>The Debtors and related parties and personnel</u>**

21.     Debtor Zetta PTE was organized on July 15, 2015, by Cassidy along with James Seagrim ("<u>Seagrim</u>") and Matthew Walter ("<u>Walter</u>"). Cassidy owned 34 percent of Zetta PTE's shares through Asia Aviation Company Pte. Ltd. ("<u>Asia Aviation</u>") and Seagrim and Walter each owned 33 percent of Zetta PTE's shares.

22.     Debtor Zetta PTE purchased Debtor Zetta USA in August 2016 and merged with Asia Aviation.

23.     Debtor Zetta USA, formerly known as Advanced Air Management, Inc. ("<u>AAM</u>") until August 2016, was a private jet charter company based in Burbank, California, and operated by Seagrim and Walter.

24.     Asia Aviation, owned by Cassidy and his then-wife, Miranda June Tang Kim Choo ("<u>Tang</u>"), operated a single jet on behalf of the jet's owner, until it was merged into Zetta PTE.

25.     Cassidy was at all relevant times the Debtors' Managing Director and a Director of Zetta PTE.

26.     Tang was at all relevant times a Director of Zetta PTE.

27.     Seagrim was the Debtors' Director of Operations and a Director of Zetta

8

PTE and Zetta USA. Seagrim was based in Zetta USA's Burbank, California, office.

28.    Walter was the Debtors' Director of Sales and a Director of Zetta PTE and Zetta USA. Walter was based in Zetta USA's Burbank, California, office.

29.    Li is a wealthy businessman and investor who resides in Hong Kong. Li became a Director of Zetta PTE on February 26, 2016. Li used three entities he controlled to manage his relationship with Zetta PTE: (1) Universal Leader Investment Limited ("Universal Leader"); (2) Truly Great Global Limited ("Truly Great"); and (3) Glove Assets Investments Ltd. ("Glove Assets").

30.    Zetta PTE did not hold any formal board meetings until August 17, 2017. Board decisions were made (1) by directors' resolutions in writing (which were signed by Walter and Seagrim in Burbank, California; by Cassidy and Tang in Singapore; and, after February 26, 2016, by Li in Hong Kong) or (2) by e-mail, where Cassidy would e-mail the rest of the Directors for their approval (again by Walter and Seagrim in Burbank, California; by Cassidy and Tang in Singapore; and after February 26, 2016, by Li in Hong Kong).

31.    Zetta PTE's Memorandum of Association requires a majority vote of its directors to enter into the transactions discussed in this Complaint. It also requires that any "director who is in any way, directly or indirectly, interested in a transaction or proposed transaction with the Company shall declare the nature of his interest in accordance with the provisions of the Act" and further states that "a director shall not vote in respect of any transaction in which he is interested (and if he does his vote shall not be counted), nor shall he be counted for the purpose of any resolution regarding the same." (Mem. of Assoc. of Zetta PTE ¶ 97.)

32.    Because Cassidy and Tang were directly or indirectly interested in each of the transactions described in this Complaint, based on Cassidy's receipt of commercial bribes and kickbacks in connection with the transactions, as well as Cassidy's embezzlement of proceeds in the transactions, their votes do not count for any of the transactions.

33.    Similarly, because Li was directly or indirectly interested in the transactions

involving Planes 6 and 7 and the Minsheng Refinancing (discussed further below), his vote would not count in those transactions. In the other transactions, Li would have been at most one out of three potential votes.

34.    Accordingly, Seagrim and Walter, as the only disinterested directors, would have had to unanimously approve the transactions before February 26, 2016 (when Li became a director), and at least one of Seagrim and Walter (along with Li) would have had to approve all transactions after February 26, 2016. As set forth below, the transactions were not properly approved by these disinterested directors because of fraudulent misrepresentations and omissions by Cassidy and the Defendants.

35.    Zetta Jet Global 6000-1 Limited ("Zetta Jet 6000-1"), Zetta Jet Global 6000-2 Limited ("Zetta Jet 6000-2"), Zetta Jet Global 6000-3 Limited ("Zetta Jet 6000-3"), Zetta Jet Global 6000-4 Limited ("Zetta Jet 6000-4"), Zetta Jet Global 6000-5 Limited ("Zetta Jet 6000-5"), Zetta Jet Global 5000-1 Limited ("Zetta Jet 5000-1"), and Zetta Jet Global 5000-2 Limited ("Zetta Jet 5000-2") (collectively, the "Zetta BVI Subsidiaries") are companies formed under the laws of the British Virgin Islands (the "BVI") by Zetta PTE. Zetta PTE is the sole shareholder of each of the Zetta BVI Subsidiaries. Cassidy and Seagrim were the directors of each of the Zetta BVI Subsidiaries.[6]

36.    The Zetta BVI Subsidiaries were formed shortly before each finance and lease transaction for which they were needed. These entities served no purpose other than their role in these transactions. They did not conduct business, had no bank account, had no employees, generated no income, had no presence in the BVI, and never held a meeting of the Board of Directors.

37.    The following Zetta Subsidiaries correspond to the following planes:

| Zetta BVI Subsidiary | Corresponding Plane |
| --- | --- |
| Zetta Jet 5000-1 | Plane 1 |
| Zetta Jet 6000-4 | Plane 4 |

---

[6] The Debtors may seek substantive consolidation of the Zetta BVI Subsidiaries through a separate motion.

| Zetta Jet 6000-5 | Plane 5 |
| Zetta Jet 6000-3 | Plane 6 |
| Zetta Jet 6000-2 | Plane 7 |
| Zetta Jet 6000-1 | Plane 10 |
| Zetta Jet 5000-2 | Plane 11 |

## C. **Fazal-Karim and related Parties and personnel**

38.     Fazal-Karim is the majority owner and Chairman of the Board of Jetcraft Corp. and Jetcraft Global, as well as the director and sole beneficial owner of FK Partners and FK Group. Upon information and belief, he is a resident of Dubai in the United Arab Emirates.

39.     Fazal-Karim has more than 25 years of experience in the aviation industry. Fazal-Karim acquired 50% of Jetcraft Corp. in May 2008. Prior to that, Fazal-Karim worked at Bombardier from approximately 2001 to 2008 as the regional vice president of sales for the Americas and then as the vice president of international sales. Before that, Fazal-Karim worked at Airbus as Vice President of Business Development and Asset Management from 1996 to 2001.

40.     Since no later than August 16, 2015, Fazal-Karim, through his entity FK Group, held himself out as the exclusive representative of Bombardier in southeast Asia. In fact, Fazal-Karim served as Bombardier's agent in southeast Asia. During the relevant period, Fazal-Karim represented Bombardier in sophisticated negotiations involving, upon information and belief, billions of dollars in Bombardier aircraft and in extraordinarily complex transactions involving some of the world's biggest corporations and richest individuals.

41.     Jetcraft Corp. is, and was at all relevant times, a Delaware corporation with its principal place of business in North Carolina.[7]

42.     Jetcraft Global is, and was at all relevant times, a BVI corporation with its

---

[7] Jetcraft's CFO testified at her Bankruptcy Rule 2004 deposition that Jetcraft's headquarters are in Raleigh, North Carolina, but its operations are largely decentralized.

1  principal place of business in North Carolina.

2  43.    "Jetcraft" also appears to be the brand name for both Jetcraft Corp. and

3  Jetcraft Global. At all relevant times, Fazal-Karim owned 95 percent of both Jetcraft Corp.

4  and Jetcraft Global.

5  44.    Jetcraft Asia is, and was at all relevant times, a BVI corporation with its

6  principal place of business in North Carolina. Jetcraft Asia is, and was at all relevant times,

7  a wholly owned subsidiary of Jetcraft Global.

8  45.    Jetcoast is, and was at all relevant times, a Delaware corporation with its

9  mailing address in North Carolina. Jetcoast is, and was at all relevant times, a wholly owned

10  subsidiary of Jetcraft Global.

11  46.    Orion is, and was at all relevant times, a BVI corporation with its registered

12  office in BVI. Orion is, and was at all relevant times, a wholly owned subsidiary of Jetcraft

13  Global.

14  47.    Jetcraft provides aircraft sales, leasing, acquisition, and trade services. It

15  distributes new and pre-owned aircraft and provides consulting, fleet planning, and contract

16  services. Fazal-Karim operates Jetcraft through his "fk-group.net" e-mail account,

17  sometimes with a signature block that says "Jetcraft Chairman." As described below, Fazal-

18  Karim negotiated on behalf of Jetcraft Corp. and its subsidiaries Jetcoast and Orion, ordered

19  Jetcraft Corp.'s CFO to pay kickbacks through Jetcraft Global, paid an additional kickback

20  through FK Partners, and managed Jetcraft's relationship with the Debtors through his FK

21  Group e-mail account.

22  48.    Anne Behrend ("Behrend") was at all relevant times Jetcraft Corp.'s Chief

23  Financial Officer and Jetcraft Global's Chief Financial Officer. At all relevant times,

24  Behrend worked out of Indianapolis, Indiana.

25  49.    Peter Antonenko ("Antonenko") was at all relevant times Jetcraft Corp.'s

26  Chief Operating Officer and is an attorney licensed to practice law in Minnesota. At all

27  relevant times, Antonenko worked out of Minneapolis, Minnesota.

28  50.    Chad Anderson ("Anderson") was at all relevant times Jetcraft Corp.'s

President. At all relevant times, Antonenko worked out of Minneapolis, Minnesota.

51.     FK Group is, and was at all relevant times, an entity based in Dubai.

52.     FK Partners is, and was at all relevant times, a UK entity with its registered office in the UK.

**D.  Bombardier Parties and related personnel**

53.     BI is, and was at all relevant times, a Canadian corporation with its principal place of business in Montreal, Canada.

54.     BAC is, and was at all relevant times, a Delaware corporation with its principal place of business in Texas. BAC is a wholly owned subsidiary of BI.

55.     Bombardier Business Aircraft is, and was at all relevant times, a division that is, upon information and belief, coextensive across both BI and BAC. Therefore, when Bombardier Business Aircraft acts or makes statements, or when the employees of Bombardier Business Aircraft act or make statements, those actions and statements are actions and statements on behalf of both BI and BAC. Thus, both BI and BAC are included together in this Complaint under the defined term Bombardier.

56.     Learjet is, and was at all relevant times, a Kansas corporation with its principal place of business in Kansas. Learjet, upon information and belief, a subsidiary of BAC.

57.     Khader Mattar ("Mattar") was at all relevant times the Vice President of Sales for the Middle East, Africa, Asia Pacific and China for Bombardier Business Aircraft. Because Bombardier Business Aircraft is coextensive between BI and BAC, each of Mattar's statements and actions alleged herein was made on behalf of both BI and BAC. In his capacity at Bombardier Business Aircraft, Mattar was at all relevant times herein responsible for overseeing Bombardier's sales in Asia and was Bombardier's primary point of contact for Bombardier's relationship with the Debtors. Upon information and belief, Mattar was at all relevant times based in Bombardier's Dubai sales office.

58.     Yu Yubin ("Yu") was at all relevant times the Vice President of Sales for the Middle East and Africa and Director of Sales for the Greater China region for

Bombardier Business Aircraft. Because Bombardier Business Aircraft is coextensive between BI and BAC, each of Yu's statements and actions alleged herein was made on behalf of both BI and BAC. Yu was also heavily involved in Bombardier's relationship with the Debtors.

59.    David Coleal ("Coleal") was at all relevant times the President of Bombardier Business Aircraft. Because Bombardier Business Aircraft is coextensive between BI and BAC, each of Coleal's statements and actions alleged herein was made on behalf of both BI and BAC. Coleal at all relevant times oversaw Mattar and Fazal-Karim's work, at least with the Debtors.

**F.    Relevant non-parties and related personnel**

60.    CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company ("CAVIC") is, and was at all relevant times, an Irish corporation located at 2 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland.

61.    AVIC International Leasing Co. Ltd. ("AVIC") is, and was at all relevant times, a Chinese corporation located at 18/F, CATIC Tower, 212 Jiangning Road Shanghai, China 200041. Upon information and belief, AVIC is the ultimate parent corporation of CAVIC and was responsible for designing the transaction structures and negotiating the terms of the Finance Leases on behalf of CAVIC.

62.    The ZJ6000-1 Statutory Trust (the "ZJ6000-1 ST"), the ZJ6000-2 Statutory Trust (the "ZJ6000-2 ST"), and the ZJ6000-3 Statutory Trust (the "ZJ6000-3 ST", and collectively with the ZJ6000-1 ST and the ZJ 6000-2 ST, the "CAVIC Statutory Trusts") are, and were at all relevant times, statutory trusts formed under Delaware law with registered offices in Delaware. The CAVIC Statutory Trusts were special purpose vehicles ("SPVs") established by AVIC specifically for the financed leases of Planes 2-4 and all control and decisions made by the trusts were under the control of AVIC.

63.    Wells Fargo Bank Northwest N.A. ("Wells Fargo") is, and was at all relevant times, a national banking association with its principal place of business in Salt Lake City, Utah. Wells Fargo acted not in its individual capacity but only as the lessee trustee in certain

aircraft transactions. Wells Fargo is a party to various trust agreements whereby Wells Fargo acted as the owner-trustee (and not in its individual capacity) of certain of the planes at issue.

64.     TVPX ARS Inc. ("TVPX") is, and was at all relevant times, a Wyoming corporation. TVPX acted not in its individual capacity but only as the owner trustee or lessee trustee in certain aircraft transactions. TVPX was a party to various trust agreements with subsidiaries of Zetta PTE, by which TVPX agreed to hold the finance leases for aircraft in trust for the benefit of these subsidiaries. At all times, the Debtors were the ultimate beneficial owners and obligors of legal and economic interests subject to the trusts. In the aviation industry, it is commonplace for non-citizen US corporate trusts to be formed to register aircraft in the US with the Federal Aviation Administration ("FAA"). TVPX also acted as signatory for the CAVIC Statutory Trusts.

65.     Element Aviation is an Ontario company with its principal place of business in Toronto, Ontario. At all relevant times, Element Aviation was a wholly owned subsidiary of ECN Capital Corporation.

66.     ECN is an Ontario company with its principal place of business in Toronto, Ontario.

67.     Michael O'Keefe ("O'Keefe") was at all relevant times the Vice President of Capital Markets in ECN's Aviation Finance Division.

68.     Frederic Larue ("Larue") was at all relevant times the Vice President of Business Development in ECN's Aviation Finance Division.

69.     Tony Bergeron ("Bergeron") was at all relevant times the President, Element Aviation Finance, of ECN.

70.     Steve Hudson ("Hudson") was at all relevant times the CEO of ECN.

71.     Export Development Canada ("EDC") is, and was at all relevant times, a Canadian corporation located at 150 Slater Street, Ottawa, Ontario, Canada K1A 1K3. EDC was CAVIC's secured lender under the Plane 2-5 finance leases.

15

**ALLEGATIONS COMMON TO ALL COUNTS**

**A.  Cassidy's evolution as a con artist**

72.    Cassidy began his career as a con artist and fraudster at a young age. In 2008, at the approximate age of 19, Cassidy made headlines in Australia when he attempted to buy two yachts worth more than $27 million by claiming that he was the chief executive of an aviation company. He was exposed when he claimed that he could not use his credit card because he had recently purchased a $300,000 piano and misspelled the name of his alleged hometown. The yacht seller called Cassidy's purported bank and discovered the bank had never even heard of Cassidy.

73.    Undaunted, Cassidy moved on to other scams. Later in 2008, he tried to buy an Australian professional basketball team by peddling the same fraudulent story, but this ploy failed as well.

74.    Cassidy re-emerged in Singapore in 2012, at the approximate age of 24, and resumed his fraudulent scheming in the Asian private luxury jet market. It was a perfect fit for Cassidy. With customers consisting of ultra-high net worth individuals and celebrities who could afford a $200,000-plus price tag for a roundtrip international flight on a private luxury jet, the luxury jet market provided Cassidy with an opportunity to succeed with a new and more ambitious fraud scheme than he had attempted in the past.

75.    By 2014, Cassidy and Tang were the owners of Asia Aviation, which managed a Bombardier jet for a wealthy Singaporean for private use.

76.    But Asia Aviation did not have an Air Carrier and Operator Certificate issued under 14 C.F.R. Part 135 (a "Part 135 Certificate") issued by the FAA, which is required to operate certain commercial charter flights for paying customers. Part 135 Certificates are tightly regulated and difficult to obtain and maintain. Part 135 Certificates also impose significant, complex, and ongoing operational and safety requirements. Without a Part 135 Certificate, Cassidy was stuck managing a single plane for a single person.

**B.  Cassidy approaches Seagrim and Walter to form Zetta PTE**

77.    Cassidy found the solution to his Part 135 Certificate problem in AAM, a

private jet charter business based in California that was operated by Seagrim and Walter. By 2014, AAM was a successful business with a fleet of nine aircraft, which were a mix of managed and leased aircraft. AAM catered primarily to high net worth individuals, celebrities, and corporate clients in the US and Europe.

78.    Unlike Cassidy's Asia Aviation, Seagrim and Walter's AAM had a Part 135 Certificate. Equally important, Seagrim and Walter had significant operational experience running a charter airline to service many customers, unlike Cassidy, who was managing one aircraft on behalf of a single owner.

79.    Around March 2014, Seagrim and Walter were approached by a representative of Cassidy, who was seeking a Part 135 Certificate so Cassidy could operate charters on the jet that Asia Aviation managed. AAM ultimately agreed to, and did, execute a Tri-Party Charter Management Agreement with Asia Aviation and the Singaporean owner of the jet.

80.    In early 2015, Cassidy began pressing Seagrim and Walter to expand their business dramatically through a business venture with him. Cassidy told Seagrim and Walter that he had access to large amounts of capital in China to purchase brand new aircraft. Cassidy also told Seagrim and Walter that he was independently wealthy due to a recent inheritance and that he had experience in his family's business operating charter services in Asia. Cassidy further told Seagrim and Walter that he had access to wealthy Chinese clientele who would pay top-of-market rates. None of this was true.

81.    On July 15, 2015, Cassidy, Seagrim, and Walter incorporated Zetta PTE in Singapore to conduct a private luxury jet charter business. Cassidy, Seagrim, and Walter each owned one-third of Zetta PTE's stock. In July 2015, AAM filed with the FAA to conduct authorized operations under the business name "Zetta Jet." This name was the logo name on all new aircraft that were delivered to Zetta PTE.

82.    Because only the holder of the Part 135 Certificate is permitted to operate certain charter flights, all of Asia Aviation and AAM's existing planes were added to AAM's Part 135 Certificate, and AAM operated all the revenue-generating chartered

1  flights.

2  **C.  Bombardier and the Asian private luxury jet market were in crisis**

3      83.    At the time Zetta PTE was formed, the Asian private jet industry was

4  experiencing difficulty driven by economic downturns in China, Asia's largest private jet

5  market. Fazal-Karim and Mattar publicly commented on the troubles in the Asian private

6  jet market. In a YouTube video posted by BAC in April 2016, Mattar indicated that that the

7  private jet industry in Asia was suffering, driven by a slow global market and slow market

8  in China. Mattar thought that until the market turned around, sales in China would continue

9  to be stagnant.[8] Mattar acknowledged that due to the economic downturn, for the years 2016

10 and 2017, Bombardier expected to see softening in the Chinese market and did not expect

11 to see growth again until 2018 and 2019.[9] In a February 20, 2018, interview with

12 Bloomberg, Fazal-Karim indicated that China had been slow for the previous five years.[10]

13 In an October 11, 2018, report, after conditions began to improve, Fazal-Karim stated that

14 the previous year had represented a "real turning point" for the industry, and the private

15 aircraft industry had just survived its "most difficult period."[11]

16     84.    Competitors in the industry, including an executive for business

17 development in China, agreed in April 2016 that "the economy is weak and . . . [i]t's

18 impacted jet sales, there's no question about that."[12] Some competitors indicated that the

19 Chinese market was further stifled by a Chinese government "crackdown" on bribery and

20 corruption. While in the West, many businesses saw the efficiency and utility of private

---

[8] Available at https://www.youtube.com/watch?v=_rB0h5j3rUY.

[9] Matt Thurber, *Bombardier Preparing for Further Growth in China*, AINonline, Apr. 11, 2016, available at https://www.ainonline.com/aviation-news/business-aviation/2016-04-11/bombardier-preparing-further-growth-china, a true and correct copy of which is attached hereto as Exhibit 2.

[10] Available at https://www.youtube.com/watch?v=kzMxAbmAxbU.

[11] "Jetcraft Releases Fourth Annual 10-Year Market Forecast," Associated Press, Oct. 11, 2018, available at https://www.apnews.com/ee25902649044535a531c5cb331e8949, a true and correct copy of which is attached hereto as Exhibit 3.

[12] Fang Yan & Siva Govindasamy, *Utility Trumps Luxury as China Private Jet Buyers Fly Economy*, Reuters, Apr. 13, 2016, available at https://www.reuters.com/article/us-china-airshow-luxury/utility-trumps-luxury-as-china-private-jet-buyers-fly-economy-idUSKCN0XA2R8, a true and correct copy of which is attached hereto as Exhibit 4.

aircraft, the general sentiment in China was that private aircraft represent a lavish luxury, and the Chinese government was discouraging its citizens from accepting extravagances.[13]

85.    In this down market, Bombardier was in dire need of aircraft orders. On August 14, 2015, Reorg Research, a financial reporting service for the restructuring industry, noted that Bombardier had "become a focal point for distressed and high yield investors" and issued a report detailing its financial woes, leading to significant layoffs:

> The company is currently struggling with low orders in . . . its business aircraft segment. For the most recent quarter [second quarter 2015], Bombardier reported only eight net new orders for its business aircraft segment, which compares to 30 units last year . . . . For the latest quarter, approximately 40% of Bombardier's total revenues were derived from the business airspace unit.
>
> *        *        *
>
> Bombardier's aircraft business has been under significant pressure. On its most recent earnings call, Bombardier stated that it is seeing reduced demand, specifically in Russia, China and Latin America. In May of 2015, the company announced that it would be laying off 1,750 jobs tied to the production of Global 5000/6000 jets due to softer than anticipated market demand.[14]

86.    Another analyst, later in the call, asked, "'How did things possibly get so bad?' to which management responded that the biggest delta in cash flow for the year was the lack of customer advances . . . ."[15] On October 29, 2015, a subsequent report by Reorg Research noted that Bombardier's $1.5 billion notes were trading between 79.25 and 84 cents on the dollar and that the ramp down of production of the Global 5000/6000 program cost the company $1 billion to $1.2 billion in cash flow in 2015.[16]

87.    Bombardier's share price for its Class B common shares (BBD.B) tumbled.[17]

---

[13] Mandy Zuo, *Mainland's private jet sales hit turbulence*, Bloomberg, Apr. 15, 2015, a true and correct copy of which is attached hereto as Exhibit 5.

[14] Reorg Report, Tear Sheet: Bombardier Global 7000 Delivery Delay and Heavy Capex Weigh on Balance Sheet, Bonds Fall to the Low 70s, Aug. 14, 2015, a true and correct copy of which is attached hereto as Exhibit 6.

[15] Reorg Report, *Updated Tear Sheet: Bombardier Takes Impairment Charges; Liquidity Remains Top Concern*, Oct. 29, 2015, a true and correct copy of which is attached hereto as Exhibit 7.

[16] *Id.*

[17] Most of Bombardier's Class A shares are owned by the Bombardier family, while most of the Class B shares are owned by the public.

From a high of CA$7.29 on March 31, 2011, and CA$4.43 on December 2, 2014, by July 15, 2015, the share price had dropped to CA$2.00, before bottoming out at CA$0.78 on February 11, 2016.

88.     On November 11, 2016, BI's CEO Allain Bellemare told the media that Bombardier was on the brink of bankruptcy in 2015. He said: "It's important to realize that Bombardier was on the brink of bankruptcy in 2015 . . . . Bombardier was in a very precarious situation. We needed liquidity."[18]

89.     Thus, in the fall of 2015, Bombardier was desperate to enhance its sales, particularly in Asia, to obtain precious liquidity and avert a possible bankruptcy.

**D.  Cassidy takes control and drives the Debtors into immediate financial crisis**

90.     Zetta PTE was formed in a manner that provided Cassidy with actual and effective control of key functions of the company, including its financial operations. Zetta PTE's finance department was located in Singapore and reported to Cassidy and his wife, Tang. Cassidy and Tang had approval rights for transfers of funds with respect to Zetta PTE at all relevant times before their termination and removal in August 2017. In addition, in late 2016, Zetta USA sent all of its financial records to Singapore at Cassidy's request.

91.     Shortly after becoming a director of Zetta PTE and the Managing Director of Zetta PTE, Cassidy also embarked on a plan to purchase high-priced Bombardier aircraft that saddled the company with almost *half of a billion dollars* in insurmountable debt in exchange for commercial bribes and kickbacks and to cover up Cassidy's embezzlement scheme. Over the little more than two years that Zetta PTE existed, Cassidy caused the Debtors to purchase at least nine Bombardier luxury jets and enter into purchase agreements or options for six more aircraft, even though it was economically impossible for the Debtors to service the debt and the Debtors were regularly failing to pay their other creditors on time.

---

[18] Bertrand Marotte, *Bombardier on 'brink of bankruptcy' in 2015, CEO reveals*, The Globe & Mail, Nov. 11, 2016, available at https://www.theglobeandmail.com/report-on-business/bombardier-on-brink-of-bankruptcy-in-2015-ceo-reveals/article32818969/, a true and correct copy of which is attached hereto as Exhibit 8.

92.    In breach of his fiduciary duties to the Debtors, Cassidy did not take any meaningful steps to negotiate lower prices from Bombardier for the purchases of these aircraft, much less implement a competitive procurement process, or request proposals from Bombardier's competitors such as Gulfstream. During one of the worst luxury jet markets in recent history, Cassidy caused the Debtors to pay at or very close to the asking price for these aircraft to the severe detriment of the Debtors and their estates.

93.    Moreover, the prices Cassidy caused the Debtors to pay for these Bombardier aircraft were significantly inflated. As described below, Cassidy caused the Debtors to pay *nearly $100 million above fair market value* on the Planes that the Debtors actually received. The Debtors could not afford these planes at the rates they could charge; in fact, the Debtors would have had to charge rates approximately three times greater than their average rate break even on the inflated purchase price. Accordingly, to pay prices significantly above market only served to propel the Debtors into a more precipitous fall into financial crisis.

94.    AAM sent Zetta PTE millions of dollars in charter revenues that Zetta PTE then used to pay deposits, down payments, and debt service on the Planes discussed below, including at least $1.4 million in December 2015 that Zetta PTE used to pay part of the deposits on Planes 1-6, as well as ▮▮▮▮▮ that AAM wired directly to Jetcraft Corp. for Plane 1. Cassidy also used revenue from AAM to repay Zetta PTE's investors. The revenue was never sufficient to cover the Debtors' outstanding obligations, and Cassidy made up the difference using loan proceeds and investor funds in a Ponzi-like scheme.

95.    Underlying these breaches of fiduciary duties to the Debtors—and the motivation for many of the breaches—was Cassidy's profiteering and self-enrichment at the expense of the Debtors, through commercial bribery and kickbacks, the operation of two Ponzi-like schemes, and a wide assortment of other fraudulent activity involving Cassidy and others who facilitated or conspired in his misconduct.

### E.  **The Defendants' commercial bribery and Cassidy's schemes**

96.    From his early forays into fraud to his time at Zetta, Cassidy had one overarching goal: to fund a lifestyle of the rich and famous at someone else's expense. Cassidy believed that he was entitled to, as he put it, "drink the top shelf expensive and exclusive alcohol and Champagne and eat caviar," instead of "bottom shelf alcohol" and "McDonalds."

97.    With the willing participation of Bombardier and Jetcraft, Cassidy accomplished this goal in four broad ways.

98.    First, as described more fully below, Fazal-Karim (through Jetcraft Corp., Jetcraft Global, and FK Partners) and Bombardier paid Cassidy more than $1 million in commercial bribes and kickbacks in exchange for sourcing the Debtors' aircraft acquisitions through Fazal-Karim and buying Bombardier planes.

99.    Second, Cassidy, among other things, (a) stole at least $2.66 million from the proceeds of one aircraft financing, (b) misappropriated approximately $3.4 million to purchase a 70-foot luxury yacht called the Dragon Pearl, and (c) misappropriated—at the very least—another $2 million of the Debtors' funds on extravagant purchases for his own personal benefit, including among others a high-end apartment in Singapore, Bentley and BMW luxury automobiles, Richard Mille watches, luxury goods from Hermes, and lavish vacations.

100.    Third, as described more fully below, Cassidy operated the Debtors as a Ponzi-like scheme. Using a fraudulent business plan promising unattainable success (because the proposed revenue per flight hour could never support the inflated purchase price of the aircraft), Cassidy induced Li to invest with promises of outsized returns, which Cassidy repaid with funds from the Minsheng Refinancing rather than revenues from the Debtors' operations. Cassidy also used the business plan to induce the financiers (including Element and AVIC) to lend him funds to buy planes that the debtors could not afford. Cassidy created a second fraudulent business plan to induce new investment to pay off the initial investments by Li, Element, AVIC, and Minsheng Financial Leasing Co., Ltd.

("Minsheng Financial") and Minsheng Business Aviation Limited ("Minsheng Business," and with Minsheng Financial, "Minsheng"), but was unable to close the deal before his fraud was discovered.

101.    Fourth, at the same time, Cassidy was engaged in another Ponzi-like scheme in which he sold "block hours" (pre-paid hours for a jet charter at a fixed price), as a means of "extracting immediate cash to pay for obligations" even though Cassidy knew that the Debtors would not be able to fulfill those hours. Those customers were left with millions of dollars of worthless block hours when the Debtors failed and they did not get their money back.

102.    Cassidy knew that his actions would harm the Debtors and their creditors. Between the inability to pay trade creditors and the inflated debt-service obligations as a result of the transactions induced by bribes and kickbacks from the Fazal-Karim Defendants and Bombardier, Zetta PTE was insolvent almost from inception, as discussed in more detail below.

103.    The Debtors were never able to recover. To the extent they were ever technically solvent, and they were not, Cassidy almost immediately either used the funds as down payments on additional planes or simply stole the money or used it for personal purchases.

104.    Despite continuous solvency, capital, and cash flow issues, with the help and willing participation of his co-conspirators the Fazal-Karim Defendants and Bombardier, Cassidy caused the Debtors to acquire 15 Planes for a total obligation of more than $450 million. The sixteenth plane was a deal constructed to pay off a $5 million obligation to Element in part to relieve Jetcraft Corp. from a guarantee with Element and Fazal-Karim.

**F.  The Transactions at Issue**

105.    Over the course of Zetta PTE's short existence, it entered into transactions for 16 planes as set forth on Schedule 1.

106.    Overview of Aircraft Financing Structures. The transactions for the planes had a broadly similar structure. The Debtors would enter an aircraft purchase agreement

("APA") with Bombardier or a Jetcraft subsidiary. Under the terms of each APA, Zetta PTE was required to pay ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

107.    The Debtors never had enough money to purchase aircraft on their own. Rather, the Debtors need to obtain financing from either the seller (in the case of Jetcraft and Li) or from an aircraft financier (such as CAVIC, Element, and Minsheng) to acquire aircraft.

108.    The financing took one of two forms: (a) a direct secured loan from a financier under which a debtor-controlled entity was a borrower and the financier was the lender (the Jetcraft-Element structure—Planes 1 and 10) or (b) a "finance lease" where the financier received the payment of principal and interest under the guise of "rent" paid under a finance "lease" over a fixed term which, upon its conclusion, the Debtors could exercise a nominal or free option to purchase the aircraft.

109.    Under both structures, the financier did not own or operate the plane, but simply received principal and interest payments from the Debtors, who would take on all the risks and rewards of ownership. At closing (or before if the financier was paying the progress payments), the financier (such as Element or CAVIC) would make a loan to Zetta PTE to finance the purchase. At closing, the financier, the Debtors, and either TVPX or Wells Fargo as owner-trustees or lessor-trustees would enter into a complex web of agreements to effectuate the transaction.[19]

_____

[19] Planes 7 and 11 were slightly different because those planes were previously owned by the financier and the deals thus were essentially self-financed. Li (through one of his entities) purchased Plane 7 from Bombardier in 2015, then leased it to Zetta PTE for a

110.     The transactions were domestic in nature because they involved transactions and obligations incurred in the US. The closings always took place, and the obligations under the agreements were incurred, in the US. The principal parties (usually corporate trustees) to the transactions were always US citizens to comply with FAA US citizenship requirements. The signature pages of the parties were gathered by FAA counsel or corporate trustees and released to each other in the US. The documents were immediately filed with the FAA in Oklahoma City, Oklahoma. The planes were delivered and accepted in the US (typically at Windsor Locks, Connecticut to avoid state sales tax).

111.     <u>Zetta USA</u>. Zetta USA played two key roles in the transactions.

112.     First, Zetta USA was the "operator" of planes under FAA regulations under its Part 135 Certificate and thus the actual lessee (under a lease from Zetta PTE), or sub-lessee (from TVPX), under the operational lease documents that were conditions precedent before the transactions could go effective. Without Zetta USA and its Part 135 operator status (which is recognized around the world), the Debtors could not operate charter flights, either in the US or elsewhere. Thus, it was essential that Zetta USA become a party to the transactional documents to ensure that the Debtors could generate revenue from flights both within and outside the US. Zetta PTE could not operate charter flights to, from, or within the US because it did not have and could not get a Part 135 Certificate. So all of the Planes would be leased or sub-leased to Zetta USA and registered under Zetta USA's Part 135 Certificate.

113.     To comply with certain FAA regulatory requirements, the Debtors' principal base of operations needed to be in the US. The Debtors' principal base of operations was located at all relevant times in Burbank, California.

114.     To comply with certain FAA regulatory requirements, the Director of Maintenance, Chief Pilot, and Director of Operations were required to be direct employees

---

period. Zetta PTE then purchased Plane 7 (along with Plane 6) in December 2015. These Planes were later refinanced with Minsheng in September 2016 in a broadly similar structure. Plane 11 was previously owned by Element and was acquired by Zetta PTE under a finance lease from Element.

of Zetta USA. Each of these individuals was at all relevant times employed by Zetta USA and based in Burbank, California. If these individuals had not continued to occupy these positions or been replaced with similarly situated individuals, Zetta USA's Part 135 certificate could have been revoked.

115.    To comply with certain FAA regulatory requirements, the president and two-thirds or more of the board of directors and other managing officers of Zetta USA were required to be citizens of the US and at least 75 per cent of the voting interests of Zetta USA were required to be owned or controlled by persons who are citizens of the US.

116.    Second, Zetta USA signed guarantees for all of the obligations under the aircraft financing documents.

117.    <u>Details of Specific Transactions</u>. In rough chronological order (although with some overlap based on how Bombardier, Fazal-Karim, and Cassidy negotiated and structured the transactions), these transactions occurred in the following rough groups:

      a.  the "<u>First Element Transaction</u>" (regarding Plane 1);

      b.  the "<u>CAVIC Transactions</u>" (regarding Planes 2-5);

      c.  the "<u>Li / Minsheng Transactions</u>" (regarding Planes 6-7);

      d.  the "<u>Bombardier Purchase Orders</u>" (regarding Planes 8-9);

      e.  the "<u>Second Element Transaction</u>" (regarding Planes 10-11);

      f.  the "<u>Minsheng Refinancing</u>" and the "<u>Challenger Transactions</u>," in which the Debtors refinanced Planes 6-7 to pay off Li and purchase Planes 12-15; and

      g.  the "<u>Falconwing Transaction</u>" (regarding Plane 16).

The specific details for each Plane are set forth on Schedule 1.

**a.  The First Element Transaction**

118.    The First Element Transaction involved the purchase of a Bombardier Global 5000 ("<u>Plane 1</u>") from Jetcraft's subsidiary Jetcoast in a transaction financed by

Element.[20]

119.    On November 19, 2015, Cassidy on behalf of Zetta PTE executed a letter of intent with Element to purchase Plane 1.

120.    On December 5, 2015, Cassidy on behalf of Zetta PTE entered into an Aircraft Purchase Agreement (the "Plane 1 APA") with Jetcraft Corp. and Jetcoast for Plane 1.

121.    The transaction closed on December 30, 2015. Element Aviation entered into an Aircraft Loan Agreement (the "Plane 1 Loan Agreement") with Zetta PTE (through one of the Zetta BVI Subsidiaries, Zetta Jet 5000-1) to finance the purchase. The same day, Zetta USA (then still AAM) agreed to guarantee the operating lease on the aircraft. Element, the Debtors (including through Zetta Jet 5000-1), and TVPX entered into a complex web of other agreements to effectuate the transaction. The agreements relating to the First Element Transaction are identified on Schedule 2.[21]

122.    Seagrim and Walter executed the directors' resolutions and other transactional documents in California.

123.    Zetta PTE was required to pay Jetcraft Corp. and Jetcoast a deposit of ███ within ███████ days of executing the APA and the balance of ███████ at closing. If Zetta PTE refused delivery or breached the APA, Jetcraft Corp. and Jetcoast's ███████████████████████████████████████████████

124.    Zetta PTE wired ███████ for Plane 1 to Jetcraft Corp.'s bank account in New York on December 10, 2015.

125.    The Plane 1 transaction closed on December 30, 2015.

---

[20] *See* Bombardier, *Zetta Jet Expands Fleet with Purchase of a Global 6000 Business Jet and Options for Four Additional Global Aircraft*, Dec. 15, 2015, available at https://www.bombardier.com/en/media/newsList/details.bombardierbusinessaircraft20151 215zetta-jet-expands-fleet-with-p.bombardiercom.html?filter-bu=all&f-year=2015&f-month=11&f-type=all&show-by-page=50&page=1&f-min-year=2002, a true and correct copy of which is attached hereto as Exhibit 9.

[21] Each of the agreements and other transactional documents in Schedule 2 is attached as an exhibit to Schedule 2, and is expressly incorporated in this Complaint in its entirety in accordance with Fed. R. Civ. P. 10(c) and Fed. R. Bankr. P. 7010.

126.    On December 30, 2015, Zetta PTE (through one of the Zetta BVI Subsidiaries, Zetta Jet 5000-1) sent a direction of funds letter to Element Aviation, which confirmed the advance of the loan of $37.8 million and authorized and directed Element Aviation to disburse $37.8 million to Jetcoast.

127.    On December 30, 2015, AAM wired ▮▮▮▮ for Plane 1 from AAM's bank account in California to Jetcraft Corp.'s bank account in New York, which Anderson confirmed on an email that copied, among others, Cassidy and Fazal-Karim.

128.    On January 5, 2016, Zetta PTE wired ▮▮▮▮ for Plane 1 to Jetcraft Corp.'s bank account in New York.

129.    At the time the transaction closed, Plane 1 was located in Cahokia, Illinois. Plane 1 was based out of AAM's operations center in Burbank, California, after the closing.

130.    Fazal-Karim, Jetcraft Corp., and Jetcoast received ▮▮▮▮ in commissions and ▮▮▮▮ in other profits on Plane 1.

131.    The First Element Transaction was domestic in nature because it involved transactions and obligations incurred in the US, including:

   a.  The parties deliberately decided to consummate closing in the US to comply with FAA regulations and ensure operation of the Plane 1 under Zetta USA's Part 135 certificate.

   b.  The closing occurred, and FAA counsel filed closing documents in, Oklahoma City.

   c.  The Debtors accepted delivery of Plane 1 at Cahokia, Illinois.

   d.  The parties agreed that the transaction would be governed by New York law and that the parties and property would be subject to jurisdiction in New York.

   e.  Upon information and belief, payment for Plane 1 was sent through Wachovia Bank in New York as a correspondent bank.

   f.  Bank of Utah, the US lessor trustee, signed and became obligated in the US.

   g.  The Debtors' signature pages were released in Oklahoma City.

132.    As part of the First Element Transaction, Jetcraft Corp. and Element Aviation entered into a Repurchase Agreement dated December 30, 2015 (the "Plane 1 Repurchase Agreement"). Under the Plane 1 Repurchase Agreement, Jetcraft Corp. agreed that if the Debtors defaulted on their obligations on Plane 1, Jetcraft Corp. would ███████ █████████████████████████████████████████████████████████ ████████

### b. The CAVIC Transactions

133.    At the same time and expressly as part of the same negotiations involving Plane 1, Cassidy negotiated and entered into a letter of intent to purchase 6 additional Global 6000s directly from Bombardier. Planes 2-5 and 6 (which was nominally purchased by one of Li's entities) were part of the letter of intent.

134.    In October and November 2015, at the same time Cassidy and Fazal-Karim were negotiating letters of intent relating to Plane 1, Cassidy and Fazal-Karim were also negotiating letters of intent to purchase five to six additional Global 6000s directly from Bombardier. Cassidy on behalf of Zetta PTE ultimately executed a letter of intent with Bombardier to purchase six planes, including Planes 2-6, on or about November 18, 2015.

135.    Cassidy, on behalf of Zetta PTE, executed four APAs with BAC (the "Plane 2-5 APAs") on December 10, 2015, for four Global 6000s ("Planes 2-5" and collectively, the "CAVIC Aircraft"), directly from Bombardier.

136.    Under the Plane 2-5 APAs, ████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████

137.    To complete the purchase of the CAVIC Aircraft, the Debtors obtained financing from CAVIC through a finance lease structure. At the closing on each plane, the Debtors (through TVPX) entered into finance lease agreements with CAVIC (through the CAVIC Statutory Trusts). Specifically, on or around May 24, 2016, the Debtors (through

1    TVPX as owner trustee) entered into a finance lease with CAVIC (through the ZJ6000-1

2    ST) for Plane 2. On or around September 16, 2016, the Debtors (through TVPX as owner

3    trustee) entered into a finance lease with CAVIC (through the ZJ6000-2 ST) for Plane 3.

4    On or around December 23, 2016, the Debtors (through TVPX as owner trustee) entered

5    into a finance lease with CAVIC (through the ZJ6000-3 ST) for Plane 4. On the same days,

6    TVPX entered into mirror sub-leases with Zetta USA.

7          138.    In order to repay CAVIC for the financing, the Debtors made payments

8    through the mechanism of "lease" payments under the finance lease. The parties' intent and

9    the economic realities of the transactions indicate that the arrangements between the parties

10   were finance leases, not operating leases.

11         139.    The finance leases were entered into by TVPX, acting as trustee for the

12   ultimate benefit of the Debtors. TVPX had no discretion in its actions under the finance

13   leases. By the "sub-leases," all responsibility and obligations under the finance leases were

14   passed from TVPX to Zetta USA. The "sub-leases" mirrored the finance leases in terms of

15   amount of "rent" (including interest) and other non-financial obligations. TVPX never made

16   or received payments on the CAVIC Aircraft. In other words, the Debtors were the true

17   parties in interest in the finance leases.

18         140.    The parties' intent to enter into a finance lease, rather than a true or operating

19   lease, is evidenced by, among other things:

20           a.    Zetta PTE was ███████████████████████

21   ████████

22           b.    Zetta PTE's option (exercised through its subsidiaries and TVPX) to

23   purchase the CAVIC Aircraft ██████████████████

24   ███

25           c.    ███████████████████████████

26   ███████████████████████████

27   ████████████████████

28

     d.  The "head leases" are "net leases," ██████████████████

████████████████████████████████████

████████████████████████████

     e.  The outstanding "rent" (i.e., the financed amount) accrued interest, and, upon default, accrued default interest;

     f.  The "rent" was calculated based upon the principal amount and interest that CAVIC owed EDC under its loan borrowed under its Facility Agreement with EDC and floating rates in interest charged under that facility;

     g.  The final payment of "rent" was calculated to be the final amount that was due to EDC by CAVIC under the Facility Agreement;

     h.  ███████████████████████████████

██████████████████████ and

     i.  ███████████████████████████████

141.  Had all obligations been fulfilled under the operative documents, CAVIC would have had no residual ownership interest in the CAVIC Aircraft. Thus, the parties intended for the Debtors to own the CAVIC Aircraft after completion of all payments, which were made up of the principal loan made to the Debtors (in the form of a financing), plus interest.

142.  The CAVIC transactions were domestic in nature because they involved transactions and obligations incurred in the US, including:

     a.  The parties deliberately decided to consummate closing in the US to comply with FAA regulations and ensure operation of Planes 2-5 under Zetta USA's Part 135 certificate.

     b.  The closings occurred, and FAA counsel filed closing documents in, Oklahoma City.

     c.  TVPX was the Registered Owner under applicable FAA regulations.

     d.  The Debtors accepted delivery of Planes 2-4 (and would have accepted delivery of Plane 5) at Windsor Locks, Connecticut.

e.   The payments for Planes 2-5 were sent to BAC's Bank of America account in Texas.

f.   TVPX, the US lessor trustee, signed and became obligated in the US.

g.   The Debtors' signature pages were released in Oklahoma City.

143.   Zetta PTE made transfers to BAC for the CAVIC Aircraft, including $1 million ($250,000 for each Plane) on December 4, 2015; $10 million on February 16, 2016; $10 million on March 8, 2016; $1.2 million on March 28, 2016; $2.4 million on or about June 30, 2016 (which were originally made in connection with Planes 8 and 9 but later transferred to Plane 4 on March 24, 2017); $3,091,334 on March 28, 2017; and $3,262,834 on June 27, 2017. The Debtors also made transfers to BAC consisting of a total of $120.36 million in loan proceeds from CAVIC.

144.   Plane 2 was delivered on or about May 24, 2016.

145.   Plane 3 was delivered on or about September 22, 2016.

146.   Plane 4 was delivered on or about March 28, 2017.

147.   Plane 5 was never delivered.

148.   Fazal-Karim personally received commissions of ███████ on each of Planes 2-5.

**c.   The Li / Minsheng Transactions**

149.   Also in December 2015, Cassidy worked with Li (who eventually became a shareholder and director of Zetta PTE) to acquire two additional Global 6000s, one that Li had purchased earlier that Zetta PTE was already operating and a second that was part of the same combined transaction negotiated by Fazal-Karim along with Planes 1 and 2-5.

150.   In October and November 2015, at the same time Cassidy and Fazal-Karim were negotiating letters of intent relating to Plane 1, Cassidy and Fazal-Karim were also negotiating letters of intent to purchase five to six additional Global 6000s directly from Bombardier. Cassidy indicated to Fazal-Karim that one of these Global 6000s would be "assigned" to Li.

151.   At the same time, Li and Cassidy discussed having Zetta PTE purchase a

1    Global 6000 ("Plane 7") from Li's company, Universal Leader. Universal Leader had

2    purchased Plane 7 in the summer of 2015 and Zetta PTE had been operating Plane 7 under

3    a separate arrangement. Cassidy offered Li a guaranteed 10 percent return, which was

4    approximately double the market rate for similar transactions.

5        152.    In December 2015, Universal Leader transferred $48 million into Zetta

6    PTE's bank account. Upon information and belief, there was no formal loan documentation

7    regarding the transfer of these funds prior to their transfer. The funds were commingled

8    with other funds in Zetta PTE's account.

9        153.    On December 10 and 28, 2015, respectively, Zetta PTE transferred $46.3

10    million and then $1 million from its Singapore account to BAC's Bank of America bank

11    account in Texas toward the purchase of another Global 6000 ("Plane 6"). Even though

12    Zetta PTE paid Bombardier directly for Plane 6 (using loan proceeds from Universal

13    Leader), Zetta PTE did not receive title to Plane 6. Zetta PTE then entered into a finance

14    lease arrangement with Glove Assets (not Universal Leader, although both entities are

15    controlled by Li) regarding Plane 6.

16        154.    Fazal-Karim received a ▮▮▮▮▮ commission from Bombardier for the

17    Plane 6 transaction.

18        155.    Fazal-Karim refused, however, to disclose the commission to Glove Assets'

19    owner, Li, as required under the agreement, stating to Mattar in a December 28, 2015, e-

20    mail: "I can't be representing I will disclose to Mr. Li I am making a few!!" On December

21    29, 2015, Bombardier amended the Sales Representative Agreement to list Zetta PTE as the

22    buyer.

23        156.    Later in December 2015, Cassidy agreed to acquire Plane 7 from Universal

24    Leader in a finance lease arrangement.

25        157.    On or about December 29, 2015, Cassidy on behalf of Zetta PTE entered

26    into a Master Aircraft Finance Lease (the "2015 Plane 7 MAFL") with Universal Leader to

27    "lease" Plane 7 under a finance lease, rather than a true lease. The 2015 Plane 7 Finance

28    Lease attached a Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreement

(together with the 2015 Plane 7 MAFL, the "2015 Plane 7 Finance Lease"). The "aircraft price" for Plane 7 under this agreement was $50 million, even though it had been flying for almost six months and had several hundred flight hours on it at that point.

158.    On or about December 29, 2015, Zetta PTE entered into a Master Aircraft Finance Lease ("2015 Plane 6 MAFL") with Glove Assets to "lease" Plane 6 under a finance lease structure. The 2015 Plane 6 MAFL attached a Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreement (the "2015 Plane 6 Purchase Option" and, together with the 2015 Plane 6 MAFL, the "2015 Plane 6 Finance Lease").

159.    Although the 2015 Plane 6 Finance Lease used the term "lease" in its title, it was not a "true" or "operating" lease under which a lessee and a lessor agree for the lessee to rent an asset at a monthly fair usage charge with the lessor retaining the residual ownership interest, and risks attendant to such ownership interest, at the conclusion of the lease term.

160.    Rather, the terms of the finance lease indicated it was actually a form of secured financing. The "lessee" was granted the full residual economic ownership of the asset, and attendant risks thereto, at the inception of the lease in exchange for the payment of principal and interest over the lease term, including a final $20 million balloon payment to be paid at the end of the lease. The obligations could not be terminated by the lessee, except for a portion of interest if an onerous prepayment penalty was paid. Thus, the "finance lease" was, in fact and in law, a loan under which the lessee acquired the economic ownership of the asset secured by lessor's retention of title until the lessee paid the principal and interest, including the final balloon payment, due under the term of the lease at which point the lessee could exercise a purchase option for no additional consideration.

161.    The free purchase option at the end of the repayment term, coupled with Zetta PTE's inability to terminate the finance lease, rendered the 2015 Plane 6 Finance Lease a financing as a matter of law, under either US or Singapore law, in that Zetta PTE, not Glove Assets, was the true economic owner of Plane 6 and had the sole residual equity interest in Plane 6 following the term of the finance lease.

162.    In particular, Zetta PTE was obligated to pay $50 million in 60 monthly installments at an effective annual interest rate of 12% including a final $20 million balloon payment at the end of the term. Annex 4 to the Supplement specifically broke down the 60 monthly "lease payment[s]" into "principal" and "interest" components to arrive at an effective interest rate over the 60-month term of 12%.

163.    If Zetta PTE paid off the balance early, it was required to pay an onerous prepayment penalty equal to 50% of the remaining interest due under the 60-month term. Once all payments were made, Glove Assets was required to convey title to Zetta PTE. Specifically, before the final balloon payment was made, Zetta PTE had the "option" of purchasing the aircraft when it paid the balloon payment**.** However, because Zetta PTE was already obligated to make the balloon payment irrespective of whether it exercised the option, Zetta PTE's exercise of the purchase option was for no additional consideration.

164.    Except for an early termination that triggered the prepayment penalty discussed above, Zetta PTE was obligated to pay all principal and interest for the entire 60-month term. It could not otherwise terminate the 2015 Plane 6 Finance Lease.

165.    Cassidy and Li consistently treated the 2015 Plane 6 Finance Lease as a loan to Zetta PTE, and not a true lease or operating lease, in all of their discussions and negotiations. In addition, the $50 million loan (subsequently used to fund the purchase price for Plane 6) was recorded on the Debtors' books and records as a loan to Zetta PTE and Plane 6 was carried as an asset on Zetta's consolidated balance sheet. As a director of Zetta PTE, Li reviewed the books and records of Zetta PTE and affirmatively approved the description of the 2015 Plane 6 Finance Lease as a loan to Zetta PTE, and not a lease, and Plane 6 as an asset of Zetta.

166.    The 2015 Plane 6 Finance Lease closed in the US, the relevant documents were filed with the FAA, the aircraft was delivered to Zetta in the US and was registered with the FAA, and all of the obligations of the Debtors were incurred in the US at closing.

167.    In particular, the law firm Crowe Dunlevy in Oklahoma City, Oklahoma acted as closing agent for the parties and assembled all of the signature pages on the

1  transaction documents from the parties. On December 29, 2015, Plane 6 was delivered to

2  debtor Zetta Jet PTE at Bombardier's facility in Windsor Locks, Connecticut, USA.

3      168.    In the Form of the Acceptance Certificate which was required to be executed

4  as part of, and attached as Exhibit D to, the 2015 Plane 6 Finance Lease, Zetta PTE

5  confirmed that it accepted Plane 6 "at the Delivery Location [i.e., Windsor Locks,

6  Connecticut]" on December 29, 2015 and "became obliged to pay" Glove Assets "the

7  amounts provided for in the [Lease]".

8      169.    Upon receipt of the Acceptance Certificate, the parties released signature

9  pages to the closing agent in Oklahoma City, Oklahoma, and the 2015 Plane 6 Finance

10  Lease was consummated in Oklahoma City, Oklahoma, USA.

11     170.    Pursuant to the finance lease documents, all of the payments Zetta PTE made

12  under the 2015 Plane 6 Finance Lease were required to be made and, in fact, were made, to

13  Universal Leader's US bank account at HSBC Bank in New York, USA. *See* Exh. B-2,

14  2015 Plane 6 Purchase Option, at § 3.26 ("'Payment Location' means in relations to all

15  payments hereunder: HSBC Bank, New York, USA, SWIFT code: MRMDUS33, Federal

16  Routing number code : 021001088, For credit to: a/c ███████ THE HONGKONG &

17  SHANGHAI BANKING CORPORATION LIMITED, HONG KONG PRIVATE

18  BANKING DIVISION, BIC: HSBCHKHHPBD, In favour of: Universal Leader Investment

19  Limited. A/C: ███████).

20     171.    Both the 2015 Plane 6 Finance Lease and the 2015 Plane 7 Finance Lease

21  contained significantly above-market returns for Li and his entities. The agreements called

22  for an effective interest rate of 12% per year over a 60-month term with a balloon payment

23  of $20 million. A 12% interest rate on a secured aircraft financing was well above market.

24     172.    The agreements also contained interest prepayment penalties that required

25  the Debtors to pay 50% of the remaining interest payments upon an early "purchase"

26  (including a refinancing) of the agreements to Universal Leader and/or Glove Assets. The

27  standard market rate for a prepayment penalty in the aircraft financing industry ranges

28  between 3% and 5%.

173.    The 2015 Plane 6 Finance Lease was domestic in nature because it involved transactions and obligations incurred in the US, including:

    a.    The parties deliberately decided to consummate closing in US to comply with FAA regulations and ensure operation of Plane 6 under Zetta USA's Part 135 certificate.

    b.    Wells Fargo, the US lessor trustee, signed and became obligated in the US.

    c.    Zetta PTE accepted delivery of Plane 6 in Windsor Locks, Connecticut.

    d.    The closing occurred, and FAA counsel filed closing documents in Oklahoma City.

    e.    The Debtors' signature pages were released in Oklahoma City.

174.    Shortly thereafter, in February 2016, Li caused a third entity, Truly Great, to invest $19 million in exchange for a 10% interest in Zetta PTE and loaned $10 million to Zetta PTE at an above-market interest rate. Li also became a Director of Zetta PTE. Cassidy used approximately $20 million of these funds to pay deposits and payments on the CAVIC Aircraft.

175.    In early March 2016, Cassidy began inquiring about purchasing a $3.4 million, 70-foot yacht called the Dragon Pearl. On May 16, 2016, Cassidy signed a contract with Maritimo Offshore Pty Ltd. ("Maritimo") to purchase the Dragon Pearl.

**d.    The Bombardier Purchase Agreements**

176.    On February 6, 2016, shortly after the initial purchases and at approximately the same time as the influx of cash from Li's initial investment, Cassidy executed two additional APAs for two additional Global 6000s ("Planes 8 and 9").

177.    Similar to the Plane 2-5 APAs, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

178.    These two additional aircraft had not even been delivered when the Debtors

1  filed for bankruptcy nearly 18 months later.

2    179.    Fazal-Karim was entitled to additional commissions of ████ each on

3  Planes 8 and 9, the same as on Planes 2-5, but it is not clear if these commissions were paid

4  because the Planes were never delivered. On July 14, 2016, an FK Group employee

5  informed Fazal-Karim that his commission for the two next Zetta planes would be ████

6  rather than ████ Fazal-Karim e-mailed Mattar the next day that this reduction was

7  "absolutely unacceptable considering all the work and expenses I incur on this account and

8  the pricing we are achieving with Zetta. I have never agreed to a fee reduction. Where is

9  this ████ coming from??" Mattar replied that he was not informed of the changes and that

10  he had already signed off on all commissions on the Zetta deals, but would look into it.

11    180.    Cassidy on behalf of Zetta PTE transferred $100,000 to Jetcraft Asia on

12  April 8, 2016, shortly after these purchases. The reason for this transfer is unclear.

13    **e.  The Second Element Transaction**

14    181.    In August and September 2016, with the Debtors now on life support and,

15  by Cassidy's estimation, only "breathing room of 1.5 months," Cassidy again acquired more

16  planes from Jetcraft (through Fazal-Karim) and Element. In the Second Element

17  Transaction, Cassidy received a $500,000 kickback as part of the Debtors' purchase of a

18  Bombardier plane ("Plane 10") from Orion, a Jetcraft affiliate. As part of the same deal, the

19  Debtors also agreed to lease another Bombardier plane ("Plane 11") owned by Element.

20    182.    By no later than June 14, 2016, at a time when Cassidy was supposedly

21  trying to "keep[] off the wolves," Cassidy and Fazal-Karim began discussing the purchase

22  of Plane 10.

23    183.    Orion, a Jetcraft affiliate, had initially purchased Plane 10 in December 2015

24  from an unrelated third party in a deal financed by Element. Under the loan agreement,

25  ████████████████████████████████████████████████ The first

26  interest payment of ████ was due on June 30, 2016.

27    184.    On June 14, 2016, Cassidy and Fazal-Karim began discussing the purchase

28  of Plane 10, and Element began to draft financing proposals for the Debtors.

185.    On June 19, 2016, Element internally circulated a financing proposal for the Debtors' purchase of Plane 10 for a purchase price of $48.8 million.

186.    On June 20, 2016, Fazal-Karim contacted Element to postpone his interest payments until the earlier of ninety days or the sale of Plane 10.

187.    On June 27, 2016, Element submitted a transaction overview to its credit committee for approval to "[p]ostpone the interest payment that is due on June 30, 2016 to September 30, 2016." The rationale was that Plane 10 "should be sold to Zetta Jet . . . . Full payout on the closing of the sale."

188.    On August 30, 2016, Cassidy on behalf of Zetta PTE (through one of the Zetta BVI Subsidiaries, Zetta Jet 6000-1) entered into an aircraft purchase agreement with Jetcraft Global and Orion for Plane 10 (the "Plane 10 APA"). Zetta USA agreed to guarantee the operating lease on the aircraft, and Element Aviation entered into a loan agreement (the "Plane 10 Loan Agreement") with Zetta PTE (through one of the Zetta BVI Subsidiaries, Zetta Jet 6000-1) to finance the purchase.

189.    On September 22, 2016, Element, the Debtors (including Zetta Jet 6000-1), and TVPX entered into a complex web of agreements to effectuate the transaction. The Debtors did not make a down payment, as they had in the First Element Transaction.

190.    Seagrim and Walter executed the directors' resolutions and other transactional documents in California.

191.    The same day, Zetta PTE (through one of the Zetta BVI Subsidiaries, Zetta Jet 6000-1) sent a direction of funds letter to Element Aviation, which confirmed the advance of the loan of ███████ and authorized and directed Element Aviation to disburse ████████ to Orion.

192.    As part of the same deal, the Debtors also agreed to acquire Plane 11. Earlier drafts of the Plane 10 loan agreement included a default if the Plane 11 transaction did not close within 30 days. Although that provision did not make it into the loan agreement because both Planes closed on the same day, the Debtors agreed that a default on either of those transactions would also be a default of the loan agreement for Plane 1.

193.    On September 22, 2016, the same day that the Debtors purchased Plane 10, ECN and TVPX entered into an "Aircraft Lease" (the "Plane 11 Master Lease"), and TVPX, as sub-lessor, leased Plane 11 to Zetta PTE, as sub-lessee, pursuant to an Aircraft Operating Sub-Lease Agreement dated September 22, 2016 (the "Plane 11 Sub-Lease").

194.    The Plane 11 Master Lease and the Plane 11 Sub-Lease (collectively, the "Plane 11 Finance Lease") was a finance lease, not a true lease. The Plane 11 Finance Lease ultimately operated as the sale of Plane 11 to Zetta PTE with 84 payments of $390,000 made to ECN over seven years and a mandatory purchase obligation of $18.5 million at the end of the "lease." In total, the Debtors were obligated to pay $51.3 million for Plane 11 over seven years.

195.    On September 22, 2016, Cassidy executed a certificate of director of Zetta PTE to enter into the Plane 11 Finance Lease.

196.    At the same time, Element, the Debtors (including a Zetta BVI Subsidiary, Zetta 5000-2), and TVPX entered into a complex web of agreements to effectuate the transaction. The agreements are identified on Schedule 2.

197.    Fazal-Karim, Jetcraft Corp., and Jetcoast received ▮▮▮▮▮▮ in commissions and ▮▮▮▮▮▮ in other profits on Plane 10. Jetcraft Corp. also received a ▮▮▮▮ "broker fee" from Element for facilitating the Plane 11 transaction.

198.    The Second Element Transaction was domestic in nature because it involved transactions and obligations incurred in the US, including:

    a.    The parties deliberately decided to consummate closing in the US to comply with FAA regulations and ensure operation of the Plane 10 under Zetta USA's Part 135 certificate.

    b.    The closing occurred, and FAA counsel filed closing documents in, Oklahoma City.

    c.    The Debtors accepted delivery of Plane 10 and, upon information and belief, Plane 11, in Cahokia, Illinois.

40

  d. The parties agreed that the transaction would be governed by New York law and that the parties and property would be subject to jurisdiction in New York.

  e. Upon information and belief, payment for Planes 10 and 11 was sent through Wachovia Bank in New York as a correspondent bank.

  f. Bank of Utah, the US lessor trustee for Plane 10, and TVPX, the US lessor trustee for Plane 11, signed and became obligated in the US.

  g. The Debtors' signature pages were released in Oklahoma City.

199. As part of the Second Element Transaction, Jetcraft Corp. and Element Aviation entered into a Repurchase Agreement dated September 22, 2016 (the "Plane 10 Repurchase Agreement"). Under the Plane 10 Repurchase Agreement, ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

### f. The Minsheng Refinancing and Challenger Transactions

200. At the same time he was entering into additional transactions with Element (without down payments), Cassidy was working to engineer a refinancing of Planes 6 and 7 that resulted in a significant, above-market payout to his initial investor and enabled Cassidy to cause the Debtors to purchase even more aircraft. Cassidy told the other directors on June 28, 2016, that they had "no choice" but to do a deal. He would try to "keep[] off the wolves" until the funds from the refinancing came in, but they only had "breathing room of 1.5 months." Cassidy did not tell the other directors that he would take almost $5 million for himself from the transaction.

201. Zetta PTE was unable to pay the debt service on the finance leases for Planes 6 and 7 and the above market loan to Li (let alone the other obligations it incurred). Thus, in September 2016, Cassidy engineered an insider transaction with Li to refinance the Universal Leader and Glove Assets debt.

202.    The Minsheng Refinancing was highly unfair to the Debtors' estates. On its face, it saddled the Debtors' estates with at least an additional incremental $10 million in liabilities on top of the already lopsided debt incurred in the 2015 transactions and even more if Cassidy's immediate theft of closing funds are deducted. In September 2016, Li was able to cash out approximately $55 million from the refinancing in exchange for Plane 7 (a 33% annualized return), a plane that was worth only $35.7 million at fair market value and $22.7-28.7 million when valued from the estates' perspective. Meanwhile, by reason of keeping the 2015 finance lease debt intact for Plane 6, the Debtors were forced to pay double the amount of debt service to use Plane 6, one debt service payment to Yuntian 3 and a second payment to Glove Assets. This double debt service resulted in the Debtors' incurring obligations totaling $113,483,566 (under the new 2016 Plane 6 finance lease and the payments under a new unsecured loan) for the use of Plane 6 over 60 months when they would have only have had to pay $42,579,167 to a third party lender for debt service on a comparable aircraft at fair market value with market interest rates over the same period.

203.    In June 2016, Cassidy approached Li about refinancing Zetta PTE's purchase of Planes 6 and 7. In a June 28, 2016, email, Cassidy informed Li that Minsheng had agreed to refinance both planes by "purchasing" them (in reality, another finance lease) for a total of $80 million. Cassidy told Li that the proceeds from this $80 million "refinance" would provide capital to Zetta PTE to purchase additional planes. Cassidy thanked "uncle" Li for his earlier support and told him that "We are partners and we are the priority over the banks."

204.    Of the $80 million in proceeds, $55 million would cover the full principal balance owed under the 2015 Plane 7 Finance Lease plus $8.6 million of the $10.5 million termination fee (with the remaining $1.9 million being added to an unsecured loan along with the full principal balance owed under the 2015 Plane 6 Finance Lease). The $55 million payment would guarantee Li a 33% annualized return on his eight-month finance lease to Zetta PTE for Plane 7 (and that does not include the additional $1.9 million that was added to the new unsecured loan). Zetta PTE would receive $12.6 million (of which Cassidy stole

almost $5 million) and use the remaining $12.4 million to make initial payments on four

Bombardier Challenger 650 planes ("Planes 12-15") from Bombardier.

205.    In connection with this proposed restructure, Li requested that if Zetta PTE

was unable to repay its debts as they became due, that Cassidy and Zetta PTE prefer Li over

other creditors (in particular, AVIC and Minsheng) and repay him first on his Plane 6

"personal money" loan. Specifically, on June 28, 2016, Li emailed Cassidy and wrote: "And

I know you want to [Plane 6] under the zettajet company, that means I take higher risk

because zettajet have nothing to guarantee, so you should promise if business is not good,

repay me first not mengshen and avic, they are company, I am the personal money."

206.    In the same exchange, Li also demanded an additional share of any future

profits of the company: "if in the future, zettajet has profit to split, I think I (and you if you

guarantee ms&avic by yourself, you take more risk too) will be have compensate, it should

be writen down, for example, if profit is X, (X*10%) will be given you & me, then left

(X*90%) will be splitted according every one's shares." Upon information and belief, this

agreement was later documented in a letter agreement dated July 19, 2016, which was not

disclosed to or approved by the Debtors' other, uninterested directors, Seagrim and Walter.

207.    In a contemporaneous email sent to the Debtors' only uninterested directors,

Seagrim and Walter (which did not include all of the details of the emails between Li and

Cassidy), Cassidy informed them that he had spoken to Li. Cassidy told them: "Ultimately

we have no choice . . . All in all we scoot through this we have breathing room of 1.5 months

. . . ."

208.    Cassidy misrepresented to and omitted from Seagrim and Walter material

parts of the agreement with Li and the result of the Minsheng Refinancing.

209.    Cassidy misrepresented to Seagrim and Walter the nature of the negotiations

with Li, stating that Li "agreed after length" to lower the monthly payments on the loan,

when in fact Li had simply dictated terms to Cassidy.

210.    Cassidy also misrepresented to Seagrim and Walter that one of the benefits

of the deal would be "Lower loan repayments," when in fact the Debtors would have to pay

1    significantly more. Indeed, Cassidy understated the monthly payments due on Planes 6 and

2    7 in an attachment to the email by one-third.

3        211.    Cassidy did not disclose to Seagrim and Walter that he had agreed to repay

4    Li first on the "personal money" Plane 6 loan.

5        212.    Cassidy did not disclose to Seagrim and Walter that he had agreed to give Li

6    and himself an additional share of any future profits of the company.

7        213.    Cassidy also did not disclose to Seagrim and Walter that he needed

8    immediate funds to pay for a yacht and that he would embezzle at least $2.66 million from

9    the proceeds of the Minsheng Refinancing.

10       214.    Because Li was directly or indirectly interested in the transactions involving

11   Planes 6 and 7 and the Minsheng Refinancing, he was not able to vote to approve this

12   transaction. Similarly, because Cassidy (and his wife Tang) were directly or indirectly

13   interested in this transaction due to the profit-sharing agreement, they were not able to vote

14   to approve this transaction. Accordingly, both Seagrim and Walter would have to approve

15   the transaction.

16       215.    Seagrim and Walter's approval of the Minsheng Refinancing was not based

17   on full, accurate information about the deal. Instead, Cassidy made material

18   misrepresentations and omissions while simultaneously telling Seagrim and Walter that

19   they had "no choice" but to accept the deal to keep the Debtors afloat.

20       216.    The Minsheng Refinancing closed on September 21, 2016. The day after

21   closing, Cassidy took $3.66 million as a "Director Fee—Geoffery Cassidy" and deposited

22   these funds into his personal bank account. Of this $3.66 million taken by Cassidy, $1

23   million was allegedly due and payable to Cassidy and his wife for their ultimate ownership

24   of equity in Asia Aviation, which was worthless. The remaining $2.66 million was plainly

25   misappropriated by Cassidy, who went so far as to fabricate invoices to cover up his theft,

26   at the time of an audit in July 2017.

27       217.    Cassidy also misappropriated an additional approximately $1 million from

28   the Minsheng Refinancing to pay for a Singapore residence and an installment payment on

his Dragon Pearl yacht. On September 27, 2016, less than one week after closing, Cassidy paid $607,084 out of the closing proceeds for the third installment on the Dragon Pearl. On September 30, 2016, Cassidy transferred $336,030 from Zetta PTE's bank account to pay for a deposit on his condominium in Singapore.

218.    In addition, Cassidy used investor funds from Li and funds embezzled from the Debtors to make the other prior and subsequent installment payments on the $3.4 million Dragon Pearl, and also caused the Debtors to hire and pay five employees to maintain and operate the Dragon Pearl.

219.    Although Cassidy framed the refinancing as vital to help the Debtors, Cassidy's true purpose was to string out his aircraft debt and misappropriate the Debtors' money, to the detriment of the Debtors and their creditors.

220.    Cassidy also caused Zetta PTE to use $12.4 million of the closing proceeds to make initial payments on purchase agreements for Planes 12-15, only one of which, Plane 12, was ever delivered. The three remaining planes were never delivered to or used by the Debtors.

221.    At closing on the Minsheng Refinancing, $12,410,240 was disbursed to Minsheng Business for amounts allegedly due and owing by Zetta PTE on Planes 12-15. Specifically, $6,852,560 was applied towards the purchase of Plane 12 (consisting of an upfront fee in the amount of $602,560, a security deposit in the amount of $870,000, and a down payment in the amount of $5,380,000) and $5,557,680 was applied towards the purchase of Planes 13-15.

222.    Fazal-Karim negotiated the sales of Planes 12-15 on behalf of Bombardier.

223.    Fazal-Karim was entitled to receive approximately ▮▮▮▮▮▮ in total commissions, but it is not clear if these commissions were paid because three of the four Planes were never delivered.

1

2

**g. The Falconwing Transaction: Cassidy pays off Fazal-Karim and Element on his way out**

224. In August 2017, at a time when Cassidy admitted, in writing, that the Debtors were "unable to provide security that it can fulfill its obligations over time," Cassidy manufactured a transaction to purchase a plane for block hours worth approximately $11 million, then re-sell it to Jetcraft Global for ████████ which Cassidy used to pay off a $5 million debt to Element Aviation (and release a guarantee that Jetcraft Corp. had given to Element). Block hours would be worthless if the Debtors failed, and Cassidy was trading the promise of future returns to the sellers for present cash to keep his Ponzi-like scheme alive. It turned out to be far too little and far too late, but Cassidy was able to pay off Element (and more importantly, relieve an obligation owed by Jetcraft Corp.) on his way out the door, at the expense of the Debtors' estates and other creditors.

225. As part of the Second Element Transaction, Zetta PTE was obligated to make a payment of $5 million to Element Aviation on or before December 1, 2016 (the "Element Obligation") and Jetcraft Corp. had entered into the Plane 10 Repurchase Agreement under which Jetcraft Corp. guaranteed that payment.

226. Zetta PTE was unable to pay the Element Obligation by December 1, 2016, and also had missed payments due on Planes 1, 10, and 11. Element threatened a default on all three planes. Zetta PTE and Element Aviation tolled the deadline to February 28, 2017, but Zetta PTE then missed that deadline as well.

227. On June 14, 2017, Fazal-Karim e-mailed O'Keefe and Bergeron informing them that he was going to meet with Cassidy and asked Element to "hold your guns until next week" (meaning to hold off from issuing a default notice to Zetta PTE for the repeated failure to pay the Element Obligation).

228. Cassidy was working on a deal to pay off the Element Obligation through a transaction to purchase a Bombardier Global 6000 ("Plane 16") from Falconwing Limited ("Falconwing"), owned by Fok Kin Canning ("Fok") and Wu Kebo ("Wu") for $11 million

1    (albeit paid in 1,500 block hours), and re-sell it to Jetcraft Global for █████████ of which

2    $5 million would be used to pay off the Element Obligation.

3        229.    Element agreed to hold off on the default in an e-mail on June 20, 2017, and

4    on June 30, 2017, again tolled the deadline for the Element Obligation to the earlier of the

5    sale of Plane 16 or July 31, 2017.

6        230.    In early August 2017, Zetta PTE executed an aircraft purchase agreement to

7    purchase Plane 16 from Falconwing for 1,500 block hours. The transaction documents

8    expressly valued Plane 16 at $11 million. At approximately the same time, Zetta PTE and

9    Jetcraft Global executed an aircraft purchase agreement under which Zetta PTE would sell

10   Plane 16 to Jetcraft Global for █████████ (which Cassidy would use to pay off the Element

11   Obligation to Element Aviation). In addition, Zetta PTE and Jetcraft Global entered into a

12   Side Letter Agreement dated August 9, 2017, ████████████████████████████████████

13   ███████████████████████████████████ Fazal-Karim had already entered into one

14   LOI and received another LOI to re-sell Plane 16 at █████████ (not including upgrades).

15       231.    Cassidy entered into this transaction to benefit Element and Fazal-Karim (by

16   paying down $5 million of the outstanding amount and thus decreasing the amount Jetcraft

17   Corp. would owe under the Plane 10 Repurchase Agreement), with whom he had a special

18   relationship, at the expense of other creditors, at a time when the Debtors were insolvent.

19       232.    Cassidy admitted in an August 10, 2017, e-mail to Seagrim and Walter

20   defending the transaction that he had to increase the number of block hours because the

21   Debtors were "unable to provide security that it can fulfill its obligations over time," were

22   "desperate for the deal and money," and needed "urgent immediate cash to fulfill [their]

23   obligations." As with almost all of his transactions, Cassidy said he was "extracting

24   immediate cash to pay for obligations" while "any downside of the transaction can be

25   realised in years to come when the company is stable." Cassidy did not disclose the true

26   purpose of the transaction, to benefit Element and Fazal-Karim.

27       233.    The Falconwing Transaction closed on August 15, 2017. On that day, the

28   Debtors made a transfer of $5 million to Element Aviation. Specifically, Jetcraft Corp.

transferred ███████ (the purchase price of Plane 16) from its Bank of America account in North Carolina to the bank account in Oklahoma of Insured Aircraft Title Service ("IATS"), who was acting as the escrow agent, which then transferred $5 million to Element at the Debtors' direction.

234.   On September 5, 2017, *after* his removal from the board of directors of the Debtors and position as director, and *twelve days before the Petition Date*, Cassidy e-mailed O'Keefe (of Element) and Fazal-Karim stating, "[i]t was good my last deed at Zetta was to get the USD $5m to you. Thanks to you and Element and JFK [Fazal-Karim] for the time and assistance in closing that saga out."

235.   Cassidy concluded the e-mail by providing a warning to Fazal-Karim and Element: "I take this time to warn you the company is insolvency and in dire need of life support, to date over 100m of statutory demands have been made, please ensure you act accordingly to cover your position."

236.   On or around December 28, 2017, Jetcraft Global entered into a contract to sell Plane 16 to Thorney Alpha Pty Ltd for ███████ After the deduction of costs, Zetta PTE was entitled to $387,500.48 under the Side Letter Agreement. Jetcraft Global has yet to pay the amounts due and owing under the Side Letter Agreement to Zetta PTE.

**G.   The kickbacks and bribes tainted each of the transactions**

237.   Fazal-Karim, Jetcraft, and Bombardier (and their related entities) each paid or caused commercial bribes to be paid to Cassidy in return for purchasing planes from Jetcraft (and its related entities) and Bombardier.

238.   Fazal-Karim directed Jetcraft's CEO to pay Cassidy at least two kickbacks through Jetcraft Global totaling $1 million: $500,000 as part of the combined transactions involving Planes 1-6 in December 2015 and another $500,000 in August 2016 as part of the acquisition of Planes 10-15, as well as to ensure that Cassidy would not cancel contracts worth hundreds of millions of dollars. Cassidy returned the favor: Fazal-Karim was involved in *at least fifteen* of the sixteen Planes.

239.   Bombardier was a participant from the beginning through the actions of its

agent Fazal-Karim, who directed the payment of the two $500,000 kickbacks in deals that were part of combined transactions involving direct purchases from Bombardier. In addition, Bombardier directly paid Cassidy one bribe worth $43,890 the day after he threatened to cancel contracts worth more than ████████ to Bombardier (which also would have forced Bombardier to have to return more than ████████ in prepayments). Bombardier also agreed to pay Cassidy another bribe worth $42,569, less than two weeks before Cassidy induced the Debtors to sign 4 APAs for the Challenger Transactions as well as accept delivery on Plane 3.

240.    Once Cassidy accepted the kickbacks and became a corrupted fiduciary, all of his subsequent transactions involving Fazal-Karim, Jetcraft, and Bombardier were tainted.

### a.  The First Kickback

241.    In November 2015, Fazal-Karim agreed to cause Jetcraft to pay Cassidy a $500,000 bribe (the "First Kickback") fraudulently disguised to look like it was a part of the purchase price of Plane 1. This kickback, fraudulently concealed and disguised as a payment for undescribed "services," was both a payoff for agreeing to use Fazal-Karim to acquire all future planes from Jetcraft or Bombardier as well as an inducement to acquire Plane 1 in the First Element Transaction and to acquire Planes 2-6 from Bombardier directly as part of a letter of intent signed at the same time as the financing proposal for the First Element Transaction.

242.    The transactions for Planes 1-6 were part of a single deal negotiated by Fazal-Karim, Yu, and Mattar on behalf of Jetcraft Corp., Jetcoast, and Bombardier. Specifically, Cassidy e-mailed Fazal-Karim on September 16, 2015, that the Debtors were on the market for "4-5x Global 6000 aircraft."

243.    Throughout October and November 2015, Fazal-Karim simultaneously negotiated with Cassidy the sale of Plane 1 from Jetcraft subsidiary Jetcoast and the sale of Planes 2-6 directly from Bombardier. Mattar, Yu, Fazal-Karim, and Cassidy expressly linked these transactions at the time.

244.    On November 3, 2015, Cassidy forwarded a letter of intent from Yu for the purchase of five Global 6000 aircraft to Fazal-Karim. In that e-mail, Cassidy indicated that one plane would be ordered directly from Bombardier and assigned to Li but ordered under Zetta PTE, four additional planes would be ordered directly from Bombardier, and that Fazal-Karim should add to this five-plane deal Plane 1 from Element. Cassidy also asked Fazal-Karim to get Mattar and Yu on board so that he could lock in Li.

245.    On November 10, 2015, Cassidy e-mailed Fazal-Karim regarding the letter of intent for direct purchases from Bombardier. Cassidy asked Fazal-Karim both to "confirm the arrangement is all in order on your end for this to be done direct with Bombardier. . . . I will sign this and send the money this week" but also to get bank details for both the Plane 1 transaction and the letter of intent so that Cassidy could receive at least two of the planes by year end.

246.    On November 10, 2015, Cassidy also sent a draft of the letter of intent for Planes 2-6 to Yu, copying Fazal-Karim, and stated that "Jahid [Fazal-Karim] has spoke to Khader [Mattar] and we are all on the same page."

247.    On November 18, 2015, Cassidy executed a letter of intent for the purchase of Planes 2-6 directly from Bombardier. The next day, Cassidy executed a letter of intent for the purchase of Plane 1 from Jetcraft financed by Element.

248.    On November 24, 2015, Fazal-Karim and Yu (with Mattar copied) both linked Plane 1 with the deal for Planes 2-6. Specifically, Fazal-Karim stated "Have been in constant com with Geoff [Cassidy]. 2m should have been received by BBAD [Bombardier]. He wants to sign contract on first airplane ASAP. Did you send him a draft PA? Please send me a copy so that I can help. On the 5000 9679 [Plane 1]. He signed the termsheet with element. We are moving fast. . . ." Yu responded that Bombardier was confirming the receipt of the $2 million and that Bombardier was "preparing the PA [Purchase Agreements] for all 5 aircrafts (one PA for each aircraft). In principle we would prefer to sign 5 aircraft PA together and we are trying to work on this direction. Will keep you posted with further updates. Also many thanks for your push on G5000 6979. Great team efforts indeed."

249.    On December 6, 2015, the day after the Plane 1 APA was executed, Yu sent Cassidy an e-mail copying Mattar and Fazal-Karim outlining the terms of the APAs for Planes 2-6.

250.    In addition, Bombardier had a direct financial interest in the sale of Plane 1 because Bombardier sold Plane 1 to Jetcraft and the pricing was structured such that Bombardier would receive a percentage of any return earned by Jetcraft if and when Jetcraft elected to resell the aircraft.

251.    Cassidy and Fazal-Karim had previously agreed on the First Kickback before the agreements relating to Planes 1-6 were executed and no later than the National Business Aircraft Association ("NBAA") conference in November 2015, which took place over the three days before Cassidy entered into the letters of intent for Planes 1-6.[22]

252.    On or about December 23, 2015, Anderson sent Fazal-Karim a spreadsheet entitled "Zetta Jet Lease Overview & Analysis.xlsx" that included a column entitled "Outline of Deal Discussed at NBAA" that included a "3rd Party Fee" of $500,000 "payable by Jetcraft" as part of the ███████ purchase price. Cassidy signed a letter of intent on behalf of Zetta PTE for Plane 1 at a ███████ purchase price on November 20, 2015.

253.    On November 23, 2015, Anderson e-mailed Larue copying Fazal-Karim among others to state that the terms of the deal for Plane 1 had changed. Among other changes, the purchase price was increased to ███████ The "Zetta Jet Lease Overview & Analysis.xlsx" spreadsheet dated December 23, 2015, discussed above also included a column entitled "Proposed Revisions to the Deal" which matched the ███████ ███████ price and again included a "3rd Party Fee" of $500,000 "payable by Jetcraft" as part of the increased purchase price.

254.    Following the execution of the Plane 1 APA, on January 18, 2016, Element internally circulated a profit-sharing analysis regarding Plane 1. That analysis shows that Jetcraft included "Outside Commissions" of ██████ in the ███████ price of the plane. It further shows that Jetcraft and Element split a profit of at least ███████ of

---

[22] The NBAA held a conference in Las Vegas on or about November 17-19, 2015.

1  which Jetcraft received ████████ in commissions and ████████ in other profits.

2  255.    On March 2, 2016, Behrend e-mailed Fazal-Karim and Anderson that

3  Jetcraft "accrued a 3rd party fee of $500k and I had noted it was for G Cassidy. Will we be

4  paying this, and if so through Jetcraft or FK Group?" Fazal-Karim responded: "The 500K

5  for G can be paid to him directly . . . I'll ask him to send an invoice . . ." In reality, of course,

6  this was the First Kickback.

7  256.    On March 4, 2016, Cassidy (from his Asia Aviation email account) sent

8  Fazal-Karim an invoice dated March 1, 2016, to Jetcraft Global that merely described the

9  reason for payment as "Support Services" and included Cassidy's private bank account.

10  257.    Cassidy provided no legitimate "services" in connection with the sale.

11  Cassidy's legitimate interest, consistent with his fiduciary obligations to the Debtors, was

12  in representing the Debtors in good faith, and not so that he, Fazal-Karim, Jetcraft, and

13  Bombardier could benefit. Fazal-Karim, Jetcraft Corp., Jetcoast, and Jetcraft Global were

14  aware that Cassidy provided no services related to Plane 1, and that he deserved no

15  remuneration the sale of Plane 1. Indeed, Jetcraft Global had no legitimate role at all in the

16  First Element Transaction.

17  258.    On March 28, 2016, Behrend sent a $500,000 wire from Jetcraft Global's

18  bank account in the Cayman Islands to Cassidy's personal bank account.

19  259.    The First Kickback was not appropriately disclosed to the Debtors' other

20  disinterested directors, Seagrim and Walter. If the First Kickback had been disclosed to

21  Seagrim and Walter, they would not have agreed to go through with the transaction.

22  260.    The First Kickback was not disclosed in the transaction documents, which

23  Antonenko executed on behalf of Jetcraft Corp. and Jetcoast. Instead, § 12.2.6 of the Plane

24  1 APA stated: ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████

26  ████████ Antonenko on behalf of Jetcraft Corp. expressly required that this language be

27  included in the APA.

28  261.    Fazal-Karim, Jetcraft Corp., Jetcoast, and Jetcraft Global knew that the First

1  Kickback had no legitimate purpose.

2       262.    Earlier in this adversary proceeding, Fazal-Karim submitted a sworn

3  declaration in support of a motion to seal portions of the original Complaint. (*See* Dkt. No.

4  10-1.) Fazal-Karim made several material false statements with knowledge that the

5  statements were false at the time they were made.

6       263.    Specifically, Fazal-Karim averred that "Cassidy, as Zetta's owner, requested

7  [the payments] be made to him and since from my perspective, funds to Cassidy were the

8  same as payments to Zetta, this was not an issue." (Dkt. No. 10-1, ¶ 4). Fazal-Karim also

9  suggested in a footnote that he did not know that Seagrim and Walter did not have an equity

10 interest in Zetta PTE and did not hold management positions in Zetta. (*See* Dkt. No. 10-1,

11 at n.3.) Each of these statements was material, false, and made with knowledge that the

12 statement was false.

13      264.    Fazal-Karim (as well as Mattar and Yu) knew at the time the APA for Plane

14 1 was executed (and at the time of all of the other transactions and closings) that Zetta PTE

15 was not a sole proprietorship and that Cassidy was not the sole owner or director of Zetta

16 PTE.

17      265.    On September 15, 2015, Cassidy emailed Yu among others the Information

18 Memorandum, which expressly identified Seagrim and Walter (along with Cassidy) as

19 founders and shareholders of Zetta PTE. On September 16, 2015, Cassidy emailed Fazal-

20 Karim the Information Memorandum. On September 21, 2015, Fazal-Karim forwarded the

21 Information Memorandum to Element and noted that "these guys"—not just Cassidy—had

22 already purchased aircraft and could be in the market for "4 to 5 Globals."

23      266.    On December 4, 2015, the day before the Plane 1 APA was executed,

24 Cassidy emailed Fazal-Karim, Mattar, and Yu a draft APA for Plane 6 and stated in the

25 cover email: "Please note this is subject to board approval of Zetta Jet Pte Ltd."

26      267.    Further, the Plane 1 closing documents included a Certificate of Director of

27 Zetta Pte Ltd. that, in Annex A, was signed by Cassidy, Tang, Seagrim, and Walter, all

28 listed as Directors of Zetta. Further, the closing documents included a Directors' Resolution

in Writing approving the aircraft purchase, signed by Cassidy, Tang, Seagrim, and Walter as Directors. The Plane 1 closing documents also included a copy of Zetta PTE's incorporation documents which lists Seagrim and Walter as Directors of the Company. Thus, Jetcraft Corp. and Jetcoast indisputably knew that Cassidy was not the sole director or owner of Zetta PTE before the Plane 1 APA closed.

268.    Fazal-Karim also falsely asserted in his declaration that the "payments to Cassidy were never secret or undisclosed" and that "Jetcraft and [Fazal-Karim] specifically disclosed information about the payments, both payee and amounts, directly to Element at the time of closing these transactions." (Dkt. No. 10-1, ¶ 4). This statement was material, false, and made with the knowledge that the statement was false.

269.    Based on the information produced to the Trustee in response to Bankruptcy Rule 2004 requests, Jetcraft Corp. and Fazal-Karim never disclosed that Cassidy was the payee of the First Kickback to Element. Instead, the lease overview and analysis spreadsheet prepared by Jetcraft and sent to Element stated only that the $500,000 was a "3rd Party Fee" and the profit-sharing analysis shared between Element and Jetcraft described the $500,000 as an "outside commission." Neither document identified Cassidy as the recipient of the $500,000.

270.    Fazal-Karim also falsely asserted in his declaration that "Cassidy negotiated for the payments openly using his Zetta company email account." (Dkt. No. 10-1, ¶ 4). The Trustee has not identified any emails between Cassidy's Zetta company email account and Fazal-Karim or anyone else at Jetcraft regarding the First Kickback. The only email that the Trustee has identified between Cassidy and Jetcraft regarding the First Kickback came from Cassidy's Asia Aviation account, not his Zetta account.

**b. The Second Kickback**

271.    In August 2016, Fazal-Karim agreed to have Jetcraft pay Cassidy a $500,000 bribe (the "Second Kickback") fraudulently disguised to look like it was a part of the purchase price of Plane 10. This kickback, fraudulently concealed and disguised as a payment for undescribed "services," was both a payoff for continuing to work with Fazal-

Karim and Bombardier as well as an inducement to acquire Planes 10 and 11 in the Second Element Transaction, to acquire Planes 12-15 in the Challenger Transactions, and to accept delivery of Plane 3 and others rather than cancel the contracts as Cassidy expressly threatened to do. Fazal-Karim later had Cassidy falsify an invoice related to this kickback and even offered to increase the amount of this kickback from $500,000 to $750,000 if Cassidy could get the Debtors to pay an additional $250,000.

272.    Fazal-Karim agreed to have Jetcraft pay the Second Kickback to Cassidy no later than the execution of the Plane 10 APA because the amount of the Second Kickback is included in the price of Plane 10.

273.    On November 21, 2016, Cassidy sent an e-mail to Fazal-Karim and asked him to "send the USD$1m to" Cassidy's personal bank account. Cassidy also said: "Appreciate if you can send it this week as I need the funds." Fazal-Karim responded: "Will do. But it is 500k. The other credit has not been allocated yet. So am gonna go ahead and ask Anne [Behrend] to send 500k immediately."[23] In reality, of course, this was the Second Kickback.

274.    Later that day, Behrend sent a $500,000 wire from Jetcraft Global's bank account in the Cayman Islands to Cassidy's personal bank account.

275.    On November 22, 2016, Behrend, Jetcraft Corp.'s CFO, at Fazal-Karim's request, asked Cassidy to send her an invoice in the amount of $500,000 made out to Orion, so that she could wire him $500,000 for "services" on Plane 10.

276.    Cassidy responded attaching an invoice to Orion that merely described the reason for the payment as "services" and included Cassidy's private bank account.

277.    Cassidy provided no legitimate "services" in connection with the sale. Cassidy's legitimate interest, consistent with his fiduciary obligations to the Debtors, was

---

[23] Upon information and belief, Cassidy was referring to an offer to transfer a $500,000 credit that Zetta PTE had with Bombardier to Jetcraft in exchange for a payment from Jetcraft to Cassidy personally. Matter had previously agreed to transfer the credit to Jetcraft in an e-mail chain involving Yu, Cassidy, and Fazal-Karim on August 25, 2016, even though the credit was non-transferable. It is not clear if the credit was transferred.

in representing the Debtors in good faith, and not so that he, Fazal-Karim, Jetcraft, and Bombardier could benefit. Fazal-Karim, Jetcraft Corp., Orion, and Jetcraft Global were aware that Cassidy provided no services related to the Plane 10 transaction, and that he deserved no remuneration from the transaction.

278.    On February 7, 2017, Bergeron at Element e-mailed Anderson and Behrend at Jetcraft seeking information regarding eight aircraft deals involving Element and Jetcraft.

279.    On February 10, 2017, Fazal-Karim asked Cassidy to send a revised invoice at $750,000 for "our files." The price on the aircraft had decreased from the original deal by $250,000, and so Cassidy had received only $500,000 as the Second Kickback. Fazal-Karim also offered to give Cassidy the remaining $250,000 if Cassidy got the Debtors to pay the remaining $250,000: "[f]or our files better 750k. So that in case you get Zetta to pay us the extra 250k I can resend to you." In short, Fazal-Karim was offering to "round trip" that money back to Cassidy's personal account if Cassidy would have the Debtors pay an extra $250,000 for the already overpriced aircraft.

280.    Fazal-Karim asked him to send the revised invoice that day because he was being audited: "Thanks dude. If you can today as my contracts are being audited. Ducking banks!!"

281.    On February 13, 2017, Cassidy sent Behrend a revised invoice to Orion with the same November 22, 2016, date and invoice number, but revised to be for $750,000.

282.    On February 16, 2017, Behrend sent Element an e-mail that, among other things, stated: "Invoices supporting the outside commissions paid have been included. FK Group is an entity owned by Jahid, and Jetcraft Asia is one of our subsidiaries. Due to the confidential and sensitive nature of some of our outside commissions, we ran some of the subagency payments through these entities. Please feel free to contact Jahid if you would like to discuss further."

283.    On February 22, 2017, internal Element e-mails show that Fazal-Karim told Bergeron that he "has all of the invoices but they are extremely confidential." Fazal-Karim offered that if Element really wanted to see the invoices, he would meet with Hudson

"where he [Fazal-Karim] will show him [Hudson] in person the invoices but we will not be able to have a copy." Bergeron also indicated that Fazal-Karim "is not even willing to show these invoices to Tony [Bergeron]." Bergeron believed that these payments "occurred because Jetcraft received some leads from Bombardier's seller and that the outside commissions is related to a commission fee paid to these sellers."

284.    The Second Kickback was not appropriately disclosed to the Debtors' other disinterested directors, Seagrim, Walter, and Li. If the Second Kickback had been disclosed to Seagrim, Walter, or Li, they would not have agreed to go through with the transaction.

285.    Nor was the Second Kickback disclosed in the transaction documents, which Jetcraft Global and Orion executed.

286.    Fazal-Karim, Jetcraft Corp., Jetcraft Global, and Orion knew that the Second Kickback had no legitimate purpose.

287.    In his declaration (Dkt. No. 10-1), Fazal-Karim also made materially false statements about the Second Kickback. Fazal-Karim asserted that the "payments to Cassidy were never secret or undisclosed" and that "Jetcraft and [Fazal-Karim] specifically disclosed information about the payments, both payee and amounts, directly to Element at the time of closing these transactions." (Dkt. No. 10-1 ¶ 4). This statement was material, false, and made with the knowledge that the statement was false.

288.    The Second Element Transaction, discussed further below, closed on September 22, 2016. As with the First Kickback, neither the transactional documents nor the analyses identified Cassidy as the recipient of the $500,000. Instead, the first time Jetcraft or Fazal-Karim disclosed that Cassidy was the payee of the Second Kickback was in February 2017. On February 7, 2017, Bergeron at Element sent Anderson and Behrend at Jetcraft a request for backup regarding certain invoices and commission payments on its deals with Jetcraft. In response, on February 16, Behrend sent Nadeau and Bergeron at Element an email including a link to an FTP containing backup invoices for individual aircraft, including for the first time the falsified invoice Cassidy had prepared at Behrend and Fazal-Karim's request. The following Monday, February 20, 2017, Nadeau stated in an

email to a colleague at Element that the invoice for the $750,000 kickback was not satisfactory, the invoice "seems to be from or addressed to Geoff Cassidy," and Nadeau "would like to dig more," all of which confirms that Fazal-Karim had not in fact disclosed the Second Kickback at the time of the closing almost six months earlier.

289.    Further, Fazal-Karim averred that Cassidy "made repeated representations to Jetcraft and me that he . . . was using his own funds to pay operating expenses and was going to use the payments for company costs or services." (Dkt. No. 10-1 ¶ 4.) This statement was material, false, and made with the knowledge that the statement was false. Fazal-Karim's offer to round-trip the additional $250,000 to Cassidy if Cassidy could get Zetta to pay the additional amount shows that Fazal-Karim knew that the payment was not going to be used by Zetta for company costs or services.

### c.  Corrupt Relationship between Fazal-Karim and Mattar

290.    Beginning no later than March 18, 2015, Fazal-Karim and Mattar entered into a corrupt relationship that involved illicit, improper, and undisclosed payments between Fazal-Karim and Mattar relating to Zetta aircraft transactions (as well as other unrelated transactions involving third parties).

291.    Evidence of these improper payments is found in an April 16, 2017, email Fazal-Karim sent to Mattar's personal Gmail account. This email has no subject and no text, and attaches an excel file entitled "KM.xlsx" (the "Spreadsheet"). A true and correct copy of the email and the Spreadsheet is attached hereto as Exhibit 10.

292.    The Spreadsheet, on its face, documents and purports to reconcile a flow of payments between Fazal-Karim and Mattar in connection with specified aircraft transactions involving Bombardier, many of which are clearly identifiable as references to the sale of Bombardier aircraft to the Debtors in transactions in which Fazal-Karim was acting as Bombardier's agent.

293.    The Spreadsheet presents the documented payments and other recorded information in two charts:

a.  The top chart has columns with headings entitled "Account," "Aircraft,"

1    "Agreement," and "Payment Received." There is a "total" at the bottom of

2    the "Agreement" column which reflects an amount of "███████████" and

3    a total at the bottom of the "Payment Received" column that reflects an

4    amount that is exactly $1.5 million short of this total: "███████████"

5    b.  The bottom chart is entitled "Payments made as of January 30, 2016." The

6        bottom of this chart reflects a "total" of "████████" of the specified

7        payments made as of January 30, 2016.

8    c.  In the top chart, several of the rows in the "Account" and "Aircraft" columns

9        refer, respectively, to "Zetta" and to Planes that Bombardier sold to the

10       Debtors in transactions in which Fazal-Karim was acting as Bombardier's

11       agent.

12   d.  Also in the top chart, the amounts set forth in the rows reflecting Zetta

13       aircraft transactions under the columns "Agreement" and "Payment"

14       received are, exactly, ███████ of the amount of Fazal-Karim's known and

15       identified commissions for Planes 2-5 and 12-15 as described in paragraphs

16       148 and 223 above.

17   e.  Row 15 refers to the "Zetta" account, "x4" aircraft, and an agreement to pay

18       "███████" Fazal-Karim was entitled to receive ████████████ in

19       commissions on Planes 2-5.

20   f.  Row 16 refers to the "Zetta" account, "Options," and an agreement to pay

21       ███████ but it does not show a payment received. Fazal-Karim originally

22       expected to receive ████████ in commissions on Planes 8-9.

23   g.  Rows 24 and 25 refer to the "Zetta" account, four Challenger 650 aircraft

24       ("Cl650" and "CL650 x 3"), and agreements to pay ████████████

25       ("████████" and "████████"). Fazal-Karim was to receive ████████ in

26       commissions on Planes 12-15.

27   h.  In addition, Row 23 refers to the "Zetta" account, and the "L75" aircraft, but

28       states "no deal" and reflects no payment. Cassidy and Fazal-Karim had

1       discussed the purchase of a Learjet 75 from Bombardier in a transaction

2       involving Jetcraft during fall 2016, but the deal ultimately was not

3       consummated.

4           i.   The bottom "Payments made as of January 30, 2016" chart reflects payments

5               for specific Zetta Planes, identified by manufacturer's serial number

6               ("MSN"): "9679" and "9788." Specifically, row 37 dated March 3, 2016, for

7               ████████ refers to Plane 1 (MSN 9679) and Plane 6 (MSN 9688). As alleged

8               above, Fazal-Karim directed Jetcraft Corp. (through Jetcraft Global) to pay

9               Cassidy the First Kickback of $500,000 in March 2016 related to Plane 1.

10          294.   The Spreadsheet shows illicit, improper, and undisclosed payments between

11  Fazal-Karim and Mattar relating to Zetta aircraft transactions. On information or belief, this

12  chart reflects amounts and payments flowing *from* Fazal-Karim *to* Mattar (and potentially

13  others at Bombardier) from the commissions or other funds that Fazal-Karim received on

14  transactions in which he acted as Bombardier's agent; however, whether the Spreadsheet

15  shows payments from Fazal-Karim to Mattar or *vice versa*, in either event the payments are

16  improper. Under no circumstances do the payments set forth in the Spreadsheet reflect

17  legitimate and proper transactions between Fazal-Karim and Mattar. The amounts in the

18  Spreadsheet do not match the commissions that Fazal-Karim or the other Fazal-Karim

19  Defendants received from Bombardier or any other party in the relevant Zetta transactions.

20  Similarly, the amounts in the Spreadsheet do not match any other legitimate or proper

21  amounts or payments that the Trustee has been able to identify in the transactional

22  documents, the closing statements, or the flows of funds from the relevant Zetta

23  transactions.

24          295.   Through his participation in the misconduct described above, and in

25  particular the inclusion of information regarding Planes 1 and 6 in the Spreadsheet along

26  with the fact that Mattar was involved in the negotiation of the combined deals for Planes

27  1-6, Mattar was aware of at least one wrongful and improper payment in connection with

28  Planes 1 and 6 that was not disclosed to the Debtors. Upon information and belief, these

payments included the First Kickback, therefore showing that Mattar was aware of the First Kickback that Jetcraft Global paid to Cassidy at Fazal-Karim's instruction.

296.    Because the Spreadsheet shows illicit and improper payments relating to Planes 1 ("9679"), Planes 2-5 ("4x"), Plane 6 ("9688"), and Planes 12-15 ("Cl650" and "CL650 x 3"), the Debtors were damaged in an amount to be proven at trial, including damages resulting from kickbacks paid to Cassidy, the Debtors' fiduciary, to induce him, in breach of fiduciary duties, to purchase hundreds of millions of dollars of aircraft through incurrence of debt that the Debtors could never repay. At a minimum, the Debtors suffered damages but at a minimum equal to the amount of the illicit and improper payments, which necessarily and improperly increased the price of the Planes. In addition to the amount of the illicit and improper payments, the Debtors were further damaged by the difference between the amount that the Debtors paid for the Planes and the amounts the Planes were actually worth.

297.    In addition, the Trustee notes that his investigation of this corrupt relationship between Mattar and Fazal-Karim has revealed that relevant facts supporting these allegations, once contained in certain highly probative documents, may not have been preserved, or may have been intentionally destroyed.

298.    During the Bankruptcy Rule 2004 process and during this Adversary Proceeding, the Trustee requested e-mail correspondence from Mattar's personal e-mail account. Upon information and belief, Mattar refused to provide consent to Bombardier to search his personal devices and personal e-mail accounts.

299.    Mattar used his personal devices and a personal Gmail account to conduct business on behalf of Bombardier. Bombardier was well aware that Mattar used his personal devices and a personal Gmail account to conduct business on behalf of Bombardier. The Debtors' files and the productions of Bombardier and others include numerous emails from Mattar's personal Gmail account and other indications that Mattar was using his personal devices to conduct business on behalf of Bombardier.

300.    Bombardier did not collect or search for documents from Mattar's personal

devices or personal Gmail account. Instead, Mattar forwarded some documents from his personal Gmail account to Bombardier for production in response to the Trustee's Bankruptcy Rule 2004 requests. Bombardier allowed Mattar to self-select these documents in a manner that was not forensically sound.

301.    Upon information and belief, at the time the original complaint was filed on September 13, 2019, Mattar was the Vice President of Sales for the Middle East, Africa, Asia Pacific and China for Bombardier Business Aircraft. Based on publicly available information, as of September 2019, at or around the Trustee filed the original complaint that included allegations detailing Mattar's central role in many of the claims asserted against Bombardier, Mattar's employment with Bombardier ended.[24]

302.    Bombardier did not produce the Spreadsheet in response to the Debtors' Bankruptcy Rule 2004 requests.[25]

303.    Upon information and belief, Mattar has withheld or destroyed relevant documents regarding his business on behalf of Bombardier, including with respect to the kickbacks and bribes Jetcraft and Bombardier paid to Cassidy and the payments between Mattar and Fazal-Karim.

304.    Based on the above, and the general nature of the information relating to these illicit and improper agreements and payments, additional facts supporting these allegations are not accessible to the Trustee and are peculiarly within Fazal-Karim's, Mattar's, and Bombardier's knowledge.

**d.  The F1 Ticket Bribe and the Sea-Doos**

305.    Bombardier paid Cassidy one bribe and agreed to pay another (that was ultimately paid by Fazal-Karim through FK Partners) as a quid pro quo in direct response to Cassidy's threat to cancel contracts worth more than ███████ to Bombardier (which would also have forced Bombardier to have to refund more than ███████ in prepayments),

---

[24] Bombardier did not disclose that Mattar no longer worked at Bombardier as of the end of September 2019 during communications with the Trustee's counsel regarding these issues.
[25] These allegations raise significant possible spoliation concerns, which the Trustee intends to continue to address with all counsel and, accordingly, reserves all rights.

as well as to ensure that Cassidy would enter into four additional contracts that Bombardier valued at $129.4 million. These bribes, which took the form of Sea-Doo jet skis and tickets to a Formula 1 ("F1") event, exceeded $86,300

306.    On July 14, 2016, Cassidy e-mailed Mattar that he needed two Sea-Doo jet skis, worth approximately $42,569, delivered to Gold Coast, Australia. Maritimo, the entity from which Cassidy purchased the Dragon Pearl yacht with stolen debtor funds, is located in Gold Coast, Australia.

307.    On July 20, 2016, Cassidy e-mailed Mattar copying Fazal-Karim, Yu, and others that he "put you [Bombardier] on formal notice of my intention to Cancel all orders and not take deliver of [Plane 3]."

308.    On July 21, 2016, Cassidy e-mailed Mattar copying Fazal-Karim, Yu, and others asking Fazal-Karim how quickly he could sell the planes and stated, "My plan is to issue termination notice I'm actually feed up with calling you guys and complaining."

309.    On July 22, 2016, Cassidy then linked the Sea-Doos to his earlier threat to cancel the contracts, e-mailing Mattar and Fazal-Karim, "Im not going to continue talking on all this rubbish, the ball is in your court. On a side note let me know on the Seadoo, otherwise I need to order one shortly."

310.    On July 28, 2016, Cassidy requested that Bombardier provide him with five tickets to the Singapore F1 event on September 16-18, 2016, worth $43,890 total. On July 29, 2016, a Bombardier employee, apparently not understanding that Cassidy was in the midst of demanding payoffs, e-mailed Cassidy that another company could sell him tickets. Less than 20 minutes later, Cassidy e-mailed Mattar copying Fazal-Karim, Yu, and others stating: "As per my earlier e-mail. Proceed to Cancel the 4 x Globals." Cassidy had also threatened earlier that day to terminate negotiations with Minsheng relating to the purchase of Planes 12-15.

311.    Cassidy thus had demanded a quid pro quo: give the Sea-Doos and F1 tickets or Cassidy would refuse to take delivery of Plane 3 and cancel the purchase agreements for Planes 4, 5, 8, and 9. Upon cancellation, Bombardier's only recourse was to recover

1  "liquidated damages" █████████████████████████████████

2  ███████████  Bombardier required that debtor Zetta PTE agree that the liquidated

3  damages ████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ███████████████████████████

9       312.    At the time Cassidy demanded the "quid pro quo", the Debtors were awaiting

10  delivery of Plane 3 and had four pending purchase agreements with Bombardier. Had

11  Cassidy cancelled the agreements and left Bombardier with its contractual remedy to collect

12  liquidated damages, the Debtors would have avoided ██████████ in insurmountable

13  aircraft financing obligations for overpriced aircraft and, in fact, been entitled to a net refund

14  of ██████ in excess prepayments. Thus, Cassidy's threat to take his business elsewhere

15  unless he was given commercial bribes, such as Sea-Doos and F1 tickets, was a real threat

16  that Bombardier could not ignore.

17       313.    The next day, on July 30, 2016, Mattar acquiesced, and with intent to

18  influence Cassidy not to cancel the contracts, directed that the tickets were for the Zetta

19  team and that the Debtors would not have to pay.

20       314.    Bombardier did not provide the F1 tickets as reasonable and legitimate client

21  entertainment, but rather as a commercial bribe in direct response to Cassidy's demand for

22  a quid pro quo.

23       315.    On August 24, 2016, Cassidy e-mailed Fazal-Karim regarding the two Sea-

24  Doos, and asked if Fazal-Karim could "ensure [Mattar] takes care of this. Maybe best

25  [Mattar] give his credit card details and let Philippe [Crevier] deal with it."

26       316.    On September 7, 2016, Fazal-Karim e-mailed Mattar and Phillipe Crevier

27  ("Crevier"), a consultant paid by Zetta PTE, that Crevier should order the two Sea-Doos

28

64

and send Fazal-Karim the invoice. Fazal-Karim indicated that he would "sort it out with Bombardier."

317.    On September 8, 2016, Cassidy told Crevier that Jetcraft would pay Bombardier directly for the two Sea-Doos or "Mick will pay for Jahid." Upon information and belief, Mick is Mick Doohan, an authorized representative for Jetcraft.

318.    On September 14, 2016, Mattar, acting on behalf of Bombardier, agreed to pay for the bribe and authorized Fazal-Karim as Bombardier's agent to do so. Specifically, Mattar wrote to Cassidy and Crevier: "Having spoken to Jahid, we can do the following, buy and bill back to Jetcraft, and I shall sort it out with [J]ahid." Mattar thus, on behalf of Bombardier, directed Cassidy to purchase the Sea-Doos and authorized Fazal-Karim, acting as Bombardier's agent, to accept and pay an invoice from Cassidy for the amount of the Sea-Doos. Mattar stated that he and Fazal-Karim would "sort it out," meaning that Fazal-Karim and Mattar would determine how to divide the cost between Jetcraft and Bombardier. By structuring the transaction in this way, Bombardier, Mattar, and Jetcraft would not have to pay Cassidy a bribe directly. Instead, the transaction would appear to be a legitimate purchase by the Debtors (even though it was not, because the Sea-Doos were for Cassidy's personal use), while Mattar would be able to reimburse Fazal-Karim in a separate transaction. The only purpose of these machinations was to disguise the payment through the cloak of legitimate business between the Debtors, Bombardier, and Jetcraft, even though the Debtors were the only ones who did not receive a benefit.

319.    On September 19, 2016, Benjamin Ng (Zetta PTE, Accounts) sent Cassidy an invoice addressed to Jetcraft Corp., Attn: Fazal-Karim, for the two Sea-Doos. Crevier then sent Fazal-Karim the invoice. The cost of the Sea-Doos according to the invoice was $42,569.

320.    On September 21, 2016, Zetta PTE purchased the Sea-Doos. On October 2, 2016, Crevier sent Mattar and Fazal-Karim an e-mail thanking them for the Sea-Doos. Plane 3 was delivered on September 22, 2016.

321.    If Cassidy had cancelled the contracts, Bombardier would have lost more than ███████ in additional revenue and been forced to return more than ███████ in prepayments. Further, Cassidy executed four additional APAs for Planes 12-15 on September 22, 2016, less than 10 days after Mattar authorized the bribe, that were worth $129.4 million to Bombardier. Fazal-Karim acted as Bombardier's agent and received a commission on each of these Planes.

**e.  Bombardier's bribes violated its own policies**

322.    Bombardier's payment of the F1 tickets and agreement to pay for the Sea-Doos violated its own policies. To be sure, the payment of the F1 tickets and the agreement to pay for the Sea-Doos were commercial bribes whether or not they violated Bombardier's policies or even if Bombardier had no policies at all. Nevertheless, the fact that the payment and agreement violated Bombardier's policies further demonstrates that Yu and Mattar (as well as Fazal-Karim, who agreed to be bound by the policies under his preferred representative agreement with BI) knew that their actions were improper.

323.    Bombardier has a Code of Ethics that seeks to set "the global standards for our business and activities, applies to all members of the Bombardier community, including the Board of Directors, management and employees at every level, in every country and from every Bombardier legal entity (including joint ventures where Bombardier has a majority/ controlling interest)."[26]

324.    At the time of the events below, Bombardier's Code of Ethics broadly prohibited giving any gifts that even *might* be improper with respect to the recipient: "Employees, suppliers, partners and other third parties representing Bombardier must avoid giving or receiving gifts or entertainment if these might improperly influence the recipient's judgment or might be perceived to do so. Gifts can include goods, services, favours, loans, trips, accommodation or use of property, etc."[27]

---

[26] https://www.bombardier.com/en/governance/code-of-ethics.html, a true and correct copy of which is attached hereto as Exhibit 11.
[27]    https://web.archive.org/web/20160424114843/https://www.bombardier.com/content/dam/Websites/ bombardiercom/supporting-documents/BInc/Bombardier-code-of-ethics-

325.    Bombardier's Code of Ethics permitted token or nominal gifts in certain limited situations: "Sometimes in business, for example, in certain cultures, an exchange of gifts is appropriate. In such instances, the gifts should be reasonable, in good taste, and have token or nominal value."[28] The bribes and kickbacks at issue were none of those things.

**f.    The Nyota Bribe and Breaches of Fiduciary Duty**

326.    Cassidy and Fazal-Karim also had a separate, undisclosed side venture in which Cassidy agreed to purchase half of a superyacht with Fazal-Karim. This side venture created an undisclosed conflict of interest, Fazal-Karim aided and abetted Cassidy's breaches of fiduciary duty because Cassidy was misusing Zetta resources for the superyacht, and it gave Fazal-Karim a convenient vehicle to pay Cassidy additional bribes.

327.    In early 2017, Cassidy and Fazal-Karim planned to begin this new business venture through which they would purchase a yacht and operate charters. Ultimately, they set their sights on the 121-foot superyacht, originally called the Tosca, which Fazal-Karim's wife named the Nyota.

328.    Fazal-Karim purchased the Nyota. Cassidy and Fazal-Karim agreed that Fazal-Karim would pay for the Nyota and Cassidy would transfer his 50% share later. Upon information and belief, Cassidy never paid for his share of the Nyota.

329.    Fazal-Karim used his various companies and assets interchangeably during the transaction.

330.    On February 7, 2017, an employee of the yacht company sent Cassidy and Fazal-Karim an e-mail attaching an invoice to FK Partners for 10% of the purchase price on the Tosca, after Fazal-Karim asked him to direct the invoice to FK Partners rather than FK Group.

331.    Cassidy and Fazal-Karim used Philippe Crevier, a consultant paid by Zetta PTE using a Zetta PTE e-mail address and signature block, to work with a service company to help register a new Maltese company to manage the yacht.

---

currentversion-en.pdf, at 14, a true and correct copy of which is attached hereto as Exhibit 12.
[28] *Id.*

332.    On February 13 and 14, 2017, Crevier, from his Zetta email address, emailed with a G-Yachts employee copying Fazal-Karim among others and confirmed that Cassidy would be listed as a director and shareholder of the entity that would own the Nyota "under his personal name." Neither suggested that Cassidy was entering into the transaction on behalf of the Debtors.

333.    On February 22, 2017, Cassidy emailed a G-Yachts employee, copying Fazal-Karim, and indicated that the Nyota would be listed on the Debtors' insurance policy for the "plane fleet," as Cassidy had done with the Dragon Pearl.

334.    On June 1, 2017, Nicholas Houseman ("Houseman") of GSM Capital e-mailed Cassidy an invoice on behalf of FK Partners to "Geoff Cassidy" for 50% of the price of the Nyota. Houseman directed Cassidy to send the funds to an FK Partners account. The same day, Fazal-Karim asked Cassidy to send the money to his "Swiss account" rather than "Singapore." Cassidy agreed to send the money in Euros to Switzerland as requested.

335.    On June 2, 2017, Cassidy asked Fazal-Karim about Jetcraft paying for the two Sea-Doos described above. Fazal-Karim replied "Jetski has nothing to do with Jetcraft. You can offset jet ski on the boat. It is personal. The invoices to Jetcraft need to be settled for accounting purposes." The "boat" referenced by Fazal-Karim was the Nyota. In June 2017, Cassidy personally owed his new venture with Fazal-Karim €1,500,000 for the purchase of the Nyota. Upon information and belief, Fazal-Karim knew that $42,569 payment for the Sea-Doos for Cassidy would cause issues for Jetcraft's accounting so he requested that Cassidy deduct the amount Fazal-Karim and Jetcraft owed him for the two Sea-Doos from the amount that Cassidy owed on the Nyota.

336.    Although Cassidy used a consultant paid by Zetta PTE to help manage the Nyota and had Zetta PTE pay for the insurance, Cassidy and Fazal-Karim agreed that Cassidy would be the director and a shareholder under his personal name and Fazal-Karim would be the other shareholder, through one of his companies.

337.    Although Fazal-Karim was aware that Cassidy was using Zetta PTE consultants and that Cassidy would list the Nyota on the Debtors' insurance policy, Fazal-

Karim referred to the Nyota as "personal," further demonstrating that Fazal-Karim knew Cassidy's use of Zetta PTE consultants and the Debtors' insurance was improper.

338.    Although Cassidy's fraud was soon to be discovered, the Nyota would have been a perfect vehicle for Fazal-Karim to funnel future bribes or kickbacks in the form of credits against Cassidy's unsatisfied obligation for his 50% ownership interest in the Nyota.

339.    On information and belief, the Nyota was sold in August 2020 for a price in the range of 3.5 million euro.

340.    Even after he was removed from the Debtors' Boards of Directors, Cassidy misrepresented his involvement with the Nyota in a statement attempting to justify his actions and falsely claimed that he had only been on the yacht as a guest.

**H.    Each of the Planes was significantly overpriced**

341.    As a threshold matter, the Debtors were damaged by the amount of the bribes, kickbacks, and illicit payments between Cassidy and Fazal-Karim, as well as between Fazal-Karim and Mattar. The payment of these bribes, kickbacks, and illicit payments was an improper and fraudulent overpayment that these Defendants caused the Debtors to pay.

342.    But the Debtors were also damaged in an even more substantial manner, because the Planes were significantly overpriced. Bombardier and Jetcraft not only sold planes to Zetta that they would not have otherwise sold to Zetta, earning ill-gotten commissions and profits for themselves in the process, but they also sold those planes at fraudulently overinflated prices, netting Jetcraft and Bombardier millions of more dollars of illicit gains at Zetta's expense and allowing Bombardier to report better sales numbers to Bombardier's investors.

343.    Based on expert analysis of publicly available valuations of similar planes from three sources as well as specific transactions involving substantially similar planes during the relevant time frame ("Fair Market Value"), the purchase prices that the Debtors agreed to pay were significantly above Fair Market Value.

344.    Based on the expert analysis described above, each and every one of the delivered planes was priced significantly above Fair Market Value:

| | Purchase Price | Fair Market Value | Difference |
|---|---|---|---|
| Plane 1 | ■■■ | $35,700,000 | ■■■ |
| Plane 2 | ■■■ | $37,400,000 | ■■■ |
| Plane 3 | ■■■ | $37,400,000 | ■■■ |
| Plane 4 | ■■■ | $35,700,000 | ■■■ |
| Plane 6 | $50,000,000 | $39,000,000 | $11,000,000 |
| Plane 7 | $50,000,000 | $37,600,000 | $12,400,000 |
| Plane 10 | ■■■ | $37,400,000 | ■■■ |
| Plane 11 | ■■■ | $30,400,000 | ■■■ |
| Plane 12 | ■■■ | $21,375,000 | ■■■ |

345.    These valuations are supported by further expert analysis from the perspective of the value provided to the Debtors' estates ("Estate Value"). Based on an analysis of the theoretical purchase price that the Debtors could have paid for the Global 5000s and 6000s (i.e., Planes 1-4, 6-7, and 10-11) to generate a conservative 10% internal rate of return, considering the revenue that an operator of similar size as the Debtors would likely generate, each and every one of the delivered planes was significantly overpriced:

| | Purchase Price | Estate Value | Difference |
|---|---|---|---|
| Plane 1 | ■■■ | $29,300,000 - $31,600,000 | ■■■ ■■■ |
| Plane 2 | ■■■ | $29,600,000 - $33,900,000 | ■■■ ■■■ |
| Plane 3 | ■■■ | $28,500,000 - $32,900,000 | ■■■ ■■■ |

| Plane 4 | ████████ | $29,200,000 - $33,700,000 | ████████ ████████ |
| Plane 6 | $50,000,000 | $22,700,000 - $28,700,000 | $21,300,000 - $27,300,000 |
| Plane 7 | $50,000,000 | $22,700,000 - $28,700,000 | $21,300,000 - $27,300,000 |
| Plane 10 | ████████ | $26,500,000 - $31,000,000 | ████████ ████████ |
| Plane 11 | ████████ | $26,400,000 - $29,200,000 | ████████ ████████ |

346.    Purchasers in the luxury business jet market, and in particular charter operators, engage in competitive bidding processes before they make significant decisions on fleet purchases. The market for private luxury jets is highly competitive and was even more acutely so in 2015-2016 given the severely depressed state of the private luxury jet market. Given the market dynamics and depressed state of the private luxury jet market, Cassidy's failure to engage in a competitive bidding process with other private luxury jet manufacturers in exchange for bribes and kickbacks was a clear breach of his fiduciary duties and directly resulted in the Debtors' inability to achieve price reductions that would have been in line with the fair market valuations listed above.

347.    Moreover, charter operators heavily negotiate prices with manufacturers and do so over a period of several months before they make significant capital commitments. Here, Cassidy made no effort to negotiate these prices with Jetcraft or Bombardier but paid full retail in a buyer's market.

348.    Although manufacturers and brokers in the luxury business jet market often discount prices for multiple purchases at one time, and the Debtors entered into letters of intent for as many as 11 planes as part of the initial negotiations in October and November 2015, Cassidy made no effort to seek such quantity discounts from Jetcraft or Bombardier.

349.    In addition to the above expert analysis, the valuations are supported by the fact that Planes 1 and 10 were purchased by Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion at significantly lower prices and then resold to the Debtors. These defendants entered into these back-to-back transactions *after* Cassidy told Fazal-Karim on September 16, 2015, that the Debtors were in the market for multiple Global 6000s.

350.    Jetcoast entered into an APA to purchase Plane 1 from Bombardier on September 25, 2016, for an effective purchase price of ██████ Internal Element valuations show that as of October 1, 2015, Plane 1 had an estimated market price of between $37.25 and $37.64 million.

351.    On October 16, 2015, Fazal-Karim e-mailed Bergeron at Element regarding the terms of a potential sale of Plane 1 to Zetta PTE and stated, "[our] net price will be . . . ██."

352.    On November 18, 2015, Larue sent a financing proposal to Fazal-Karim for Zetta PTE's purchase of Plane 1 for ██████. Later that same day, Fazal-Karim responded to Element's financing proposal by asking Element to raise the purchase price to ██████ and stated that he would brief them later, despite Fazal-Karim's prior indication that the price would be ██████ (██████ plus a ██████ refundable deposit).

353.    On November 20, 2015, Cassidy executed a renewed financing proposal at a ██████ purchase price. This price already included upgrades to the plane.

354.    On November 23, 2015, despite the fact that Cassidy had already executed a financing proposal with a purchase price of ██████, Fazal-Karim, Antonenko, and Bergeron exchanged e-mail correspondence and raised the price again, now to ██████ ██████. On November 24, 2015, Element sent another financing proposal to Cassidy, who executed and returned the proposal at this new and higher price.

355.    In December 2015, Element submitted a "Transaction Summary and Approval" to its credit committee, which outlined the terms of the First Element Transaction. Although the aircraft was purchased for ██████ from Bombardier, the base

1  purchase price was listed as ██████, plus $1.855 million in upgrades, and a ██████

2  security deposit, for a total purchase price of ██████

3      356.    Thus, in less than 60 days, the price of Plane 1 increased from ██████

4  to ██████ (excluding upgrades and deposit). Moreover, the price of Plane 1 increased

5  by ██████ *in four days* from the time that Cassidy signed the first financing agreement

6  to the time he executed the final financing proposal.

7      357.    Jetcraft Corp. and Jetcoast entered into various agreements to sell Plane 1 to

8  the Debtors on December 5, 2015, for ██████ The sales price included the

9  $500,000 First Kickback and thus the price of the plane was overstated by at least that much.

10  In addition, according to a commission calculation spreadsheet that Jetcraft sent to Element

11  on January 18, 2016, Jetcraft Corp. and Element split gross profits of ██████ and

12  Jetcraft Corp. also received a sales commission of ██████ Upon information and belief,

13  the price also included significantly overstated costs for maintenance (i.e. upgrades) of more

14  than $1.1 million, amounts which Jetcraft Corp. described as "high estimates" that "should

15  come in less" but which were not adjusted to reflect the actual costs.

16      358.    Orion entered into an APA to purchase Plane 10 from a third party on

17  December 30, 2015, for ██████

18      359.    Orion and Jetcraft Global entered into various agreements to sell Plane 10 to

19  the Debtors on September 22, 2016, for ██████ The sales price included the $500,000

20  Second Kickback and thus the price of the plane was overstated by at least that much. In

21  addition, according to a commission calculation spreadsheet that Jetcraft sent to Element on

22  February 3, 2017, Jetcraft Corp. and Element split gross profits of ██████ and

23  Jetcraft Corp. also received a sales commission of ██████. Upon information and

24  belief, the price also included significantly overstated costs for maintenance (i.e. upgrades)

25  of more than $1.2 million and travel of more than $100,000.

26      360.    On June 22, 2016, less than six months after selling Zetta at least nine Global

27  6000s at prices ranging from ██████ (and before any of those planes

28  had been delivered), Fazal-Karim emailed Bergeron that Bombardier had agreed to sell him

1  a new 6000 for ███████. Three months later, Fazal-Karim through Jetcraft Global and

2  Orion sold Zetta Plane 10 in a deal financed by Element for ████████

3  **I.    The scheme falls apart and the Debtors file for bankruptcy**

4      361.    In mid-2017, during preparations for Zetta PTE's first, statute-mandated

5  audit, Zetta PTE's CFO (who later quit during the audit) started asking questions about the

6  $2.66 million that Cassidy embezzled following the Minsheng Refinancing. Cassidy ham-

7  handedly falsified two invoices but the jig was up.

8      362.    On August 12, 2017, Walter sent the Zetta PTE Board of Directors and the

9  Debtors' new CFO a blistering e-mail stating that everyone recognized that "Zetta has been

10  operating without proper financial controls," noted that the CFO quitting mid-audit was a

11  "BIG RED FLAG," and explicitly accused Cassidy of "managing **a Ponzi scheme**" (all

12  emphasis original). In a follow up e-mail the same day, Walter also noted that Cassidy's

13  presentation to the French investment bank overstated the value of the Debtors' aircraft by

14  $150 million dollars which Walter twice described as another "**MASSIVE RED FLAG**"

15  (emphasis original). Walter ultimately demanded that Cassidy "prove to us that Zetta is not

16  a Ponzi scheme."

17      363.    On August 17, 2017, the Zetta PTE Board of Directors had a meeting in

18  Hong Kong. Seagrim, Walter, and Li voted to suspend Cassidy and Tang. On August 22,

19  2017, Cassidy and Tang were removed from the board and their roles at the Debtors.

20      364.    On September 8, 2017, the Debtors filed a federal civil lawsuit against

21  Cassidy in the United States District Court for the Central District of California, Case No.

22  2:17-cv-06648-JAK-GJS.

23      365.    On September 15, 2017 (the "Petition Date"), the Debtors commenced these

24  bankruptcy proceedings by filing voluntary petitions for relief under chapter 11 of the

25  Bankruptcy Code (the "Chapter 11 Cases").

26      366.    On November 30, 2017, based upon a lack of funds to operate the Debtors'

27  business, the Trustee shut down operations, terminated all employees, and, on December 4,

28

2017, this Court entered the orders granting the Trustee's motions to convert the Debtors' Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.

367.    On December 5, 2017, the US Trustee appointed the Trustee to serve as the Chapter 7 Interim Trustee in these Chapter 7 Cases. The Trustee became the permanent chapter 7 trustee in these Chapter 7 Cases after the conclusion of the section 341 meeting of creditors.

## ALLEGATIONS RELATING TO ALTER EGO

### A.  Fazal-Karim treated the other FK Defendants as alter egos of himself and one another.

368.    Fazal-Karim used his various companies, including the Jetcraft entities, FK Group, and FK Partners, interchangeably and as alter egos of himself and one another.

369.    During the relevant period, Fazal-Karim treated the other Fazal-Karim Defendants, including Jetcraft Corp., Jetcraft Global, Jetcoast, Orion, Jetcraft Asia, FK Group, and FK Partners, as a single entity such that the individuality and separateness between them ceased.

370.    The Fazal-Karim Defendants commingled funds and assets and failed to segregate the assets of the separate entities. Behrend, Jetcraft's CFO, testified in her Bankruptcy Rule 2004 deposition that she "move[s] cash around as needed between our [Jetcraft] entities" and "based on where we have our cash balances, we used one of our bank accounts from an entity to pay on behalf of another." For example, after Behrend asked Fazal-Karim whether to pay the First Kickback through Jetcraft or FK Group, Behrend ultimately paid the First Kickback out of a Jetcraft Global account in the Cayman Islands. Similarly, after Behrend directed Cassidy to falsify an invoice for the Second Kickback to Orion, she then paid the Second Kickback out of a Jetcraft Global account in the Cayman Islands.

371.    Further, several of the relevant entities had no bank accounts at all. Jetcoast and Orion did not have their own bank accounts and Jetcraft Corp. and Jetcraft Global would make and receive payments on their behalf. Funds that should have been in separate bank

accounts for Jetcoast and Orion were commingled with Jetcraft Corp. and Jetcraft Global funds by having those payments made to accounts belonging to Jetcraft Corp. and Jetcraft Global. Because Jetcraft Corp. and Jetcraft Global did not set up separate bank accounts, they failed to segregate their assets from those of Jetcoast and Orion. For example, the Debtors made $5.555 million in transfers between December 10, 2015, and January 5, 2016, to Jetcraft Corp.'s Bank of America account in North Carolina in connection with Plane 1, as set forth on Schedule 3, even though Jetcoast was the proper payee on the Plane 1 APA. The loan proceeds on Planes 1 and 10, which should have been paid to Jetcoast and Orion under the Plane 1 and Plane 10 APAs, respectively, likewise were not put into separate, segregated accounts.

372.    The Fazal-Karim Defendants also failed to maintain proper books and records. For example, Behrend directed Cassidy to falsify invoices for the First and Second Kickbacks. In addition, when Behrend calculated the internal commissions due from Jetcraft Corp. to FK Group on a plane unrelated to the Debtors, she indicated in an email to Fazal-Karim on July 18, 2016, that she would post those commissions to Plane 10: "I just discovered that I did not accrue ▮▮▮ as a 3rd party fee for the TB matter on Global ▮▮▮ ▮▮. We had discussed this back in march. If I post this to the deal now, I'll have to recalculate the Element split, internal commissions, etc. I could go ahead and pay the ▮▮ to FK Group now, but would you be ok if I posted ▮▮ each to 9697 and ▮▮ instead of the ▮▮ to ▮▮?"

373.    In addition, in his declaration, Fazal-Karim asserted that he has "a contractual arrangement through my separate business, FK Partners, to be compensated for my work or role in completed aircraft transactions." Jetcraft's internal financial statements show that FK Group, rather than FK Partners, received payments from Jetcraft Global relating to specific transactions.

374.    Fazal-Karim treated the assets of the Fazal-Karim Defendants as his own. For example, according to the testimony of Jetcraft Corp.'s CFO, Behrend, she prepared a personal financial statement for Fazal-Karim because Fazal-Karim was personally

guaranteeing the lines of credit and loans for Jetcraft Corp. and Jetcraft Global. Although Fazal-Karim purchased the Nyota using funds transferred from FK Partners, and held the Nyota in the name of a Panamanian entity, Fazal-Karim directed Behrend to include the Nyota as Fazal-Karim's personal asset on his personal financial statement. Although Fazal-Karim described the Nyota as "personal," he used assets of another Fazal-Karim Defendant to pay for it.

375.    Fazal-Karim had at all relevant times a direct or indirect controlling ownership interest and dominated all of the Fazal-Karim Defendants. Fazal-Karim owns 95 percent of Jetcraft Corp. and Jetcraft Global, Anderson and Antonenko each owns 2 percent of each entity, while Behrend owns the remaining 1 percent of each entity. Jetcraft Asia, Jetcoast, and Orion are each direct or indirect wholly owned subsidiaries of Jetcraft Global. Based on available public information, Fazal-Karim is also the sole direct or indirect owner of FK Group and FK Partners. Fazal-Karim is the Chairman of the Board of Jetcraft Corp. and FK Group. Fazal-Karim is the sole director and person with significant control of FK Partners.

376.    Fazal-Karim controlled the business of the Fazal-Karim Defendants. Although the Fazal-Karim Defendants purport to have separate existence, Fazal-Karim is the nerve center for all of the Fazal-Karim Defendants.

377.    Fazal-Karim used the Fazal-Karim Defendants as mere conduits of one another by having one entity pay obligations on behalf of another entity. For example, the Debtors made $5.555 million in transfers between December 10, 2015, and January 5, 2016, to Jetcraft Corp.'s Bank of America account in North Carolina in connection with Plane 1, as set forth on Schedule 3, even though Jetcoast was the proper payee on the Plane 1 APA. Although the invoices relating to the Second Kickback were sent to Orion, Fazal-Karim directed Jetcraft Corp.'s CFO to pay the Second Kickback to Cassidy from a Jetcraft Global bank account. Fazal-Karim also directed Jetcraft Corp.'s CFO to pay the First Kickback from a Jetcraft Global account even though Jetcraft Global was not involved in the First Element Transaction in any way. Further, Behrend told Element that Fazal Karim used

Jetcraft Asia and FK Group to pay "extremely confidential" "outside commissions" as part of transactions involving Jetcraft Corp. None of these entities had any legal obligation or other appropriate reason to make these payments.

378.    Fazal-Karim controlled all of his business for the various Fazal-Karim Defendants from his FK Group e-mail address. Each e-mail that Fazal-Karim sent that is referenced in this Complaint came from Fazal-Karim's FK Group e-mail address. Because Fazal-Karim conducted all of his business using the same e-mail address, it was not clear to third parties which of the Fazal-Karim Defendants he was conducting business on behalf of, or whether he was acting for his own personal business.

379.    Fazal-Karim routinely used the employees of one of the Fazal-Karim Defendants for the business of another. For example:

    a.  Behrend is the Chief Financial Officer of both Jetcraft Corp. and Jetcraft Global.

    b.  Joanna Kwong holds herself out as a Sales Director of FK Group; a Vice President, Business Development of Jetcraft Asia; and a Director of Business Development of Jetcraft. Fazal-Karim directed Kwong to conduct business on his behalf with no distinction as to which entity or role she was in.

    c.  Shariff Narayanin holds himself out as a Regional Sales Director of "Jetcraft / FK Group."

    d.  Peter Antonenko, the Chief Operating Officer of Jetcraft Corp., was referred to by Fazal-Karim as his personal lawyer in correspondence regarding a post-petition lawsuit.

380.    Fazal-Karim treated the Fazal-Karim Defendants as a single combined business. For example, although Fazal-Karim signed the Bombardier representative agreements in his personal capacity, Fazal-Karim holds out FK Group as Bombardier's exclusive representative in Asia.

381.    Upon information and belief, there may be additional entities that are alter egos of Fazal-Karim and the Fazal-Karim Defendants.

**B.  It would be inequitable to allow Fazal-Karim to hide behind the corporate form.**

382.    Adhering to the fiction of separate existence of the Fazal-Karim Defendants would be inequitable because it would sanction fraud and promote injustice to the Debtors and their creditors because Fazal-Karim used Jetcraft Global, Jetcraft Asia, FK Group, and FK Partners to pay kickbacks disguised as off-shore commissions expressly to hide these fraudulent and illicit transactions from the Debtors and other parties.

383.    Specifically, Behrend, Jetcraft's CFO, admitted in an email to Element that Jetcraft ran subagency payments that should have been made by Jetcraft Corp. or Jetcraft Global through subsidiaries, including Jetcraft Asia and FK Group, because of the "confidential and sensitive nature" of the payments. Similarly, Behrend at Fazal-Karim's direction paid the First Kickback from Jetcraft Global's account even though Jetcraft Global was not a party to or involved in the transaction for which the "commission" was purportedly owed to disguise the nature of the First Kickback. Fazal-Karim and Behrend misrepresented the corporate structure (i.e., they made payments from the accounts of Jetcraft Global, FK Group, and Jetcraft Asia rather than the party that purportedly owed the commissions) in bad faith to insulate Jetcraft from potential liability if their scheme was discovered.

384.    Similarly, Fazal-Karim used subsidiaries like Orion and Jetcoast as mere shells or conduits for the business conducted by Jetcraft Corp. and Fazal-Karim. Each of these entities was incorporated under Jetcraft Global rather than Jetcraft Corp. These entities had no apparent capital at all and, at least in the case of Orion, were dissolved. These steps were taken to insulate Jetcraft Corp. and ultimately Fazal-Karim for potential liability, including from the transactions with the Debtors.

385.    Fazal-Karim similarly used FK Group and FK Partners to insulate himself and Jetcraft from potential liability for the Nyota Credit bribe and any future bribes that could have been funneled to Cassidy in the form of credits on the Nyota.

386.    Allowing the Fazal-Karim Defendants to maintain their separate existence in the face of the above acts would promote injustice because it would allow the Fazal-

Karim Defendants to limit their liability solely because Fazal-Karim caused and directed subsidiaries and affiliates to undertake the wrongful acts.

## ALLEGATIONS RELATING TO AGENCY

387.    In addition to Bombardier's direct participation in the bribes, Bombardier is also independently liable for the misconduct of its agent, Fazal-Karim, and the conspiracy between Cassidy, Bombardier, and the Fazal-Karim Defendants.

388.    Fazal-Karim negotiated the combined transactions for Planes 1-6 directly on behalf of Bombardier along with Mattar and Yu in October through December 2015, as described above. Fazal-Karim negotiated the purchase orders for Planes 8 and 9 directly on behalf of Bombardier along with Mattar and Yu. Fazal-Karim also negotiated the Challenger Transactions for Planes 12-15 on behalf of Bombardier along with Mattar and Yu. In addition, Bombardier had a direct financial interest in the sale of Plane 1 because Bombardier sold Plane 1 to Jetcraft and the pricing was structured such that Bombardier would receive a percentage of any return earned by Jetcraft if and when Jetcraft elected to resell the aircraft.

389.    Bombardier and Fazal-Karim, individually, entered into several contracts that ostensibly governed their relationship, including: (i) individual seller-representative agreements that governed commissions; and (ii) a Sales Representative Agreement dated July 1, 2016, effective through June 30, 2018. The circumstances of the Bombardier and Fazal-Karim relationship, coupled with the operation of the agreements as a whole, contradict any boilerplate disclaimers and show that Bombardier and Fazal-Karim understood and agreed that Fazal-Karim was acting and holding himself out as Bombardier's agent.

390.    As seen below, Fazal-Karim, individually and through FK Group, publicly holds himself out as Bombardier's *exclusive representative* for Southeast Asia. Even the address for FK Group's webpage identifies FK Group as Bombardier's representative: http://www.fk-group.net/bombardier-representative. Similar language has been used since

at least 2015. Upon information and belief, Bombardier has been aware of this website since at least 2015.



http://www.fk-group.net/bombardier-representative
(last accessed on August 25, 2019)[29]

391.    On October 22, 2017, in response to discovery requests from Bombardier relating to a pre-petition lawsuit filed by the Debtors, Antonenko sent Bombardier a letter on behalf of Jetcraft and Fazal-Karim that "Mr. Fazal-Karim, individually, represents Bombardier as an authorized representative of Bombardier but not as a 'distributor' . . . Mr. Fazal-Karim did . . . act as the representative for Bombardier in the sale of certain Bombardier aircraft to Zetta Jet. Bombardier is fully aware of the aircraft sold by Bombardier to Zetta Jet for which Mr. Fazal-Karim acted as Bombardier's representative and the compensation paid to Mr. Fazal-Karim relative to such sales." Bombardier did not dispute that Fazal-Karim was its agent.

392.    As important, both Bombardier and Fazal-Karim acted as though Fazal-Karim was an agent of Bombardier. Fazal-Karim was, internally and externally, a critical member of the Bombardier team. For example, Bombardier gave Fazal-Karim sensitive pricing information that Bombardier deems to be trade secret and provided him access to

---

[29] Since the original Complaint was filed, FK Group has removed this page from its website in a failed attempt to disguise the relationship between FK Group, Fazal-Karim, and Bombardier. The page was up at all relevant times from at least 2015 to at least September 10, 2019.

1  Bombardier Business Aircraft's highest executives. Fazal-Karim participated in internal

2  Bombardier strategy decisions, made recommendations to executives, and received and

3  followed directions from executives, including the President of Bombardier Aviation.

4      393.    Further, Bombardier controlled how Fazal-Karim managed customer

5  relationships and marketed Bombardier's planes around the world. Bombardier (i) trained

6  him, (ii) gave him the authority to use Bombardier's trademarks and logos, and (iii) required

7  him to comply with Bombardier policies.

8      394.    Bombardier's agreements with Fazal-Karim treat him as an agent, not an

9  independent contractor, because they give Bombardier the right to control Fazal-Karim's

10  conduct with respect to the sale of aircraft. For example, in the Seller Representative

11  Agreement between BI and Fazal-Karim (which also covered BI's affiliates, including

12  BAC):

13          a.  Bombardier granted Fazal-Karim the right "acquire the right to market and

14              sell" Bombardier aircraft;

15          b.  Bombardier made Fazal-Karim its "PREFERRED sales representative" for

16              the territory;

17          c.  Bombardier required that Fazal-Karim would "comply with Bombardier's

18              Code of Ethics and Business Conduct";

19          d.  Bombardier gave Fazal-Karim the "right to use the trademark, trade name,

20              sign, logo, and symbol 'Bombardier' and any other trademarks, trade names,

21              and service marks owned by Bombardier or its Affiliates";

22          e.  Bombardier required that Fazal-Karim not "make any claim or cause any

23              advertising, invitation, other promotional material or press release to be

24              issued containing information relating to the Aircraft, any other Bombardier

25              goods or services, or [Fazal-Karim's] relationship with Bombardier without

26              the prior written consent of Bombardier";

27          f.  Bombardier required Fazal-Karim to "for a period of five years . . . prepare

28              and maintain accurate records as necessary to document its activities under

this Agreement and to verify that [he] has complied with this Agreement";
and

    g.   Bombardier required that Fazal-Karim grant the "right to access" and to "examine and audit these records and the systems and facilities they are stored in and to interview its employees, managers and agents to verify Compliance."

395.    Bombardier employees, including Mattar and Yu, constantly looked to Fazal-Karim to handle matters on their behalf with the Debtors. Fazal-Karim is copied on most of the e-mails between Cassidy and Bombardier regarding the negotiation of the aircraft the Debtors purchased. Moreover, Bombardier employees worked hand-in-hand with Fazal-Karim as their representative.

396.    For example, Fazal-Karim negotiated the terms of the combined transactions for Planes 1-6 on behalf of Bombardier with Cassidy in November 2015, as discussed further above.

397.    In a December 22, 2015, e-mail regarding the sale of Plane 6, Fazal-Karim characterized himself as Bombardier's agent in a transaction with Cassidy, without contradiction from Bombardier: (i) "I am clearly Bombardier's exclusive representative in Singapore"; (ii) "the plane is delivering this year and we have done our job as Bombardier's rep to push the client to perform to achieve a year end delivery for Bombardier."; and (iii) "Geoffery Cassidy . . . is my client and to whom and with whom I negotiated this transaction for Bombardier."

398.    In July 2016, Fazal-Karim worked with Mattar and Coleal (President of Bombardier Aviation) to manage the Cassidy relationship. In a July 5, 2016, e-mail chain, Fazal-Karim stated, "David, I apologize for bringing you in on the Zetta crisis but only you can make a decision here to maintain a proper relationship with Geoff. Can [Mattar] and I call you now?" Mattar then sent a follow up e-mail later in the day stating, "I would also like to inform you that [Fazal-Karim] and I had a call with [Cassidy], and related all issues discussed . . . ."

399.    Fazal-Karim was paid handsome commissions in his individual capacity in exchange for his services to Bombardier. Fazal-Karim received, at a minimum, commissions of ▉▉▉▉ each on Planes 2-6 and 11, and received or would have received additional commissions of ▉▉▉▉ each on Planes 8 and 9 as well as approximately ▉▉ ▉▉ total on Planes 12-15, although it is not clear if all of those commissions were paid because not all of the Planes were delivered.

## ALLEGATIONS RELATING TO
## ACTUAL INTENT FRAUDULENT TRANSFER

**A. Cassidy operated the Debtors as a fraudulent scheme**

400.    Each of the obligations that Cassidy caused the Debtors to incur and each of the transfers that Cassidy caused the Debtors to make was essential to and in furtherance of Cassidy's fraudulent scheme to enrich himself at the expense of the Debtors and their creditors. Cassidy caused the Debtors to acquire each of the 16 Planes and caused the Debtors to make payments and transfers related to each of the 16 Planes to keep the scheme on-going.

401.    These were not ordinary business transactions separate from or outside of Cassidy's fraudulent scheme. Rather, each transaction and transfer was necessary to the continuance of and perpetuated Cassidy's fraudulent scheme to enrich himself with bribes and kickbacks and to allow him to continue to embezzle millions from the Debtors.

402.    The aircraft acquisitions from Jetcraft and its affiliates and Bombardier both allowed Cassidy to receive kickbacks and bribes, and created a patina of legitimacy to allow Cassidy to continue to grow and operate the Debtors' business.

403.    The repayment of the financing loans kept credit flowing from Li, Minsheng, Element, and other financiers and stabilized the Debtors' fraudulent house of cards.

404.    Cassidy caused the Debtors to incur the obligations and made the transfers with full knowledge that the Debtors' entire business was based on his fraudulent scheme.

405.    By operating the Debtors as a fraudulent scheme, taking commercial bribes and kickbacks, and embezzling millions, Cassidy totally abandoned the Debtors' interests

and acted entirely for his own purpose.

406.    Accordingly, each of the transactions and transfers was made with actual intent to hinder, delay, or defraud the Debtors' then and future creditors.

407.    As part of his overarching fraudulent scheme, Cassidy conducted a Ponzi-like scheme in which he used and attempted to use loans and investments from new financiers to pay off old financiers. One aspect of this scheme was a refinancing by Minsheng that allowed Cassidy to cause the repayment of investments by Li, made through Universal Leader and Glove Assets.

408.    The scheme began in 2015 with Cassidy's preparation of a materially false and misleading "information memorandum" (the "First Business Plan") that promised intentionally overstated profits and returns that Cassidy well knew were not achievable through the Debtor's operations, in order to seek funding from investors, including Li, and to induce various financiers to lend the Debtors significant funds that the Debtors would not be able to repay. After convincing Li to invest significant sums by promising him these outsized and unachievable returns, Cassidy then repaid Li with new funds from the Minsheng and Yuntian entities.

409.    Cassidy caused the First Business Plan to be sent to potential investors and lenders in hallmark Ponzi scheme fashion. In furtherance of his scheme, Cassidy emailed the First Business Plan to Fazal-Karim on September 16, 2015; to Li on October 28, 2015; and to various financiers, including AVIC on September 15, 2015, to Element on January 17, 2016, and to at least three other financiers in September 2015.

410.    The materially false and misleading statements in the First Business Plan, which Cassidy necessarily knew to be false at the time the statements were made, include the following:

      a.   The First Business Plan represents that Zetta PTE had contracted for approximately $75 million of block hours as of September 1, 2015. In fact, Zetta PTE had not contracted for any block hours as of September 1, 2015. Indeed, internal records show that as of August 2017, nearly two years later,

the Debtors had contracted for only $46 million of block hours over the entire life of Zetta PTE.

b. The First Business Plan projects EBITDA of $38.8 million on $85.8 million in revenue with an EBITDA margin of 45.2 percent in FY 2016 and EBITD of $54 million on $116.8 million in revenue with an EBITDA margin of 45.5 percent in FY 2017. Based on publicly available information, the Debtors' more established competitors had EBITDA margins of less than 20 percent. In fact, Zetta PTE's EBITDA margin in FY 2016 was approximately 16 percent.

c. The First Business Plan states that the Debtors were operating five planes as of September 2015 and intended to acquire an additional 5 planes by the end of FY 2017. Cassidy ended up tripling this number and causing the Debtors to enter into agreements to acquire 15 additional planes by the end of FY 2017 (although many of these were not delivered).

d. The First Business Plan projects finance costs of $4.7 million in FY 2016 and $10.1 million in FY 2017, based on average effective interest rates of 5.36 percent per annum. Cassidy caused Zetta PTE to incur total financing costs of $19.8 million in FY 2016 and $59.3 million in FY 2017 (not including commitments of more than $170.1 million in the third and fourth quarters of 2017, which Zetta was unable to meet). Cassidy also caused Zetta PTE to enter into agreements with effective interest rates of 7 percent or more with Jetcraft and Element and 10 percent or more with Li's entities.

e. The First Business Plan projects average charter rates of "about US$12,000 per hour for on-demand services and US$13,800 per hour for blocked hours" and projects that these are "expected to grow at 3% on year-on-year basis." Based on internal records, Zetta PTE only ever signed one contract at or above those rates for blocked hours and averaged approximately $8,500 per hour overall.

f.  The First Business Plan projects costs for FY 2016 to be $46 million. Actual costs for FY 2016 were $70 million (and that does not include the finance lease payments).

411.    In December 2015, Li became an investor in Cassidy's Ponzi-like scheme. By that time, Li had previously purchased a Global 6000 (Plane 7) through his entity Universal Leader in summer 2015 and allowed Zetta PTE to operate it. In December 2015, Zetta PTE entered into finance lease agreements with Glove Assets for Plane 6 and Universal Leader for Plane 7. The agreements contained onerous terms that were extremely unfavorable to the Debtors and their estates. The agreements called for an effective interest rate of 10 percent per year over a 60-month term with a balloon payment of $20 million. The 10 percent interest rate was well above market. The agreements also contained interest prepayment penalties that required the Debtors to pay 50 percent of the remaining interest payments upon an early "purchase" (including a refinancing) of the agreements to Universal Leader and/or Glove Assets. The standard market rate for a prepayment penalty in the aircraft financing industry ranges between 3 and 5 percent.

412.    Cassidy also convinced Li (through his entity TGG) to invest $19 million in exchange for 100,000 shares, or 10%, of Zetta PTE pursuant to a Subscription Agreement dated February 26, 2016. As part of this deal, Li also became a director of Zetta PTE. Li also loaned the Debtors $10 million for one year at 10 percent per annum as part of the same deal. This loan was significantly above market rates, but entirely consistent with Cassidy's 10 percent guarantee.

413.    With Li now a director of Zetta PTE, Cassidy continued his Ponzi-like scheme by repaying Li through a refinancing and new funds obtained from Minsheng (described above). In doing so, Zetta PTE paid Li and his entities a significant above-market return using the new funds from Minsheng to keep the Ponzi-like scheme alive.

414.    In the Minsheng Refinancing, Zetta PTE paid Li and his entities a significant above-market return using new funds from Minsheng to keep the Ponzi-like scheme alive. The structure of the deal proved that getting Li an above-market return was a priority. Of

the $80 million in proceeds, $55 million would go to Universal Leader to cover the full principal balance owed on Plane 7 ($46,949,152.52) plus $8.6 million of a $10.5 million prepayment fee. The $55 million payment generated a 33 percent annualized rate of return on Universal Leader's eight-month loan for Plane 7 (in addition to the $6 million that the Debtors had already paid on Plane 7). They also agreed that an additional $1,941,215.11 of the remaining prepayment fee for Plane 7 would be added to the amount remaining on Plane 6, as an unsecured loan at a 10 percent interest rate.

415.    In connection with this proposed restructure, Li requested that if Zetta PTE was unable to repay its debts as they became due, that Cassidy and Zetta PTE prefer Li over other creditors (in particular, AVIC and Minsheng) and repay him first on the Plane 6 "personal money" unsecured loan. Specifically, on June 28, 2016, Li emailed Cassidy and wrote: "And I know you want to [have Plane 6] under the zettajet company, that means I take higher risk because zettajet have nothing to guarantee, so you should promise if business is not good, repay me first not mengshen and avic, they are company, I am the personal money."

416.    Thus, Cassidy used the new money from the Minsheng Refinancing to pay off his initial investor Li at a 33 percent annualized rate of return, while also promising that Li would continue to receive the guaranteed return of 10 percent per annum on all of the funds he invested.

417.    Li (through his entities) invested or loaned the Debtors more than $150 million, consisting of: (1) $50 million in December 2015 to fund the purchase of Plane 6; (2) what was effectively a $50 million loan to purchase Plane 7 from one of Li's entities; (3) $19 million in February 2016 in exchange for 10% of Zetta PTE; (4) $10 million in February 2016 as part of an above-market loan; (5) $10 million in July 2016 as part of a short-term loan and undisclosed profit-sharing agreement; and (6) $15 million in June 2017 to purchase additional shares as a bridge loan to sustain the company until it could find new investors.

418.    But Li also received at least $79.7 million back on the above-market loans and as part of the Minsheng Refinancing (and he also still had approximately $48.5 million remaining on the unsecured Plane 6 loan and his 25 percent equity stake in Zetta PTE), including (1) $329,000 in interest on the $48 million before it was used to purchase Plane 6; (2) $12 million in "rent" payments on Planes 6 and 7; (3) $2.3 million in above-market interest payments on the loans; (4) $55 million from the Minsheng Refinancing; and (5) $10.1 million in loan payments on the unsecured obligation relating to Plane 6. In short, Cassidy paid Li back more than half of what Li put in at rates in excess of 10 percent per annum and as high as 33 percent per annum.

419.    During the summer of 2017, Cassidy made another run at furthering his Ponzi-like scheme, this time through attempts to induce new investors or financiers to invest in Zetta PTE, in order to allow him to pay off his previous promises of above-market returns.

420.    Much like his earlier steps in furtherance of the scheme, Cassidy again prepared a materially false and misleading information memorandum (the "Second Business Plan") to use in order to entice new investors. Ultimately the document was not finalized because Cassidy was removed from his positions with the Debtors. But the last draft of the Second Business Plan included numerous materially false statements.

421.    The Second Business Plan estimated that the Debtors needed at least $150 million in new investments, including $105 million for aircraft acquisition, $20 million to refinance existing loans, and $25 million for working capital. But Cassidy knew that Zetta needed almost $170 million in the second half of 2017 alone to make required payments on the planes that had not yet been delivered (without taking into account the payments to service the finance leases for planes that had already been delivered).

422.    The Second Business Plan vastly misrepresented the Debtors' revenues. It stated that the Debtors generated revenues of $122 million in 2016 and expected approximately $225 million in 2017. The Debtors generated revenues of $89.8 million in 2016 and $111.6 million in the first three quarters of 2017.

423.    The Second Business Plan also overstated the Debtors EBIT margin by more than double.

424.    The Second Business Plan valued the Debtors' fleet at $406.5 million, which was overstated by at least $100 million to $150 million. For example, Plane 2 was valued at $69.7 million, which is more than $20 million more than the Debtors paid for it and more than $32 million more than it was actually worth when the Debtors acquired it, without taking into account any wear or depreciation in value.

425.    The Second Business Plan asserted that the Debtors were not involved in any pending or threatened legal proceedings, which was false at the time.

426.    Cassidy took other steps in furtherance of his Ponzi-like scheme in addition to drafting the Second Business Plan, including enlisting a French investment bank to try to find new investors. In addition, Cassidy contacted a Chinese private equity and venture capital fund for the same purpose, and began meeting with personnel affiliated with Wu to try to get him to invest. But Cassidy was unable to find any new investors to pay off his existing investors and financiers.

427.    In another Ponzi-like scheme, Cassidy also caused the Debtors to sell "block hours" (pre-paid hours for a jet charter at a fixed price) that he knew the Debtors would never be able to fulfill, as a means of "extracting," in his own words, "immediate cash to pay for obligations," including both legitimate expenses of the Debtors and Cassidy's misappropriations. In fact, customers who purchased block hours lost millions of dollars when the Debtors failed.

428.    The Debtors sold approximately $46 million worth of block hours (not counting the $11 million of block hours in the Falconwing transaction). As of August 2017, those customers had used only $30 million of the block hours and had a balance of at least $16 million ($27 million including the block hours in the Falconwing transaction) that they were unable to use due to the commencement of the chapter 11 cases.

429.    In an August 10, 2017, e-mail to Seagrim and Walter, Cassidy expressly stated that by selling block hours he was "extracting immediate cash to pay for obligations"

while "any downside of the transaction can be realised in years to come when the company is stable."

430.    Similarly, in a September 1, 2016, email to a customer (at approximately the same time that Cassidy had represented to Seagrim and Walter that the Debtors had "breathing room of 1.5 months" and could barely keep off the wolves), Cassidy offered a "prepayment purchase of a bulk block hours" with no time limit for $8,000 per block hour, as long as the customer made a "full prepayment." Cassidy represented to the customer that this was "near the cost of operating the aircraft." In fact, it was significantly below the cost of operating the aircraft after taking into account the financing costs.

**B.    Cassidy believed that the consequences of his actions were substantially certain to hinder, delay, or defraud creditors, and should have seen this result as a natural consequence of his actions**

431.    Because Cassidy was engaged in a commercial bribery and kickback scheme, fraud, misappropriations, and Ponzi-like schemes, he believed at the time of each aircraft transaction that the consequences of his actions were substantially certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen this result as a natural consequence of his actions.

432.    More than that, because the Debtors could not operate profitably or generate sufficient revenues to service the loans on the Planes, Cassidy believed at the time of each aircraft transaction that the consequences of his actions were substantially certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen this result as a natural consequence of his actions.

433.    As set forth below, the Debtors were by Cassidy's own admission made insolvent by the Plane 1 transaction and the subsequent transactions did not improve that position.

434.    In addition, the Debtors' records show that they could not operate the Planes profitably.

435.    In December 2015, while negotiating the financing for Planes 2-5, AVIC was concerned about whether the Debtors were "stable." Cassidy prepared a spreadsheet at

1    AVIC's request to demonstrate the Debtors' "break even" point to service the debt on the

2    new aircraft acquisitions (Planes 1-6 and 7, which the Debtors had been operating but would

3    now own). The spreadsheet showed that the Debtors would need to fly each plane at an

4    average rate of $10,000 per hour. Cassidy asserted this would equal approximately $5,500

5    in "profit per hour," but from context meant EBITDA per hour (i.e., the cash flow available

6    to service the loans). In reality, the Debtors would need to fly each plane at an average rate

7    of approximately $35,100 per hour to break even. The spreadsheet also showed that the

8    Debtors would need to fly each plane for approximately 100 hours per month (and the new

9    Globals (Planes 1-7) for 160 hours per month) at the $10,000 per hour rate.

10        436.    Yet the Debtors' average revenue per hour during the relevant period was

11   less than $8,000 per hour. The EBITDA per hour was less than $2,000 per hour. And the

12   Debtors could not make up the difference on volume (even ignoring the understated break-

13   even price, the logistical difficulties of tripling the number of flight hours per aircraft, and

14   the increased maintenance and down time that would come from additional flights) because

15   the new Globals (some of which would not be delivered for months or years) were flying

16   less than 160 hours per month.

17        437.    In other words, the Debtors could not meet their "break even" numbers—let

18   alone the numbers in the fraudulently inflated First Business Plan—and thus never had a

19   realistic possibility of servicing the loans for the new Planes.

20        438.    Internal records show that it was actually much worse than that, due in part

21   to Cassidy's theft and embezzlement as well as the exorbitant interest penalty he paid Li in

22   the Minsheng Refinancing as part of his Ponzi-like scheme. Internal debtor records show

23   that at the rates Zetta PTE was able to charge, the Debtors were incurring a net *loss* of

24   $874.17 per flight hour for the 15 months ending October 31, 2016 based on Zetta PTE's

25   audited financial statements and a net *loss* of $374.21 per flight hour for the 6 months ending

26   April 30, 2017, based on unaudited financial statements.

27        439.    Similarly, an analysis of the Debtors' combined financials shows that the

28   Debtors' operating income was never sufficient to cover the principal and interest payments

1  on the Planes. Yet the Debtors kept adding more liabilities and obligations despite knowing

2  that their operations would not be sufficient to cover the debt service on those obligations.

3      440.    Even if Cassidy's obvious frauds in 2015 could be attributed to wishful

4  thinking of a start-up entrepreneur, and they cannot, Cassidy knew beyond any doubt in the

5  summer of 2016 that his business plan was a failure and that the Debtors were on the verge

6  of liquidation. As such, Cassidy should have immediately cancelled the hundreds of

7  millions in pending purchase orders with Bombardier (for Planes 3-5 and 8-9) and

8  renegotiated the exorbitantly above-market deals with Li (for Planes 6 and 7) to bring them

9  back to market. Had he done so, the Debtors would have had a fighting chance to survive

10 given the existing fleet (including aircraft inherited from the previously profitable Zetta

11 USA) and more than ▓▓▓▓ in deposits that Bombardier would have been obligated to

12 return to the Debtors.

13     441.    Rather than pursuing this responsible path, Cassidy used his threat to cancel

14 Bombardier orders, not to get a price reduction or other relief from Bombardier, but to get

15 F1 tickets and the promise of Sea-Doos for the yacht he had purchased with embezzled

16 funds. With these commercial bribes in hand, Cassidy moved forward in September 2016

17 to close on one purchase from Bombardier (Plane 3) and two purchases from Jetcraft and

18 Element (Planes 10 and 11), incurring $150 million in debt that Cassidy assuredly knew by

19 then that the Debtors would never be able to repay, while signing new agreements to

20 purchase four additional planes from Bombardier (Planes 12-15). He also rescinded his

21 threat to cancel three additional purchases from Bombardier (including Plane 4, which

22 closed in March 2017). This resulted in present and future revenue for Bombardier of more

23 than ▓▓▓▓ and present and future commissions and other profits of more than ▓

24 ▓▓ for Fazal-Karim. Cassidy also moved forward with the Minsheng Refinancing to

25 pay Li a 33% return on Plane 7.

26     442.    Most importantly from Cassidy's perspective, Cassidy was able to

27 immediately steal $2.6 million from closing proceeds, secure a second $500,000 kickback

28

from Fazal-Karim, and misappropriate another $4.5 million of Zetta funds for the Dragon Pearl, his Singapore condominium, and other personal luxury items.

443.    Aircraft financing debt more than doubled from $200 million to $450 million after the closings in September 2016 and the closing of Plane 4 in March 2017.

444.    Meanwhile, trade creditors were left holding the bag—they were not getting paid the amounts they were owed and the overall amount due to them was exploding. Overdue trade payables leapt from $5 million to over $55 million from September 2016 through commencement of the cases.

445.    Cassidy was able to prioritize the financiers over the trade creditors until February 2017, at which point the overdue payments on the loans also exploded, to more than $20 million by the time of filing.

446.    Cassidy's actions were not the actions of a deluded entrepreneur who hoped the goals of business plan might someday be realized. His actions were those of a thief who knew creditors would suffer from his actions.

447.    Under these circumstances, Cassidy believed at the time of each aircraft transaction that the consequences of his actions were substantially certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen this result as a natural consequence of his actions.

**C.  The Badges of Fraud**

448.    The kickbacks and bribes were not disclosed to the Debtors' other directors whose approval was required to consummate each transaction.

449.    The transactions involving Planes 1-6 were negotiated simultaneously by Cassidy and Fazal-Karim as part of a single purchasing program that involved all or substantially all of the Debtors' assets. The transactions involving Planes 10-11 and 12-15 involved all or substantially all of the Debtors' available cash at the time of each transaction (excepting amounts that Cassidy simply stole from the Debtors at approximately the same time as those transactions).

450.    Cassidy removed assets from the Debtors in the transactions involving Planes 1-6 when he received the First Kickback, in the transactions involving Planes 10-11 when he received the Second Kickback, and in the transactions involving Planes 6-7 and 12-15 as part of the Minsheng Refinancing, which Cassidy engineered in part to steal almost $5 million from the Debtors to purchase the Dragon Pearl yacht and other luxury items.

451.    As described in paragraphs 341-360 and 465-466, the Debtors did not receive reasonably equivalent value in the transactions.

452.    As described below in paragraphs 467-474, the initial payments on Plane 1 alone made the Debtors insolvent. Similarly, the initial payments on Planes 1 and 6 (even after accounting for additional projected revenue), made the Debtors insolvent. Further, as described above in paragraphs 431-447, from an income perspective, each Plane was a net loser for the Debtors at the rates that the Debtors were able to charge.

453.    Each of the transfers to the Defendants described in this Complaint was made shortly before or after the Debtors incurred substantial debt.

454.    Cassidy and Fazal-Karim had a special relationship because they were, at the time of the transactions in question, close associates and friends. Fazal-Karim and Cassidy had a very close association, and as Cassidy indicated in his personal statement Fazal-Karim was involved in "many aspects of the Company." Fazal-Karim essentially became an insider at the Debtor, negotiating on behalf of the Company and profiting off of the Zetta aircraft transactions. The two also initiated a joint venture to purchase and charter a yacht together. They also traveled together and spent time together socially. All of this shows that Fazal-Karim and Cassidy were not mere business associates, but were close associates and friends.

455.    Fazal-Karim indicated on prospect registration forms with Bombardier that had "known Geoff Cassidy for many years when he was operating planes for other clients of mine" and "[m]aintained my relationship with him through his career and founding of Zetta Jet." Emails recovered by the Trustee show that Cassidy knew Fazal-Karim for more than five years before Zetta Pte was founded.

456.    Cassidy and Fazal-Karim were close associates based on Fazal-Karim's involvement in the Debtors' business and operations. In a personal statement Cassidy sent out defending his actions after the Debtor filed for bankruptcy, he asserted that Fazal-Karim was involved in "many aspects of the Company" and credited Fazal-Karim with Zetta "reach[ing] the heights it did."

457.    Fazal-Karim essentially became an insider of the Debtors. Cassidy agreed to purchase the Planes exclusively through Fazal-Karim's company Jetcraft Corp. and its affiliates or from Bombardier with Fazal-Karim acting as Bombardier's agent. Fazal-Karim was deeply involved in the majority of the Debtors' transactions.

458.    For example, Fazal-Karim and Mattar discussed "coach[ing]" Cassidy on his communications with Bombardier executives and Fazal-Karim ghost-wrote (with input from Mattar) draft communications between Cassidy and Bombardier executives, including Bombardier Business Aircraft President Coleal.

459.    Cassidy and Fazal-Karim's close association is further demonstrated by their involvement together in various side businesses and agreements, both before and during Cassidy's time at the Debtors.

460.    For example, in August 2012, Cassidy and Fazal-Karim discussed an agreement in which Asia Aviation and Jetcraft Corp. would co-market an Embraer Legacy 600 and split the profits. Cassidy repeatedly approached Fazal-Karim with various business opportunities over the years.

461.    Cassidy and Fazal-Karim also agreed to purchase and charter the yacht Nyota in 2017. Cassidy and Fazal-Karim agreed to purchase of the yacht Nyota in Cassidy's personal name, separate from the Debtors' business (although they agreed to use the Debtors' contractors and put the yacht on the Debtors' insurance policy without reimbursing the Debtors). The transaction was not disclosed to or agreed to by the Debtors' uninterested directors and management. Cassidy ultimately failed to pay his half of the purchase price, but both men were deeply involved in the purchase and outfitting of the yacht.

462.    Fazal-Karim and Cassidy were also friends. For example, Fazal-Karim and Cassidy planned and went on various social trips together with other friend and family members, including going to Miami to "party" and going to Las Vegas to see a Connor McGregor fight.

463.    Because Fazal-Karim is the alter ego of Jetcraft Corp. and the other Fazal-Karim Defendants, his special relationship with Cassidy also applies to them.

464.    Because Fazal-Karim was acting as Bombardier's agent in each of the transactions, his special relationship with Cassidy also applies to Bombardier.

## ALLEGATIONS RELATING TO
## CONSTRUCTIVE FRAUDULENT TRANSFER

### A.  The Debtors did not receive reasonably equivalent value in the Transactions

465.    Under a variety of different analyses, including both the Fair Market Value and the Estate Value, the Debtors did not receive reasonably equivalent value for the Planes.

466.    As discussed in paragraphs 341-344 above, an analysis of the Fair Market Value of each Plane reveals that the Planes were significantly overpriced. Similarly, as discussed in paragraph 345 above, an analysis of the Estate Value of each Plane reveals that the Planes were significantly overpriced.

### B.  The Debtors were insolvent at the time of or were made insolvent by each Transaction

467.    The Debtors were insolvent almost from the inception of Zetta PTE in July 2015.

468.    Each of the aircraft transactions either made the Debtors insolvent or occurred when the Debtors were already insolvent.

469.    Cassidy repeatedly emailed Seagrim and Walter that Zetta would be insolvent based on the aircraft purchases.

470.    Cassidy e-mailed Seagrim and Walter a "Zetta Jet Overview" as of December 2, 2015, that showed that Zetta PTE would be more than $1.6 million in the red based on the closing of Plane 1—*without* considering the acquisitions of Planes 2-7. The

document also shows that a portion of the funds that Zetta PTE planned to use to pay the deposit on Plane 1 came from Zetta USA.

471.    Cassidy e-mailed Seagrim and Walter an updated "Zetta Jet Overview" as of December 8, 2015, that showed that Zetta PTE would still be more than $1.2 million in the red after the closing of Planes 1 and 6—again, *without* considering any of the other acquisitions. The document again shows that a portion of the funds that Zetta PTE planned to use to pay the deposit on Plane 1 came from Zetta USA.

472.    As of December 31, 2015, the Debtors' consolidated balance sheet, at fair value, after giving effect to the closings on Planes 1, 6, and 7, indicated assets of $114 million and liabilities of $140 million, thus showing a net deficit of $36 million.

473.    In June 2016, Cassidy emailed Seagrim and Walter in connection with the refinancing of Planes 6 and 7 that they needed to approve the deal because the Debtors only had "breathing room of 1.5 months." Despite that knowledge, Cassidy stole millions of dollars from the proceeds of the refinancing.

474.    Using the valuations of the planes developed by expert analysis discussed above at paragraphs 341-345, Zetta PTE was balance sheet insolvent from December 2015 to the time of filing as well as at the time that each of the transactions closed.

**C.    The Debtors had unreasonably small capital**

475.    To the extent that the Debtors were technically solvent at any point after December 1, 2015, they were just barely so and left in a condition in which bankruptcy was substantially likely because at most, they only had capital sufficient to fund the small initial deposits on the Planes, and the Debtors even stopped providing those initial down payments.

476.    Any funds that came in from operations, investments from Li, or the Minsheng Refinancing were either stolen by Cassidy or used to incur additional debt rather than pay down the existing Planes or the Debtors' other creditors.

**D.    The Debtors incurred debts that they knew they could not pay as they came due**

477. Cassidy knew at the time that he closed on each of the Planes and incurred the related obligations that the Debtors likely would not be able to pay their current and subsequent creditors as their claims matured.

478. At the time that Cassidy caused the Debtors to enter into and close on each of the transactions, Cassidy planned to take kickbacks and bribes and to embezzle millions from the Debtors. Cassidy knew that his operation of the Debtors as a fraudulent scheme would result in the Debtors' failure, and that the Debtors' current and subsequent creditors likely would not be paid.

479. But even setting aside Cassidy's fraud, when the first transactions closed in December 2015, the Debtors were already behind on their bills and balance sheet insolvent.

480. The other metrics similarly showed an inability to pay debts as they came due. As discussed above, the Debtors were not able to charge rates high enough to reach their self-described "break even" point and the Debtors were operating the aircraft at a net loss per flight hour. Adding additional planes and flying more hours thus worsened rather than improved their position.

481. Similarly, as discussed above, the Debtors were never able to generate sufficient operating income to service their debt.

482. Cassidy's only plan to pay current and subsequent creditors was by convincing new investors or financiers to provide funds based on fraudulent business plans and above-market returns. Yet even after they received investments from Li or new financing such as in the Minsheng Refinancing, the Debtors remained insolvent and remained behind on their bills. Cassidy never had any plan or intention to pay the debts that the Debtors incurred with legitimate funds, nor could he because the Debtors were never able to generate sufficient revenue to pay down their debts.

483. The Debtors' overdue trade payables confirms that Cassidy had no plan or ability to pay debts as they came due. Because Cassidy had to prioritize debt service over all other obligations, to keep the scheme from collapsing, the Debtors' overdue trade

payables exploded, from approximately $1.6 million in December 2015 to almost $55 million when the Debtors filed for bankruptcy.

484.    All of the above confirms that Cassidy had no plan or intention for the Debtors to pay their debts as they came due.

## ALLEGATIONS RELATING TO PREFERENCE TRANSFERS

485.    The Trustee is entitled to and seeks to avoid preference transfers made to BAC and Learjet during the 90 days prior to the Petition Date (the "Preference Period").

486.    During the Preference Period, the Debtors are presumed to be insolvent under 11 U.S.C. § 547(f), and in fact were insolvent.

**A.  The Promissory Note Preference Transfer**

487.    On December 10, 2015, Zetta PTE and BAC entered into an aircraft purchase agreement for Plane 4.

488.    In connection with the purchase of Plane 4, Zetta PTE and BAC entered into a promissory note dated March 28, 2017 (the "Promissory Note"). A copy of the Promissory Note is attached as Exhibit 13. ████████████████████████████████

████████████████████████████████

489.    Zetta PTE made a transfer of $3,262,834 to BAC on June 27, 2017, 80 days before the Petition Date, to satisfy the antecedent debt on the Promissory Note (the "Promissory Note Payment").

490.    Based on the Promissory Note, BAC was unsecured.

491.    The transfer allowed BAC to receive more than it would have in this Chapter 7 proceeding.

492.    The Debtors were insolvent at the time of the transfer.

**B.  The Settlement Agreement Preference Transfer**

493.    Following the delivery of Plane 12, the Debtors alleged that Plane 12 suffered from various technical issues, and a dispute (the "Dispute") arose between the Debtors and Bombardier regarding Plane 12's technical issues and the operating costs to be

paid to Zetta PTE under a time sharing agreement between Global Flight, Inc. ("Global Flight"), an affiliate of BI, and Zetta USA, whereby Global Flight agreed to lease Plane 12 and its flight crew from Zetta USA on a time sharing basis.

494.    In addition, the Debtors obtained repair and maintenance work at BAC service centers and had an outstanding balance, which Bombardier alleged it was owed (the "Bombardier Claim").

495.    On June 21, 2017, the Debtors, BI, and BAC entered into a settlement agreement (the "Settlement Agreement"), under which the parties resolved the Dispute and the Bombardier Claim. A copy of the Settlement Agreement is attached as Exhibit 14. Under the Settlement Agreement, the Debtors were required to pay BI and BAC ███████ on or before June 30, 2017.

496.    Zetta PTE made a transfer of ██████ to Learjet for the benefit of BI and BAC on July 3, 2017, 74 days before the Petition Date, in payment of the antecedent debt regarding the Dispute that was resolved under the Settlement Agreement (the "Settlement Agreement Payment").

497.    Based on the Settlement Agreement, Learjet, BI, and BAC were unsecured.

498.    The transfer allowed Learjet, BI, and BAC to receive more than they would have in this Chapter 7 proceeding.

499.    The Debtors were insolvent at the time of the transfer.

## ALLEGATIONS RELATING TO STAY VIOLATIONS

500.    The Trustee also brings claims against BAC for violations of the automatic stay under 11 U.S.C. § 362.

501.    BAC violated and continues to violate the automatic stay under 11 U.S.C. § 362 because it refused to pay amounts due under charter agreements and impermissibly set off debts.

502.    Zetta PTE and BAC (together, the "Charter Parties") are party to a series of 15 agreements through which Zetta PTE would provide charter services on its aircraft to

BAC (the "Charter Agreements"). The Charter Agreements were entered into between January 17, 2017, and September 5, 2017. BAC owes Zetta PTE $2,360,190 for unpaid charter services under the Charter Agreements (the "Bombardier Debts").

503.    The Bombardier Debts were immediately due and payable, with past due interest, and were not subject to setoff or deduction. Paragraph 5(a) of the Zetta Terms and Conditions attached to the Charter Agreements provides that:

> [a]ll payments due to Zetta Jet [PTE] shall, unless otherwise agreed by Zetta Jet [PTE], be paid by the client in the manner agreed and/or stated on the invoice on its issuance (the "Payment Deadline"), **without setoff or deduction. Time of payment of the Charter Price is of the essence.**

(emphasis added). Further, in paragraph 5(b) of the Charter Agreement, "[a]ll outstanding payments due to Zetta Jet [PTE] shall be subject to interest at 10% per annum from the date due until Payment to Zetta Jet [PTE]." The contract is fully integrated and cannot be modified unless made in writing and signed by both parties. No other agreement, much less an agreement made in writing signed by both Charter Parties, alters the Charter Parties' obligations discussed above.

504.    Upon information and belief, BAC exercised an impermissible setoff of the Bombardier Debts against amounts owed to it by the Debtors (the "Bombardier Setoff") on September 7, 2017, eight days before the Petition Date. There is no writing signed by both parties permitting a deviation from the express terms of the Charter Agreements/Zetta Terms and Conditions prohibiting setoff. Therefore, BAC's impermissible setoff constitutes a recoverable preferential transfer of the Debtors' property within the 90-day period immediately prior to the Petition Date.

505.    Subsequent to the Petition Date, prior to learning of BAC's impermissible Setoff of the Bombardier Debt, the Trustee, through his counsel, demanded that BAC remit the Bombardier Debt to the Debtors' estates. Thereafter, BAC informed the Trustee that it exercised the Setoff of the Bombardier Debt against amounts owed to it by Zetta PTE, despite the fact that the Charter Agreements and related documents prohibited any setoff absent a writing executed by both Bombardier and Zetta PTE. BAC has failed to produce

any such writing (other than furnishing the existing Smart Parts Agreements, which are inapplicable). BAC's impermissible Setoff and continued refusal to turn over the Bombardier Debt to Zetta PTE's estates constitutes a continuing, ongoing violation of the automatic stay.

506.    In addition, the Charter Parties are party to a series of executory contracts, one of which requires BAC to provide services related to existing warranties on aircraft (the "Warranty Contract"). The second bundle of contracts are a series of Bombardier Smart Parts Preferred Agreements, which have varying terms, the longest extending through 2022 (the "Smart Parts Contract," and together with the Warranty Contract, the "Service Agreements"). The Service Agreements are executory contracts under 11 U.S.C. § 365 because performance remains outstanding by each of the Charter Parties.

507.    Zetta USA (through its predecessor AAM), as lessee, and Scout Aviation II, LLC ("Scout"), as lessor, are party to an Exclusive Aircraft Lease Agreement, dated October 7, 2014 (as amended, the "Scout Aircraft Lease") for the lease of a Bombardier Global Express BD-700-1A10 aircraft (the "Scout Aircraft"). The Scout Aircraft was in BAC's possession as of December 5, 2017. Prior to the Petition Date, BAC was performing "spot work" on the Scout Aircraft under the Smart Parts Contract. BAC ceased work on the Scout Aircraft prior to the Petition Date and refused to recommence work on the Scout Aircraft during the Chapter 11 Cases. BAC asserted a perfected lien against the Scout Aircraft under A.R.S. § 33-1022(A) and attempted to provide notice of such alleged lien pursuant to 11 U.S.C. § 546(b). The Debtors and Scout disputed the validity of BAC's lien.

508.    BAC refused to perform under the Smart Parts Agreement with respect to the Aircraft. As Zetta USA was the lessor under the Aircraft Lease prior to its rejection, its leasehold interest in the Aircraft was property of its bankruptcy estate under 11 U.S.C. § 541. Further, the Smart Parts Agreement was an executory contract and BAC was required to perform under such agreement during the Chapter 11 Cases. BAC's refusal to perform under the Smart Parts Agreement violated the automatic stay and constituted an unlawful interference with Zetta USA's leasehold interests under the Aircraft Lease.

1

### ALLEGATIONS RELATING TO
### CHOICE OF LAW

2    509.    The choice-of-law provisions in the relevant agreements do not affect the

3    Trustee's claims for three separate and independent reasons.

4    **A.  The Trustee is not bound by the choice-of-law provisions**

5    510.    The Trustee is not bound by the choice-of-law provisions in the agreements

6    because the agreements were part of actual or constructively fraudulent transfers or

7    obligations.

8    511.    The parties to a contractual conveyance or transaction subject to avoidance

9    cannot in their contract make a choice of law that binds the Trustee and creditors who allege

10    they were defrauded by, or could otherwise avoid, the conveyance. *See, e.g., In re Morse*

11    *Tool*, 108 B.R. 384, 386 (Bankr. D. Mass. 1989); *In re EPD Inv. Co., LLC*, 821 F.3d 1146,

12    11511152 (9th Cir. 2016).

13    512.    Choice-of-law provisions cannot bind non-parties to an agreement unless the

14    non-parties are third-party beneficiaries of the agreement.

15    513.    For the purpose of the Trustee's claims under 11 U.S.C. §§ 542, 547 and

16    548, the Trustee stands in the shoes of the creditors, not the Debtors. *In re EPD Inv. Co.,*

17    *LLC*, No. CV 13-08768 SJO, 2014 WL 12597148, at *4 (C.D. Cal. Aug. 29, 2014), *aff'd*,

18    821 F.3d 1146 (9th Cir. 2016).

19    514.    The Trustee was thus not a party to the relevant agreements.

20    515.    The Trustee was not a third-party beneficiary of the relevant agreements.

21    516.    The innocent creditors were not parties to the relevant agreements.

22    517.    The innocent creditors were not third-party beneficiaries of the relevant

23    agreements.

24    518.    The Trustee alleges in Counts 8-17, 21-22, and 31-32 that the estates were

25    actually or constructively defrauded by the conveyances and obligations at issue in the

26    contracts. Specifically, the Trustee asserts that each of the transfers made and obligations

27    incurred was actually or constructively fraudulent.

28

519.    More to the point, in addition to being actually and constructively fraudulent transfers or obligations, the agreements were fraudulent because Cassidy caused the Debtors to enter into the agreements in exchange for kickbacks and bribes, as part of his Ponzi-like schemes, and to misappropriate funds from the Debtors (including without limitation in the Minsheng Refinancing).

520.    Accordingly, the choice-of-law provisions in the agreements do not bind the Trustee or the creditors on whose behalf the Trustee is proceeding.

**B.  The choice-of-law provisions are ineffective under the relevant choice-of-law rules.**

521.    Bankruptcy courts apply federal choice-of-law rules. Federal courts apply the Restatement (Second) of Conflicts of Laws. Restatement § 6(1) provides that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." Restatement § 6(1) "applies to choice of law clauses in a contract when a state has a statutory directive concerning such clauses." *In re Gibson*, 234 B.R. 776, 779-80 (Bankr. N.D. Cal. 1999). Restatement § 187 "is intended to apply only when there is no such statutory directive." *Id.*

522.    California Commercial Code § 1301 is a statutory directive under Restatement § 6(1).

523.    The choice-of-law provisions in the CAVIC Finance Leases, the Minsheng Finance Leases, and the Plane 12 Finance Lease selecting English law are not effective under Section 1301 because the transactions at issue do not have a "reasonable relation" to England.

524.    None of the parties to the CAVIC Finance Leases, the Minsheng Finance Leases, the Plane 12 Finance Lease, the Minsheng Refinancing, or the Plane 2, 3, 4, or 12 transactions resides in England, is incorporated or organized under English law, or has its principal place of business in England.

    a.  Wells Fargo is organized under Utah law and its registered office and principal place of business are in Utah.

b.   TVPX is organized under Wyoming law and its registered office and
     principal place of business are in Wyoming.

c.   Zetta Pte is organized under Singapore law and its registered office and
     principal place of business are in Singapore.

d.   Zetta USA is organized under California law and its registered office and
     principal place of business are in California.

e.   The Zetta BVI Subsidiaries are organized under BVI law and their
     registered offices are in BVI, while their principal place of business is in
     Singapore.

f.   Glove Assets is organized under BVI law and its registered offices are in
     BVI, while its principal place of business is in Hong Kong.

g.   EDC is a Canadian state-owned entity with its principal place of business
     in Canada.

h.   BAC is organized under Delaware law and has its registered office and
     principal place of business in Texas.

i.   BI is organized under Canadian law and has its registered office and
     principal place of business in Canada.

j.   AVIC is organized under Chinese law and has its registered office and
     principal place of business in China.

k.   CAVIC is organized under Irish law and has its registered office and
     principal place of business in Ireland.

l.   The CAVIC Statutory Trusts are organized under Delaware and Wyoming
     law, and have their registered offices and principal places of business in
     Delaware and Wyoming.

525.   The place of payment was not in England. For Planes 2-5 and 12-15, the
place of payments to BAC was Texas, while the place of payments to CAVIC and the
Yuntian Entities was in Ireland. For Planes 6 and 7, the place of payment for the aircraft

1    payments was in New York, while the place of payment for the rent payments was in Hong

2    Kong.

3        526.    The denomination of all payments was in US dollars, not pounds sterling.

4        527.    The Planes were not located in England at the time of closing. All of the

5    Planes were located within the US at the time of closing. Planes 2, 3, 4, 6, and 12 were

6    located at Windsor Locks, Connecticut. Upon information and belief, Plane 7 was located

7    at Hartford, Connecticut.

8        528.    The parties were not located in England at the time of execution of the

9    contracts. Bank of Utah and Wells executed in Utah, TVPX in Wyoming, Zetta PTE and

10    the Zetta BVI entities in Singapore, Zetta USA in California, CAVIC and Glove Assets in

11    China, and BAC in Texas.

12        529.    In short, there is no connection whatsoever between the CAVIC Finance

13    Leases, the Minsheng Finance Leases, the Plane 12 Finance Lease, the Minsheng

14    Refinancing, or the Plane 2, 3, 4, or 12 transactions and England.

15        530.    The choice-of-law provisions in the APAs for Planes 2-6 and 12-15 selecting

16    New York law similarly are not effective under Section 1301 because the APAs at issue do

17    not have a "reasonable relation" to New York.

18        531.    Neither Zetta PTE nor BAC (the only parties to the APAs) resides in New

19    York, is incorporated or organized under New York law, or has its principal place of

20    business in New York.

21        532.    The place of payment under the APAs for Planes 2-6 and 12-15 was

22    Bombardier's Bank of America account in Texas.

23        533.    Each of the APAs contemplates delivery of the Planes in Windsor Locks,

24    Connecticut.

25        534.    The parties were not located in New York at the time of execution of the

26    contracts. The letters of intent were executed in Las Vegas for Planes 2-6. The APAs for

27    Planes 2-6 were executed in Texas by BAC and in Singapore by Zetta PTE. The APAs for

28    Planes 12-15 were executed in Orlando.

535.    In short, there is no connection whatsoever between the APAs for Planes 2-6 and 12-15 and New York.

536.    In the absence of an effective choice of law provision, Section 1301 requires the application of California law if the transaction has an "appropriate relation" to California.

537.    The transaction has an "appropriate relation" to California. As noted above, Zetta USA is organized under California law and has its registered office and principal place of business in California. Zetta USA executed all of the agreements in California, and Seagrim and Walter executed the directors' resolutions regarding Zetta PTE's involvement in the transactions in California. One of the two directors of each of the Zetta BVI Trusts was in California. All of the planes were ultimately based in California.

538.    Accordingly, California law applies to all of the Trustee's claims.[30]

539.    The Cape Town Convention on International Interests in Mobile Equipment (the "Cape Town Convention") and the Protocol to the Convention on International Interests in Mobile Equipment on matters specific to aircraft equipment (the "Aircraft Protocol" and, along with the Cape Town Convention, the "Cape Town Treaty") do not apply to the Trustee's claims.

540.    Article VIII of the Aircraft Protocol only allows "parties to an agreement" to "agree on the law which is to govern their contractual rights and obligations[.]" (Official Comment 5.42.) Therefore, "[p]arty choice is limited to contractual rights and obligations. Proprietary rights prospectively affect third parties and rights of creditors on the debtor's insolvency, and are outside the scope of [Article VIII]." (Official Comment 5.42.)

541.    Under Article VIII, the choice of law applies only to "their" (meaning the parties') contractual rights and obligations, not third parties' rights and obligations.

---

[30] The Fazal-Karim Defendants have already conceded that California law applies to the Trustee's claims and the Court has ruled that they are "estopped from arguing that any other jurisdiction's law applies." (Dkt. No. 107, at 4 n.3.)

542.    Neither the Trustee nor the innocent creditors were parties to the relevant agreements.

543.    Further, contractual rights and obligations do not include proprietary rights, including whether an agreement creates a security interest or a lessor-lessee relationship.

544.    The Trustee's claims are about proprietary rights and obligations, not contractual rights and obligations.

**C.    English law supports the Trustee**

545.    Under English law, the transactions would be characterized as finance leases, not operating leases.

546.    English law distinguishes between finance leases and operating leases. A finance lease is a lease that is a form of financing and which transfers substantially all the risks and rewards of ownership of an asset to the lessee, whereas an operating lease is one in which the lessor retains the risks and rewards of ownership.

547.    Further, a finance lease involves payment by a lessee to a lessor of the full cost of the asset together with a return on the finance provided by the lessor. The lessee also is required to capitalize a finance lease on its accounts and would usually treat its liability under a finance lease as "financial indebtedness" for the purposes of compliance with borrowing covenants or limits and in determining compliance with general banking covenants (such as leverage and gearing ratios). ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ █████████████████████

548.    Here, the Plane 2, 3, and 4 Lease Agreements would be treated as finance leases under English law because the finance leases transferred all of the risks and rewards of ownership to the Debtors. ███████████████████████████████ ████████████████████████████████████████ The Debtors were obligated to make the payments for the entire term of the finance leases. At the end of the

1  lease term, ███████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████    The term of the subject leases (7 years) are consistent with them

6  being finance leases only (being typically financing terms of 5-10 years). Operating leases

7  are typically 2-4 years in duration, with no up-front capital payment, no purchase option ██

8  ████████████████████ and with the lessor taking the risk and reward with respect to the residual

9  value of the aircraft at the end of the lease term.

10      549.    The Defendants retained none of the risks or rewards of ownership. Instead,

11  they would receive the principal and interest payments from the Debtors and thus bore no

12  risk of unprofitable operation of the planes. Similarly, the Defendants would not share in

13  the gains from the profitable operation of the planes and because they had no reversionary

14  interest, they also would not share in any appreciation in value or residual value at the end

15  of the lease term. ████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████ Such a rent

19  payment structure represents a typical finance lease payment structure. Operating lease

20  structures do not (typically) have any concept of actual or notional principal outstanding

21  under the lease.

22      550.    In addition, the loan amounts were recorded on the Debtors' books and

23  records as loans to Zetta PTE and the planes were carried as assets on the Debtors'

24  consolidated balance sheet. Upon information and belief, the Defendants likewise listed the

25  loan amounts as loans on their books and records and likewise did not carry the planes as

26  assets on their balance sheets.

27      551.    Thus, under English law, the finance leases would be treated as a finance

28  lease, that is, a form of financial indebtedness, and not an operating lease. Significantly,

because English law treats finance leases as a form of financial indebtedness, these types of agreements are subject to equitable relief and statutory powers in English insolvency proceedings and thus do not need to be recharacterized. Instead, English law simply acknowledges that they are financings rather than operating leases.

**D.  Singapore law also supports the Trustee**

552.    The 2015 Plane 6 Finance Lease includes a Singapore choice-of-law provision.

553.    Singapore law also recognizes the distinction between finance leases and operating leases. For example, Section 10D of the Income Tax Act defines finance lease as "a lease of any machinery or plant (including any arrangement or agreement in connection with the lease) which has the effect of transferring substantially the obsolescence, risks or rewards incidental to ownership of such machinery or plant to the lessee" and operating lease as "the leasing of any machinery or plant, other than finance leasing."

554.    Under Singapore law, the Court should look objectively at the obligations entered into by the parties, to determine whether "the lessee has substantially all the risks and rewards associated with the ownership of the asset, other than the legal title." If so, the obligation is a finance lease under Singapore law.

555.    For the same reasons set forth in the preceding section with respect to English law, the 2015 Plane 6 Finance Lease would be considered a finance lease, and thus a form of financial indebtedness rather than an operating lease. Accordingly, the 2015 Plane 6 Finance Lease is a financing rather than a true lease or operating lease under Singapore law.


**CLAIMS**

**COUNT 1**
**Against the Fazal-Karim Defendants and Bombardier**
**Aiding and Abetting Breach of Fiduciary Duty**

556.    The Trustee re-alleges all paragraphs above.

557.    Cassidy, as a director and officer, owed fiduciary duties of care, loyalty, and good faith to the Debtors.

558.    By taking the kickbacks and bribes in exchange for inducing the Debtors to purchase the Planes, Cassidy violated his fiduciary duties to the Debtors by knowingly acting against their interests.

559.    Fazal-Karim, Jetcraft Corp., Jetcoast, Jetcraft Global, Orion, and Bombardier aided and abetted Cassidy's breaches of fiduciary duty and corrupted the fiduciary relationship between Cassidy and the Debtors by directing Jetcraft Global to pay the Kickbacks in transactions involving Jetcraft Corp., Jetcoast, Jetcraft Global, Orion, and Bombardier.

560.    Bombardier aided and abetted Cassidy's breaches of fiduciary duty and corrupted the fiduciary relationship between Cassidy and the Debtors by giving Cassidy the F1 tickets and offering Cassidy the Sea-Doos as part of a quid pro quo to ensure Cassidy would take delivery of the Planes rather than cancel the transactions, as well as cause the Debtors to enter into additional transactions.

561.    Fazal-Karim and FK Partners aided and abetted Cassidy's breaches of fiduciary duty and corrupted the fiduciary relationship between Cassidy and the Debtors by giving Cassidy a credit on the amounts that he personally owed on the Nyota as part of a quid pro quo to ensure Cassidy would take delivery of the Planes rather than cancel the transactions, as well as cause the Debtors to enter into additional transactions.

562.    Cassidy further breached his fiduciary duties to the Debtors by personally entering into a deal to purchase and operate the Nyota with Fazal-Karim, FK Group, and FK Partners, while simultaneously using the Debtors' resources for the venture, including the Debtors' insurance policies and personnel.

563.    Fazal-Karim, FK Group, and FK Partners aided and abetted Cassidy's breaches of fiduciary duties by entering into the Nyota deal with Cassidy personally while simultaneously knowing that Cassidy was using the Debtors' resources for the venture.

564.    Fazal-Karim individually and each of the other Fazal-Karim Defendants, through Fazal-Karim, and Bombardier, through Fazal-Karim as its agent as well as Yu and Mattar, were aware of Cassidy's breaches of his fiduciary duties because they paid or agreed to pay Cassidy commercial bribes and kickbacks in exchange for his agreement to purchase planes and his agreement not to cancel existing contracts and deliveries.

565.    Fazal-Karim individually and each of the other Fazal-Karim Defendants, through Fazal-Karim, and Bombardier, through Fazal-Karim as its agent as well as Yu and Mattar, had the specific intent to facilitate Cassidy's wrongful conduct because they paid or agreed to pay Cassidy commercial bribes and kickbacks in exchange for his agreement to purchase planes and his agreement not to cancel existing contracts and deliveries.

566.    Fazal-Karim individually and each of the other Fazal-Karim Defendants, through Fazal-Karim, and Bombardier, through Fazal-Karim as its agent as well as Yu and Mattar, provided substantial assistance and encouragement to Cassidy's breaches of fiduciary duty because they paid or agreed to pay Cassidy commercial bribes and kickbacks in exchange for his agreement to purchase planes and his agreement not to cancel existing contracts and deliveries.

567.    The conduct of Fazal-Karim individually and each of the other Fazal-Karim Defendants, through Fazal-Karim, and Bombardier, through Fazal-Karim as its agent as well as Yu and Mattar, was a substantial factor in causing harm to the Debtors because they paid or agreed to pay Cassidy commercial bribes and kickbacks in exchange for his agreement to purchase planes and his agreement not to cancel existing contracts and deliveries.

568.    As a direct and proximate result of the Defendants' conduct, the Debtors were damaged in an amount to be proven at trial, but at a minimum equal to the amount of the kickbacks and bribes.

569.    In addition to the amount of the kickbacks and bribes, the Debtors were further damaged by the difference between the amount that the Debtors paid for the Planes and the amounts the Planes were actually worth.

570.    In the alternative to damages, the Trustee is entitled to and seeks restitution of the profits that the kickbacks and bribes yielded to the Defendants, in an amount at least equal to the amount of the kickbacks and bribes, plus the revenue that the kickbacks and bribes generated for the Defendants, minus the cost of goods sold and other variable costs incurred in making the relevant sales.

571.    In addition to direct liability for their participation in aiding and abetting Cassidy's breaches of fiduciary duty, the Fazal-Karim Defendants are also liable because they are alter egos of Fazal-Karim and each other as set forth in paragraphs 368-386 above.

572.    In addition to direct liability for their participation in aiding and abetting Cassidy's breaches of fiduciary duty, BI and BAC are also liable for the actions of Fazal-Karim, who was their agent as set forth in paragraphs 387-399 above.

**COUNT 2**
**Against the Fazal-Karim Defendants and Bombardier**
**Civil Conspiracy**

573.    The Trustee re-alleges all paragraphs above.

574.    The Defendants each had a role in a common plan to pay Cassidy bribes and kickbacks to induce Cassidy to cause the Debtors to purchase aircraft from Jetcraft and Bombardier, to defraud the Debtors by misrepresenting and omitting the existence of and true nature of the bribes and kickbacks, to aid and abet Cassidy's breach of fiduciary duties owed to the Debtors, and to commit other tortious acts, as set forth in Counts 1, 3-7, and 26-29.

575.    The Fazal-Karim Defendants agreed to pay Cassidy kickbacks in exchange for his purchase of aircraft from Jetcraft and Bombardier. Fazal-Karim and the Fazal-Karim Defendants received millions of dollars as a result of their participation in the conspiracy.

576.    Bombardier agreed to participate in the conspiracy through its agent Fazal-Karim. Bombardier also agreed to pay Cassidy bribes directly so that he would continue to purchase and take delivery of Bombardier aircraft and not cancel existing APAs. Bombardier received millions of dollars in payments directly from the Debtors and

indirectly from the proceeds of the loans that Cassidy procured to purchase the Bombardier aircraft as a result of its participation in the conspiracy.

577.    When they agreed to participate in the conspiracy, each of the Defendants had actual or constructive knowledge of Fazal-Karim's and Bombardier's agreements to pay kickbacks and bribes to Cassidy.

578.    In exchange for the kickbacks and bribes, Cassidy agreed to enter into transactions on behalf of the Debtors to purchase aircraft from Jetcraft and Bombardier.

579.    Each of the Defendants committed one or more overt acts in furtherance of the conspiracy by directly or indirectly paying the kickbacks and bribes and entering into the purchase and financing agreements for the aircraft.

580.    As a direct and proximate result of the Defendants' conduct, the Debtors were damaged in an amount to be proven at trial, but at a minimum equal to the amount of the kickbacks and bribes.

581.    In addition to the amount of the kickbacks and bribes, the Debtors were further damaged by the difference between the amount that the Debtors paid for the Planes and the amounts the Planes were actually worth.

582.    In the alternative to damages, the Trustee is entitled to and seeks restitution of the profits that the kickbacks and bribes yielded to the Defendants, in an amount at least equal to the amount of the kickbacks and bribes, plus the revenue that the kickbacks and bribes generated for the Defendants, minus the cost of goods sold and other variable costs incurred in making the relevant sales.

**COUNT 3**
**Against the Fazal-Karim Defendants and Bombardier**
**Cal. Bus. & Prof. Code § 17200 and Cal. Penal Code § 641.3**

583.    The Trustee re-alleges all paragraphs above.

584.    Under the California Business & Professions Code §17200, businesses are not permitted to engage in "any unlawful, unfair or fraudulent business act or practice."

585.    The Defendants have each engaged in unlawful business acts practices in violation of Cal. Penal Code § 641.3 and § 182(a)(1, 4).

586.    Cal. Penal Code § 641.3(a, b) provides: "Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery. This section does not apply where the amount of money or monetary worth of the thing of value is two hundred fifty dollars ($250) or less."

587.    Fazal-Karim directed Jetcraft Corp.'s CFO to pay Cassidy the First and Second Kickbacks from Jetcraft Global and also gave Cassidy the Nyota Credit (through FK Partners) in return for Cassidy using his position to cause the Debtors to enter into the transactions described above and to accept delivery of the Planes.

588.    Bombardier gave Cassidy things of value, including the F1 Tickets, and offered Cassidy things of value, including the Sea-Doos, in return for Cassidy using his position to cause the Debtors to enter into the transactions described above and to accept delivery of the Planes.

589.    Jetcraft Global at the direction of Fazal-Karim gave Cassidy the First and Second Kickbacks and FK Partners at the direction of Fazal-Karim gave Cassidy the Nyota Credit in return for Cassidy using his position to cause the Debtors to enter into the transactions described above and to accept delivery of the Planes.

590.    The monetary worth of the First and Second Kickbacks, the Nyota Credit, the F1 Tickets, and the Sea-Doos, separately or in aggregate, is more than $250.

591.    Cal. Penal Code § 182(a)(1, 4) makes it illegal for two or more persons to "conspire . . . to commit any crime" or "[t]o cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform those promises."

116

592. Fazal-Karim, Jetcraft Corp., Jetcoast, Jetcraft Global, Orion, and Bombardier conspired together to give Cassidy kickbacks and bribes in exchange for Cassidy using his position to cause the Debtors to enter into the transactions described above and to accept delivery of the Planes under false pretenses, namely that they had not offered or given Cassidy the bribes and kickbacks.

593. These Defendants each engaged in unfair business practices, including by providing the kickbacks and bribes to Cassidy and by concealing and failing to disclose the kickbacks and bribes to the Debtors' uninterested directors and management.

594. The Defendants have engaged in fraudulent conduct, including by misrepresenting, concealing, and failing to disclose the kickbacks and bribes as described in Counts 6-7 below.

595. The Defendants used these acts of unlawful, unfair, and fraudulent conduct to their advantage, and to the Debtors' detriment, and unfairly benefitted as a result of these acts. These unlawful, fraudulent, and anti-competitive acts directly resulted in financial losses to the Debtors, which ultimately resulted in their bankruptcy.

596. As a direct and proximate result of the Defendants' conduct alleged above, the Debtors suffered an economic injury caused by the violations described herein. The Debtors are therefore entitled to restitution in the amount to be determined at trial.

597. In addition to direct liability for their participation in the unlawful, unfair, and fraudulent conduct described above, the Fazal-Karim Defendants are also liable because they are alter egos of Fazal-Karim and each other as set forth in paragraphs 368-386 above.

598. In addition to direct liability for their participation in the unlawful, unfair, and fraudulent conduct described above, BI and BAC are also liable for the actions of Fazal-Karim, who was their agent as set forth in paragraphs 387-399 above.

**COUNT 4**
**Intentionally Omitted**

**COUNT 5**
**Intentionally Omitted**

## COUNT 6
### Against the Fazal-Karim Defendants and Bombardier
### Fraudulent Misrepresentation

599.     The Trustee re-alleges all paragraphs above.

600.     Fazal-Karim, Jetcraft Corp. Jetcraft Global, and Orion made representations as to a past or existing material fact, specifically that the two $500,000 payments to Cassidy, the First and Second Kickbacks, were made in return for "services."

601.     With respect to Plane 1, on or about March 2, 2016, Fazal-Karim indicated in an email to Behrend that he would ask Cassidy for an invoice in the amount of $500,000 to cover up the First Kickback. Cassidy sent Fazal-Karim a falsified invoice on March 4, 2016, to Jetcraft Global for "Support Services."

602.     Cassidy provided no legitimate "Support Services" in connection with Plane 1. Fazal-Karim, Jetcraft Corp., Jetcoast, and Jetcraft Global were aware that Cassidy provided no services related to Plane 1, and that he deserved no remuneration from Jetcraft Global or any other entity for the sale of Plane 1. Indeed, Jetcraft Global had no role at all in the First Element Transaction.

603.     With respect to Plane 10, on November 22, 2016, Fazal-Karim directed Behrend to ask Cassidy to falsify an invoice for "services" in the amount of $500,000 to cover up the Second Kickback. Cassidy sent Behrend a falsified invoice on November 22, 2016, to Orion for "services." On February 10, 2017, Fazal-Karim asked Cassidy to send a revised invoice at $750,000 for "our files." Fazal-Karim also offered to give Cassidy the remaining $250,000 if Cassidy got the Debtors to pay the remaining $250,000. On February 13, 2017, Cassidy sent Behrend a revised invoice to Orion for "services" with the same November 22, 2016, date and invoice number, but revised to be for $750,000.

604.     Cassidy provided no legitimate "services" in connection with Plane 10. Fazal-Karim, Jetcraft Corp., Jetcoast, and Jetcraft Global were aware that Cassidy provided no services related to Plane 10, and that he deserved no remuneration from Jetcraft Global or any other entity for the sale of Plane 10.

605.    Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion made representations as to a past or existing material fact, specifically that the prices in the First and Second Element Transactions did not include the amounts of the First and Second Kickbacks.

606.    The purchase prices of Planes 1 and 10 included the amount of the First and Second Kickbacks at the time the Plane 1 and Plane 10 APAs were executed. If these defendants had not included the amounts of the First and Second Kickbacks in the purchase prices, the purchase prices would have been decreased by at least $500,000 for each plane.

607.    Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion made representations as to a past or existing material fact, specifically that the First and Second Element Transactions did not include any outside commissions.

608.    Both the Plane 1 and Plane 10 APAs ███████████████████ ███████ Section 12.2.6 of each APA includes a representation and warranty that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████

609.    These representations were false when made. Jetcraft Global at Fazal-Karim's direction paid Cassidy undisclosed kickbacks to induce him to cause the Debtors to enter into and guarantee the First and Second Element Transactions. These fraudulent kickbacks also induced Cassidy to enter into each of the other transactions, for which Fazal-Karim received millions in commissions, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion received tens of millions in transfers, and Bombardier received hundreds of millions in sales and transfers. The kickbacks also induced Cassidy to cause the Debtors to accept delivery of each of the Planes, which ensured that Bombardier would receive the entire amounts of the purchase price rather than liquidated damages.

610.    Fazal-Karim was acting as Bombardier's agent when he directed Jetcraft Corp.'s CFO to pay the First Kickback through Jetcraft Global as part of a single combined set of transactions including Planes 1-6. Bombardier also had a profits interest on the resale of Plane 1 to the Debtors.

611.    Jetcraft Corp. and Jetcoast executed the Plane 1 APA on December 5, 2015, while Jetcraft Global and Orion executed the Plane 10 APA on August 30, 2016. Fazal-Karim negotiated the Plane 1 and Plane 10 APAs on behalf of Jetcraft Corp., Jetcoast, Jetcraft Global, and Orion.

612.    Jetcraft Corp., Jetcraft Global, Jetcoast, Orion, and Fazal-Karim knew that these representations were false when made. The representations were meant to hide the fact that Cassidy would receive kickbacks. Because the First and Second Kickbacks were included in the price of Planes 1 and 10, respectively, Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion had already agreed to pay the First and Second Kickbacks at the time that the APAs were executed. Further, because Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion knew that Cassidy was receiving kickbacks disguised as commissions, they knew the kickbacks were not "outside commissions" and had no legitimate purpose.

613.    Jetcraft Corp., Jetcraft Global, Jetcoast, Orion, and Fazal-Karim made these representations with an intent to defraud the Debtors.

614.    Jetcraft Corp., Jetcoast, and Fazal-Karim specifically intended that Seagrim and Walter would rely on the representations in entering into the Plane 1 APA and related agreements. At the time of the transaction, Zetta PTE had only four directors and could not have entered into the transaction without the approval of Seagrim and Walter.

615.    Jetcraft Global, Orion, and Fazal-Karim specifically intended that Seagrim, Walter, and Li would rely on the representations in entering into the Plane 10 APA and related agreements. At the time of the transaction, Zetta PTE could not have entered into the transaction without the approval of Seagrim, Walter, and Li.

616.    The Debtors' uninterested directors and management were unaware of the falsity of the representations.

617.    The Debtors' uninterested directors and management reasonably relied on these misrepresentations.

618.    It was reasonable for the Debtors' uninterested directors and management to be unaware of the kickbacks and bribes. The Debtors' uninterested directors and

management were not aware of the kickbacks and bribes because Cassidy received the kickbacks to his personal bank account and received the bribes directly.

619.    As a direct and proximate result of the Defendants' conduct, the Debtors were damaged in an amount to be proven at trial, but at a minimum equal to the amount of the kickbacks and bribes.

620.    In addition to the amount of the kickbacks and bribes, the Debtors were further damaged by the difference between the amount that the Debtors paid for the Planes and the amounts the Planes were actually worth.

621.    In the alternative to damages, the Trustee is entitled to and seeks restitution of the profits that the kickbacks and bribes yielded to the Defendants, in an amount at least equal to the amount of the kickbacks and bribes, plus the revenue that the kickbacks and bribes generated for the Defendants, minus the cost of goods sold and other variable costs incurred in making the relevant sales.

622.    In addition to direct liability for their fraudulent misrepresentations and omissions described above, the Fazal-Karim Defendants are also liable because they are alter egos of Fazal-Karim and each other as set forth in paragraphs 368-386 above.

623.    BI and BAC are also liable for the actions of Fazal-Karim, who was their agent as set forth in paragraphs 387-399 above.

**COUNT 7**
**Against the Fazal-Karim Defendants and Bombardier**
**Fraudulent Concealment / Nondisclosure**

624.    The Trustee re-alleges all paragraphs above.

625.    The Fazal-Karim Defendants and Bombardier concealed a material fact from the Debtors, specifically that they paid Cassidy kickbacks and bribes so he would induce the Debtors to acquire aircraft from the Fazal-Karim Defendants and Bombardier.

626.    Jetcraft Corp. (through Jetcraft Global) at Fazal-Karim's direction paid Cassidy undisclosed kickbacks to induce him to cause the Debtors to enter into and guarantee the First and Second Element Transactions. These fraudulent kickbacks also induced Cassidy to enter into each of the other transactions, for which Fazal-Karim received

millions in commissions, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion received tens of millions in transfers, and Bombardier received hundreds of millions in sales and transfers. The kickbacks also induced Cassidy to cause the Debtors to accept delivery of each of the Planes, which ensured that Bombardier would receive the entire amounts of the purchase price rather than liquidated damages.

627.    Fazal-Karim was acting as Bombardier's agent when he directed Jetcraft Corp. (through Jetcraft Global) to pay the First Kickback as part of a single combined set of transactions including Planes 1-6. Bombardier also had a profits interest on the resale of Plane 1 to the Debtors.

628.    Bombardier also paid a $43,890 bribe to Cassidy and agreed to pay a $42,569 bribe that Fazal-Karim later paid, to ensure that the Debtors would take delivery of Planes 2-4 and 8-9, rather than terminate those agreements, so that Bombardier would receive more than ███████████ in additional payments rather than have to refund more than ███████ in prepayments, as well as enter into additional agreements to purchase Planes 12-15, which Bombardier valued at ███████████.

629.    Because the First and Second Kickbacks were included in the price of Planes 1 and 10, respectively, Fazal-Karim, Jetcraft Corp., Jetcraft Global, Jetcoast, and Orion had already agreed to pay the First and Second Kickbacks at the time that the APAs were executed.

630.    The Defendants had a duty to disclose the kickbacks and bribes because they knew that the kickbacks and bribes were neither known nor readily accessible to the Debtors' uninterested directors and management.

631.    The Defendants actively concealed the material facts that they were paying Cassidy kickbacks and bribes to enter into the transactions and to ensure that the Debtors would take delivery of the Planes.

632.    The Defendants exclusively knew the material facts that they were paying Cassidy kickbacks and bribes to enter into the transactions and to ensure that the Debtors would take delivery of the Planes.

633.    The Defendants intentionally concealed or suppressed the kickbacks and bribes with the intent to defraud the Debtors.

634.    The Debtors' uninterested directors and management were unaware of these facts and would not have entered into the transactions or accepted delivery of the Planes if they had known the concealed or suppressed facts.

635.    Because Cassidy received the kickbacks to his personal bank account and received the bribes directly, it was reasonable for the Debtors' uninterested directors and management to be unaware of the kickbacks and bribes.

636.    As a direct and proximate result of the Defendants' conduct, the Debtors were damaged in an amount to be proven at trial, but at a minimum equal to the amount of the kickbacks and bribes.

637.    In addition to the amount of the kickbacks and bribes, the Debtors were further damaged by the difference between the amount that the Debtors paid for the Planes and the amounts the Planes were actually worth.

638.    In the alternative to damages, the Trustee is entitled to and seeks restitution of the profits that the kickbacks and bribes yielded to the Defendants, in an amount at least equal to the amount of the kickbacks and bribes, plus the revenue that the kickbacks and bribes generated for the Defendants, minus the cost of goods sold and other variable costs incurred in making the relevant sales.

639.    In addition to direct liability for their fraudulent misrepresentations and omissions described above, the Fazal-Karim Defendants are also liable because they are alter egos of Fazal-Karim and each other as set forth in paragraphs 368-386 above.

640.    In addition to direct liability for their fraudulent misrepresentations and omissions described above, BI and BAC are also liable for the actions of Fazal-Karim, who was their agent as set forth in paragraphs 387-399 above.

**COUNT 8**
**Against Jetcraft Corp. and Jetcoast**
**Avoidance and Recovery of Actual Intent Fraudulent Transfers (Plane 1)**

**11 U.S.C. §§ 548, 550**

1

2      641.    The Trustee re-alleges all paragraphs above.

3      642.    On December 5, 2015, Zetta PTE entered into an aircraft purchase agreement

4  (the "Plane 1 APA") to purchase Plane 1 from Jetcraft Corp., Jetcoast, and the Bank of

5  Utah. In addition, to finance the purchase of Plane 1, ECN made a loan to Zetta PTE

6  pursuant to a loan agreement (the "Plane 1 Loan Agreement").

7      643.    As part of the First Element Transaction, the Debtors made transfers to or

8  for the benefit of Jetcraft Corp. and Jetcoast consisting of $37.8 million in loan proceeds to

9  Jetcoast from Element at Zetta PTE's direction, $4.555 million from Zetta PTE to Jetcraft

10  Corp., and $1 million from Zetta USA to Jetcraft Corp., as set forth on Schedule 2.

11      644.    As described in paragraphs 400-430, Cassidy was operating the Debtors as

12  a fraudulent scheme or Ponzi-like scheme, or both, to enrich himself at the expense of

13  creditors, and thus had the actual intent to delay, hinder or defraud creditors.

14      645.    In the alternative, as described in paragraphs 431-447, Cassidy believed at

15  the time of each aircraft transaction that the consequences of his actions were substantially

16  certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen

17  this result as a natural consequence of his actions. Cassidy knew at the time he entered into

18  and closed on the transactions and at the time of each of the transfers that the transactions

19  would waste the financial resources of the Debtors to the detriment of creditors; that there

20  was no economic justification for the transactions because there was no realistic possibility

21  that the transactions would ever be profitable for the Debtors and thus would ultimately

22  harm creditors; and that the transactions were undertaken to enrich himself at the expense

23  of creditors.

24      646.    In the alternative, as described in paragraphs 448-464, the badges of fraud

25  are present in this transaction. In addition, as set forth above, Cassidy failed to disclose that

26  he caused the Debtors and their subsidiaries to enter into and close on the Plane 1 APA and

27  Plane 1 Loan Agreement (as well as the transactions involving the CAVIC Planes and Plane

28  6) in exchange for the kickbacks he received from Fazal-Karim and Jetcraft Global; the

1    transfers combined with the simultaneously negotiated transfers for other Planes involved

2    all or substantially all of the Debtors' assets at the time; Cassidy removed or concealed

3    assets in the form of the kickbacks; the Debtors did not receive reasonably equivalent value;

4    the initial payments on Plane 1 alone would make the Debtors insolvent; the transfers

5    occurred shortly after the Debtors incurred substantial debt; and Cassidy had a special

6    relationship with Fazal-Karim, Jetcraft Corp., and Bombardier.

7        647.    These transfers were made less than two years before the Petition Date.

8        648.    These transfers were transfers of Zetta PTE's property.

9        649.    Pursuant to 11 U.S.C. § 548(a)(1), the Trustee is entitled to and therefore

10    seeks to avoid the Plane 1 APA and Plane 1 Loan Agreement and any obligations arising

11    from those agreements, as well as the agreements relating to Plane 1 listed on Schedule 2.

12        650.    Because these obligations are avoidable under 11 U.S.C. § 548(a)(1)(A), the

13    Trustee is entitled to and therefore seeks to recover the value of the transfers made on

14    account of the obligations under Plane 1 APA and Plane 1 Loan Agreement pursuant to 11

15    U.S.C. § 550(a).

16        651.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks

17    to recover the value of these transfers from Jetcraft Corp. and Jetcoast as the initial

18    transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C.

19    § 550(a).

20

21                                    **COUNT 9**
22                         **Against Jetcraft Corp. and Jetcoast**
      **Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 1)**
23                              **11 U.S.C. §§ 548, 550**

24        652.    The Trustee re-alleges all paragraphs above.

25        653.    On December 5, 2015, Zetta PTE entered into the Plane 1 APA to purchase

26    Plane 1 from Jetcraft Corp., Jetcoast, and the Bank of Utah. In addition, to finance the

27    purchase of Plane 1, ECN made a loan to Zetta PTE pursuant to the Plane 1 Loan

28    Agreement.

654.    As part of the First Element Transaction, the Debtors made transfers to or for the benefit of Jetcraft Corp. and Jetcoast consisting of $37.8 million in loan proceeds to Jetcoast from Element at Zetta PTE's direction, $4.555 million from Zetta PTE to Jetcraft Corp., and $1 million from Zetta USA to Jetcraft Corp., as set forth on Schedule 2. Zetta PTE also made payments to or for the benefit of Element Aviation of at least $11,897,094.26, as set forth on Schedule 3.

655.    Zetta PTE did not receive reasonably equivalent value for the obligations it incurred in entering into the Plane 1 APA and Plane 1 Loan Agreement because, from the perspective of the Debtors' estates, Plane 1 was not able to generate income sufficient to equal the purchase price or the debt service on it.

656.    Further, as set forth above in paragraphs 341-360 and 465-466, the purchase price of Plane 1 was significantly higher than its Fair Market Value and Estate Value.

657.    At the time Zetta PTE made these transfers, as set forth above in paragraphs 467-484, the Debtors were insolvent or became insolvent as a result of the transfers, were engaged in business or about to engage in business for which their remaining property was unreasonably small capital, or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

658.    These transfers were made less than two years before the Petition Date.

659.    These transfers were transfers of Zetta PTE's property.

660.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the Plane 1 APA and Plane 1 Loan Agreement and any obligations arising from those agreements, as well as the agreements relating to Plane 1 listed on Schedule 2.

661.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the Plane 10 APA and Plane 10 Loan Agreement and any transfers made under those agreements, as well as the agreements relating to Plane 10 listed on Schedule 2.

662.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Jetcraft Corp. and Jetcoast, as the initial

1  transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C.

2  § 550(a).

3                              **COUNT 10**
                         **Against Jetcraft Global and Orion**
4  **Avoidance and Recovery of Actual Intent Fraudulent Transfers (Plane 10)**
                          **11 U.S.C. §§ 548, 550**
5

6       663.    The Trustee re-alleges all paragraphs above.

7       664.    On August 30, 2016, Zetta Jet 6000-1 entered into the Plane 10 APA to

8  purchase Plane 10 from Orion, Jetcraft Global, and the Bank of Utah. In addition, to finance

9  the purchase of Plane 10, ECN made a loan to Zetta PTE pursuant to the Plane 10 Loan

10  Agreement.

11      665.    As part of the Second Element Transaction, the Debtors made transfers to or

12  for the benefit of Jetcraft Global and Orion consisting of $49.5 million in loan proceeds to

13  Orion from Element at Zetta PTE's direction, as set forth on Schedule 5.

14      666.    As described in paragraphs 400-430, Cassidy was operating the Debtors as

15  a fraudulent scheme or Ponzi-like scheme, or both, to enrich himself at the expense of

16  creditors, and thus had the actual intent to delay, hinder or defraud creditors.

17      667.    In the alternative, as described in paragraphs 431-447, Cassidy believed at

18  the time of each aircraft transaction that the consequences of his actions were substantially

19  certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen

20  this result as a natural consequence of his actions. Cassidy knew at the time he entered into

21  and closed on the transactions and at the time of each of the transfers that the transactions

22  would waste the financial resources of the Debtors to the detriment of creditors; that there

23  was no economic justification for the transactions because there was no realistic possibility

24  that the transactions would ever be profitable for the Debtors and thus would ultimately

25  harm creditors; and that the transactions were undertaken to enrich himself at the expense

26  of creditors.

27      668.    In the alternative, as described in paragraphs 448-464, the badges of fraud

28  are present in this transaction. In addition, as set forth above, Cassidy failed to disclose that

he caused the Debtors and their subsidiaries to enter into and close on the Plane 10 APA and Plane 10 Loan Agreement in exchange for the kickbacks he received from Fazal-Karim and Jetcraft Global; the transfers combined with the simultaneously negotiated transfers for other Planes involved all or substantially all of the Debtors' assets at the time; Cassidy removed or concealed assets in the form of the kickbacks; the Debtors did not receive reasonably equivalent value; the initial payments on Plane 1 alone would make the Debtors insolvent; the transfers occurred shortly after the Debtors incurred substantial debt; and Cassidy had a special relationship with Fazal-Karim, Jetcraft, and Bombardier.

669.    These transfers were made less than two years before the Petition Date.

670.    These transfers were transfers of Zetta PTE's property.

671.    Pursuant to 11 U.S.C. § 548(a)(1), the Trustee is entitled to and therefore seeks to avoid the Plane 10 APA and Plane 10 Loan Agreement and any obligations arising from those agreements, as well as the agreements relating to Plane 10 listed on Schedule 5.

672.    Because these obligations are avoidable under 11 U.S.C. § 548(a)(1)(A), the Trustee is entitled to and therefore seeks to recover the value of the transfers made on account of the obligations under Plane 10 APA and Plane 10 Loan Agreement pursuant to 11 U.S.C. § 550(a).

673.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Jetcraft Global and Orion as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

**COUNT 11**
**Against Jetcraft Global and Orion**
**Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 10)**
**11 U.S.C. §§ 548, 550**

674.    The Trustee re-alleges all paragraphs above.

675.    On August 30, 2016, Zetta Jet 6000-1 entered into an aircraft purchase agreement (the "Plane 10 APA") to purchase Plane 10 from Orion, Jetcraft Global, and the Bank of Utah. In addition, to finance the purchase of Plane 10, ECN made a loan to Zetta PTE pursuant to a loan agreement (the "Plane 10 Loan Agreement").

128

676.     As part of the Second Element Transaction, the Debtors made transfers to or for the benefit of Jetcraft Global and Orion consisting of $49.5 million in loan proceeds to Orion from Element at Zetta PTE's direction, as set forth on Schedule 5.

677.     Zetta PTE did not receive reasonably equivalent value for the obligations it incurred in entering into the Plane 10 APA and Plane 10 Loan Agreement because, from the perspective of the Debtors' estates, Plane 10 was not able to generate income sufficient to equal the purchase price or the debt service on it.

678.     Further, as set forth above in paragraphs 341-360 and 465-466, the purchase price of Plane 10 was significantly higher than its market price.

679.     At the time Zetta PTE made these transfers, as set forth above in paragraphs 467-484, the Debtors were insolvent or became insolvent as a result of the transfers, were engaged in business or about to engage in business for which their remaining property was unreasonably small capital, or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

680.     These transfers were made less than two years before the Petition Date.

681.     These transfers were transfers of Zetta PTE's property.

682.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the Plane 10 APA and Plane 10 Loan Agreement and any transfers made under those agreements, as well as the agreements relating to Plane 10 listed on Schedule 2.

683.     Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Orion and Jetcraft Global, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

**COUNT 12**
**Against Bombardier**
**Avoidance and Recovery of Actual Intent Fraudulent Transfers (Planes 2-5)**
**11 U.S.C. §§ 548, 550**

684.     The Trustee re-alleges all paragraphs above.

685.    On December 10, 2015, Zetta PTE entered into the Plane 2-5 APAs with Bombardier for the CAVIC Aircraft.

686.    Zetta PTE made transfers from Zetta PTE bank accounts to BAC for the CAVIC Aircraft, including $1 million ($250,000 for each Plane) on December 4, 2015; $10 million on February 16, 2016; $10 million on March 8, 2016; $1.2 million on March 28, 2016; $2.4 million on or about June 30, 2016 (which were originally made in connection with Planes 8 and 9 but later transferred to Plane 4 on March 24, 2017); $3,091,334 on March 28, 2017; and $3,262,834 on June 27, 2017.

687.    As described in paragraphs 400-430, Cassidy was operating the Debtors as a fraudulent scheme or Ponzi-like scheme, or both, to enrich himself at the expense of creditors, and thus had the actual intent to delay, hinder or defraud creditors.

688.    In the alternative, as described in paragraphs 431-447, Cassidy believed at the time of each aircraft transaction that the consequences of his actions were substantially certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen this result as a natural consequence of his actions. Cassidy knew at the time he entered into and closed on the transactions and at the time of each of the transfers that the transactions would waste the financial resources of the Debtors to the detriment of creditors; that there was no economic justification for the transactions because there was no realistic possibility that the transactions would ever be profitable for the Debtors and thus would ultimately harm creditors; and that the transactions were undertaken to enrich himself at the expense of creditors.

689.    In the alternative, as described in paragraphs 448-464, the badges of fraud are present in this transaction. In addition, as set forth above, Cassidy failed to disclose that he caused the Debtors and their subsidiaries to enter into the Plane 2-5 APAs in exchange for the kickbacks he received from Fazal-Karim and Jetcraft Global as part of the same transactions involving Plane 1, the CAVIC Planes, and Plane 6; the transfers combined with the simultaneously negotiated transfers for other Planes involved all or substantially all of the Debtors' assets at the time; Cassidy removed or concealed assets in the form of the

kickbacks; the Debtors did not receive reasonably equivalent value; the $1 million in initial deposits as part of the combined transaction would make the Debtors insolvent; the transfers occurred shortly before or after the Debtors incurred substantial debt; and Cassidy had a special relationship with Fazal-Karim, Jetcraft, and Bombardier.

690.    These transfers were made less than two years before the Petition Date.

691.    These transfers were transfers of Zetta PTE's property.

692.    Pursuant to 11 U.S.C. § 548(a)(1), the Trustee is entitled to and therefore seeks to avoid the Plane 2-5 APAs and any obligations arising from those agreements.

693.    Because these obligations are avoidable under 11 U.S.C. § 548(a)(1)(A), the Trustee is entitled to and therefore seeks to recover the value of the transfers made on account of the obligations under the Plane 2-5 APAs pursuant to 11 U.S.C. § 550(a).

694.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

695.    Because the transfers at issue in this Count were made from Debtor bank accounts with Debtor funds, this Count does not require recharacterization of any agreements for the Trustee to avoid these transactions and obligations and recover the value of the transfers.

**COUNT 13**
**Against Bombardier**
**Avoidance and Recovery of Constructive Fraudulent Transfers (Planes 2-5)**
**11 U.S.C. §§ 548, 550**

696.    The Trustee re-alleges all paragraphs above.

697.    On December 10, 2015, Zetta PTE entered into the Plane 2-5 APAs with Bombardier for the CAVIC Aircraft.

698.    Zetta PTE made transfers from Zetta PTE bank accounts to BAC for the CAVIC Aircraft, including $1 million ($250,000 for each Plane) on December 4, 2015; $10 million on February 16, 2016; $10 million on March 8, 2016; $1.2 million on March 28, 2016; $2.4 million on or about June 30, 2016 (which were originally made in connection

with Planes 8 and 9 but later transferred to Plane 4 on March 24, 2017); $3,091,334 on March 28, 2017; and $3,262,834 on June 27, 2017.

699.    Zetta PTE did not receive reasonably equivalent value for the transfers made under the Plane 2-5 APAs because, from the perspective of the Debtors' estates, Planes 2-5 were not able to generate income sufficient to equal the purchase price or the debt service on them.

700.    Further, as set forth above in paragraphs 341-360 and 465-466, the purchase price of Planes 2-5 were significantly higher than the market prices.

701.    At the time Zetta PTE made these transfers, as set forth above in paragraphs 467-484, the Debtors were insolvent or became insolvent as a result of the transfers, were engaged in business or about to engage in business for which their remaining property was unreasonably small capital, or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

702.    These transfers were made less than two years before the Petition Date.

703.    These transfers were transfers of Zetta PTE's property.

704.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the transfers made under the Plane 2-5 APAs.

705.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

706.    Because the transfers at issue in this Count were made from Debtor bank accounts with Debtor funds, this Count does not require recharacterization of any agreements for the Trustee to avoid these transactions and obligations and recover the value of the transfers.

**COUNT 14**
**Against Bombardier**
**Avoidance and Recovery of Actual Intent Fraudulent Transfers (Planes 2-5)**
**11 U.S.C. §§ 548, 550**

707.    The Trustee re-alleges all paragraphs above.

708.    On December 10, 2015, Zetta PTE entered into the Plane 2-5 APAs with Bombardier for the CAVIC Aircraft.

709.    On or around May 24, 2016, the Debtors (through TVPX as owner trustee) entered into the Plane 2 Finance Lease with CAVIC (through the ZJ6000-1 ST).

710.    On or around September 16, 2016, the Debtors (through TVPX as owner trustee) entered into the Plane 3 Finance Lease with CAVIC (through the ZJ6000-2 ST).

711.    On or around December 23, 2016, the Debtors (through TVPX as owner trustee) entered into the Plane 4 Finance Lease with CAVIC (through the ZJ6000-3 ST).

712.    TVPX, not in its individual capacity but solely as owner trustee, is a party to the Plane 2, Plane 3, and Plane 4 Finance Leases as lessee. At all relevant times, the Debtors rather than TVPX were the real parties in interest on the Plane 2, Plane 3, and Plane 4 Finance Leases.

713.    The CAVIC Statutory Trusts are parties to the Plane 2, Plane 3, and Plane 4 Finance Leases as lessors. At all times, CAVIC was the real party in interest on the Plane 2, Plane 3, and Plane 4 Finance Leases.

714.    The Plane 2, Plane 3, and Plane 4 Finance Leases are not true leases or operating leases, but finance leases that create a security interest both per se and under the economic realities test.[31]

715.    A per se security interest is created if (a) the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee and (b) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement. Under the economic realities test,

---

[31] The Trustee sought a declaratory judgment recharacterizing the Plane 2, Plane 3, and Plane 4 Finance Leases as finance leases, rather than true leases, in Count I of the original complaint in *King v. CAVIC*, AP No. 2:19-ap-1147-SK ("*CAVIC*"), filed on May 21, 2019. The Trustee continues to seek a declaratory judgment recharacterizing the Plane 2, Plane 3, and Plane 4 Finance Leases as finance leases, rather than true leases, in Count I of the amended *CAVIC* complaint.

1  a lease creates a security interest if the economic substance of the transaction indicates that

2  the arrangements were not true or operating leases, but rather finance leases.

3       716.    First, the per se test is satisfied here. ████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████ As a

7  result, the Plane 2, Plane 3, and Plane 4 Finance Leases constituted finance leases between

8  CAVIC and the Debtors, and therefore created a per se security interest in Planes 2, 3, and

9  4for the Debtors.

10      717.    Second, the economic realities test is satisfied here. CAVIC did not retain

11  any entrepreneurial risk under the Plane 2, Plane 3, and Plane 4 Finance Leases and, ████

12  ████████████████████████████████████████████████████████████████

13  ████████ CAVIC did not expect to retain the property at the end of the lease term.

14  CAVIC's only expectation was to receive payments of principal and interest during the

15  course of the alleged "lease." The Debtors were at all times the actual economic owners of

16  Planes 2, 3, and 4, bearing the risks and benefits of that ownership both before and after the

17  acquisition of Planes 2, 3, and 4.

18      718.    Under either US or English law, the Debtors, not CAVIC, were the true

19  economic owners of Planes 2, 3, and 4 and had the sole residual equity interest in Planes 2,

20  3, and 4 following payment of the "rent" through the terms of the Plane 2, Plane 3, and

21  Plane 4 Finance Leases.

22      719.    Accordingly, under either the per se test or the economic realities test, the

23  Court should declare that the Plane 2, Plane 3, and Plane 4 Finance Leases should be

24  recharacterized as secured financings under US or English law, not as true or operating

25  leases, and that the Plane 2, Plane 3, and Plane 4 Finance Leases vested the Debtors with an

26  economic ownership interest in Planes 2, 3, and 4 for the purposes of the Trustee's claims

27  under section 105(a), 548, and 550 of the Bankruptcy Code.

28

720.    The Debtors made transfers to BAC consisting of a total of $120.36 million in loan proceeds from CAVIC on behalf of the Debtors.

721.    As described in paragraphs 400-430, Cassidy was operating the Debtors as a fraudulent scheme or Ponzi-like scheme, or both, to enrich himself at the expense of creditors, and thus had the actual intent to delay, hinder or defraud creditors.

722.    In the alternative, as described in paragraphs 431-447, Cassidy believed at the time of each aircraft transaction that the consequences of his actions were substantially certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen this result as a natural consequence of his actions. Cassidy knew at the time he entered into and closed on the transactions and at the time of each of the transfers that the transactions would waste the financial resources of the Debtors to the detriment of creditors; that there was no economic justification for the transactions because there was no realistic possibility that the transactions would ever be profitable for the Debtors and thus would ultimately harm creditors; and that the transactions were undertaken to enrich himself at the expense of creditors.

723.    In the alternative, as described in paragraphs 448-464, the badges of fraud are present in this transaction. In addition, as set forth above, Cassidy failed to disclose that he caused the Debtors and their subsidiaries to enter into the Plane 2-5 APAs in exchange for the kickbacks he received from Fazal-Karim and Jetcraft Global as part of the same transactions involving Plane 1, the CAVIC Planes, and Plane 6; the transfers combined with the simultaneously negotiated transfers for other Planes involved all or substantially all of the Debtors' assets at the time; Cassidy removed or concealed assets in the form of the kickbacks; the Debtors did not receive reasonably equivalent value; the $1 million in initial deposits as part of the combined transaction would make the Debtors insolvent; the transfers occurred shortly before or after the Debtors incurred substantial debt; and Cassidy had a special relationship with Fazal-Karim, Jetcraft, and Bombardier.

724.    These transfers were made less than two years before the Petition Date.

725.    These transfers were transfers of Zetta PTE's property.

726.    As set forth above, the Trustee is not bound by the English choice-of-law provisions in the Plane 2, Plane 3, and Plane 4 Finance Leases. Even if the Trustee were bound by the choice-of-law provisions, they would be ineffective under the choice-of-law rules that the Court must apply. Nevertheless, under either US or English law, the Debtors, not CAVIC, were the true economic owners of Planes 2, 3, and 4 and had the sole residual equity interest in Planes 2, 3, and 4 following payment of the "rent" through the terms of the Plane 2, Plane 3, and Plane 4 Finance Leases.

727.    Accordingly, under either the per se test or the economic realities test, the Plane 2, Plane 3, and Plane 4 Finance Leases should be recharacterized as secured financings under US law or, alternatively, recognized as finance leases under English law, not as true or operating leases, and that the transactions provided the Debtors with a vested economic ownership interest in Planes 2, 3, and 4.

728.    Pursuant to 11 U.S.C. § 548(a)(1), the Trustee is entitled to and therefore seeks to avoid the Plane 2-5 APAs and any obligations arising from those agreements.

729.    Because these obligations are avoidable under 11 U.S.C. § 548(a)(1)(A), the Trustee is entitled to and therefore seeks to recover the value of the transfers made on account of the obligations under the Plane 2-5 APAs pursuant to 11 U.S.C. § 550(a).

730.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

**COUNT 15**
**Against Bombardier**
**Avoidance and Recovery of Constructive Fraudulent Transfers (Planes 2-5)**
**11 U.S.C. §§ 548, 550**

731.    The Trustee re-alleges all paragraphs above.

732.    On December 10, 2015, Zetta PTE entered into the Plane 2-5 APAs with Bombardier for the CAVIC Aircraft.

733.    On or around May 24, 2016, the Debtors (through TVPX as owner trustee) entered into the Plane 2 Finance Lease with CAVIC (through the ZJ6000-1 ST).

734.    On or around September 16, 2016, the Debtors (through TVPX as owner trustee) entered into the Plane 3 Finance Lease with CAVIC (through the ZJ6000-2 ST).

735.    On or around December 23, 2016, the Debtors (through TVPX as owner trustee) entered into the Plane 4 Finance Lease with CAVIC (through the ZJ6000-3 ST).

736.    TVPX, not in its individual capacity but solely as owner trustee, is a party to the Plane 2, Plane 3, and Plane 4 Finance Leases as lessee. At all relevant times, the Debtors rather than TVPX were the real parties in interest on the Plane 2, Plane 3, and Plane 4 Finance Leases.

737.    The CAVIC Statutory Trusts are parties to the Plane 2, Plane 3, and Plane 4 Finance Leases as lessors. At all times, CAVIC was the real party in interest on the Plane 2, Plane 3, and Plane 4 Finance Leases.

738.    The Plane 2, Plane 3, and Plane 4 Finance Leases are not true leases or operating leases, but finance leases that create a security interest both per se and under the economic realities test.[32]

739.    A per se security interest is created if (a) the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee and (b) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement. Under the economic realities test, a lease creates a security interest if the economic substance of the transaction indicates that the arrangements were not true or operating leases, but rather finance leases.

---

[32] The Trustee sought a declaratory judgment recharacterizing the Plane 2, Plane 3, and Plane 4 Finance Leases as finance leases, rather than true leases, in Count I of the original *CAVIC* complaint, filed on May 21, 2019. The Trustee continues to seek a declaratory judgment recharacterizing the Plane 2, Plane 3, and Plane 4 Finance Leases as finance leases, rather than true leases, in Count I of the amended *CAVIC* complaint.

740.    First, the per se test is satisfied here. █████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████ As a
result, the Plane 2, Plane 3, and Plane 4 Finance Leases constituted finance leases between
CAVIC and the Debtors, and therefore created a per se security interest in Planes 2, 3, and
4 for the Debtors.

741.    Second, the economic realities test is satisfied here. CAVIC did not retain
any entrepreneurial risk under the Plane 2, Plane 3, and Plane 4 Finance Leases and, ████
████████████████████████████████████████████████████
██████████ CAVIC did not expect to retain the property at the end of the lease term.
CAVIC's only expectation was to receive payments of principal and interest during the
course of the alleged "lease." The Debtors were at all times the actual economic owners of
Planes 2, 3, and 4, bearing the risks and benefits of that ownership both before and after the
acquisition of Planes 2, 3, and 4.

742.    Under either US or English law, the Debtors, not CAVIC, were the true
economic owners of Planes 2, 3, and 4 and had the sole residual equity interest in Planes 2,
3, and 4 following payment of the "rent" through the terms of the Plane 2, Plane 3, and
Plane 4 Finance Leases.

743.    Accordingly, under either the per se test or the economic realities test, the
Court should declare that the Plane 2, Plane 3, and Plane 4 Finance Leases should be
recharacterized as secured financings under US or English law, not as true or operating
leases, and that the Plane 2, Plane 3, and Plane 4 Finance Leases vested the Debtors with an
economic ownership interest in Planes 2, 3, and 4 for the purposes of the Trustee's claims
under section 105(a), 548, and 550 of the Bankruptcy Code.

744.    The Debtors made transfers to BAC consisting of a total of $120.36 million
in loan proceeds from CAVIC on behalf of the Debtors.

745.    Zetta PTE did not receive reasonably equivalent value for the transfers made

under the Plane 2-5 APAs because, from the perspective of the Debtors' estates, Planes 2-5 were not able to generate income sufficient to equal the purchase price or the debt service on them.

746.    Further, as set forth above in paragraphs 341-360 and 465-466, the purchase price of Planes 2-5 were significantly higher than the market prices.

747.    At the time Zetta PTE made these transfers, as set forth above in paragraphs 467-484, the Debtors were insolvent or became insolvent as a result of the transfers, were engaged in business or about to engage in business for which their remaining property was unreasonably small capital, or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

748.    These transfers were made less than two years before the Petition Date.

749.    These transfers were transfers of Zetta PTE's property.

750.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the transfers made under the Plane 2-5 APAs.

751.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

**COUNT 16**
**Against Bombardier**
**Avoidance and Recovery of Actual Intent Fraudulent Transfer (Plane 6)**
**11 U.S.C. §§ 548, 550**

752.    The Trustee re-alleges all paragraphs above.

753.    On December 10, 2015, Zetta PTE made a transfer of $46.3 million to BAC towards the purchase of Plane 6. On December 28, 2015, Zetta PTE made an additional transfer of $1 million to BAC toward the purchase of Plane 6.

754.    Despite making these transfers, Zetta PTE was not a party to any contract with BAC for Plane 6. Instead, BAC entered into an Asset Purchase Agreement with Glove Assets for the purchase of Plane 6.

1    755.    After these transfers were made, BAC sold Plane 6 to Glove Assets and

2    Glove Assets was thereafter the beneficial owner of this plane. Zetta PTE thereafter

3    purchased Plane 6 from Glove Assets through a finance lease and other agreements.

4    756.    As described in paragraphs 400-430, Cassidy was operating the Debtors as

5    a fraudulent scheme or Ponzi-like scheme, or both, to enrich himself at the expense of

6    creditors, and thus had the actual intent to delay, hinder or defraud creditors.

7    757.    In the alternative, as described in paragraphs 431-447, Cassidy believed at

8    the time of each aircraft transaction that the consequences of his actions were substantially

9    certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen

10    this result as a natural consequence of his actions. Cassidy knew at the time he entered into

11    and closed on the transactions and at the time of each of the transfers that the transactions

12    would waste the financial resources of the Debtors to the detriment of creditors; that there

13    was no economic justification for the transactions because there was no realistic possibility

14    that the transactions would ever be profitable for the Debtors and thus would ultimately

15    harm creditors; and that the transactions were undertaken to enrich himself at the expense

16    of creditors.

17    758.    In the alternative, as described in paragraphs 448-464, the badges of fraud

18    are present in this transaction. In addition, as set forth above, Cassidy failed to disclose that

19    he caused the Debtors and their subsidiaries to enter into the Plane 6 APA and make the

20    transfers in exchange for the kickbacks he received from Fazal-Karim and Jetcraft Global

21    as part of the same transactions involving Plane 1, the CAVIC Planes, and Plane 6; the

22    transfers combined with the simultaneously negotiated transfers for other Planes involved

23    all or substantially all of the Debtors' assets at the time; Cassidy removed or concealed

24    assets in the form of the kickbacks; the Debtors did not receive reasonably equivalent value;

25    the $1 million in initial deposits as part of the combined transaction would make the Debtors

26    insolvent; the transfers occurred shortly before or after the Debtors incurred substantial

27    debt; and Cassidy had a special relationship with Fazal-Karim, Jetcraft, and Bombardier.

28    759.    These transfers were made less than two years before the Petition Date.

760.    These transfers were transfers of Zetta PTE's property.

761.    Because these transfers are avoidable under 11 U.S.C. § 548(a)(1)(A), the Trustee is entitled to and therefore seeks to recover the value of the transfers made pursuant to 11 U.S.C. § 550(a).

762.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

**COUNT 17**
**Against Bombardier**
**Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 6)**
**11 U.S.C. §§ 548, 550**

763.    The Trustee re-alleges all paragraphs above.

764.    On December 10, 2015, Zetta PTE made a transfer of $46.3 million to BAC towards the purchase of Plane 6. On December 28, 2015, Zetta PTE made an additional transfer of $1 million to BAC toward the purchase of Plane 6.

765.    Despite making these transfers, Zetta PTE was not a party to any contract with BAC for Plane 6. Instead, BAC entered into an Asset Purchase Agreement with Glove Assets for the purchase of Plane 6.

766.    After these transfers were made, BAC sold Plane 6 to Glove Assets and Glove Assets was thereafter the beneficial owner of this plane. Zetta PTE thereafter purchased Plane 6 from Glove Assets through a finance lease and other agreements.

767.    Zetta PTE did not receive reasonably equivalent value for the obligations it incurred in purchasing Plane 6 because Zetta was not a party to any contract with BAC for Plane 6 and thus had no legal obligation to make the transfers, nor did Zetta PTE receive title to Plane 6. Further, from the perspective of the Debtors' estates, Plane 6 was not able to generate income sufficient to equal the purchase price or the debt service on it.

768.    Further, as set forth above in paragraphs 341-360 and 465-466, the purchase price of Plane 6 was significantly higher than its market price.

769.     At the time Zetta PTE made these transfers, as set forth above in paragraphs 467-484, the Debtors were insolvent or became insolvent as a result of the transfers, were engaged in business or about to engage in business for which their remaining property was unreasonably small capital, or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

770.     These transfers were made less than two years before the Petition Date.

771.     These transfers were transfers of Zetta PTE's property.

772.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the transfers relating to Plane 6.

773.     Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

**COUNT 18**
**By Zetta PTE against BAC**
**Avoidance and Recovery of US Preference Transfer**
**11 U.S.C. §§ 547, 550**

774.     The Trustee re-alleges all paragraphs above.

775.     In the 90 days prior to the Petition Date, Zetta PTE made a transfer of $3,262,834 to BAC.

776.     This transfer was made while the Debtors were insolvent.

777.     This transfer was to or for the benefit of BAC, who was a creditor under 11 U.S.C. § 547(b)(1).

778.     The transfer was made on account of Zetta PTE's antecedent debt in the amount of $3,262,834 to BAC under the Promissory Note.

779.     The transfer enabled BAC to recover more than it would have received (i) as a creditor in the Chapter 7 Cases; (ii) if the transfer had not been made, and (iii) if BAC had received payment of its debt to the extent provided by the Bankruptcy Code.

780.     The Trustee bases this allegation on: (i) BAC is an unsecured creditor under the Promissory Note; and (ii) a review of the Debtors' schedules and proofs of claim filed

1   in its bankruptcy cases and the current balances in the estates' bank accounts show that

2   general unsecured creditors will not receive a meaningful distribution absent recoveries in

3   this and other avoidance actions.

4       781.    Accordingly, pursuant to 11 U.S.C. § 547, the Trustee is entitled to and

5   therefore seeks to avoid the transfer.

6       782.    BAC was the initial transferee.

7       783.    Because the transfer is avoidable under 11 U.S.C. § 547 it is recoverable

8   pursuant to 11 U.S.C. § 550(a).

9       784.    The Trustee is entitled to and therefore seeks to recover the value of the

10  transfers from BAC, as the initial transferee or the transferee for whose benefit the transfer

11  was made, pursuant to 11 U.S.C. § 550(a).

12                              **COUNT 19**
                    **By Zetta PTE against Learjet, BI, and BAC**
13              **Avoidance and Recovery of US Preference Transfer**
                          **11 U.S.C. §§ 547, 550**
14

15      785.    The Trustee re-alleges all paragraphs above.

16      786.    In the 90 days prior to the Petition Date, Zetta PTE made a transfer of

17  ██████████ to Learjet.

18      787.    The transfer was made while the Debtors were insolvent.

19      788.    The transfer was made to Learjet for the benefit of BI or BAC or both, who

20  were each creditors under 11 U.S.C. § 547(b)(1).

21      789.    The transfer was made on account of an antecedent debt in the amount of

22  ██████████ owed by the Debtors to BI and BAC under the Settlement Agreement.

23      790.    The transfer enabled Learjet, BI, and BAC to recover more than they would

24  have received (i) as a creditor in the Chapter 7 Cases; (ii) if the transfer had not been made,

25  and (iii) if Learjet had received payment of its debt to the extent provided by the Bankruptcy

26  Code.

27      791.    The Trustee bases this allegation on: (i) BAC, BI, and Learjet are unsecured

28  creditors under the Settlement Agreement; and (ii) a review of the Debtors' schedules and

                                143

1    proofs of claim filed in its bankruptcy cases and the current balances in the estates' bank

2    accounts show that general unsecured creditors will not receive a meaningful distribution

3    absent recoveries in this and other avoidance actions.

4        792.    Accordingly, pursuant to 11 U.S.C. § 547, the Trustee is entitled to and

5    therefore seeks to avoid the transfers.

6        793.    Learjet was the initial transferee.

7        794.    Because the transfers are avoidable under 11 U.S.C. § 547 they are

8    recoverable pursuant to 11 U.S.C. § 550(a).

9        795.    The Trustee is entitled to and therefore seeks to recover the value of the

10   transfers from Learjet, as the initial transferee or from BI and BAC, the transferees for

11   whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

12                                  **COUNT 20**
                                   **Against BAC**
13                        **Violation of Automatic Stay**
                              **<u>11 U.S.C. § 362</u>**
14

15       796.    The Trustee re-alleges all paragraphs above.

16       797.    Since the Debtors' filing of their chapter 11 petitions on September 15, 2017,

17   there has been a stay prohibiting any entity from obtaining possession of, interfering with,

18   or exercising control over, the Debtors' property, including, but not limited to, any interests

19   in executory contracts and unexpired leases, and any attempt to retain possession of property

20   of the estates absent relief from the automatic stay.

21       798.    As set forth above, BAC performed an unauthorized Setoff of the

22   Bombardier Debts against debts owed to it by Zetta PTE, and since the Petition Date, BAC

23   has continued to refuse pay the Bombardier Debts, which are assets of the Debtors' estates,

24   to Zetta PTE. BAC's actions are in clear violation of the Debtors' automatic stay under

25   applicable law.

26       799.    As set forth above, BAC refused to perform under the Smart Parts

27   Agreement, which represented an illegal, unilateral ceasing of performance under an

28   executory contract, in violation of 11 U.S.C. § 365, and which also constitutes direct

1    interference with Zetta PTE's leasehold interest in the Aircraft Lease. BAC's actions were

2    in clear violation of the automatic stay under 11 U.S.C. § 362(a)(3).

3         800.    Zetta PTE has been damaged by BAC's willful violations of the stay,

4    through the delay in the use of the Aircraft, which was not air-ready until the maintenance

5    BAC is to provide under the Smart Parts Program is completed, through the loss of access

6    to estate property and funds that were needed to maintain the Debtors' business as a going

7    concern prior to the Shutdown Date. The Trustee and the estates are also entitled to

8    attorneys' fees that the Trustee has incurred in enforcing the automatic stay with respect to

9    this violation as compensatory damages.

**COUNT 21**
**Intentionally Omitted**

**COUNT 22**
**Intentionally Omitted**

**COUNT 23**
**Intentionally Omitted**

**COUNT 24**
**By Zetta PTE against Jetcraft Corp. and Jetcraft Global**
**Turnover of Property of the Estate**
**<u>11 U.S.C. § 542</u>**

     801.    The Trustee re-alleges all paragraphs above.

     802.    On August 9, 2017, Zetta PTE and Jetcraft Global entered into the Side

Letter Agreement, under which ███████████████████████████████████

███████████████████████

     803.    On or around December 28, 2017, Jetcraft Global entered into a contract to

sell Plane 16 to Thorney Alpha Pty Ltd for ██████████ After the deduction of costs, Jetcraft

Corp. or Jetcraft Global calculated that Zetta PTE was entitled to $387,500.48 under the

Side Letter Agreement.

804.    Jetcraft Corp. or Jetcraft Global is in possession or control of $387,500.48, which is property of the Debtors' estate.

805.    Under 11 U.S.C. § 542(b), "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."

806.    The $387,500.48 is a debt owed to Zetta PTE, which is payable on demand and is not subject to offset under 11 U.S.C. § 553.

807.    Accordingly, Jetcraft Corp. or Jetcraft Global must turn over the $387,500.48 due to Zetta PTE to the Trustee for the benefit of Zetta PTE's estate.

**COUNT 25**
**Against all Defendants**
**Disallowance of Claims**
**11 U.S.C. § 502(d)**

808.    The Trustee re-alleges all paragraphs above.

809.    11 U.S.C. § 502(d) provides that the claim of any entity from which property is recoverable under 11 U.S.C. §§ 542 or 550, or that is a transferee of a transfer avoidable under 11 U.S.C. §§ 547 or 548, shall be disallowed unless the transferee has paid the amount for which it is liable under 11 U.S.C. §§ 542 or 550.

810.    The Defendants are entities from which property is recoverable under 11 U.S.C. §§ 542 or 550 or transferees of transfers which are avoidable under 11 U.S.C. §§ 547 or 548.

811.    Pursuant to 11 U.S.C. § 502(d), any and all claims of the Defendants against the Debtors must be disallowed until such time as the Defendants pay the Trustee the amounts required or turned over the property that is recoverable.

**COUNT 26**
**Intentionally Omitted**

**COUNT 27**
**Intentionally Omitted**

**COUNT 28**
**Intentionally Omitted**


**COUNT 29**
**Intentionally Omitted**


**COUNT 30**
**Intentionally Omitted**


**COUNT 31**

**Against Bombardier**
**Avoidance and Recovery of Actual Intent Fraudulent Transfer (Plane 6)**
**11 U.S.C. §§ 548, 550**

812.    The Trustee re-alleges all paragraphs above.

813.    On December 10, 2015, Zetta PTE made a transfer of $46.3 million to BAC towards the purchase of Plane 6. On December 28, 2015, Zetta PTE made an additional transfer of $1 million to BAC toward the purchase of Plane 6.

814.    On or about December 29, 2015, Zetta PTE entered into the 2015 Plane 6 Finance Lease.

815.    Although the 2015 Plane 6 Finance Lease used the term "lease" in its title, it was not a "true" or "operating" lease under which a lessee and a lessor agree to for the lessee to rent an asset at a monthly fair usage charge with the lessor retaining the residual ownership interest, and risks attendant to such ownership interest, at the conclusion of the lease term.

816.    Cassidy and Li consistently treated the 2015 Plane 6 Finance Lease as a loan to Zetta PTE, and not a true lease, in all of their discussions and negotiations. In addition, the $50 million loan (the proceeds of which had already been paid by Universal Leader to the Debtors, which used the proceeds to fund the purchase price for Plane 6) was recorded on the Debtors' books and records as a loan to Zetta PTE and Plane 6 was carried as an asset on Zetta's consolidated balance sheet. As a director of Zetta PTE, Li reviewed the books and records of Zetta PTE and affirmatively approved the description of the 2015

Plane 6 Finance Lease as a loan to Zetta PTE, and not a lease, and Plane 6 as an asset of Zetta.

817.     Accordingly, the Plane 6 Finance Lease should be recharacterized under applicable law as an investment, not an operating lease, and that the transaction provided the Debtors with a vested economic ownership interest in Plane 6.

818.     Once the Plane 6 Finance Lease is properly recharacterized, the Debtors had a property interest in the $47.3 million that it transferred to Bombardier.

819.     As described in paragraphs 400-430, Cassidy was operating the Debtors as a fraudulent scheme or Ponzi-like scheme, or both, to enrich himself at the expense of creditors, and thus had the actual intent to delay, hinder or defraud creditors.

820.     In the alternative, as described in paragraphs 431-447, Cassidy believed at the time of each aircraft transaction that the consequences of his actions were substantially certain to hinder, delay, or defraud the Debtors' creditors, and Cassidy should have seen this result as a natural consequence of his actions. Cassidy knew at the time he entered into and closed on the transactions and at the time of each of the transfers that the transactions would waste the financial resources of the Debtors to the detriment of creditors; that there was no economic justification for the transactions because there was no realistic possibility that the transactions would ever be profitable for the Debtors and thus would ultimately harm creditors; and that the transactions were undertaken to enrich himself at the expense of creditors.

821.     In the alternative, as described in paragraphs 448-464, the badges of fraud are present in this transaction. In addition, as set forth above, Cassidy failed to disclose that he caused the Debtors and their subsidiaries to enter into the Plane 6 APA and make the transfers in exchange for the kickbacks he received from Fazal-Karim and Jetcraft Global as part of the same transactions involving Plane 1, the CAVIC Planes, and Plane 6; the transfers combined with the simultaneously negotiated transfers for other Planes involved all or substantially all of the Debtors' assets at the time; Cassidy removed or concealed assets in the form of the kickbacks; the Debtors did not receive reasonably equivalent value;

the $1 million in initial deposits as part of the combined transaction would make the Debtors insolvent; the transfers occurred shortly before or after the Debtors incurred substantial debt; and Cassidy had a special relationship with Fazal-Karim, Jetcraft, and Bombardier.

822.    These transfers were made less than two years before the Petition Date.

823.    These transfers were transfers of Zetta PTE's property.

824.    Under either US or Singapore law, the Debtors, not Glove Assets, were the true economic owners of Plane 6 and had the sole residual equity interest in Plane 6 following payment of the "rent" through the term of the 2015 Plane 6 Finance Lease.

825.    Accordingly, under either the per se test or the economic realities test, the 2015 Plane 6 Finance Leases should be recharacterized as a secured financing under US law or, alternatively, recognized as a finance lease under Singapore law, not as a true or operating lease, and that the transaction provided the Debtors with a vested economic ownership interest in Plane 6.

826.    Because these transfers are avoidable under 11 U.S.C. § 548(a)(1)(A), the Trustee is entitled to and therefore seeks to recover the value of the transfers made pursuant to 11 U.S.C. § 550(a).

827.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

## COUNT 32
### Against Bombardier
### Avoidance and Recovery of Constructive Fraudulent Transfer (Plane 6)
### 11 U.S.C. §§ 548, 550

828.    The Trustee re-alleges all paragraphs above.

829.    On December 10, 2015, Zetta PTE made a transfer of $46.3 million to BAC towards the purchase of Plane 6. On December 28, 2015, Zetta PTE made an additional transfer of $1 million to BAC toward the purchase of Plane 6.

830.    On or about December 29, 2015, Zetta PTE entered into the 2015 Plane 6 Finance Lease.

831.    Although the 2015 Plane 6 Finance Lease used the term "lease" in its title, it was not a "true" or "operating" lease under which a lessee and a lessor agree to for the lessee to rent an asset at a monthly fair usage charge with the lessor retaining the residual ownership interest, and risks attendant to such ownership interest, at the conclusion of the lease term.

832.    Cassidy and Li consistently treated the 2015 Plane 6 Finance Lease as a loan to Zetta PTE, and not a true lease, in all of their discussions and negotiations. In addition, the $50 million loan (the proceeds of which had already been paid by Universal Leader to the Debtors, which used the proceeds to fund the purchase price for Plane 6) was recorded on the Debtors' books and records as a loan to Zetta PTE and Plane 6 was carried as an asset on Zetta's consolidated balance sheet. As a director of Zetta PTE, Li reviewed the books and records of Zetta PTE and affirmatively approved the description of the 2015 Plane 6 Finance Lease as a loan to Zetta PTE, and not a lease, and Plane 6 as an asset of Zetta.

833.    As set forth above in paragraphs 341-360 and 465-466, the purchase price of Plane 6 was significantly higher than its market price. Zetta PTE thus did not receive reasonably equivalent value.

834.    At the time Zetta PTE made these transfers, as set forth above in paragraphs 467-484, the Debtors were insolvent or became insolvent as a result of the transfers, were engaged in business or about to engage in business for which their remaining property was unreasonably small capital, or intended to incur, or believed that they would incur, debts that were beyond their ability to pay as such debts matured.

835.    These transfers were made less than two years before the Petition Date.

836.    These transfers were transfers of Zetta PTE's property.

837.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee is entitled to and therefore seeks to avoid the transfers relating to Plane 6.

838.    Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to and therefore seeks to recover the value of these transfers from Bombardier, as the initial transferee or the transferee for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

## **RESERVATION OF RIGHTS**

839.    The Trustee reserves the right to bring all other claims or causes of action that the Trustee may have against any Defendant, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this Complaint.

840.    The Trustee has intentionally omitted Counts 4, 5, 21, 22, 23, 26, 27, 28, 29, and 30; information regarding CAVIC, the CAVIC Statutory Trusts, Glove Assets, Wells Fargo, and TVPX; and certain other allegations and information from the First Amended Adversary Complaint in response to the Court's July 13, 2021 Memorandum of Decision on "Motion For Leave To Amend Adversary Complaint," Docket #199, Filed by Chapter 7 Trustee Jonathan D. King" [Adv. Docket No. 241]. By doing so, the Trustee does not intend to and does not waive or forfeit his claims as set forth in the proposed First Amended Adversary Complaint, including claims against the parties identified above, or any right to appeal the Court's memorandum or other decisions with respect to the pleadings, including without limitation the Court's denial of consolidation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in his favor, and against the Defendants, as follows:

a.    Enter judgment in favor of the Trustee and against the Fazal-Karim Defendants and Bombardier for compensatory and punitive damages in an amount to be determined at trial;

b.    Enter judgment in favor of the Trustee and against the Fazal-Karim Defendants and Bombardier for restitution and disgorgement in the amount to be determined at trial;

c.    Intentionally omitted;

d.      Enter judgment in favor of the Trustee and against Jetcraft Corp. and Jetcoast, pursuant to 11 U.S.C. §§ 548(a)(1)(A) or 548(a)(1)(B), 548(c), and 550, avoiding the transfers made in the amount of at least $43.355 million pursuant to the Plane 1 APA and Plane 1 Loan Agreement and directing Jetcraft Corp. and Jetcoast to return the value of the transfers to the Trustee;

e.      Enter judgment in favor of the Trustee and against Jetcraft Global and Orion pursuant to 11 U.S.C. §§ 548(a)(1)(A) or 548(a)(1)(B), 548(c), and 550, avoiding the transfers made in the amount of at least $49.5 million pursuant to the Plane 10 APA and Plane 10 Loan Agreement and directing Jetcraft Global and Orion to return the value of the transfers to the Trustee;

f.      Declare that the Plane 2, Plane 3, and Plane 4 Finance Leases are secured financings under US or English law, not true or operating leases, and that the Plane 2, Plane 3, and Plane 4 Finance Leases vested the Debtors with an economic ownership interest in Planes 2, 3, and 4 for the purposes of the Trustee's claims;

g.      Enter judgment in favor of the Trustee and against Bombardier pursuant to 11 U.S.C. §§ 548(a)(1)(A) or 548(a)(1)(B), 548(c), and 550, avoiding the transfers in the amount of at least $30,954,168 from Zetta PTE bank accounts to Bombardier made pursuant to the Plane 2-5 APAs and directing Bombardier to return the value of the transfers to the Trustee;

h.      Enter judgment in favor of the Trustee and against Bombardier pursuant to 11 U.S.C. §§ 548(a)(1)(A) or 548(a)(1)(B), 548(c), and 550, avoiding the transfers in the amount of at least $120.36 million in loan proceeds from CAVIC on behalf of the Debtors to Bombardier made pursuant to the Plane 2-5 APAs and directing Bombardier to return the value of the transfers to the Trustee;

i.      Enter judgment in favor of the Trustee and against Bombardier pursuant to 11 U.S.C. §§ 548(a)(1)(A) or 548(a)(1)(B), 548(c), and 550, avoiding the transfers in the amount of at least $47.3 million relating to Plane 6, and directing Bombardier to return the value of the transfers to the Trustee;

j.      Enter judgment in favor of the Trustee and against BAC, pursuant to 11 U.S.C. §§ 547 and 550, avoiding the transfer in the amount of at least $3,262,834 and directing Bombardier to return the value of the transfer to the Trustee;

k.      Enter judgment in favor of the Trustee and against Learjet, BI, and BAC, pursuant to 11 U.S.C. §§ 547 and 550, avoiding the transfer in the amount of at least ▮▮▮▮▮▮ and directing Learjet, BI, and BAC to return the value of the transfer to the Trustee;

l.      Enter judgment in favor of the Trustee and against BAC for violation of the automatic stay imposed by 11 U.S.C. § 362, and awarding damages to the Trustee in an amount to be determined at trial;

m.      Intentionally omitted;

n.      Intentionally omitted;

o.      Enter judgment in favor of the Trustee and against Jetcraft Corp. and Jetcraft Global, pursuant to 11 U.S.C. § 542, directing Jetcraft Corp. and Jetcraft Global to turn over any property of the Debtors' bankruptcy estates including the $387,500.48 due to Zetta PTE under the Side Letter;

p.      Enter judgment in favor of the Trustee and against all Defendants pursuant to 11 U.S.C. § 502(h) disallowing any claims filed by the Defendants until they return the various transfers to the Trustee;

q.      Intentionally omitted;

r.      Intentionally omitted;

s.      Declare that the Plane 6 Finance Lease is a secured financing under US or Singapore law, not a true or operating lease, and that the Plane 6 Finance Leases vested the Debtors with an economic ownership interest in Plane 6 for the purposes of the Trustee's claims; and

t.      Grant such other relief as is just and equitable.

*      *      *

Dated: July 28, 2021

Respectfully submitted,

**DLA PIPER LLP (US)**

By: */s/John K. Lyons*
    DAVID B. FARKAS
    JOHN K. LYONS (*Pro Hac Vice*)
    JEFFREY S. TOROSIAN (*Pro Hac Vice*)
    JOSEPH A. ROSELIUS (*Pro Hac Vice*)

*Attorneys for the Trustee*