# Exhibit A

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

KeyCite Yellow Flag - Negative Treatment
Holding Limited by   Nautilus, Inc. v. Yang,   Cal.App. 4 Dist.,   April 21,
2017

2013 WL 164247
United States District Court, D. Nevada.

In re NATIONAL CONSUMER
MORTGAGE, LLC, Debtor.
John P. Brincko, Plaintiff,
v.
Rio Properties, Inc., Defendant.

No. 2:10–CV–00930–PMP–PAL.
|
Jan. 14, 2013.

**Attorneys and Law Firms**

Lita Beth Wright, Bijan Amini, Storch Amini & Munves P.C., Jason Levin, New York, NY, Jay A. Ghoreichi, Ghoreichi Law Firm, Los Angeles, CA, Brandon P. Kemble, Dennis L. Kennedy, Bailey Kennedy, Las Vegas, NV, for Plaintiff.

Genevieve G. Weiner, James P. Fogelman, Oscar Garza, Samuel A. Newman, Shannon E. Mader, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, James D. Boyle, Cotton, Driggs, Walch, Holley, Woloson & Thompson, Las Vegas, NV, for Defendant.

*ORDER*

PHILIP M. PRO, District Judge.

**\*1** Presently before the Court is Defendant Rio Properties, Inc.'s ("Rio") Motion for Summary Judgment on the Actual and Constructive Intent Fraudulent Transfer Claims (Doc.183–187), filed on August 15, 2011. Also before the Court is Rio's Motion for Summary Judgment on the Good Faith Defense (Doc.189–193), filed on August 15, 2011. Plaintiff John P. Brincko ("Trustee") filed an Omnibus Opposition, a Countermotion for Summary Judgment on the Fraudulent Transfer Claims and Rio's Good Faith Defense, and a Motion for Sanctions (Doc. 217–224) on September 19, 2011. Rio filed a Reply in support of its Motions for Summary Judgment and an Opposition to the Trustee's Countermotion (Doc. # 226) on October 19, 2011. Rio also filed an Opposition to the Trustee's Motion for Sanctions

(Doc. # 229) on October 19, 2011. The Trustee filed a Reply in support of its Countermotion for Summary Judgment and its Motion for Sanctions (Doc. # 231) on November 3, 2011.

Also before the Court are Rio's Motions in Limine to Exclude the Expert Testimony of Robert Leahy, Alex Seddio, and Peter Djinis (Doc.204–206), filed on September 1, 2011. The Trustee filed an Omnibus Opposition to Rio's Motions in Limine (Doc. # 228) on October 19, 2011.

**I. BACKGROUND**

The parties are familiar with the facts of this case and the Court will not repeat them here except where necessary. The parties have submitted nearly 400 pages in briefs and over 6,800 pages of exhibits. As Magistrate Judge Leen stated in a prior Order (Doc. # 156) in this case, the Court does not have the time and resources to systematically cite to the entire record to resolve the pending motions.

Debtor National Consumer Mortgage, LLC ("NCM") is a California limited liability company that operated a mortgage broker business beginning in 2001. NCM was owned by Sandra Favata and Dorothy Morisette ("Morisette"). Salvatore Favata, also known as Sam Favata ("Favata"), is the husband of Sandra Favata, and the son of Morisette. Although Favata was not an owner or named officer of NCM, Sandra Favata and Morisette turned financial control of NCM over to Favata.

In 2004, NCM created a division called the Private Money Group, through which Favata solicited investments from individuals for funding residential mortgages which were supposed to be secured by deeds of trust, but generally were not. Funds from the investors were deposited into NCM's bank account and commingled with NCM's other funds obtained through the mortgage broker business.

On April 3, 2006, NCM filed for bankruptcy, and the Trustee subsequently was appointed for the debtor's estate. The Trustee initiated this adversary proceeding against Rio in the United States Bankruptcy Court for the Central District of California on April 2, 2008. (Compl.(Doc.# 36).) In the adversary proceeding, the Trustee alleges that Favata operated the Private Money Group as a Ponzi scheme. The Trustee further contends Favata wrote NCM business checks to himself for over $10 million, used those funds to purchase 66 cashier's checks from several banks made payable to himself, put those checks on deposit at the Rio, and then gambled the proceeds at the Rio's sports book. Through this adversary

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

proceeding, the Trustee seeks to recover the $10 million from the Rio under the bankruptcy code and California's Uniform Fraudulent Transfer Act ("CUFTA"). Rio denies it must return the funds to the bankruptcy estate, contending, among other things, that it verified the cashier's checks were legitimate, and it therefore is a good faith transferee.

**\*2**  On March 29, 2010, the United States District Court for the Central District of California granted Rio's motion to withdraw the reference of the adversary proceeding from the bankruptcy court. (Order (Doc. # 28).) The Trustee thereafter filed an Amended Complaint alleging claims for actual intent fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550 (count one), constructive fraudulent transfer under 11 U.S.C. §§ 548(a)(1)(B) and 550 (count two), avoidance of actual intent fraudulent transfers under 11 U.S.C. §§ 544 and 550 and California Civil Code § 3439.04(a)(1) (count three), and avoidance of constructive fraudulent transfers under 11 U.S.C. §§ 544 and 550 and California Civil Code § 3439.04(a)(2) (count four). (Second Am. Compl. (Doc. # 40).) Rio filed an Answer in which it raised the affirmative defense of good faith. (Am. Answer (Doc. # 71) at 5–6.) On June 10, 2010, the United States District Court for the Central District of California granted Rio's motion to transfer venue to this Court. (Order (Doc. # 109).)

Rio filed two motions for summary judgment. In its first Motion, Rio argues the Trustee cannot establish a prima facie case of actual or constructive fraudulent transfers. In its second Motion, Rio argues it is entitled to summary judgment on its good faith defense. The Trustee opposes Rio's Motions and countermoves for summary judgment on the same issues. Rio also filed related motions in limine to exclude the Trustee's experts' reports and testimony, which the Trustee opposes.

## II. MOTIONS TO EXCLUDE

Federal Rule of Evidence 702 permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable. The trial court acts as a "gatekeeper" to exclude expert testimony that is not both relevant and reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999).

Testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995) (stating testimony

is relevant if it "logically advances a material aspect of the proposing party's case"). To be helpful to the jury, the testimony must be " 'tied to the facts' " of the particular case. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591 (1993) (quoting *United States v.. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)).

Expert testimony is reliable if it is "based on sufficient facts or data," "the product of reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. Reliability is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology." *Stilwell v. Smith & Nephew, Inc.,* 482 F.3d 1187, 1192 (9th Cir.2007) (quotation omitted). The trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152.

**\*3**  Whether to admit expert testimony, as well as deciding how to determine the testimony is reliable, lies within the trial court's discretion. *Kumho Tire,* 526 U.S. at 152; *United States v. Calderon–Segura,* 512 F.3d 1104, 1109 (9th Cir.2008). The party offering the expert testimony bears the burden of establishing its admissibility. *Lust By & Through Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir.1996).

### A. Rio's Motion to Exclude Alex Seddio's Testimony

Rio moves to exclude the report and testimony of the Trustee's expert, Alex Seddio ("Seddio"). Rio argues Seddio is not qualified to opine on the good faith inquiry of what a reasonable Las Vegas casino would have done during the relevant time because he has no familiarity with the standards and practices of Las Vegas casinos. Rio also argues Seddio's testimony is irrelevant because the federal anti-money laundering regulations are irrelevant, as the Trustee does not and cannot bring a federal money laundering claim against Rio. Rio also argues Seddio's testimony consists of inadmissible conclusions because Seddio does not identify at what point in time Rio was on inquiry notice; rather, Seddio does a totality of the circumstances analysis based on hindsight. Rio also contends Seddio's testimony consists of inadmissible legal opinions about what the federal anti-money laundering regulations require. Rio further contends Seddio improperly relied on another expert for the Trustee, Robert Leahy ("Leahy"), to opine Favata engaged in structuring, even though Leahy admitted he was not an expert in structuring.

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

Finally, Rio argues the probative value of Seddio's testimony is substantially outweighed by the risk of prejudice, confusion, and misleading the jury. Specifically, Rio argues Seddio's testimony will confuse the jury into thinking Rio is on trial for violating the anti-money laundering regulations. Additionally, Rio contends allowing testimony on the alleged connection between money laundering and the September 11 attacks is prejudicial.

The Trustee responds that Rio improperly attempts to change the good faith standard from what a reasonable casino would have done to what other Las Vegas casinos were doing at the relevant time. The Trustee argues Seddio properly opines that the federal regulations applied to all casinos nationwide, and imposed obligations upon all casinos which, had Rio complied, would have raised red flags to the Rio regarding Favata's activities. The Trustee contends Seddio therefore does not need specific experience or knowledge regarding the actual practices of Las Vegas casinos. The Trustee argues Rio has offered experts on whether Rio acted in good faith, and the experts at least in part rely on Rio's compliance with Nevada regulations. The Trustee contends he therefore may offer Seddio as a rebuttal witness to opine that Rio failed to comply with other applicable regulations, and therefore Rio did not act in good faith.

*4 As to Seddio's report being conclusory, the Trustee contends Seddio explained what he meant by totality of the circumstances, and identified that Rio was suspicious of Favata from the time it filed a Suspicious Activity Report against him prior to any of the transactions at issue in this case. As to Seddio offering legal opinions, the Trustee argues that expert testimony which opines Rio failed to comply with industry standards properly may include testimony related to whether Rio complied with applicable legal requirements. As to Seddio's reliance on Leahy, the Trustee argues Leahy's charts and summaries are admissible, and are based on Rio's own data. The Trustee notes that Leahy is not an expert on structuring, but Seddio is, and he properly relied on Leahy's analysis of the data to reach an opinion on structuring.

Finally, as to the probative value being outweighed by prejudice, the Trustee argues that Rio put the issue of whether it complied with all applicable regulations at issue in its good faith defense, and therefore the Trustee is entitled to respond. As for the September 11 attacks, the Trustee argues revealing the history of federal regulations will not evoke an emotional response in the jury.

Rio's argument regarding Seddio's lack of familiarity with the standards and practices of Las Vegas casinos rests on Rio's erroneous statement of the applicable standard. The standard is not, as Rio put it, what other Las Vegas casinos "would have done (or did do) under similar circumstances," or "whether the Rio's actions were consistent or inconsistent with other Las Vegas casinos ." (Rio's Mot. in Lim. to Exclude Alex Seddio (Doc. # 205) at 13 & 16 n. 4.) The good faith inquiry, as set forth more fully below, is what a reasonable casino would do, not what Las Vegas casinos actually were doing. Seddio opines a reasonable casino would comply with federal anti-money laundering standards that applied to the Rio, other casinos, and other financial institutions regardless of geographic location within the United States. To the extent the casinos' actual practices bear on this analysis, Rio's criticism goes to the weight of Seddio's testimony, not its admissibility. The Court therefore will not exclude Seddio's report based on a lack of familiarity with the practices of Las Vegas casinos during the relevant time frame.

For similar reasons, the Court rejects Rio's argument that Seddio's testimony regarding the federal anti-money laundering regulations is irrelevant. The Trustee does not assert a federal money laundering claim against Rio. Rather, the Trustee offers Seddio's testimony regarding the federal regulations to rebut Rio's good faith defense which is based, at least in part, on Rio's own expert testimony that Rio acted in good faith as shown by its compliance with applicable Nevada regulations. Rio's expert testified that Nevada gaming law would require casinos to comply with federal regulations. (Trustee's Omnibus Mem. P. & A. in Opp'n to Rio's Three Mots. in Limine (Doc. # 228) ["Trustee's Limine Opp'n"], Ex. A–1 at 213–14.) Other courts have looked to a casino's compliance with applicable regulations as part of the good faith inquiry. *See In re Armstrong,* 285 F.3d 1092, 1094, 1096–98 (8th Cir.2002) (finding casino did not act in good faith based in part on casino's failure to comply with Louisiana gaming regulations). Seddio's opinion that a reasonable casino would comply with applicable federal anti-money laundering regulations therefore is relevant.

*5 Moreover, such testimony is not inadmissible legal opinion testimony. *See Hangarter v. Provident Life & Acc. Ins. Co.,* 373 F.3d 998, 1016 (9th Cir.2004) (holding an expert's opinion that the defendants "deviated from industry standards" was admissible so long as the expert did not "reach[ ] a legal conclusion that Defendants actually acted in bad faith"). Rio's own expert on good faith offered opinions on Rio's compliance with Nevada regulations.

In re National Consumer Mortg., LLC, Not Reported in F.Supp.2d (2013)

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

Rio's other criticisms, including that Seddio's opinions do not comport with his prior experience regarding money laundering behavior, go to the weight of Seddio's testimony, not its admissibility. The Court therefore will not exclude Seddio's report for reaching improper legal conclusions.

Additionally, the Court will not exclude Seddio's testimony based on Seddio not identifying a precise point in time Rio was on inquiry notice. It is for the fact finder to determine when along the continuum, if ever, Rio acted in bad faith, and Seddio's testimony may assist the fact finder in making this determination. Rio's argument on this point goes to the weight, not the admissibility, of Seddio's testimony. *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir.1993) ("Absolute certainty of result is not required for admissibility" of expert opinions. (quotation omitted)).

The Court also rejects Rio's argument that Seddio improperly relied on Leahy's report for the underlying data because Leahy is not an expert in structuring. The Trustee does not offer Leahy as an expert in structuring. Seddio is offered as an expert in structuring, and Rio does not offer any argument, authority, or evidence that Seddio could not rely on Leahy's data analysis to reach his opinion on structuring. The Court therefore will not exclude Seddio's report for relying on Leahy's report.

Finally, the probative value of Seddio's testimony is not substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. *See* Fed.R.Evid. 403. The jury will be instructed on the appropriate legal standards governing the claims the Trustee is asserting against Rio. Rio argues it acted in good faith as demonstrated by its compliance with applicable regulations. The Trustee may attempt to rebut that defense with evidence that Rio did not comply with all applicable regulations. The Court therefore will deny Rio's Motion on this basis.

However, the Court agrees with Rio that any testimony referencing the alleged connection between money laundering and the September 11, 2001 terrorist attacks is of little to no probative value, and is substantially outweighed by potential prejudice. The reason the federal government enacted the regulations is irrelevant to whether Rio complied with those regulations and any consequent impact Rio's noncompliance may have on the issue of good faith in this fraudulent transfer action. Seddio can identify the regulations and when they went into effect without tying the regulations to the September 11 attacks. The Court therefore will grant Rio's

Motion to Exclude Seddio's testimony to the extent Seddio references the September 11 terror attacks. [1]

[1]    Rio also moves to exclude the testimony of Peter Djinis ("Djinis"), another expert of the Trustee. However, the Trustee does not rely upon Djinis's testimony in either his opposition to Rio's Motions or in support of his own Countermotion for Summary Judgment. The Court therefore will deny Rio's Motion to Exclude Djinis's testimony as moot, without prejudice to renew at trial.

**B. Rio's Motion to Exclude Robert Leahy's Testimony**

 *6  Rio moves to strike the testimony of the Trustee's other expert, Leahy, [2] on a variety of grounds. The Trustee opposes.

[2]    On January 8, 2013, the Trustee informed the Court that Leahy passed away. (Letter (Doc. # 245).) Given the lack of a comparable expert by Rio and the Court's ruling denying Rio's Motion to Exclude, it is unclear whether a replacement expert will be necessary or whether Leahy's deposition testimony will suffice for trial. However, should a motion for a replacement expert be filed, the Court will refer the matter to the Magistrate Judge.

*1. Qualifications*

Rio argues Leahy is not qualified as an expert because he is not a certified public accountant, and thus he is not qualified to opine on whether Rio complied with Generally Accepted Accounting Principles ("GAAP"). Rio also argues Leahy is not qualified because he is not a lawyer, he has never worked for FinCEN or the Treasury Department, and he admitted he is not an expert on structuring. Rio thus contends Leahy is not qualified to opine on whether Favata engaged in structuring. Next, Rio argues Leahy has never worked for a Las Vegas casino and has no knowledge of casino practices during the relevant time frame, and thus Leahy is not qualified to opine on what a reasonable casino would have done during the relevant time period. Finally, as to qualifications, Rio argues Leahy is not an expert on the handling of cashier's checks, as he has no experience in the matter.

The Trustee responds that Leahy is not offering an opinion on whether Rio complied with GAAP, whether Favata was engaged in structuring, or on cashier's check handling procedures, and thus these arguments are irrelevant. The Trustee argues Leahy is qualified to opine on what a

In re National Consumer Mortg., LLC, Not Reported in F.Supp.2d (2013)
2013 WL 164247, 90 Fed. R. Evid. Serv. 560

reasonable casino would have done because of his extensive experience in internal controls in the gaming industry. The Trustee contends the geographic location of a casino is irrelevant to this inquiry.

Rio does not provide any evidence that Leahy is opining that Rio failed to comply with GAAP, that Favata was engaged in structuring, or on any topic regarding Rio's cashier's check handling procedures. The Trustee denies Leahy will offer opinions on these subjects. The Court therefore will deny Rio's Motion to Exclude on these grounds as moot.

As to whether Leahy is qualified to construct financial analyses and draw conclusions therefrom, Leahy has an accounting degree. He was employed for over nine years with a gaming resort, and held positions such as Manager of Information Technology, Director of Accounting and Operational Analysis, Vice President of Finance, and Vice President of Process Improvement. Leahy currently is employed for a company which owns, operates, and manages casino resort properties. Through his positions, Leahy has acquired experience in preparing and reviewing financial reports, operating analyses, financial data, operating data, and internal controls within the gaming industry setting. Leahy has reviewed company internal controls and has received training on the subject throughout his career.

Rio does not dispute Leahy's qualifications except to note that Leahy has not worked for any Las Vegas casinos. Rio's insistence that Leahy must have Las Vegas casino experience is based on Rio's erroneous statement of the good faith standard, as discussed above with respect to Seddio. Leahy need not have worked for a Las Vegas casino to opine on the internal controls or financial and operational data of casinos generally, and Rio does not identify any difference between Las Vegas casinos and other casinos which would render Leahy's testimony inadmissible. The Court therefore will deny Rio's Motion to Exclude on this basis.

### 2. GAAP

**\*7**  Rio argues Leahy's opinions lack a reliable foundation because although Leahy testified he prepared a financial analysis in conformity with GAAP, he could not identify what GAAP standards would require Rio to prepare such an analysis. The Trustee responds that Leahy identified the methodology he used, and that Rio does not dispute Leahy's calculations are accurate.

Leahy does not opine that GAAP required Rio to perform the analyses he performed. Rather, he testified that he performed his own analysis in conformity with GAAP. Leahy described the processes he used to create his graphs, which are visual summaries of information Leahy obtained from Rio. (Trustee's Limine Opp'n, Ex. A–13 at 72–74, 78–79.) Specifically, Leahy identified his methodology as "accounting for financial analysis," and he described that analysis. (*Id.* at 78–80.) Rio does not dispute the accuracy of any of Leahy's calculations or graphs. Because Leahy does not offer the opinion to which Rio objects, Leahy describes his methodology, and Rio does not dispute the accuracy of Leahy's calculations or graphs, the Court will deny Rio's Motion to Exclude on this basis.

### 3. Opinions on Rio's Management

Rio argues Leahy's opinions about what Rio management should have done lack a reliable foundation because Leahy has no experience in the operation and management of Las Vegas casinos. The Trustee responds that Leahy does not need experience in Las Vegas casino management because the internal control principles about which he is opining would apply to any casino, regardless of geographic location.

As discussed above, Leahy need not have experience specifically related to Las Vegas casinos. Rio's argument is based on its erroneous statement of the applicable standard, and Rio does not identify any material difference between Las Vegas casinos and other casinos that would render Leahy's testimony inadmissible. The Court will deny Rio's Motion to Exclude on this basis.

### 4. Assisting the Trier of Fact

Rio argues Leahy's proposed testimony is not helpful to the jury in resolving the issues in the case because the activity in a customer's front money account or the amount of complimentary services he received from the casino have no bearing on whether Rio acted in good faith in cashing Favata's cashier's checks. Additionally, Rio contends Leahy's report is nothing more than "simple math" that is not helpful to the jury. The Trustee responds that Leahy's testimony would assist the jury in providing a summary of Rio's financial records, as well as the conclusions Leahy drew from that analysis.

As an initial matter, if Leahy's charts and graphs are the result of "simple math," they would be admissible as summary or calculation evidence as a compilation of Rio's source materials. *See* Fed.R.Evid. 1006. Moreover, Leahy testified

In re National Consumer Mortg., LLC, Not Reported in F.Supp.2d (2013)
2013 WL 164247, 90 Fed. R. Evid. Serv. 560

that to create the charts and tables he created, a person would need an understanding of accounting, gaming, and how to operate the software application he used. (Trustee's Limine Opp'n, Ex. A–13 at 75.) Further, the extent to which certain data within Leahy's analyses and opinions impacts the question of Rio's good faith goes to the weight, not admissibility, of Leahy's testimony. The Court therefore will deny Rio's Motion to Exclude on this basis.

### 5. Probative Value

**\*8** Rio argues the probative value of Leahy's testimony is substantially outweighed by the danger of prejudice, confusion of the issues, and would be misleading to the jury because a jury might be confused into thinking casinos prepare such charts and Rio failed to comply with GAAP by not doing so, or that Favata was convicted of structuring when he was not. The Trustee responds that Leahy is not offering an opinion that Las Vegas casinos prepare such charts or that Favata was convicted of structuring.

As discussed previously, Leahy testified he was not opining Rio should have compiled these exact reports. Rather, he testified that Rio had available the same data and, had it analyzed that data, Rio would have discovered significant changes in Favata's behavior and other details about Favata's dealings with Rio. (See, e.g., Trustee's Limine Opp'n, Ex. A13 at 81.) The Court therefore will deny Rio's Motion to Exclude on this basis.

### 6. Rule 26

Finally, Rio argues Leahy's report does not comply with Rule 26 because his report consists of charts with no meaningful explanation of those charts, such as an explanation of the data or what methodology he used to create each chart. The Trustee responds that Leahy's report complies with Rule 26, as he provides a thirteen page narrative analysis to explain his charts.

Expert reports are required to eliminate "unfair surprise to the opposing party and [to conserve] resources." *Elgas v. Colo. Belle Corp.,* 179 F.R.D. 296, 299 (D.Nev.1998) (quotation omitted). Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert's written report to contain, among other things, a "complete statement of all opinions the witness will express and the basis and reasons for them." However, an expert report need not "replicate every word that the expert might say on the stand." *See Walsh v. Chez,* 583 F.3d 990, 994 (7th Cir.2009). Rather, the expert's report must "convey

the substance of the expert's opinion, along with the other background information required by [the rule], so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Id.; see also* Fed.R.Civ.P. 26, 1993 advisory comm. n.

Pursuant to Federal Rule of Civil Procedure 37(c)(1):

(1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B)may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

**\*9** "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Penn .,* 673 F.3d 1240, 1246 (9th Cir.2012). Where the sanction effectively will constitute dismissal of a claim, the Court must consider whether the sanctioned party's actions involved "willfulness, fault, or bad faith." *Id.* at 1247. Additionally, the Court must consider lesser sanctions. *Id.*

Here, Leahy's report is inadequate under Rule 26(a)(2)(B). Leahy's report does not set forth the basis or reasons for his opinions. Although his report contains a summary in addition to the charts, the summary merely identifies what is in the charts without explaining how Leahy calculated any of the figures represented in the charts.

Nevertheless, the Court finds any such failure was relatively harmless. Rio has been in possession of Leahy's report since March 2010. (Stip.(Doc.# 96) at 2.) Rio has presented no evidence that it advised the Trustee during discovery that Leahy's report was inadequate. Rio had an opportunity at Leahy's deposition to explore the bases for his opinions. Although Rule 26(a)(2)(B) is designed in part to obviate the need for depositions if the report adequately sets forth the expert's opinions and the bases therefor, Rio presents no

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

evidence that it objected to the report or to deposing Leahy in the absence of a more complete report, or that Rio sought any other relief during the discovery period relating to the adequacy of Leahy's report.[3] Instead, Rio waited until the parties had committed enormous resources to completing discovery and submitting the matter on summary judgment to object to the adequacy of Leahy's initial report. Under these circumstances, an order precluding consideration of Leahy's deposition testimony on summary judgment is too severe a sanction.

[3]    Rio did move to compel further deposition testimony from Leahy after the Trustee's counsel inappropriately advised Leahy not to answer certain questions at Leahy's deposition. The Magistrate Judge ruled in Rio's favor, allowing for a continued deposition of Leahy. (Order (Doc. # 233).) The Magistrate Judge also awarded Rio sanctions in the form of reasonable costs and attorney's fees for both the motion to compel and the continued deposition. (*Id.*)

Rule 37(c)(1) allows the Court to consider sanctions other than precluding use of the inadequately disclosed evidence. The Court, in its discretion, concludes that in this case, the sanction of requiring the Trustee to pay the reasonable costs and attorney's fees associated with Leahy's first deposition is an appropriate sanction. Given this and other issues addressed in this Order, the Court concludes a settlement conference in this matter may be productive, and the Court will refer this action to the Magistrate Judge for a settlement conference. Rio shall serve and file a memorandum, supported by an affidavit of counsel, establishing the amount of fees and costs incurred in the first deposition of Leahy within fourteen (14) days after the settlement conference to be set in this matter, if no settlement is reached. The Court will grant Rio's Motion to Exclude Leahy's testimony only to this limited extent. The Motion is denied in all other respects.

## III. MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-

moving party. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. *Leisek v. Brightwood Corp.,* 278 F.3d 895, 898 (9th Cir.2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party. *Id.*

**\*10**    Sections 548 and 544 of the Bankruptcy Code allow a bankruptcy trustee to avoid a fraudulent transfer under either federal law or state law. Under section 548, a trustee may avoid a transfer if the transfer is made within one year[4] of the filing of a bankruptcy petition and the debtor either (1) had actual intent to defraud or (2) received less than reasonably equivalent value in exchange for the transfer and was insolvent, was made insolvent by the transfer, was operating or about to operate without property constituting reasonably sufficient capital, or was unable to pay debts as they became due. 11 U.S.C. § 548(a)(1)(A), (B).

[4]    Section 548 now provides that transfers within two years of the petition are voidable, but at the time NCM filed its petition, the statute provided that transfers within one year of the petition were voidable.

Under section 544, a bankruptcy trustee may avoid a transfer that an unsecured creditor with an allowable claim could have avoided under applicable state law. *Id.* § 544(b)(1). Under CUFTA, a transfer is voidable if the debtor made the transfer (1) with actual intent to defraud or (2) without receiving a reasonably equivalent value in exchange for the transfer and was insolvent, was "engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Cal. Civil Code § 3439.04(a)

Upon avoiding a fraudulent transfer under either section 544 or section 548, a trustee may recover the transferred property or the value thereof from the initial transferee or from any subsequent transferees. 11 U.S.C. § 550(a). However, a trustee may not recover from "a transferee that takes for value, ... in good faith, and without knowledge of the voidability of the transfer avoided." *Id.* § 550(b)(1); *see also*

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

Cal. Civ.Code § 3439.08(a) (providing a similar good faith defense under CUFTA).

### A. The Trustee's Prima Facie Case

Rio contends the Trustee cannot establish his prima facie case for actual intent fraudulent transfer as a matter of law. First, Rio argues the Trustee cannot show the debtor, NCM, acted with the requisite intent because Favata's intent cannot be imputed to NCM, as Favata was not an officer or director of NCM. Second, Rio argues that even if Favata's intent can be imputed to NCM, Favata testified he did not intent to hinder, delay, or defraud NCM's creditors. Third, Rio argues the Trustee is not entitled to the Ponzi presumption, which assumes intent where the debtor operated a Ponzi scheme, because Favata's plea agreement is inadmissible hearsay, and Favata does not admit to a Ponzi scheme in any event. Rio also contends the Trustee cannot rely on Favata's deposition testimony to establish a Ponzi scheme because Favata testified NCM was operating a legitimate and profitable mortgage brokering business.

As to constructive fraudulent transfers, Rio argues the Trustee cannot show NCM was insolvent at the time of each transfer. Rio contends the Trustee cannot rely on Favata's plea agreement to establish insolvency because the plea agreement is inadmissible and in any event the plea agreement does not set forth any facts that NCM was insolvent. Additionally, Rio contends the Trustee cannot rely on Favata's deposition testimony because he testified NCM operated a legitimate and profitable business. Rio further argues the Trustee cannot rely on a reconstruction of records performed by the Trustee because the reconstruction is inadmissible as speculative lay opinion testimony. Rio also argues the reconstruction does not establish insolvency at the time of any particular transfer, even if it were admissible.

**\*11** The Trustee responds that he has established actual intent fraudulent transfers through Favata's plea agreement, which the Trustee contends is admissible, as well as through Favata's deposition testimony in which he admits he operated a Ponzi scheme through NCM. The Trustee also contends that even absent the Ponzi presumption, the transfers carry badges of fraud which would support a finding of actual intent. As to whether Favata's intent can be imputed to NCM, the Trustee contends that Favata had actual and apparent authority to act on NCM's behalf, as demonstrated by the testimony of Sandra Favata and Morisette, who both testified they turned financial control of NCM over to Favata.

As to constructive fraudulent transfers, the Trustee argues Favata's plea agreement and testimony establish insolvency. Moreover, the Trustee contends the reconstruction is admissible as a summary and conclusions drawn therefrom are admissible as lay opinion that establishes NCM's insolvency.

A trustee can bring fraudulent transfer claims under both section 548 and section 544 based on either actual intent to defraud creditors or constructive fraud. To establish fraudulent transfers made with the actual intent to hinder, delay or defraud creditors, the Trustee must show (1) the debtor transferred an interest in property to the defendant; (2) the transfer occurred within the applicable time period, and (3) the debtor made the transfer with the actual intent to hinder, delay, or defraud its creditor or creditors. 11 U.S.C. §§ 548(a)(1)(A), 544; Cal. Civ.Code §§ 3439.04(a)(1), 3439.09. To establish constructive fraudulent transfers, the Trustee must show (1) the transfer involved the debtor's property; (2) the transfer was made within the applicable time period; (3) the debtor did not receive reasonably equivalent value in exchange for the property transferred; and (4) the debtor was insolvent, was made insolvent by the transaction, was operating or about to operate without property constituting reasonable sufficient capital, or was unable to pay debts as they became due at the time of the transfer. 11 U.S.C. §§ 548(a)(1)(B), 544; Cal. Civ.Code §§ 3439.04(a)(2), 3439.09.

### 1. The Ponzi Presumption

A Ponzi scheme is "a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture." *Donell v. Kowell,* 533 F.3d 762, 767 n. 2 (9th Cir.2008) (quotation omitted). "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *Id.* (quotation omitted); *see also In re Slatkin,* 525 F.3d 805, 809 n. 1 (9th Cir.2008). The "mere existence of a Ponzi scheme is sufficient to establish actual intent under § 548(a)(1) or a state's equivalent to that section." *In re AFI Holding, Inc.,* 525 F.3d 700, 704 (9th Cir.2008) (quotation omitted). Courts presume actual intent in relation to a Ponzi scheme because the debtor knows at the time of the transfer that the scheme ultimately must collapse. *In re Indep. Clearing House Co.,* 77 B.R. 843, 860 (D.Utah 1987). Proof that transfers were made pursuant to a Ponzi scheme likewise establishes insolvency for constructive fraudulent transfers.

In re National Consumer Mortg., LLC, Not Reported in F.Supp.2d (2013)

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

Case 2:19-ap-01382-SK   Doc 282-1   Filed 09/07/21   Entered 09/07/21 11:44:24   Desc
Exhibit A -- Unpublished Cases   Page 10 of 210

*Donell,* 533 F.3d at 770–71; *Warfield v. Byron,* 436 F.3d 551, 558–59 (5th Cir.2006) (stating a Ponzi scheme "is, as a matter of law, insolvent from its inception").

**\*12** A plea agreement in which the defendant admits he ran a Ponzi scheme is admissible under Federal Rule of Evidence 807, the residual hearsay exception. *In re Slatkin,* 525 F.3d at 811–12. Moreover, a "debtor's admission, through guilty pleas and a plea agreement admissible under the Federal Rules of Evidence, that he operated a Ponzi scheme with the actual intent to defraud his creditors conclusively establishes the debtor's fraudulent intent under 11 U.S.C. § 548(a)(1) (A) and California Civil Code § 3439.04(a)(1), and precludes relitigation of that issue." *Id.* at 814.

Here, Favata's plea agreement is admissible under Federal Rule of Evidence 807. Moreover, even if the plea agreement was inadmissible, Favata reaffirmed the statements in his plea agreement during his deposition in this case. Rio's argument that Favata did not admit to a Ponzi scheme is meritless. Favata unambiguously admitted to operating a Ponzi scheme in his plea agreement, and he reaffirmed those admissions at his deposition. Specifically, Favata admitted that from 2000 to 2006, he "used the investment division of NCM to operate a fraudulent scheme that bilked hundreds of investors of sums totaling in excess of $20 million." (Trustee's Countermot. for Summ. J. (Doc. # 217) ["Trustee's Countermot."], Ex. B–25 at 4.) Favata admitted he (1) "falsely represented that NCM directly loaned money at high rates of return to borrowers who required short term credit," (2) "falsely told investors they could purchase the notes that secured these loans and thus acquire the right to collect the interest payments," and (3) "falsely assured investors that their principal ... would be returned once the borrower paid off the loan from NCM." (*Id.* at 4–5.) Additionally, Favata admitted that at the time he made these representations to investors, he "knew that the purported private money note investments that he offered to investors simply did not exist," and that he "had neither the means nor the intention of investing his client['s] money as promised." (*Id.* at 5.) Favata further admitted that he falsely promised substantial rates of return and that real property secured the investments. (*Id.*)

Additionally, Favata admitted he diverted investors' funds to his personal use and also "used investor funds to prevent detection of his scheme. In particular, he often diverted funds from new investors to feign purported interest payments to the original investors in the scheme. As a result of these lulling payments, Favata induced many victims to reinvest

their principal into the scheme rather [than] withdrawing their funds." (*Id.* at 5–6.) Favata's admissions are conclusive and preclude relitigation of the issue of whether Favata acted with the requisite intent to defraud.

Favata's admissions also conclusively establish insolvency from the inception of the Ponzi scheme, as a Ponzi scheme is insolvent from its inception as a matter of law. The mere fact that NCM conducted some legitimate business does not raise an issue of fact as to whether Favata was operating a massive Ponzi scheme. Rio relies on Favata's testimony that NCM was generating $300,000 per month through its legitimate business to argue NCM was solvent despite the Ponzi scheme. Favata testified at his deposition that "[a]t one point" the legitimate side of the business was profitable. (Trustee's Countermot., Ex. B–54 at 183.) Specifically, Favata testified that from late 2004 until it closed, the legitimate side was doing well, and in the last six months of NCM's business, NCM was generating $250,000 to $300,000 per month in profit from the legitimate side of the business. (*Id.* at 184–85.) However, Favata also testified that from 2002 to February 2005, he had duped investors out of approximately $5 or $6 million dollars through his Ponzi scheme, and as of February 2005, NCM had a $4 million deficit due to the Ponzi scheme. (*Id.* at 187–89.) During the same period when the legitimate side was doing well, the Ponzi scheme grew even more dramatically, as Favata raised about $15 million from February 2005 to the end of 2005. (*Id.* at 187–89.) Profits from the legitimate side may have assisted Favata in extending his scheme, as Favata commingled funds from both sides of the business. But no genuine issue of fact remains that the legitimate business was dwarfed by Favata's massive Ponzi scheme, and NCM was insolvent from its inception and throughout its existence. [5]

[5]    Rio's reliance on Favata's testimony that someone offered him $10 million for NCM also does not raise an issue of fact as to solvency. Favata did not disclose the fraudulent nature of his business to the potential purchaser, and thus any purported sales price would be illusory. Nor is it plausible that Favata would have sold his Ponzi scheme to a legitimate business which would uncover his wrongdoing.

**\*13** Because no genuine issue of fact remains that NCM was insolvent at the time of each of the alleged transfers, the Trustee is entitled to summary judgment that he has established insolvency for his prima facie case of constructive

In re National Consumer Mortg., LLC, Not Reported in F.Supp.2d (2013)
2013 WL 164247, 90 Fed. R. Evid. Serv. 560

fraudulent transfers under 11 U .S.C. § 548(a)(2), § 544, and CUFTA § 3439.04(a)(2). However, as to actual intent fraudulent transfers, Rio disputes whether Favata's intent can be imputed to NCM.

*2. Imputation*

To be a fraudulent transfer under 11 U.S.C. § 548(a)(1), § 544, and CUFTA § 3439.04(a)(1), the debtor must act with the actual intent to delay, hinder, and defraud its creditors. Rio contends that even if Favata acted with such intent, NCM did not, as Favata was not an owner, officer, or director of NCM. The Trustee responds that Sandra Favata and Morisette turned NCM's financial affairs completely over to Favata, and he thus had actual and/or apparent authority to act on NCM's behalf.

A corporation can form intent only through its agents. *Sea Horse Ranch, Inc. v. Superior Court,* 24 Cal.App. 4th 446, 456–57 (Cal.Ct.App.1994). An agent may have actual or ostensible authority to act on behalf of the corporation. Cal. Civ.Code § 2298. "An agency is actual when the agent is really employed by the principal." *Id.* § 2299. "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." *Id.* § 2300.

Where an agent acts within the scope of his authority, his acts and knowledge generally are imputed to the principal. See *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP,* 133 Cal.App. 4th 658, 679 (Cal.Ct.App.2005); *In re Tran,* 301 B.R. 576, 581 (Bankr.S.D.Cal.2003). A corporate agent's knowledge is not imputed to a corporation if he is acting adverse to the corporation's interest. *Meyer v. Glenmoor Homes, Inc.,* 246 Cal.App.2d 242, 264 (Cal.Ct.App.1966). However, a corporate agent's fraud may be imputed to the corporation where the wrongdoer or wrongdoers were the sole relevant actors for the corporation. See *Peregrine Funding, Inc.,* 133 Cal.App. 4th at 679–80; *Casey v. U .S. Bank Nat'l Ass'n,* 127 Cal.App. 4th 1138, 1143–44 (Cal.Ct.App.2005). This "sole actor" rule is based on the principle that where the principal grants authority to an unsupervised agent, "the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to act without accountability." *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1417–18 (7th Cir.1988).

Here, no genuine issue of material fact remains that Favata acted with actual authority in controlling all of NCM's

financial affairs. The fact that Favata was not a named officer or director of NCM is not dispositive. Rather, the undisputed testimony from Sandra Favata and Favata is that Morisette and Sandra Favata gave Favata complete and unfettered control over NCM's finances. Favata personally was involved in raising investor funds for NCM and he decided the interest rate to be advertised to investors in the Ponzi scheme. Favata testified he had authority to make business decisions for NCM and that he did not have to ask Sandra Favata for permission because he "controlled it myself." (Trustee's Countermot., Ex. B–54 at 224–25.) Morisette signed hundreds of blank checks at a time and turned them over to Favata to run NCM's finances. (*Id.* at 70–73.) Sandra Favata and Favata both testified Favata made decisions regarding the benefits and compensation Sandra Favata received from NCM. (*Id.* at 76; Trustee's Countermot., Ex. B47 at 176.) Sandra Favata also testified that Favata determined his own compensation from NCM. (Trustee's Countermot., Ex. B–47 at 176–77.) Favata likewise testified that he was "in control of the checkbook, the moneys in/moneys out." (Trustee's Countermot., Ex. B54 at 69.) Additionally, Sandra Favata signed a casino credit application with the Rio which identified Sam Favata as being employed by and an owner of NCM. (Trustee's Countermot., Ex. B–9.) Rio presents no contrary evidence to suggest Favata was not actually authorized to act on NCM's behalf.

**\*14** Because Favata had unfettered control over NCM's finances, including decisions regarding compensation to himself, Sandra Favata, and Morisette, he was acting in the course of his employment and within the scope of his authority when he transferred funds from NCM to himself. The movement of corporate assets and decisions about compensation for owners and employees are ordinary functions of management which typically would be attributed to the company. The mere fact that Favata performed illegal acts does not mean he acted outside the scope of his authority. See *USACM Liquidating Trust v. Deloitte & Touche, LLP,* 764 F.Supp.2d 1210, 1222–23 (D.Nev.2011).

However, no genuine issue of fact remains that Favata acted adversely to NCM. NCM obtained no benefit from Favata's looting of the company through his Ponzi scheme. Thus, the question which remains is whether Favata was the sole relevant actor at NCM such that his intent should be imputed to the company even though he was acting adverse to NCM's interests.

Viewing the facts in the light most favorable to the Trustee on Rio's Motion for Summary Judgment, a reasonable jury

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

could find Favata was the sole relevant actor at NCM. Sandra Favata and Morisette, while nominally the owners and controlling members of NCM, granted Favata unfettered and unsupervised control over NCM's finances. Morisette went so far as to sign hundreds of blank checks for Favata's use to operate NCM. Neither party points to any evidence that Morisette, had she been aware of the fraud, could or would have stopped it. As to Sandra Favata, she testified Favata informed her that he did not have the deeds of trust to secure the investments in NCM's Private Money Group approximately four to five weeks after she first learned of an SEC investigation in early to mid January 2006. (Trustee's Countermot., Ex. B–47 at 267–71.) Sandra Favata testified she contacted an attorney the next day. (*Id.* at 269.) However, Sandra Favata never turned Favata in to the authorities, and Favata continued to cash cashier's checks at the Rio with funds derived from NCM as late as March 22, 2006. A reasonable jury therefore could find that Sandra Favata either could not or would not take steps to end Favata's fraudulent behavior even after she became aware of it, and thus find Favata was the sole relevant actor at NCM whose intent should be imputed to NCM. The Court therefore will deny Rio's Motion on this basis.

Rio contends the Trustee has made inconsistent allegations in this action and a related action against Bank of America, and the Trustee must be bound by his prior allegations regarding the separation between Favata and the debtor NCM. In the Bank of America action, the Trustee alleged Favata was NCM's agent who acted contrary to the debtor's interest and without the debtor's permission. (Rio's Mot. Summ. J. (Doc. # 189) ["Rio's MSJ"], Ex. B–4.) However, the Trustee did not allege in the Bank of America action that Favata's intent was not imputable to NCM. The Trustee's allegations are consistent with his allegations in this action, and with imputation law and its various exceptions. Moreover, the Trustee can plead in the alternative. Fed.R.Civ.P. 8(d)(2).

**\*15** The Court does not find the Trustee must be judicially estopped from asserting Favata's intent is imputable to NCM, as Rio presents no evidence a court accepted a prior clearly inconsistent position or that allowing the Trustee to proceed would give the Trustee an unfair advantage over Rio. *United States v. Ibrahim,* 522 F.3d 1003, 1009 (9th Cir.2008). Rio argues the Trustee should be judicially estopped because the Trustee survived a motion to dismiss and then settled with Bank of America in the other action. However, Bank of America moved to dismiss based only on the argument that Bank of America did not have actual knowledge Favata was

looting, and therefore it could not have aided and abetted Favata. (Rio's MSJ, Ex. B–5.) The Trustee responded by arguing the bank had actual knowledge of facts which put the bank on notice of Favata's activities. (*Id.*) Rio presents no evidence, for example, that in response to an in pari delicto defense raised by Bank of America, the Trustee alleged that Favata's actions could not be imputed to NCM. Rio presents no prior court order adopting any such position by the Trustee. Further, a settlement does not amount to a court adopting the Trustee's purportedly inconsistent position. To the extent the Trustee's allegations in the Bank of America action are judicial admissions which suggest Favata's intent should not be imputed to NCM, Rio may use them to bolster its position at trial. However, the Court will deny Rio's Motion for Summary Judgment on the issue.

Viewing the facts in the light most favorable to Rio on the Trustee's Countermotion for Summary Judgment, a reasonable jury could find Favata was not the sole relevant actor at NCM. Although Favata exercised de facto control, both Morisette and Sandra Favata had actual authority within the company to stop Favata's fraudulent conduct. Sandra Favata averred in an affidavit that upon learning that the "private money business operated by Sam Favata had problems," she employed an accounting firm to perform an audit, and ultimately filed the petition for NCM's bankruptcy, thus effectively putting an end to Favata's ability to use NCM for fraudulent purposes. (Trustee's Countermot., Ex. B23 at 3 ¶ 13.) A reasonable jury thus could find Favata was not the sole relevant actor at NCM, and his intent should not be imputed to NCM. The Court therefore will deny the Trustee's Countermotion on this basis.

### B. Rio's Good Faith Defense

#### 1. Trustee's Motion for Sanctions

The Trustee moves for sanctions under Federal Rule of Civil Procedure 37(c) based on Rio's denial throughout discovery that it was not required to comply with the federal anti-money laundering regulation set forth in 31 C.F.R. § 103.64. The Trustee contends that after discovery closed, Rio took the contrary position via the rebuttal expert report of Courtney J. Linn ("Linn"). The Trustee requests that Rio be bound to its original position in discovery, and that it not be permitted to put forth Linn's testimony that Rio substantially complied with section 103.64. Alternatively, the Trustee requests costs pursuant to Rule 37(c)(2) for expenses incurred in proving Rio was bound by the regulation.

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

**\*16** Rio responds the Court should deny the Motion as procedurally defective because the Trustee did not meet and confer prior to filing the Motion, the Trustee did not move to compel during discovery, a Rule 37(c)(2) motion should be brought only after trial, and Rule 37(c)(2) allows only for costs, not striking of a defense. On the merits, Rio argues it has not taken any inconsistent positions, as it always has asserted Rio met all standards and practices of Las Vegas casinos at the time. Rio contends that although it initially contested the application of the federal anti-money laundering statute, it made the decision to narrow the issues for trial by no longer contesting the regulation's application. Finally, Rio notes that the Trustee previously moved to strike Linn's report before the Magistrate Judge, and, rather than strike Linn's report, the Magistrate Judge allowed the Trustee to submit a rebuttal expert report. Rio argues the Trustee improperly is seeking reconsideration of the Magistrate Judge's decision.

Pursuant to Federal Rule of Civil Procedure 37(c)(2), where a party fails to admit something in response to a request for admission and the requesting party later proves the matter to be true, the requesting party may move for sanctions in the amount of "the reasonable expenses, including attorneys fees, incurred in making that proof." The Court must award costs unless the Court finds the request objectionable, the request for admission was immaterial, "the party failing to admit had a reasonable ground to believe that it might prevail on the matter," or the party failing to admit had "other good reason for the failure to admit." Fed.R.Civ.P. 37(c)(2)(A)-(D).

Because a Rule 37 motion is not a discovery-related motion, the Trustee did not need to meet and confer prior to filing it, nor did he have to move for relief during the discovery period. *Hoffman v. Constr. Protective Servs., Inc.,* 541 F.3d 1175, 1179 (9th Cir.2008). The Court concludes that Rio's refusal to admit during discovery that it was subject to the federal anti-money laundering regulation was relatively harmless. The Trustee would have conducted extensive discovery on Rio's compliance with the federal anti-money laundering regulation regardless of whether Rio admitted the regulation applied because a substantial portion of the Trustee's good faith argument is centered on Rio's purported failure to comply with the regulation. Additionally, the Magistrate Judge lessened any prejudice by allowing the Trustee to file a rebuttal expert report from a new expert in response to Linn's report. At the hearing before the Magistrate Judge, the Trustee indicated that he did not prefer the remedy of striking the Linn report, but rather preferred getting to the merits of the case and offering his own expert in response. (Tr. (Doc.# 154) at 39–

40.) Finally, the Trustee may explore in front of the jury any inconsistencies in Rio's positions. To the extent the Trustee seeks, either directly or effectively, to preclude Rio's good faith defense, the availability of monetary sanctions combined with the Trustee's ability to reveal to the jury Rio's positions taken throughout this case are appropriate lesser sanctions.

**\*17** The Court therefore will deny the Trustee's Motion for Sanctions to the extent it seeks to preclude the Rio from arguing or presenting evidence on the issue of whether it complied with the federal anti-money laundering regulations. The Court will deny the Trustee's request for monetary sanctions under Rule 37(c)(2), without prejudice to renew after the parties' settlement conference if no settlement is reached.

*2. CUFTA*
Twenty-three of the challenged transfers totaling $2,022,008.21 occurred more than one year prior to the bankruptcy petition date. (Second Am. Compl., Ex. A.) These transfers therefore are voidable only under section 544 and the applicable state law, CUFTA as set forth in California Civil Code § 3439.04. *See* Pub.L. 109–8 §§ 1402(1), 1406(b)(2) (Apr. 20, 2005) (changing one year clawback period in section 548 to two years for any petition commenced more than one year after April 20, 2005). The parties disagree about the good faith standard under CUFTA. Rio argues that under CUFTA, a transferee acts in good faith unless it colludes with or actively participates in the fraudulent scheme. The Trustee contends CUFTA's standard is the same as the bankruptcy code, and CUFTA thus denies a good faith defense where the transferee is on inquiry notice that the transfer is actually or constructively fraudulent.

The California Supreme Court has not addressed whether CUFTA's good faith defense applies to any transferee except one who colludes with the transferor or otherwise participates in the debtor's fraudulent scheme. "Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it." *Giles v. Gen. Motors Acceptance Corp.,* 494 F.3d 865, 872 (9th Cir.2007) (quotation omitted). "In answering that question, this court looks for 'guidance' to decisions by intermediate appellate courts of the state and by courts in other jurisdictions." *Id.* (quotation omitted).

CUFTA's good faith defense is set forth in section 3439.08(a). Legislative comments to the section state that good faith "means that the transferee acted without actual fraudulent

intent and that he or she did not collude with the debtor or otherwise actively participate in the fraudulent scheme of the debtor. The transferee's knowledge of the transferor's fraudulent intent may, in combination with other facts, be relevant on the issue of the transferee's good faith of the transferor or of the transferor's insolvency." Cal. Civ.Code § 3439.08 Leg. Comm. cmt. 1 (1986). The same comment also states that "[k]nowledge of the facts rendering the transfer voidable would be inconsistent with the good faith that is required of a protected transferee." *Id.*

Relying on the first part of the legislative comment, two California intermediate appellate decisions have held that a transferee acts in good faith unless the transferee colluded with the debtor or otherwise participated in the debtor's fraudulent scheme. *See Annod Corp. v. Hamilton & Samuels,* 100 Cal.App. 4th 1286, 1299–1300 (Cal.Ct.App.2002); *Lewis v. Superior Ct.,* 30 Cal.App. 4th 1850, 1858–59 (Cal.Ct.App.1994). However, the United States Court of Appeals Bankruptcy Appellate Panel for the Ninth Circuit ("Ninth Circuit BAP") and the United States District Court for the Northern District of California looked to the entire legislative comment and determined that a transferee does not act in good faith under CUFTA if the transferee "(1) colludes with the debtor or otherwise actively participates in the debtor's fraudulent scheme, or (2) has actual knowledge of facts which would suggest to a reasonable person that the transfer was fraudulent." *CyberMedia, Inc. v. Symantec Corp.,* 19 F.Supp.2d 1070, 1075 (N .D.Cal.1998) (emphasis omitted); *see also In re Cohen,* 199 B.R. 709, 719 (9th Cir.BAP1996).

*\*18* The Court concludes that if the California Supreme Court addressed the issue, it would adopt the position of the Ninth Circuit BAP and the Northern District of California. Viewing the legislative comment in its entirety, a transferee is not entitled to the good faith defense if it colludes with the debtor or participates in the fraudulent scheme. A transferee's good faith defense also may fail if the transferee had actual knowledge of facts which would suggest to a reasonable person the transfer was fraudulent.

*3. Bankruptcy Code*

The Bankruptcy Code does not define what constitutes good faith. The United States Court of Appeals for the Ninth Circuit has declined to set forth a comprehensive test for good faith, concluding that "good faith is not susceptible to precise definition." *In re Agric. Research & Tech. Grp., Inc. ("In re Agritech"),* 916 F.2d 528, 536 (9th Cir.1990) (quotation

omitted); *see also Donell,* 533 F.3d at 771 n. 3. Courts are reluctant to establish a singular test for good faith given the "unpredictable circumstances in which the courts may find its presence or absence." *In re M & L Bus. Mach. Co., Inc.,* 84 F.3d 1330, 1335 (10th Cir.1996) (quotation omitted). Consequently, good faith is a factual question, "determined on a case-by-case basis." *In re Sherman,* 67 F.3d 1348, 1355 (8th Cir.1995); *In re Armstrong,* 285 F.3d 1092, 1096 (8th Cir.2002).

The good faith inquiry is determined by asking "what the transferee objectively 'knew or should have known' ..., rather than examining what the transferee actually knew from a subjective standpoint." *In re Agritech,* 916 F.2d at 535–36. A transferee does not act in good faith if it is on inquiry notice as to either the debtor's fraudulent intent or the debtor's possible insolvency. *See In re Nieves,* 648 F.3d 232, 238–39 (4th Cir.2011) (stating that "a transferee does not act in good faith when he has sufficient [actual] knowledge to place him on inquiry notice of the debtor's possible insolvency" (quotation omitted)); *In re Agritech,* 916 F.2d at 539–40 (holding no good faith as a matter of law where evidence showed transferee knew or should have known the debtor was operating a Ponzi scheme). A transferee thus does not act in good faith if the facts actually known by the transferee, and all reasonable inferences drawn therefrom, would suggest to a reasonable person in the transferee's position that it was receiving a voidable transfer. *In re Bressman,* 327 F.3d 229, 236–37 (3d Cir.2003); *In re Agritech,* 916 F.2d at 535 (stating "a transferee's knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether [the transferor] intended to delay or defraud his creditors ... should be deemed to have notice ... as would invalidate the sale as to him" (quotation omitted)). Whether a transferee acted in good faith is evaluated in the context of the industry in which the transferee operates. *In re Nieves,* 648 F.3d at 239. The party asserting the good faith defense bears the burden of proving it received the transfer in good faith. *In re Agritech,* 916 F.2d at 535 (applying the bankruptcy code); *In re Cohen,* 199 B.R. at 718–19 (applying CUFTA).

*\*19* The Trustee presents no evidence and does not argue that Rio actually knew of or participated in Favata's fraudulent scheme. [6] Consequently, under CUFTA and the bankruptcy code, the only question is whether Rio actually knew of facts which would suggest to a reasonable casino in Rio's position that the transfers were voidable.

In re National Consumer Mortg., LLC, Not Reported in F.Supp.2d (2013)
2013 WL 164247, 90 Fed. R. Evid. Serv. 560

6        Nor does the Trustee argue that Rio did not provide
         reasonably equivalent value.

Viewing the facts in the light most favorable to the Trustee
on Rio's Motion for Summary Judgment, a reasonable jury
could find Rio has not established its good faith defense.
The Trustee has presented evidence that Rio failed to comply
with applicable federal regulations, and had Rio done so, it
would have discovered that Favata gambled 66 high dollar
cashier's checks in two and a half years out of his front
money account at the Rio, and wagered over $48 million
during this time frame. Some of those checks identified NCM
as the purchaser of the cashier's checks. Favata gave false
information on his application for a front money account
at the Rio regarding Favata's relationship to NCM. Favata
gambled so extensively at Rio that Rio monitored him
because his wagering alone could affect the Rio Sports Book's
take. During the time Favata's gambling dramatically spiked
and he gambled millions of dollars at the Rio, Rio knew
Favata had a low limit credit card that could not even cover
his room and incidentals during his trips to the Rio on
more than one occasion. Rio already suspected Favata of
structuring once, and some of his transactions arguably appear
to be structuring activity. Rio also knew the Nevada Gaming
Control Board was investigating Favata. Viewing these facts
and others identified in the Trustee's briefs, expert reports,
and testimony in the light most favorable to the Trustee in
this highly fact-driven, case-by-case inquiry, a reasonable jury
could find Rio has not established its good faith defense.
The Court therefore will deny Rio's Motion for Summary
Judgment based on the good faith defense.

Viewing the facts in the light most favorable to Rio on the
Trustee's Countermotion, a reasonable jury could find Rio
acted in good faith. Rio presented evidence that it verified
the cashier's checks with Favata's banks, and no check ever
was dishonored or the subject of a stop payment order. A
reasonable jury could conclude that a casino such as Rio
reasonably could rely on the nationally recognized banks,
who also are subject to the federal anti-money laundering
regulations, to vet the source of the funds used to purchase
cashier's checks. Additionally, Rio presents evidence that it
did not extend Favata credit, and thus the fact that it did
not conduct further investigation of Favata was consistent
with how a reasonable casino would behave under the
circumstances. Rio also presents evidence that even if Rio
should have conducted further inquiry, it would not have
uncovered that NCM was a Ponzi scheme or that the
source of Favata's funds was illegal where several different
governmental agencies were investigating Favata, and none

had filed charges at any time while Rio was engaging
in transactions with Favata. None of those governmental
agencies advised Rio not to engage in transactions with
Favata. Viewing these facts and others identified in Rio's
briefs, expert reports, and testimony in the light most
favorable to Rio in this highly fact-driven, case-by-case
inquiry, a reasonable jury could find Rio has established
its good faith defense. The Court therefore will deny the
Trustee's Countermotion for Summary Judgment based on the
good faith defense.

## IV. CONCLUSION

**\*20**  IT IS THEREFORE ORDERED that Defendant Rio
Properties, Inc.'s Motion for Summary Judgment on the
Actual and Constructive Intent Fraudulent Transfer Claims
(Doc.183–187) is hereby DENIED.

IT IS FURTHER ORDERED that Rio's Motion for Summary
Judgment on the Good Faith Defense (Doc.189–193) is
hereby DENIED.

IT IS FURTHER ORDERED that Plaintiff John P. Brincko's
Countermotion for Summary Judgment on the Fraudulent
Transfer Claims and Rio's Good Faith Defense (Doc.217–
224) is hereby GRANTED in part and DENIED in part. The
Motion is granted to the extent that the Trustee has established
no issue of fact remains that the debtor was insolvent at all
relevant times for the purpose of the Trustee's constructive
fraudulent transfer claims. The Motion is denied in all other
respects.

IT IS FURTHER ORDERED that the Trustee's Motion
for Sanctions (Doc.217–224) is hereby DENIED without
prejudice to move for costs following the settlement
conference, if no settlement is reached.

IT IS FURTHER ORDERED that Defendant Rio Properties,
Inc.'s Motion in Limine to Exclude the Expert Testimony of
Robert Leahy (Doc. # 204) is hereby GRANTED in part and
DENIED in part. The Motion is granted in that the Court will
allow Defendant Rio Properties, Inc. to recover the reasonable
costs and attorney's fees associated with the first deposition
of Robert Leahy. The Motion is denied in all other respects.

IT IS FURTHER ORDERED that Defendant Rio Properties,
Inc. shall serve and file a memorandum, supported by the
affidavit of counsel, establishing the amount of attorney's
fees and costs incurred in the first deposition of Robert

2013 WL 164247, 90 Fed. R. Evid. Serv. 560

Leahy within fourteen (14) days following the settlement conference, if no settlement is reached.

IT IS FURTHER ORDERED that Defendant Rio Properties, Inc.'s Motion in Limine to Exclude the Expert Testimony of Alex Seddio (Doc. # 205) is hereby GRANTED in part and DENIED in part. The Motion is granted to the extent that Alex Seddio's testimony regarding the relationship between the federal anti-money laundering regulations and the September 11 attacks is excluded. The Motion is denied in all other respects.

IT IS FURTHER ORDERED that Defendant Rio Properties, Inc.'s Motion to Exclude the Expert Testimony of Peter Djinis

(Doc. # 206) is hereby DENIED as moot, without prejudice to renew at trial.

IT IS FURTHER ORDERED that this matter is referred to United States Magistrate Judge Peggy A. Leen for a settlement conference.

IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial order on or before February 18, 2013.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 164247, 90 Fed. R. Evid. Serv. 560

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Davidoff v. Farina, Not Reported in F.Supp.2d (2005)
2005 WL 2030501

KeyCite Yellow Flag - Negative Treatment
Distinguished by   In re HEXO Corp. Securities Litigation,   S.D.N.Y.,
March 8, 2021

2005 WL 2030501
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

DAVIDOFF, et al., Plaintiffs,
v.
FARINA, et al., Defendants.

No. 04 Civ. 7617(NRB).
|
Aug. 22, 2005.

**Attorneys and Law Firms**

William S. Lerach, Jonah H. Goldstein, Amber L. Eck,
Ryan A. Llorens, Lerach, Coughlin, Stoia, Geller, Rudman
& Robbins LLP, San Diego, CA, Jeffrey A. Klafter, Kurt B.
Olsen, Klafter & Olsen LLP, White Plains, NY, for Plaintiffs.

James P. Gillespie, Matthew E. Papez, Kirkland & Ellis,
LLP, Washington, DC, William H. Pratt, Frank Holozbiec,
Kirkland & Ellis LLP, New York, NY, for Verizon
Communications, Inc.

John D. Donovan, Jr., Ropes & Gray LLP, Boston, MA, for
the Individual Defendants.

Mitchell A. Lowenthal, Carmine D. Boccuzzi, Jr., Cleary
Gottlieb Steen & Hamilton LLP, New York, NY, for Smith
Barney.

MEMORANDUM and ORDER

BUCHWALD, J.

**\*1** This putative securities class action arises out of the
June 28, 2000 initial public offering of 173,913,000 shares
of Class A common stock (the "IPO") of Genuity, Inc.
("Genuity"), as well as the subsequent demise and ultimate
bankruptcy of that company. Plaintiffs, who purchased shares
of Genuity during the putative class period (which extends
from the IPO through the filing of bankruptcy), have sued
Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney
Holdings Inc.) ("Smith Barney"),[1] Verizon Communications

Inc. ("Verizon")[2] and three former Genuity officers (the
"Individual Defendants"),[3] seeking damages for alleged
violations of the United States securities laws. All defendants
have moved to dismiss plaintiffs' complaint on the ground
that it fails to state a claim for relief under Fed.R.Civ.P. 12(b)
(6) and fails to plead with sufficient particularity under both
Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform
Act of 1995 (the "PSLRA"). For the reasons set forth herein,
defendants' motions to dismiss are granted.

[1]    Smith Barney was one of two lead underwriters
for Genuity's IPO. Plaintiffs allege that, as part
of its responsibilities in this regard, Smith Barney
performed due diligence that included a review
and approval of Genuity's business plan.

[2]    As explained below, Verizon was created by a
merger of GTE Corporation and Bell Atlantic
Corporation, the same merger that created Genuity
as a spin-off company.

[3]    The Individual Defendants are Paul R. Gudonis,
who was Genuity's Chairman and C.E.O., Daniel
P. O'Brien, who was Genuity's Executive Vice
President and C.F.O., and Joseph C. Farina, who
was Genuity's President and C.O.O.

*BACKGROUND* [4]

[4]    The facts set forth below are drawn from
plaintiffs' First Amended Class Action Complaint
for Violation of the Securities Exchange Act of
1934, dated November 19, 2004 (the "Complaint"),
and are, as is appropriate in deciding these motions,
assumed to be true herein.

This lawsuit was instituted after Genuity filed for protection
under Chapter 11 of the United States Bankruptcy Code
on November 27, 2002. On October 2, 2003, Genuity filed
with the bankruptcy court a Second Amended Disclosure
Statement in support of the Consolidated Plan of Liquidation
(the "Disclosure Statement"), which allegedly revealed to
plaintiffs that Genuity had been significantly undercapitalized
since the company went public on June 28, 2000. In
their 79-page Complaint, plaintiffs allege that the June
27, 2000 Prospectus that Genuity filed with the Securities
and Exchange Commission ("S.E.C.") in connection with
the IPO (the "Prospectus"), as well as Genuity's spring

2005 WL 2030501

2000 Form S-1 Registration Statement and two subsequent amendments thereto, (collectively, the "IPO statements") were materially misleading because they failed to disclose this undercapitalization. Plaintiffs allege further that various public statements made by Genuity about its business and financial health in the period between the IPO and the company's ultimate bankruptcy filing (collectively, the "post-IPO statements") were materially misleading for a myriad of reasons. The putative class period is alleged to extend through the entire solvent life of the company, from the June 28, 2000 IPO through the November 27, 2002 bankruptcy filing. Below, we outline the IPO and subsequent relevant events before detailing plaintiffs' allegations and defendants' arguments in support of dismissal.

I. Events Leading Up To the IPO

Genuity was a "Tier 1" Internet backbone provider [5] that offered customers suites of managed Internet infrastructure services such as dedicated and broadband access, web hosting and content delivery and value-added services such as Voice over IP and managed Internet security services. Genuity's origins can be traced to BBN Corporation, a Massachusetts telecommunications company that was acquired in 1997 by GTE Internetworking Inc. ("GTE Internetworking"), a holding company subsidiary of GTE Corporation ("GTE").

[5]   The Complaint defines Tier 1 Internet backbone providers as "hav [ing] the network scale and on-network traffic to offer their customers connectivity to virtually all addresses on the [I]nternet, either directly through their [I]nternet backbone or through cost-free, high speed private connections to other Tier 1 Internet backbones." Compl. ¶ 2.

*2   In July 1998, GTE and Bell Atlantic Corporation ("Bell Atlantic") announced a proposed merger, which would combine the two companies into what is now known as Verizon. As part of the merger, and in response to objections by the Federal Communications Commission ("F.C.C."), GTE and Bell Atlantic determined that GTE Internetworking would be spun off to create an independent company, Genuity. [6] Pursuant to the spin-off plan, Genuity would conduct an IPO that would give the public over 90.5% of the Class A voting equity stock and Verizon (the merged company) approximately 10% of the Class A stock and 95% of the Class B stock. Under the plan, once Verizon obtained requisite approvals from state telecommunications regulators,

it would have the option of converting its Class B stock into 80% of the outstanding Class A stock and thereby regaining control of Genuity. Also pursuant to the plan, Verizon both retained rights of consent over various corporate actions by Genuity and was entitled to elect one member of Genuity's board of directors.

[6]   Under the Telecommunications Act of 1996, the former regional Baby Bells, such as Bell Atlantic, were prohibited from owning long distance assets without obtaining approvals, referred to as "271 Approvals," from state regulators. Because the F.C.C. classified certain Internet backbone assets of and services provided by GTE Internetworking as long distance assets, it would not approve the GTE-Bell Atlantic merger unless either those assets were divested or GTE Internetworking became independent of the merged company.

II. The IPO

Genuity's IPO was the largest in Internet history. According to the Complaint and the Disclosure Statement, when discussions about a possible IPO began in the spring of 2000, the original target offering price was $25 per share, which would have generated approximately $4.3 billion in proceeds. As discussed more fully below, plaintiffs allege that Genuity's business plan was developed with this figure in mind. With preparations for the IPO underway, however, market conditions began to deteriorate and, as of June 24, 2000, at the recommendation of the investment bankers retained to underwrite the IPO, GTE and Bell Atlantic publicly hoped for an offering price of $12 to $15 per share. [7] By June 28, 2000, however, market conditions had deteriorated further such that the company settled upon an $11 per share offering price, which would generate approximately $1.9 billion in proceeds. Notwithstanding these changes, plaintiffs allege, Genuity neither altered its business plan nor disclosed in its Prospectus that the plan "was severely underfunded as a result of raising only $1.9 billion [through] the IPO." Compl. ¶ 6. The IPO was eventually conducted on June 28, 2000 at an offering price of $11 per share and, as expected, raised approximately $1.9 billion in proceeds.

[7]   The Complaint alleges that this offering price was disclosed in the financial press on June 24, 2000.

III. Events Subsequent to the IPO

From early June 2000 through September 2000, GTE and Bell Atlantic worked with their existing bank lenders, including Smith Barney's "sister company," Citibank, N.A., to obtain a credit facility for Genuity. On September 5, 2000, a $2 billion credit facility (the "September 5, 2005 Loan") was established by a consortium of banks under an agreement that also provided that an event of default would occur at such time, if ever, as Verizon was no longer in a position to exercise its option to regain control of Genuity.

Immediately following the IPO, according to the Complaint, Genuity began to expend capital in accordance with its preexisting business plan at a rate of approximately $400 million per quarter. As part of that spending plan, Genuity launched a $20 million marketing and advertising campaign in September 2000 promoting its "Black Rocket" product, which, according to promotional materials, would bundle key Internet infrastructure into one fully integrated package for mid- to large-sized businesses. To entice potential buyers of the product, Genuity guaranteed that, once ordered, Black Rocket would be delivered within 10 business days or the buyer would be credited for all installation fees. Additionally, Genuity guaranteed that Black Rocket customers would receive credits to their accounts if their product did not have "up-times" of at least 99.9%.

**\*3** In March 2001, in order to obtain more needed capital, Genuity secured a $500 million loan from defendant Verizon (the "Verizon Loan"). In September 2001, the parties to the Verizon Loan amended the loan to make up to $2 billion available to Genuity. As with the September 5, 2000 Loan, the Verizon Loan provided for cancellation if Verizon did not maintain its option to reacquire control of Genuity.

By the end of 2001, plaintiffs allege that Genuity was facing serious financial difficulties as a result of low revenues, failing sales programs, retention of obsolete equipment and continued significant capital expenditures under the business plan. On July 21, 2002, Genuity's board of directors held a Sunday night meeting at which it was decided that Genuity would draw down the remaining $850 million available to it under the September 5, 2000 Loan.[8] On July 24, 2002, Genuity announced publicly that Verizon had cancelled its option to reacquire control over Genuity and terminated the Verizon Loan. Finally, on November 27, 2002, Genuity filed for Chapter 11 bankruptcy protection. Plaintiffs allege that the bankruptcy filing was due to Genuity's "inability to recover from the drastically underfunded IPO, its continued high rate of capital expenditures, and its inability to acquire capital

from either the banks [that provided the September 5, 2000 Loan] or Verizon." Compl. ¶ 16. Genuity's stock, which, according to the Complaint, had been trading as high as $70 per share in early 2001, was trading for pennies per share at the time that bankruptcy was declared.

[8]     The Complaint alleges that Deutsche Bank, one of the lenders involved in the September 5, 2000 Loan, refused to forward its portion of the requested $850 million "because it believed that Genuity requested the funds only because Genuity knew that Verizon was backing out of its plan to reacquire [Genuity]." Compl. ¶ 15. On July 23, 2002, Deutsche Bank sent a letter to Genuity asking whether Genuity had any reason to believe that Verizon was no longer interested in reacquiring Genuity. Genuity did not answer Deutsche Bank's letter and instead filed a breach of contract lawsuit against Deutsche Bank.

IV. The Alleged Misrepresentations
Plaintiffs assert two claims for relief. Claim One alleges that the Individual Defendants and Smith Barney violated § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, when the IPO statements and the post-IPO statements were issued. Claim Two alleges that the Individual Defendants and Verizon are liable for the alleged misleading statements as a result of their status as "controlling persons" within the meaning of § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). Before discussing defendants' arguments in support of dismissal, we briefly outline the statements that plaintiffs allege were misleading.

A. The IPO Statements
As mentioned above, plaintiffs contend that the Prospectus and the pre-IPO Registration Statement (and amendments thereto), were misleading because they failed to disclose to potential investors that the IPO offering price was substantially lower than had initially been anticipated and that Genuity's business plan-and particularly its planned capital expenditures-had not been modified to take into account the substantially lessened initial capital that would be available to the company at the eventual offering price. In support of this argument, plaintiffs rely primarily on the Disclosure Statement that Genuity filed with the bankruptcy court on October 2, 2003. That statement reads in relevant part as follows:

2005 WL 2030501

**\*4** In early 1999, GTE Internetworking developed a business plan for the expansion of the GTE/BBN Internet business. As merger planning between GTE and Bell Atlantic progressed, the parties decided that the merged company would, as part of its overall business strategy, enter into direct competition with AT & T, Sprint UUNet (a subsidiary of MCI Worldcom) and others to provide data transmission and Internet backbone services. Accordingly, the merged GTE and Bell Atlantic would require construction of a far larger telecommunications network than GTE Internetworking had originally been contemplating. The two companies developed this new, expanded business plan through the summer and fall of 1999, in order to start construction of the expanded network as soon as they consummated their merger. The companies planned to spend $11-13 billion in capital within five years to build its business and network with over 500 POPs. In early 2000 the GTE board of directors approved this business plan for the GTE Internetworking business....

As described above, Genuity Inc.'s business plan contemplated $11-13 billion of capital expenditures over five years. To fund this plan, Bell Atlantic and GTE began discussions with investment bankers in the spring of 2000 with a view toward raising $4.3 billion in an initial public offering of Genuity Inc. stock (the "IPO"), which was to remain with Genuity Inc. as the foundation of its capitalization. The $4.3 billion target was based on an estimated IPO price of about $25 per share.

With preparations for the IPO underway, the market for equity in telecommunications and Internet-based businesses began to deteriorate. At the recommendation of their investment bankers, GTE and Bell Atlantic lowered the target IPO share price to a range of $12-15 per share. Notwithstanding the lower-than-expected IPO price and the corresponding reduction in the initial equity capitalization of Genuity Inc., GTE and Bell Atlantic did not change the terms of the Genuity IPO Spin-Out. GTE and Bell Atlantic did not cancel the IPO, because accomplishing the Genuity IPO Spin-Out was an absolute necessity and precondition to consummating the merger of GTE and Bell Atlantic. Nor did GTE and Bell Atlantic alter the Genuity Inc. Group business plan, in part because they had sought approval of the merger from their respective shareholders based on a business plan that contemplated the Genuity Inc. Group constructing a massive telecommunications network that would be

reintegrated into Verizon as soon as Verizon obtained the requisite 271 Approvals.

By June of 2000, owing to further decline of the industry and the capital markets, the investment bankers recommended a final price for the IPO of $11 per share, which would provide Genuity Inc. with only $1.9 billion of initial equity capital, or 40% of the sum anticipated when GTE and Bell Atlantic formulated the Genuity Inc. Group's business plan. Notwithstanding this further reduction in the equity capitalization of Genuity Inc., GTE and Bell Atlantic did not make any attempt to alter the Genuity Inc. Group's business plan or to defer the IPO. Nor did GTE and Bell Atlantic contribute any additional equity capital to Genuity Inc. to compensate for the shortfall in IPO proceeds and initial capitalization. On June 27, 2000, the Genuity Inc. board of directors approved the $11 per share IPO pricing, and the IPO was consummated on June 30, 2000. [9]

[9]    The other submissions in this case indicate that the IPO actually occurred on June 28, 2000.

**\*5** Immediately after the IPO, the Genuity Inc. Group began its capital expenditure program in accordance with its business plan. This caused the Genuity Inc. Group to spend cash at the rate of approximately $400 million per quarter. At this rate, given its paid-in capital, the Genuity Inc. Group would have exhausted its cash in little more than 12 months. The Genuity Inc. Group's business plan, as GTE and Bell Atlantic had approved it, contemplated that Genuity Inc. would have to raise additional funds in the debt markets to supplement what was expected to be an initial equity capitalization of $4.3 billion.

Murphy Decl., Ex. F at 12-13.

Relying on the Disclosure Statement, plaintiffs argue that Genuity's allegedly undisclosed business plan was "predicated" and "dependent" on "initially raising $4.3 billion through the IPO." Compl. ¶¶ 17, 65, 69, 189. Plaintiffs allege that the business plan "contemplated Genuity's construction of a massive telecommunications network that would be reintegrated into Verizon as soon as Verizon obtained the requisite 271 approvals from state regulators," *id.* ¶ 19, and thus called for Genuity to spend capital "at a rate of $400 million per quarter," *id.* ¶ 11. The Complaint further alleges that Genuity's business plan required an initial "foundational" capital infusion of the intended $4.3 billion from the IPO to "enable[ ] Genuity to pursue its Business Plan for almost three years without the necessity of having to raise additional funds during that period and limit[ing] its need to obtain

*Davidoff v. Farina*, Not Reported in F.Supp.2d (2005)
2005 WL 2030501

additional financing from other sources," Compl. ¶ 17. In contrast, plaintiffs argue, the $1.9 billion that the IPO actually generated would last the company approximately twelve months at the planned expenditure rate. *See id.* ¶ 11. As a result, plaintiffs contend, Genuity's business plan was undercapitalized from the beginning and the IPO statements were materially misleading because they failed to disclose these facts to potential investors.

### B. The Post-IPO Statements

Plaintiffs also allege that defendants made various false or misleading statements in the wake of the IPO and leading up to Genuity's bankruptcy in November 2002. The statements alleged to be false or misleading were made, for the most part, in interviews with the press, press releases and S.E.C. filings. They are also numerous, but it is unnecessary to recount each statement individually here because all of plaintiffs' post-IPO allegations essentially reduce to four claims, namely: (i) Genuity's statements about its financial condition throughout the putative class period were misleading because Genuity was improperly recognizing revenue in violation of GAAP; (ii) Genuity's statements about its financial condition in 2001 were misleading because Genuity improperly delayed taking an impairment charge on allegedly outdated networking equipment for several months; (iii) Genuity's optimistic representations regarding its Black Rocket product were misleading because they were unrealistic; and (iv) Genuity's statements about its network capabilities were misleading because Genuity's actual network capabilities were substantially less than the company publicly represented them to be.

#### 1. Improper Revenue Recognition

**\*6** Plaintiffs allege that numerous statements made by Genuity in its financial statements and in the press regarding the company's financial health were misleading because the company was improperly recording revenue under GAAP. The alleged GAAP violations occurred in at least four distinct ways. First, plaintiffs allege that Genuity recognized revenue on sales contracts at the time the contracts were signed rather than when the products at issue were delivered, "even though the contracts could be, and often were, cancelled" by Genuity's customers. Compl. ¶ 138. Plaintiffs also allege that Genuity improperly recognized revenue on "multi-year" contracts in full at the time the contracts were signed rather than deferring revenue to later periods in which revenue would actually be realized. Plaintiffs allege that these practices "violated the basic GAAP concept that revenue must

be earned and realizable in order for a company to recognize it." Compl. ¶ 138.

Second, and relatedly, plaintiffs allege that Genuity improperly recognized revenue in connection with "last minute deals" in which, in order to "bridge the gap between the company's forecasted sales and its actual sales," Genuity would enter into sales agreements with customers either (i) at the end of a quarter or (ii) at the beginning of a quarter but "backdate" the contracts to reflect a signing during the previous quarter. Compl. ¶¶ 141-43. These techniques were improper, plaintiffs allege, because, although Genuity would recognize the revenue on these contracts during the period in which they purported to be signed, the revenue associated with them was not properly realizable because customers "had the ability to cancel the agreement[s] and in fact often did cancel these agreements." *Id.* ¶ 142. Moreover, plaintiffs allege, recognizing revenue on these contracts at the time of signing was improper because "the customer was not required to pay anything until the services were actually delivered." *Id.* ¶ 143.

Third, plaintiffs allege that Genuity engaged in an improper "dark fiber swap" with Qwest, another Internet service provider, in the first quarter of 2001. Compl. ¶¶ 27, 144-49. The alleged transaction involved an exchange between the companies of "very large ... fiber optical capacity assets for a period of 99 years." *Id.* ¶ 144. The capacity exchanged "was dark fiber and was not anticipated to be lit up for the foreseeable future." *Id.* ¶ 145. [10] Plaintiffs contend that, since the exchange "did not involve the culmination of an earnings process," the proper GAAP treatment of the transaction would have been for Genuity "to record the asset received at the carrying value of the asset transferred." *Id.* ¶ 147. Allegedly in violation of GAAP, however, Genuity treated the exchange as two separate transactions whereby the company first recognized earnings associated with the transfer of its capacity to Qwest and then recorded an asset purchase in the same dollar amount for the capacity it received from Qwest, even though no money actually changed hands. [11] Plaintiffs allege that Genuity's treatment of the transaction "wrongly inflated Genuity's revenue for this period." *Id.* ¶ 149. [12]

[10]    The Complaint does not define the terms "dark fiber" or "lit up." We assume for our purposes here that plaintiffs mean that the fiber optical capacity exchanged did not carry Internet traffic.

11    Plaintiffs allege that Qwest subsequently acknowledged that the proper accounting treatment of transactions such as this was to "record [ them] as exchanges of similar productive assets based on the carrying value of the optical capacity assets that we[re] provided in the exchanges." Compl. ¶ 148. Plaintiffs further allege that the S.E.C. filed civil charges against Qwest's executives "for their roles in an array of questionable deals, including deals between Qwest and Genuity," and that "Qwest's accounting further led to a criminal investigation by the Department of Justice and an investigation by the House Committee on Energy and Commerce." *Id.* ¶ 150.

12    Plaintiffs also allege that, in the third quarter of 2000, Genuity engaged in a transaction with Qwest whereby Genuity acquired modems, equipment and services for $260 million and Qwest paid Genuity a "bonus" of $4 million for closing the transaction before the end of the quarter. Plaintiffs allege that Qwest's accounting treatment of its receipt of the $260 million was of a "questionable nature." It is unclear how, if at all, these allegations relate to plaintiffs' claims against Genuity.

**\*7** Finally, plaintiffs allege that revenue was improperly recognized on "fictitious" sales invoices. Plaintiffs contend that the Individual Defendants encouraged its sales staff to submit bogus invoices by instituting a policy whereby sales staff would be paid commissions in full upon submission of an invoice and then, if the order was subsequently cancelled, charged the amount of the commission from the employee's next paycheck. Moreover, according to a "former Genuity Partner Manager, ... several sales people submitted sizeable fictitious sales orders and then resigned from Genuity before the orders were provisioned." *Id.* ¶ 154-55. Plaintiffs contend that Genuity's recognition of revenue associated with such sales orders was improper because the revenue was not realizable.

2. Delayed Impairment Charge on Long-Lived Assets
Plaintiffs' second post-IPO claim is that Genuity's statements regarding its financial condition in 2001 were misleading because Genuity improperly delayed taking a $2.6 billion impairment charge on various networking equipment until the fourth quarter of 2001 that should have been taken in "late 2000/early 2001." Compl. ¶¶ 157-68. Plaintiffs allege that, in late 2000, Genuity bulk purchased millions of dollars worth

of routing and switching equipment to supply future orders. Plaintiffs further allege that, by early 2001, $30-$50 million worth of the equipment was sitting in Genuity's "data centers" unused, and it was apparent that "large amounts" of Genuity's stockpiled networking equipment had become "outdated and obsolete," Compl. ¶ 31, in part because demand was shifting away from dial-up services to DSL and cable modem services, *id.* ¶ 167.

Citing the Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standard ("SFAS") No. 121, plaintiffs argue that Genuity was required to record an impairment charge "whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable." Plaintiffs contend that, as a result of Genuity's networking equipment becoming "outdated and obsolete," demand for Genuity's services declined rapidly and it became apparent in early 2001 that Genuity would not recover the carrying amounts of a significant portion of its stockpiled equipment. Nevertheless, plaintiffs contend, Genuity improperly waited to record the $2.6 billion charge until the fourth quarter of 2001. [13]

13    The Complaint states that the reason Genuity waited to record the impairment charge was that the company was seeking $2.3 billion in financing from Verizon and various banks in 2001 and that "Genuity would not have been able to obtain this additional $2.3 billion of financing in 3Q01 if it had properly accounted for its impaired assets." *Id.* ¶ 166.

3. Statements Concerning Black Rocket
The third class of alleged misrepresentations concern Genuity's Black Rocket product. As noted earlier, Black Rocket was a packaged bundle of Internet services aimed to serve mid- to large-sized business. As also mentioned above, Genuity guaranteed to its customers that it would either deliver Black Rocket within 10 days of a customer's order or credit all of the customer's installation fees. According to the Complaint, the product had an "average price tag of $100,000 to $1 million." Compl. ¶ 12.

**\*8** The Complaint alleges that, for several reasons, Genuity's public statements about Black Rocket were misleading. First, plaintiffs allege that Genuity's optimistic statements about Black Rocket's market potential were misleading because the networking technology on which Black Rocket was based was quickly becoming obsolete at the time Black

2005 WL 2030501

Rocket was being ramped up. Second, plaintiffs contend that statements touting Genuity's 10-day delivery guarantee were misleadingly unrealistic because of the time-consuming complexity and amount of work involved in designing, building, installing, testing and delivering each customized Black Rocket product to each individual customer. Third, plaintiffs allege, while Genuity represented to the public that Black Rocket sales were "extremely profitable," the company actually "was unable to determine the costs of each Black Rocket installation due to the high level of customization required, which caused the costs associated with each Black Rocket project to vary greatly." Compl. ¶ 36. Fourth, plaintiffs allege that Genuity's representations regarding demand for and customer acceptance of Black Rocket were misleading because "the Black Rocket service offering was neither competitive nor successful due to lack of customer demand, the unrealistic installation guarantees, and the fact that Genuity had over-purchased huge stockpiles of equipment in anticipation of demand that failed to materialize and which quickly became outdated." *Id.* ¶ 37.

4. Statements Concerning Genuity's Network Capabilities
The last category of alleged misrepresentations is Genuity's public statements about its fiber network capacity. According to the complaint, Genuity made public statements about "the substantial progress of its network build-out." Compl. ¶ 38. Plaintiffs allege that these statements were false because "on multiple occasions Genuity built temporary, non-functional structures." *Id* . Moreover, plaintiffs contend, "[a]fter the phony sites were erected and announcements about their completion were made, Genuity tore them down." *Id.* Plaintiffs allege that, as of mid-2001, only 10% of Genuity's fiber network was "actually lit" and that "the majority of Genuity's fiber network was incapable of carrying network traffic. *Id.* ¶ 39.

V. Defendants' Motions to Dismiss
All defendants have moved to dismiss on the ground that plaintiffs have neither stated a claim for relief under Fed.R.Civ.P. 12(b)(6) nor pleaded with adequate particularity under Fed.R.Civ.P. 9(b) and the PSLRA. All defendants argue that the IPO statements were not misleading as a matter of law both because the securities laws did not require Genuity to disclose prior targeted offering prices that it had chosen not to pursue in the actual IPO and because the Prospectus adequately warned plaintiffs of the risks and facts that plaintiffs now contend materialized and caused them harm. With respect to the post-IPO statements, defendants argue

that plaintiffs have failed to plead with sufficient particularity and that, even if plaintiffs' allegations were sufficiently particularized, defendants' statements are protected under the PSLRA's safe harbor provision for forward-looking statements, *see* 15 U.S.C. § 78u-5(c). Defendants argue further that plaintiffs have failed adequately to plead *scienter* or "loss causation," both of which are required under the PSLRA. Finally, Verizon argues that the claims against it should be dismissed both because Verizon did not "control" Genuity within the meaning of § 20(a) of the 1934 Act and because Verizon is not alleged to have been a "culpable participant" in any wrongdoing. On July 28, 2005, the Court heard oral argument.

*9 For the reasons discussed below, we dismiss plaintiffs' complaint in its entirety on the ground that, with respect to each alleged misrepresentation, plaintiffs have failed adequately to plead falsity, *scienter* and/or "loss causation."

*DISCUSSION*

In considering defendants' motions to dismiss, the Court may consider the Complaint as well as documents on which plaintiffs clearly relied in drafting the Complaint, such as the Prospectus and the Disclosure Statement. *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). We must accept as true all material factual allegations in the Complaint. *Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001). A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In evaluating the Complaint under this standard, we first address plaintiffs' IPO claims.

I. The IPO Statements
Defendants argue that the IPO statements were not misleading because they did not omit any fact required to be disclosed under the securities laws. Defendants argue further that the "bespeaks caution" doctrine precludes liability because the Prospectus adequately informed plaintiffs of the risks of which they now complain. We agree that, under either of these rationales, plaintiffs' IPO claims must fail.

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Davidoff v. Farina, Not Reported in F.Supp.2d (2005)    Exhibit A - Unpublished Cases    Page 24 of 210

2005 WL 2030501

The securities laws affirmatively require the disclosure of information that may "render[ ] prior public statements materially misleading." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 810 (2d Cir.1996) (quoting *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 268 (2d Cir.1993)). Under the facts alleged in the present case, the relevant inquiry is essentially the same as that required under the "bespeaks caution" doctrine, which holds that misstatements in the context of a stock offering are immaterial as a matter of law when "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002); *see also P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92, 96 (2d Cir.2004) ("A defendant may not be liable ... for misrepresentations in a prospectus if the alleged misrepresentations were sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security.").

The required analysis comprises two steps: first, we must identify the risk that plaintiffs allege was not disclosed in the IPO statements; second, we examine the IPO statements "to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in [the] loss did not actually exist." *Halperin,* 295 F.3d at 359.

**\*10** The allegedly undisclosed risk in this case was that the IPO would not provide Genuity with sufficient capital to proceed with its business plan. Even a cursory examination of the Prospectus, however, reveals that this risk and the facts underlying it were fully disclosed to potential investors. First, it was disclosed exactly how much cash the business plan required Genuity to spend and at what rate:

- "Our capital expenditures program, as currently contemplated, will require between $11 billion and $13 billion during the five-year period ending December 31, 2004, the majority of which will be for the expansion of our network infrastructure." Pratt Decl., Ex. B at 9. [14]

[14]    In fact, the estimated $11 billion to $13 billion, evenly spread over the five-year period ending December 31, 2004, would require an expenditure rate of between $550 million and $650 million per quarter, a sum that substantially exceeds the

$400 million per quarter that plaintiffs allege was actually spent.

- "We currently intend to spend $11 billion to $13 billion over the five-year period ending December 31, 2004, of which approximately $1.8 billion to $2.0 billion is expected to be spent during 2000, on the continued expansion of our network infrastructure and other capital expenditures." *Id.* at 10.

Second, it was disclosed exactly how much capital the IPO would raise:

- "We estimate that the net proceeds from our sale of the 173,913,000 shares of Class A common stock we are offering at the initial public offering price of $11.00 per share will be approximately $1.8 billion." *Id.* at 21.

Third, it was disclosed at what rate the IPO proceeds would be spent and that, at the intended spending rate, the proceeds would be completely depleted in a matter of months:

- "Of the net proceeds of this offering, we intend to use approximately $1.5 billion for capital expenditures, including approximately $1.2 billion in connection with the expansion of our fiber network and approximately $300 million for expansion of our product lines for delivery of advanced data services to our customers." *Id.* at 21.

- "In the near term, we believe that the proceeds from this offering ... should be sufficient to meet our cash needs through the first quarter of 2001." *Id.* at 34.

Fourth, it was emphasized that significant capital in addition to the IPO proceeds would be needed and that, if additional funding was not obtained, Genuity's business would suffer:

- "We will need significant additional capital to fund our business plan and achieve profitability." *Id.* at 10.

- "We may be unsuccessful in raising sufficient capital on terms that we consider acceptable, when needed or at all. If this happens, we would have to delay or abandon our development and expansion plans, which would adversely affect our competitive position." *Id.*

Davidoff v. Farina, Not Reported in F.Supp.2d (2005)
2005 WL 2030501

In light of these disclosures, it is hard to imagine what could have further been said to complete the picture of Genuity's financial situation. It had to have been perfectly clear to anyone who read the Prospectus that the initial capital infusion from the IPO would soon be gone and that Genuity would have to rely on the capital markets to obtain the additional financing that its business plan required. [15]

[15]    Plaintiffs make much of the fact that, in connection with a motion filed on behalf of Genuity in the bankruptcy court to have a settlement of claims against Verizon approved, the Individual Defendants' attorneys, Ropes & Gray LLP, stated that they believed Genuity had a "potentially viable" breach of fiduciary duty claim against Verizon based on Genuity's inadequate initial capitalization. Pl. Opp'n at 13-14. Plaintiffs attach inordinate significance to this statement, however. For one thing, a claim for breach of fiduciary duty against Verizon, even if viable, would not imply that Genuity had made false statements in its IPO documents. For another, in the brief on which plaintiffs base their argument, Ropes & Gray ultimately concluded that:

> The shareholders of Genuity likely would have an extremely difficult time stating a claim for breach of fiduciary duty due to undercapitalization, because the registration statement filed with the SEC, and the prospectus distributed to investors, at the time of the Genuity IPO contained extensive disclosure of the risk factors concerning Genuity's business plan and capitalization and the shareholders purchased their shares anyway. Any breach of fiduciary duty claim would, therefore, have to be brought on behalf of Genuity's creditors.

Olsen Decl., Ex B at 28.

**\*11**    Plaintiffs maintain, however, that the Prospectus failed to disclose that Genuity's business plan was "undercapitalized" in the sense that it was "predicated" on raising $4.3 billion (the amount resulting from an IPO at $25 per share) in an IPO [16] and that skilled investors knowing all of the relevant facts about the business plan would have concluded that the company was doomed to failure from the start. [17] This argument simply is not tenable given that all of the operative facts-the business plan's overall capital requirement of $11 billion to $13 billion with

capital expenditures in excess of $400 million per quarter, the $1.9 billion that the IPO would generate, the scheduled depletion of those proceeds in short order and the necessity to immediately seek additional debt financing to cover the gap between the capital generated through the IPO and that required under the business plan-were fully disclosed. Moreover, plaintiffs acknowledge that several of the alleged "insiders" in this case-the Individual Defendants, Verizon and Smith Barney's parent, Citigroup-themselves acquired significant portions of Genuity's public stock. [18] Verizon, Citigroup and a consortium of other sophisticated banks further loaned Genuity billions of dollars shortly after the IPO and throughout the duration of the company's solvency. And, up until shortly before Genuity's initial bankruptcy filing, Verizon is alleged to have intended to reacquire control of the company. These circumstances suggest in the strongest of terms that sophisticated investors with the most intimate knowledge of Genuity's business plan and capitalization had confidence in the company's future and certainly did not think that the company was "undercapitalized" as plaintiffs use that term. [19]

[16]    Plaintiffs conceded at oral argument that the previous target of $25 per share, which undoubtedly was a moving one in the months preceding the IPO, was not required to be disclosed in the Prospectus. Plaintiffs further conceded that any sophisticated investor would have known that market conditions in the months preceding the IPO would have allowed a higher offering price for Genuity shares than the $11 that was ultimately obtained.

[17]    In this vein, plaintiffs referred the Court during oral argument to the Fifth Circuit's decision in *Matter of Mobile Steel Company,* which defined "undercapitalization" as a condition that exists "if, in the opinion of a skilled financial analyst, [existing capital] would definitely be insufficient to support a business of the size and nature of the [company at issue] in light of the circumstances existing at the time the [company] was capitalized." 563 F.2d 692, 703 (5th Cir.1977). Plaintiffs argue that the "bespeaks caution" doctrine does not apply in the present case because the gravamen of their IPO claim is the alleged failure of the Prospectus to disclose the "present fact" that the company's business plan was "undercapitalized" under *Matter of Mobile Steel Company'* s definition, not that

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A - Unpublished Cases    Page 26 of 210

Davidoff v. Farina, Not Reported in F.Supp.2d (2005)

2005 WL 2030501

the Prospectus failed to disclose the "future risk" that Genuity would fail due to insufficient capital. *See* Pl. Opp'n at 7-10 (citing *P. Stolz Family Partnership L.P.,* 355 F.3d at 97 (holding that "bespeaks caution" doctrine applies to warnings about risks of future contingencies, not to representations of "[h]istorical or present fact")). Apart from the obvious question of whether there is a meaningful distinction between these concepts under the facts alleged here, there is, for the reasons discussed above, little support in the Complaint or in plaintiffs' other submissions for the notion that, at the time of the IPO, "skilled financial analysts" thought that Genuity's capitalization would preclude viability.

[18]    Indeed, Citigroup and Verizon together acquired approximately 21.5% of the publicly traded shares.

[19]    These facts also compel the conclusion that defendants did not act with the *scienter* that is required under the securities laws. *See* Part II.C, *infra.* Indeed, it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail.

Finally, and perhaps most tellingly, plaintiffs' fundamental premise that Genuity had an undisclosed "business plan" that was "predicated" on a "foundational" infusion of $4.3 billion in IPO proceeds is a misreading of the Disclosure Statement. According to that statement, upon which plaintiffs stated at oral argument their premise is entirely based, Genuity's "new, expanded business plan" was "developed ... through the summer and fall of 1999." Murphy Decl., Ex. F at 11. The Disclosure Statement also states, however, that the original $4.3 billion IPO figure was not even contemplated until months later, when "Bell Atlantic and GTE began discussions with investment bankers in the spring of 2000" about a possible IPO. *Id.* at 12. The Disclosure Statement clarifies, moreover, that "the $4.3 billion target was based on an estimated IPO price of about $25 per share" and thus was not some predetermined figure that Genuity's analysts determined was necessary to fund the business plan. *Id.* As defendants pointed out during oral argument, the "business plan" was thus a spending plan and appears not to have contemplated sources of capital, "foundational" or otherwise.

**\*12**    Faced with the numerous financial disclosures in the IPO statements and acknowledging that there is no disclosure requirement for earlier hoped for IPO share prices,

plaintiffs have devised a contorted claim of failure to disclose a so-called business plan, which is simply unsupported by the documents on which they rely. For the reasons stated above, plaintiffs' claim that the IPO statements were fraudulent is dismissed for failure adequately to allege any material misrepresentation. [20] We now turn to the post-IPO statements.

[20]    Plaintiffs clarified at oral argument that their claim against defendant Smith Barney is based solely on the IPO statements, not on the post-IPO statements. Accordingly, Smith Barney must be dismissed as a defendant for the reasons stated above, and the discussion that follows applies only to the allegations against the Individual Defendants and Verizon.

## II. The Post-IPO Statements

Defendants seek to dismiss all of plaintiffs' post-IPO claims on numerous grounds, including that the Complaint fails to plead fraud with adequate particularity, that *scienter* is not sufficiently pleaded and that the PSLRA's "loss causation" requirement is not satisfied. [21]

[21]    Before evaluating these arguments, however, it is worth noting that the Complaint makes clear that the IPO claim, which we have just dismissed, is the lynchpin of plaintiffs' case in terms of the defined class, which includes "all purchasers of the publicly traded securities of Genuity ... during the period from June 28, 2000 through November 27, 2002." Compl. ¶ 1. There is no delineation in the Complaint of any subclass related to any of the post-IPO statements. Yet the majority of the post-IPO allegations, even if sufficiently pleaded, would be applicable to only discrete and very narrow classes, if any.

### A. Particularity

Defendants' principal objection to the post-IPO claims is that plaintiffs fail to plead the existence of fraudulent misrepresentations with the particularity required by Fed.R.Civ.P. 9(b) and the PSLRA. We agree that the majority of plaintiffs' allegations lack the requisite particularity and therefore must be dismissed.

### 1. The Legal Standard

*Davidoff v. Farina*, Not Reported in F.Supp.2d (2005)
2005 WL 2030501

Where a complaint alleges fraud, Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... shall be stated with particularity." Where a complaint alleges securities fraud as a result of misleading public statements, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

What these rules mean in the context of a fraudulent misrepresentation claim under Rule 10b-5 is that plaintiffs must "(1) specify the statements that [they] contend[ ] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (internal citation omitted). While the particularity mandates of Fed.R.Civ.P. 9(b) and the PSLRA do not require plaintiffs to plead "every single fact upon which their beliefs concerning false or misleading statements are based," *Novak*, 216 F.3d at 313, they do require plaintiffs to plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement[s] or omission[s]," *id.* at 314 n. 1. Where improper accounting under GAAP is alleged, moreover, plaintiffs "must provide at the very least some level of detail about the improper accounting alleged to underlie misleading statements, and their materiality, in order to survive the motion to dismiss phase." *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291, 2004 WL 2210269, *13 (S.D.N.Y. Sept.30, 2004); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.2004) ( "[P]laintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity how that is so."); *San Leandro Emergency Medical Group Profit Sharing Plan*, 75 F.3d at 812 (stating that, "[i]n order to satisfy the requirements of Rule 9(b), plaintiffs must allege in what respects the statements at issue were false"). On the other hand, these particularity requirements are not meant to bar potentially meritorious securities claims where missing facts can only be obtained through discovery. *See, e.g., In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, No. 02 Civ. 5575, 2004 WL 992991, *12 (S.D.N.Y. May 5, 2004).

**\*13** Under these standards, most of plaintiffs' claims relating to the post-IPO statements cannot survive scrutiny under the particularity requirement. We now evaluate those claims seriatim.

## 2. Improper Revenue Recognition

Despite the Complaint's purported reliance on former Genuity employees and corporate insiders, plaintiffs' allegations regarding improper revenue recognition are exceedingly general and do not explain with any specificity what effect the alleged conduct had on the company's statements regarding its financial health. For example:

- Plaintiffs allege that recognizing revenue at the time Genuity's contracts were signed was improper under GAAP because "most customers" had "cancellation rights" that were "often" exercised, Compl. ¶ 21, but plaintiffs do not allege which customers cancelled, what kinds of "cancellation rights" were retained, by whom they were retained or how much revenue was improperly recognized as a result.

- Plaintiffs allege that "[i]n many instances, ... last minute agreements were cancelled in the following quarter," *id.* ¶ 142, but plaintiffs do not explain which agreements were cancelled or how much revenue was recognized as a result.

- Plaintiffs allege that "Genuity would recognize revenue from multi-year contracts in full upon the signing of the contract," *id.* ¶ 140, but they do not explain how often this was done, by whom or how much revenue was improperly recognized.

- Plaintiffs allege that Genuity's sales team "creat[ed] fictitious sales orders," *id.* ¶¶ 28, 154-56, but plaintiffs do not indicate when, by whom or what size "fictitious" orders were generated. [22]

[22]    Nor do plaintiffs explain why, if there were truly an effort on Genuity's part to create "fictitious" sales orders, the company would have paid its sales people commissions to do so. The more logical and cheaper approach would have been simply to create the allegedly fake orders without involving the sales staff at all.

More generally, it is impossible to tell from the Complaint whether this conduct could have materially affected Genuity's financial statements so as to render them misleading to such an extent as to create liability under the securities laws.

Nor do plaintiffs allege with any particularity a concerted scheme by any defendant or defendants to misrepresent

2005 WL 2030501

Genuity's financial condition for any particular purpose. [23] It is impossible, therefore, to infer that the alleged improper accounting activity infected Genuity's practices to such an extent as to have any material impact on the company's financial statements. Accordingly, with two exceptions, which we explain shortly, we must dismiss plaintiffs' allegations of improper revenue recognition as insufficiently particularized under Fed.R.Civ.P. 9(b) and the PSLRA.

[23]     Plaintiffs allege simply that, "[i]n order to overstate its earnings and assets in 2000-2002, Genuity violated GAAP and SEC rules by improperly recognizing revenue and by failing to timely record a charge to write-down its impaired assets to reflect impairment of its long-lived assets." Compl. ¶ 133.

In opposing this result, plaintiffs rely heavily on *In re Computer Associates Class Action Securities Litigation,* 75 F.Supp.2d 68 (E.D.N.Y.1999). However, the court in that case found that plaintiffs had alleged a "widespread" and "pervasive fraudulent scheme." *Id.* at 73-74. If we could say the same here, we would have less hesitation to assume, as the court in that case did, that materiality existed as a "huge net effect in error as to the company's overall figures," *id.* at 73, and thus to overlook plaintiffs' failure to point to specific instances of improperly backdated or "multi-year" contracts, "last minute deals" or "phony sales orders." As it is, however, plaintiffs have simply failed to plead such an effect. Accordingly, in the absence of allegations of a pervasive fraudulent scheme and in the absence of specifics about particular transactions, we cannot determine to what extent the allegedly wrongful conduct would affect Genuity's financial and press statements and render those statements materially misleading.

**\*14**  The two exceptions, which are adequately pleaded, are plaintiffs' allegations that: (i) according to a Genuity Project Manager named Rick Goodwin, Genuity's Texas office backdated a "sizeable"[24] contract with AOL in the second quarter of 2000, *id.* ¶¶ 25, 143; and (ii) that Genuity improperly recognized revenue in connection with its "dark fiber swap" with Qwest in the first quarter of 2001, *id.* ¶¶ 27, 144-49. We find that these allegations are sufficiently specific under the Federal Rules and the PSLRA, and we therefore decline to dismiss them on particularity grounds. [25]

[24]     Giving plaintiffs the benefit of the doubt on these motions to dismiss, we assume that "sizeable" would equate to materiality.

[25]     Plaintiffs also allege that, "[i]n December 2002, per a former Genuity Account Representative, Genuity backdated a multimillion dollar contract with Verizon that was scheduled to close in 1Q03 and recognized the revenue associated with this contract in 4Q02," Compl. ¶ 143; *see also id.* ¶ 25. We do think that this allegation is sufficiently specific to survive dismissal on grounds of particularity. However, the conduct alleged falls outside the putative class period, which, according to the Complaint, ends on November 27, 2002. Accordingly, this allegation is not relevant to the issue before us.

### 3. Delayed Impairment Charge

With respect to the claims that Genuity improperly delayed taking an impairment charge on $30-$50 million worth of outdated networking equipment in 2001, while plaintiffs' allegations could be more precisely drafted, we believe that they are sufficiently specific to avoid dismissal on grounds of particularity.

### 4. Black Rocket

Plaintiffs' allegations with respect to Black Rocket are insufficiently particularized. Other than general statements about Genuity's difficulty in meeting its 10-day delivery guarantee, inordinately high pricing and difficulty in ascertaining profitability, plaintiffs offer no specific statements that are demonstrably false and materially misleading in the context of the facts pleaded in the Complaint. [26] It is thus impossible to tell from the Complaint whether the statements at issue were false or misleading and, if so, whether they were materially so.

[26]     For example, plaintiffs allege that Genuity's statement that Black Rocket was based on "industry-leading hardware and software" was materially misleading because Genuity's "equipment was outdated by the time they installed it and technologically inferior," Compl. ¶ 99, presumably because demand was shifting away from dial-up services toward DSL and cable, *see id.* ¶ 167. It is impossible to evaluate from these allegations, however, what hardware was

"outdated," to what extent, or how, given that the trend toward DSL and cable was undoubtedly not "inside" information, Genuity's statement could have been materially misleading to the public. Similarly, plaintiffs allege that Genuity's statements that Black Rocket was "extremely profitable" were misleading because it was difficult at the time to calculate the varying profit margin on each installation, but they do not tell us whether Black Rocket was, in fact, profitable at the times the various statements were made. The Complaint's other allegations about Black Rocket are similarly unspecific.

Moreover, a substantial portion of plaintiffs' allegations with respect to Black Rocket center on Genuity's public touting of the product and its market potential, without identifying any specific material falsehoods in those statements. The Second Circuit has made clear, however, that such puffery must be allowed. *See, e.g., Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.2004) ( "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage .' ") (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129-30 (2d Cir.1994)). Accordingly, plaintiffs' claims based on statements about the Black Rocket product must be dismissed.

### 5. Genuity's Network Capabilities

Plaintiffs' allegation that Genuity misrepresented its network capacity is likewise insufficiently specific. The Complaint goes no further in particularity than to allege that Genuity made "public representations regarding the substantial progress of its network build-out," statements that allegedly were false because "only approximately 10% of Genuity's fiber network was actually lit." Compl. ¶¶ 38-39. Plaintiffs provide no guidance as to what the alleged false statements were, who made them and when, why they were false when made or why ten percent of Genuity's network being "actually lit" was not "substantial progress." Accordingly, this claim is dismissed.

### B. Loss Causation

**\*15** In light of the discussion above, only three of plaintiffs' post-IPO allegations remain. Those allegations are that

Genuity's statements about its financial health were materially misleading because: (i) in the second quarter of 2000, Genuity improperly recognized revenue when it backdated a "sizeable" contract with AOL; (ii) late in the first quarter of 2001, Genuity improperly recognized revenue in connection with its "dark fiber swap" with Qwest; and (iii) in 2001, Genuity improperly delayed by several months the taking of an impairment charge on its outdated networking equipment. We now examine these claims against defendants' argument that plaintiffs have failed to plead "loss causation."

To state a claim under the securities laws, a plaintiff must allege "loss causation," *i.e.,* a causal connection between the alleged material misrepresentation and the plaintiff's loss. *See, e.g., Dura Pharms., Inc. v. Broudo,* --- U.S. ----, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005). Where a plaintiff alleges that he was harmed by a misleading statement and subsequent decline in stock price, he or she must allege that "the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) (emphasis in original). In other words, the plaintiff must allege that " 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' ... *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001)) (emphasis in original). As the Second Circuit has explained, a loss causation analysis examines the relationship between the loss alleged and the information that the defendant allegedly misstated or concealed. *Id.* at 174. If that relationship is sufficiently direct, then the loss causation requirement is satisfied.

We find that plaintiffs have failed to plead loss causation with respect to all of the remaining claims. First, with respect to the claim that Genuity improperly delayed taking an impairment charge on its networking equipment in 2001, plaintiffs conceded at oral argument that "there is no loss causation associated with that revelation." July 28, 2005 Tr. 37.

With respect to the allegation that Genuity backdated a contract with AOL in mid-2000, plaintiffs do not allege that a decline in stock price occurred because the fact that the contract was backdated was disclosed to the public or that any stock decline was related to the subject of contract itself. Nor do plaintiffs explain more generally how backdating

2005 WL 2030501

a contract from one quarter to the previous one could have misrepresented Genuity's aggregate financial position to investors who, like the putative class members, held stock during both quarters.[27] Loss causation is thus not satisfied as to this claim.

[27]    It is important to note that these observations apply equally to plaintiffs' other allegations about improperly backdated contracts, which were discussed above. Thus, even if those allegations had been pleaded with sufficient particularity, they would nevertheless be dismissed for failure to plead loss causation.

**\*16** Finally, with respect to the claim that Genuity improperly recorded revenue from its "dark fiber swap" with Qwest, plaintiffs do attempt to allege loss causation, but they fail to do so adequately. The Complaint alleges that, on February 21, 2002, approximately one year after the alleged "dark fiber swap," Genuity held a quarterly analysts' breakfast meeting at which company management stated, among other things, "that the company never recorded swap revenues, was not in danger of violating its debt covenants and had access to significant funding." Compl. ¶ 116. The Complaint further alleges that, "[f]ollowing this announcement, Genuity shares fell nearly 10%-from $22.20 per share on February 20, 2002 to $20 per share on February 21, 2002." *Id.* ¶ 117. In opposing defendants' loss causation argument, plaintiffs contend that Genuity's denial that it recorded swap revenues caused the stock price dip: "Although Genuity falsely denied engaging in such 'recorded swap revenues,' it is reasonable to infer that the market discounted that denial in light of the 'negative news coming out of [that] sector' regarding improperly 'recorded swap revenues.'" Pl. Opp'n at 36 (alteration in original). In support of this argument, plaintiffs cite the Court's decision in *In re Flag Telecom Holdings, Ltd. Securities Litigation,* 352 F.Supp.2d 429, 442 (S.D.N.Y.2005), which, plaintiffs note, describes a "46% stock price drop on Flag's February 13, 2002 announcement that it had entered into revenue swap transactions." Pl. Opp'n at 36. Plaintiffs conclude that, because it was becoming public at the time that various telecommunications companies had improperly recognized revenue associated with fiber swaps, and because Genuity affirmatively came out and denied that it was engaging in that practice, the public did not believe Genuity's denial and discounted the value of Genuity's stock accordingly.

Plaintiffs' argument must be rejected. There is no allegation that the February 21, 2002 stock price decline followed any revelation of information that Genuity had recorded swap revenues. To the contrary, the relevant statement during the February 21, 2002 analysts' meeting was a *denial* that Genuity had recorded such revenues. Plaintiffs' speculation that the public disbelieved that denial and therefore discounted the stock price is too strained an inference even on a motion to dismiss. *See, e.g., Lentell,* 396 F.3d at 175 (Plaintiffs "must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered."). From the facts alleged in the Complaint, the more reasonable inference is that Genuity's stock price fell as part of the general decline in that business sector.

For these reasons, plaintiffs' remaining three claims must be dismissed for plaintiffs' failure to plead any associated loss causation.

### C. *Scienter*

Although each of the post-IPO claims must be dismissed on grounds of insufficient particularity or loss causation, it is important to note that these claims are deficient for the additional reason that plaintiffs have failed to plead *scienter.* Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To satisfy this requirement, which is a particularized version of the Second Circuit's pre-PSLRA *scienter* pleading standard, *see Novak,* 216 F.3d at 311 ("When all is said and done, we believe that the enactment of paragraph (b)(2) did not change the basic pleading standard for scienter in this circuit (except by the addition of the words 'with particularity').", plaintiffs must specifically allege facts that either: (i) demonstrate that defendants had a motive and opportunity to commit fraud; or (ii) constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 170 (2d Cir.2000); *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000).[28]

[28]    This discussion of *scienter* is more relevant to plaintiffs' claims against the Individual Defendants than it is to the claims against Verizon, who plaintiffs allege is liable on a "control person" theory under § 20(a) of the 1934 Act. Nonetheless, in the context of a claim under § 20(a), plaintiffs

2005 WL 2030501

are still required, in order to make out a *prima facie* case, to allege that Verizon "was in some meaningful sense a culpable participant" in the post-IPO statements. *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quoting *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996)). The Complaint, however, does not allege *any* involvement by Verizon in the post-IPO statements. In fact, the motives at issue here would suggest that those who were aware of any alleged wrongdoing would desire to keep Verizon in the dark in order to avoid giving Verizon a reason not to exercise its option to reacquire the company. Moreover, plaintiffs' allegations that Verizon had the option to "reacquire" control over Genuity but never exercised that option belie plaintiffs' argument that Verizon was a "control person" under § 20(a). Accordingly, the post-IPO claims against Verizon must be dismissed on the additional grounds that the Complaint does not satisfy the "control person" and the "culpable participation" requirements of § 20(a).

**\*17** Plaintiffs have not argued that motive or opportunity is alleged as to any of the post-IPO statements.[29] With respect to the allegations of GAAP violations, which comprise the bulk of plaintiffs' post-IPO claims, this failure to allege motive is fatal because allegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of "corresponding fraudulent intent." *Novak,* 216 F.3d at 309 (quoting *Chill,* 101 F.3d at 270). Thus, even if it could be established that the Individual Defendants were each aware of the allegedly improper accounting activity, plaintiffs would nevertheless have to establish that the Individual Defendants intended to defraud the public about the content of Genuity's financial statements or had some reason to do so.[30] The Complaint, however, is devoid of factual allegations, circumstantial or otherwise, indicating that the Individual Defendants acted with such intent.

[29]  In their opposition papers, plaintiffs do argue that they have adequately alleged motive and opportunity with respect to their claim that the IPO statements were misleading, but they do not do so as to their post-IPO claims.

[30]  Plaintiffs cannot establish the requisite fraudulent motive simply by alleging that the Individual

Defendants desired to keep their jobs or increase their compensation by artificially inflating Genuity's stock price. *Cf., e.g., Novak,* 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders....") Plaintiffs must "assert a concrete and personal benefit to the individual defendants resulting from the [alleged] fraud." *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001). Plaintiffs have failed to do that. Even the Complaint's allegations about reasons that the alleged misrepresentations may have made the company appear to be performing better than it was, *see, e.g.,* Compl. ¶ 141 (alleging that "last minute deals" were entered into to "bridge the gap between the company's forecasted sales and its actual sales") do not suggest any concrete benefit received by any Individual Defendant.

With respect to the post-IPO statements regarding Black Rocket and Genuity's network capabilities, which were unrelated to GAAP, plaintiffs must allege, at the very least, facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. To satisfy this requirement, plaintiffs must allege "highly unreasonable" conduct representing "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *Rothman,* 220 F.3d at 90 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978)); *see also Chill v. General Electric Co.,* 101 F.3d 263, 269 (2d Cir.1996) (same). Where, as here, there is no indication of motive, "the strength of circumstantial allegations must be correspondingly greater." *Kalnit,* 264 F.3d at 142 (quoting *Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987)). Moreover, to the extent plaintiffs claim that defendants had knowledge of specific facts that rendered their public statements misleading, they "must supply some factual basis for the allegation that the defendants [gained this knowledge] at some point during the time period alleged." *Rotham,* 220 F.3d at 91 (quoting *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 769 (S.D.N.Y.1981)).

Plaintiffs have not done this. They rely simply on the Individual Defendants' positions as "Genuity's three highest officers" and, without differentiating among the Individual Defendants, argue that those individuals were in a position to know certain things. Pl. Opp'n at 34.[31] As logical as it may be, however, to assume that the Individual Defendants collectively were aware of the specifics of Genuity's business, the PSLRA requires more in order to attach liability to an

2005 WL 2030501

individual for a specific public statement. It requires that
plaintiffs "specifically allege[ each] defendant['s] knowledge
of facts or access to information contradicting [his] public
statements." *Novak,* 216 F.3d at 308. The general rule,
therefore, is that nonspecific allegations that a defendant's
knowledge of certain practices can be inferred from his or
her high position in a company are not sufficient to satisfy
the PSLRA's heightened pleading requirement with respect to
*scienter. See, e.g., In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d
15, 34 (S.D.N.Y.2004) ( "Allegations that [defendants] should
have known about [corporation's subsidiary's] financial state
based solely on their executive positions are not enough to
plead *scienter."* ); *In re Sotheby's Holdings, Inc. Sec. Litig.,*
No. 00 Civ. 1041, 2000 WL 1234601, *7 (S.D.N.Y. Aug.
31, 2000)* ("It is well established that boilerplate allegations
that defendants knew or should have known of fraudulent
conduct based solely on their board membership or executive
positions are insufficient to plead *scienter."* ); *Duncan v.
Pencer,* No. 94 Civ. 0321, 1996 WL 19043, *14 (S.D.N.Y.
Jan. 18, 1996)* ("[Plaintiff] would totally thwart the *scienter*
requirements of Section 10(b) and Rule 9(b) if he could
satisfy them by simply listing the Individual Defendants' job
titles in the Complaint."). [32] Other than general allegations
that it would be "logical" for the Individual Defendants to
have been aware of certain things, the Complaint gives us no
factual basis to conclude that actual knowledge on the part of
any Individual Defendant existed. [33] Under the PSLRA, such
allegations are insufficient.

[31]    In the paragraph of their Complaint that purports
to set forth the basis of plaintiffs' allegation
that the Individual Defendants "knew or acted
in deliberate reckless disregard of the true state
of Genuity's business," plaintiffs allege simply
that: (i) "the large number of rescissions of
sales force commissions as orders were not
provisioned or cancelled would logically have been
known to the Individual Defendants;" (ii) any
failures of Genuity to comply with its 10-day
provisioning guarantee "would have been known
to the Individual Defendants;" (iii) "the stockpiling
of tens of millions of dollars of equipment
in 11 data centers owned by the Company
would logically have been at the direction of
its most senior officers;" (iv) "[s]ales were
backdated specifically at the direction of upper
management;" (v) "[t]he dark fiber swap with
Qwest could not have been accomplished without

the complicity of the Individual Defendants;" and
(vi) "Genuity's inability to competitively price its
outdated equipment was well within the purview
of the Individual Defendants' responsibilities."
Compl. ¶ 191.

[32]    Plaintiffs' reliance on our decision in *In re
Complete Management Inc. Securities Litigation,*
153 F.Supp.2d 314, 324-327 (S.D.N.Y.2001), is
misplaced. Although we noted in that case that "[i]t
thoroughly strain[ed] credulity to imagine that the
individual defendants, by virtue of their positions
at CMI and the interactions with GMMS that those
positions demanded, were ignorant of the practices
at GMMS," we also explained that plaintiffs had
pleaded the alleged fraud and the defendants'
knowledge of it with "great specificity." The same
cannot be said here.

[33]    Plaintiffs do adequately allege a specific factual
basis for one area of knowledge: that Genuity's
actual sales were falling short of its sales forecasts.
*See* Compl. ¶ 191 (alleging that: (i) defendant
Gudonis received "rolled-up sales results;" (ii)
defendant Farina received "an Excel spreadsheet
with the Company's declining sales results and
orders" on a weekly basis; (iii) that defendant
Farina received "monthly Flash Reports showing
the shortfall between forecasted and actual orders
was always 'very significant;' ' and (iv) at his
"Tuesday Morning Roll Call Sales Meetings,"
defendant Farina "demanded explanations as to
why sales and orders were not materializing").
Such knowledge, however, does not bear on
plaintiffs' allegations in this case, which do not
include the claim that Genuity publicly stated
that actual sales were meeting or exceeding the
company's forecasts.

*CONCLUSION*

**\*18**  For the reasons set forth above, defendants' motions
to dismiss are granted and the Complaint is dismissed with
prejudice. [34] The Clerk of the Court is respectfully requested
to close this case on the Court's docket.

[34]    In their opposition papers, plaintiffs request that,
if the Court deems their allegations insufficient,
they be afforded a chance to replead. Plaintiffs

2005 WL 2030501

do not specify what they would say in such an amended pleading, however. Moreover, in several premotion letters submitted by defendants to the Court, plaintiffs were alerted to the specific bases of defendants' arguments in support of dismissal discussed herein. By letter from the Court dated November 4, 2004, plaintiffs were given the opportunity to amend their complaint and were specifically warned that, if they chose not to amend to address the points raised in defendants' premotion letters and the Court subsequently determined that defendants' arguments were correct, plaintiffs would not be given another chance to amend. In response, defying the dictates of Fed. R. Civ. P 8(a), and even allowing for the heightened pleading

requirements in this case, plaintiffs submitted an exceedingly lengthy 79 page complaint recounting every quarterly and annual S.E.C. filing and myriad public statements made by Genuity during the entire duration of the company's solvency. Notwithstanding its breadth, that pleading is insufficient for the reasons stated above. In these circumstances, we do not see any basis to allow plaintiffs to amend yet again. Accordingly, plaintiffs' request for leave to do so is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2030501

---

End of Document                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 34 of 210

In re Castle Trading, Inc., Not Reported in B.R. Rptr. (2017)

2017 WL 2375493

2017 WL 2375493
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States Bankruptcy Appellate
Panel of the Ninth Circuit.

IN RE: CASTLE TRADING, INC., Debtor.

Richard K. Diamond, Chapter 7
Trustee, Appellant/Cross–Appellee,
v.
Mesisca Riley & Kreitenberg
LLP, Appellee/Cross–Appellant.

BAP Nos. CC–16–1322–FTaKu, CC–16–
1323–FTaKu, CC–16–1324–FTaKu, CC–
16–1352–FTaKu, CC–16–1353–FTaKu, CC–
16–1354–FTaKu (Related Cross–appeals)
|
Bk. No. 2:13–bk–15021–BB
|
Adv. Nos. 2:14–ap–01022–BB, 2:14–
ap–01122–BB, 2:14–ap–01312–BB
|
Argued and Submitted on May
18, 2017 at Pasadena, California
|
Filed May 31, 2017

Appeals from the United States Bankruptcy Court for the
Central District of California, Honorable Sheri Bluebond,
Chief Bankruptcy Judge, Presiding

**Attorneys and Law Firms**

George E. Schulman of Danning, Gill, Diamond & Kollitz,
LLP argued on behalf of Appellant/Cross–Appellee Richard
K. Diamond, Chapter 7 Trustee.

Dennis P. Riley of Mesisca Riley & Kreitenberg, LLP argued
on behalf of Appellee/Cross–Appellant Mesisca Riley &
Kreitenberg LLP.

Before: FARIS, TAYLOR, and KURTZ, Bankruptcy Judges.

**MEMORANDUM** [*]

[*]   This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive

value it may have, see Fed. R. App. P. 32.1, it has no
precedential value, see 9th Cir. BAP Rule 8024–1.

**INTRODUCTION**

**\*1**  Debtor Castle Trading, Inc. retained Appellee/Cross-
Appellant Mesisca Riley & Kreitenberg LLP ("MRK") to
provide specified legal services. To pay for these future
services, Castle Trading signed a promissory note in favor of
MRK and deeds of trust encumbering certain properties. After
Castle Trading filed for bankruptcy protection, Appellant/
Cross-Appellee Richard K. Diamond, Chapter 7 [1]  Trustee
("Trustee"), sought to avoid the promissory note and deeds
of trust as fraudulent transfers, arguing that the prepetition
executory contract for MRK's future legal services did not
provide "reasonably equivalent value" in exchange for the
promissory note and deeds of trust. The bankruptcy court
disagreed, holding that the promise of future services was
reasonably equivalent value.

[1]    Unless specified otherwise, all chapter and section
references are to the Bankruptcy Code, 11 U.S.C.
§§ 101–1532, all "Rule" references are to the
Federal Rules of Bankruptcy Procedure, and all
"Civil Rule" references are to the Federal Rules of
Civil Procedure.

On appeal, the Trustee argues that the bankruptcy court erred
because the value of the executory contract was uncertain
or limited and did not provide reasonably equivalent value.
MRK cross-appeals, arguing that the agreement could not
have been a fraudulent transfer because Castle Trading was
not insolvent inasmuch as a $3.8 million "shareholder loan"
was actually a capital contribution, as opposed to a liability.

We AFFIRM the bankruptcy court's holding that the
agreement provided reasonably equivalent value. We need not
reach the points of error raised in MRK's cross-appeals.

**FACTUAL BACKGROUND**

**A. The 2008 Action and 2011 Action**
Yuri and Natalia Plyam are the sole owners, directors,
and officers of Castle Trading. It began as a commodities
brokerage but later transitioned to real estate development and
investment.

2017 WL 2375493

In January 2008, Precision Development, LLC ("Precision"), a company previously owned by Mr. Plyam, filed a complaint against the Plyams in the state superior court (the "2008 Action"). Essentially, Precision alleged that the Plyams diverted substantial funds that Precision's investors had wired to them for a real estate development project and instead used the money for personal gain. In July 2010, MRK substituted in as counsel for the Plyams.

Following a jury trial, the superior court entered judgment against the Plyams in the amount of $10.3 million. The Plyams unsuccessfully appealed the judgment.

In July 2011, Precision filed a lawsuit against Castle Trading, the Plyams, and Ms. Plyam's mother, Anna Logvin, in state court (the "2011 Action"), alleging that the Plyams fraudulently transferred assets to Castle Trading. Precision recorded a lis pendens against each of Castle Trading's real property assets.

## B. The Fee Agreement between Castle Trading and MRK

Because of MRK's familiarity with the Plyams and Castle Trading, the defendants sought MRK's representation in the 2011 Action.

On September 7, 2011, Castle Trading entered into a fee agreement with MRK (the "Fee Agreement"). MRK agreed to represent Castle Trading in three state court proceedings: (1) the 2011 Action; (2) Castle Trading, Inc. v. Aframian, a breach of contract action (the "Aframian Action"); and (3) Castle Trading, Inc. v. Greer, an unlawful detainer action (the "Greer Action"). The Fee Agreement recited that, because of the substantial judgment against the Plyams in the 2008 Action, Castle Trading did not have the financial ability to pay MRK. Therefore, the parties agreed that: (1) MRK would represent Castle Trading in the Aframian Action for an earned fee of $202,500, based on an estimate of 270 hours at $750 per hour; (2) MRK would represent Castle Trading in the 2011 Action for an earned fee of $412,500, based on an estimate of 550 hours, and $750 per hour for time spent in excess of 550 hours; and (3) MRK would represent Castle Trading in the Greer Action for an earned fee of $20,000, based on an estimate of 40 hours at $500 per hour. Castle Trading acknowledged that it would be indebted to MRK for the total amount of $635,000 (plus any amount billed over the estimated 550 hours in the 2011 Action). Accordingly, Castle Trading executed a promissory note in favor of MRK in the amount of $635,000.

**\*2** MRK agreed to delay collection of the $635,000 and instead take as security deeds of trust encumbering certain real property owned by Castle Trading. The deeds of trust were recorded against five of Castle Trading's properties in California, which were known as: (1) the "Hayvenhurst Property," (2) the "Alta Mesa Property," (3) the "Meadow Bay Property," (4) the "Bay View Property," and (5) the "Angelo Property."

MRK advised Castle Trading to consult independent counsel prior to entering into the Fee Agreement. Ms. Plyam testified that three other attorneys told her that the Fee Agreement was a "great deal," especially because no other attorney would likely agree to represent Castle Trading.

MRK represented Castle Trading in each of the three lawsuits. It obtained a judgment in favor of Castle Trading in the Aframian Action, successfully ejected the tenants in the Greer Action, and represented Castle Trading in the 2011 Action until Castle Trading filed for bankruptcy.[2] According to its billing records, if MRK were billing Castle Trading on an hourly basis, its fee (based on the recorded time) would have been $217,819.[3]

[2]     In February 2012, the state of California suspended Castle Trading's corporate status for nonpayment of taxes. On March 23, 2012, Castle Trading filed a Notice of Suspension and Inability to Participate in Litigation in the 2011 Action.

[3]     In the 2011 Action, MRK's recorded fees and costs totaled $197,317.25. In the Aframian Action, MRK's recorded fees and costs totaled $18,652.87. In the Greer Action, MRK's recorded fees and costs totaled $1,849.

## C. Castle Trading's bankruptcy filing and the Trustee's adversary proceedings

On February 23, 2013, Castle Trading filed a chapter 7 petition in the United States Bankruptcy Court for the Central District of California. On the same day, the Plyams filed a joint chapter 7 petition. The bankruptcy court initially appointed Alberta P. Stahl as chapter 7 trustee in both cases; Ms. Stahl later resigned from the Castle Trading case to avoid a conflict with her role as trustee in the Plyams' personal bankruptcy case. The bankruptcy court thereafter appointed Mr. Diamond as successor chapter 7 trustee.

In re Castle Trading, Inc., Not Reported in B.R. Rptr. (2017)
2017 WL 2375493

In its schedules, Castle Trading estimated that it held assets totaling $3,262,242. It listed liabilities of $16,070,990, including $1,932,533 in secured debts and a $3,814,457 "loan from shareholder" as an unsecured, nonpriority debt. The schedules identified Mr. Plyam as the creditor on the shareholder loan.

Proofs of claims were filed by a number of creditors. Of relevance to this proceeding, Ms. Stahl, the Plyams' chapter 7 bankruptcy trustee, filed a claim for $3,316,568.04 based on the shareholder loan. MRK filed a proof of claim against Castle Trading in the amount of $728,769.83, based on the terms of the Fee Agreement.

The bankruptcy court approved the Trustee's sale of the Hayvenhurst Property, Alta Mesa Property, Meadow Bay Property, and Bay View Property. The court order directed that the disputed liens held by MRK and others were removed from the properties and attached to the net sale proceeds.

After the sale of Castle Trading's properties, the Trustee filed adversary complaints to avoid the liens and recover fraudulent transfers concerning the Hayvenhurst Property, the Alta Mesa Property, and the Meadow Bay Property. [4] As relevant to these appeals, the Trustee alleged that Castle Trading "received less than a reasonably equivalent value in exchange for the MRK Deed of Trust and the MRK Obligation" and that he "is entitled to avoid the MRK Obligation and the MRK Deed of Trust."

[4]    The Trustee filed three separate complaints, one per property. Diamond v. Greater Atlantic Bank, Adv. Pro. 2:14–ap–01022–BB concerns the Meadow Bay Property and is on appeal as BAP No. CC–16–1322; Diamond v. Logvin, Adv. Pro. 2:14–ap–01122–BB concerns the Hayvenhurst Property and is on appeal as BAP No. CC–16–1323; and Diamond v. Logvin, Adv. Pro. 2:14–ap–01312–BB concerns the Alta Mesa Property and is on appeal as BAP No. CC–16–1324.

**D. The trial**

**\*3** The bankruptcy court scheduled a consolidated trial for August 24, 2016 in all three adversary proceedings. [5] Prior to the trial, the bankruptcy court entered joint pretrial orders (collectively, the "Pretrial Order") in the three adversary proceedings. The Pretrial Order provided that the following issues of fact, among others, remained to be litigated:

13. What type of fee agreement was the 2011 Agreement?

14. When the 2011 Fee Agreement was signed, was the entire fee earned upon receipt?

15. When the 2011 Fee Agreement was signed, was the entire fee earned upon receipt of the Deeds of Trust?

[5]    The Trustee settled with all other defendants prior to trial; MRK was the only remaining party.

The Pretrial Order included the following issues of law to be litigated:

5. Whether reasonably equivalent value was provided by MRK to the Debtor in exchange for the MRK Deeds of Trust and the MRK Note.

....

13. Whether the 2011 Fee Agreement provides for an earned on receipt retainer or a flat fee.

Following the trial, the bankruptcy court orally ruled that the Trustee was not entitled to avoid the promissory note and deeds of trust as fraudulent transfers. It held that the Trustee did not meet his burden to prove an actual fraudulent transfer. As to constructive fraudulent transfer, the bankruptcy court considered whether Castle Trading received reasonably equivalent value by looking at the work done by MRK, its billing records, its time estimates, and other circumstances surrounding the litigation. It concluded that the Trustee did not provide sufficient evidence to establish lack of reasonably equivalent value.

On September 22, 2016, the bankruptcy court issued its findings of fact and conclusions of law in the three adversary proceedings. In relevant part, it found that: (1) the Fee Agreement was a flat fee for two of the matters and a flat fee for a certain number of hours then hourly thereafter for the third matter; (2) MRK's records reflect $212,165.00 in hourly billing and $6,554.12 in costs for litigation in the three matters identified in the Fee Agreement; (3) the deeds of trust were not provided by Castle Trading to MRK as security for an Earned on Receipt Retainer; and (4) the deeds of trust secured payment of the fee charged by MRK to handle the three proceedings.

In relevant part, the court made the following conclusions of law: (1) MRK provided Castle Trading with reasonably

2017 WL 2375493

equivalent value in exchange for the deeds of trust and promissory note; (2) the Trustee may not avoid the deeds of trust and promissory note as fraudulent transfers pursuant to § 544(b) and California state law; and (3) the Trustee failed to meet his burden to prove that the transfers were fraudulent transfers and avoidable.

The Trustee timely filed his notices of appeal, and MRK timely filed its "protective" cross-appeals.

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

### ISSUE

Whether the bankruptcy court erred in holding that MRK's promise to provide future legal services under the Fee Agreement represented "reasonably equivalent value" such that the promissory note and deeds of trust in favor of MRK were not constructive fraudulent transfers.

### STANDARDS OF REVIEW

As a general rule, we review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109 (9th Cir. 2010).

**\*4** We review de novo questions of statutory interpretation, including whether a particular type of consideration constitutes "value." Gladstone v. Schaefer (In re UC Lofts on 4th, LLC), BAP No. SC–14–1287–JuKlPa, 2015 WL 5209252, at \*15 (9th Cir. BAP Sept. 4, 2015) (citing Maddox v. Robertson (In re Prejean), 994 F.2d 706, 708 (9th Cir. 1993)). De novo review requires that we consider a matter anew, as if no decision had been rendered previously. United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988).

But when we consider whether the value is "reasonably equivalent," a finding concerning the value of the transferred property "is a finding of fact which may be reversed only if it is shown that it was clearly erroneous." In re JTS Corp., 617 F.3d at 1109 (citations omitted). "To be clearly erroneous, a

decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.), 262 F.3d 725, 729 (8th Cir. 2001) (quoting Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988)); see Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (A factual finding is clearly erroneous if, after examining the evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed."). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error. United States v. Elliott, 322 F.3d 710, 714 (9th Cir. 2003).

### DISCUSSION

These appeals deal only with the Trustee's contention that he is entitled to avoid the promissory note and deeds of trust as fraudulent transfers. The Trustee does not contend (in these appeals) that the Fee Agreement is subject to challenge under state law (other than state fraudulent transfer provisions). The bankruptcy court correctly decided the narrow issue before it.

### A. The bankruptcy court did not err in holding that the Fee Agreement represented "reasonably equivalent value."

The Trustee's primary issue on appeal challenges the bankruptcy court's holding that MRK provided reasonably equivalent value for the $635,000 promissory note and deeds of trust. We discern no error.

A bankruptcy trustee may bring an action to avoid a prepetition transfer that is allegedly either intentionally or constructively fraudulent under §§ 548(a)(1)(A) or (B) or applicable state law. In relevant part, § 548(a) provides:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property ... that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

....

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation ....

§ 548(a)(1). In other words, a transfer is constructively fraudulent if (1) the debtor made the transfer on or within two years before the date of filing the bankruptcy petition, (2) the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," and (3) the debtor was suffering from certain kinds of financial distress. Official Committee of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.), 714 F.3d 1141, 1145 (9th Cir. 2013) (internal citations omitted). California law is substantially similar. See Cal. Civ. Code §§ 3439.04, 3439.05. [6]

[6]    "California's fraudulent conveyance statutes are similar in form and substance to the Code's fraudulent transfer provisions. Both allow a transfer to be avoided where 'the debtor did not receive a "reasonably equivalent value" in exchange for the transfer and [the debtor] was either insolvent at the time of the transfer or was engaged in business with unreasonably small capital.' " Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 594 (9th Cir. 1991) (citation omitted).

**5** These appeals involve § 548(a)(1)(B)(i), which considers whether Castle Trading received reasonably equivalent value for the promissory note and deeds of trust. Our inquiry follows a two-step process: "First, the court must determine that the debtor received value in exchange for the transfer.... Second, if there was value in exchange, the court must determine whether the value of what was transferred was reasonably equivalent to what the debtor received." Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP), 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009); see also Hasse v. Rainsdon (In re Pringle), 495 B.R. 447, 463 (9th Cir. BAP 2013) ("An examination into reasonably equivalent value is comprised of three inquiries: (1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received."). The Trustee must prove each element of his fraudulent transfer claim by a preponderance of the evidence. Flemmer v. Weiner (In re Vill. Concepts, Inc.), BAP No. EC–15–1186–JuFD, 2015 WL 8030974, at *7 (9th Cir. BAP Dec. 4, 2015).

**1. MRK's promises constituted "value."**
The Trustee argues that MRK's promise to perform legal services in the future did not qualify as "value" at all. We disagree.

The Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" § 548(d)(2)(A). State law is similar. See Cal. Civ. Code § 3439.03; In re UC Lofts on 4th, LLC, 2015 WL 5209252, at *16.

In determining whether the debtor received value, "a court must consider whether, based on the circumstances that existed at the time of the transfer, it was legitimate and reasonable to expect some value accruing to the debtor ...." Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.), 444 F.3d 203, 212 (3d Cir. 2006) (quotations and citation marks omitted).

The Ninth Circuit has not explicitly stated whether an executory contract or promise of future services can qualify as "value." However, in Pringle, we considered the "value" prong of the "reasonably equivalent value" analysis and stated: " 'Case law has embroidered this concept to include "any benefit" to the debtor, "direct or indirect" as value.' Indeed, with only limited exceptions, '**any ... kind of enforceable executory promise is value for purposes of section 548**.' Regardless of its form, the economic benefit must be real and quantifiable." In re Pringle, 495 B.R. at 463 (quoting 5 Collier on Bankruptcy ¶ 548.05[5] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2013)). [7] Other courts also adopt this view. See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 152 (3d Cir. 1996) ("[S]o long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred."); Dobieco, Inc. v. Brown (In re Brown), 265 B.R. 167, 175 (Bankr. E.D. Ark. 2001) (assumption of obligation to pay rent is "value" given in exchange for assignment of lease); Krommenhoek v. Nat. Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.), 166 B.R. 701, 704–05 (Bankr. D. Idaho 1994) (holding that monies paid under an installment contract were not recoverable as a fraudulent transfer because in exchange for the two payments,

2017 WL 2375493

the debtor received: (1) discharge of the obligation to pay the transferee under the contract terms and (2) property in the form of the continued vitality of the contract).

7    The Trustee argues that Pringle is inapplicable because the discussion of fraudulent conveyance law as supported by Collier "is not essential to its holding." Pringle's statements are persuasive even if they are dicta.

**\*6** The Trustee's reliance on the Second Circuit's decision in HBE Leasing Corp. v. Frank, 61 F.3d 1054 (2d Cir. 1995), is unavailing. In that case, the appellate court held that the judgment debtor's transfer of bonds, a mortgage, and notes to his attorney "in large part to secure the payment of future legal fees and expenses" valued at $350,000 was not "fair consideration." 61 F.3d at 1060. But that case does not stand for the proposition that a contract for future legal services can never amount to "value" as a matter of law; rather, it held that, based on the particular facts of the case, the agreement was undefined and of uncertain duration such that it could not give "fair consideration." Indeed, it acknowledged that a services contract may be fair consideration where the services are definite and fixed. Id. at 1061. As discussed below, the bankruptcy court in the present cases accepted the evidence that the Fee Agreement was a flat-fee (and semi-flat-fee) agreement for specific cases and services. HBE Leasing does not aid the Trustee's case.

The only other cases on which the Trustee relies are nineteenth century cases from outside of the Ninth Circuit. We are not bound by any of these cases.

We are also guided by the principles of statutory interpretation. The doctrine of expressio unius est exclusio alterius, meaning "to express or include one thing implies the exclusion of the other, or of the alternative," Black's Law Dictionary 620 (8th ed.), "creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." Silvers v. Sony Pictures Entm't, Inc., 402 F.3d 881, 885 (9th Cir. 2005). "The expressio unius canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.' " N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 940 (2017) (citation omitted).

Section 548(d)(2)(A) excludes from the definition of value "an unperformed promise to furnish support to the debtor ...." Similarly, the corresponding state statute excludes "an unperformed promise ... to furnish support to the debtor

or another person." Cal. Civ. Code § 3439.03. The Fee Agreement is not a promise to furnish support. A reasonable reading of the statute supports the negative implication that other types of future promises, such as a promise of legal services, can qualify as "value" under the statute. See In re Treasure Valley Opportunities, Inc., 166 B.R. at 705 ("The strong negative implication of this exclusion is that any other kind of enforceable executory promise is value for purposes of section 548.").

The Trustee argues that the bankruptcy court erred in not considering the question of "value." But the Trustee does not show that he explicitly raised this issue before the bankruptcy court. See Yamada v. Nobel Biocare Holding AG, 825 F.3d 536, 543 (9th Cir. 2016) ("[g]enerally, an appellate court will not hear an issue raised for the first time on appeal"). Moreover, implicit in the bankruptcy court's holding that MRK gave "reasonably equivalent value" is the determination that the Fee Agreement constituted value.

Accordingly, we hold that MRK gave "value."

**2. The value of MRK's promise was "reasonably equivalent."**

We next consider whether the value provided was reasonably equivalent to $635,000. The Trustee contends that the bankruptcy court erred by considering the future value of the legal services (as opposed to the value at the time the parties executed the Fee Agreement) and by not limiting the value of the Fee Agreement to the amounts recorded in MRK's billing records. We disagree.

The Bankruptcy Code does not define "reasonably equivalent value." Nevertheless, we have stated:

it "is not an esoteric concept: a party receives reasonably equivalent value ... if it gets roughly the value it gave." "Reasonably equivalent value" is a key concept in fraudulent transfer law. As the underlying goal of § 548 is to preserve estate assets, courts assess reasonably equivalent value from the creditors' perspective.

**\*7** This examination requires the court to consider all of the circumstances surrounding the transfer, but "the focus is whether the net effect of the transaction has depleted the bankruptcy estate."

....

[T]he value to the estate must be reasonably equivalent to the value given up .... This equivalence need not be precise. "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange."

In re Pringle, 495 B.R. at 463–64 (internal citations omitted); see In re Brobeck, Phleger & Harrison LLP, 408 B.R. at 341 ("Reasonable equivalence does not require exact equality in value, but means 'approximately equivalent' or 'roughly equivalent.' ").

The bankruptcy court weighed the evidence to make a factual determination as to whether the Fee Agreement constituted reasonably equivalent value. It found the testimony of Dennis Riley, an MRK attorney, credible and found that MRK's promise to represent Castle Trading in the 2011 Action, the Aframian Action, and the Greer Action was roughly equivalent in value to $635,000. In particular, the bankruptcy court noted that Mr. Riley estimated the costs of his legal services based on prior litigation with Precision and its counsel. It stated that there was no evidence that the work was not completed or that the litigation results were problematic. We hold that the bankruptcy court did not clearly err.

The Trustee argues that the value of MRK's services should be capped at $217,819, which is the amount reflected in its billing records. We again disagree in the context of this appeal. The bankruptcy court accepted Mr. Riley's testimony that the records may not have reflected all of the work done in the cases because MRK was not billing by the hour. As such, there was no exact dollar amount that could be associated with MRK's actual work. Moreover, the value that MRK provided to Castle Trading was not limited to the dollar amount in the billing records. Castle Trading needed an attorney to represent it in multiple lawsuits, but it was insolvent. MRK agreed to represent Castle Trading, despite its financial distress, and MRK was familiar with the client, its owners, the adversary, and the adversary's counsel. These factors provided additional, unquantifiable value. See Meeks v. Perroni (In re Armstrong), 234 B.R. 899, 906 (Bankr. E.D. Ark. 1999) ("reasonably equivalent value includes more than the tangible hours actually expended").

Therefore, we hold that the bankruptcy court did not err in finding that MRK provided reasonably equivalent value in

exchange for the $635,000 promissory note and the deeds of trust. [8]

[8]    We do not address any other grounds on which the Trustee might be able to limit MRK's claim.

**B. The bankruptcy court did not err in applying the Pretrial Order.**

The Trustee argues that the bankruptcy court erred in not deciding two disputed questions of fact listed in the Pretrial Order. The court did not err.

The relevant part of the Pretrial Order identifies the factual issues that the parties and the court thought were necessary before the trial began. After hearing the evidence and arguments, the bankruptcy court decided that it did not need to decide some of those factual issues. This was proper.

 *8    The Trustee argues at length that the bankruptcy court should have found that the Fee Agreement was not an earned-on-receipt retainer. As we stated above, we do not reach this argument. In the fraudulent transfer analysis, the salient question was whether the Fee Agreement provided reasonably equivalent value to Castle Trading, and the bankruptcy court appropriately held that it did; it found that the value of MRK's promise was reasonably equivalent to what MRK received. The bankruptcy court was not required to determine in what legal cubbyhole to place the Fee Agreement because such a finding would not have affected its decision that the promissory note and deeds of trust were not avoidable on a fraudulent transfer theory.

CONCLUSION

For the reasons set forth above, the bankruptcy court did not err in determining that MRK's legal services provided Castle Trading with reasonably equivalent value for the promissory note and deeds of trust. Therefore, the transfer was not a constructive fraudulent transfer, and we AFFIRM. We do not reach the issues raised in MRK's protective cross-appeals.

All Citations

Not Reported in B.R. Rptr., 2017 WL 2375493

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-ap-01382-SK   Doc 282-1   Filed 09/07/21   Entered 09/07/21 11:44:24   Desc
Exhibit A -- Unpublished Cases   Page 41 of 210

In re Aletheia Research and Management, Inc., Not Reported in B.R. Rptr. (2015)
2015 WL 8483728

2015 WL 8483728
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States Bankruptcy Appellate
Panel of the Ninth Circuit.

IN RE: ALETHEIA RESEARCH
AND MANAGEMENT, INC., Debtor.

Jeffrey Ian Golden, Chapter 7 Trustee, Appellant,
v.
Clay Lacy Aviation, Inc., Appellee.

BAP No. CC–15–1081–KiTaKu
|
Adv. No. 14–01735
|
Bk. No. 2:12–47718–BR
|
Argued and Submitted on November 19, 2015
|
Filed December 10, 2015

Appeal from the United States Bankruptcy Court for the Central District of California, Honorable Barry Russell, Bankruptcy Judge, Presiding

**Attorneys and Law Firms**

Aaron H. Stulman of Ashby & Geddes, P.A. argued for appellant Jeffrey Ian Golden, Chapter 7 Trustee; Amy L. Goldman of Lewis Brisbois Bisgaard & Smith LLP argued for appellee Clay Lacy Aviation, Inc.

Before: KIRSCHER, TAYLOR and KURTZ, Bankruptcy Judges.

**MEMORANDUM** [1]

[1]   This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (*see* Fed. R.App. P. 32.1), it has no precedential value. *See* 9th Cir. BAP Rule 8024–1.

**\*1**   Chapter 7 [2] trustee Jeffrey I. Golden appeals an order dismissing his complaint against Clay Lacy Aviation, Inc., which sought to avoid and recover from Clay Lacy certain constructive fraudulent transfers under § 544(b), 548(a)(1)

(B) and Cal. Civ.Code § 3439. For several years prior to the petition date, Clay Lacy provided private flight-related services to the debtor, Aletheia Research and Management, Inc. and its management and/or employees. Trustee had alleged that insolvent Aletheia did not receive reasonably equivalent value, or any value, in exchange for flights that he alleged were of a personal nature, benefitting only Aletheia's corporate officers, non-employees and family members of Aletheia's principals. The bankruptcy court determined, however, that Aletheia got exactly what it bargained for —a chartered plane to fly persons from point A to point B, regardless of who received the benefit of the flight. Further, Trustee had not alleged that the fees charged by Clay Lacy were something other than fair market value. As such, the court concluded Aletheia had not received less than reasonably equivalent value from Clay Lacy and that Trustee's complaint failed. We VACATE and REMAND.

[2]   Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001–9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

**I. FACTUAL BACKGROUND
AND PROCEDURAL HISTORY**

Aletheia, a California corporation, was founded in 1997. One of its founders, Peter J. Eichler, Jr., served as Aletheia's chief executive officer. Aletheia filed a chapter 11 bankruptcy case on November 11, 2012. Thereafter, Trustee served as the chapter 11 trustee, closed the business, and the case was converted to chapter 7.

**A. Trustee's complaint**

Trustee later filed an avoidance action against Clay Lacy and Christy Eichler a/k/a Mavis Christine Lessley, the wife of Mr. Eichler. [3] He alleged that Clay Lacy had provided flight services to management, "ostensibly for purposes related to Aletheia and/or in furtherance of Aletheia's business operations." During the four years prior to the petition date, Aletheia paid to Clay Lacy no less than $5,262,355.50 for flight-related services (the "Transfers"). However, alleged Trustee, the Transfers paid for flights for personal use by employees or members of management and their family and friends and served no business purpose of Aletheia.

In re Aletheia Research and Management, Inc., Not Reported in B.R. Rptr. (2015)
2015 WL 8483728

Many of these flights paid for by Aletheia did not have a single Aletheia employee on board. For example, Clay Lacy received $267,198 to charter a flight to Europe for two weeks in connection with the Eichlers' son's graduation. The flight included the Eichlers and their five children. Trustee alleged this flight neither served a business purpose nor conferred any benefit to Aletheia.

3      Mrs. Eichler, who apparently was never an Aletheia employee, was served with Trustee's complaint on January 12, 2015. Mrs. Eichler failed to file any timely response. On Trustee's request, the clerk entered Mrs. Eichler's default on March 19, 2015, after this appeal had been filed. One day prior, on March 18, 2015, Mrs. Eichler filed a voluntary chapter 7 bankruptcy case. As a result, Trustee's avoidance action against her has been stayed.

*2 Within Trustee's complaint were detailed examples of other flights he contended were for personal use and not for the benefit of Aletheia, including multiple trips to the Eichlers' Lake Tahoe vacation home, ski trips to Salt Lake City, and Eichler family vacations to Hawaii. Obtaining the information from flight manifests, Trustee's complaint included the date of each flight in question, the name of each person on the flight, the flight destination and the fee paid to Clay Lacy. A detailed list of each flight and the amount paid to Clay Lacy was also attached to the complaint, including one flight that alone cost over $500,000.

Trustee further alleged that Aletheia was insolvent at the time the Transfers were made to Clay Lacy. He argued that no reasonable person would conclude any of the listed flights were for a legitimate business purpose of Aletheia and, thus, the Transfers made on account of these flights were not received by Clay Lacy in good faith. In closing, Trustee reserved the right to amend his complaint.

**B. Clay Lacy's motion to dismiss, Trustee's opposition and Clay Lacy's reply**

**1. Clay Lacy's motion to dismiss**

Clay Lacy moved to dismiss Trustee's complaint under Civil Rule 12(b)(6)("Motion to Dismiss"). In short, Clay Lacy argued that Trustee's complaint asserted conclusory statements and failed to provide any specificity or ultimate fact.

Clay Lacy argued that Trustee's claims for avoidance of constructive fraudulent transfers should be dismissed for two reasons. First, the complaint failed to show a lack of reasonably equivalent value received by Aletheia. Trustee had not presented any comparison of the value of the Transfers in relation to the value Aletheia received. For example, Trustee failed to allege any other carrier or provider like Clay Lacy could have provided similar services for less cost. Instead, argued Clay Lacy, Trustee erroneously focused on the identity of each flight passenger and his or her purported relationship to Aletheia to summarily conclude that no business purpose or benefit was provided to Aletheia as a result of these flights. Clay Lacy argued that even if it was aware of the names of each passenger to whom it provided services, it did not have any legal duty to inquire as to why a particular passenger was on a given flight or to ascertain or question the purpose of each passenger's flight plan. Clay Lacy argued that it provided the appropriate services if and when requested by Aletheia—i.e., a fueled plane to fly to a specific location at a specific time and date with flight attendants and requested food and beverage items—in exchange for reasonably equivalent value—i.e., payment for such services.

Second, Clay Lacy argued that Trustee's complaint failed to provide any facts to support his unsubstantiated conclusion that Aletheia was insolvent at the time of the Transfers. The complaint merely stated "at the time that Aletheia made each of the alleged transfers to Clay Lacy, Aletheia was insolvent." This conclusory allegation of insolvency, argued Clay Lacy, failed to meet the pleading standard in *Twombly*. 4

4      *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554 (2007).

**2. Trustee's opposition**

Trustee contended that his complaint met the *Twombly* standard and sufficiently alleged that while Aletheia was insolvent, it made at least 126 transfers totaling no less than $5,262,355.50 to Clay Lacy for which Aletheia did not receive reasonably equivalent value, or any value, in return. Trustee reiterated that during the fraudulent transfer period, Aletheia chartered at least 21 flights purportedly for the benefit of Aletheia amounting to no less than $355,949.35 for which no Aletheia employee was even present. Trustee argued that no value was received for these flights. An additional 41 flights all purportedly undertaken for Aletheia's benefit that cost Aletheia no less than $1,512,150.53 were personal in nature for the Eichler family and their friends, such as vacation trips to Lake Tahoe, Hawaii and Europe. Trustee

In re Aletheia Research and Management, Inc., Not Reported in B.R. Rptr. (2015)
2015 WL 8483728

argued that Aletheia received little to no value on account of those flights.

 **\*3**  As for Clay Lacy's contention that the complaint failed to plead facts alleging lack of reasonably equivalent value, Trustee argued that "reasonably equivalent value" focuses on what the debtor surrendered and what the debtor received, not what the creditor gave. Trustee contended that his complaint had met this standard by alleging that Aletheia paid Clay Lacy certain sums of money for which it received little or no value in return. Trustee further disputed Clay Lacy's contention that his complaint failed to present any comparison of the value of the alleged Transfers in relation to the value Aletheia received. In fact, he had alleged that Aletheia received no value in return for the amount paid to Clay Lacy where no employee was on board and no business purpose existed. Thus, the comparison of value was self-evident. Moreover, argued Trustee, his complaint focused on the identity of each flight passenger because if no employees were on board (e.g., Mrs. Eichler and her four friends flying to Salt Lake City at an expense to Aletheia of $16,798.01), then no Aletheia business could have been conducted and Aletheia received no value in return for the payments it made to Clay Lacy.

Finally, Trustee argued that he did not need to plead insolvency with particularity. Rather, insolvency could be pleaded generally and still be sufficient to survive a motion to dismiss. Trustee contended that his allegation of Aletheia's insolvency had to be considered in a light most favorable to him and assumed to be true for purposes of Clay Lacy's motion. Any question regarding Aletheia's insolvency would be further developed in discovery, on summary disposition or at a trial on the merits. Alternatively, Trustee requested leave to amend his complaint to address any possible deficiencies.

 **3. Clay Lacy's reply**
In reply, Clay Lacy argued that while Trustee's complaint alleged facts about flights he contended were personal in nature and of no benefit to Aletheia and it recited the statutory elements of a constructive fraudulent transfer under the Code and California law, nothing sufficiently connected the description of the flights and passengers to the allegations of constructive fraudulent transfer against Clay Lacy. Clay Lacy argued that Trustee's complaint either missed or was trying to avoid the simple facts that: (1) Aletheia requested flights and other related services; (2) Clay Lacy provided the services Aletheia requested; and (3) Aletheia paid Clay Lacy for the services provided. Whether or not the passengers were Aletheia employees and whether or not the paid flights were

to serve a specific business purpose, argued Clay Lacy, was inapposite to the analysis of a constructive fraudulent transfer claim. Clay Lacy contended that if "reasonably equivalent value" was defined by the ultimate purpose of the service, such a standard would hinder service providers from engaging in business with debtors such as Aletheia.

As for insolvency, Clay Lacy reiterated that Trustee's complaint merely parroted the statutory elements of § 548(a)(1)(B) and failed to allege any facts regarding Aletheia's financial condition at the time of the Transfers, such as a reference to a balance sheet or a description of the obligations Aletheia owed as compared to the working capital Aletheia had at that time.

 **C. The bankruptcy court's ruling to dismiss Trustee's complaint**
At the start of the hearing on Clay Lacy's Motion to Dismiss, the bankruptcy court noted it was not clear from Trustee's complaint whether Aletheia or some individual not representing Aletheia hired Clay Lacy for each of the flights in question. Counsel for Trustee responded that it appeared Aletheia had hired Clay Lacy each time, but they were still investigating whether certain executive employees may have made the call on behalf of Aletheia. Counsel conceded that such employees would have had the authority to arrange the flights.

The bankruptcy court then made its ruling from the bench, granting Clay Lacy's Motion to Dismiss:

> Okay. Well, let me tell you this. This is going to be a very short hearing; I think you can see where I'm going. When I read this I said this can't possibly be the law. Maybe, sometimes it is. But this case, it's quite clear that the debtor got what it bargained for.

>  **\*4**  ....

> There's not going to be a debate. It is so clear to me that you got it wrong; just the whole theory of this is wrong.... There are two things going on here. The debtor got what it bargained for. As they pointed out, there is no – your theory is that it's ... a fraudulent transfer because ... there was no good purpose for it and so forth. I really do understand it but I just don't buy it for a second.

> What actually happened here is in any commercial activity, like, for example, with renting a car or renting a house .... The debtor got what it bargained for. It got a plane. Period.

And as they point out, there's no evidence that this was a higher price for the normal planes....

What you're saying is well, because the use of the plane didn't benefit the debtor, therefore, it's a fraudulent transfer. I just don't buy that for a second.

If indeed, for instance—and I'm not ruling on it ... because it's not before me, but as [Mrs. Eichler] is concerned, if the debtor then gave away, in this case, free transportation to her at a certain value then that might very well be. I'm not saying it is but that, at least, as far as ... any of these other people that got a free ride ... yes, that could very easily be a fraudulent transfer. But the transfer there would be from the debtor giving the actual seats on the plane[.] That could easily be a fraudulent transfer because the debtor got no benefit on that. But here, the debtor got what it bargained for. It got a plane, a chartered plane. Period.

So ... there is no fraudulent transfer here.... Hr'g Tr. (Feb. 11, 2015) 8:19–23, 9:7–21, 10:1–20. The court did not discuss whether Trustee would be given leave to amend.

The order granting Clay Lacy's Motion to Dismiss and dismissing Trustee's complaint was entered on February 24, 2015. The order, drafted by counsel for Clay Lacy, failed to articulate or incorporate any of the bankruptcy court's findings. It was also silent as to whether the complaint was dismissed with or without prejudice. Trustee timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We initially determined the order on appeal was interlocutory. After briefing by the parties, the Panel agreed to consider Trustee's notice of appeal as a motion for leave to appeal and granted leave to appeal. *See* Rule 8004(d). Accordingly, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err when it granted Clay Lacy's Motion to Dismiss?

2 Did the bankruptcy court abuse its discretion when it dismissed Trustee's complaint without leave to amend?

## IV. STANDARDS OF REVIEW

We review de novo the bankruptcy court's order dismissing a complaint under Civil Rule 12(b)(6). *Hernandez v. Cty. of Tulare,* 666 F.3d 631, 636 (9th Cir.2012); *Tracht Gut, LLC v. Cty. of L.A. (In re Tracht Gut, LLC),* 503 B.R. 804, 810 (9th Cir. BAP2014). A dismissal without leave to amend and with prejudice is reviewed for an abuse of discretion. *Id.* A bankruptcy court abuses its discretion by denying leave to amend unless amendment would be futile or the plaintiff has failed to cure the complaint's deficiencies despite repeated opportunities. *Hernandez,* 666 F.3d at 636. A bankruptcy court also abuses its discretion when it commits an error of law. *Id.*

## V. DISCUSSION

### A. Standard for dismissal under Civil Rule 12(b)(6)

 **\*5**  Under Rule 7012, incorporating Civil Rule 12(b)(6), a defendant may move to dismiss a complaint if it fails to "state a claim upon which relief can be granted." Under Rule 7008, incorporating Civil Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." [5] Civil Rule 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(quoting *Twombly,* 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of "further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557).

[5]     Neither party has contended that the heightened pleading standard of Civil Rule 9(b) applies to constructive fraud claims. We agree it does not apply. *See Cendant Corp. v. Shelton,* 474 F.Supp.2d 377, 380 (D.Conn.2007)(Civil Rule 9(b) applies only to actual, not constructive, fraud claims); *Charys Liquidating Trust v. McMahan Sec. Co. (In re Charys Holding Co.),* 443 B.R. 628, 632 n.2 (Bankr.D.Del.2010)(constructive fraudulent transfer claims are governed by Civil Rule 8, not the heightened Civil Rule 9(b) pleading standard);

In re Aletheia Research and Management, Inc., Not Reported in B.R. Rptr. (2015)

2015 WL 8483728

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.),* 409 B.R. 737, 755–56 (Bankr.E.D.N.C.2009)(Civil Rule 9(b) is inapplicable to constructive fraud claims because such claims are not based on actual fraud but instead rely on the debtor's financial condition and the sufficiency of consideration paid by the transferee)(citing cases).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 556). "[A] complaint [that] pleads facts that are 'merely consistent with' a defendant's liability ... 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Although a court must accept as true all factual allegations contained in a complaint, a court need not accept plaintiff's legal conclusions as true. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Twombly,* 550 U.S. at 555). A dismissal under Civil Rule 12(b)(6) may be based on either the lack of cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys.,* 534 F.3d 1116, 1121 (9th Cir.2008).

**B. Governing law: §§ 544, 548 and CAL. CIV. CODE § 3439**

A bankruptcy trustee can avoid constructive fraudulent transfers under state law and the Code. Section 544(b) allows the trustee to avoid any transfers of a debtor's property which would be avoidable by an unsecured creditor under state law. Section 548 provides a federal statutory basis for avoiding fraudulent transfers. *Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 593 (9th Cir.1991). Trustee sought to avoid the Transfers to Clay Lacy under both §§ 544(b) and 548(a)(1)(B).

Under § 548(a)(1)(B), a trustee may avoid any transfer of an interest of the debtor in property that was made within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer, and was insolvent on the date that such transfer was made or became insolvent as a result of such transfer. § 548(a)(1)(B)(i), (ii)(I). The applicable state law for Trustee's claim under § 544(b) is

California law, namely CAL. CIV. CODE §§ 3439.04(a)(2) and 3439.05. [6] These state statutes are essentially identical to § 548(a)(1)(B), except the limitations period for avoidance is longer—the later of 4 years after the transfer or 1 year after the date of reasonable discovery. *See* CAL. CIV. CODE § 3439.09(a).

[6]    Under California law, constructive fraud may be found as to any present or future creditor when a debtor does not receive a reasonably equivalent value in exchange for the transfer, and either: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (B) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due. CAL. CIV. CODE § 3439.04(a)(2). Similarly, constructive fraud can be found under CAL. CIV. CODE § 3439.05 "as to an existing creditor if the debtor does not receive reasonably equivalent value and 'was insolvent at that time or ... became insolvent as a result of the transfer." *Mejia v. Reed,* 31 Cal.4th 657, 670 (2003)(quoting CAL. CIV. CODE § 3439.05).

**\*6**  Both state and federal law allow a transfer to be avoided where "the debtor did not receive a reasonably equivalent value in exchange for the transfer and the debtor was either insolvent at the time of the transfer or was engaged in business with unreasonably small capital." *In re United Energy Corp.,* 944 F.2d at 594 (citation and internal quotation marks omitted). Because California law is similar in form and substance to the Code's fraudulent transfer provisions, they may be interpreted contemporaneously. *Id.*

Applying *Twombly* to the present case, a complaint seeking relief under §§ 544(b) and 548(a)(1)(B)(i) and (ii)(I) must contain sufficient facts plausible on their face that establish the debtor: (1) made a transfer of the debtor's property; (2) within 2 or 4 years of the petition date; (3) received less than a reasonably equivalent value in exchange for the transfer; and (4) was insolvent on the date the transfer was made or became insolvent as a result of the transfer. *In re United Energy Corp.,* 944 F.2d at 594 (stating elements of a claim under § 548).

Whether the Transfers were property of Aletheia and that they were made within 2 or 4 years of the petition date was not disputed. We agree these two elements were supported by

In re Aletheia Research and Management, Inc., Not Reported in B.R. Rptr. (2015)
2015 WL 8483728

the requisite factual allegations. The complaint identified the property transferred (i.e., Aletheia funds paid to Clay Lacy) and provided dates of the Transfers, which were all within 2 or 4 years of the petition date. The issue before us is whether Trustee sufficiently pleaded that Aletheia was insolvent at the time of the Transfers (or became insolvent as a result) and whether he sufficiently pleaded that Aletheia did not receive reasonably equivalent value in exchange for the Transfers.

### C. The bankruptcy court erred when it granted Clay Lacy's Motion to Dismiss.

#### 1. The bankruptcy court applied an incorrect standard of law in ruling that Clay Lacy could not be a transferee.

The bankruptcy court's ruling here is ambiguous, making our review somewhat difficult. It appears the court did two things. First, it seems to have ruled as a matter of law that Clay Lacy could never be a proper transferee because Aletheia "got what it bargained for." This ruling was in error.

We agree with Trustee that the bankruptcy court incorrectly determined that because Aletheia directly contracted with Clay Lacy, no fraudulent conveyance claim can be asserted, ruling that "if a principal of the debtor ... incurs debts and then the debtor pays those debts; that's different.... But this is [Aletheia] who incurred the debt. So I'm going to ... grant the motion to dismiss." Hr'g Tr. (Feb. 11, 2015) 11:18–25. The general rule is that the party who receives a transfer of property directly from the debtor is the initial transferee. *Incomnet, Inc. v. Universal Serv. Admin. Co. (In re Incomnet, Inc.),* 299 B.R. 574, 578 (9th Cir. BAP2003), *aff'd,* 463 F.3d 1064, 1073 (9th Cir.2006). The fact that a corporate debtor directly incurred a debt to a service provider, such as Clay Lacy, is not an automatic bar to recovery for a fraudulent conveyance from the service provider transferee. *See Burdick v. Lee,* 256 B.R. 837 (D.Mass.2001); *Lawrence v. Bonadio, Insero & Co. (In re Interco Sys., Inc.),* 202 B.R. 188 (Bankr.W.D.N.Y.1996); *Brandt v. Charter Airlines, LLC (In re Equip. Acquisition Res., Inc.),* 511 B.R. 527 (Bankr.N.D.Ill.2014), *rev'd* in part, 2015 WL 4764145 (N.D.Ill.2015) (hereinafter "*EAR*").

*EAR* involved substantially similar facts. There, the corporate debtor, EAR, had contracted directly with the defendant, Charter Airlines, to provide flights for EAR's officers in exchange for payment. 511 B.R. at 530, 533. The flights were paid for by EAR. *Id.* The plaintiff plan administrator sought to avoid certain transfers to Charter Airlines for flights

that he contended were taken by the debtor's officers "purely for personal pleasure, not as business trips taken on EAR's behalf," and that did not benefit EAR. *Id.* at 530, 535. No argument was raised that Charter Airlines charged more than fair market value for the flights. The primary focus was whether EAR received reasonably equivalent value for the chartered flights it contracted and paid for. *Id.* at 530, 534–35. In its defense, Charter Airlines offered an affidavit of the chief pilot and captain of every flight, who asserted that the flights were for business purposes based on his belief that he was flying EAR's officers to business meetings and his observations of cell phone conversations of a business nature. *Id.* at 535. Ultimately, the bankruptcy court denied summary judgment to the plan administrator, holding that a factual issue remained for trial as to whether EAR received reasonably equivalent value. *Id.* [7]

> [7] After discovery, the bankruptcy court granted summary judgment in favor of defendant Charter Airlines due to its good faith defense under § 548(c). *Id.* at 536. However, as we discuss below, the defense of "good faith" is fact-specific and should not be considered in the context of a motion to dismiss.

**\*7** A similar claim was at issue in *Burdick.* There, the corporate debtor had contracted with a charter flight service, Enterprises, for flights taken by one of its officers, Mr. Lee. 256 B.R. at 839. The chapter 7 trustee sought to avoid transfers to Enterprises for flights that he alleged benefitted only Mr. Lee. *Id.* A question for trial was whether the debtor received less than reasonably equivalent value for the flights taken by Mr. Lee and charged to the debtor via the defendant, Enterprises. *Id.* at 839–40. Enterprises ultimately prevailed. Mr. Lee testified that he used the plane for both business and personal travel, but that he paid with his own funds for any personal use. Therefore, the court held that it could not infer the corporate debtor received less than reasonably equivalent value for the expenses incurred for Mr. Lee's personal use of the plane. *Id.* at 840.

Finally, one of the issues in *Interco Systems, Inc.* was whether the corporate debtor received reasonably equivalent value for payments it made to attorneys for legal services provided in connection with a sale of one of the debtor's company divisions. 202 B.R. at 191. In suing the attorneys for recovery of the fees, the chapter 7 trustee alleged that the legal services requested and paid for by the corporate debtor benefitted only the debtor's corporate officer. *Id.* at 192–93. Thus, reasonably

In re Aletheia Research and Management, Inc., Not Reported in B.R. Rptr. (2015)
2015 WL 8483728

equivalent value to the debtor was lacking. Ultimately, the trustee lost at trial. The bankruptcy court concluded that the corporate debtor, in its business judgment, believed that it received a financial benefit from the sale transaction. *Id.* at 194. The court went on to note:

> Certainly, if the facts and circumstances indicate that a payment of professional fees or other expenses by a corporation was for services or goods which solely benefitted a third party, whether it be a principal, officer or employee, and had no reasonable, good faith business judgment benefit to the corporation, that payment would be avoidable under Section 548 because of a lack of reasonably equivalent value, if all of the other requirements of that Section were met. In this case, the $150.00 paid by Interco for services rendered to Davie in connection with his matrimonial is such an improper and avoidable transfer. However, when in the exercise of reasonable, good faith business judgment, there is a perceived financial benefit to the corporation which justifies the fees or expenses paid, as in the case of the sale to UDI, unless the Trustee meets his or her burden to prove that there was in fact no benefit, or a substantially and reasonably quantifiable disproportionate financial benefit, the payment of professional fees or expenses to the professionals or others who perform the services or provided the goods at the request of the corporation and charged a reasonable rate is not avoidable as a fraudulent conveyance under Section 548(a)(2) (B)(I).

*Id.*

Regardless of the outcome, these cases have one important common denominator: the corporate debtor contracted and paid for a service that may not have benefitted the debtor, but rather may have benefitted only the debtor's corporate officer or employee. In each case, the defendant service provider was the recipient of the transfer (i.e., money for services rendered), which was potentially avoidable because the corporate debtor may have received less than reasonably equivalent value in exchange. Such defendants, however, may offer an affirmative defense, as did some of the defendants discussed. However, resolution of such defenses is not proper in the context of a motion to dismiss under Civil Rule 12(b) (6). *McFarland v. Gen. Elec. Capital Corp. (In re Int'l Mfg. Grp., Inc.),* 538 B.R. 22, 33 (Bankr.E.D.Cal.2015)(citing *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.),* 440 B.R. 243, 256 (Bankr.S.D.N.Y.2010)). *But see Asarco, LLC v. Union Pac. R.R. Co.,* 765 F.3d 999, 1004 (9th Cir.2014)(dismissal under Civil Rule 12(b)(6) on the basis of an affirmative defense is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint.)

**\*8** Therefore, to the extent the bankruptcy court ruled as a matter of law that Clay Lacy could not be a transferee because Aletheia incurred the debt for flight services and got what it bargained for, we believe it erred.

### 2. The bankruptcy court further erred in making a factual determination as to reasonably equivalent value.

The bankruptcy court also appears to have found as a matter of fact that even if Clay Lacy could be a transferee, it undisputedly provided Aletheia with reasonably equivalent value for the Transfers because it provided Aletheia with the service it requested at a fair market price. Such findings are not appropriate in the context of a motion to dismiss under Civil Rule 12(b)(6).

The question of whether or not reasonably equivalent value was provided in exchange for a transfer is clearly a question of fact. *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.3d 588, 593 (11th Cir.1990); *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.),* 850 F.2d 342, 344 (8th Cir.1988); *Samson v. W. Capital Partners LLC (In re Blixeth),* 2012 WL 1981719, at *15 (Bankr.D. Mont. June 1, 2012); *Salven v. Munday (In re Kemmer),* 265 B.R. 224, 232 (Bankr.E.D.Cal.2001). *See also Decker v. Tramiel (In re JTS Corp.),* 617 F.3d 1102, 1109–10 (9th Cir.2010)(holding that bankruptcy court's finding as to reasonably equivalent value was not "clearly erroneous"). The primary focus is on the net effect of the transaction on the debtor's estate and funds

available to the unsecured creditors. *Frontier Bank v. Brown (In re N. Merch., Inc.),* 371 F.3d 1056, 1059 (9th Cir.2004); *Maddox v. Robertson (In re Prejean),* 994 F.2d 706, 708–09 (9th Cir.1993)(reasonably equivalent value under California UFTA is "determined from the standpoint of the creditors"). *See also In re United Energy Corp.,* 944 F.2d at 597 ("[T]he analysis is directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost.").

In reviewing the complaint, Trustee alleged that in exchange for the Transfers, Aletheia received little or no value for flights where (1) employees took the flight for personal purposes or (2) no Aletheia employees were even on board. He provided a comprehensive list of the flights in question, including the dates, names of each passenger on the flight, the flight's destination and the price paid to Clay Lacy. Viewing the complaint in a light most favorable to Trustee, we conclude he stated sufficient facts to show Aletheia may not have received reasonably equivalent value from Clay Lacy for the Transfers.

### 3. Trustee failed to plead sufficient facts to establish a plausible claim for insolvency.

The bankruptcy court did not rule on Trustee's allegation of Aletheia's insolvency. However, our review is de novo, and we conclude Trustee's complaint fell short on the matter.

For this required element under both state and federal law, Trustee alleged generally that at the time Aletheia made each of the alleged Transfers to Clay Lacy, "Aletheia was insolvent." Trustee's complaint failed to set forth any factual support for this conclusion that would demonstrate plausibility. He did not offer a **single** fact to show that Aletheia was insolvent at the time of the Transfers or became insolvent as a result. This threadbare allegation does not pass muster under *Twombly,* 550 U.S. at 555 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Notably, some of the alleged Transfers reach back as far as four years before Aletheia filed its bankruptcy case; thus, plausibility for those

transfers is highly questionable without more supportive facts from Trustee. However, he will have another opportunity to plead his claim.

### D. The bankruptcy court abused its discretion when it dismissed Trustee's complaint without leave to amend.

 **\*9**  Trustee contends the bankruptcy court abused its discretion by not granting his request for leave to amend. The court did not discuss amendment at the hearing. In addition, the order dismissing Trustee's complaint fails to state whether it was dismissed with or without prejudice. However, because the court believed that Trustee could never plead a fraudulent conveyance claim against Clay Lacy, we can only presume it believed any amendment would be futile and that dismissal was with prejudice. Due to the errors committed by the court discussed above, we agree with Trustee.

Under Rule 7015, incorporating Civil Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." If a Civil Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000)(en banc)(internal quotation marks and citation omitted). In other words, dismissal is proper if any potential amendment of the complaint would be futile. Although Trustee failed to plead sufficient facts to show insolvency, we do not conclude that amending his complaint would be futile.

### VI. CONCLUSION

Accordingly, we VACATE and REMAND to the bankruptcy court with instruction that Trustee be allowed to amend his complaint.

### All Citations

Not Reported in B.R. Rptr., 2015 WL 8483728

---

2013 WL 1829648
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States Bankruptcy Court, C.D. California,
Los Angeles Division.

In re SCI REAL ESTATE INVESTMENTS,
LLC, a Virginia limited liability company,
Secured California Investments, Inc.,
a California corporation; Debtors.
William Hoffman, not individually but
solely as Liquidating Trustee of the SCI
Bankruptcy Liquidating Trust, Plaintiff,
v.
Joel D. and Fay S. Adelman, et al., Defendants.

Bankrutpcy No. 2:11–bk–15975–PC.
|
Adversary No. 2:13–ap–01175–PC.
|
May 1, 2013.

**Attorneys and Law Firms**

Jeffrey W. Dulberg, Scotta E. McFarland, Pachulski, Stang, Ziehl & Jones, LLP, Jeffrey N. Pomerantz, Los Angeles, CA, Bruce J. Zabarauskas, Thompson & Knight, New York, NY, for Debtors.

Kay S. Kress, Pepper Hamilton, LLP, Southfield, MI, for Plaintiff.

Joel D. and Fay S. Adelman, pro se.

Marc & Renee Paul, FLP, pro se.

Punam Patel or Vidya Patel, Trustee, pro se.

Penelope Parmes Rutan & Tucker LLP, Costa Mesa, Christine M. Pajak, Los Angeles, CA, for Defendants.

Alicia Lomeli, Trustee, pro se.

Alice LeFebvre, LS, pro se.

Nancy Kresek Revocable Trust, pro se.

Glen P. & Jacqueline Kaner, pro se.

Glen Kaner, pro se.

Philip L. Grauman, pro se.

Mathew P. & Cynthia Zinn, pro se.

TLRX Properties, LLC, pro se.

Sterling Trust Company FBO Alice Schmitt, pro se.

SCI Ft. Myers Fund LLC for The R & J Limited Partnership, pro se.

Lewis M. Savage, IRA Union Bank of CA, pro se.

**MEMORANDUM DECISION**

PETER H. CARROLL, United States Bankruptcy Judge.

**\*1** This matter comes before the court on a motion by Defendants, Joel D. Adelman, *et al.,* (collectively, the "Defendants") seeking a dismissal of Plaintiff's Complaint for: (1) Avoidance and Recovery of Actual Fraudulent Transfers [11 U.S.C. §§ 544(B), 550(A), 551 and California Uniform Fraudulent Transfer Act, Cal. Civ.Code Sections 3439.01—3439.12]; (2) Avoidance and Recovery of Constructive Fraudulent Transfers [11 U.S.C. §§ 544(B), 550(A), 551 and California Uniform Fraudulent Transfer Act, Cal. Civ.Code Sections 3439.01—3439.12]; and (3) Second Omnibus Objection to and Disallowance of Claims Held by Defendants [See Attached Exhibit 1 for List of Defendants' Proofs of Claim] [11 U.S.C. §§ 502(B)(1) and 502(D) ]("Complaint") pursuant to F.R.Civ.P. 12(b) (6).[1] William Hoffman, Liquidating Trustee of the SCI Bankruptcy Liquidating Trust ("Hoffman") opposes the motion. Appearances were stated on the record. The court, having considered the pleadings and arguments of counsel, makes the following findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052 and applied to adversary proceedings in bankruptcy cases.

[1]   Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references

2013 WL 1829648

are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

## I. *STATEMENT OF FACTS*

On February 11, 2011, SCI Real Estate Investments, LLC ("SCI LLC") and Secured California Investments, Inc. ("SCI Inc.") filed voluntary petitions under chapter 11 of the Code in Case Nos. 2:11–bk–15975–PC and 2:11–bk–15987–BR, respectively, in the United States Bankruptcy Court, Central District of California, Los Angeles Division. By order entered on March 4, 2011, the SCI Inc. case was reassigned to Judge Peter H. Carroll to be jointly administered with SCI LLC under Case No. 2:11–bk–15975–PC. On June 15, 2012, the court confirmed the First Amended Joint Chapter 11 Plan of Liquidation for SCI Real Estate Investments, LLC and Secured California Investments, Inc. dated April 19, 2012. Under the confirmed plan, Hoffman is authorized as the Liquidating Trustee to prosecute and settle all causes of action owned by the trust.

On February 15, 2013, Hoffman filed his four-count Complaint against the Defendants in this adversary proceeding. According to the Complaint, SCI Inc. and SCI LLC (collectively, the "Debtors") operated approximately 60 limited liability companies engaged in the business of real estate investment. Each of the Debtors' limited liability companies would acquire equity in one or more commercial real estate properties and offer co-ownership interests in those properties to individual investors. One of the Debtors' limited liability companies was SCI Ft. Myers Fund, LLC ("SCI Ft. Myers"). SCI Ft. Myers and Naples Realty Group, LLC formed Ft. Myers Property Investment Co. to acquire and operate three apartment communities in Ft. Myers, Florida. SCI Inc. owned an 8.8% interest in SCI Ft. Myers. Each of the Defendants invested with SCI Inc. in SCI Ft. Myers and, as an SCI Ft. Myers Fund Investor, received an SCI Ft. Myers Membership Interest. Defendants' initial investments in SCI Ft. Myers ranged from $1,000 to $1,021,000 each, according to Exhibit 1 to the Complaint.

 **\*2**  When the Ft. Myers Property Investment Co. proved unprofitable, SCI Ft Myers sent a letter to each of the Defendants offering to acquire their respective SCI Ft. Myers Membership Interests. By Assignment Agreement dated November 1, 2008, the Defendants each transferred their respective SCI Ft. Myers Membership Interests to SCI Inc. and released SCI Inc. and its affiliates from any liability

arising out of SCI Ft. Myers in exchange for SCI Inc.'s promise evidenced by a promissory note ("Ft. Myers Note") to reimburse each Defendant for the Initial Investment, less any amounts already received. Hoffman alleges that the Debtors were insolvent at the time of this transfer, and thereafter, did not make any payments on the Ft Myers Notes given to the Defendants in conjunction with the transfer. Hoffman objects to the Defendants' respective proofs of claim and seeks to avoid and recover the transfers pursuant to § 544(b) as either actually or constructively fraudulent under state law.

On March 21, 2013, Defendants filed their Motion to Dismiss seeking a dismissal of Hoffman's Complaint with prejudice pursuant to F.R.Civ.P 12(b)(6) on the following grounds:

> *First,* the Complaint fails to describe any "fraudulent scheme" of the Debtors, let alone with the particularity that is required for allegations of fraud. *Second,* the fraudulent conveyance allegations are premised on the unsupportable allegation that the SCI Ft. Myers Membership Interests were "worthless" or "had negligible value" ..., even though, at no point, does the Complaint assert the value of the underlying Portfolio Properties. *Third,* based on the assumption that the SCI Ft. Myers Membership Interests had little value, the Complaint summarily concludes that the Ft. Myers Notes given in exchange for the SCI Ft. Myers Membership Interests (and the Defendants' Releases) were not of "a reasonably equivalent value," without any factual basis to make such claim "plausible." *Finally,* the Complaint does not contain any factual allegation to support the conclusion that the Debtors were insolvent at the time of, or were made insolvent by, the SCI Ft. Myers Membership Interest Transfer—which was 27 months before the Petition Date. [2]

[2]      Motion to Dismiss ("Defendants' Motion") 6:21 to 7:8.

On April 2, 2013, Hoffman filed opposition to Defendants' Motion and Defendants replied on April 9, 2013. After a hearing on April 16, 2013, the court took the matter under submission. [3]

[3]      At the conclusion of oral argument, the court advised counsel for the parties of its intention to grant Defendants' motion and dismiss Hoffman's Complaint with leave to amend. The court notes that Defendants "do not consent to entry of final

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
In re SCI Real Estate Investments, LLC, Slip Copy (2013)    Exhibit A -- Unpublished Cases    Page 51 of 210

2013 WL 1829648

orders or judgment by the bankruptcy judge in this adversary proceeding." Defendants' Motion 1:18–21. Absent consent or waiver, this court lacks constitutional authority to enter a final judgment on a fraudulent transfer claim against a person or entity that has not filed a proof of claim against the bankruptcy estate. *See Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.),* 702 F.3d 553, 565 (9th Cir.2012). Dismissal with leave to amend, however, does not implicate *Stern v. Marshall* because it does not end the litigation on the merits. *See Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.),* 2013 WL 1342751 (Bankr.W.D.La.2013).

## II. *DISCUSSION*

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) & (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

A. *Standard for Dismissal Under Rule 12(b)(6)*
Rule 12(b)(6) authorizes the court, upon motion of the defendant, to dismiss a complaint for failure to state a claim upon which relief can be granted.[4] F.R.Civ.P. 12(b)(6). Under Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[5] F.R.Civ.P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 556). "[A] complaint [that] pleads facts that are 'merely consistent with' a defendant's liability ... 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557). Further, although a court must accept as true all factual allegations contained in a complaint, a court need not accept plaintiff's

legal conclusions as true. *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Twombly,* 550 U.S. at 555).

[4]    Rule 12(b)(6) is applicable to adversary proceedings by virtue of FRBP 7012(b).

[5]    Rule 8(a) is applicable to adversary proceedings by virtue of FRBP 7008(a).

**\*3** In the bankruptcy context, *Twombly* means that a plaintiff can no longer simply recite the statutory language of the particular Code section under which a claim is brought and expect the complaint to give sufficient notice to a defendant of the plaintiff's claim for relief. To pass muster under *Twombly,* a plaintiff must state a plausible claim for relief by identifying the specific facts upon which the plaintiff relies to support a finding on each element of the plaintiff's claim. Only then will a defendant have sufficient notice of plaintiff's claim under Rule 8(a). *See, e.g., Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.2009) ("the nonconclusory 'factual content,' and reasonable inferences from that content ... [must] plausibly [suggest] a claim entitling the plaintiff to relief."); *Limestone Dev. Corp. v. Vill. of Lemont, Ill.,* 520 F.3d 797, 802–03 (7th Cir.2008)(stating that *Twombly* "teaches that a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case").

B. *Hoffman's Complaint Fails to State a Plausible Claim for Avoidance and Recovery of an Actual Fraudulent Transfer*
Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." F.R.Civ.P. 9(b). Rule 9(b)'s heightened pleading standard applies to allegations of fraud and allegations sounding in fraud, including false misrepresentations. *See Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106–07 (9th Cir.2003); *Neilson v. Union Bank of Cal., N.A.,* 290 F.Supp.2d 1101, 1141 (C.D.Cal.2003). Allegations under Rule 9(b) must be stated with "specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir.2007). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 52 of 210

In re SCI Real Estate Investments, LLC, Slip Copy (2013)
2013 WL 1829648

anything wrong." *Bly–Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (citations/ internal quotations omitted). Moreover, where a plaintiff pleads allegations of fraud against more than one defendant, Rule 9(b) "requires that a plaintiff plead with sufficient particularity attribution of the alleged misrepresentations or omissions to each defendant." *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 752 (N.D.Cal.1997).

To state a claim for fraud, the plaintiff must also plead knowledge of falsity, or scienter. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1546 (9th Cir.1994)(en banc). The requirement for pleading scienter is less rigorous than that which applies to allegations regarding the "circumstances that constitute fraud" because Rule 9(b) states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." F.R.Civ.P. 9(b). However, the plaintiff must "set forth facts from which an inference of scienter could be drawn." *Cooper v. Pickett,* 137 F.3d 616, 628 (9th Cir.1997)(quoting *GlenFed,* 42 F.3d at 1546).

**\*4** Under California law, a transfer made with the actual intent to hinder, delay or defraud any creditor of the debtor violates California's Uniform Fraudulent Transfer Act ("UFTA"). Cal. Civ.Code § 3439.04; *see Mejia v. Reed,* 31 Cal.4th 657, 664 (2003). To prevail under California's UFTA § 3439.04(a)(1), Hoffman must establish by a preponderance of the evidence that the Debtors transferred the Ft. Myers Notes and releases in exchange for the SCI Ft. Myers Membership Interests with the actual intent to hinder, delay or defraud a creditor. *See Wolkowitz v. Beverly (In re Beverly),* 374 B.R. 221, 235 (9th Cir. BAP2007)("Whether there is actual intent to hinder, delay, or defraud under UFTA is a question of fact to be determined by a preponderance of evidence."). Because a debtor rarely admits to such a transfer, the evidence of intent "must of necessity consist of inferences drawn from the circumstances surrounding the transaction and the relationship and interests of the parties." *Neumeyer v. Crown Funding Corp.,* 56 Cal.App.3d 178, 183 (1976); *see Beverly,* 374 B.R. at 235 ("Since direct evidence of intent to hinder, delay or defraud is uncommon, the determination typically is made inferentially from circumstances consistent with the requisite intent."). The UFTA identifies 11 non-exclusive factors, or "badges of fraud," that may be applied by a court to divine fraudulent intent:

1. Whether the transfer or obligation was to an insider.

2. Whether the debtor retained possession or control of the property after the transfer.

3. Whether the transfer or obligation was disclosed or concealed.

4. Whether the debtor was sued or threatened with suit before the transfer was made or obligation incurred.

5. Whether the transfer was of substantially all of the debtor's assets.

6. Whether the debtor absconded.

7. Whether the debtor removed or concealed assets.

8. Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or obligation incurred.

9. Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation incurred.

10. Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

11. Whether the debtor transferred essential assets of the business to a lienholder who then transferred the assets to an insider of the debtor.

Cal. Civ.Code § 3439.04(b). The UFTA factors are intended "to provide guidance to the trial court, not compel a finding one way or another." *Filip v. Bucurenciu,* 129 Cal.App.4th 825, 834 (2005). As the court observed in *Beverly:*

> The UFTA list of "badges of fraud" provides neither a counting rule nor a mathematical formula. No minimum number of factors tips the scales toward actual intent. A trier of fact is entitled to find actual intent based on the evidence in the case, even if no "badges of fraud" are present. Conversely, specific evidence may negate an inference of fraud notwithstanding the presence of a number of "badges of fraud."

**\*5** 374 B.R. at 236.

In this case, Hoffman's Complaint describes SCI Inc.'s acquisition of each of the Defendants' SCI Ft. Myers

2013 WL 1829648

Membership Interests in exchange for a Ft. Myers Note and a release. Hoffman's Complaint identifies the date of the transfer and alleges that the transfer "was in connection with, and in furtherance of, the Debtors' on-going fraudulent scheme."[6] According to Hoffman, "the Debtors needed to appease their most prized investors, and did so, by acquiring Defendants' worthless SCI Ft. Myers Membership Interests in exchange for the Ft. Myers Notes—in order to ensure that the Defendants would continue to invest in SCI TIC Real Estate Investments."[7] Hoffman's Complaint does not, however, sufficiently allege facts that would form the basis for a finding that the exchange itself hindered, delayed or defrauded a creditor of the Debtors or that the Debtors intended the exchange to do so on the date of the transfer.

[6]    Complaint 13:13–14; 13:15–16.

[7]    Id. 13:16–19.

In paragraph 63 of the Complaint, Hoffman alleges three "badges of fraud" from which the court is asked to divine the requisite actual intent.[8] However, the allegations in Hoffman's Complaint "set forth [few] facts from which an inference of scienter [can] be drawn." See Cooper, 137 F.3d at 628. Each of the allegations in paragraph 63 is a legal conclusion "which may not [be] substitute[d] for well-pleaded facts allowing the Court to reasonably infer that those conclusions are true." Allstate Ins. Co. v. Countrywide Fin. Corp., 842 F.Supp.2d 1216, 1226 (C.D.Cal.2012).

[8]    Id. 14:24–15:4.

Absent the following facts, Hoffman's Complaint fails to state a plausible claim to recover an actual fraudulent transfer under § 544(b) and Cal. Civ.Code § 3439.04(a)(1):

1) The value of the SCI Ft. Myers Membership Interest conveyed by each Defendant to SCI Inc. on the date of the transfer, together with facts forming the basis for such valuation;

2) The value of the Ft. Myers Note and release conveyed to each Defendant by SCI Inc. on the date of the transfer, together with facts forming the basis for such valuation;

3) Facts that form the basis for Hoffman's assertion that "the Debtors were insolvent as of December 31, 2007."[9] [A debtor is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at fair valuation."  11 U.S.C. § 101(32)(A) ].

[9]    Id. 12:14–15.

4) Facts that form the basis for Hoffman's assertion that "[t]he Defendants knew that the value of the consideration received by the Debtors in exchange for the Ft. Myers Notes was not of a reasonably equivalent value."[10]

[10]    Id. 14:19–20.

5) Facts that form the basis for Hoffman's assertion that "the Debtors were (i) insolvent when the Actual Fraudulent Transfers were made to the Defendants, or became insolvent as a result of the Actual Fraudulent Transfers made to the Defendants; or (ii) engaged in business or a transaction, or were about to engage in a business or a transaction, for which the property remaining with the Debtors after the Actual Fraudulent Transfers were made constituted unreasonably small capital; or, in the alternative, (iii) at the time the Actual Fraudulent Transfers were made, the Debtors intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as they matured."[11]

[11]    Id. 14:24–15:4.

*6    For these reasons, Hoffman's first cause of action to avoid and recover actual fraudulent transfers must be dismissed for failure to state a claim upon which relief can be granted.

C. *Hoffman's Complaint Fails to State a Plausible Claim for Avoidance and Recovery of a Constructively Fraudulent Transfer*
Courts do not generally apply the heightened pleading standard of Rule 9(b) to constructive fraud claims. The 1849 Condominiums Assoc., Inc. v. Bruner, 2010 WL 2557711 (E.D.Cal.2010), citing Cendant Corp. v. Shelton, 474 F.Supp.2d 377, 380 (D.Conn.2007). Rule 9(b) is inapplicable because constructive fraud claims "are not based on actual fraud but instead rely on the debtor's financial condition and the sufficiency of the consideration provided by the transferee." In re Careamerica, Inc., 409 B.R. 737, 755–56 (Bankr.E.D.N.C.2009). Still, a constructive fraud claim must satisfy Rule 8(a) and contain sufficient facts to establish that the claim is plausible.

Under California law, constructive fraud may be found as to any present or future creditor when a debtor does not receive

2013 WL 1829648

a reasonably equivalent value in exchange for a transfer, and either

(A) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, [or]

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Cal. Civ.Code § 3439.04(a)(2). Similarly, constructive fraud can be found under Cal. Civ.Code § 3439.05, "as to an existing creditor if the debtor does not receive reasonably equivalent value and 'was insolvent at that time or ... became insolvent as a result of the transfer'" *Mejia v. Reed,* 31 Cal.4th at 670, *quoting* Cal Civ.Code § 3439.05.

Here, Hoffman's constructive fraud claims are insufficiently stated and must be dismissed. At its core, "a constructive fraudulent transfer has two elements: reasonable equivalent value and insolvency." *Allstate Ins. Co.,* 842 F.Supp.2d at 1224. As previously stated, Hoffman's Complaint does not state sufficient facts to plausibly show that on the date of the transfer the Debtors were actually insolvent or received less than was given to the Defendants. Absent the following facts, Hoffman's Complaint fails to state a plausible claim to recover a constructive fraudulent transfer under § 544(b) and Cal. Civ.Code § 3439.04(a)(2) or § 3439 .05:

1. The value of the SCI Ft. Myers Membership Interest conveyed by each Defendant to SCI Inc. on the date of the transfer, together with facts forming the basis for such valuation;

2. The value of the Ft. Myers Note and release conveyed to each Defendant by SCI Inc. on the date of the transfer, together with facts forming the basis for such valuation;

3. Facts that form the basis for Hoffman's assertion that "the Debtors were actually insolvent at the time the Constructive Fraudulent Transfers were made to each of the Defendants." [12]

[12]    *Id.* 16:23–24.

**\*7** 4. Facts that form the basis for Hoffman's assertion that "the Debtors were (i) insolvent when the Constructive Fraudulent Transfers were made to the Defendants,

or became insolvent as a result of the Constructive Fraudulent Transfers made to the Defendants; or (ii) engaged in business or a transaction, or were about to engage in a business or a transaction, for which the property remaining with the Debtors after the Constructive Fraudulent Transfers were made constituted unreasonably small capital; or, in the alternative, (iii) at the time the Constructive Fraudulent Transfers were made, the Debtors intended to incur, or believed they would incur, debts that would be beyond the Debtors' ability to pay as they matured." [13]

[13]    *Id.* 16:25–17:5.

For these reasons, Hoffman's second cause of action to avoid and recover constructive fraudulent transfers must be dismissed for failure to state a claim upon which relief can be granted.

D. *Hoffman's Complaint Fails to State a Plausible Claim for Disallowance of Defendants' Proofs of Claim Pursuant to* 11 U.S.C. § 502(d) *or* 11 U.S.C. § 502(b)(1)

Having failed to sufficiently plead the actual fraudulent transfer claims and constructive fraudulent transfer claims, Hoffman's third and fourth causes of action must be dismissed.

E. *Leave to Amend*

Rule 15(a)(2) of the Federal Rules of Civil Procedure states that "[t]he court should freely give leave [to amend] when justice so requires." F.R.Civ.P. 15(a)(2). [14] If a complaint lacks facial plausibility, a court must grant leave to amend unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Gompper v. VISX, Inc.,* 298 F.3d 893, 898 (9th Cir.2002). It is not clear to the court at this juncture whether the deficiencies in Hoffman's Complaint cannot be cured by amendment.

[14]    Rule 15(a)(2) is applicable to adversary proceedings by virtue of FRBP 7015.

*CONCLUSION*

As Hoffman fails to state a claim upon which relief can be granted with respect to each of the counts in the Complaint, Defendants' motion to dismiss under F.R.Civ.P. 12(b)(6) will be granted with leave to amend. Hoffman shall file and serve

2013 WL 1829648

Plaintiff's First Amended Complaint not later than June 3, 2013, to cure the deficiencies identified above and to state a plausible claim for relief on each of his four causes of action. Defendants must file and serve a response to Hoffman's First Amended Complaint not later than June 28, 2013.

A separate order will be entered consistent with this opinion.

**All Citations**

Slip Copy, 2013 WL 1829648

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 90332
Only the Westlaw citation is currently available.
United States Bankruptcy Court, N.D. California.

IN RE: DOORMAN PROPERTY
MAINTENANCE, Debtor.
Andrea A. Wirum, Trustee, Plaintiff,
v.
Nicholas Kraemer, Barrett Raftery and Doorman
Property Management, Inc., Defendants.

Case No. 15–30912 DM
|
Adv. Proc. No. 16–03072
|
Signed 01/10/2017

**Attorneys and Law Firms**

Tiffany R. Norman, TRN Law Associates, San Francisco, CA,
Nancy Weng, Trinh Law, San Jose, CA, for Debtor

MEMORANDUM DECISION ON DEFENDANTS'
MOTION TO DISMISS AND TRUSTEE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

DENNIS MONTALI, U.S. Bankruptcy Judge

**\*1** On December 16, 2016, this court heard the motion of Doorman Property Management *dba* Doorman *dba* Doorman Property Maintenance ("Debtor"), Nicholas Kraemer, and Barrett Raftery (collectively, "Defendants") to dismiss the adversary complaint filed against them by Andrea A. Wirum ("Trustee"), chapter 7 trustee for Debtor's chapter 7 estate. It also heard the Trustee's counter-motion for partial summary judgment on her ninth, tenth and eleventh claims for relief. For the reasons set forth below, the court is granting both motions in part and denying them in part.

I. STANDARDS GOVERNING RULE 12(b) MOTIONS
Defendants seek dismissal of all but one claim against them pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12"), incorporated by Federal Rule of Bankruptcy Procedure 7012(b)) ("Bankruptcy Rule 7012"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[D]ismissal for failure to state a claim is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted).

II. ANALYSIS OF SPECIFIC CAUSES OF ACTION
Trustee asserted eleven causes of action against Defendants, who moved for dismissal of all except the first (breach of fiduciary duty). Applying the foregoing standards governing Rule 12(b)(6) motions, the court will address the second through eleventh causes of action in turn:

**A. Second Claim for Relief: Breach of Fiduciary Duty
by Abuse of Process**
Incorporating the allegations of the first claim for relief, Trustee asserted a separate claim for breach of fiduciary duty by abuse of process in her second claim. Defendants concede that the facts alleged (albeit disputed) in the first claim could give rise to a claim for breach of fiduciary duty, but seek dismissal of the second claim for "breach of fiduciary duty by abuse of control" as duplicative and unrecognized as a separate tort under California law. The court agrees. As noted in *In re Zoran Corp. Derivative Litigation*, 511 F.Supp.2d 986, 1019 (N.D. Cal. 2007), claims for abuse of control or gross mismanagement "are often considered a repackaging of claims for breach of fiduciary duties instead of being a separate tort." Abuse of control may be an element of proof for a claim for breach of fiduciary duty, but does not give rise to an additional independent tort. The court will therefore dismiss the second claim for relief without leave to amend.

**B. Third Claim for Relief: Gross Negligence**
Defendants contend that California does not recognize a separate and distinct claim for gross negligence that is independent of any statutory basis, citing *Eriksson v. Nunnink*, 191 Cal.App.4th 826, 856 n. 18 (2011) ("In reality, California does not recognize a distinct cause of action for 'gross negligence' independent of a statutory basis."). In making this statement, the *Nunnick* court quoted and relied on the holding of *Saenz v. Whitewater Voyages, Inc.*, 226 Cal.App.3d 758, 766 n. (1990). The California Supreme Court, however, described this language as "offhand dicta" in *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 780 (2007). It

2017 WL 90332

observed that a distinction between gross negligence and ordinary negligence is generally unnecessary but that such a distinction is appropriate if gross negligence is "the only negligence-based theory open to plaintiffs and real parties in interest." Therefore, in cases involving anticipatory releases and exculpation clauses that release liability except in cases of gross negligence or willful misconduct, the law continues to recognize gross negligence as a theory of recovery. *Id.* at 781.

**\*2** Trustee argues that her third claim is necessary, as gross negligence provides an exception to the business judgment defense. "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of [a corporation's directors] if the latter's decision can be "attributed to any rational business purpose." *Katz v. Chevron Corp.*, 22 Cal.App.4th 1352, 1366 (1994). Instead "[u]nder the business judgment rule[,] director liability is predicated upon concepts of gross negligence." *Id.*

The court acknowledges that gross negligence precludes the successful assertion of the business judgment defense to Trustee's breach of fiduciary duty cause of action. When and if Defendants assert that defense, Trustee can argue that they cannot prevail as their actions were willful or grossly negligent. A separate cause of action for gross negligence is not necessary. That said, Trustee is entitled to take discovery in anticipation of the assertion of the business judgment defense by Defendants. The motion to dismiss the third claim for relief is granted with leave to amend.

### C. Fourth Claim for Relief: Conversion

Trustee alleges in her fourth claim for relief that Defendants wrongfully exercised dominion over and converted for their own benefit money and property of the Debtor. In their motion to dismiss, Defendants contend that they had a possessory interest in the money and thus there can be no conversion. The Trustee disputes the legitimacy of this possessory interest, thus giving rise to factual issues that preclude dismissal as a matter of law.

Trustee has sufficiently pled a claim for conversion of money, identifying in para 11(f) and (g) specific sums purportedly intercepted and retained by the defendants. As noted by one California appellate courts:

> A cause of action for conversion requires allegations of plaintiff's

ownership or right to possession of property; defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession; and damage to plaintiff. Money cannot be the subject of a cause of action for conversion **unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment.**

*McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 1491 (2006); *see also Fischer v. Machado*, 50 Cal.App.4th 1069, 1072–1074 (1996) (sales agent liable for conversion of proceeds from consignment sale of farm products); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal.App.4th 472, 485 (1996) ("money cannot be the subject of a conversion action unless a specific sum capable of identification is involved").

As Trustee has identified the specific funds purportedly converted by Defendants, the court will deny the motion to dismiss the fourth claim for relief.

### D. Fifth Claim for Relief: Unjust Enrichment

Trustee's claim for unjust enrichment involves the same identified monies as those alleged in support of the conversion claim: the receipt of $26,000 in rent payments due to Debtor and the receipt of a $306,000 real estate commission to which Debtor was entitled. (*See* paras. 45 & 46 of the Complaint). As noted by Judge Whyte in the *Apple/AT & T* litigation, unjust enrichment claims that simply duplicate other statutory or tort claims are not cognizable:

> [C]ourts have repeatedly held that "there is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal.App.4th 779, 794, 131 Cal.Rptr.2d 347 (2003). Moreover, plaintiffs cannot assert unjust enrichment claims that are merely duplicative of statutory or tort claims. *See, e.g., Rosal v. First Federal Bank of Cal.*, 671 F.Supp.2d 1111, 1133 (N.D. Cal. 2009).

**\*3** *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F.Supp.2d 1070, 1077 (N.D. Cal. 2011). The court will therefore dismiss the fifth claim for relief without leave to amend.

In re Doorman Property Maintenance, Not Reported in B.R. Rptr. (2017)
2017 WL 90332

### E. Sixth and Seventh Claims for Relief: Fraudulent Transfers

Defendants request that the court dismiss the sixth and seventh claims for recovery of fraudulent transfers, contending that Trustee has failed to state a state a claim with the particularity required by *Iqbal*. The court disagrees. Paragraphs 10 and 11 of the complaint describe Debtor's property and business opportunities purportedly usurped by Defendants for their own benefit. In the Sixth Claim, Trustee alleges that the Defendants usurped or received the property rights described in paragraphs 10 and 11 for less than reasonably equivalent value when Debtor was insolvent or on the brink of insolvency, and that the transfers were made with actual intent to hinder, delay or defraud any entity to which Debtor was or would become indebted. Because these allegations sufficiently set forth a claim for relief, the court is denying the motion to dismiss the sixth and seventh claims.

### F. Eighth Claim for Relief: Preferential Transfers

According to paragraph 25 in Trustee's first claim for relief (breach of fiduciary duty), Defendants diverted for their own personal use a $306,250 real estate commission belonging to Debtor and had Debtor pay rent on their personal premises. Contending that these funds had been wrongfully usurped, Trustee has asserted alternate theories for recovery of the sums: breach of fiduciary duty, conversion, unjust enrichment and fraudulent transfers. These transfers are also the basis of Trustee's eighth claim for relief to recover preferential transfers.

Bankruptcy Code section 547(b)(2) sets forth the second element for recovery of a preferential transfer: the transfer must be for or on account of an antecedent debt owed by a debtor before the transfer was made. Trustee's complaint, however, does not sufficiently allege the existence of an antecedent debt. If such an antecedent debt exists, Trustee may amend the complaint to describe it. Otherwise, Trustee has not set forth a preference claim upon which relief can be granted. If in the course of discovery or litigation, Defendants assert the existence of such an antecedent debt (to demonstrate that they received property for value), Trustee may amend her complaint. The court will therefore grant the motion to dismiss the eighth claim for relief with leave to amend.

### G. Ninth Claim for Relief: Determination of Liability Under Section 723

When the petition commencing the underlying bankruptcy case was filed, Debtor was identified as "Doorman Property Management DBA Doorman Property Maintenance." While Doorman Property Maintenance is a corporation, Doorman Property Management is a partnership. The petition and schedules, signed by Defendant Barrett Rafferty as CFO, repeatedly refer to Doorman Property Management without reference to Doorman Property Maintenance (*see, e.g.*, the Declaration of Mr. Rafferty at page 32 of Docket No. 1 in Case No. 15–30912; on Schedule E, (id. at page 12). Following the initial section 341 meeting of creditors on August 25, 2015, Defendants attempted to amend their petition to replace "Doorman Property Management" with "Doorman Property Maintenance, a CA SCorp, formerly known as Doorman Property Management, a CA SCorp [sic]." *See* Amended Voluntary Petition filed on October 9, 2015 (Docket No. 13 in Case No. 15–30912). The Trustee thereafter filed a motion for substantive consolidation, which this court granted on April 12, 2016, specifying that the assets and liabilities of the partnership are and were part of the bankruptcy case retroactive to the petition date of July 16, 2015.

**\*4** In light of this substantive consolidation, and in light of its reasons set forth on the record at the hearing on December 16, 2016, the court will deny Debtor's motion to dismiss the ninth claim for relief and will grant Trustee's motion for partial summary judgment in her favor on that claim.

### H. Tenth and Eleventh Claims for Relief: Turnover and Injunctive Relief

In the tenth and eleventh claims for relief, Trustee requests that this court enjoin Defendants' use or retention of certain intellectual property assets and to compel the turnover of such assets. These are not independent claims; the Trustee will need to demonstrate her entitlement to turnover and injunctive relief by prevailing on her other substantive claims. The court will therefore deny both the Defendants' motion to dismiss and the Trustee's motion for summary judgment as to these claims.

### III. CONCLUSION

Counsel for the Trustee should upload an order granting relief consistent with this Memorandum Decision. The order should not contain separate findings or conclusions, but should simply incorporate the reasoning of this Memorandum Decision. The court shall hold a further status conference in this adversary proceeding on February 24, 2017, at 1:30 p.m.

2017 WL 90332

**All Citations**

Not Reported in B.R. Rptr., 2017 WL 90332

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3700337
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

IN RE: TRIBUNE COMPANY
FRAUDULENT CONVEYANCE LITIGATION
Marc S. Kirschner, as Litigation Trustee for the
Tribune Litigation Trust, Plaintiff-Appellant,
v.
Large Shareholders, Financial Advisors, Financial
Institution Holders, Financial Institution
Conduits, Pension Funds, Individual Beneficial
Owners, Mutual Funds, Defendants-Appellees.
Marc S. Kirschner, as Litigation Trustee for the
Tribune Litigation Trust, Plaintiff-Appellant,
v.
Citigroup Global Markets Inc., Merrill
Lynch, Pierce, Fenner & Smith
Incorporated, Defendants-Appellees.

Docket Nos. 19-3049-cv; 19-449-cv
|
August Term 2020
|
Argued: August 24, 2020
|
Decided: August 20, 2021

**Synopsis**
**Background:** Litigation trustee appointed under Chapter
11 debtor-newspaper company's confirmed plan brought
fraudulent conveyance and other claims on behalf of
creditors against shareholders who sold their stock in debtor's
leveraged buyout (LBO) less than one year prior to debtor's
bankruptcy filing, and against financial advisors that helped
debtor navigate and complete the LBO. The United States
District Court for the Southern District of New York, Richard
J. Sullivan and Denise L. Cote, JJ., entered judgment and
orders dismissing claims, and denied leave to file sixth
amended complaint. Litigation trustee appealed.

**Holdings:** The Court of Appeals, Chin, Circuit Judge, held
that:

[1] trustee failed to plausibly allege that fraudulent intent
of debtor's senior management should be imputed to special
committee created by board of directors to evaluate LBO;

[2] trustee failed to plead "badges of fraud" sufficient to raise
strong inference of actual fraudulent intent on the part of
special committee;

[3] debtor's LBO structured in two steps was not a unitary
transaction such that steps could be collapsed into one for
purposes of fraudulent conveyance claims;

[4] trustee failed to sufficiently allege that debtor was
insolvent as required to support claims that controlling
shareholders breached their fiduciary duties by pushing for
LBO;

[5] exceptions to in pari delicto doctrine did not apply
to permit trustee to pursue aiding and abetting breach of
fiduciary duty and professional malpractice claims;

[6] factual question whether two financial advisors provided
reasonably equivalent value for success fee was not
appropriate to determine on motion to dismiss; and

[7] District Court did not abuse its discretion in denying
trustee leave to amend claims.

Affirmed in part, vacated in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim; Motion to Amend the Complaint.

West Headnotes (55)

[1]    **Federal Courts** 👈 Pleading
       **Federal Courts** 👈 Dismissal for failure to
       state a claim
       Court of Appeals reviews de novo a district
       court's grant of a motion to dismiss for failure
       to state a claim, accepting the complaint's factual
       allegations as true and drawing all reasonable
       inferences in the plaintiff's favor. Fed. R. Civ. P.
       12(b)(6).

[2]    **Federal Courts** 👈 Pleading

2021 WL 3700337

Court of Appeals reviews a district court's denial of leave to amend complaint for abuse of discretion. Fed. R. Civ. P. 15.

**[3]**    **Federal Courts** 🔑 Pleading

If district court's denial of leave to amend complaint was based on futility, Court of Appeals reviews that legal conclusion de novo. Fed. R. Civ. P. 15.

**[4]**    **Bankruptcy** 🔑 Pleading

An intentional fraudulent conveyance claim must be pled with specificity as required by rule governing fraud pleadings. 11 U.S.C.A. § 548(a)(1)(A); Fed. R. Civ. P. 9(b).

**[5]**    **Bankruptcy** 🔑 Pleading

For an intentional fraudulent conveyance claim to be pled with specificity as required by rule governing fraud pleadings, the alleged fraud must relate to the specific payment or transfer the plaintiff is seeking to avoid, rather than to the overall course of business. 11 U.S.C.A. § 548(a)(1)(A); Fed. R. Civ. P. 9(b).

**[6]**    **Bankruptcy** 🔑 Intent of debtor

By "actual intent," statute governing intentional fraudulent conveyance claims contemplates intent existing in fact or reality and not merely the imputed intent that would suffice for a constructive fraudulent conveyance claim. 11 U.S.C.A. §§ 548(a)(1)(A), 548(a)(1)(B).

**[7]**    **Bankruptcy** 🔑 Pleading

Because of difficulties in proving intent to defraud, pleader asserting intentional fraudulent conveyance claim may rely on "badges of fraud," i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to inference of intent. 11 U.S.C.A. § 548(a)(1)(A).

**[8]**    **Bankruptcy** 🔑 Pleading

Where Chapter 11 debtor-company's board of directors delegated its authority to approve merger and redemption of company's stock, as part of leveraged buyout (LBO) less than one year prior to debtor's bankruptcy filing, to special committee pursuant to Delaware law, litigation trustee asserting intentional fraudulent conveyance claims arising out of the LBO was required to plead allegations that gave rise to a strong inference that the special committee had the actual intent to hinder, delay, or defraud company's creditors. 11 U.S.C.A. § 548(a)(1)(A); 8 Del. Code §§ 141(a), (c), 160(a), 251(b).

**[9]**    **Corporations and Business Organizations** 🔑 Corporation acts through officers or agents

Corporation can only act through its directors and officers.

**[10]**    **Bankruptcy** 🔑 Intent of debtor

Court looks to state law to determine who has the authority to act on behalf of a corporation and therefore whose actions to review to see whether there was fraudulent intent or badges of fraud, in context of intentional fraudulent conveyance claims. 11 U.S.C.A. § 548(a)(1)(A).

**[11]**    **Bankruptcy** 🔑 Intent of debtor

For an intentional fraudulent transfer claim, which requires actual intent, a company's intent may be established only through the actual intent of the individuals in a position to control the disposition of the transferor's property. 11 U.S.C.A. § 548(a)(1)(A).

**[12]**    **Bankruptcy** 🔑 Intent of debtor

Litigation trustee failed to plausibly allege that fraudulent intent of Chapter 11 debtor-company's senior management should be imputed to special committee created by board of directors to evaluate leveraged buyout

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)

2021 WL 3700337

(LBO) less than one year prior to debtor's bankruptcy filing, as required to support intentional fraudulent conveyance claims arising out of the LBO, absent allegations that senior management dominated the special committee, inappropriately pressured independent directors on the special committee, or controlled transfer of property in question. 11 U.S.C.A. § 548(a)(1)(A).

**[13]    Bankruptcy**    Intent of debtor

Litigation trustee failed to plead "badges of fraud" sufficient to raise strong inference of actual fraudulent intent on the part of special committee created by board of directors to evaluate leveraged buyout (LBO) less than one year prior to debtor-newspaper company's Chapter 11 filing, as required to support intentional fraudulent conveyance claims arising out of the LBO, based on allegations that independent directors on the special committee, who owned only 0.08% of debtor's shares, stood to earn $6 million for selling their shares if they approved the LBO, and that independent directors knew debtor was falling far short of projections and thus was unlikely to generate enough cash to service its debt, at a time when other newspaper companies were also struggling. 11 U.S.C.A. § 548(a)(1)(A).

**[14]    Corporations and Business Organizations**    Fiduciary duty in general

Under Delaware law, shareholder owes company fiduciary duty only if it owns majority interest in or exercises control over business affairs of corporation.

**[15]    Corporations and Business Organizations**    Individual profits or benefits from corporate business

Under Delaware law, if fiduciary duty exists, shareholder breaches that duty if, for its own benefit, it approves transaction that renders corporation insolvent.

**[16]    Bankruptcy**    Nature and Form of Transfer

Under *Sabine* factors to determine whether two steps should be viewed as a single transaction, for purposes of intentional fraudulent conveyance claims, court considers (1) whether all of the parties involved had knowledge of the multiple transactions, (2) whether each transaction would have occurred on its own, and (3) whether each transaction was dependent or conditioned on other transactions; *In re Sabine Oil & Gas Corp.*, 547 B.R. 503. 11 U.S.C.A. § 548(a)(1)(A).

**[17]    Corporations and Business Organizations**    Contracts and Indebtedness

Under Delaware's step-transaction doctrine, corporation's transactions can be treated as a single transaction if a party can satisfy any one of three tests: (1) the "end result test," which authorizes collapse if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result; (2) the "interdependence test," which authorizes collapse if the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series; and (3) the "binding-commitment test," which allows collapse only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps.

**[18]    Bankruptcy**    Nature and Form of Transfer

Chapter 11 debtor-newspaper company's leveraged buyout (LBO) structured in two steps, less than one year prior to debtor's bankruptcy filing, was not a unitary transaction such that steps could be collapsed into one for purposes of litigation trustee's intentional fraudulent conveyance claims arising out of the LBO; parties intended to structure the two steps as independent transactions, step one was able to stand alone, and there was no binding commitment to undertake step two. 11 U.S.C.A. § 548(a)(1)(A).

2021 WL 3700337

**[19]    Federal Civil Procedure** 🔑 **Matters deemed admitted;  acceptance as true of allegations in complaint**

Although the court must accept as true all plausible allegations set forth in the complaint when deciding a motion to dismiss for failure to state a claim, the court need not accept threadbare recitals of a cause of action's elements that are supported by mere conclusory statements. Fed. R. Civ. P. 12(b)(6).

**[20]    Corporations and Business Organizations** 🔑 **Insolvency in General**

Litigation trustee failed to sufficiently allege that Chapter 11 debtor-newspaper company was insolvent at step one of two-step leveraged buyout (LBO), as required to support claims that controlling shareholders breached heir fiduciary duties under Delaware law by pushing for the LBO based on projections they knew to be false and by causing debtor to incur debt they knew would leave the company insolvent, based on allegations that debtor had already made commitments to borrow an additional $3.7 billion of debt and to make an additional $4 billion distribution to its shareholders, for which performance was due at step two, without alleging that the $8 billion borrowed at step one, standing alone, rendered debtor insolvent.

**[21]    Corporations and Business Organizations** 🔑 **What constitutes corporate insolvency**

Under Delaware law, under the balance sheet test, an entity is insolvent if it has liabilities in excess of a reasonable market value of assets held.

**[22]    Federal Civil Procedure** 🔑 **Effect**

District Court did not abuse its discretion in dismissing with prejudice litigation trustee's claims that controlling shareholders breached their fiduciary duties under Delaware law by pushing for leveraged buyout (LBO) based

on projections they knew to be false and by causing Chapter 11 debtor-newspaper company to incur debt they knew would leave the company insolvent, on defendants' motion to dismiss for failure to state a claim, since trustee did not explain what specific facts he would plead to salvage those claims. Fed. R. Civ. P. 12(b)(6).

**[23]    Fraud** 🔑 **Persons liable**

Under Delaware law, a third party may be liable for aiding and abetting a breach of fiduciary duty if there is (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.

**[24]    Action** 🔑 **Illegal or immoral transactions**

Under Delaware law, the in pari delicto doctrine acts as an affirmative defense by barring a plaintiff from recovering damages if his losses are substantially caused by activities the law forbade him to engage in.

**[25]    Equity** 🔑 **He Who Comes into Equity Must Come with Clean Hands**

Under Delaware law, a plaintiff can generally only sue for aiding and abetting a breach of fiduciary duty if the plaintiff's hands are clean.

**[26]    Corporations and Business Organizations** 🔑 **Imputed liability in general**

Under Delaware law, illegal actions of a corporation's officers and directors are imputed to the corporation itself, for purposes of in pari delicto doctrine.

**[27]    Corporations and Business Organizations** 🔑 **Adverse Interest**

Under Delaware law, pursuant to adverse interest exception to in pari delicto doctrine, a corporation is permitted to sue those alleged

to have aided an agent's wrongdoing when the corporate agent responsible for the wrongdoing was acting solely to advance his own personal financial interest, rather than that of the corporation itself.

**[28]**   **Corporations and Business Organizations**  🔑 Adverse Interest

Under Delaware law, the adverse interest exception to in pari delicto doctrine does not enable a plaintiff to recover if the wrongdoing benefits the corporation.

**[29]**   **Corporations and Business Organizations**  🔑 Adverse Interest

Under Delaware law, the adverse interest exception to in pari delicto doctrine does not apply even when the benefit enjoyed by the corporation is ultimately outweighed by the long-term damage that is done when the agent's mischief comes to light, instead, it only covers the unusual case where allegations support a reasonable inference of total abandonment of the corporation's interests.

**[30]**   **Corporations and Business Organizations**  🔑 Wrongful Acts or Omissions

Under Delaware law, fiduciary/insider exception to in pari delicto doctrine allows suit to be brought against corporate fiduciaries who knowingly caused corporation to commit illegal acts and, as result, caused corporation to suffer harm.

**[31]**   **Corporations and Business Organizations**  🔑 Aiding and abetting

Under Delaware law, fiduciary exception precludes application of in pari delicto doctrine to aiding and abetting claims against non-fiduciaries of corporation who occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties.

**[32]**   **Negligence**  🔑 Trades, Special Skills and Professions

Under both New York law and Illinois law, professional malpractice claims are viewed as species of negligence.

**[33]**   **Negligence**  🔑 Violations of law; criminal conduct

Under both New York and Illinois law, in pari delicto doctrine bars claims against co-conspirators for negligence.

**[34]**   **Corporations and Business Organizations**  🔑 Wrongful Acts or Omissions

Under both New York and Illinois law, in pari delicto doctrine precludes corporation engaged in wrongdoing from suing its co-conspirators on grounds of negligence.

**[35]**   **Corporations and Business Organizations**  🔑 Aiding and abetting

Litigation trustee plausibly alleged that financial advisors aided and abetted Chapter 11 debtor-newspaper company's directors and officers in breaching their fiduciary duties under Delaware law by alleging that advisors hid debtor's true financial state to complete leveraged buyout (LBO).

**[36]**   **Federal Courts**  🔑 In general; necessity

Although Court of Appeals has discretion to consider arguments waived below where necessary to avoid a manifest injustice, such an exercise of discretion is not favored in circumstances where those arguments were available to the party below and no reason is proffered for their failure to raise them.

**[37]**   **Bankruptcy**  🔑 In general; standing

Adverse interest exception to in pari delicto doctrine under Delaware law did not apply to permit litigation trustee to pursue aiding and abetting breach of fiduciary duty and professional malpractice claims against Chapter 11 debtor-newspaper company's financial advisors, alleging that advisors hid debtor's true financial state to complete leveraged buyout (LBO), as the LBO conferred at least some benefit on debtor, and debtor itself explained in a proxy statement that the LBO was in its best interest.

**[38]    Bankruptcy** 👈 In general; standing

Fiduciary/insider exception to in pari delicto doctrine under Delaware law did not apply to permit litigation trustee to pursue aiding and abetting breach of fiduciary duty and professional malpractice claims against Chapter 11 debtor-newspaper company's financial advisors, alleging that advisors hid debtor's true financial state to complete leveraged buyout (LBO), as engagement letters between debtor and advisors expressly provided that they did not create fiduciary relationships and that advisors were not acting as debtor's agents, instead, letters made clear that debtor would make an independent analysis and decision regarding any transaction based on their advice.

**[39]    Bankruptcy** 👈 Intent of debtor

Litigation trustee failed to sufficiently allege that $10 million payment to financial advisor for Chapter 11 debtor-newspaper company, for fairness opinion in connection with evaluating leveraged buyout (LBO), was made with actual intent to hinder, delay, or defraud creditors, as required to support intentional fraudulent conveyance claim against advisor, absent allegations suggesting that payment for the opinion was motivated by fraudulent intent. 11 U.S.C.A. § 548(a)(1)(A).

**[40]    Bankruptcy** 👈 Intent of debtor

Litigation trustee failed to show that alleged "badges of fraud" surrounding payments for advisory fees to certain financial advisors for Chapter 11 debtor-newspaper company, in connection with evaluating leveraged buyout (LBO), supported strong inference of fraudulent intent supporting intentional fraudulent conveyance claims; while payments were made when debtor was insolvent, nothing in the pleadings supported the notion that fees paid to advisors pursuant to their respective engagement letters were outside the ordinary course of debtor's business. 11 U.S.C.A. § 548(a)(1)(A).

**[41]    Bankruptcy** 👈 Fraudulent transfers

Chapter 11 debtor-newspaper company's allegedly hastily hiring of financial advisor in connection with evaluating leveraged buyout (LBO) after another firm initially hired to perform a solvency analysis informed debtor that it could not provide a favorable solvency opinion, and after another prominent firm rebuffed debtor, and when advisor had charged debtor the highest fee it had ever charged for a solvency opinion and had agreed to define "fair value" inconsistently with the industry standard upon which it had relied for prior solvency opinions, presented sufficient "badges of fraud" to support inference of actual intent to hinder, delay or defraud creditor, as required to support intentional fraudulent conveyance claim against advisor. 11 U.S.C.A. § 548(a)(1)(A).

**[42]    Bankruptcy** 👈 "Reasonably equivalent value" in general

"Reasonably equivalent value," for purposes of constructive fraudulent conveyance claims, is determined by the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged. 11 U.S.C.A. § 548(a)(1)(B).

**[43]    Bankruptcy** 👈 "Reasonably equivalent value" in general

In determining whether debtor received "reasonably equivalent value" for alleged constructive fraudulent transfer, court need not strive for mathematical precision but must keep equitable purposes of Bankruptcy Code's fraudulent transfer provisions firmly in mind, recognizing that any significant disparity between value received and obligation assumed will have significantly harmed innocent creditors. 11 U.S.C.A. § 548(a)(1)(B).

**[44]** **Bankruptcy** 🔑 "Reasonably equivalent value" in general

To determine whether reasonably equivalent value was provided, for constructive fraudulent transfer avoidance purposes, court must ultimately examine totality of circumstances, including arms-length nature of transaction, and good faith of transferee. 11 U.S.C.A. § 548(a)(1)(B).

**[45]** **Bankruptcy** 🔑 Pleading

Where the reasonably equivalent value analysis for constructive fraudulent transfer claim requires more than a simple math calculation, such a computation usually should not be made at the motion to dismiss stage. 11 U.S.C.A. § 548(a)(1)(B).

**[46]** **Bankruptcy** 🔑 Pleading
**Bankruptcy** 🔑 Trial

While the determination of whether reasonably equivalent value was exchanged, for purposes of constructive fraudulent transfer claim, is largely a question of fact, courts have dismissed such claims where the complaint does not plausibly allege that the debtor received less than reasonably equivalent value. 11 U.S.C.A. § 548(a)(1)(B).

**[47]** **Bankruptcy** 🔑 Pleading

Factual question whether two financial advisors provided reasonably equivalent value for $12.5

million success fee paid to each firm upon consummation of Chapter 11 debtor-newspaper company's leveraged buyout (LBO) could not be decided without first assessing whether advisors satisfactorily performed their duties, and therefore was not appropriate to determine on advisors' motion to dismiss litigation trustee's constructive fraudulent transfer claims for failure to state a claim. 11 U.S.C.A. § 548(a)(1)(B); Fed. R. Civ. 12(b)(6); Fed. R. Bankr. P. 7012.

**[48]** **Bankruptcy** 🔑 Insolvency of debtor

Fees paid to financial advisors that helped Chapter 11 debtor-newspaper company navigate and complete leveraged buyout (LBO) upon delivery of their contracted-for opinions did not support constructive fraudulent transfer claims, as advisors had no financial stake in the LBO's consummation and payments were in large part due before debtor was insolvent. 11 U.S.C.A. § 548(a)(1)(B).

**[49]** **Federal Civil Procedure** 🔑 Liberality in allowing amendment

Leave to amend the complaint shall be freely given when justice so requires. Fed. R. Civ. P. 15.

**[50]** **Federal Civil Procedure** 🔑 Injustice or prejudice
**Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

Court may deny leave to amend the complaint for a valid ground, such as futility or undue prejudice. Fed. R. Civ. P. 15.

**[51]** **Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6), 15.

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)
2021 WL 3700337

**[52]    Federal Civil Procedure** ⚷ **Form and sufficiency of amendment; futility**

To determine whether granting leave to amend the complaint would be futile, court considers the proposed amendments and the original complaint. Fed. R. Civ. P. 15.

**[53]    Bankruptcy** ⚷ **Pleading**

District Court did not abuse its discretion in denying litigation trustee leave to amend intentional fraudulent transfer claims in connection with Chapter 11 debtor-newspaper company's leveraged buyout (LBO) less than one year prior to debtor's bankruptcy filing, since trustee had ample opportunity to plead a viable claim in the District Court, indeed, the operative pleading was the fifth amended complaint, but he failed to propose any amendments that would cure the pleading defects. 11 U.S.C.A. § 548(a)(1)(A); Fed. R. Civ. P. 15; Fed. R. Bankr. P. 7015.

**[54]    Bankruptcy** ⚷ **Pleading**

District Court did not err when in denying litigation trustee leave to amend constructive fraudulent transfer claims against shareholders who sold their stock in debtor's leveraged buyout (LBO) less than one year prior to debtor's bankruptcy filing, since amendments would be futile, as well as unduly prejudicial, with thousands of shareholders who had been impacted by the ongoing litigation, all of whom relinquished control of their stock more than 12 years ago. 11 U.S.C.A. §§ 546(e), 548(a)(1)(B); Fed. R. Civ. P. 15; Fed. R. Bankr. P. 7015.

**[55]    Federal Civil Procedure** ⚷ **Matters considered in general**

Document is "integral" to the complaint, and thus may be considered on a motion to dismiss for failure to state a claim, where the complaint relies heavily upon its terms and effect. Fed. R. Civ. P. 12(b)(6).

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, (Sullivan and Cote, *JJ.*)

**Attorneys and Law Firms**

Lawrence S. Robbins (Roy T. Englert, Jr., on the brief), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC; Robert J. Lack, Jeffrey R. Wang, Friedman Kaplan Seiler & Adelman LLP, New York, New York; David M. Zensky, Akin Gump Strauss Hauer & Feld LLP, New York, New York, for Plaintiff-Appellant.

Douglas Hallward-Driemeir, (Jonathan Ference-Burke on the brief), Ropes & Gray LLP, Washington, DC; Andrew Devore, Joshua Sturm, Ropes & Gray LLP, Boston, MA; Philip D. Anker, Alan E. Schoenfeld, Ryan Chabot, Wilmer Cutler Pickering Hale & Dorr LLP, New York, New York; Joel W. Millar, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC; Matthew L. Fornshell, Ice Miller LLP, Columbus, Ohio; Andrew J. Entwistle, Entwistle & Cappucci LLP, New York, New York; Mark A. Neubauer, Carlton Fields, LLP, Los Angeles, California; P. Sabin Willett, Michael C. D'Agostino, Morgan, Lewis & Bockius LLP, Boston, Massachusetts; Michael S. Doluisio, Dechert LLP, Philadelphia, Pennyslvania, for Defendants-Appellees Pension Funds, Financial Institution Holders, Individual Beneficial Owners, Mutual Funds, Certain Large Shareholders, and Financial Institution Conduits.

Erin E. Murphy, Kirkland & Ellis LLP, Washington, DC; Gabor Balassa, Brian Borchard, Kirkland & Ellis LLP, Chicago, Illinois; Oscar Garza, Douglas G. Levin, Gibson, Dunn & Crutcher LLP, Irvine, California; Matthew D. McGill, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Defendants-Appellees Large Shareholders.

Kannon K. Shanmugam (Masha G. Hansford, Joel S. Johnson, on the brief), Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C.; Andrew G. Gordon, Kira A. Davis, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Daniel L. Cantor, Daniel S. Shamah, O'Melveny & Myers LLP, New York, New York, for Defendants-Appellees Citigroup Global Markets, Inc. and Merrill Lynch, Pierce, Fenner & Snith Inc.

Jonathan D. Polkes (Gregory Silbert, Stacy Nettleton, on the brief), Weil, Gotshal & Manges LLP, New York, New York;

In re Tribune Company Fraudulant Conveyance Litigation, --- F.4th ---- (2021)
2021 WL 3700337

George E. Mastoris, Winston & Strawn LLP, New York, New York, for Defendants-Appellees Financial Advisors.

Before: Raggi and Chin, Circuit Judges. [*]

[*]    Our late colleague Judge Ralph K. Winter was originally assigned to this panel. The two remaining members of the panel, who are in agreement, have decided this case in accordance with Second Circuit Internal Operating Procedure E(b). *See* 28 U.S.C. § 46(d); *United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

**Opinion**

Chin, Circuit Judge:

 **\*1** In 2007, the Tribune Company ("Tribune"), then-publicly traded, executed a leveraged buyout (the "LBO") to go private. Less than a year later, Tribune filed for Chapter 11 bankruptcy. Plaintiff-appellant Marc Kirschner, the bankruptcy litigation trustee (the "Trustee"), brought fraudulent conveyance and other claims on behalf of creditors against shareholders who sold their stock in the LBO and against the financial advisors that helped Tribune navigate and complete the LBO. In several orders and decisions, the district court dismissed the Trustee's claims for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the reasons set forth below, we **AFFIRM in part,** **VACATE in part,** and **REMAND** for further proceedings.

*BACKGROUND*

**I.** *The Facts*

The facts alleged in the operative complaints are assumed to be true for purposes of this appeal. [2]

[2]    In Appeal No. 19-3049, the operative complaint is the Fifth Amended Complaint in No. 12-CV-2652, referred to by the district court as the *FitzSimons* action. In Appeal No. 19-449, the operative complaint is the First Amended Complaint in No. 12-CV-6055, referred to by the district court as the *Citigroup* action.

Prior to its bankruptcy in 2008, Tribune was a media company that owned numerous radio and television stations and major national newspapers, including *The Chicago Tribune*, *The Los Angeles Times*, and *The Baltimore Sun*. In 2005, the newspaper publishing industry faced severe decline and, by 2006, Tribune, which derived approximately 75% of its total revenues from such publishing, started faltering financially. In September 2006, Tribune's board of directors (the "Board") created a special committee (the "Special Committee") to consider ways to return value to Tribune's shareholders. The Special Committee was comprised of all seven of the Board's independent directors (the "Independent Directors").

**A.** *Tribune Retains Advisors*

Before the formation of the Special Committee, the Board hired two financial advisors, defendant-appellee Merrill, Lynch, Pierce, Fenner, and Smith, Inc. ("Merrill Lynch") on October 17, 2005 and defendant-appellee Citigroup Global Markets Inc. ("Citigroup") on October 26, 2005, to conduct a strategic review and to recommend possible responses to the ongoing changes in the media industry. Both Merrill Lynch and Citigroup signed engagement letters, which promised each a "Success Fee" of $12.5 million if a "Strategic Transaction" was completed. The engagement letters also allowed each firm to play a role in helping to finance any such "Strategic Transaction," despite the potential conflict of interest inherent in the firms' distinct roles in any such deal. The engagement letters further specified that neither Merrill Lynch nor Citigroup was a fiduciary.

On October 17, 2006, the Special Committee hired Morgan Stanley & Co. LLC f/k/a Morgan Stanley & Co. Inc. ("Morgan Stanley") to serve as its independent financial advisor. Morgan Stanley's engagement letter specified that the firm owed no fiduciary duty to Tribune.

**B.** *Proposed LBO*

 **\*2** In early 2007, Sam Zell, an investor, proposed to take Tribune private. At this time, defendants-appellees Chandler Trust No. 1, Chandler Trust No. 2, and certain Chandler sub-trusts (collectively, the "Chandler Trusts") held approximately 20% of Tribune's publicly-held shares. The Robert R. McCormick Foundation and the Cantigny Foundation (collectively, the "Foundations") held another 13% of shares. The Special Committee sought the views of the Chandler Trusts and the Foundations (together, the "Large Shareholders") on Zell's proposal. Concerned that Tribune's stock price would fall before they could sell their shares, the

2021 WL 3700337

Large Shareholders indicated that they would only vote for a two-step LBO that allowed them to cash out during the first step. In response, Zell suggested a two-step LBO, in which, at Step One, Tribune would borrow money to buy back roughly half of its shares and, at Step Two, Tribune would borrow more money to purchase all remaining shares. Tribune would then merge with a specially created shell corporation. The new entity would become an S Corporation, resulting in nearly $1 billion in anticipated tax savings. In considering whether to approve the LBO, the Board consulted Citigroup and Merrill Lynch.

To secure financing for the LBO, Tribune needed an opinion stating that it would be solvent after each step of the proposed LBO. On February 13, 2007, the Board hired Duff & Phelps to provide such a solvency opinion. Toward that end, Tribune gave Duff & Phelps financial projections predicting that Tribune would fare better in the second half of 2007 as compared to the same period from the year prior (the "February Projections"). These figures were created by Tribune's management team, which, according to the Trustee, had a conflict of interest because its members stood to cash out Tribune shares worth $36 million and reap other gains if an LBO were executed.

After conducting its analysis, Duff & Phelps concluded it could not provide a solvency opinion without considering the $1 billion in tax savings that Tribune expected at Step Two. Duff & Phelps, however, also determined that considering such tax savings in a solvency opinion was not appropriate. Accordingly, on April 1, 2007, Duff & Phelps instead provided a "viability opinion," which concluded that the fair market value of Tribune's assets would exceed its liabilities after the close of the LBO.

The same day, Morgan Stanley and Merrill Lynch issued fairness opinions that the price to be paid for Tribune's stock was fair. These opinions were filed with the SEC as proxy statements. Also, on April 1, 2007, the Special Committee unanimously voted to recommend the two-step LBO, which the Board ultimately approved.

### C. Implementation of LBO
Still in need of a solvency opinion to secure financing for the approved LBO, Tribune approached Houlihan Lokey, which declined, on March 29, 2007, to bid for the engagement. On April 11, 2007, Tribune retained Valuation Research Company ("VRC") to provide two solvency opinions, one for Step One and one for Step Two. To secure the engagement,

VRC, "a virtually unknown firm," agreed to use a non-standard approach in formulating its solvency opinions. 3049 Appellant's Br. at 12–13.[3] VRC charged Tribune $1.5 million -- VRC's highest fee ever for such an engagement -- to issue the solvency opinions.

[3]      References to "3049 Appellant's Br." and "449 Appellant's Br." refer to the Trustee's briefs in Appeal Nos. 19-3049 and 19-449, respectively.

On May 24, 2007, VRC issued an opinion that Tribune would be solvent after completing Step One. According to the Trustee, however, after VRC issued this solvency opinion, Tribune's management team realized that the February Projections, upon which VRC's opinion was based, were no longer an accurate forecast of Tribune's 2007 second half performance. No one alerted VRC that Tribune was unlikely to meet the February Projections. Indeed, the Trustee alleges that Citigroup and Merrill Lynch reviewed VRC's solvency analysis but "failed to fulfill their responsibilities as 'gatekeepers' retained to objectively analyze the LBO." 449 Appellant's Br. at 8.

Despite the issue with VRC's solvency opinion, Tribune delivered it to the financing banks on June 4, 2007. That same day, Step One closed. Tribune borrowed $7 billion to pay off its existing bank debt and to complete a tender offer, buying back just over half of its publicly held shares. The Large Shareholders sold all their shares, and the members of the Board appointed by those shareholders resigned. After Step One, Tribune issued a proxy statement, which explained that while the LBO was in the company's best interest, it was risky and might not create the anticipated value.

*3  In October 2007, management again updated its financial projections (the "October Projections") in preparation for Step Two. The October Projections still forecasted that Tribune's performance would improve, but not as quickly as the February Projections had predicted.

Even with the October Projections, VRC was reluctant to author a second solvency opinion because it did not appear that Tribune would be able to repay its debts without refinancing its existing debts. Tribune management represented to VRC that Morgan Stanley -- the Special Committee's financial advisor -- believed that Tribune would be able to refinance its debts, even though Morgan Stanley had not drawn that conclusion. On December 18, 2007, VRC

2021 WL 3700337

issued a solvency opinion stating that Tribune would be solvent after Step Two.

The Board's retained financial advisors did not agree with VRC's second solvency opinion. In fact, analyses from Citigroup and Merrill Lynch showed that, at the close of Step Two, Tribune would be insolvent by more than $1.4 billion and $1.5 billion respectively, but neither advisor tried to stop the transaction. On December 20, 2007, Step Two closed, and Tribune borrowed an additional $3.7 billion, which it used to buy back its remaining publicly held shares.

After the close of Step Two, Tribune had roughly $13 billion in debt. Tribune's directors and officers received approximately $107 million from selling their stock and from bonuses. Citigroup and Merrill Lynch were each paid their $12.5 million success fee because they helped effectuate a "Strategic Transaction." A group of pension funds (the "Pension Funds"), who are defendants-appellees in this case, also received cash proceeds in connection with the LBO.

## II. *Procedural History*

On December 8, 2008 -- less than one year after Step Two closed -- Tribune filed for Chapter 11 bankruptcy in Delaware. Claims were eventually filed in the Delaware Bankruptcy Court on behalf of creditors, including for fraudulent conveyance. Tribune emerged from bankruptcy in 2012; pursuant to Tribune's plan of reorganization, the claims were transferred to the Tribune Litigation Trust, and the Trustee was appointed to pursue the claims on behalf of Tribune's creditors.

In the meantime, some seventy-four federal and state lawsuits asserting fraudulent conveyance and related claims were filed around the country by Tribune's creditors. Eventually, the Judicial Panel on Multidistrict Litigation transferred the bankruptcy claims as well as the federal and state actions to the Southern District of New York, where they were consolidated on the basis that the claims all arose out of the LBO and Tribune's 2008 Chapter 11 bankruptcy filing. *See In re: Tribune Co. Fraudulent Conv. Litig.*, 831 F. Supp. 2d 1371, 1372 (J.P.M.L. 2011).

On September 23, 2013, the district court (Sullivan, *J.*) dismissed several state law constructive fraudulent conveyance claims that were brought against Tribune. The parties appealed, and on March 29, 2016, this Court affirmed the district court's dismissal of the state law fraudulent conveyance claims. *See In re Tribune Co. Fraudulent Conv.*

*Litig.*, 818 F.3d 98, 105 (2d Cir. 2016) ("*Tribune I*"). After further proceedings in this Court and the Supreme Court, we issued an amended opinion on December 19, 2019, affirming the district court's dismissal of the state law constructive fraudulent conveyance claims on the basis that these claims were preempted by section 546(e) of the Bankruptcy Code, which provides that a trustee may not avoid a transfer made by or to a "financial institution" in connection with "a securities contract." *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 78, 96 (2d Cir. 2019) ("*Tribune II*"). [4]

[4]
> On July 22, 2016, this Court denied rehearing *en banc*, and our mandate issued on August 1, 2016. On September 9, 2016, the Trustee petitioned for certiorari to the Supreme Court. In April 2018, the Supreme Court advised the parties that their petition for certiorari as to *Tribune I* would be deferred to allow this Court to consider whether to recall the mandate in light of the Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, ––– U.S. ––––, 138 S. Ct. 883, 892, 200 L.Ed.2d 183 (2018), which held, *inter alia*, that Section 546(e) does not protect transfers in which financial institutions served as mere conduits. *See Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found.*, ––– U.S. ––––, 138 S. Ct. 1162, 1163, 200 L.Ed.2d 735 (2018) (statement of Justices Kennedy and Thomas). As a result, this Court recalled its mandate and eventually issued *Tribune II*.

 **\*4**  In the meantime, the district court proceeded to consider defendants' motions to dismiss the remaining claims. On January 6, 2017, the district court (Sullivan, *J.*) dismissed the Trustee's intentional fraudulent conveyance claims with prejudice because it found that the complaint failed to allege that Tribune had the actual intent to defraud its creditors when it bought back shares from shareholders at both steps of the LBO. In particular, the district court concluded that the intent of the Tribune officers who created the February and October Projections could not be attributed to the Special Committee, which approved the LBO. The district court also declined to grant the Trustee leave to amend its complaint in the *FitzSimons* action, "without prejudice to renewal in the event of an intervening change in the law." 3049 S. App'x at 28.

On November 30, 2018, the district court (Sullivan, *J.*) dismissed the Trustee's state law claims for breach of

fiduciary duty asserted in the *FitzSimons* Complaint and certain "tag-along" actions. In particular, the district court declined to collapse the two-step LBO into a unitary transaction, thereby concluding that (1) Tribune was solvent at Step One, and (2) the Large Shareholders were not liable at Step Two because they had relinquished their board seats and Tribune stock by that point.

On December 1, 2018, the case was reassigned to Judge Cote. On January 23, 2019, the district court (Cote, *J.*) granted Citigroup and Merrill Lynch's motions to dismiss certain claims in the *FitzSimons* and *Citigroup* actions. As relevant here, the district court dismissed the aiding-and-abetting and professional malpractice claims under the *in pari delicto* doctrine and it dismissed the fraudulent conveyance claims on the ground that the advisory fees received did not constitute actual or constructive fraudulent conveyances. On April 23, 2019, the district court denied the Trustee's request to amend his complaint in the *FitzSimons* action, denying leave to file what would have been a Sixth Amended Complaint.

These appeals followed.

## DISCUSSION

Three categories of claims are at issue: (1) intentional fraudulent conveyance claims against the shareholders based on the buy-back of their shares; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary claims against the allegedly controlling shareholders; and (3) aiding and abetting breach of fiduciary duty, professional malpractice, intentional fraudulent conveyance, and constructive fraudulent conveyance claims against Citigroup, Merrill Lynch, Morgan Stanley, and VRC (collectively, the "Financial Advisors"). We discuss these claims in turn, as well as the district court's denial of leave to amend.

**[1]** **[2]** **[3]** We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (internal quotation marks omitted). "We review the district court's denial of leave to amend for abuse of discretion." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks omitted). If, however, "the denial was based

on futility, ... we review that legal conclusion *de novo*." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014).

## I. *Intentional Fraudulent Conveyance Claims*
We first consider whether the district court erred in dismissing the Trustee's intentional fraudulent transfer claims against the shareholders based on the buy-back of their shares.

### A. *Applicable Law*
**[4]** **[5]** **[6]** The Bankruptcy Code allows a bankruptcy trustee to recover fraudulent transfers where a transfer has been made with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). An intentional fraudulent conveyance claim must be pled with specificity, as required by Fed. R. Civ. P. 9(b). *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). The alleged fraud must relate to the specific payment or transfer the plaintiff is seeking to avoid, rather than to the overall course of business. *See id.* (differentiating between alleged fraud in obtaining funding from noteholders and subsequent payment of some proceeds to defendant). And by "actual intent," the statute contemplates intent "existing in fact or reality" and not merely the imputed intent that would suffice for a constructive fraudulent conveyance claim. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, ––– U.S. ––––, 140 S. Ct. 768, 776, 206 L.Ed.2d 103 (2020) (holding, in context of ERISA, that "actual" means "existing in fact or reality," more than "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal") (citations and internal quotation marks omitted); *compare* 11 U.S.C. § 548(a)(1)(A) (intentional fraudulent conveyance) *with id.* § 548(a)(1)(B) (constructive fraudulent conveyance); *see also United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000) ("[T]he should-have-known alternative connotes a concept more akin to negligence than to knowledge.").

**\*5** **[7]** Because of the difficulties in proving intent to defraud, a pleader may rely on "badges of fraud," *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent. *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). Courts have inferred intent to defraud from the "concealment of facts and false pretenses by the transferor," "reservation by [the transferor] of rights in the transferred property," the transferor's "absconding with or secreting the proceeds of the transfer immediately after their receipt," "the existence of an unconscionable discrepancy between the value of property transferred and the consideration received therefor," the

Case 2:19-ap-01382-SK   Doc 282-1   Filed 09/07/21   Entered 09/07/21 11:44:24   Desc
Exhibit A -- Unpublished Cases   Page 72 of 210

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)

2021 WL 3700337

oppressed debtor's creation "of a closely-held corporation to receive the transfer of his property," as well as the oppressed debtor's transfer of property while insolvent. *Id.* (citation omitted); *see also Sharp*, 403 F.3d at 56.

**[8]** **[9]** **[10]** A corporation can only act through its directors and officers, and we look to state law to determine who has the authority to act on behalf of a corporation (and therefore whose actions to review to see whether there was fraudulent intent or badges of fraud). *See Burks v. Lasker*, 441 U.S. 471, 478, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979) ("[T]he first place one must look to determine the powers of corporate directors is in the relevant State's corporation law."). Under Delaware law -- Tribune's state of incorporation -- only the board of directors (or a committee to which the board has delegated its authority) has the power to approve an extraordinary transaction such as a merger or consolidation. *See* Del. Gen. Corp. Law §§ 141(a), (c), 160(a), 251(b). Here, the Board delegated its authority to approve a merger and redemption of Tribune's stock to the Special Committee, and thus the Trustee was required to plead allegations that gave rise to a strong inference that the Special Committee had the "actual intent to hinder, delay, or defraud" Tribune's creditors, as required by 11 U.S.C. § 548(a)(1)(A).

The Trustee does not argue that the members of the Special Committee had "actual intent" to harm Tribune's creditors but instead contends that Tribune's senior management had the necessary fraudulent intent, and that this intent must be imputed to the Special Committee. The issue of whether a company's officers' intent to defraud creditors can be imputed to an independent special committee for purposes of a fraudulent conveyance claim under the Bankruptcy Code is a question of first impression in this Circuit. The First Circuit has addressed the issue and applied a "control" test -- a court "may impute any fraudulent intent of [an actor] to the transferor ... [if the actor] was in a position to control the disposition of [the transferor's] property." *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983). The district court here applied the control test, holding that "this test appropriately accounts for the distinct roles played by directors and officers under corporate law, while also factoring in the power certain officers and other actors may exercise over the corporation's decision to consummate a transaction." 3049 S. App'x at 9.

**[11]** The Trustee argues that the district court erred in applying the control test, and that the correct standard is either a scope-of-employment agency standard or a "proximate cause" standard. We are not persuaded. In the circumstances

here, we affirm the district court's use of a "control" test for imputation. We agree that for an intentional fraudulent transfer claim, which requires "actual intent," a company's intent may be established only through the "actual intent" of the individuals "in a position to control the disposition of [the transferor's] property." *Roco*, 701 F.2d at 984; *see also In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 576 (S.D.N.Y. 2015) ("[T]he Court's analysis regarding imputation must turn on *actual control* of [the debtor].").[5]

[5]
> In arguing for a lesser imputation standard, the Trustee relies heavily on *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). That case, however, applied a "motivating factor" standard under the Uniformed Services Employment and Reemployment Rights Act, *id.* at 417–18, 131 S.Ct. 1186, and we are not persuaded that it carries much weight in a case requiring "actual intent" under the Bankruptcy Code.

**B.** *Application*

**\*6** The Trustee makes two arguments in support of his intentional fraudulent transfer claims. First, he argues that Tribune's senior management possessed actual intent to defraud, and that intent should be imputed to the Special Committee. Second, even assuming the imputation argument fails, the Trustee maintains that Independent Directors on the Special Committee had the required intent as demonstrated by "badges of fraud."

### 1. *Imputation of Intent*

**[12]** We conclude that the Trustee failed to plausibly allege that the intent of Tribune's senior management should be imputed to the Special Committee because the Trustee failed to allege that Tribune's senior management controlled the transfer of the property in question.

As discussed above, the Board created an independent Special Committee to evaluate the LBO. The Special Committee, in turn, hired Morgan Stanley to serve as its independent financial advisor. As the district court observed, the Trustee failed to allege that senior management inappropriately pressured the Independent Directors -- who included former senior officers of major corporations -- to approve the transactions or that senior management dominated the Special Committee.

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)
2021 WL 3700337

The Trustee failed to allege any financial or personal ties between senior management and the Independent Directors that could have affected the impartiality of the Special Committee. And to the extent that the officers misled the Special Committee by presenting it with the February Projections and a flawed viability and solvency opinions, Morgan Stanley and the Special Committee itself checked these figures. Therefore, to impute the officers' intent onto the Special Committee, which was working independently with an outside financial advisor and independently reviewed opinions provided by Duff & Phelps and VRC, would stretch the "actual intent" requirement as set forth in § 548(a)(1)(A) to include the merely possible or conceivable or hypothetical as opposed to existing in fact and reality.

### 2. *The Badges of Fraud*

[13]  On appeal, the Trustee contends that five of the traditional "badges of fraud" weigh in favor of finding actual intent -- (1) lack of consideration for the shareholder transfers; (2) Tribune's financial condition; (3) the relationship among the parties; (4) the "pattern of transactions"; and (5) the "general chronology" of the events. 3049 Appellant's Br. at 37–38. While some of these factors arguably weigh in favor of the Trustee, in the end we conclude that the district court correctly held that the Trustee failed to plead "badges of fraud" sufficient to raise a strong inference of actual fraudulent intent on the part of the Special Committee. *See Kaiser*, 722 F.2d at 1582–83.

The Trustee's assertion that Independent Directors stood to earn $6 million for selling their shares if they approved the LBO is insufficient to satisfy the stringent pleading standard of Rule 9(b). First, it would be unreasonable to assume actual fraudulent intent whenever the members of a board of directors (or a committee created by that board) stood to profit from a transaction they recommended or approved. *See, e.g., Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice [to demonstrate fraud]. ... Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation."). Second, the Independent Directors owned only a small fraction (0.08%) of Tribune's shares, and the Independent Directors' shares were sold at a price only slightly above the price at which Tribune stock had been

trading. These assertions, even assuming they are true, do not give rise to a strong inference of actual fraudulent intent.

*7  The Trustee's arguments that the Independent Directors "knew that Tribune was falling far short of projections and thus was unlikely to generate enough cash to service its debt" and the risky nature of the proposed LBO were indications of fraud are also unpersuasive. 3049 Appellant's Br. at 38. Even assuming the Independent Directors were wrong in believing that Tribune's financial condition would improve, their approval of a risky transaction when Tribune and other newspaper companies were struggling would arguably support a negligence or constructive fraud claim but not, in the circumstances here, an intentional fraudulent transfer claim. *See, e.g., In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 577 ("Indeed, there is nothing unlawful about a company transacting business during unusually difficult financial times in an attempt to prevent its own collapse. To find otherwise would place in question any contract executed during a financial downturn and invite upheaval in the financial markets."). Moreover, Tribune's contemporaneous public filings warned that its projections could fall short, and the Independent Directors had an obligation to try to achieve the highest price for Tribune's shareholders. *See, e.g., Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986) (directors have duty to obtain highest price for shareholders).

Again, the Trustee was required to plausibly allege *actual* fraudulent intent on the part of the members of the Special Committee. We agree with the district court that the Trustee failed to do so.

### II. *State Law Fiduciary Duty Claims*
We next consider the Trustee's claims that the Large Shareholders breached their fiduciary duties under Delaware law by pushing for the LBO based on projections they knew to be false and by causing Tribune to incur debt they knew would leave the company insolvent. The Trustee also alleges that through this conduct the Large Shareholders aided and abetted senior management's own breach of fiduciary duty and were unjustly enriched. The Trustee argues that Steps One and Two of the LBO should be collapsed so that the LBO is viewed as a single unitary transaction. The Trustee contends that, if the LBO is so viewed and Tribune's Step Two obligations taken into account at the start, Tribune was insolvent as of April 1, 2007, the day that Tribune's Board originally voted to approve the LBO. The Trustee alleges that the Large Shareholders were controlling shareholders with attendant fiduciary duties

2021 WL 3700337

before Step One and that these fiduciary duties were breached by advocating for and executing the LBO.

The district court dismissed Trustee's claims, holding that Steps One and Two could not be collapsed into a unitary transaction and that Tribune's purported insolvency had to be analyzed separately at each of the LBO's two steps. The district court concluded that the Trustee's allegations failed at Step One because he could not plausibly allege that Tribune was insolvent at that point. While the district court concluded that the Trustee had adequately pleaded Tribune's insolvency at Step Two, it held that the fiduciary duty claims nevertheless failed because, after Step One, the Large Shareholders no longer owned any Tribune stock and their appointed directors had resigned from the Board.

The principal issue with respect to these claims is thus whether the Trustee's pleadings support collapsing Step One and Step Two into one event.

### A. *Applicable Law*

[14]    [15]    Under Delaware law, a shareholder owes the company a fiduciary duty "only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987). If such a fiduciary duty exists, a shareholder breaches that duty if, for its own benefit, it approves a transaction that renders the corporation insolvent. *See, e.g.*, *In re Tropicana Entm't, LLC*, 520 B.R. 455, 471 (Bankr. D. Del. 2014) (holding that creditor must allege either that corporation was or became insolvent as result of fiduciary's misconduct to bring suit for breach of fiduciary duty); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) (noting this Court may "affirm the judgment on any basis that is supported by the record"). [6]

[6]    We assume, without deciding, that the Large Shareholders had a fiduciary duty to Tribune. We note, however, that together the Chandler Trusts and the Foundations owned only 33% of Tribune's publicly held shares. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) ("[A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary

status.") (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)).

**\*8**   [16]    To determine whether the two steps should be viewed as a single transaction, the district court applied the *Sabine* factors, which consider (i) "[w]hether all of the parties involved had knowledge of the multiple transactions"; (ii) "[w]hether each transaction would have occurred on its own"; and (iii) "[w]hether each transaction was dependent or conditioned on other transactions." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 541 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016).

[17]    In performing this analysis, Delaware courts have sometimes applied a "step-transaction doctrine," under which collapse is warranted if a party can satisfy any one of three tests: (1) the "end result test," which authorizes collapse "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result"; (2) the "interdependence test," which authorizes collapse if "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series"; and (3) the "binding-commitment test," which allows collapse "only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps." *Bank of N.Y. Mellon Tr. Co. v. Liberty Media Corp.*, 29 A.3d 225, 240 (Del. 2011) (internal quotation marks omitted).

Delaware courts have also noted that, regardless of the test to be applied, the substance of the transaction is what matters, not the form. *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007). Further, they have noted that "courts have found that a set of transactions may be viewed as one integrated transaction if the transactions reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange." *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 91 (D. Del. 2002) (internal quotation marks omitted). In *Hechinger*, the court denied a motion to dismiss and noted that it was "reluctant to conclude that because the defendants structured the set of transactions in a certain manner, they [were] immune from a claim of breach of fiduciary duty, especially where the [complaint] allege[d] that the harms it complain[ed] of were foreseeable results of the acts of the defendants." *Id.*

### B. *Application*

### 1. *Was the LBO a Unitary Transaction?*

 **[18]**    **[19]**  Although we must accept as true all plausible allegations set forth in the complaint, we need not accept "threadbare recitals of a cause of action's elements" that are "supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Here, the Trustee failed to sufficiently allege that the two steps should be collapsed into one.

First, it is undisputed that there were several obstacles that Tribune needed to clear after Step One and before completing Step Two. At Step One, Tribune borrowed approximately $7 billion and executed a tender offer, by which the company repurchased half of Tribune's outstanding common stock and refinanced its existing debt. Even if Step Two were never consummated, Step One would have amounted to a standalone recapitalization plan -- similar to transactions Tribune had engaged in prior to the LBO. [7]

> [7]     In May 2006, Tribune engaged in a leveraged recapitalization by which it purchased 55 million shares of outstanding stock for $1.8 billion in May 2006. In March 2007, Tribune again considered a "more modest recapitalization plan." 3049 J. App'x at 198.

 **\*9**  Additionally, the "knowledge and intent of the parties" weigh heavily against the Trustee's collapse argument as neither Tribune nor the Large Shareholders knew for certain whether both steps would be completed. Step Two required shareholder approval, which was not received until months after Step One closed, and the Trustee does not allege that the Large Shareholders had anything to do with the "pie-in-the-sky" February Projections. 3049 J. App'x at 146–47. Similarly, Tribune never knew that Step Two was a foregone conclusion, as its merger would need government approval.

Further, the complaint acknowledges that there were several additional hurdles Tribune had to clear to effectuate Step Two, including receiving a solvency opinion, and that the Large Shareholders were concerned that the deal would not actually close. Indeed, Tribune's July 13, 2007 proxy statement warned that there was a "risk that the conditions to the [Step Two] Merger will not be met, including the conditions requiring receipt of FCC approval, the receipt of financing and receipt of a solvency opinion." 3049 J. App'x at 1740. Finally, as the Large Shareholders point out,

the two-step transaction was designed to guard against the possibility that the second step might not close if conditions precedent were not satisfied. The Trustee even acknowledges that the LBO was structured in two steps *because* the Board "express[ed] concerns regarding the delays and completion risk associated with Zell's [initial single-step] proposal." 3049 J. App'x at 191. Therefore, the Board decided instead on the two-step LBO to "provide an upfront distribution to Tribune's stockholders," even if Step Two were never consummated. *Id.*

The parties do not dispute that *Sabine* applies federally, though ultimately we conclude that, regardless of whether *Sabine* or Delaware's "step-transaction doctrine" applies, the two steps of this LBO should not be collapsed. As the facts alleged in the complaint make clear, the third *Sabine* factor weighs against collapse. Further, collapse is inappropriate under all three of the step-transaction tests, because the parties intended to structure the two steps as independent transactions, Step One was able to stand alone, and there was no binding commitment to undertake Step Two. Accordingly, we affirm the district court's conclusion that the two steps must be considered independently.

### 2. *Was Tribune Insolvent at Step One?*

 **[20]**  The Trustee argues that even if the two steps are not treated as a unitary transaction, he sufficiently alleged Tribune's insolvency at Step One, to support a claim that the Large Shareholders breached their fiduciary duties when approving of a transaction that resulted in insolvency. The district court held that the Trustee failed to sufficiently allege that Tribune was insolvent at Step One of the LBO under either the "balance sheet" or the "inability to pay debt when due" tests. We agree.

 **[21]**  In Delaware, "[u]nder the balance sheet test, an entity is insolvent if it has liabilities in excess of a reasonable market value of assets held." *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (internal quotation marks omitted). We are not persuaded by the Trustee's argument that the district court erred in failing to take into account "the commitments Tribune had *already* made -- notably to borrow an additional $3.7 billion of debt and to make an additional $4 billion distribution to its shareholders -- for which performance was due at Step Two." 3049 Appellant's Br. at 65. This argument rests on the same logic undergirding the Trustee's argument in favor of collapsing the two steps, which we have rejected for the

reasons outlined above. Moreover, the Trustee himself admits that he "did not allege that the $8 billion borrowed at Step One, standing alone, rendered Tribune insolvent." *Id.* at 62.

**\*10**  As to the "inability to pay debts when due" test, the Trustee's argument again hinges upon his assertion that the district court should have considered whether Tribune was able to pay upcoming debts or raise additional capital in the future -- *i.e.*, by taking "Step Two into account, along with Tribune's ability to access additional funds." *Id.* at 70. In other words, the Trustee argues that courts should not limit their consideration to past debt payments and instead also consider whether companies will be able to pay upcoming debts or raise additional capital in the future.

There appears to be no consensus in Delaware courts, however, as to whether this test is forward-looking. *See, e.g.*, Robert J. Stearn, Jr. & Cory D. Kandestin, *Delaware's Solvency Test: What Is It and Does It Make Sense? A Comparison of Solvency Tests Under the Bankruptcy Code and Delaware Law*, 36 Del. J. Corp. L. 165, 182 (2011) ("The [inability to pay debts when due] test is not entirely clear: the unanswered question is whether the test is present or forward-looking. ... The case law does not answer this question definitively."). The Trustee cites several Delaware cases, *see* 3049 Appellant's Br. at 69, but they are inapposite as none definitively establishes that courts *must* consider future debts to be incurred as part of its insolvency analysis. Moreover, as the district court observed, this Court offered a definitive answer in *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005). There, we rejected a forward-looking approach, noting that such a test would "project[ ] into the future to determine whether capital will remain adequate over time while the Delaware [inability to pay debts when due] test looks solely at whether the corporation has been paying bills on a timely basis." *Id.* at 343. We see no reason to overturn that holding here.

 **[22]**  Accordingly, we conclude that the district court did not err in dismissing the Trustee's state law claims against the Large Shareholders. We additionally conclude that the district court did not abuse its discretion in dismissing these claims with prejudice, as the Trustee has not explained what specific facts he would plead to salvage these claims.

### III. *Claims Against Financial Advisors*

We next consider whether the district court erred in dismissing the following claims against the Financial Advisors: (1) aiding and abetting breaches of fiduciary duty

and professional malpractice [8]; (2) intentional fraudulent conveyance; and (3) constructive fraudulent conveyance. For the reasons set forth below, we affirm the district court's dismissal of the aiding and abetting and professional malpractice claims as to all Financial Advisors; we affirm the district court's dismissal of the intentional fraudulent conveyance claims as to Morgan Stanley, Citigroup, and Merrill Lynch, and vacate the dismissal of these claims as to VRC; and we affirm the dismissal of the constructive fraudulent conveyance claims as to Morgan Stanley and VRC and vacate the dismissal of these claims as to Citigroup and Merrill Lynch.

[8]     Additionally, the Trustee asserted a breach of fiduciary claim, but against only Morgan Stanley. The district court did not explicitly address this claim in its January 23, 2019 opinion. In a February 13, 2019 order, however, the district court stated that this claim was "barred for the same reasons discussed in the January 23 Opinion with respect to the other common law claims asserted against Morgan Stanley ... namely, the doctrine of *in pari delicto*." 3049 S. App'x at 180.

### A. *Aiding and Abetting Breach of Fiduciary Duty and Professional Malpractice Claims*

#### 1. *Applicable Law*

 **\*11** **[23]**  Under Delaware law, [9] a third party may be liable for aiding and abetting a breach of fiduciary duty if there is "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015).

[9]     The parties agree that Delaware law governs the Trustee's aiding and abetting claim.

 **[24]**     **[25]**     **[26]**  The *in pari delicto* doctrine acts as an affirmative defense to an aiding and abetting claim by barring a plaintiff "from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 301–02 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015) (internal quotation marks omitted). In other words, a plaintiff can generally only sue for aiding and abetting a breach of

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)
2021 WL 3700337

fiduciary duty if the plaintiff's hands are clean. As applied to corporations, the illegal actions of a corporation's officers and directors are imputed to the corporation itself. *Id.* at 303. There are, however, exceptions that render the *in pari delicto* doctrine inapplicable and therefore permit a plaintiff to sue, even if its hands are not clean.

**[27]** **[28]** First, under the adverse interest exception, a corporation is permitted to sue those alleged to have aided an agent's wrongdoing when "the corporate agent responsible for the wrongdoing was acting *solely* to advance his own personal financial interest, rather than that of the corporation itself." *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 891 (Del. Ch. 2009) ("*AIG II*"), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010) (emphasis added). The adverse interest exception, however, does not enable a plaintiff to recover if the wrongdoing benefits the corporation. *Stewart*, 112 A.3d at 309.

**[29]** Further, the exception does "not apply even when the 'benefit' enjoyed by the corporation is ultimately outweighed by the long-term damage that is done when the agent's mischief comes to light"; instead, it only covers the "unusual" case where allegations support a reasonable inference of "total abandonment of the corporation's interests." *Id.* at 303, 309 (describing "siphoning corporate funds or other outright theft" as such "unusual" cases); *see also In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 827 (Del. Ch. 2009) ("*AIG I*") (holding that the adverse interest test is directed at insiders who are "essentially stealing from the corporation as opposed to engaging in improper acts that, even if also self-interested, have the effect of benefiting the corporation financially"), *aff'd sub nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

**[30]** **[31]** Second, the fiduciary/insider exception to the *in pari delicto* doctrine allows a suit to be brought against corporate fiduciaries who "knowingly caused the corporation to commit illegal acts and, as a result, caused the corporation to suffer harm." *AIG II*, 976 A.2d at 889. The *AIG II* court appeared, on public policy grounds, to limit the application of the fiduciary exception to "gatekeepers," third parties employed by a corporation to help ensure the lawful operation of the corporation. *Id.* at 890 n.49, 892–93; *see also RBC Cap. Mkts.*, 129 A.3d at 865 n.191 (rejecting the proposition that financial advisors are inherently "gatekeepers," explaining that "the role of a financial advisor is primarily contractual in nature" and defined by its engagement letter). Similarly, the fiduciary exception precludes application of the *in pari*

*delicto* doctrine to aiding and abetting claims against "non-fiduciaries ... who occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties." *Stewart*, 112 A.3d at 320 (holding that the auditor defendants played a "gatekeeper" role).

**\*12** **[32]** The *in pari delicto* doctrine also applies to the Trustee's professional malpractice claims. Under both New York law and Illinois law, [10] professional malpractice claims are viewed as a species of negligence. *See Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000); *Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016).

[10]    In the district court, the parties disputed whether New York (where Citigroup and Merrill Lynch are headquartered) or Illinois (where Tribune was headquartered) law governed the Trustee's professional malpractice claim. This argument has been largely abandoned, likely because, as the district court explained, the states' laws are nearly the same.

**[33]** **[34]** It is settled in both New York and Illinois that the *in pari delicto* doctrine bars claims against co-conspirators for negligence. *See, e.g., Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010) ("The justice of the in pari delicto rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent."); *Peterson v. McGladrey & Pullen, LLP*, No. 10 C 274, 2010 WL 4435543, at \*4 (N.D. Ill. Nov. 3, 2010) ("[T]he *in pari delicto* principles that preclude plaintiff from seeking redress for [the trustee's] alleged negligence ... apply equally to plaintiff's claims against [the defendant auditor.]"), *vacated on other grounds*, 676 F.3d 594 (7th Cir. 2012). Thus, the *in pari delicto* doctrine precludes a corporation engaged in wrongdoing from suing its co-conspirators on the grounds of negligence.

## 2. Application

**[35]** As an initial matter, accepting the Trustee's factual assertions to be true, he plausibly alleges that the Financial Advisors aided and abetted Tribune's directors and officers in breaching their fiduciary duties when they hid Tribune's true financial state to complete the LBO. In particular, the Trustee's complaint alleges that Citigroup and Merrill Lynch reviewed VRC's solvency analysis and failed to alert anyone that the February Projections, which formed the bedrock

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)
2021 WL 3700337

of VRC's first solvency opinion, were no longer accurate. Instead, they allowed VRC's analysis to be delivered to the financing banks at Step One of the LBO. Likewise, the Trustee contends that Citigroup's analysis showed that Tribune was insolvent by more than $1.4 billion before the close of Step Two, and Merrill Lynch's analysis showed that Tribune was insolvent by more than $1.5 billion. Still, neither tried to stop the LBO.

 [36]  Indeed, for purposes of these appeals, Citigroup and Merrill Lynch do not challenge the allegations of wrongdoing or negligence. Instead, they contend that any aiding and abetting breach of fiduciary duty and malpractice claims must be dismissed based on the *in pari delicto* doctrine. And for his part, the Trustee does not argue on appeal that the *in pari delicto* doctrine is inapplicable; instead, he argues that two exceptions to that doctrine should apply to allow the claims to go forward -- the adverse interest exception, which it argued below to the district court, and the fiduciary/insider exception, which it argues for the first time on appeal. This Court has discretion to consider arguments waived below where necessary to avoid a manifest injustice. *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008). In circumstances where those arguments were available to the party below and no reason is proffered for their failure to raise them, such an exercise of discretion is not favored. *Id.*

### a. *Adverse Interest Exception*

 **\*13**   [37]  Here, the adverse interest exception does not apply because the LBO conferred at least some "benefit" on Tribune. *AIG II*, 976 A.2d at 891. Tribune received over $300 million in additional capital from Zell's investment, and there was also the potential for $1 billion in tax savings. Even putting aside the tax savings -- which Moody's called a "key assumption" for the LBO, 449 J. App'x at 112, but which were ultimately never realized -- the transaction still infused hundreds of millions of dollars of capital into the business at a time when Tribune was struggling, provided value to many shareholders by helping cash them out, and gave Tribune a chance to continue as a going concern by allowing it to pay off at least some existing debt. Indeed, Tribune itself explained in a proxy statement that the LBO was in its best interest.

The Trustee also makes no specific allegations that support an inference that Tribune received *no* benefit from the LBO; instead, it contends that the net effect of the LBO was negative. But the net effect is not relevant when considering

whether the adverse interest exception will apply. *Stewart*, 112 A.3d at 303. Therefore, despite any "long-term damage," *id.*, the adverse interest exception to the *in pari doctrine* does not apply in this case. [11]

[11]  Notwithstanding the Trustee's argument to the contrary, the district court did not resolve any issues of fact by holding that the adverse interest exception did not apply here. Instead, it simply observed that the infusion of $300 million in capital stated in the Complaint conferred some benefit on Tribune, and therefore, the defendants had not acted "*solely* to advance [their] own personal financial interest." *AIG*, 976 A.2d at 891 (emphasis added).

### b. *Fiduciary/Insider Exception*

 [38]  The Delaware Chancery Court has explained that for the fiduciary/insider exception to apply, the party must "occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties," thereby playing a " 'gatekeeper' role vis-à-vis the [corporation]." *Stewart*, 112 A.3d at 319. Here, the Trustee has failed to sufficiently allege that any of the Financial Advisors played such a role.

While a corporation's auditors "assume[ ] a public responsibility transcending any employment relationship," *United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (emphasis omitted), and act as the gatekeepers of standards designed to avoid damage to corporations, the Delaware Supreme Court has emphasized that "the role of a financial advisor is primarily contractual in nature" and that a financial advisor's "engagement letter typically defines the parameters of the financial advisor's relationship and responsibilities with its client," *RBC Cap. Mkts.*, 129 A.3d at 865 n.191. Here, the engagement letters between Tribune and Citigroup and between Tribune and Merrill Lynch expressly provide that they did not create fiduciary relationships and that Citigroup and Merrill Lynch were not acting as Tribune's agents. The letters instead made clear that Tribune would "make an independent analysis and decision regarding any Transaction based on [their] advice." 449 J. App'x at 366. Citigroup and Merrill Lynch were financial advisors, not "gatekeepers," *AIG II*, 976 A.2d at 890 n.49, and, further, neither Citigroup nor Merrill Lynch "materially participate[d]" in the discharge of fiduciary duties, *Stewart*, 112 A.3d at 320.

Moreover, the Delaware Supreme Court has cautioned against "inappropriately ... suggest[ing] that any failure by a financial advisor to prevent directors from breaching their duty of care gives rise to an aiding and abetting claim against the advisor." *RBC Cap. Mkts.*, 129 A.3d at 865 n.191. Instead, such a claim may arise where "the [financial advisor] knows that the board is breaching its duty of care and participates in the breach by misleading the board or creating [an] informational vacuum." *Id.* at 862.

**\*14** Here, although the Trustee lodges numerous allegations of misconduct on the Financial Advisors' part, there is little to suggest that their conduct created an " 'informational gap[ ]' ... l[eading] to the Board's breaches of fiduciary duties," as occurred in *Stewart*, 112 A.3d at 322, much less the "fraud on the Board" and "intentional[ ] dup[ing]" of directors that warranted liability of the financial advisor in *RBC Cap. Mkts.*, 129 A.3d at 865. Rather, the Trustee alleges that Tribune's officers and advisors conspired with their financial advisors (among others) to carry out the LBO.

Accordingly, the district court did not err in dismissing the Trustee's aiding and abetting breach of fiduciary duty and professional malpractice claims against the Financial Advisors.

### B. *Intentional Fraudulent Conveyance Claims*

As discussed above, the Bankruptcy Code allows a bankruptcy trustee to recover transfers made with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). The complaint does not sufficiently allege that the transfers to Citigroup, Merrill Lynch, and Morgan Stanley as financial advisors were made with an "actual intent to hinder, delay, or defraud" creditors. *Id.* It does, however, sufficiently plead such an actual intent as to VRC.

 [39] As to Morgan Stanley, the complaint alleges that Tribune paid the firm $10 million for a fairness opinion, but the complaint then barely mentions the fairness opinion again, much less suggest that payment for the opinion was motivated by fraudulent intent. Without additional allegations, the Trustee cannot satisfy Rule 9(b)'s heightened pleading standard as to Morgan Stanley.

 [40] As to Citigroup and Merrill Lynch, the Trustee's allegations -- that these firms "were incentivized to promote the LBO over other proposals being considered by [Tribune]," 3049 J. App'x at 59, and that they "purported to rely on the

unrealistic February 2007 Projections even as each month's below-projection performance showed conclusively that they could not be achieved," 3049 J. App'x at 118 -- are insufficient to support an inference of intent to defraud as to the payment of their financial advisory fees. *Kaiser*, 722 F.2d at 1582.

Specifically, the Trustee maintains that "multiple badges of fraud" support the requisite strong inference of fraudulent intent against Citigroup and Merrill Lynch, including that (1) the advisory fees were paid to these firms in December 2007, following the close of Step Two when Tribune was insolvent; (2) Tribune received less than reasonably equivalent value for the fees paid; (3) the fees were not paid in the ordinary course of Tribune's business; and (4) Tribune's management engaged in deceptive conduct by concealing the February and October Projections from certain others in management, and induced Citigroup and Merrill Lynch to use those projections to bring the LBO to a close. 449 Appellant's Br. at 53.

Regarding this first alleged badge of fraud, payments to Citigroup and Merrill Lynch when Tribune was insolvent weigh in favor of finding actual fraudulent intent. As to the second badge of fraud, whether Tribune received reasonably equivalent value for these payments is a disputed factual question, which also weighs in the Trustee's favor at this stage.

As to third badge of fraud, nothing in the pleadings supports the notion that fees paid to Citigroup and Merrill Lynch pursuant to their respective engagement letters were outside the ordinary course of Tribune's business. Rather, the pleadings on these payments relate to the tortious performance of financial advisory services and the alleged fraudulent nature of the LBO transaction as a whole. They do not admit an inference of fraudulent intent as to Tribune's specific payment of the advisory fees, *see Sharp*, 403 F.3d at 56, which occurred pursuant to engagement letters entered into with Citigroup and Merrill Lynch in October 2005, long before the LBO was proposed.

 **\*15** As to the fourth badge of fraud, the Trustee's allegations of deceptive conduct by Tribune's management are too attenuated from the advisory fee payments to Citigroup or Merrill Lynch to indicate Tribune's intent as to those payments. At most, the Trustee's allegations indicate that Citigroup and Merrill Lynch did not report Tribune's management's concealment of facts. But other checks on such behavior existed as Morgan Stanley and the Special Committee independently reviewed the relevant figures.

In sum, the Trustee's highlighted badges of fraud fail to raise a strong inference of fraudulent intent. In the absence of other common badges of fraud -- reserving rights in the property, hiding funds, and paying an unconscionable price, *Kaiser*, 722 F.2d at 1582 -- the Trustee has not satisfied the heightened pleading standard for demonstrating an actual fraudulent conveyance as to Citigroup and Merrill Lynch.

**[41]**   The Trustee contends that these same "multiple badges of fraud" also support the requisite strong inference of fraudulent intent as to VRC. The first alleged badge of fraud weighs against finding actual fraudulent intent because VRC received the majority of its payment before Step Two closed and, therefore, prior to Tribune's insolvency.

As to the second alleged badge of fraud, whether Tribune received reasonably equivalent value for these payments is again a disputed factual question, weighing in the Trustee's favor at this stage.

The third alleged badge of fraud favors a finding of actual fraudulent intent for the payments made to VRC. Specifically, the Trustee alleges that: Tribune hastily hired VRC after Duff & Phelps, the company initially hired to perform a solvency analysis, informed Tribune that it could not provide a favorable solvency opinion, and after another "prominent" valuation firm rebuffed Tribune, 3049 J. App'x at 211; VRC charged Tribune the highest fee it had ever charged for a solvency opinion; and VRC agreed, among other things, to define "fair value," *id.* at 212, inconsistently with the industry standard upon which VRC had relied for its previous solvency opinions. These allegations are sufficient to admit an inference that the VRC payments were outside the ordinary course of Tribune's business. *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 447–49 (Bankr. S.D.N.Y. 2012) (concluding that actual intent was sufficiently pled where allegations included, *inter alia*, that "each transaction ... was unprecedented in the prior course of business between the parties, and the industry generally").

As to the fourth badge of fraud, the Trustee persuasively argues that Tribune's management's manipulation of the definition of "fair value" in its engagement letter with VRC was deceptive conduct that was (1) necessary for the LBO to proceed and (2) directly tied to Tribune's payments to VRC, in that VRC was retained precisely because it was willing to employ such a definition in formulating a solvency opinion. Further, the questionable nature of the "fair value" definition

is highlighted by VRC's charge of an unprecedented fee to take the assignment.

In sum, as to Morgan Stanley, Citigroup, and Merrill Lynch, we agree with the district court that the pleaded badges of fraud are insufficient to create a strong inference of actual fraudulent intent. As to VRC, however, we conclude that the Trustee has sufficiently pleaded actual fraudulent intent.

### C. *Constructive Fraudulent Conveyance Claims*

A trustee may recover "constructive" fraudulent transfers where "the debtor ... received less than a reasonably equivalent value in exchange for such transfer or obligation" and: (1) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation"; (2) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital"; (3) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured"; or (4) "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business." *See* 11 U.S.C. § 548(a)(1)(B).

**\*16**  **[42]**  **[43]**   The Bankruptcy Code does not define "reasonably equivalent value," only defining "value" as the "satisfaction ... of a present or antecedent debt of the debtor." *Id.* § 548(d)(2)(A). This court, however, has stated that "reasonably equivalent value is determined by the value of the consideration exchanged between the parties *at the time of the conveyance or incurrence of debt* which is challenged." *In re NextWave Pers. Commc'ns, Inc.,* 200 F.3d 43, 56 (2d Cir. 1999) (internal quotation marks omitted). Hence, in determining whether the debtor received "reasonably equivalent value," the court "need not strive for mathematical precision" but "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed ... will have significantly harmed the innocent creditors." *Rubin v. Mfrs. Hanover Tr. Co.,* 661 F.2d 979, 994 (2d Cir. 1981) (discussing § 67(d) of the Bankruptcy Act of 1898, predecessor to § 548 of the Bankruptcy Code); *see also United States v. McCombs,* 30 F.3d 310, 326 (2d Cir. 1994) ("[T]he concept [of fair consideration] can be an elusive one that defies any one precise formula." (discussing N.Y. Debt. & Cred. Law § 272)).

**[44]**  To determine whether reasonably equivalent value was provided, "the Court must ultimately examine the totality of the circumstances, including the arms-length nature of the transaction; and ... the good faith of the transferee." *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 334 (Bankr. S.D.N.Y. 2011) (internal quotation marks omitted).

**[45]**    **[46]**  Where the reasonably equivalent value analysis requires "more than a simple math calculation," such a computation usually should not be made at the motion to dismiss stage. *Id.*; *see also In re Agape World, Inc.*, 467 B.R. 556, 571 (Bankr. E.D.N.Y. 2012). Still, while the determination of whether reasonably equivalent value was exchanged is "largely a question of fact," *Am. Tissue Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 105 (S.D.N.Y. 2004) (internal quotation marks omitted); *accord In re Jesup & Lamont, Inc.*, 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014), courts have dismissed constructive fraudulent transfer claims where the complaint does not plausibly allege that the debtor received less than reasonably equivalent value, *see, e.g.*, *In re Trinsum Grp., Inc.*, 460 B.R. 379, 388–89 (Bankr. S.D.N.Y. 2011) (dismissing constructive fraudulent transfer claims due to the trustee's failure to sufficiently plead the less than reasonably equivalent value requirement); *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 113–15 (Bankr. S.D.N.Y. 2011) (dismissing certain of Trustee's claims that failed to meet the particularity requirement and relied on transfers outside the applicable time period).

Here, the various Financial Advisors are differently situated. Upon *de novo* review, we conclude that the constructive fraudulent conveyance claims against Citigroup and Merrill Lynch cannot be dismissed on the pleadings, but those against Morgan Stanley and VRC were properly dismissed.

As to Citigroup and Merrill Lynch, the Trustee alleges that the $12.5 million success fee paid to each firm upon consummation of the LBO was a constructive fraudulent conveyance. We first consider "the time of the conveyance or incurrence of debt" to determine whether there was reasonably equivalent value. *NextWave*, 200 F.3d at 56 (emphasis and citation omitted). The district court found that the debt was incurred when Citigroup's and Merrill Lynch's engagement letters were signed, years before the LBO's completion, thus rendering the success fees that the Trustee seeks to claw back unavoidable antecedent debt. We conclude otherwise.

The pleadings record indicates that Citigroup's and Merrill Lynch's success fees were not debts incurred or owed until December 2007 when the LBO closed at Step Two, at which point a triggering "Strategic Transaction" took place. Indeed, under their engagement letters, Citigroup and Merrill Lynch were entitled to payment of their success fees only "upon consummation of a Transaction involving" Tribune. 449 J. App'x at 368. Accordingly, the financial firms were only paid their success fees after the completion of Step Two and the closure of the LBO. Further, the engagement letters required Tribune to reimburse Citigroup and Merrill Lynch for all reasonable expenses incurred in providing financial advisory services prior to the consummation of the LBO, "[r]egardless of whether any [t]ransaction [was] proposed or consummated." 449 J. App'x at 368; *see also id.* at 376. This suggests that Tribune's obligations to pay the two $12.5 million success fees were separate, additional debts that were only payable in the event of a successful transaction. Accordingly, because the success fees were only incurred upon consummation of the LBO, they were not antecedent debt constituting categorically reasonably equivalent value.

**\*17**  Because the Trustee has adequately pleaded Tribune's insolvency upon the completion of Step Two, it is plausible that Tribune: (1) was "insolvent on the date" that the success fees were paid; (2) was engaged in the transaction of paying the success fees while it retained "unreasonably small capital"; and/or (3) "incurred" the success fees, which may have been "beyond [its] ability to pay." Therefore, the issue of whether Citigroup's and Merrill Lynch's success fees constitute a constructive fraudulent transfer hinges on whether the services that Tribune received in exchange were of "reasonably equivalent value." 11 U.S.C. § 548(a)(1)(B).

Turning then to the question of "reasonably equivalent value," we note that according to Citigroup and Merrill Lynch's engagement letters, Tribune owed success fees only if the advisors performed satisfactorily. Specifically, Citigroup's engagement letter states that it will "perform such financial advisory and investment banking services for [Tribune] in connection with the proposed Transaction as are customary and appropriate in transactions of this type." Merrill Lynch's engagement similarly states that it "will perform such financial advisory and investment banking services for [Tribune] as are customary and appropriate in transactions of this type." The Trustee alleges that Citigroup and Merrill Lynch fell short of "customary and appropriate" industry standards, were grossly negligent in carrying out their responsibilities, and rendered their services in bad faith.

In re Tribune Company Fraudulent Conveyance Litigation, --- F.4th ---- (2021)

2021 WL 3700337

Thus, according to the Trustee, because these firms provided "no value" to Tribune, consummation of the LBO would not trigger the contractual obligation to pay fees and the success fees should be clawed back.

On a motion to dismiss, we must accept factual allegations as true as long as they are not "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (alteration and internal quotation marks omitted).

The complaint alleges plausible facts that Citigroup and Merrill Lynch knew or should have known the February Projections would not be met and that each firm thought Tribune was insolvent by over $1 billion, and that they yet failed to act.

**[47]** To determine whether the Financial Advisors' guidance met the standard of reasonably equivalent value, courts evaluate the totality of the circumstances, considering, *inter alia*, the number of hours worked, industry standards, fees paid compared to the overall size of the transaction, when the engagement letters were signed, and opportunity costs. Here, the determination of whether the Citigroup and Merrill Lynch provided reasonably equivalent value likely requires more than "a simple math calculation." *Madoff*, 454 B.R. at 334. Unlike in *In re Old Carco LLC*, where the trustee's allegations simply "appl[ied] implausible values" or "omit[ted] other key assets," 509 F. App'x 77, 79 (2d Cir. 2013) (summary order), the Trustee in this case alleges, amongst other failings, that Citigroup and Merrill Lynch failed to advise Tribune about the flaws in VRC's Step One solvency analysis, which stemmed from the February Projections that the firms knew would not be met. The Trustees also alleges that both Citigroup's and Merrill Lynch's analyses showed Tribune was insolvent by more than $1 billion before the close of Step Two. How much, if at all, this ought to detract from the fees they were paid should not have been decided on a motion to dismiss. *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) ("[T]he question of 'reasonably equivalent value' and 'fair equivalent' is fact intensive, and usually cannot be determined on the pleadings."); *see also In re Andrew Velez Const., Inc.*, 373 B.R. 262, 271 (Bankr. S.D.N.Y. 2007) (declining to dismiss constructive fraudulent transfer claim given the complexities of the factual background giving rise to the issue of "reasonably equivalent value").

**\*18** While it is a close call, because we are required to accept the allegations in the Trustee's complaint as true,

we conclude the factual question of whether Citigroup and Merrill Lynch provided reasonably equivalent value for their success fees cannot be decided without first assessing whether the banks satisfactorily performed their duties. Thus, dismissal of the constructive fraudulent conveyance claims against these parties was premature.

**[48]** In contrast, we find no error in the dismissal of these claims against Morgan Stanley and VRC. While these firms adopt the arguments set forth by Citigroup and Merrill Lynch, their actions differ in several important respects. First, Morgan Stanley was hired as advisor for and was responsive to a different part of Tribune -- the Special Committee. Second, Morgan Stanley and VRC did not have the same incentives as Citigroup and Merrill Lynch. Because both Morgan Stanley and VRC earned their respective fees upon delivery of their contracted-for opinions, they had no financial stake in the LBO's consummation. Finally, and most important, the Morgan Stanley and VRC payments were in large part due *before* Step One closed. Because there is hardly an allegation that Tribune was insolvent before the first step, the constructive fraudulent transfer claims against Morgan Stanley and VRC must fail.

### VI. *Leave to Amend*

The Trustee sought leave to amend his complaint as to the shareholders in two respects: first, to provide additional allegations in support of his intentional fraudulent conveyance claims and, second, to add a constructive fraudulent conveyance claim. The district court denied both requests.

**[49]    [50]    [51]    [52]** "[L]eave [to amend] shall be freely given when justice so requires." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (citing Fed. R. Civ. P. 15(a) (2)). A court may deny leave to amend, however, for a "valid ground," *id.*, such as futility or undue prejudice, *see Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018). To determine whether granting leave to amend would be futile, we consider the proposed amendments and the original complaint. *See Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225–26 (2d Cir. 2017).

### A. *Intentional Fraudulent Conveyance Claims*

In denying the Trustee leave to amend his intentional fraudulent conveyance claims, the district court noted that the Trustee gave "no clue as to how the complaint's defects would be cured." 3049 S. App'x at 26 (alteration omitted). On appeal, the Trustee argues that if given the opportunity to amend, he would have been able to satisfy the imputation standard applied by the district court.

 [53] We are not persuaded. The Trustee had ample opportunity to plead a viable claim in the district court -- indeed, the operative pleading was the *Fifth* Amended Complaint -- but he failed to propose any amendments that would cure the pleading defects. Nor has he identified on appeal any additional factual allegations that would give rise to a strong inference of fraudulent intent on the part of the Special Committee. Accordingly, we find no abuse of discretion in the district court's denial of leave to amend the Trustee's intentional fraudulent transfer claims.

### B. *Constructive Fraudulent Conveyance Claims*

**\*19**  [54]  The Trustee did not initially assert a constructive fraudulent transfer claim against the shareholders but sought leave to file a Sixth Amended Complaint to add such a claim. On April 23, 2019, the district court (Cote, *J.*) denied the request, on two independent grounds: (1) the shareholders would suffer substantial prejudice; and (2) the proposed amendments to the constructive fraudulent transfer claim would be futile.

Under the Bankruptcy Code, certain transactions fall within a safe harbor and the payments that are part of those transactions cannot be clawed back via a federal constructive fraudulent transfer claim. *See* 11 U.S.C. §§ 544, 546(e). These include a payment made "in connection with a securities contract" if that payment was made by "a financial institution." *Id.* at § 546(e). As we held in *Tribune II*, however, Tribune's payments to its shareholders fell within this safe harbor. *See* 946 F.3d at 77–81, 90–97 (holding that Tribune was a "financial institution" within meaning of safe harbor provision and that payments to shareholders were payments "in connection with a securities contract"). On appeal, the Trustee argues that the district court and the *Tribune II* panel improperly concluded that Tribune was a financial institution, first by incorrectly taking judicial notice of certain documents and second by misinterpreting those documents. We are not persuaded.

As an initial matter, we are bound by the *Tribune II* panel's decision that Computershare Trust Company ("CTC"), a financial institution for purposes of § 546(e), was Tribune's agent when it served as a depository to help effectuate the LBO, which was a securities contract. *Tribune II*, 946 F.3d at 78-81; *see also 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 211 n.8 (2d Cir. 2019) ("We are bound by the decision of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." (internal quotation marks omitted)).

 [55]  The Trustee takes issue with how the district court took judicial notice of certain documents to conclude that CTC was Tribune's agent. That argument is without merit, as "[w]e have recognized ... that in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." *Id.* (internal quotation marks omitted). Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.

Similarly, the Trustee's argument that CTC was not Tribune's agent because it was given no discretion and was not a fiduciary lacks merit. Here, Tribune entered into an agreement with CTC whereby CTC was hired to be a steward of Tribune's money and its shareholders' stock. It was clearly acting on behalf of Tribune, which is enough to satisfy § 546(e). Accordingly, even on *de novo* review, the district court did not err when it denied the Trustee leave to amend its complaint as futile.

Separately, the district court did not abuse its discretion when it alternatively refused to grant leave to amend because doing so would be unduly prejudicial. There are thousands of shareholders who have been impacted by this ongoing litigation, all of whom relinquished control of their stock more than twelve years ago. As both this Court and the district court pointed out, allowing another amended complaint would prevent "certainty, speed, finality, and stability" in the market. 3049 S. App'x at 27 (citing *Tribune II*); *see also Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 568 (2d Cir. 2016) (discussing the importance of finality).

 **\*20**  Accordingly, we conclude that the district court did not abuse its discretion in denying the Trustee leave to amend his

complaint to add a constructive fraudulent claim under federal law.

***CONCLUSION***

For the foregoing reasons, the judgment and orders of the district court are **AFFIRMED in part** and **VACATED in part** as follows:

1. the district court's dismissal of the intentional fraudulent conveyance claims against the shareholders based on the buy-back of their shares is **AFFIRMED**;

2. the district court's dismissal of the breach of fiduciary duty and aiding and abetting breach of fiduciary claims against the allegedly controlling shareholders is **AFFIRMED**;

3. (a) the district court's dismissal of the aiding and abetting breach of fiduciary duty and professional malpractice claims against the Financial Advisors is **AFFIRMED**;

(b) the district court's dismissal of the actual fraudulent conveyance claims is **AFFIRMED** as to Morgan Stanley, Citigroup, and Merrill Lynch and **VACATED** as to VRC; and

(c) the district court's dismissal of the constructive fraudulent conveyance claims is **AFFIRMED** as to Morgan Stanley and VRC and **VACATED** as to Citigroup and Merrill Lynch; and

4. the district court's denial of the Trustee's motion for leave to amend to amplify his intentional fraudulent conveyance claim against the shareholders and to add a constructive fraudulent conveyance claim against the shareholders is **AFFIRMED**.

The case is hereby **REMANDED** for further proceedings in accordance with the above.

**All Citations**

--- F.4th ----, 2021 WL 3700337

**End of Document**     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7658490
Only the Westlaw citation is currently available.
United States Bankruptcy Court, C.D. California.

IN RE: ZETTA JET USA, INC. Debtor(s).

Jonathan D. King Plaintiff(s),

v.

Export Development Canada, Glove Assets
Investment Limited, Minsheng Business
Aviation Limited, Minsheng Financial Leasing
Co., Ltd., Li Qi, Truly Great Global Limited,
Universal Leader Investment Limited, Yuntian
3 Leasing Company Designated Activity
Company, Yuntian 4 Leasing Company
Designated Activity Company Defendant(s).

Case No.: 2:17-bk-21386-SK
|
Adv No: 2:19-ap-01383-SK
|
Miscellaneous 07/22/2020
|
Filed 07/29/2020

**Attorneys and Law Firms**

Talin Keshishian, Brutzkus Gubner Rozansky Seror Weber
LLP, Woodland Hills, CA, for Debtor(s).

CHAPTER 7

**COURT'S MEMORANDUM OF DECISION ON:
"(A) NOTICE OF MOTION AND MOTION TO
DISMISS COUNTS IX AND XV OF ADVERSARY
COMPLAINT AND (B) PARTIAL JOINDER
TO YUNTIAN 4 LEASING COMPANY'S
MOTION TO DISMISS COUNTS IX AND XV
OF ADVERSARY COMPLAINT," FILED BY
EXPORT DEVELOPMENT CANADA, DOCKET #88**

Sandra R. Klein, United States Bankruptcy Judge

**\*1** On 7/22/20, the Court heard the "(A) Notice of Motion
and Motion to Dismiss Counts IX and XV of Adversary
Complaint and (B) Partial Joinder to Yuntian 4 Leasing
Company's Motion to Dismiss Counts IX and XV of

Adversary Complaint" (Motion), Docket #88, filed by Export
Development Canada.

Appearances were as noted on the record. All parties were
given an opportunity to be heard. At the conclusion of the
7/22/20 hearing, the Court took the Motion under submission.
A copy of the Court's Memorandum of Decision is attached
hereto.

Before the Court is the "Motion to Dismiss Counts IX and
XV of Adversary Complaint and ... Partial Joinder to Yuntian
4 Leasing Company's Motion to Dismiss Counts IX and
XV of Adversary Complaint" [1] (Motion) filed by Export
Development Canada (EDC). AP Docket #88. [2]

[1]    Yuntian 3 Leasing Company Limited Designated
Activity Company (Yuntian 3) and Yuntian 4
Leasing Company Limited Designated Activity
Company (Yuntian 4, and together with Yuntian 3,
Y3/Y4), filed a motion to dismiss (Y3/Y4 MTD),
which is analyzed separately.

[2]    All references to "Zetta USA Docket" are to the
docket in In re Zetta USA, Inc., 17-bk-21386-
SK. All references to "Zetta Singapore Docket"
are to the docket in In re Zetta Jet PTE Ltd., 17-
bk-21387-SK. All references to "AP Docket" are to
the docket in Jonathan D. King v. Yuntian 3 Leasing
Company Designated Activity Company et al., 19-
ap-01383-SK (AP).

On 4/30/20, Jonathan D. King (King), in his capacity as
chapter 7 trustee (Trustee) of Zetta Jet USA, Inc. (Zetta
USA) and Zetta Jet PTE, Ltd. (Zetta Singapore), filed an
"Opposition to Defendant Export Development Canada's
(A) Motion to Dismiss Counts IX and XV of Adversary
Complaint and (B) Partial Joinder to Yuntian 4 Leasing
Company's Motion to Dismiss Counts IX and XV of
Adversary Complaint" (Opposition). AP Docket #121. On
5/5/20, the Trustee filed a "Request for Judicial Notice in
Support of Trustee's Oppositions to Motions to Dismiss Filed
by Defendants" (RJN). AP Docket #122.

On 5/22/20, EDC filed a "Reply in Support of (A) Motion
to Dismiss Counts IX and XV of Adversary Complaint and
(B) Partial Joinder to Yuntian 4 Leasing Company's Motion to
Dismiss Counts IX and XV of Adversary Complaint" (Reply).
AP Docket #130. In support of the Reply, EDC filed a

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7658490

"Declaration of Dylan Potter" (Potter 5/22/20 Decl.). AP Docket #130.

On 6/12/20, the Trustee filed a "Motion to Strike Portions of Export Development Canada's Reply in Support of Motion to Dismiss Counts IX and XV of Adversary Complaint and Declaration of Dylan Potter in Support of Same" (MTS). AP Docket #141. On 7/17/20, EDC filed a "Response in Opposition to Motion to Strike ... Portions of Export Development Canada's Reply ...." (MTS Opposition). AP Docket # 163. On 7/20/20, the Trustee filed a "Reply in Support of Trustee's Motion to Strike Portions of Export Development Canada's Reply in Support of Motion to Dismiss Counts IX and XV of Adversary Complaint and Declaration of Dylan Potter in Support of Same" (MTS Reply). AP Docket #166.

**\*2** On 7/22/20, the Court held a hearing on the Motion during which counsel for the Trustee and EDC appeared and were given an opportunity to be heard. At the conclusion of the hearing, the Court took the Motion under submission. Based on the argument in the pleadings and argument of counsel during the hearing, and for the reasons stated in the analysis below, the Court rules as follows: the Motion is granted regarding Count IX with leave to amend and granted regarding Count XV with leave to amend, if EDC files a proof of claim. This memorandum constitutes the Court's findings of facts and conclusions of law regarding the legal sufficiency of the counts at issue in the Motion.

## I. Facts

### a. Bankruptcy Cases
On 9/15/17 (Petition Date), Zetta USA and Zetta Singapore filed chapter 11 petitions (collectively, Cases). Zetta USA Docket #1; Zetta Singapore Docket #1. King was appointed as the chapter 11 trustee, and after the Cases were converted, he was appointed as the chapter 7 trustee. Zetta USA Docket #s 159, 452, 458.

### b. Adversary Proceeding
On 9/13/19, the Trustee filed an adversary complaint (Complaint) against: 1) Yuntian 3, 2) Yuntian 4, 3) Minsheng Financial Leasing Co., Ltd. (Minsheng Financial), 4) Minsheng Business Aviation Limited (Minsheng Business), 5) EDC, 6) Universal Leader Investment Limited (UL), 7) Glove Assets Investment Limited (GA), 8) Truly Great Global Limited (TG), and 9) Li Qi (collectively, the Defendants),

which alleges that Zetta Singapore was formed and run by a con artist, Geoffrey Cassidy (Cassidy), who, over a two-year period, with the help of the Defendants, obtained $10 million from kickbacks, bribes and embezzlement, while saddling the Debtors with almost $500,000,000 in unsustainable debt incurred by purchasing overpriced aircraft in a down market. AP Docket #1.

The Complaint contains the following counts, which are at issue in this Motion:

1) Avoidance and Recovery of Preference Transfer, under 11 U.S.C. §§ 547 and 550, against EDC and Yuntian 4 (Count IX); and

2) Disallowance of Claims, under 11 U.S.C. § 502(d), against Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, UL, GA, and EDC (Count XV).

Complaint ¶¶ 270-79, 318-21.

## II. Legal Standards

### a. Motions to Dismiss Generally
Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP or Rules) applies in adversary proceedings and provides that a party may assert the defense of "failure to state a claim upon which relief can be granted." Fed. R. Bankr. P. 7012(b); In re Kvassay, 2014 WL 2446181, at \*9 (B.A.P. 9th Cir. May 30, 2014). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001); Student Loan Mktg. Ass'n v. Hanes, 181 F.R.D. 629, 634 (S.D. Cal. 1998). "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)).

In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, and accept all well-plead factual allegations as true. Johnson, 534 F.3d at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001). The Court, however, is not bound by conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7658490

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." Id. at 562 (emphasis in original) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).

**\*3** In Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Supreme Court elaborated on the <u>Twombly</u> standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

The allegations of a complaint, along with other materials properly before the court on a motion to dismiss, can establish an absolute bar to recovery. <u>See</u> Weisbuch v. Cty. of L.A., 119 F.3d 778, 783 n.1 (9th Cir. 1997) ("If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts."). Generally, when ruling on a Rule 12(b)(6) motion to dismiss, courts cannot consider material outside the pleadings. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018); Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001). If matters outside of the pleadings are "presented to and not excluded by the court," the motion to dismiss is converted to a motion for summary judgment under Rule 56 and all parties must be given a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are, however, two exceptions to this rule: 1) matters that the Court can take judicial notice of under Rule 201 of the Federal Rules of Evidence; and 2) the "incorporation-by-reference doctrine, which treats certain documents as if they were "part of the complaint itself." Khoja, 899 F.3d at 999, 1002.

The party seeking dismissal under Rule 12(b)(6) has the burden of proof. In re Reed, 532 B.R. 82, 88 (Bankr. N.D. Ill.

2015); In re Enron Corp., 316 B.R. 434, 449 (Bankr. S.D.N.Y. 2004).

### III. Arguments and Analysis

#### a. RJN

In the RJN, the Trustee requests that the Court take judicial notice of several proofs of claims filed in the Cases. RJN at 2-3. No timely opposition to the RJN was filed.

Under Federal Rule of Evidence (FRE) 201, the Court can take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In re James, 300 B.R. 890, 894 (Bankr. W.D. Tex. 2003). The burden is on the party requesting judicial notice. Id. (ruling that the party requesting judicial notice has the burden of persuading the Court that the fact is "appropriate for judicial notice").

The Court can take judicial notice of the fact that undisputed matters of public record were filed or recorded. Lee v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001); C.B. v. Sonora Sch. Dist., 691 F. Supp.2d 1123, 1138 (E.D. Cal. 2009) ("The Court may take judicial notice of matters of public record, including duly recorded documents, and court records available to the public through the PACER system via the internet."). And, the Court may take judicial notice of its own docket. In re Tuma, 916 F.2d 488, 491 (9th Cir. 1990) ("We may take judicial notice of bankruptcy records in the underlying proceeding.").

**\*4** The Court can take judicial notice of the fact that the proofs of claims listed in the RJN were filed, but it cannot take judicial notice of any of the facts stated or alleged in those documents. In re Eckert, 485 B.R. 77, 81 (Bankr. M.D. Penn. 2013) ("A bankruptcy judge may take judicial notice of his or her own docket. ... However, the truth of the contents of those records is not inferred by a judge taking judicial notice of the records."); In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D. S.C. 2008) ("[W]hile the Court *may* take judicial notice of the fact that a document or pleading has been filed for certain purposes, [citation], it does not necessarily take judicial notice of the facts contained within the pleading. Admission into evidence of facts contained within a pleading filed with a court must also be evaluated using the remaining evidentiary rules ....").

2020 WL 7658490

b. Incorporation by Reference

The "incorporation-by-reference" doctrine treats certain documents as if they were "part of the complaint itself." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018). The incorporation by reference doctrine permits courts "to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." Knieval v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (citations and internal quotations omitted). A defendant may offer such a document, and the court may treat it as part of the complaint, and may assume that its contents are true for purposes of a 12(b)(6) motion to dismiss. U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). The incorporation by reference doctrine is designed to prevent "artful pleading by plaintiffs," who select only portions of documents that support their claims and omit portions of those very documents that weaken —or "doom"—their claims. Khoja, 899 F.3d at 1002-03.

Evidence that is not properly authenticated is inadmissible. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (stating that documents must be authenticated before they can be admitted); Evans v. Bd. of Educ. Sw. City Sch. Dist., 2010 WL 1849273, at *3 (S.D. Ohio 2010) (indicating that "unauthenticated documents are inadmissible under the Federal Rules of Evidence.").

In support of its position, EDC relied on documents that were attached to the Motion. Those documents were not authenticated and the Court cannot consider them. Docket #88 Exs. A, B, C; Orr, 285 F.3d at 773; Evans, 2010 WL 1849273, at *3.

c. The Extraterritorial Application of 11 U.S.C. §§ 547 and 550

EDC argues that the allegations against it in the Complaint must be dismissed because they impermissibly seek extraterritorial application of the Bankruptcy Code's avoidance provisions. Motion at 2. The Trustee responds that the presumption against extraterritoriality does not apply. Opposition at 11-12. EDC replies that the transaction at issue happened overseas. Reply at 14.

1. The Presumption Against the Extraterritorial Application of Federal Law

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2100 (2016). The question is not whether a court thinks "Congress would have wanted" a statute to apply to foreign conduct "if it had thought of the situation before the court" but whether Congress has "affirmatively and unmistakably instructed that the statute will do so." Id. "When a statute gives no clear indication of an extraterritorial application, it has none." Id. (quoting Morrison v. National Australia Bank Ltd., 561 U.S. 247, 255 (2010)).

The Supreme Court has announced a two-step framework for analyzing extraterritoriality issues. First, courts analyze whether "the presumption against extraterritoriality has been rebutted—that is whether the statute provides a clear, affirmative indication that it applies extraterritorially." Id. at 2101. Second, courts examine a statute's "focus" to determine whether the case involves a domestic application. Id. If the relevant conduct occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the relevant conduct occurred in a foreign country, then the case involves an impermissible extraterritorial application even though some conduct occurred in the United States. Id.

2. The Language of the Statutes – 11 U.S.C. §§ 547 and 550

*5  Title 11 United States Code § 547(b) provides that a trustee may avoid "any transfer of an interest of the debtor in property" to or for the benefit of a creditor, for or on account of an antecedent debt, made on or within 90 days before the petition date, while the debtor was insolvent, and which enables the creditor to receive more than it would if the case were a chapter 7, the transfer had not been made, and the creditor received payment under the Bankruptcy Code.

Title 11 United States Code § 550 provides that if a transfer is avoided under § 547, the trustee may recover, for the benefit of the estate the property transferred.

For the reasons set forth in the Y3/Y4 MTD memorandum of decision, §§ 547 and 550 do not have extraterritorial application.

3. Relevant Transactions

EDC "joins in, adopts and supports," and incorporates by reference the Y3/Y4 MTD to the extent relevant to Counts IX and XV. Motion at 18. EDC argues that the Complaint impermissibly seeks extraterritorial application of the Bankruptcy Code's avoidance provisions. Motion at 2. EDC contends that as set forth in the Y3/Y4 MTD, there is no U.S. nexus supporting preference claims involving rent paid under the "Aircraft Lease Agreement" dated 10/26/16 (Plane 12 Master Lease) and the 10/26/16 "Deed of Guarantee and Indemnity" (Zetta Singapore Guarantee) relating to Plane 12. Motion at 10, 12-13 (citing Complaint ¶ 125). EDC asserts that the Trustee's preference attack highlights the lack of any U.S. nexus to the transfers at issue, because: 1) it was a lender to Yuntian 4; 2) it had no privity or negotiations with the Debtors; and 3) the loan agreements were governed by English law and were between itself and Yuntian 4, foreign counterparties. Id. at 10. According to EDC, the only contact it had with the Debtors, was a "know-your-customer-due-diligence meeting" with the Debtors in Singapore regarding its issuance of a loan to Yuntian 4. Id. EDC contends that the Trustee should not be allowed to invoke U.S. bankruptcy law to attack transactions that have no connection with the United States. Id.

According to EDC: 1) under the Plane 12 Master Lease, Wells Fargo as owner trustee and lessor, leased Plane 12 to TVPX as owner trustee for an affiliate of the Debtors and lessee; and 2) under the 10/26/16 "Aircraft Sub-Lease Agreement" (Plane 12 Sublease), Zetta USA leased Plane 12 from TVPX. Id. at 12 (citing Complaint ¶ 125). EDC contends that pursuant to the Zetta Singapore Guarantee, Zetta Singapore guaranteed all payments due and payable by TVPX under the Plane 12 Master Lease and/or Zetta USA under the Plane 12 Sublease. Id. at 12-13 (citing Complaint ¶ 125).

EDC argues that it is not a party to any of the lease and related transactions between the Debtors and Yuntian 4. Id. at 13. Instead, it provided Yuntian 4 financing to buy Plane 12, through its owner trustee. Id. Other than executing acknowledgements of collateral assigned by Yuntian 4 (or its owner trustee), the Debtors are neither a party to, nor executed, any of the loan documents between EDC and Yuntian 4. Id. It argues that its transaction was independent from the leasing agreements between Yuntian 4 and the Debtors. Id. It highlights that it: 1) did not have any negotiations or dealings with the Debtors; 2) none of the negotiations between it and Yuntian 4 occurred in the United States; and 3) the loan transaction agreements between it and Yuntian 4 are governed by English law. Id.

*6 According to EDC, the 7/26/17 $956,244.53 payment at issue in Count IX was from Zetta Singapore's HSBC account in Singapore to EDC. Id. at 15-17 (citing Motion Ex. C). It argues that the Trustee admits that this payment was for rent payable by the Debtors to Yuntian 4 under the Plane 12 Master Lease and Plane 12 Sublease. Id.

EDC acknowledges that it was the initial recipient of the $956,244.53 payment from Zetta Singapore's Singapore account, but it contends that the Trustee does not allege any facts demonstrating that EDC was the "initial transferee" of these funds under § 550(a)(1). Id. And, EDC asserts that it did not have unfettered control and discretion regarding how to use the funds, because it was required to allocate the payments on account of Yuntian 4's loan obligations. Id.

The Trustee responds that as set forth in his opposition to the Y3/Y4 MTD, AP Docket #55, EDC's extraterritoriality argument should be rejected. Opposition at 11. The Trustee argues that on 7/26/17, Zetta Singapore transferred $956,244.53 to EDC towards the purchase of Plane 12, which Zetta Singapore acquired as part of the Minsheng Refinancing. Id. at 6. The Trustee highlights that the transfer was made to EDC's bank account in New York. Id. at 6, 10, 11-12 (citing AP Docket #88, Ex. C; In re Arcapita Bank B.S.C., 575 B.R. 299, 245 (Bankr. S.D.N.Y. 2017)).

The Trustee notes that Plane 12 was financed under a disguised financing by EDC through Yuntian 4, the Debtors' direct lender and the nominal "lessor" under the Plane 12 Master Lease. Id. at 6. According to the Trustee, Count IX seeks to avoid and recover the $956,244 transfer to EDC from either EDC or Yuntian 4. Id.

The Trustee contends that the focus of the $956,244 transfer was the United States because: 1) Zetta USA's Part 135 Certificate, issued by the FAA and necessary to operate commercial charter flights in the United States, was critical to Plane 12's leveraged financing transaction; 2) the Plane 12 Master Lease required FAA registration; 3) the Plane 12 Master Lease required the aircraft to be immediately subleased to Zetta USA and operated under its Part 135 Certificate; 4) the Plane 12 Master Lease required Plane 12 to be maintained at a U.S. base; 5) "rent" payments had to be made in U.S. dollars, requiring all payments to be routed through U.S. banks, either directly or through correspondent banks; and 6) the Debtors and Yuntian 4 used U.S. corporate trusts and U.S. trustees to act as nominal owners and lessees

Case 2:19-ap-01382-SK  Doc 282-1  Filed 09/07/21  Entered 09/07/21 11:44:24  Desc
Exhibit A -- Unpublished Cases  Page 90 of 210

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7658490

and to register the aircraft in the U.S. with the FAA. Id. at 9 (citing Complaint ¶¶ 49-50, 55, 108, 112, 124; Torborg 3/23/20 Decl. ¶ 14, Ex. H [3]).

[3]    AP Docket #95.

The Trustee argues that EDC was a secured lender, it obtained a New York mortgage and registered the mortgage with the FAA, and it purposefully availed itself of U.S. law to perfect its security interest in Plane 12. Id. (citing Torborg 3/23/20 Decl. ¶ 14, Ex. H).

In the Reply, EDC incorporates by reference the arguments raised in the Y3/Y4 MTD and contends that the transaction at issue occurred overseas, and the Trustee highlights numerous irrelevant factors to create some United States nexus for the Plane 12 Master Lease and the payments made under it. Reply at 14 (citing AP Docket #s 32, 44, 61, 93).

The question of whether transactions are foreign or domestic depends "very heavily" on the facts of each case. In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 246 (Bankr. S.D.N.Y. 2017). Recent Supreme Court decisions have analyzed the "focus" of statutes to determine whether a case involves domestic or foreign applications of statutes. RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090 (2016); Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010).

 *7  Morrison involved National Australia Bank Limited (National), whose "ordinary shares" were traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, but not on any American exchange. Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 251 (2010). In 1998, National bought Florida mortgage-servicing company HomeSide Lending, Inc. (HomeSide) and until 2001, National touted the success of HomeSide's business. Id. at 251-52. After Australian citizens Russell Leslie Owen (Owen) and Brian and Geraldine Silverlock (Silverlocks) bought National shares, National announced that it was writing down the value of HomeSide's assets by more than $2 billion. Id. at 252. Owen and the Silverlocks sued National and HomeSide in the District Court for the Southern District of New York for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, seeking to represent a class of foreign purchasers of National's ordinary shares. Id. at 252-53. National and HomeSide moved to dismiss for failure to state a claim under Rule 12(b)(6) and lack of subject matter jurisdiction under Rule 12(b)(1). Id. at 253. The district court dismissed under Rule 12(b)(1),

finding that it had no jurisdiction because the acts in the United States were "at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad." Id. The Second Circuit affirmed because "[t]he acts performed in the United States did not 'compris[e] the heart of the alleged fraud.' " Id. at 253-54.

The Supreme Court affirmed, although it noted that the extraterritorial reach of § 10(b) is a merits question, not a subject matter jurisdiction question. Id. at 254. The Court then indicated that it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Id. at 255 (citations and internal quotation marks omitted). After holding that the Exchange Act contained no affirmative indication that § 10(b) applied extraterritorially, the Supreme Court focused on Owen's and the Silverlocks' argument that Florida was where HomeSide and its executives engaged in the deceptive conduct and where HomeSide executives made misleading public statements. Id. at 265-66. The Supreme Court held that these American contacts were insufficient to displace the presumption against extraterritoriality because "it is a rare case of extraterritorial application that lacks all contact with the territory of the United States." Id. at 266. (emphasis in original). The Court continued that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case." Id. (emphasis in original).

The Supreme Court highlighted that the "focus" of the Exchange Act is the purchase and sale of securities in the United States, not where the deception occurred. Id. Because National's ordinary shares were not listed on a domestic exchange, and all aspects of the purchases occurred outside the United States, the Supreme Court stated that the case should have been dismissed under 12(b)(6), based on failure to state a claim. Id. at 266, 273.

According to the Supreme Court, the two tests that the Second Circuit had developed for determining whether conduct was foreign or domestic in the context of § 10(b)—an "effects test," that was premised on an effect on American securities markets and a "conduct test," that was premised on wrongful conduct in the United States—were inappropriate. Id. at 257-61. The Supreme Court reasoned that the "results of judicial-speculation-made law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against

2020 WL 7658490

extraterritoriality" because instead of guessing "anew in each case," the presumption can be applied in all cases, which preserves a stable background against which Congress can legislate with predictable effects. Id. at 261.

In Nabisco, RJR Nabisco, Inc. (RJR) and other unspecified parties allegedly participated in a global money-laundering scheme involving the illegal sale of drugs and cigarettes in various countries. RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2098 (2016). The European Community and 26 of its member states sued RJR in the Eastern District of New York for civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), and RJR moved to dismiss the complaint, arguing that RICO does not apply to racketeering activity occurring outside U.S. territory or to foreign enterprises. Id. at 2098-99. The district court agreed with RJR and dismissed the RICO claims as impermissibly extraterritorial, but the Second Circuit reinstated those claims, concluding that Congress had clearly communicated its intent that RICO applied to extraterritorial conduct. Id. at 2099. The Supreme Court granted certiorari because the lower courts disagreed regarding RICO's extraterritorial application. Id.

*8 The Supreme Court stated that to determine whether a case involves a domestic application of a statute, courts must look to the "focus" of the statute. Id. at 2101. According to the Court, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.

The Court noted that "when a statute provides for some extraterritorial application the presumption against extraterritoriality operates to limit that provision to its terms." Id. at 2102 (quoting Morrison, 561 U.S. at 265). The Court held that the complaint did not impermissibly allege extraterritorial violations of the RICO Act because the pattern of racketeering activity involved predicate offenses that were either committed in the United States or in a foreign country in violation of a predicate statute that applied extraterritorially. Id. at 2105. Section 1964(c), however, required that a civil RICO plaintiff allege and prove a domestic injury, recovery was not available for foreign injuries, and the European Community and the member states had stipulated to waive

their claims for domestic injuries, so the Court held that the RICO claims had to be dismissed. Id. at 2111.

Most recently, the Supreme Court expanded on the "focus" of a statute by indicating that it is the "object of its solicitude," which can include the conduct that it "seeks to regulate" and the parties and interests it "seeks to protect" or vindicate. Western Geco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) (quoting Morrison, 561 U.S. at 267).

To determine the conduct that is relevant to the analysis, the Court must consider the "focus" of the avoidance and recovery provisions (§§ 547, 548, and 550), which is "the initial transfer that depletes the property that would have become property of the estate." In re CIL, 582 B.R. at 93; see also In re Ampal-Am. Israel Corp., 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (same); In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93, 98 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277) ("[I]n actions involving both [§ 548 and § 550], § 550(a) regulates the debtor's initial transfer."); In re Sherwood Investments Overseas Ltd., Inc., 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("Courts applying the extraterritoriality presumption to fraudulent transfers typically hold that the proper focus is the transfers sought to be avoided, not the parties' relationship or locus." (emphasis in original)).

In several of the cases cited by the parties, the courts found that the relevant conduct was extraterritorial.

In Maxwell I, Maxwell Communication Corporation plc (MCC) sold significant portions of its U.S. assets and used some of the proceeds to repay overdraft balances to Barclays Bank plc (Barclays) (£2 million), National Westminster Bank plc (NatWest) (£71.5 million), and Societe General (SocGen) (£5.7 million). In re Maxwell Communication Corp. plc, 186 B.R. 807, 813 (S.D.N.Y. 1995). After MCC filed bankruptcy in the U.S. and England, MCC and examiner Richard A. Gitlin (Gitlin), who had been appointed to harmonize the two bankruptcy proceedings, filed complaints against Barclays, NatWest, and SocGen to avoid and recover the transfers. Id. at 812. MCC, Barclays, and NatWest were English companies, and SocGen was a French company. Id at 812-13.

*9 The bankruptcy court dismissed the complaints based in part on the presumption against extraterritoriality. Id. at 815. On appeal, MCC and Gitlin argued that the transfers were not

In re Zeta Jet USA, Inc., Slip Copy (2020)

2020 WL 7658490

extraterritorial because the money derived from the sale of U.S. assets. Id. at 816.

The district court affirmed, noting that a § 547 analysis requires courts to consider all events involving the transfers, and viewing the transfers in this manner resulted in a finding that they occurred overseas. Id. at 816-17. The court considered that: 1) MCC, Barclays, NatWest, and SocGen were all foreign entities whose relationship was "centered in England;" 2) the antecedent debts underlying the transfers arose from MCC's overdrafts on accounts maintained with banks in England and governed by English law; and 3) MCC repaid its debts by transferring funds to accounts in the U.K. Id. at 817. The court noted that the transferred funds were proceeds from the sale of U.S. assets, which depleted the availability of MCC's assets to satisfy creditors' claims. Id. But, the court stated that the source of the funds was "at best only one component" of the conduct proscribed by § 547, and even assuming the transfers were initiated in the U.S. after U.S. asset sales, this conduct was more appropriately described as a "preparatory step" to the transfers. Id.[4]

[4]    MCC and Gitlin appealed, and the Second Circuit in Maxwell II affirmed but declined to decide "whether, setting aside considerations of comity, the 'presumption against extraterritoriality' would compel a conclusion that the Bankruptcy Code does not reach the pre-petition transfers at issue." In re Maxwell Communication Corp. plc by Homan (Maxwell II), 93 F.3d 1036, 1055 (2d Cir. 1996).

In CIL, CIL Limited (CIL), a Cayman Islands entity, transferred an equity interest in CEVA Group Plc (CEVA Group), a U.K. entity, to CEVA Holdings LLC (CEVA Holdings), a Marshall Islands entity. In re CIL Ltd., 582 B.R. 46, 68 (Bankr. S.D.N.Y. 2018). CIL filed a petition commencing provisional liquidation proceedings in the Grand Court of the Cayman Islands, and shortly thereafter, an involuntary chapter 7 petition was filed against it in the Bankruptcy Court for the Southern District of New York. Id. at 56. Salvatore LaMonica (LaMonica), the chapter 7 trustee for CIL, filed a complaint against CEVA Logistics Finance B.V. (CEVA Finance), CEVA Group, and CEVA Holdings (together with CEVA Finance and CEVA Group, CEVA Entities), to avoid and recover the transfer under §§ 544, 548, 550, and 551. Id. at 56, 68. The CEVA Entities moved to dismiss the avoidance claims based on the presumption against extraterritoriality, and LaMonica countered that the transfer was not extraterritorial. Id. at 82-83, 94.

The court held that the transfer was extraterritorial because: 1) it was among foreign entities and allegedly harmed foreign creditors; and 2) it was accomplished outside the United States by i) CIL, acting through its boards at meetings chaired in London, consenting to CEVA Group's recapitalization and restructuring, and ii) CEVA Group issuing "New CEVA Shares" in accordance with U.K. law during a meeting of shareholders in London, attended by a CIL representative who consented to the issuance. Id. at 93-94. LaMonica argued that the court had to consider all components of the transfers, and the "center of gravity" was the United States because the scheme to divest CIL of the CEVA Group equity was "planned and hatched" in the United States. Id. at 94. The court rejected this argument for several reasons: 1) CIL's professionals were in the Cayman Islands and performed significant work there; 2) negotiating and documenting the transfer in the United States was not enough to make the transaction domestic; 3) it was questionable whether the "component parts test" advocated by LaMonica, remained relevant after the Supreme Court's rejection in Morrison of the similar "conduct and effects test" used by the Second Circuit to determine where conduct occurred; and 4) even under LaMonica's "center of gravity" test, the issuance of the "New CEVA Shares" was not a domestic transaction. Id. at 94-96.

**\*10**  In Ampal-American, New York holding company Ampal-American Israel Corp. (Ampal) instructed Bank Hapoalim in Tel Aviv to transfer 344,322.64 New Israeli Shekels (NIS) from its account to a Bank Hapoalim account of its Israeli law firm, Goldfarb Seligman & Co. In re Ampal-Am. Israel Corp., 562 B.R. 601, 603-04 (Bankr. S.D.N.Y. 2017). Within 90 days of the transfer, Ampal filed bankruptcy. Id. at 604. Alex Spizz (Spizz), the chapter 7 trustee for Ampal, filed a § 547 and 550 complaint to avoid and recover the NIS transfer. Id. at 603. The court determined that the presumption against extraterritoriality prevented Spizz from avoiding the transfer, because it occurred in Israel between a U.S. transferor headquartered in Israel and an Israeli transferee accomplished entirely through accounts at the same Israeli bank. Id. The court acknowledged that Goldfarb's legal services had some U.S. connections, including Ampal's shares being traded on the NASDAQ, Goldfarb's services involving legal work related to Ampal's SEC and NASDAQ filings, Goldfarb rendering opinions on Israeli law for inclusion in Ampal's annual report, and a Goldfarb partner attending meetings in New York regarding the filing of Ampal's bankruptcy case. Id. at 613 & n.14. But, the court highlighted that most of these services were performed in Israel, and even

2020 WL 7658490

where claims "touch and concern" the United States, they must do so with "sufficient force" to displace the presumption against extraterritoriality. Id. at 613-14.

In Sherwood, Royal Bank of Scotland N.V. (RBS), located in the Netherlands, financed complex derivatives trading for Sherwood Investments Overseas Limited, Inc. (Sherwood), a BVI corporation. In re Sherwood Investments Overseas Ltd., Inc., 2015 WL 4486470, at *1, 20 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016). Because Sherwood did not meet RBS's risk criteria, it was not a "formal" client of RBS. Id. at *4. But, they created a "workaround:" Sherwood operated through an approved counterparty, UBS, a Swiss bank. Id. When Sherwood and RBS wanted to execute a trade, RBS sent instructions to Sherwood and, if approved, to UBS, who paid the required amount from funds in Sherwood's UBS accounts. Id.

In September 2008, Sherwood transferred almost $1.3 million to RBS. Id. at *18. It then filed bankruptcy and an avoidance action against RBS, alleging that the $1.3 million transfer was avoidable and recoverable under §§ 548 and 550. Id. RBS moved for summary judgment based on the presumption against extraterritoriality, claiming that the transfers occurred entirely abroad. Id. Sherwood countered that the "center of gravity" of its relationship with RBS was in the United States because: 1) its principal, Julian Benscher (Benscher), lived in and directed trades from and initiated all of his contacts with RBS from the United States; 2) it kept all of its books and records in the United States; and 3) it operated an orchid growing subsidiary, Sherwood Farms, from the United States. Id. at *19.

The court stated that the proper focus is the *transfers* sought to be avoided, not the parties' relationship or locus. Id. (emphasis in original). According to the court, the transfers were foreign because: 1) the transfers were made from Sherwood's accounts at UBS in Switzerland to RBS's accounts in England; 2) Sherwood was a BVI corporation, and RBS was a Netherlands entity; and 3) all trading and creation of the underlying securities purchased with the transfers was performed in London. Id. at *20, 21. The court stated that the "minimal contacts" with the United States—Benscher living in and initiating the transfers from Florida and RBS having U.S. branches—did not displace the presumption against extraterritoriality because even if claims "touch and concern" the United States, they must do so with sufficient force to displace the presumption. Id. at *20.

In FAH, Bayerische Moteren Werke Aktiengesellschaft (BMW) executed agreements with Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc. (together FAH Cos.), Delaware corporations headquartered in California, for the installation of BMW engines and parts into FAH-made vehicles. In re FAH Liquidating Corp., 572 B.R. 117, 121, 124 (Bankr. D. Del. 2017). FAH Cos. then transferred approximately $32,579,799 to BMW,[5] but faced many difficulties, including battery pack safety recalls and the loss of their lending facility provided through the U.S. Department of Energy (DOE). Id. at 121-22. FAH Cos. filed a voluntary chapter 11 petition, and Emerald Capital Advisors Corp. (Emerald), in its capacity as trustee for the FAH Liquidating Trust, filed a complaint against BMW, a German corporation with its principal place of business in Munich, to avoid and recover the alleged constructively fraudulent transfers under §§ 542, 544, 548, and 550. Id. at 120-22. BMW moved to dismiss the complaint, arguing that the transfers were foreign because: 1) they involved development work by a German company based on German contracts, which required application of German law; and 2) BMW was to perform the work in Germany in exchange for FAH Cos. paying in Euros. Id. at 123, 124. Emerald countered that the transfers were not extraterritorial and highlighted that the transfers: 1) originated from the United States; 2) were made by a Delaware corporation headquartered in California; and 3) were made using funds provided by a DOE loan program. Id. at 124.

5    FAH Cos. made the payments in Euros, and the Court approximated the amount in dollars. Id. at 122 n.5.

*11    The court focused on the "center of gravity" and held that it was Germany because: 1) the agreements specified milestones to be achieved at BMW's production facilities in Germany; 2) the agreements had provisions mandating the forum for disputes as Munich; 3) German law applied; and 4) payments were required in Euros. Id. at 124-25. Although the court recognized that the transfers originated in the United States from a Delaware corporation, it concluded that these facts were insufficient to overcome the "primarily foreign nature" of the agreements. Id. at 124.

In contrast to the cases mentioned immediately above, courts in other cases have found that the transfers at issue were domestic.

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7658490

In Arcapita, Arcapita Bank B.S.C.(c) (Arcapita), a Bahraini investment bank, made investments through Bahrain Islamic Bank (BisB), which was headquartered in Bahrain, and Tadhamon Capital B.S.C. (Tadhamon), a Bahraini corporation and a subsidiary of a Yemini bank, under agreements that were negotiated and signed in Bahrain and provided that Bahrain law governed. In re Arcapita Bank B.S.C., 575 B.R. 229, 233-34 (Bankr. S.D.N.Y. 2017). Arcapita transferred $10 million from its JP Morgan Chase account in New York to a correspondent account at the same New York bank maintained by BisB and BisB bought commodities for Arcapita through a London broker. Id. at 234. The next day, Arcapita made two $10 million transfers from its JP Morgan Chase account to an account at HSBC Bank in New York which was a correspondent bank account maintained by Tadhamon's bank in Bahrain, and the funds were then immediately transferred to Tadhamon's account at a bank in Bahrain. Id. Less than a month after the transfers, Arcapita filed a voluntary chapter 11 petition. Id. The committee of unsecured creditors (Committee) filed a § 547 avoidance action against BisB and Tadhamon to avoid and recover the transfers. Id. at 233, 235, 243.

BisB and Tadhamon moved to dismiss the complaint, arguing that the transfers in the United States by themselves were not enough to overcome the presumption against extraterritoriality, and the focus should be on when the payment was completed. Id. at 244. The Committee countered that the challenged conduct was domestic. Id. The court held that BisB's and Tadhamon's "receipt of the transferred funds in New York correspondent bank accounts" was at the "heart" of the § 547 cause of action. Id. at 239. The court rejected BisB's and Tadhamon's argument that the parties expected Bahraini law to apply and the United States had no interest in regulating transactions involving Bahraini parties for investments made outside of the U.S. Id. It held that the link between the United States, as the regulating state, and the regulated activity in question was sufficiently strong given that the transfers took place through use of U.S. correspondent bank accounts. Id.

In Picard, Bernard L. Madoff Investment Securities LLC (Madoff Securities), a U.S.-based entity transferred billions of dollars from its New York JP Morgan Chase account to several foreign "feeder funds," [6] which then transferred the money to foreign investors. In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277). Irving H. Picard (Picard), the trustee

for the liquidation of Madoff Securities, filed avoidance and recovery actions under §§ 548 and 550 against the foreign feeder funds, which moved to dismiss. Id. at 91. The bankruptcy court and district court held that the avoidance and recovery claims should be dismissed based on the presumption against extraterritoriality or international comity principals. Id. at 91, 94. Both courts reasoned that Picard could not recover property that one foreign entity received from another foreign entity. Id.

[6]     A "feeder fund" is an entity that pools money from numerous investors and then places it into a "master fund" on their behalf. Id. at 92. A "master fund," which is what Madoff Securities advertised its funds to be, pools investments from multiple feeder funds and then invests the money. Id.

*12 The Second Circuit reversed, noting that when a trustee seeks to avoid and recover subsequently transferred property under §§ 548(a) and 550(a), the relevant transfer that must be avoided is the initial transfer. Id. at 98. The Second Circuit rejected the lower courts' test that considered the subsequent transfer, reasoning that the relevant conduct was Madoff Securities's "fraudulent *transfer* of property, not the transferees' *receipt* of property." Id. at 100 (emphasis in original). The court expressed no opinion regarding whether a domestic debtor or a transfer of property from a U.S. bank account would be sufficient to support a finding of a domestic transfer. Id. at 99 n.9. Because Madoff Securities was a domestic entity, which transferred property from its U.S. bank account to the feeder funds, the court held that the transfers were domestic. Id.

Determining whether a transfer is extraterritorial is fact dependent and the Court will consider the transaction, the FAA registration and Part 135 Certificate, the maintenance of the aircraft at a U.S. airbase and the security interests, the nominal trustees, and the denomination of the payments.

i. The Transaction: Count IX – Avoidance and Recovery of Preference Transfer, under 11 U.S.C. §§ 547 and 550, against EDC and Yuntian 4

In Count IX, the Trustee seeks to avoid and recover a 7/26/17 $956,244.53 payment from Zetta Singapore to EDC for the benefit of Yuntian 4. Complaint ¶ 271, 273, 278-79, Sch. C. The Complaint alleges: 1) Zetta Singapore made the $956,244 "rent" payment from its Singapore account to EDC for the

In re Zetta Jet USA, Inc., Slip Copy (2020)

2020 WL 7658490

benefit of Yuntian 4, pursuant to the Plane 12 Master Lease and Plane 12 Sublease, Complaint ¶ 85 (Zetta Singapore had a Singapore account), ¶ 271 (Zetta Singapore made the $956,244 transfer to EDC); and 2) the transfer benefited Yuntian 4 and EDC by reducing the debt Yuntian 4 owed EDC for the financing of Plane 12. Complaint ¶¶ 271, 273-74.

Although the Trustee contends that Zetta Singapore sent the $956,244 payment to EDC's New York bank account, Opposition at 6 (citing Complaint ¶¶ 122-23, Schedule C; AP Docket #88, Ex. C), the document on which the Trustee relies is not authenticated and cannot be considered by the Court. Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (stating that documents must be authenticated before they can be admitted); Evans v. Bd. of Educ. Sw. City Sch. Dist., 2010 WL 1849273, at *3 (S.D. Ohio 2010) (indicating that "unauthenticated documents are inadmissible under the Federal Rules of Evidence"). Even if, however, there were admissible evidence that Zetta Singapore transferred the $956,244 from its Singapore account to a New York EDC account, that U.S. connection would not make a difference because the focus of the Bankruptcy Code's avoidance provisions is the "the initial transfer that depletes the property that would have become property of the estate." In re CIL, 582 B.R. at 93; see also In re Ampal-Am. Israel Corp., 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (same); In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 98, 100 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277) (holding that in recovery actions where a trustee alleges a debtor's transfers are avoidable as fraudulent under § 548(a) (1)(A), [7] § 550(a) regulates the fraudulent transfer of property depleting the estate, and indicating that the relevant conduct was Madoff Securities's fraudulent *transfer* of property and not the transferees' *receipt* of property (emphasis in original)).

[7]    The cases that address extraterritoriality often do not distinguish between §§ 547 and 548 because the relevant language is the same in both statutes. In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 244 n.6 (Bankr. S.D.N.Y. 2017) (noting that both §§ 547 and 548 allow a trustee "avoid any transfer of an interest of the debtor in property").

*13   The Trustee's citation to Arcapita is unpersuasive because the transferor in that case sent money from its own account in New York to correspondent accounts in New York maintained by the transferees (or the transferees' banks), In re Arcapita Bank B.S.C., 575 B.R. 229, 234 (Bankr. S.D.N.Y.

2017), whereas here Zetta Singapore made the transfer from its Singapore account. Complaint ¶¶ 85, 271.

### ii. FAA Registration and Part 135 Certificate

Regarding the Trustee's position that Zetta USA's FAA-issued Part 135 Certificate was critical to the leveraged financing of Plane 12, and the Plane 12 Master Lease required Plane 12 to be registered with the FAA and immediately subleased to Zetta USA and operated under its Part 135 Certificate, Opposition at 9, the focus of the Bankruptcy Code's avoidance and recovery provisions is *the transfers*, not other conditions in contracts or lease agreements. See RJR Nabisco, Inc. v. European Community, 136 S.Ct. 2090, 2101 (2016) (directing courts to look to the "focus" of a statute to determine whether a case involves a domestic application of it); In re CIL Ltd., 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018) (providing that the "focus" of the avoidance and recovery provisions is "the initial transfer that depletes the property that would have become property of the estate").

### iii. Maintenance at a U.S. Base and Security Interests

The Trustee contends that under the Plane 12 Master Lease, Plane 12 was required to be maintained at a U.S. base. Opposition at 9. He also alleges that EDC was a secured lender, it obtained a New York mortgage, which was registered with the FAA, and it purposefully availed itself of U.S. law to perfect its security interest in Plane 12. Id. (citations omitted). These facts, however, are irrelevant to the analysis because they do not address the transfers themselves but instead involve other contract provisions or requirements. See RJR Nabisco, Inc. v. European Community, 136 S.Ct. 2090, 2101 (2016); In re CIL Ltd., 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018).

### iv. The Subleases to Zetta USA and the Nominal Trustees

The Trustee highlights that the Debtors and Yuntian 4 used U.S. corporate trusts and U.S. trustees to act as nominal owners and lessees and to register aircraft in the U.S. with the FAA. Opposition at 9. The Complaint alleges that: 1) Wells Fargo has its principal place of business in Utah and, in its capacity as trustee, is a party to trust agreements with Yuntian 4 where it acted as the owner trustee of Plane 12; and 2) TVPX is a Wyoming corporation that, as trustee, acted as the

2020 WL 7658490

registered owner of Plane 12 for Zetta Jet Challenger 650-1 Limited (Zetta Jet 650-1) [8] in the transactions for that aircraft. Complaint ¶¶ 49, 50, 124.

[8]   Zetta Jet 650-1, one of the "Zetta BVI Subsidiaries," was formed under BVI law, and Zetta Singapore is its "ultimate parent." Complaint ¶ 20.

As explained above, however, the focus of the Bankruptcy Code's avoidance and recovery provisions is the transfers from Zetta Singapore, not FAA registration, and the Complaint stresses that the use of Wells Fargo and TVPX as nominal trustees related to FAA registration. Complaint ¶ 49 (alleging that Wells Fargo acted as the owner-trustee of Plane 12), ¶ 50 (indicating that TVPX acted as the registered owner of Plane 12, and in the aviation industry, it is commonplace for non-citizen U.S. corporate trusts to be formed *as an option for the registration of aircraft in the United States with the FAA* (emphasis added)), ¶ 124 (Yuntian 4, through Wells Fargo, leased Plane 12 to TVPX acting as trustee for Zetta BVI Subsidiary Zetta Jet 650-1, and TVPX, as trustee, subleased Plane 12 to Zetta USA, which was the entity that actually operated Plane 12, and Wells Fargo and TVPX acted on behalf of Yuntian 4 and Zetta Jet 650-1 "solely as trustees").

**\*14** Using American professionals in a transaction is not enough to make the transaction domestic. CIL Ltd., 582 B.R. at 96 (stating that CIL retained professionals outside the United States, but even if the relevant transfer had been negotiated and documented by professionals in the United States, it would not have been enough to make the transfer a domestic transaction); Ampal, 562 B.R. at 613-14 (holding that where legal services had some U.S. connections—a company's stock was traded on the NASDAQ, and an attorney performed legal work regarding SEC and NASDAQ filings —it did not result in the transactions being domestic; In re Lyondell Chem. Co., 543 B.R. 127, 150-51 & n.91 (Bankr. S.D.N.Y. 2016) (acknowledging that the managers of BI S.à.r.l. and Basell GP were probably in New York when they approved the shareholder distributions at issue, but indicating that under Morrison, the court must target its inquiry on the "focus" of congressional concern, and the connection to the United States was not sufficiently strong for the transfer to be considered domestic); In re Sherwood Invs. Overseas Ltd., Inc., 2016 WL 5719450, at \*11 (M.D. Fla. Sept. 30, 2016) (finding that the debtor-in-possession failed to overcome the presumption against extraterritoriality where its dealings with RBS had, at most, a "tangential connection" with the United

States, even though the debtor-in-possession's principal and his normal RBS trader had "several conversations" in New York).

### v. Denomination of Payments

The Trustee claims that all "rent" payments had to be made in U.S. dollars, which required the payments to be routed through U.S. banks, either directly or through correspondent banks. Opposition at 9. Even assuming this were true, the denomination of payments generally has no bearing on whether transactions are foreign or domestic. See Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineração S.A., 2019 WL 2514056, at \*5 (S.D.N.Y. June 18, 2019) (holding, in an action for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, consummating transactions for Brazilian bonds with U.S. dollars was insufficient to plead a domestic transaction because the currency used does not necessarily have any bearing on whether a purchase or sale is domestic, and U.S. dollars can be used anywhere); see also In re Maxwell Communication Corp. plc, 186 B.R. 807 (S.D.N.Y. 1995) (concluding that the transfers were foreign despite the payment in U.S. dollars).

### vi. Relevant Transaction Conclusion

For the reasons stated above, the Court finds that the transaction at issue in Count IX involving EDC is extraterritorial. [9]

[9]   As analyzed above, the Court concludes that Count IX must be dismissed because §§ 547 and 550 do not apply extraterritorially and the relevant transaction was foreign. Therefore, the Court need not address the substantive arguments regarding that count or the MTS.

### d. Count XV

EDC argues that Count XV, which is brought against Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, UL, GA, and EDC, and seeks disallowance under § 502(d), is defective because it did not file a proof of claim. Motion at 30. EDC asserts that to allege a valid cause of action under § 502(d), a proof of claim must have actually been filed by the creditor whose claim the debtors seek to disallow. Id. (citing

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7658490

45 John Lofts, LLC v. Meridian Capital Group LLC (In re 45 John Lofts, LLC), 599 B.R. 730, 750 (Bankr. S.D.N.Y. 2019); Hill v. LG Funding, LLC (In re Hill), 589 B.R. 614, 630 (Bankr. N.D. Ill. 2018)).

The Trustee responds that dismissal of Count XV against EDC is premature. Opposition at 22. He argues that Yuntian 4 filed various proofs of claims regarding amounts allegedly owed on Plane 12, and EDC made a loan to Yuntian 4 and is the leveraged financier of Plane 12. Id. (citing Complaint ¶ 45). According to the Trustee, the only logical inference is that EDC holds a significant economic interest in the Yuntian 4 proof of claim, and it has done nothing formally to disprove that inference, which must be taken as true. Id. The Trustee contends that if EDC confirmed that it does not have any ownership interest in Yuntian 4's proof of claim, he would dismiss Count XV against EDC. Id. at 22 n.21. According to the Trustee, until EDC disclaims any economic interest in Yuntian 4's proof of claim, he should be allowed to engage in discovery on the merits of Count XV against Yuntian 4 and EDC. Id.

 *15 EDC replies that the Trustee cannot support Count XV because it did not file a proof of claim. Reply at 15. EDC asserts that it expressly and repeatedly represented to the Trustee that it has not asserted any claims against the Debtors, and the Trustee's suppositions amount to frivolous allegations that appear to be interposed solely to harass. Id. at 15-16.

Title 11 U.S.C. § 502(d) provides as follows:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542 [or] 550 ... of this title or that is a transferee of a transfer that is avoidable under section ... 547 [or] 548 ... of this title. ...

For a trustee to plead a § 502(d) claim for disallowance, "a proof of claim must have actually been filed in the case by the creditor whose claim the debtor seeks to disallow." 45 John Lofts, LLC v. Meridian Capital Group LLC (In re 45 John Lofts, LLC), 599 B.R. 730, 750 (Bankr. S.D.N.Y. 2019); see also Hill v. LG Funding, LLC (In re Hill), 589 B.R. 614, 630 (Bankr. N.D. Ill. 2018) (stating that § 502(d) "presupposes that a transferee has filed a proof of claim in a debtor's bankruptcy case"). A disallowance claim is premature if a

defendant has not filed a proof of claim. 45 John Lofts, LLC., 599 B.R. at 750.

The Trustee does not attempt to distinguish 45 John Lofts, and his argument that Count XV should not be dismissed because Yuntian 4 filed proofs of claims regarding Plane 12, and EDC made a loan to Yuntian 4 and is the leveraged financier of Plane 12, is unpersuasive. EDC has not filed a proof of claim and the deadline in which to do so has long since passed. [10] Therefore, Count XV is dismissed.

[10]    The bar date for filing general unsecured claims was 4/16/18. Zetta USA Docket #633.

    e. Leave to Amend
In the Motion, EDC summarily argues that Counts IX and XV should be dismissed without leave to amend. Motion at 2, 3, 32. In the Opposition, the Trustee does not address leave to amend, but he asserts that the Court should deny the Motion. Opposition at 22. In the Reply, EDC summarily argues that the Complaint should be dismissed without leave to amend. Reply at 16.

Federal Rule of Bankruptcy Procedure 7015 provides that Rule 15 of the FRCP applies to supplemental and amended pleadings in bankruptcy cases. Rule 15(a)(2) indicates that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

Courts have the discretion to grant or deny leave to amend a complaint. Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996). "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981). Consequently, the policy to grant leave to amend is applied with "extreme liberality." Id.

Parties seeking leave to amend have the initial burden to show a legitimate reason for seeking amendment. See Foman v. Davis, 371 U.S. 178, 182 (1962); Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 989 F. Supp. 1237, 1241 (N.D. Cal. 1997). Assuming the movant meets that burden, the burden then shifts to the party opposing amendment to show that leave to amend is not warranted. Advanced Cardiovascular Sys., Inc., 989 F. Supp. at 1241 ("Once a party seeking leave to amend has given a legitimate reason for amendment, the burden shifts to the party opposing

amendment to demonstrate why leave to amend should not be granted.") (citing Genentech, Inc. v. Abbott Labs., 127 F.R.D. 529, 530-31 (N.D. Cal. 1989)). The party opposing amendment must demonstrate that the following factors warrant denial of leave to amend:

**\*16** 1. Bad faith;

2. Undue delay;

3. Prejudice to the opposing party; and

4. Futility of amendment.

Ditto v. McCurdy, 510 F.3d 1070, 1079 (9th Cir. 2007) (internal citations omitted); Smith v. Chrysler Corp., 938 F. Supp. 1406, 1412 (S.D. Ind. 1996) ("Defendants have the burden of showing that the amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice.") (internal citations omitted); see also Reed v. Dynamic Pet Prod., 2016 WL 4491597, at \*1 (S.D. Cal. 2016).

Of the factors courts analyze when adjudicating motions for leave to amend, the potential for prejudice to the opposing party "carries the greatest weight." Id. The opposing party has the burden of establishing prejudice. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 187 (9th Cir.1987). Absent prejudice or a strong showing of any of the remaining factors, "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). "For an amendment to be futile, it must appear on its face that it is not actionable." Coble v. Derosia, 2011 WL 444961, at \*4 (E.D. Cal. Feb. 8, 2011).

Because of the policy to grant leave to amend with "extreme liberality," and because there have been no previous amendments, the Court finds that it is appropriate to grant the Trustee leave to amend Count IX and, if EDC files a proof of claim, leave to amend Count XV. See Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineração S.A., 2019 WL 2514056, at \*2-3 (S.D.N.Y. June 18, 2019) (indicating that the defendants' motion to dismiss a previous version of the complaint based "principally" on the presumption against extraterritoriality was denied without prejudice, and the plaintiff was allowed to amend the complaint to add facts that were submitted in support of the plaintiff's opposition to the motion to dismiss; and dismissing the complaint at issue with prejudice because of the plaintiff's "repeated failures to cure" and notice from the court that it would not have another opportunity to sufficiently allege a domestic transaction).

IV. Conclusion
For the reasons stated above, Count IX is dismissed with leave to amend, and Count XV is dismissed with leave to amend, if EDC files a proof of claim. Pursuant to LBR 9021-1(b)(1)(B), EDC must serve and lodge a proposed order via LOU within 7 days of the filing of this memorandum of decision.

**All Citations**

Slip Copy, 2020 WL 7658490

---

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   14

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 99 of 210

2020 WL 7682136
Only the Westlaw citation is currently available.
United States Bankruptcy Court, C.D. California.

IN RE: ZETTA JET USA, INC. Debtor(s).

Jonathan D. King Plaintiff(s),

v.

Export Development Canada, Glove Assets
Investment Limited, Minsheng Business
Aviation Limited, Minsheng Financial Leasing
Co., Ltd., Li Qi, Truly Great Global Limited,
Universal Leader Investment Limited, Yuntian
3 Leasing Company Designated Activity
Company, Yuntian 4 Leasing Company
Designated Activity Company Defendant(s).

Case No.: 2:17-bk-21386-SK
|
Adv No: 2:19-ap-01383-SK
|
Signed 07/29/2020

Attorneys and Law Firms

Ron Bender, John-Patrick M Fritz, Levene, Neale, Bender,
Yoo & Brill L.L.P, Robbin L. Itkin, Sklar Kirsh, Juliet Y. Oh,
Los Angeles, CA, for Debtor(s).

**COURT'S MEMORANDUM OF DECISION
ON: "MOTION TO DISMISS COUNTS I, II,
IV, V, VIII, XIII, XIV, & XV OF ADVERSARY
COMPLAINT," FILED BY UNIVERSAL
LEADER INVESTMENT LIMITED, GLOVE
ASSETS INVESTMENT LIMITED, AND TRULY
GREAT GLOBAL LIMITED, DOCKET #45**

Sandra R. Klein, United States Bankruptcy Judge

**\*1** On 7/22/20, the Court heard the "Motion to Dismiss
Counts I, II, IV, V, VIII, XIII, XIV, & XV of Adversary
Complaint" (Motion), Docket #45, filed by Universal Leader
Investment Limited, Glove Assets Investment Limited, and
Truly Great Global Limited.

Appearances were as noted on the record. All parties were
given an opportunity to be heard. At the conclusion of the
7/22/20 hearing, the Court took the Motion under submission.

A copy of the Court's Memorandum of Decision is attached
hereto.

Before the Court is the "Motion to Dismiss Counts I, II, IV,
V, VIII, XIII, XIV, & XV of Adversary Complaint" (Motion)
filed by Universal Leader Investment Limited (UL), Glove
Assets Investment Limited (GA), and Truly Great Global
Limited (TG, and together with UL and GA, UL/GA/TG). AP
Docket #45. [1] In support of the Motion, UL/GA/TG filed a
"Declaration of Brian Condon" (Condon 12/20/19 Decl.). AP
Docket #45.

[1]    All references to "Zetta USA Docket" are to the
docket in In re Zetta Jet USA, Inc., 17-bk-21386-
SK. All references to "Zetta Singapore Docket"
are to the docket in In re Zetta Jet PTE Ltd., 17-
bk-21387-SK. All references to "AP Docket" are to
the docket in Jonathan D. King v. Yuntian 3 Leasing
Company Designated Activity Company et al., 19-
ap-01383-SK (AP).

On 1/31/20, Jonathan D. King (King), in his capacity as
chapter 7 trustee (Trustee) of Zetta Jet USA, Inc. (Zetta
USA) and Zetta Jet PTE, Ltd. (Zetta Singapore), filed a
"Combined Opposition to Motions to Dismiss Adversary
Complaint by Defendants Yuntian 3 Leasing Company
Limited Designated Activity Company, Yuntian 4 Leasing
Company Limited Designated Activity Company, Minsheng
Business Aviation Limited, Universal Leader Investment
Limited, Glove Assets Investment Limited, and Truly Great
Global Limited" (Opposition). [2] AP Docket #55. In support
of the Opposition, the Trustee filed a "Declaration of John K.
Lyons" (Lyons 1/31/20 Decl.). AP Docket #55.

[2]    The motions to dismiss filed by Yuntian 3 Leasing
Company Limited Designated Activity Company
(Yuntian 3), Yuntian 4 Leasing Company Limited
Designated Activity Company (Yuntian 4), and
Minsheng Business Aviation Limited (Minsheng
Business), are analyzed separately.

On 2/21/20, UL/GA/TG filed: 1) a "Reply in Support of
Motion to Dismiss Counts I, II, IV, V, VIII, XIII, XIV, &
XV of Adversary Complaint" (Reply); 2) a "Supplemental
Declaration of Brian K. Condon" (Condon 2/21/20 Decl.); 3)
a "Declaration of Harprabdeep Singh" (Singh 2/17/20 Decl.);
and 4) a "Declaration of Daniel Chan" (Chan 2/21/20 Decl.).
AP Docket #64.

In re Zetta Jet USA, Inc., Slip Copy (2020)

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 100 of 210

2020 WL 7682136

On 3/23/20, UL/GA/TG filed a "Request for Judicial Notice" (UL/GA/TG RJN), AP Docket #92. On 5/5/20, the Trustee filed a "Limited Omnibus Objection to Requests for Judicial Notice" (Objection to UL/GA/TG RJN), AP Docket #123, and a "Request for Judicial Notice in Support of Trustee's Oppositions to Motions to Dismiss Filed by Defendants" (Trustee RJN). AP Docket #122. On 5/29/20, UL/GA/TG filed a "Reply to Objections to Request for Judicial Notice in Support of Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, and Truly Great Global Limited's Motion to Dismiss Counts I, II, IV, V, VIII, XIII, XIV, & XV of Adversary Complaint" (UL/GA/TG RJN Reply), AP Docket #137.

**\*2** On 7/22/20, the Court held a hearing on the Motion during which counsel for the Trustee and UL/GA/TG appeared and were given an opportunity to be heard. At the conclusion of the hearing, the Court took the Motion under submission. Based on the argument in the pleadings and argument of counsel during the hearing, and for the reasons stated in the analysis below, the Court rules as follows: the Motion is granted regarding Counts I, II, IV, V, VIII, XIII, and XV, with leave to amend, and is denied regarding Count XIV. This memorandum constitutes the Court's findings of facts and conclusions of law regarding the legal sufficiency of the counts at issue in the Motion.

I. Facts

a. Bankruptcy Cases
On 9/15/17, Zetta USA and Zetta Singapore filed chapter 11 petitions (collectively, Cases). Zetta USA Docket #1; Zetta Singapore Docket #1. King was appointed as the chapter 11 trustee, and after the Cases were converted, he was appointed as the chapter 7 trustee. Zetta USA Docket #s 159, 452, 458.

b. Adversary Proceeding
On 9/13/19, the Trustee filed an adversary complaint (Complaint) against: 1) Yuntian 3, 2) Yuntian 4, 3) Minsheng Financial Leasing Co., Ltd. (Minsheng Financial),[3] 4) Minsheng Business, 5) Export Development Canada (EDC), 6) UL, 7) GA, 8) TG, and 9) Li Qi (collectively, the Defendants), which alleges that Zetta Singapore was formed and run by a con artist, Geoffrey Cassidy (Cassidy), who, over a two-year period, with the help of the Defendants, obtained $10 million from kickbacks, bribes and embezzlement, while saddling the Debtors with almost $500,000,000 in

unsustainable debt incurred by purchasing overpriced aircraft in a down market. AP Docket #1.

[3]    Minsheng Financial was served on 6/4/20. AP Docket #143.

The Complaint contains the following counts, which are at issue in this Motion:

1) Avoidance and Recovery of Fraudulent Transfers (2015 Acquisitions), under 11 U.S.C. §§ 548 and 550, against UL, GA, and Li Qi (Count I);

2) Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7), under 11 U.S.C. §§ 548 and 550, against Li Qi, UL, GA, Yuntian 3, Minsheng Financial, and Minsheng Business (Count II);

3) In the Alternative, Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers), under 11 U.S.C. §§ 547 and 550, against Li Qi, UL, and GA (Count IV);

4) In the Alternative, Avoidance and Recovery of Preference Transfer ($55 Million Transfer), under 11 U.S.C. §§ 547 and 550, against Li Qi and UL (Count V);

5) Avoidance and Recovery of Preference Transfers (Interest Payment Transfers), under 11 U.S.C. §§ 547 and 550, against UL and Li Qi (Count VIII);

6) Recharacterization of the Third Investment as Equity Interest, under 11 U.S.C. § 105(a), against UL (Count XIII);

7) Violation of the Automatic Stay, under 11 U.S.C. § 362, against TG and Li Qi (Count XIV); and

8) Disallowance of Claims, under 11 U.S.C. § 502(d), against Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, UL, GA, and EDC (Count XV).

Complaint ¶¶ 167-95, 210-37, 257-69, 308-21.

II. Legal Standards

a. Motions to Dismiss Generally
Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP or Rules) applies in adversary proceedings and provides that a party may assert the defense of "failure to state a claim upon which relief can be granted." Fed. R. Bankr. P. 7012(b); In re Kvassay, 2014 WL 2446181, at \*9 (B.A.P. 9th Cir. May 30,

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 101 of 210

2014). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001); Student Loan Mktg. Ass'n v. Hanes, 181 F.R.D. 629, 634 (S.D. Cal. 1998). "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)).

*3 In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, and accept all well-plead factual allegations as true. Johnson, 534 F.3d at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001). The Court, however, is not bound by conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." Id. at 562 (emphasis in original) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).

In Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Supreme Court elaborated on the Twombly standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

The allegations of a complaint, along with other materials properly before the court on a motion to dismiss, can establish an absolute bar to recovery. See Weisbuch v. Cty. of L.A., 119 F.3d 778, 783 n.1 (9th Cir. 1997) ("If the pleadings establish facts compelling a decision one way, that is as good

as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts."). Generally, when ruling on a Rule 12(b)(6) motion to dismiss, courts cannot consider material outside the pleadings. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018); Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001). If matters outside of the pleadings are "presented to and not excluded by the court," the motion to dismiss is converted to a motion for summary judgment under Rule 56 and all parties must be given a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are, however, two exceptions to this rule: 1) matters that the Court can take judicial notice of under Rule 201 of the Federal Rules of Evidence; and 2) the "incorporation-by-reference doctrine, which treats certain documents as if they were "part of the complaint itself." Khoja, 899 F.3d at 999, 1002.

The party seeking dismissal under Rule 12(b)(6) has the burden of proof. In re Reed, 532 B.R. 82, 88 (Bankr. N.D. Ill. 2015); In re Enron Corp., 316 B.R. 434, 449 (Bankr. S.D.N.Y. 2004).

### III. Arguments and Analysis

#### a. RJN

In the UL/GA/TG RJN, UL/GA/TG request that the Court take judicial notice of numerous documents filed in the Cases and in the related adversary proceedings. UL/GA/TG RJN at 3-5. The Trustee responds that UL/GA/TG do not adequately identify what they seek to have judicially noticed, and many requests seek judicial notice of disputed facts or conclusions allegedly contained in or drawn from public documents, which is improper under Ninth Circuit law. Objection to UL/GA/TG RJN at 2, 4 (citing Baird v. BlackRock Inst. Tr. Co. NA, 403 F. Supp. 3d 765, 774 (N.D. Cal. 2019); Segura v. Felker, 2010 WL 5313770, at *2 n.1 (E.D. Cal Dec. 20, 2010)). The Trustee objects to the requests to the extent that they do not merely seek judicial notice of the existence or filing of the documents themselves. Id. at 2. UL/GA/TG reply that the Court should overrule each of the Trustee's objections because: 1) they sufficiently identified the facts to be noticed; 2) the documents will aid the Court in ruling on the Motion; 3) the cited facts are not reasonably subject to dispute; and 4) the Court may take judicial notice of its own docket. UL/GA/TG RJN Reply at 3-11.

*4 Under Federal Rule of Evidence (FRE) 201, the Court can take judicial notice of "a fact that is not subject to

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
In re Zetta Jet USA, Inc., Slip Copy (2020)    Exhibit A -- Unpublished Cases    Page 102 of 210

2020 WL 7682136

reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In re James, 300 B.R. 890, 894 (Bankr. W.D. Tex. 2003). The burden is on the party requesting judicial notice. Id. (ruling that the party requesting judicial notice has the burden of persuading the Court that the fact is "appropriate for judicial notice").

The Court can take judicial notice of the fact that undisputed matters of public record were filed or recorded. Lee v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001); C.B. v. Sonora Sch. Dist., 691 F. Supp.2d 1123, 1138 (E.D. Cal. 2009) ("The Court may take judicial notice of matters of public record, including duly recorded documents, and court records available to the public through the PACER system via the internet."). And, the Court may take judicial notice of its own docket. In re Tuma, 916 F.2d 488, 491 (9th Cir. 1990) ("We may take judicial notice of bankruptcy records in the underlying proceeding.").

Of the documents that UL/GA/TG requested that the Court take judicial notice of, the Court only considered UL's and GA's proofs of claims. Proofs of Claims #s 94, 95; UL/GA/TG RJN at 5. The Court can take judicial notice of the fact that these proofs of claims were filed, but the Trustee is correct, it cannot take judicial notice of any of the facts stated or alleged in those documents. [4] In re Eckert, 485 B.R. 77, 81 (Bankr. M.D. Penn. 2013) ("A bankruptcy judge may take judicial notice of his or her own docket. ... However, the truth of the contents of those records is not inferred by a judge taking judicial notice of the records."); In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008) ("[W]hile the Court *may* take judicial notice of the fact that a document or pleading has been filed for certain purposes, [citation], it does not necessarily take judicial notice of the facts contained within the pleading. Admission into evidence of facts contained within a pleading filed with a court must also be evaluated using the remaining evidentiary rules ....").

[4]     Similarly, the Court can take judicial notice of the proofs of claims filed in the Cases that are mentioned in the unopposed Trustee RJN 2-3. The Court, however, cannot take judicial notice of any facts stated or alleged in those documents.

b. Incorporation by Reference
The "incorporation-by-reference" doctrine treats certain documents as if they were "part of the complaint itself." Khoja

v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018). The incorporation by reference doctrine permits courts "to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005) (citations and internal quotations omitted). A defendant may offer such a document, and the court may treat it as part of the complaint, and may assume that its contents are true for purposes of a 12(b)(6) motion to dismiss. U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). The incorporation by reference doctrine is designed to prevent "artful pleading by plaintiffs," who select only portions of documents that support their claims and omit portions of those very documents that weaken —or "doom"—their claims. Khoja, 899 F.3d at 1002-03.

**\*5** In support of their positions, both sides relied extensively on documents that were not attached to the Complaint. The Court relies on the following exhibits attached to and authenticated by:
1) The Condon 12/20/19 Decl.:

a. ¶ 3 Ex. A (12/29/15 "Master Aircraft Finance Lease Agreement" for Plane 6 with Wells Fargo as trustee and Lessor, Zetta Singapore as Lessee, and GA as Beneficiary),[5]

b. ¶ 4 Ex. B (12/29/15 "Supplemental No 1 Aircraft Finance Lease Purchase Option Agreement" for a plane with msn 9688 (Plane 6) with Wells Fargo as trustee and Lessor, Zetta Singapore as Lessee, and GA as Beneficiary),[6]

c. ¶ 5 Ex. C (12/31/15 "Master Aircraft Finance Lease Agreement" for Plane 7 with Wells Fargo as trustee and Lessor, Zetta Singapore as Lessee, and UL as Beneficiary),[7]

d. ¶ 6 Ex. D (12/31/15 "Supplemental No 1 Aircraft Finance Lease Purchase Option Agreement" for a plane with msn 9606 (Plane 7) with Wells Fargo as trustee and Lessor, Zetta Singapore as Lessee, and UL as Beneficiary),[8]

e. ¶ 7 Ex. E (9/20/16 "Sale and Leaseback Purchase Agreement" for a plane with msn 9688 with Wells Fargo as trustee and Seller, GA as Beneficial Owner, Wells Fargo as trustee and Buyer, and TVPX as trustee and Lessee),[9]

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

f. ¶ 8 Ex. F (9/20/16 "Sale and Leaseback Purchase Agreement" for a plane with msn 9606 with Wells Fargo as trustee and Seller, UL as Beneficial Owner, Wells Fargo as trustee and Buyer, and TVPX as trustee and Lessee), [10]

g. ¶ 9 Ex. G (2017 "Confirmatory Deed of Loan" between Zetta Singapore as Borrower and UL as Lender). [11]

2) The Torborg 12/9/19 Decl. [12] :

a. ¶ 14 Ex. J (9/20/16 $40 million invoice for the sale of an aircraft with msn 9606, with Wells Fargo as trustee for UL as Seller and Wells Fargo as trustee for Yuntian 3 as Buyer), [13]

b. ¶ 15 Ex. K (9/20/16 $40 million invoice for the sale of an aircraft with msn 9688 with Wells Fargo as trustee for GA as Seller and Wells Fargo as trustee for Yuntian 3 as Buyer), [14]

c. ¶ 16 Ex. L (9/19/16 "Payment Instructions – MSN 9606" addressed to IATS), [15]

d. ¶ 17 Ex. M (9/19/16 "Payment Instructions – MSN 9688" addressed to IATS), [16]

e. ¶ 20 Ex. P (9/19/16 "Outward Remittance Advice," showing a $40 million transfer from Minsheng Business to IATS), [17]

f. ¶ 21 Ex. Q (9/19/16 "Outward Remittance Advice," showing a $40 million transfer from Minsheng Business to IATS). [18]

The Complaint references and relies on each of these exhibits. Therefore, consideration of this evidence is appropriate and does not convert this motion into a motion for summary judgment.

[5]    Complaint ¶ 86.

[6]    Complaint ¶ 86.

[7]    Complaint ¶ 82.

[8]    Complaint ¶ 82.

[9]    Complaint ¶ 108.

[10]    Complaint ¶ 108.

[11]    Complaint ¶ 311.

[12]    In the Opposition, the Trustee responds to the UL/GA/TG Motion as well as the Y3/Y4 Motion, relies on many documents attached to the Torborg 12/9/19 Decl., which were submitted in support of the Y3/Y4 Motion, and does not challenge the authenticity of any documents attached to the Torborg 12/9/19 Decl. Therefore, the Court believes that it is appropriate to incorporate by reference certain documents attached to the Torborg 12/9/19 Decl., which are relevant to the analysis of the UL/GA/TG Motion.

[13]    Complaint ¶ 108.

[14]    Complaint ¶ 108.

[15]    Complaint ¶ 106.

[16]    Complaint ¶ 106.

[17]    Complaint ¶ 106.

[18]    Complaint ¶ 106.

**\*6** In support of the Opposition, the Trustee submitted a number of documents attached to and authenticated by the Lyons 1/31/20 Decl. The Trustee, however, presented no authority—and the Court was unable to locate any—indicating that it would be appropriate for the Court to consider documents submitted by the plaintiff when ruling on a motion to dismiss. Therefore, the Court will not consider any documents attached to the Lyons 1/31/20 Decl. because it believes that doing so would be an improper application of the incorporation by reference doctrine. See U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003) (stating that *defendants* may offer documents to be incorporated by reference) (emphasis added).

c. The Extraterritorial Application of 11 U.S.C. §§ 105, 502, 547, 548, and 550

UL/GA/TG assert that the Bankruptcy Code provisions on which the Trustee relies do not apply extraterritorially to the transactions at issue in the Complaint. Motion at 12. They argue that relevant conduct involved: 1) financing of Zetta Singapore, a Singapore company, by foreign entities from China and the British Virgin Islands (BVI); 2) using funds transferred from an account in Singapore to an

2020 WL 7682136

account in Hong Kong; and 3) contracts governed by the laws of Singapore, the United Kingdom and Hong Kong. Id. The Trustee responds that the presumption against extraterritoriality does not require dismissal of the Complaint because: 1) the Bankruptcy Code's avoidance statutes apply extraterritorially; 2) the presumption does not apply when the conduct occurs within the United States, and the parties here structured their aircraft transactions to "close through the United States" to obtain FAA registration and operate the planes under Zetta USA's Part 135 Certificate; and 3) the underlying obligations that the Trustee seeks to avoid were incurred in the United States: all payments were in U.S. dollars and were made through U.S. correspondent banks. Opposition at 23-24. The Trustee asserts UL and GA waived the presumption against extraterritoriality by filing proofs of claim. Id. at 23.

UL/GA/TG reply that the avoidance and recharacterization claims cannot be applied to the foreign transactions at issue in the Complaint. Reply at 12. They highlight "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Id. (quoting Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010)). According to UL/GA/TG, there is "no room" for the Trustee to disregard Morrison by arguing "context" and offering his opinion regarding policy considerations or importing from different Bankruptcy Code provisions to extend his avoidance powers to foreign transactions. Id. at 13.

### 1. The Presumption Against the Extraterritorial Application of Federal Law

"Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2100 (2016). The question is not whether a court thinks "Congress would have wanted" a statute to apply to foreign conduct "if it had thought of the situation before the court" but whether Congress has "affirmatively and unmistakably instructed that the statute will do so." Id. "When a statute gives no clear indication of an extraterritorial application, it has none." Id. (quoting Morrison v. National Australia Bank Ltd., 561 U.S. 247, 255 (2010)).

The Supreme Court has announced a two-step framework for analyzing extraterritoriality issues. First, courts analyze whether "the presumption against extraterritoriality has been rebutted—that is whether the statute provides a clear,

affirmative indication that it applies extraterritorially." Id. at 2101. Second, courts examine a statute's "focus" to determine whether the case involves a domestic application. Id. If the relevant conduct occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the relevant conduct occurred in a foreign country, then the case involves an impermissible extraterritorial application even though some conduct occurred in the United States. Id.

### 2. The Language of the Statutes – 11 U.S.C. §§ 105, 502, 547, 548, and 550

**\*7** UL/GA/TG contend that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Motion at 16 (quoting Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010)). They assert that a statute applies extraterritorially only if Congress has provided "clear" and "affirmative" indications that it governs foreign transactions. Id. (citing Morrison, 561 U.S. at 265). According to UL/GA/TG, if one part of a statute expressly applies extraterritorially and another part is silent regarding its extraterritorial application, courts should not presume that the latter provision's silence means that it applies extraterritorially. Id.

UL/GA/TG note that the Trustee seeks to avoid and recharacterize foreign transactions under §§ 547, 548, 550, 502 and 105. Id. at 16. They contend that §§ 547 and 548 allow trustees to avoid transfers of "an interest of the debtor in property," § 502 provides that courts can disallow claims that are avoidable under §§ 547 and 548, and § 550 allows a trustee to recover transfers avoided under §§ 547 and 548. Id. But, UL/GA/TG assert that none of these sections reference extraterritorial application. Id.

They contrast these sections of the Bankruptcy Code with § 541, which expressly states that when a bankruptcy case is filed, an estate is created that includes all of the debtor's property, "*wherever located* and by whomever held." Id. at 16-17 (emphasis in original) (quoting 11 U.S.C. § 541). According to UL/GA/TG, courts have repeatedly held that Congress' silence in §§ 547, 548, 550, and 502 regarding extraterritoriality means that Congress did not intend them to apply abroad. Id. at 17 (citing In re CIL Ltd., 582 B.R. 46, 92 (Bankr. S.D.N.Y.2018); In re Ampal-Am. Israel Corp., 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017); In re Bankr. Estate of Midland Euro Exch. Inc., 347 B.R. 708, 718 (Bankr. C.D.

Cal. 2006); In re Maxwell Commc'n Corp. plc, 186 B.R. 807, 820-21 (S.D.N.Y. 1995)). They acknowledge that a minority of courts, none of which are in the Ninth Circuit, have held that property subject to avoidance under §§ 547 and 548 is included in § 541's definition of estate property. Id. But, they indicate that In re Bankr. Estate of Midland Euro Exch. Inc., 347 B.R. 708 (Bankr. C.D. Cal. 2006), rejected this position and courts in this Circuit have repeatedly held that property subject to avoidance is not property of the estate when a case is filed. Id. at 17-18 (citing In re Huber, 2013 WL 6184986, at *3 (Bankr. W.D. Wash. Nov. 25, 2013); In re Fehrs, 391 B.R. 53, 72 (Bankr. D. Idaho 2008)).

UL/GA/TG also argue that in Count XIII, the Trustee seeks to recharacterize a loan from UL to Zetta Singapore as equity under 11 U.S.C. § 105(a), but that section of the Bankruptcy Code contains no reference to extraterritoriality. Id. at 18. They contend that Congress has not clearly indicated an intent to grant bankruptcy courts a "free-floating ability to recharacterize loans made anywhere in the world," and the Court must presume that § 105(a) applies only domestically. Id.

The Trustee counters that there is no "clear statement rule" to determine congressional intent, and context can be consulted. Opposition at 24 (citing Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 265 (2010); WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018); In re French, 440 F.3d 145, 150 (4th Cir. 2006); In re Lyondell Chem. Co., 543 B.R. 127, 151 (S.D.N.Y. 2016)). According to the Trustee, Congress's intent to apply the Bankruptcy Code's avoidance sections extraterritorially is "evident" in its text and overall statutory scheme. Id. The Trustee highlights that § 541(a) defines property of the estate as all "interests of the debtor in property ... wherever located and by whomever held," which he argues demonstrates that a bankruptcy trustee is vested with title of the bankrupt in property which is located domestically and abroad. Id. (citing French, 440 F.3d at 151). The Trustee asserts that Congress intended § 548 to apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located. Id. at 24-25 (citing French, 440 F.3d at 151; Lyondell, 343 B.R. at 151-55; Sec. Investor Protection Corp. v. Madoff Inv. Sec. LLC, 480 B.R. 501, 527 (Bankr. S.D.N.Y. 2012) (Madoff I); In re FAH Liquidating Corp., 572 B.R. 117, 124 (Bankr. D. Del. 2017)).

**\*8** The Trustee argues that Midland Euro is not binding authority, and the Ninth Circuit has not considered the

extraterritorial application of §§ 547, 548, and 550. Id. at 25 (citing Camreta v. Greene, 363 U.S. 692, 709 n.7 (2011)). And, the Trustee claims that Midland Euro conflicts with French and both Madoff I and Lyondell rejected Midland Euro and followed French. Id. The Trustee highlights that the court in Madoff I explained that Midland Euro "misunderstood French's holding," and § 548's reference to § 541 shows Congress' intent to grant the Trustee authority to avoid and recover all transfers that would have been property of the estate—even if not currently property of the estate—including "assets fraudulently transferred overseas." Id. (citing Madoff I).

The Trustee argues that it is "hard to believe" that Congress intended the Bankruptcy Code to apply extraterritorially regarding property of the estate, but not regarding what would have been property of the estate but for a fraudulent transfer. Id. (citing Lyondell, 543 B.R. at 154). The Trustee notes that Congress's failure to apply § 548 to transfers outside of the United States creates a "loophole" for "unscrupulous debtors" to transfer their assets to shell entities abroad and avoid the Bankruptcy Code's reach. Id. (citing Midland Euro, 347 B.R. at 718). The Trustee questions why courts should "ascribe bad policy" to Congress and determine that United States avoidance laws do not apply when courts can apply United States laws "as Congress would wish." Id. at 25-26 (citing Jay Lawrence Westbrook, Avoidance of Pre-Bankruptcy Transactions in Multinational Bankruptcy Cases, 42 Tex. Int'l L.J. 899, 910 (2007)).

In the Reply, UL/GA/TG contend that Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010), altered how courts analyze whether a statute is intended to apply extraterritorially and whether the facts of a particular case result in an extraterritorial application of a statute. Reply at 14. They contend that Morrison requires courts to presume that a statute does not apply extraterritorially unless it affirmatively indicates that it does. Id. at 15. If a statute is silent about extraterritorial application, courts should conclude that it does not apply extraterritorially. Id.

UL/GA/TG claim that the Trustee "misleadingly quotes" Morrison, but the Supreme Court did not hold that there is "no clear statement rule" to determine Congress' intent. Id. Instead, they assert that Morrison stated that "we do not say ... that the presumption against extraterritoriality is a 'clear statement rule,' *if by that is meant* a requirement that a statute say 'this law applies abroad.' " Id. (emphasis in original) (citing Morrison, 561 U.S. at 265). They contend

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 106 of 210

In re Zeta Jet USA, Inc., Slip Copy (2020)

2020 WL 7682136

that apart from this "caveat," the Supreme Court stated that the presumption against extraterritoriality means that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." Id.

UL/GA/TG assert that the Trustee incorrectly argues that the Court can consult "context" and "transmute" § 541(a)'s extraterritorial application into a broader and unstated Congressional intent that other bankruptcy statutes also apply extraterritorially. Id. at 15-16. But, they argue that these context arguments have been rejected by Morrison. Id. According to UL/GA/TG, "the presumption against extraterritoriality must be applied separately" to each statute at issue. Id. at 16 (quoting RJR Nabisco Inc. v. European Cmty., 136 S. Ct. 2090, 2108 (2016). They contend that the Fourth Circuit's conflation of §§ 541 and 548 in French is "fatally undermined" by RJR Nabisco. Id. at 17. UL/GA/ TG argue that Congress' failure to include "property subject to avoidance" in § 541 or to express clear intent to treat avoidance provisions as extraterritorial means that Congress had "no such intent." Id. They contend that In re Lyondell Chem. Co., 543 B.R. 127, 154 (Bankr. S.D.N.Y. 2016), improperly followed French and a law review article, which are contrary to Morrison. Id. at 17-18. UL/GA/TG highlight that the Court should not try to discern what Congress "would wish" because there is a paramount policy of preserving a "stable background against which Congress can legislate," which requires courts to presume that Congress did not intent to act extraterritorially. Id. at 18 (citing Morrison, 561 U.S. at 261). UL/GA/TG conclude that the Trustee did not attempt to rebut their showing that Count XIII, the recharacterization claim under § 105, applies extraterritorially. Id.

**\*9** Title 11 United States Code § 547(b) provides that a trustee may avoid "any transfer of an interest of the debtor in property" to or for the benefit of a creditor, for or on account of an antecedent debt, made on or within 90 days before the petition date, while the debtor was insolvent, and which enables the creditor to receive more than it would if the case were a chapter 7, the transfer had not been made, and the creditor received payment under the Bankruptcy Code.

Title 11 United States Code § 548(a)(1) provides that a trustee may avoid any transfer of "an interest of the debtor in property" made or incurred by the debtor within two years of the petition date if the debtor: A) acted with the intent to hinder, delay or defraud, or B) received less than reasonably equivalent value and: i) was insolvent on the date of the transfer or became insolvent because of the transfer; ii) was

engaged in business or about to engage in business for which any property remaining was an unreasonably small capital; or iii) intended to incur or believed that it would incur debts beyond its ability to repay.

Title 11 United States Code § 550 provides that if a transfer is avoided under §§ 547 and 548, the trustee may recover for the benefit of the estate the property transferred.

Neither the Supreme Court nor the Ninth Circuit has addressed whether §§ 547 or 548 apply extraterritorially and there is disagreement among the lower courts regarding the issue. [19] The majority of cases, which follow Midland Euro, hold that §§ 547 and 548 do not have extraterritorial application. See In re Estate of Midland Euro Exch. Inc., 347 B.R. 708 (Bankr. C.D. Cal. 2006) (declining to apply § 548 extraterritorially); In re Sherwood Investments Overseas Ltd., Inc., 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) (same); In re CIL Ltd., 582 B.R. 46 (Bankr. S.D.N.Y. 2018) (same); Madoff II, 513 B.R. 222 (S.D.N.Y. 2014), rev'd on other grounds, 917 F.3d 85 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277) (same); In re Maxwell Communication Corp. plc, 186 B.R. 807 (S.D.N.Y. 1995) (predating Midland Euro and declining to apply § 547 extraterritorially); In re Ampal-Am. Israel Corp., 562 B.R. 601 (Bankr. S.D.N.Y. 2017) (declining to apply § 547 extraterritorially). A minority of courts, which follow French, hold that Congress intended § 548 to apply extraterritorially. See In re French, 440 F.3d 145 (4th Cir. 2006) (applying § 548 extraterritorially); In re Lyondell Chem. Co., 543 B.R. 127 (Bankr. S.D.N.Y. 2016) (same); In re FAH Liquidating Corp., 572 B.R. 117 (Bankr. D. Del. 2017) (same); Sec. Investor Protection Corp. v. Madoff Inv. Sec. LLC, 480 B.R. 501 (Bankr. S.D.N.Y. 2012) (same and accusing the Midland Euro court of "misunderstanding" French).

[19]    The cases that address extraterritoriality often do not distinguish between §§ 547 and 548 because the relevant language is the same in both statutes. In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 244 n.6 (Bankr. S.D.N.Y. 2017) (noting that both §§ 547 and 548 allow a trustee "avoid any transfer of an interest of the debtor in property").

In French, George W. Liebmann (Liebmann), the chapter 7 trustee for Betty Irene French's estate (BIF), filed a § 548(a)(1)(B) avoidance action against BIF's children, Randy Lee French (RLF) and Donna Marie Shaka (DMS), to whom

she had transferred a house in the Bahamas. In re French, 440 F.3d 145, 148 (4th Cir. 2006). BIF bought the house in 1976 and gifted it to RLF and DMS in Maryland in 1981, but they did not record the deed until "mid-2000," after BIF's financial problems began. Id. BIF's creditors filed an involuntary chapter 7 petition against her in October 2000, and a few years later, Liebman filed an avoidance action against RLF and DMS, alleging that the transfer of the Bahamas house was a constructively fraudulent transfer. Id. RLF and DMS moved to dismiss, arguing among other things that § 548 did not apply because of the presumption against extraterritoriality. Id. at 149. The bankruptcy court rejected this argument, the district court affirmed, and RLF and DMS appealed. Id.

**\*10** The Fourth Circuit found that "several indicia of congressional intent" rebutted the presumption against extraterritoriality: 1) § 541 defines "property of the estate" broadly as all of the debtor's property "wherever located," which includes foreign and domestic property; 2) § 548 allows a trustee to avoid certain transfers of "interest[s] of the debtor in property;" and 3) Congress "incorporat[ed]" the language of § 541 to define what property a trustee may recover under his or her § 548 avoidance powers. Id. at 151-52. According to the Fourth Circuit, Congress manifested its intent that § 548 apply to all property that, absent a prepetition transfer, *would have been* "property of the estate," before the transfer in question, even if the property was not "property of the estate" *now*. Id. at 151 (emphasis in original).

Midland Euro involved a § 548 and § 550 action filed by Christopher Barclay (Barclay), the chapter 7 trustee for the consolidated estate of Midland Euro, Inc. (MEI), Midland Euro Exchange, Inc. (MEEI), Midland Group, Inc. (MGI), and other related entities (collectively Midland Entities), to set aside $897,000 they paid to the Swiss Financial Corporation, Ltd. (SFC), a foreign exchange brokerage. In re Estate of Midland Euro Exch. Inc., 347 B.R. 708, 710-11 (Bankr. C.D. Cal. 2006) (Mund, J.). MGI was a Barbados corporation set up to hold proceeds of a Ponzi scheme, and it opened a trading account with SCF, which was formed under English law and headquartered in London. Id. at 712. The Midland Entities transferred $1 million from MEEI's Lloyd's Bank account in London to SFC's HSBC Bank account in New York. Id. at 713. Then, SFC transferred those funds to an unspecified bank account in England and took $897,000. Id. After involuntary bankruptcy petitions were filed against the Midland Entities, Barclay sued SFC. Id.

SFC moved to dismiss the complaint, arguing, among other things, that based on the plain language of § 548, Congress did not intend for it to apply extraterritorially. Id. at 711, 715. Barclay countered that Congress intended to apply § 548 extraterritorially, arguing that a decision otherwise would create a "loophole" in the Bankruptcy Code by allowing unscrupulous debtors to hide their assets abroad and outside the reach of the United States bankruptcy system. Id. at 711, 718.

The court granted SFC's motion to dismiss, observing that nothing in § 548's text demonstrated that Congress intended it to apply extraterritorially. Id. at 717, 720. The court then examined § 541 in conjunction with § 548, to determine whether it showed congressional intent to apply the latter extraterritorially. Id. at 717-18. The court noted that there was a split of authority regarding whether "property of the estate" defined in § 541 includes property that could be, but had not yet been, recovered as a fraudulent transfer. Id. It held that allegedly fraudulent transfers do not become property of the estate until they are avoided. Id. (citing In re Saunders, 101 B.R. 303, 304-05 (Bankr. N.D. Fla. 1989); FDIC v. Hirsch (In re Colonial Realty Co., 980 F.2d 125, 131 (2d Cir. 1992); Dunes Hotel Assocs. v. Hyatt Corp., 245 B.R. 492, 504-05 (D.S.C. 2000)).

The court recognized that policy considerations favored extraterritorial application of § 548 because failing to extend § 548 to extraterritorial transfers creates a "loophole" for unscrupulous debtors to freely transfer their assets to shell entities abroad. Id. at 718. But, the court balanced this policy concern with the presumption against extraterritoriality's purpose to protect against unintended clashes between American law and other nations' laws, which could result in "international discord." Id. And, it noted that in the Ninth Circuit, policy concerns alone are insufficient to overcome the presumption against extraterritoriality. Id. (citing Subafilms, Ltd. v. MGM-Pathe Communications Co., 24 F.3d 1088, 1096 (9th Cir. 1994) (en banc)).

**\*11** The court in Midland Euro took issue with a "logical leap" made by the Fourth Circuit in French, that by "incorporating" the language of "§ 541 to define what property a trustee may recover," § 548 allows a trustee to avoid any transfer of property that "*would have been*" property of the estate before the transfer in question. Id. at 718-19 (emphasis in original). The court stated that this reasoning "presumes" that the debtor retains a "legal or equitable" interest in the property that was transferred

2020 WL 7682136

prepetition and ignores the language of §§ 541(a)(1) and (a) (3) that the debtor must have an interest in the property "as of the commencement of the case" and that property of the estate includes "any interest in property that the trustee *recovers* under" § 550. Id. at 719 (emphasis in original). According to the court in Midland Euro, the Bankruptcy Code is "very clear to any ordinary reader": fraudulently transferred property only becomes property of the estate when the transfer has been set aside. Id. The court described French's methodology as "unclear and convoluted" and noted having a "great deal of trouble" following it. Id. The court concluded by suggesting that the "true reason" the Fourth Circuit extended extraterritorial application to § 548 was because it sought to uphold the "purposes" of the Bankruptcy Code's avoidance provisions to prevent debtors from illegitimately disposing of property that should be available to their creditors. Id. The court reiterated, however, that in the Ninth Circuit, policy considerations alone are not valid grounds for overcoming the presumption against extraterritoriality. Id. (citing Subafilms, Ltd. v. MGM-Pathe Communications Co., 24 F.3d 1088, 1096 (9th Cir. 1994)).

The Trustee urges the Court to adopt French's holding that Congress intended to apply the Bankruptcy Code's avoidance provisions extraterritorially but the Court agrees with Judge Mund that French's reasoning is "convoluted" and hard to follow. Midland Euro, 347 B.R. at 719. If Congress "clearly," "affirmatively," and "unmistakably" intended §§ 547 and 548 to apply extraterritorially, it would not have expressed its intent in such an unclear way as the court in French thought, which has led to such disagreement among the courts.

According to the Trustee, "[t]here is no 'clear statement rule' to determine Congressional intent, rather, 'context can be consulted as well.' " Opposition at 24 (quoting Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 265 (2010); citing WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018); French, 440 F.3d at 150; In re Lyondell Chem. Co., 543 B.R. 127, 151 (S.D.N.Y 2016)). He argues that Congress's intent to apply the Bankruptcy Code's avoidance and recovery provisions extraterritorially is evident from its text and overall statutory scheme, citing § 541(a)(1), which defines estate property as all "interests of the debtor in property ... wherever located and by whomever held." Id. The Trustee, however, selectively quotes from Morrison, which states:

[W]e do not say, as the concurrence seems to think, that the presumption against extraterritoriality is a "clear statement rule," if by that is meant a requirement that a statute say "this law applies abroad." Assuredly context can be consulted as well.

Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 265 (2010) (internal citations omitted). According to the Supreme Court, "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms," and "the presumption against extraterritoriality must be applied separately" to each statutory provision. Morrison, 561 U.S. at 265; RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2108 (2016) (stating that "the presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action"). Therefore, to the extent that the Trustee advocates that the Court consider § 541(a)(1) to define the property that he can avoid under § 548, the Court declines to do so.

Finally, the Trustee urges the Court to adopt French for policy reasons, but there are a number of problems with this request. First, the question is not whether "Congress *would have wanted*" a statute to apply to foreign conduct if it had thought of the situation before the court, but whether Congress "affirmatively and unmistakably" instructed that the statute will do so. RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2100 (2016) (emphasis added). Second, in the Ninth Circuit, policy considerations alone do not overcome the presumption against extraterritoriality. Subafilms, Ltd. v. MGM-Pathe Communications Co., 24 F.3d 1088, 1096 (9th Cir. 1994) (rejecting the argument that the presumption against extraterritoriality can be overcome if there would be "adverse effects within the United States" and indicating that the "ultimate touchstone of extraterritoriality" is determining Congress' intent); Midland Euro, 347 B.R. at 719 (stating that in the Ninth Circuit, policy considerations alone are insufficient to overcome the presumption against extraterritoriality). And finally, it is for Congress, and not the courts, to weigh good and bad policy regarding the extraterritorial application of §§ 547 and 548. See Midland Euro, 347 B.R. at 720 (indicating that "Congress is the ultimate arbiter of the laws it enacts and it has the power

2020 WL 7682136

to alter the language of the statute to clearly manifest its intent"). [20]

[20]    In a footnote, the Trustee contends that Midland Euro did not consider § 541(a)(3). Id. at 26 n.13 (citing Jay Lawrence Westbrook, Avoidance of Pre-Bankruptcy Transactions in Multinational Bankruptcy Cases, 42 Tex. Int'l L.J. 899, 908 (2007)). As discussed above, it did.

**\*12**  UL/GA/TG highlight that § 502, which is at issue in Count XV, contains no extraterritorial language. Motion at 17, 18. Section 502 provides that "the court shall disallow any claim of any entity from which property is recoverable under section ... 550 ... of this title or that is a transferee of a transfer avoidable under section ... 547 [or] 548 ... of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section ... 550 ... of this title." 11 U.S.C. § 502(d). The Trustee does not provide any analysis or authority to show that § 502 applies abroad.

Likewise, § 105(a), which is at issue in Count XIII, indicates that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title ... shall be construed to preclude the court from ... making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

As UL/GA/TG note, § 105 contains no extraterritorial reference, and the Trustee does not argue that § 105(a) has extraterritorial application. Motion at 18.

   3. Relevant Transactions
UL/GA/TG claim that each of the UL and GA transactions was extraterritorial. [21] Motion at 18. They argue that a trustee cannot establish domestic application of a statute merely by highlighting some U.S-based conduct. Id. at 18-19 (citing Morrison, 561 U.S. at 266-67; CIL Ltd., 582 B.R. at 95). They

contend that the focus of §§ 547 and 548 is the fraudulent transfer of property rather than any conduct occurring before or after the transfer. Id. at 19 (citing In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 99 (2d Cir. 2019), petition for cert. denied (U.S. June 1, 2020) (No. 19-277); In re Fitness Holdings Int'l, Inc., 714 F.3d 1141, 1147 (9th Cir. 2013); Ampal, 562 B.R. at 613).

[21]    The analysis includes only the facts alleged in the Complaint regarding UL, GA, and TG.

UL/GA/TG argue that the following transactions alleged in the following counts were foreign:

1) Count I – 11 U.S.C. §§ 548 and 550 (Avoidance and Recovery of Fraudulent Transfers (2015 Acquisitions): six transfers for Planes 6 and 7 between 1/28/16 and 7/7/16, totaling approximately $11.9 million, from Zetta Singapore's Singapore account, to UL's Hong Kong account, half of which were made for the benefit of GA. Complaint ¶¶ 85, 175-77, Sch. E; Condon 12/20/19 Decl. ¶¶ 4, 6 Exs. B § 3.26, D § 3.26.

2) Count II – 11 U.S.C. §§ 548 and 550 (Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7))

  a. A $55 million transfer ($55 Million Transfer) from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's Hong Kong HSBC account in September 2016. Complaint ¶ 106; Motion at 23; Condon 12/20/19 Decl. ¶¶ 7, 8 Exs. E at Sch. 2, F at Sch. 2; Torborg 12/9/19 Decl. ¶¶ 16-17, 20-21, Exs. L, M, P, Q.

  b. Thirteen transfers (Plane 6 Loan Transfers) between 8/1/16 and 7/31/17 totaling approximately $10,148,723 from Zetta Singapore's Singapore account to UL's Hong Kong account, regarding the loan for Plane 6. Complaint ¶¶ 85, 150, Sch. A; Condon 12/20/19 Decl. ¶ 7, Ex. E at Sch. 2.

3) Count IV – 11 U.S.C. §§ 547 and 550 (Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers), in the alternative to Count II)

4) Count V – 11 U.S.C. §§ 547 and 550 (Avoidance and Recovery of Preference Transfer ($55 Million Transfer), in the alternative to Count II)

5) Count VIII – 11 U.S.C. §§ 547 and 550 (Avoidance and Recovery of Preference Transfers (Interest Payment

In re Zetta Jet USA, Inc., Slip Copy (2020)

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 110 of 210

2020 WL 7682136

Transfers)): Twelve interest payments on the "First and Second Loans"[22] totaling $2.3 million from Zetta Singapore's Singapore account to UL's Hong Kong account between 9/19/16 and 8/15/17. Complaint ¶¶ 85, 259, Sch. D; Condon 12/20/19 Decl. ¶ 7, Ex. E at Sch. 2.

**\*13** 6) Count XIII – 11 U.S.C. § 105(a) (Recharacterization of the Third Investment as Equity Interest): a 6/27/17 $15 million transfer from UL's Hong Kong account to Zetta Singapore's Singapore account, in exchange for 20% of Zetta Singapore's outstanding shares being transferred to TG. Complaint ¶¶ 85, 309-11; Condon 12/20/19 Decl. ¶ 7, Ex. E at Sch. 2.

UL/GA/TG assert that Count I involves Zetta Singapore's acquisition of Planes 6 and 7 from UL and GA in December 2015, which was an extraterritorial transaction because all parties involved were foreign: Zetta Singapore is a Singapore corporation; UL and GA are BVI companies; and Li Qi is a citizen of China who resides in Hong Kong. Id. at 19-20 (citing Complaint pg. 1 and ¶¶ 24, 26, 22). They indicate that Zetta Singapore sent funds from its alleged Singapore account and that Plane 6's and Plane 7's Master Aircraft Finance Leases (Planes 6 and 7 MAFLs)[23] indicate that although initially routed through New York, the funds were to be sent to their account in Hong Kong. Id. at 20 (citing Complaint ¶ 85, Condon 12/20/19 Decl. ¶¶ 4, 6, Exs. B § 3.26, D § 3.26). UL/GA/TG reiterate that the Court "must focus *on the Debtor's transfers*" and here, the relevant conduct occurred outside of the United States. Id. (emphasis in original) (citing Morrison, 561 U.S. at 266; Midland, 347 B.R. at 715; Maxwell I, 186 B.R. at 817 n.5).

[22]  Li Qi made a $10 million loan to Zetta Singapore through UL in February 2016 (First Loan) and another $10 million loan to Zetta Singapore through UL on 7/19/16 (Second Loan). Complaint ¶¶ 91, 117-18.

[23]  The Planes 6 and 7 MAFLs include the Master Aircraft Finance Lease Agreements for Planes 6 and 7, and the Supplemental No. 1 Aircraft Finance Lease Purchase Option Agreements for Planes 6 and 7. Complaint ¶¶ 82, 86; Condon 12/20/19 Decl. ¶¶ 3-6, Exs. A, B, C, D.

UL/GA/TG contend that although Count I alleges that Wells Fargo acted "as owner trustee" for the relevant parties, the use of U.S.-based professional services is insufficient to convert a foreign transaction into a domestic one, there is no allegation

that Wells Fargo was a party to the transaction, had any independent economic interest in it, received any funds, or engaged in any other conduct that Congress sought to regulate in §§ 547 and 548. Id. at 21 (citing Complaint ¶¶ 49-50; Condon 12/20/19 Decl., ¶¶ 3, 5 Exs. A at Title Page, C at Title Page; CIL Ltd., 582 B.R. at 96; Ampal, 562 B.R. at 613; Lyondell, 543 B.R. at 150; In re Sherwood Invs. Overseas Ltd., Inc., 2016 WL 5719450, at \*11 (M.D. Fla. Sept. 30, 2016)). UL/GA/TG claim that even though a transaction involves an asset that might be used in the United States, among other places, that does not change a transfer of funds between non-U.S. entities into a domestic transaction. Id. at 21-22 (citing Lyondell, 543 B.R. at 132-34; Maxwell I, 186 B.R. at 818).

UL/GA/TG argue that the "Minsheng Transaction" (Minsheng Refinancing)[24] at issue in Counts II, IV, and V, involved "Minsheng" and Yuntian 3 buying Planes 6 and 7 from them and leasing the planes to Zetta Singapore. Id. at 22-23. According to UL/GA/TG, this transaction was foreign because: 1) the parties are all foreign entities from China (Minsheng Financial and Minsheng Business), Hong Kong (Minsheng Business), Ireland (Yuntian 3), Singapore (Zetta Singapore), and the BVI (UL); 2) the Trustee does not plead that the $55 Million Transfer from Minsheng to UL at issue in Counts II and V originated from anywhere other than Minsheng; 3) the payments were sent to UL's HSBC Hong Kong account; and 4) the agreements are governed by English law and require, with limited exception, all disputes regarding the agreements to be heard in English courts. Id. at 22-23 & n.7-9 (citing Complaint ¶¶ 41-43, 97, 106, 112; Condon 12/20/19 Decl. ¶¶ 7-8, Exs. E at Sch. 2 and § 11.3(a), F at Sch. 2 and § 11.3(a)). UL/GA/TG acknowledge that some tangential conduct surrounding the Minsheng Refinancing touched the United States—using U.S.-based nominal trustees and, "in *separate, subsequent transactions*, leasing planes to U.S. entities"—but they contend that all of the conduct that Congress sought to regulate in §§ 547 and 548 (Zetta Singapore's prepetition transfer of funds) occurred outside of the United States by and for the benefit of Chinese, Singaporean, Hong Kong, and Irish entities. Id. at 23 (emphasis in original) (citing Complaint ¶ 112).

[24]  According to the Complaint, the Minsheng Refinancing was a June to September 2016 multi-step, multi-party transaction that involved "Minsheng" refinancing Planes 6 and 7. Complaint ¶¶ 96-116. It is described in more detail below.

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 111 of 210

**\*14** UL/GA/TG note that the Complaint alleges that after the Minsheng Refinancing: 1) GA and Zetta Singapore entered into a "Clarification," indicating that Zetta Singapore still had to repay its outstanding obligation on Plane 6; and 2) Counts II and IV seek to avoid $10 million that Zetta Singapore paid to UL and GA under the Clarification. Id. (citing Complaint ¶¶ 110, 150). But, they argue that these transfers are extraterritorial. Id. (citing Complaint ¶ 110, 150). UL/GA/TG assert at issue in Count VIII are interest payments Zetta Singapore made on the First and Second Loans. Id. (citing Complaint ¶¶ 91, 110, 118, 259). They contend that because the Trustee does not plausibly allege that payments Zetta Singapore made to UL in the Minsheng Refinancing or for the First and Second Loans were domestic activity, he fails to state a claim for avoidance of any transfers to UL in Counts I, II, IV, V, and VIII as a matter of law. Id.

Finally, UL/GA/TG contend that the "Third Loan"—a June 2017 $15 million loan from UL to Zetta Singapore at issue in Count XIII, which the Trustee seeks to recharacterize as equity—was extraterritorial because: 1) it was between foreign entities, UL, a BVI company, and Zetta Singapore, a Singapore company; 2) in return, TG, a BVI company, received additional shares of Zetta Singapore stock; 3) it is governed by Hong Kong law; and 4) there is no allegation of U.S. transfers. Id. at 24. (citing Complaint ¶¶ 24, 126, 129, 311; Condon 12/20/19 Decl. ¶ 9, Ex. G § 16).

The Trustee responds that the relevant conduct occurred in the United States. Opposition at 29. He contends that the test for whether the relevant conduct was extraterritorial is "flexible" and allows courts to consider all components of the transfers, including whether the participants, acts, targets, and effects involved in the transactions are primarily foreign or primarily domestic. Id. (citing In re FAH Liquidating Corp., 572 B.R. 117, 124 (Bankr. D. Del. 2017)). The Trustee asserts that UL/GA/TG ignore the domestic focus of the transactions at issue: "three planes, financed through closings in the U.S., involving transfers into and through the U.S. bank accounts, using U.S. corporate trusts to serve as fronting lessors/lessees, registered with the FAA, operated by a domestic debtor, and generating the income for the transfers the Trustee seeks to avoid and recover." Id.

The Trustee claims that the Debtors and the "Defendants" deliberately structured the planes' acquisitions and the "disguised financing loans" to close in and flow through the United States, highlighting that: 1) the Defendants *required* the planes to be registered with the FAA and to be subleased

to Zetta USA; 2) the Defendants and the Debtors ensured that the disguised financing transactions closed in the United States; 3) the Defendants and the Debtors used U.S. corporate trustees to hold legal title to the planes and act as nominal owners, lessors, and lessees; 4) the Defendants and the Debtors used U.S. escrow agents with U.S. bank accounts who paid proceeds to the Defendants', the Debtors', and Bombardier's U.S. bank accounts; 5) the Defendants and the Debtors required that the planes be maintained at a U.S. maintenance facility; 6) the security interests were filed in the United States; and 7) the Defendants and the Debtors required all payments be made in U.S. dollars, so that the transfers had to be made directly from U.S. banks or through U.S. correspondent banks. Id. at 21-22, 29-30 (emphasis in original) (citing Complaint ¶¶ 55, 112, 124; Lyons 1/31/20 Decl. ¶¶ 9-11, Exs. C, D, & E; Torborg 12/9/19 Decl. ¶¶ 14-15, 20-21, Exs. J, K, P, & Q).

The Trustee argues that the parties' nationalities are irrelevant and the transactions at issue involved lending money to the Debtors to buy and operate United States-based planes under the FAA's regulatory scheme. Id. at 30. According to the Trustee, the fact that some of the parties were foreign does not change the "focus" of the transfers from the United States. Id. (citing In re Arcapita Bank B.S.C., 575 B.R. 229, 245 (Bankr. S.D.N.Y. 2017)).

**\*15** Regarding choice-of-law provisions, the Trustee contends that: 1) they do not make transactions extraterritorial because the focus is on the parties' conduct, not a contractual choice-of-law clause; and 2) a court can disregard a choice-of-law clause, which does not bind third parties, such as a bankruptcy trustee. Id. (citing In re Eagle Enters., Inc., 223 B.R. 290 (Bankr. E.D. Pa. 1998)).

The Trustee argues that even though TVPX and Wells Fargo were "nominal" players, they were also critical because U.S. corporate trusts were necessary for the planes to be registered with the FAA, and without FAA registration and Zetta USA's Part 135 Certificate, the planes had no commercial value. Id. The Trustee claims that this situation is a "far cry" from the use of "professionals" in CIL. Id.

Finally, the Trustee asserts that the transfers through U.S. bank accounts were not "fleeting" but critical to maintain the U.S. focus of the transactions. Id. at 31. The Trustee contends that all transfers made at the closing on the Minsheng Refinancing occurred in the United States because the transfers were made from a U.S. bank account by IATS, a U.S.

escrow agent. Id. (citing Y3/Y4 Motion at 25). The Trustee argues that the court in Arcapita found that the defendants' use of a bank in New York "touched and concerned the United States" and displaced the presumption against extraterritoriality, and Arcapita distinguished Maxwell I and Loginovskaya as cases that involved a U.S. bank on only one side of the challenged transfer. Id. (citing Arcapita, 575 B.R. at 245; Midland Euro, 347 B.R. 708). The Trustee contends that here, as in Arcapita, all parties to the Minsheng Refinancing agreed to use a domestic escrow agent and its domestic bank account to complete the transfers. Id. The Trustee claims that this deliberate use of U.S. banking law by the parties on both sides of the transfers provides sufficient contact with the United States to make the $55 Million Transfer to UL at issue in Counts II and V a domestic transfer. Id. The Trustee asserts that using U.S. dollars as the denomination of payment further supports this conclusion. Id. at 31 n.18 (citing FAH Liquidating Corp., 572 B.R. at 124).

UL/GA/TG reply that the parties and relevant conduct were outside the United States. Reply at 19. They contend that the Trustee does not rely on or cite the controlling Morrison test that looks to the conduct that is the "focus" of congressional concern, but instead relies on a pre-Morrison test that examined "all component events of the transfers," which did not survive Morrison. Id. at 19-20. They highlight that in E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 247 (1991) (Aramco), an employee unsuccessfully argued U.S. employment discrimination law applied to his job in Saudi Arabia because he was a U.S. citizen, hired by a Delaware company, originally as an engineer in Houston, and Morrison explained that "neither the territorial event [of hiring in Houston] nor that relationship [of U.S. citizenship] was the 'focus' of congressional concern ... but rather domestic employment." Id. at 20 (citing Morrison, 561 U.S. at 266). UL/GA/TG argue that "the Trustee's method of tallying up domestic contacts of a transaction, regardless of whether those aspects are the focus of the statute, improperly turns the presumption against extraterritoriality into a 'craven watchdog' against overextension of U.S. law." Id. (citing Morrison, 561 U.S. at 266). And, UL/GA/TG argue that courts give significant weight to the parties' nationality and location. Id. at 20 n.10 (citing Maxwell I, 186 B.R. 807, 817 (S.D.N.Y. 1995)).

**\*16** UL/GA/TG claim that the Trustee addresses "*everything but* the focus of Congressional concern," and the Trustee's attempted "slight of hand" by arguing that the "focus of *these transactions*" is domestic violates Morrison, which

directed courts to assess the focus "*of the statute*," not the parties' conduct. Id. at 20 & n.11 (emphasis in original) (citing Morrison, 561 U.S. at 266). UL/GA/TG assert that FAA certificates, nominal U.S. ownership of the planes, where the planes were maintained, and the planes' security interests are outside the focus of the Bankruptcy Code's avoidance provisions, and these contacts do not make the transactions domestic. Id. at 20-21 (citing Maxwell I, 186 B.R. at 816).

UL/GA/TG claim that the use of intermediary U.S. banks to process transfers between foreign parties and their foreign bank accounts does not make the transfers domestic, and courts have uniformly refused to expand U.S. law to cover any dollar-denominated transaction involving a U.S. intermediary bank. Id. at 21 (citing Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 513 B.R. 222, 228 n.1 (S.D.N.Y. 2014); Maxwell I, 186 B.R. at 817 n.5). They contend that Arcapita found the relevant transaction was domestic because the initial transfer was from Arcapita's U.S. bank account and both sides of the transfer used a U.S. bank to complete the transfer. Id. (citing Arcapita, 575 B.R. at 246). They highlight that the court in Arcapita cited with approval other cases holding that using "U.S. intermediary banks *to carry out* the transactions, but that were not the transactions themselves, *does not* render a transaction domestic." Id. (emphasis in original) (citing Arcapita, 575 B.R. at 246 n.10). UL/GA/TG argue that because the relevant transfers here were between foreign entities (Minsheng and themselves), with foreign bank accounts, using U.S. intermediary banks to carry out the transfers does not establish a domestic transaction. Id.

UL/GA/TG assert that the Trustee tries to fit this case into Arcapita's facts by arguing that the Minsheng Refinancing at issue in Counts II, IV, and V involved a transfer: 1) from Minsheng's foreign account, 2) to an escrow agent's U.S. account, 3) to the parties' intermediary U.S. accounts, and 4) to the non-Minsheng parties' foreign accounts. Id. According to UL/GA/TG, the Trustee improperly focuses on intermediate steps 2 and 3 and ignores the actual transfer in steps 1 and 4. Id. UL/GA/TG claim that the Trustee cannot rely on escrow transfers and agreements that are not alleged in the Complaint but are instead mentioned for the first time in the Opposition. Id. at 22 (citing In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 2013 WL 5614294, at *4 (C.D. Cal. Sept. 30, 2013)). They argue that transfers to an escrow agent are irrelevant to the extraterritoriality analysis because intermediary escrow transfers are not the "focus" of the Code's avoidance provisions, which apply only to recipients who have "dominion" over the funds and not to

In re Zeta-Jet USA, Inc., Slip Copy (2020)

2020 WL 7682136

mere "conduits" such as escrow agents. Id. (citing In re Incomnet, Inc., 463 F.3d 1064, 1071 (9th Cir. 2006)). UL/GA/TG highlight that putting aside the conduits, the transfers at issue were "*from* foreign parties and their foreign bank accounts *to* foreign parties and their foreign bank accounts." Id. (emphasis in original).

UL/GA/TG note that except for the Minsheng Refinancing, none of the transactions involving them are alleged to include escrow transfers, and the Trustee has not identified any other basis to establish that the claims addressing the initial Plane 6 and 7 leases (Count I), the Clarification (Counts II and IV), or the Third Loan (Count XIII) were domestic transfers. Id. (citing Complaint ¶¶ 79-88, 110, 126-131). According to UL/GA/TG, the Court may grant their Motion on these issues based solely on the Trustee's failure to oppose. Id. (citing Minasyan v. Allen L. Adkins & Assocs., PC, 2012 WL 3848648, at *1 (C.D. Cal. Sept. 5, 2012)).

*17  Finally, UL/GA/TG argue that the Trustee does not identify the transactions that he considers to be "subsequent transfers," which he seeks to avoid, and the Complaint does not identify those transfers. Id. at 22-23. They contend that to the extent the Trustee is limiting the "initial transfers" to the Minsheng Refinancing and payments under the Planes 6 and 7 MAFLs, all transfers involved in those transactions originated from and were received by foreign entities and their foreign bank accounts. Id. at 23. They conclude that "if the relevant conduct occurred in another country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id. (citing WesternGeo LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018)).

The question of whether transactions are foreign or domestic depends "very heavily" on the facts of each case. In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 246 (Bankr. S.D.N.Y. 2017). Recent Supreme Court decisions have analyzed the "focus" of statutes to determine whether a case involves domestic or foreign applications of statutes. RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090 (2016); Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010).

Morrison involved National Australia Bank Limited (National), whose "ordinary shares" were traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, but not on any American exchange. Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 251 (2010). In 1998, National bought Florida mortgage-servicing

company HomeSide Lending, Inc. (HomeSide) and until 2001, National touted the success of HomeSide's business. Id. at 251-52. After Australian citizens Russell Leslie Owen (Owen) and Brian and Geraldine Silverlock (Silverlocks) bought National shares, National announced that it was writing down the value of HomeSide's assets by more than $2 billion. Id. at 252. Owen and the Silverlocks sued National and HomeSide in the District Court for the Southern District of New York for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, seeking to represent a class of foreign purchasers of National's ordinary shares. Id. at 252-53. National and HomeSide moved to dismiss for failure to state a claim under Rule 12(b)(6) and lack of subject matter jurisdiction under Rule 12(b)(1). Id. at 253. The district court dismissed under Rule 12(b)(1), finding that it had no jurisdiction because the acts in the United States were "at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad." Id. The Second Circuit affirmed because "[t]he acts performed in the United States did not 'compris[e] the heart of the alleged fraud.' " Id. at 253-54.

The Supreme Court affirmed, although it noted that the extraterritorial reach of § 10(b) is a merits question, not a subject matter jurisdiction question. Id. at 254. The Court then indicated that it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Id. at 255 (citations and internal quotation marks omitted). After holding that the Exchange Act contained no affirmative indication that § 10(b) applied extraterritorially, the Supreme Court focused on Owen's and the Silverlocks' argument that Florida was where HomeSide and its executives engaged in the deceptive conduct and where HomeSide executives made misleading public statements. Id. at 265-66. The Supreme Court held that these American contacts were insufficient to displace the presumption against extraterritoriality because "it is a rare case of extraterritorial application that lacks *all* contact with the territory of the United States." Id. at 266. (emphasis in original). The Court continued that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." Id. (emphasis in original).

*18  The Supreme Court highlighted that the "focus" of the Exchange Act is the purchase and sale of securities in the United States, not where the deception occurred. Id. Because National's ordinary shares were not listed on a domestic

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 114 of 210

In re Zeta Jet USA, Inc., Slip Copy (2020)

2020 WL 7682136

exchange, and all aspects of the purchases occurred outside the United States, the Supreme Court stated that the case should have been dismissed under 12(b)(6), based on failure to state a claim. Id. at 266, 273.

According to the Supreme Court, the two tests that the Second Circuit had developed for determining whether conduct was foreign or domestic in the context of § 10(b)—an "effects test," that was premised on an effect on American securities markets and a "conduct test," that was premised on wrongful conduct in the United States—were inappropriate. Id. at 257-61. The Supreme Court reasoned that the "results of judicial-speculation-made law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality" because instead of guessing "anew in each case," the presumption can be applied in all cases, which preserves a stable background against which Congress can legislate with predictable effects. Id. at 261.

In Nabisco, RJR Nabisco, Inc. (RJR) and other unspecified parties allegedly participated in a global money-laundering scheme involving the illegal sale of drugs and cigarettes in various countries. RJR Nabisco, Inc. v. European Community, 136 S. Ct. 2090, 2098 (2016). The European Community and 26 of its member states sued RJR in the Eastern District of New York for civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), and RJR moved to dismiss the complaint, arguing that RICO does not apply to racketeering activity occurring outside U.S. territory or to foreign enterprises. Id. at 2098-99. The district court agreed with RJR and dismissed the RICO claims as impermissibly extraterritorial, but the Second Circuit reinstated those claims, concluding that Congress had clearly communicated its intent that RICO applied to extraterritorial conduct. Id. at 2099. The Supreme Court granted certiorari because the lower courts disagreed regarding RICO's extraterritorial application. Id.

The Supreme Court stated that to determine whether a case involves a domestic application of a statute, courts must look to the "focus" of the statute. Id. at 2101. According to the Court, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.

The Court noted that "when a statute provides for some extraterritorial application the presumption against extraterritoriality operates to limit that provision to its terms." Id. at 2102 (quoting Morrison, 561 U.S. at 265). The Court held that the complaint did not impermissibly allege extraterritorial violations of the RICO Act because the pattern of racketeering activity involved predicate offenses that were either committed in the United States or in a foreign country in violation of a predicate statute that applied extraterritorially. Id. at 2105. Section 1964(c), however, required that a civil RICO plaintiff allege and prove a domestic injury, recovery was not available for foreign injuries, and the European Community and the member states had stipulated to waive their claims for domestic injuries, so the Court held that the RICO claims had to be dismissed. Id. at 2111.

*19 Most recently, the Supreme Court expanded on the "focus" of a statute by indicating that it is the "object of its solicitude," which can include the conduct that it "seeks to regulate" and the parties and interests it "seeks to protect" or vindicate. Western Geco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) (quoting Morrison, 561 U.S. at 267).

To determine the conduct that is relevant to the analysis, the Court must consider the "focus" of the avoidance and recovery provisions (§§ 547, 548, and 550), which is "the initial transfer that depletes the property that would have become property of the estate." In re CIL, 582 B.R. at 93; see also In re Ampal-Am. Israel Corp., 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (same); In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93, 98 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277) ("[I]n actions involving both [§ 548 and § 550], § 550(a) regulates the debtor's initial transfer."); In re Sherwood Investments Overseas Ltd., Inc., 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("Courts applying the extraterritoriality presumption to fraudulent transfers typically hold that the proper focus is the transfers sought to be avoided, not the parties' relationship or locus." (emphasis in original)).

In several of the cases cited by the parties, the courts found that the relevant conduct was extraterritorial.

In Maxwell I, Maxwell Communication Corporation plc (MCC) sold significant portions of its U.S. assets and used some of the proceeds to repay overdraft balances to Barclays

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 115 of 210

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

Bank plc (Barclays) (£2 million), National Westminster Bank plc (NatWest) (£71.5 million), and Societe General (SocGen) (£5.7 million). In re Maxwell Communication Corp. plc, 186 B.R. 807, 813 (S.D.N.Y. 1995). After MCC filed bankruptcy in the U.S. and England, MCC and examiner Richard A. Gitlin (Gitlin), who had been appointed to harmonize the two bankruptcy proceedings, filed complaints against Barclays, NatWest, and SocGen to avoid and recover the transfers. Id. at 812. MCC, Barclays, and NatWest were English companies, and SocGen was a French company. Id at 812-13. The bankruptcy court dismissed the complaints based in part on the presumption against extraterritoriality. Id. at 815. On appeal, MCC and Gitlin argued that the transfers were not extraterritorial because the money derived from the sale of U.S. assets. Id. at 816.

The district court affirmed, noting that a § 547 analysis requires courts to consider all events involving the transfers, and viewing the transfers in this manner resulted in a finding that they occurred overseas. Id. at 816-17. The court considered that: 1) MCC, Barclays, NatWest, and SocGen were all foreign entities whose relationship was "centered in England;" 2) the antecedent debts underlying the transfers arose from MCC's overdrafts on accounts maintained with banks in England and governed by English law; and 3) MCC repaid its debts by transferring funds to accounts in the U.K. Id. at 817. The court noted that the transferred funds were proceeds from the sale of U.S. assets, which depleted the availability of MCC's assets to satisfy creditors' claims. Id. But, the court stated that the source of the funds was "at best only one component" of the conduct proscribed by § 547, and even assuming the transfers were initiated in the U.S. after U.S. asset sales, this conduct was more appropriately described as a "preparatory step" to the transfers. Id. [25]

[25]    MCC and Gitlin appealed, and the Second Circuit in Maxwell II affirmed but declined to decide "whether, setting aside considerations of comity, the 'presumption against extraterritoriality' would compel a conclusion that the Bankruptcy Code does not reach the pre-petition transfers at issue." In re Maxwell Communication Corp. plc by Homan (Maxwell II). 93 F.3d 1036, 1055 (2d Cir. 1996).

*20    In CIL, CIL Limited (CIL), a Cayman Islands entity, transferred an equity interest in CEVA Group Plc (CEVA Group), a U.K. entity, to CEVA Holdings LLC (CEVA Holdings), a Marshall Islands entity. In re CIL Ltd., 582 B.R. 46, 68 (Bankr. S.D.N.Y. 2018). CIL filed a petition

commencing provisional liquidation proceedings in the Grand Court of the Cayman Islands, and shortly thereafter, an involuntary chapter 7 petition was filed against it in the Bankruptcy Court for the Southern District of New York. Id. at 56. Salvatore LaMonica (LaMonica), the chapter 7 trustee for CIL, filed a complaint against CEVA Logistics Finance B.V. (CEVA Finance), CEVA Group, and CEVA Holdings (together with CEVA Finance and CEVA Group, CEVA Entities), to avoid and recover the transfer under §§ 544, 548, 550, and 551. Id. at 56, 68. The CEVA Entities moved to dismiss the avoidance claims based on the presumption against extraterritoriality, and LaMonica countered that the transfer was not extraterritorial. Id. at 82-83, 94.

The court held that the transfer was extraterritorial because: 1) it was among foreign entities and allegedly harmed foreign creditors; and 2) it was accomplished outside the United States by i) CIL, acting through its boards at meetings chaired in London, consenting to CEVA Group's recapitalization and restructuring, and ii) CEVA Group issuing "New CEVA Shares" in accordance with U.K. law during a meeting of shareholders in London, attended by a CIL representative who consented to the issuance. Id. at 93-94. LaMonica argued that the court had to consider all components of the transfers, and the "center of gravity" was the United States because the scheme to divest CIL of the CEVA Group equity was "planned and hatched" in the United States. Id. at 94. The court rejected this argument for several reasons: 1) CIL's professionals were in the Cayman Islands and performed significant work there; 2) negotiating and documenting the transfer in the United States was not enough to make the transaction domestic; 3) it was questionable whether the "component parts test" advocated by LaMonica, remained relevant after the Supreme Court's rejection in Morrison of the similar "conduct and effects test" used by the Second Circuit to determine where conduct occurred; and 4) even under LaMonica's "center of gravity" test, the issuance of the "New CEVA Shares" was not a domestic transaction. Id. at 94-96.

In Ampal-American, New York holding company Ampal-American Israel Corp. (Ampal) instructed Bank Hapoalim in Tel Aviv to transfer 344,322.64 New Israeli Shekels (NIS) from its account to a Bank Hapoalim account of its Israeli law firm, Goldfarb Seligman & Co. In re Ampal-Am. Israel Corp., 562 B.R. 601, 603-04 (Bankr. S.D.N.Y. 2017). Within 90 days of the transfer, Ampal filed bankruptcy. Id. at 604. Alex Spizz (Spizz), the chapter 7 trustee for Ampal, filed a §§ 547 and 550 complaint to avoid and recover the NIS transfer. Id. at 603. The court determined that the presumption against

2020 WL 7682136

extraterritoriality prevented Spizz from avoiding the transfer, because it occurred in Israel between a U.S. transferor headquartered in Israel and an Israeli transferee accomplished entirely through accounts at the same Israeli bank. Id. The court acknowledged that Goldfarb's legal services had some U.S. connections, including Ampal's shares being traded on the NASDAQ, Goldfarb's services involving legal work related to Ampal's SEC and NASDAQ filings, Goldfarb rendering opinions on Israeli law for inclusion in Ampal's annual report, and a Goldfarb partner attending meetings in New York regarding the filing of Ampal's bankruptcy case. Id. at 613 & n.14. But, the court highlighted that most of these services were performed in Israel, and even where claims "touch and concern" the United States, they must do so with "sufficient force" to displace the presumption against extraterritoriality. Id. at 613-14.

**\*21**  In Sherwood, Royal Bank of Scotland N.V. (RBS), located in the Netherlands, financed complex derivatives trading for Sherwood Investments Overseas Limited, Inc. (Sherwood), a BVI corporation. In re Sherwood Investments Overseas Ltd., Inc., 2015 WL 4486470, at \*1, 20 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016). Because Sherwood did not meet RBS's risk criteria, it was not a "formal" client of RBS. Id. at \*4. But, they created a "workaround:" Sherwood operated through an approved counterparty, UBS, a Swiss bank. Id. When Sherwood and RBS wanted to execute a trade, RBS sent instructions to Sherwood and, if approved, to UBS, who paid the required amount from funds in Sherwood's UBS accounts. Id.

In September 2008, Sherwood transferred almost $1.3 million to RBS. Id. at \*18. It then filed bankruptcy and an avoidance action against RBS, alleging that the $1.3 million transfer was avoidable and recoverable under §§ 548 and 550. Id. RBS moved for summary judgment based on the presumption against extraterritoriality, claiming that the transfers occurred entirely abroad. Id. Sherwood countered that the "center of gravity" of its relationship with RBS was in the United States because: 1) its principal, Julian Benscher (Benscher), lived in and directed trades from and initiated all of his contacts with RBS from the United States; 2) it kept all of its books and records in the United States; and 3) it operated an orchid growing subsidiary, Sherwood Farms, from the United States. Id. at \*19.

The court stated that the proper focus is the transfers sought to be avoided, not the parties' relationship or locus.

Id. (emphasis in original). According to the court, the transfers were foreign because: 1) the transfers were made from Sherwood's accounts at UBS in Switzerland to RBS's accounts in England; 2) Sherwood was a BVI corporation, and RBS was a Netherlands entity; and 3) all trading and creation of the underlying securities purchased with the transfers was performed in London. Id. at \*20, 21. The court stated that the "minimal contacts" with the United States—Benscher living in and initiating the transfers from Florida and RBS having U.S. branches—did not displace the presumption against extraterritoriality because even if claims "touch and concern" the United States, they must do so with sufficient force to displace the presumption. Id. at \*20.

In FAH, Bayerische Moteren Werke Aktiengesellschaft (BMW) executed agreements with Fisker Automotive Holdings, Inc. and Fisker Automotive, Inc. (together FAH Cos.), Delaware corporations headquartered in California, for the installation of BMW engines and parts into FAH-made vehicles. In re FAH Liquidating Corp., 572 B.R. 117, 121, 124 (Bankr. D. Del. 2017). FAH Cos. then transferred approximately $32,579,799 to BMW,[26] but faced many difficulties, including battery pack safety recalls and the loss of their lending facility provided through the U.S. Department of Energy (DOE). Id. at 121-22. FAH Cos. filed a voluntary chapter 11 petition, and Emerald Capital Advisors Corp. (Emerald), in its capacity as trustee for the FAH Liquidating Trust, filed a complaint against BMW, a German corporation with its principal place of business in Munich, to avoid and recover the alleged constructively fraudulent transfers under §§ 542, 544, 548, and 550. Id. at 120-22. BMW moved to dismiss the complaint, arguing that the transfers were foreign because: 1) they involved development work by a German company based on German contracts, which required application of German law; and 2) BMW was to perform the work in Germany in exchange for FAH Cos. paying in Euros. Id. at 123, 124. Emerald countered that the transfers were not extraterritorial and highlighted that the transfers: 1) originated from the United States; 2) were made by a Delaware corporation headquartered in California; and 3) were made using funds provided by a DOE loan program. Id. at 124.

26    FAH Cos. made the payments in Euros, and the Court approximated the amount in dollars. Id. at 122 n.5.

**\*22**  The court focused on the "center of gravity" and held that it was Germany because: 1) the agreements specified

2020 WL 7682136

milestones to be achieved at BMW's production facilities in Germany; 2) the agreements had provisions mandating the forum for disputes as Munich; 3) German law applied; and 4) payments were required in Euros. Id. at 124-25. Although the court recognized that the transfers originated in the United States from a Delaware corporation, it concluded that these facts were insufficient to overcome the "primarily foreign nature" of the agreements. Id. at 124.

In contrast to the cases mentioned immediately above, courts in other cases have found that the transfers at issue were domestic.

In Arcapita, Arcapita Bank B.S.C.(c) (Arcapita), a Bahraini investment bank, made investments through Bahrain Islamic Bank (BisB), which was headquartered in Bahrain, and Tadhamon Capital B.S.C. (Tadhamon), a Bahraini corporation and a subsidiary of a Yemeni bank, under agreements that were negotiated and signed in Bahrain and provided that Bahrain law governed. In re Arcapita Bank B.S.C., 575 B.R. 229, 233-34 (Bankr. S.D.N.Y. 2017). Arcapita transferred $10 million from its JP Morgan Chase account in New York to a correspondent account at the same New York bank maintained by BisB and BisB bought commodities for Arcapita through a London broker. Id. at 234. The next day, Arcapita made two $10 million transfers from its JP Morgan Chase account to an account at HSBC Bank in New York which was a correspondent bank account maintained by Tadhamon's bank in Bahrain, and the funds were then immediately transferred to Tadhamon's account at a bank in Bahrain. Id. Less than a month after the transfers, Arcapita filed a voluntary chapter 11 petition. Id. The committee of unsecured creditors (Committee) filed a § 547 avoidance action against BisB and Tadhamon to avoid and recover the transfers. Id. at 233, 235, 243.

BisB and Tadhamon moved to dismiss the complaint, arguing that the transfers in the United States by themselves were not enough to overcome the presumption against extraterritoriality, and the focus should be on when the payment was completed. Id. at 244. The Committee countered that the challenged conduct was domestic. Id. The court held that BisB's and Tadhamon's "receipt of the transferred funds in New York correspondent bank accounts" was at the "heart" of the § 547 cause of action. Id. at 239. The court rejected BisB's and Tadhamon's argument that the parties expected Bahraini law to apply and the United States had no interest in regulating transactions involving Bahraini parties for investments made outside of the U.S. Id. It held that the

link between the United States, as the regulating state, and the regulated activity in question was sufficiently strong given that the transfers took place through use of U.S. correspondent bank accounts. Id.

In Picard, Bernard L. Madoff Investment Securities LLC (Madoff Securities), a U.S.- entity transferred billions of dollars from its New York JP Morgan Chase account to several foreign "feeder funds,"[27] which then transferred the money to foreign investors. In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277). Irving H. Picard (Picard), the trustee for the liquidation of Madoff Securities, filed avoidance and recovery actions under §§ 548 and 550 against the foreign feeder funds, which moved to dismiss. Id. at 91. The bankruptcy court and district court held that the avoidance and recovery claims should be dismissed based on the presumption against extraterritoriality or international comity principals. Id. at 91, 94. Both courts reasoned that Picard could not recover property that one foreign entity received from another foreign entity. Id.

[27]    A "feeder fund" is an entity that pools money from numerous investors and then places it into a "master fund" on their behalf. Id. at 92. A "master fund," which is what Madoff Securities advertised its funds to be, pools investments from multiple feeder funds and then invests the money. Id.

*23  The Second Circuit reversed, noting that when a trustee seeks to avoid and recover subsequently transferred property under §§ 548(a) and 550(a), the relevant transfer that must be avoided is the initial transfer. Id. at 98. The Second Circuit rejected the lower courts' test that considered the subsequent transfer, reasoning that the relevant conduct was Madoff Securities's "fraudulent *transfer* of property, not the transferees' *receipt* of property." Id. at 100 (emphasis in original). The court expressed no opinion regarding whether a domestic debtor or a transfer of property from a U.S. bank account would be sufficient to support a finding of a domestic transfer. Id. at 99 n.9. Because Madoff Securities was a domestic entity, which transferred property from its U.S. bank account to the feeder funds, the court held that the transfers were domestic. Id.

Determining whether a transfer is extraterritorial is fact dependent and the Court will consider the parties, the transactions, the choice of law provisions, the FAA

In re Zetta Jet USA, Inc., Slip Copy (2020)

2020 WL 7682136

registration and Part 135 Certificate, the maintenance of the aircraft at a U.S. airbase, the location of the closings, the nominal trustees, and the denomination of the payments.

### i. Parties

Here, all of the parties involved in the relevant transactions are foreign; they are from Singapore, BVI, China, Hong Kong, Ireland, and Canada. Complaint ¶ 60 (Zetta PTE was incorporated in Singapore), ¶ 24 (TG is incorporated under BVI law), ¶ 26 (GA is incorporated under BVI law), ¶ 28 (UL is incorporated under BVI law), ¶ 41 (Minsheng Financial is organized under Chinese law and has a principal place of business in Beijing), ¶ 42 (Minsheng Business is organized under Chinese law and has a principal place of business in Hong Kong), ¶ 22 (Li Qi, who was a director and insider of Zetta Singapore and is the director of UL, TG, and GA, resides in Hong Kong), ¶ 43 (Yuntian 3 is organized under Irish law and has a principal place of business in Dublin), ¶ 44 (Yuntian 4 is a company organized under Irish law with a principal place of business in Dublin), ¶ 45 (EDC is an agency wholly owned by the Government of Canada, with a principal place of business in Ottawa).

Although the Trustee claims that the nationality of the parties is irrelevant,[28] the majority of cases addressing the issue find that the parties' nationalities is relevant. Compare In re Maxwell Communication Corp. plc, 186 B.R. 807, 817 (S.D.N.Y. 1995) (considering that MCC, NatWest, Barclays, and SocGen were all foreign entities); In re CIL Ltd., 582 B.R. 46, 93-94, 96 (Bankr. S.D.N.Y. 2018) (holding that a transfer was foreign in part because it was made among entities from the U.K., the Cayman Islands, and the Marshall Islands); In re Ampal-Am. Israel Corp., 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (holding that a transfer was foreign in part because it was from an American transferor headquartered in Israel to an Israeli transferee); and In re Sherwood Investments Overseas Ltd., Inc., 2015 WL 4486470, at *20-21 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) (holding that transfers were foreign in part because Sherwood was a BVI corporation and RBS was a Netherlands entity); with In re Arcapita Bank B.S.C., 575 B.R. 229, 243-244, 247 (Bankr. S.D.N.Y. 2017) (holding that the transfers were domestic even though the parties were all from Bahrain, and rejecting the argument that the parties' nationality should be considered); see also In re FAH Liquidating Corp., 572 B.R. 117,124 (Bankr. D. Del.

2017) (not mentioning the parties' German and American nationalities in its reasoning for concluding that the transfers were foreign, but applying a "flexible" test that allows courts to consider all component events of the transfers, including "whether the participants, acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily domestic"); In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 97-99 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277) (noting that the focus of §§ 548 and 550 is the initial transfer, and holding that a domestic debtor's transfer of property from the United States was domestic).

28    The Trustee's contention, that the nationality of the parties is irrelevant, is surprising given that a page earlier he advocates for a "flexible" approach that allows courts to consider facts including "whether the participants ... involved in the transaction at issue are primarily foreign or primarily domestic." Opposition at 29 (citing FAH Liquidation Corp., 572 B.R. at 124).

### ii. Transactions

A. Count I – Avoidance and Recovery of Fraudulent Transfers (2015 Acquisitions), under 11 U.S.C. §§ 548 and 550, against UL, GA, and Li Qi

**\*24**  Section 548 allows a trustee to "avoid any transfer ... of an interest of the debtor in property" under certain circumstances, and § 550(a) provides that to the extent a transfer is avoided under §§ 547 or 548, the trustee may recover the property transferred.

In Count I, the Trustee seeks to avoid and recover the following six transfers for Planes 6 and 7 from Zetta Singapore's Singapore HSBC account to UL's HSBC Hong Kong account. Complaint ¶¶ 175-77; see also Complaint ¶ 85 (indicating that Zetta Singapore had a Singapore account); Condon 12/20/19 Decl. ¶¶ 4, 6 Ex. B § 3.26 ("Supplemental No 1 Aircraft Finance Lease Purchase Option Agreement" to the Aircraft Finance Lease Purchase Option Agreement relating to a Bombardier Global 6000 with MSN 9688, which is Plane 6, directing "all payments" to UL's HSBC account in Hong Kong with an account ending in "0002"), Ex. D § 3.26 (same regarding a Bombardier Global 6000 with MSN 9606, which is Plane 7).

| Date of Transfer | Amount of Transfer |
| --- | --- |

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

| | |
|---|---|
| 1/28/16 | $2,006,779.66 |
| 2/29/16 | $1,996,610.16 |
| 3/31/16 | $1,986,440.68 |
| 4/29/16 | $1,976,271.18 |
| 6/2/16 | $1,996,101.70 |
| 7/7/16 | $1,955,932.20 |
| **TOTAL** | **$11,918,135.58** |

The Trustee seeks recovery of the value of these transfers from UL as the "initial transferee," and one-half of the transfers from GA, the entity for whose benefit half of the transfers were made. Complaint ¶ 176-177.

The six transfers at issue in Count I were foreign because they were sent from Zetta Singapore's Singapore account to UL's Hong Kong account. [29]

[29]   UL/GA/TG cite Minasyan v. Allen L. Adkins & Assocs., PC, 2012 WL 3848648, at *1 (C.D. Cal. Sept. 5, 2012), in support of their argument that the Trustee's failure to allege a U.S.-based connection regarding the initial Planes 6 and 7 leases, the Clarification, or the "Third Loan," means that the Court may grant their Motion regarding these transfers based on the Trustee's failure to oppose. Reply at 22. Although that is true, even if it were not, the Court finds that these were solely foreign transactions for the reasons stated in this memorandum.

B. Count II – Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7), under 11 U.S.C. §§ 548 and 550, against Li Qi, UL, GA, Yuntian 3, Minsheng Financial, and Minsheng Business

The Trustee seeks to avoid the following transfers from Zetta Singapore to UL: 1) the $55 Million Transfer; and 2) $10,148,723 of "Plane 6 Loan Transfers." Complaint ¶¶ 190-92; Sch. A.

I. The $55 Million Transfer

The $55 Million Transfer was part of the Minsheng Refinancing, which the Complaint describes as follows. In June 2016, Cassidy approached Li Qi about "Minsheng" refinancing Zetta Singapore's purchase of Planes 6 and 7. Complaint ¶ 98. Cassidy proposed using the refinance proceeds from "Minsheng" to pay off the amount due and owing on Plane 7, while leaving in place the obligations regarding Plane 6, with the remainder of the proceeds to be disbursed to Zetta Singapore and Minsheng Business. Complaint ¶ 99. The first step of the Minsheng Refinancing was an adjustment of the purchase prices of Planes 6 and 7, where the new purchase prices were more than the principal due on the aircraft. Complaint ¶¶ 104-05. The second step involved entering into new purchase agreements with "Minsheng" and Yuntian 3 with Minsheng buying each plane under a disguised financing structure. Complaint ¶ 106. From the proceeds at closing, $55 million went to UL to pay off Plane 7, $12.4 million went to "Minsheng" to pay fees and down payments and deposits for four Bombardier Challenger aircraft, and an additional amount went to Zetta Singapore. Complaint ¶ 106. The Complaint alleges that the Debtors would repay the total amount "Minsheng" paid to refinance the planes by making debt service payments disguised as "rent" payments under disguised finance leases entered into with "Minsheng's" affiliate, Yuntian 3. Complaint ¶ 107. On 9/20/16, Yuntian 3, by and through its trustee, Wells Fargo, entered into new purchase agreements for Planes 6 and 7. Complaint ¶ 108. The final step of the Minsheng Refinancing was the closing on 9/21/16. Complaint ¶ 111.

**\*25** The $55 Million Transfer was sent on 9/19/16 from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's Hong Kong HSBC

account. Complaint ¶ 106; Condon 12/20/19 Decl. ¶¶ 7-8, Ex. E at Sch. 2 (showing "Payment Instructions" from Wells Fargo as Trustee for Yuntian 3 directing IATS to transfer $27,500,000 to UL's HSBC account in Hong Kong with an account number ending in "-0002," regarding Plane 6), Ex. F at Sch. 2 (same regarding Plane 7); Torborg 12/9/19 Decl. ¶¶ 16-17, 20-21 Ex. L (showing Minsheng Business's account was with China Minsheng Bank in Hong Kong, with an account number ending in 2-214, and providing 9/19/16 "Payment Instructions" for Plane 7 directing $27,500,000 of $40,000,000 to be transferred to UL's account with HSBC in Hong Kong with account number ending in -0002), Ex. M (same regarding Plane 6), Ex. P (showing that on 9/19/16, Minsheng Business transferred $40,000,000 to IATS's Bank of America account in New York regarding Plane 7), Ex. Q (same regarding Plane 6).

Although the Trustee argues that the $55 Million Transfer was domestic because the parties "agreed to use a domestic escrow agent and its domestic account to complete the transfers," Opposition at 31 (citing In re Arcapita Bank B.S.C., 575 B.R. 229, 233-34 (Bankr. S.D.N.Y. 2017), the Court disagrees. Arcapita is distinguishable because the transferor in that case sent money from its own account in New York to correspondent accounts in New York maintained by the transferees (or the transferees' banks). In re Arcapita Bank B.S.C., 575 B.R. 229, 233-34 (Bankr. S.D.N.Y. 2017). In contrast, as discussed above, the $55 Million Transfer was sent by Minsheng Business from its Hong Kong account through IATS's intermediary account in New York to UL's Hong Kong account two days later. Complaint ¶ 231; Torborg 12/9/19 Decl. ¶¶ 20-21 Ex. P, Q. UL/GA/TG also provide authority that a party must have "dominion" over money to be a transferee for purposes of § 550, and as an escrow agent,

IATS did not have dominion over the $55 Million Transfer. In re Incomnet, Inc., 463 F.3d 1064, 1070-71 (9th Cir. 2006) (stating that the Ninth Circuit has adopted the "dominion" test for whether a party is an "initial transferee" for purposes of §§ 547 and 550, and under the dominion test, a transferee is one who has "dominion over the money or other asset, the right to put the money to one's own purposes"). Finally, the fact that the transfers were routed through an HSBC account in New York, Condon 12/20/19 Decl. ¶¶ 7-8, Ex. E at Sch. 2, Ex. F at Sch. 2, does not affect the analysis because, as stated above, the funds were transferred by Minsheng Business from its Hong Kong bank account for credit to UL's HSBC account in Hong Kong. See Maxwell I, 186 B.R. 807, 817 n.5 (S.D.N.Y. 1995) (holding that a transfer was foreign where the transfer was made from an MCC Natwest account in London to Barclays's branch in New York, through which all payments made to Barclays in dollars were routed, *and the funds were then immediately credited to the outstanding balance on MCC's London overdraft account* with Barclays (emphasis added)).

## II. Plane 6 Loan Transfers

The Trustee alleges that after the Minsheng Refinancing, Plane 7 was paid off and GA received nothing at the closing. Complaint ¶ 149. Instead, Li Qi and Cassidy agreed to leave the amount owing on Plane 6 on Zetta Singapore's books, and under a "Clarification," Zetta Singapore was required to repay the amount of principal allegedly due on Plane 6 to GA as an unsecured loan. Id. At issue are the following 13 payments on the Plane 6 Loan, which Zetta Singapore made from its Singapore account, to UL's Hong Kong account, rather than to GA:

| Date of Transfer | Amount of Transfer |
|---|---|
| 8/1/16 | $780,671.00 |
| 8/30/16 | $780,671.00 |
| 10/3/16 | $780,671.00 |
| 10/31/16 | $780,671.00 |
| 11/30/16 | $780,671.00 |
| 1/6/17 | $780,671.00 |
| 2/2/17 | $780,671.00 |
| 3/7/17 | $780,671.00 |

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

| | |
|---|---|
| 4/11/17 | $780,671.00 |
| 5/2/17 | $780,671.00 |
| 6/2/17 | $780,671.00 |
| 7/3/17 | $780,671.00 |
| 7/31/17 | $780,671.00 |
| **TOTAL** | **10,148,723.00** |

**\*26** Complaint ¶¶ 150, 192; Sch. A; see also Complaint ¶ 85 (indicating that Zetta Singapore's account was in Singapore); Condon 12/20/19 Decl. ¶ 7, Ex. E at Sch. 2 (showing "Payment Instructions" for IATS to transfer funds to UL's HSBC account in Hong Kong, with account number ending in -0002, and to Zetta Singapore's HSBC Singapore account, with account number ending in 181). There are no allegations that these 13 payments had any U.S. nexus.

C. Count IV – In the Alternative, Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers), under 11 U.S.C. §§ 547 and 550, against Li Qi, UL, and GA

Like § 548, § 547 allows a trustee to "avoid any transfer ... of an interest of the debtor in property" in certain situations, and § 550(a) states that the trustee may recover the property transferred to the extent a transfer is avoided under § 547.

Count IV is brought in the alternative to Count II, Complaint ¶ 211, and for the reasons stated above, the "Plane 6 Loan Transfers" from Zetta Singapore's account in Singapore to UL's account in Hong Kong at issue in Count II are foreign.

D. Count V – In the Alternative, Avoidance and Recovery of Preference Transfer ($55 Million Transfer), under 11 U.S.C. §§ 547 and 550, against Li Qi and UL

Count V is an alternative to Count II, and as discussed above, the $55 Million Transfer from Minsheng Business's Hong Kong account, through IATS's New York escrow account, to UL's Hong Kong HSBC account, at issue in Count II, is foreign.

E. Count VIII – Avoidance and Recovery of Preference Transfers (Interest Payment Transfers), under 11 U.S.C. §§ 547 and 550, against UL and Li Qi

In or around February 2016, Li Qi made the $10 million First Loan to Zetta Singapore through UL, and on 7/19/16, Li Qi made the $10 million Second Loan to Zetta Singapore through UL. Complaint ¶¶ 91, 117-118.

In Count VIII, the Trustee seeks to avoid and recover the following twelve interest payments, totaling $2.3 million, which Zetta Singapore paid to UL on the First Loan and Second Loan:

| Date of Transfer | Amount of Transfer |
|---|---|
| 9/19/16 | $83,333.00 |
| 10/14/16 | $583,333.00 |
| 11/15/16 | $83,333.00 |
| 12/28/16 | $83,333.00 |
| 1/19/17 | $83,333.00 |
| 2/17/17 | $583,333.00 |

| | |
|---|---:|
| 3/16/17 | $83,333.00 |
| 4/20/17 | $83,333.00 |
| 5/19/17 | $166,666.00 |
| 6/16/17 | $166,666.00 |
| 7/17/17 | $166,666.00 |
| 8/15/17 | $166,666.00 |
| **TOTAL** | **$2,333,328.00** |

Complaint ¶ 259, Sch. D. As stated above, Zetta Singapore's account was with HSBC in Singapore and UL's account was with HSBC in Hong Kong, and as UL/GA/TG highlight, there are no facts alleged to show that the transfers ever entered the United States. Motion at 23.

F. Count XIII, Recharacterization of the "Third Investment" as Equity Interest, under 11 U.S.C. § 105(a), against UL

According to the Complaint on 6/27/17, Li Qi made an equity investment in Zetta Singapore, which UL disguised as a loan (6/27/17 Transfer). Complaint ¶¶ 308-09. The Complaint alleges that in exchange for $15 million from UL, Matthew Walter [30] and James Seagrim [31] agreed to transfer 20% of Zetta Singapore's outstanding shares to TG, which the Trustee alleges was controlled and owned by Li Qi. Complaint ¶ 311. And, on 8/14/17, a "Confirmatory Deed of Loan" was executed regarding the 6/27/17 Transfer. Complaint ¶ 311. The Complaint seeks to recharacterize UL's claim against Zetta Singapore as equity under 11 U.S.C. § 105. Complaint ¶ 312.

[30]    Matthew Walter was the Debtors' Director of Sales and a Director of both Zetta Singapore and Zetta USA. Complaint ¶ 19.

[31]    James Seagrim was the Debtors' Director of Operations and a Director of both Zetta USA and Zetta Singapore. Complaint ¶ 18.

*27  Section 105 permits a bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); U.S. Energy Resources Co., Inc., 495 U.S. 545 (1990). The power granted to bankruptcy courts under § 105 is not limitless. See Law v. Siegel, 571 U.S. 415, 421

(2014) ("It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." (internal quotation marks omitted)); Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 403 (1st Cir. 2002) (indicating that § 105(a) "does not provide bankruptcy courts with a roving writ, much less a free hand" and it may be invoked only if an equitable remedy "is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code") (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 969 (1988)); see also In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir. 2003) (stating that § 105(a) provides bankruptcy courts with the power to exercise equity in carrying out *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing, and a exercise of § 105 power must be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective (emphasis in original)).

The $15 million was sent by UL from its account in Hong Kong to Zetta Singapore's account in Singapore, and in exchange, TG received shares of stock in Zetta Singapore. Complaint ¶ 309 (alleging that the 6/27/17 Transfer was made by UL in name and was an equity investment in Zetta Singapore by Li Qi); see also Complaint ¶ 85 (indicating that Zetta Singapore's account was in Singapore); Condon 12/20/19 Decl. ¶ 7, Ex. E at Sch. 2 (showing that UL's HSBC account, with account number -0002, was in Hong Kong, and Zetta Singapore's HSBC account, with account number 181, was in Singapore). As UL/GA/TG highlight, there is no allegation of any U.S. involvement with the 6/27/17 Transfer. Motion at 24. [32]

[32]    Although the Trustee mentions that the Debtors' initial purchase of Plane 6 was made using

Bombardier's U.S. bank account, the Trustee does not seek to avoid this transfer and the use of Bombardier's U.S.-based account is irrelevant. Opposition at 21 (citing Complaint ¶ 85).

### iii. Choice of Law

UL/GA/TG highlight that the agreements regarding: 1) the $55 Million Transfer at issue in Counts II and V; and 2) the 6/27/17 Transfer from UL to Zetta Singapore, at issue in Count XIII, had choice-of-law provisions requiring the application of English law and Hong Kong law, respectively. Condon 12/20/19 Decl. ¶¶ 7-9, Ex. E § 11.3(a) ("Sale and Leaseback Purchase Agreement" for Plane 6, at issue in Counts II, IV, and V, indicated that it was "governed by and shall be construed in accordance with English law"), Ex. F § 11.3(a) (same regarding Plane 7), Ex. G § 16 ("Confirmatory Deed of Loan" between Zetta Singapore and UL regarding the 6/27/17 Transfer at issue in Count XIII, indicated that it would be "governed by and construed in accordance with the laws of Hong Kong").

The cases that have addressed this issue have not agreed on the relevance of choice of law provisions. Compare In re Arcapita Bank B.S.C., 575 B.R. 229 (Bankr. S.D.N.Y. 2017) (ignoring the parties' Bahrain choice of law clause and finding that transfers were domestic); with In re FAH Liquidating Corp., 572 B.R. 117, 124-25 (Bankr. D. Del. 2017) (finding that the transactions were German in part because the agreements had provisions mandating the application of German law and the forum for disputes as Munich).

### iv. FAA Registration and Part 135 Certificate

Regarding the Trustee's position that the transactions were domestic because the 9/20/16 Aircraft Lease Agreements for Planes 6 and 7 (Planes 6 and 7 ALAs) required the planes to be FAA registered and operated under Zetta USA's Part 135 Certificate, and without FAA registration and Zetta USA's Part 135 Certificate the planes would have "*no* commercial value," Opposition at 21, 29 (emphasis in original), the focus of the Bankruptcy Code's avoidance and recovery provisions is *the transfers*, not other conditions in the lease agreements. See RJR Nabisco, Inc. v. European Community, 136 S.Ct. 2090, 2101 (2016) (directing courts to look to the "focus" of a statute to determine whether a case involves a domestic application of it); In re CIL Ltd., 582 B.R. 46, 93 (Bankr.

S.D.N.Y. 2018) (providing that the "focus" of the avoidance and recovery provisions is "the initial transfer that depletes the property that would have become property of the estate").

### v. Maintenance of Aircraft at a U.S. Base

**\*28** The Trustee contends that there is a strong U.S. nexus here because under the Planes 6 and 7 ALAs, the planes had to be maintained at a U.S. base. Opposition at 22, 29 (citing Lyons 1/31/20 Decl. ¶¶ 9-11, Exs. C, D). The Trustee highlights that the Planes 6 and 7 ALAs provided that the lessee, TVPX as trustee for Zetta BVI Subsidiaries, "shall 'ensure that operational control over the Aircraft is maintained in the Aircraft Base,' which is 'the principal place of business of the Operator in the United States of America.' " Opposition at 22 n.10 (quoting Lyons 1/31/20 Decl. ¶¶ 9-11, Exs. C, D); see also Complaint ¶ 112 (indicating that TVPX acted as trustee for Zetta Jet Global 6000-3 Limited (Zetta Jet Global 6000-3) and Zetta Jet Global 6000-2 Limited (Zetta Jet 6000-2) in the transactions for Planes 6 and 7, respectively). These facts, however, are irrelevant to the analysis because they do not address the transfers themselves but instead involve other contract provisions or requirements. See RJR Nabisco, Inc. v. European Community, 136 S.Ct. 2090, 2101 (2016); In re CIL Ltd., 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018).

### vi. The Closings, Subleases to Zetta USA, and Nominal Trustees

The Trustee claims that the aircraft were financed through closings in the United States but the exhibits he cites merely indicate that Wells Fargo, "not in its individual capacity but solely as owner trustee under" trust agreements with UL (Torborg 12/9/19 Decl. ¶ 14 Ex. J) and GA (Torborg 12/9/19 Decl. ¶ 15 Ex. K), bought two Bombardier aircraft as trustee for Yuntian 3: Plane 6 (Torborg 12/9/19 Decl. ¶ 14 Ex. J), and Plane 7 (Torborg 12/9/19 Decl. ¶ 15 Ex. K). Opposition at 21-22, 29 (citing Torborg 12/9/19 Decl. ¶¶ 14-15, 20-21, Exs. J, K, P, Q). None of the exhibits specify that a closing occurred (or was to occur) in the U.S. Even if they did, however, it would not make a difference because the focus of the Bankruptcy Code's avoidance and recovery provisions is the initial fraudulent transfer of property. Similarly, although the Trustee contends that the aircraft had to be subleased to Zetta USA to operate, that fact does not concern the actual transfers he seeks to avoid and recover. Id. at 29.

2020 WL 7682136

The Trustee highlights the parties' use of U.S. corporate trustees to hold legal title to the planes and act as nominal owners, lessors, and lessees and argues that the use of the "nominal" trustees was critical for the planes to be registered with the FAA. Opposition at 21, 29, 30 (citing Complaint ¶¶ 49-50, 108, 124). The Complaint alleges that: 1) Wells Fargo has its principal place of business in Utah and, in its capacity as trustee, is a party to trust agreements with Yuntian 3 where it acted as the owner trustee of Planes 6 and 7; 2) Wells Fargo, in its capacity as trustee, is also party to various trust agreements with UL and GA, where it acted as the trustee in the sale of Planes 6 and 7; and 3) TVPX is a Wyoming corporation that, as trustee, acted as the registered owner of Planes 6 and 7 for two "Zetta BVI Subsidiaries" in the transactions for those aircraft. Complaint ¶¶ 49, 50, 112, 124.

As explained above, however, the focus of the Bankruptcy Code's avoidance and recovery provisions is the transfers, not FAA registration, and the Complaint stresses that the use of Wells Fargo and TVPX as nominal trustees related to FAA registration. Complaint ¶ 49 (alleging that Wells Fargo acted as the owner-trustee of Planes 6 and 7), ¶ 50 (indicating that TVPX acted as the registered owner of Planes 6 and 7, and in the aviation industry, it is commonplace for non-citizen U.S. corporate trusts to be formed *as an option for the registration of aircraft in the United States with the FAA* (emphasis added)), ¶ 108 (Yuntian 3, by and through Wells Fargo, entered into purchase agreements for Planes 6 and 7 with UL and TVPX as trustee for Zetta BVI subsidiaries, and Wells Fargo and TVPX acted on behalf of Yuntian 3 and the Zetta BVI Subsidiaries "solely as trustees"); see also Condon 12/20/19 Decl. ¶¶ 3, 5, Ex. A at Title Page (indicating that Wells Fargo was involved in the Plane 6 MAFL "not in its individual capacity but solely as owner trustee, except as otherwise expressly provided herein"), Ex. C at Title Page (same regarding the Plane 7 MAFL).

**\*29**  Using American professionals in a transaction is not enough to make the transaction domestic. CIL Ltd., 582 B.R. at 96 (stating that CIL retained professionals outside the United States, but even if the relevant transfer had been negotiated and documented by professionals in the United States, it would not have been enough to make the transfer a domestic transaction); Ampal, 562 B.R. at 613-14 (holding that where legal services had some U.S. connections—a company's stock was traded on the NASDAQ, and an attorney performed legal work regarding SEC and NASDAQ filings —it did not result in the transactions being domestic); In re

Lyondell Chem. Co., 543 B.R. 127, 150-51 & n.91 (S.D.N.Y. 2016) (acknowledging that the managers of BI S.à.r.l. and Basell GP were probably in New York when they approved the shareholder distributions at issue, but indicating that under Morrison, the court must target its inquiry on the "focus" of congressional concern, and the connection to the United States was not sufficiently strong for the transfer to be considered domestic); In re Sherwood Invs. Overseas Ltd., Inc., 2016 WL 5719450, at *11 (M.D. Fla. Sept. 30, 2016) (finding that the debtor-in-possession failed to overcome the presumption against extraterritoriality where its dealings with RBS had, at most, a "tangential connection" with the United States, even though the debtor-in-possession's principal and his normal RBS trader had "several conversations" in New York).

### vii. Denomination of Payments

The Trustee claims that because all rent payments had to be made in U.S. dollars, any transfers had to be made either directly from U.S. banks or through U.S. correspondent banks, but he does not cite any allegations in the Complaint to support this argument. Opposition at 30. Even assuming this were true, the denomination of payments generally has no bearing on whether transactions are foreign or domestic. See Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineração S.A., 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019) (holding, in an action for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, consummating transactions for Brazilian bonds with U.S. dollars was insufficient to plead a domestic transaction because the currency used does not necessarily have any bearing on whether a purchase or sale is domestic, and U.S. dollars can be used anywhere); see also In re Maxwell Communication Corp. plc, 186 B.R. 807, 817-18 (S.D.N.Y. 1995) (concluding that the transfers were foreign despite the payment in U.S. dollars).

For the reasons stated above, all transfers at issue in Counts I, II, IV, V, VIII, and XIII regarding UL/GA/TG are foreign.

### 4. Proofs of Claim

UL/GA/TG argue that a statute applies extraterritorially only if Congress has clearly expressed its intent "to give a statute extraterritorial effect." Motion at 22 (citing Morrison, 561 U.S. at 255). They argue that §§ 547, 548, and 550 cannot be

2020 WL 7682136

expanded beyond what Congress intended by litigants filing proofs of claims. Id.

The Trustee responds that the Defendants' "deliberate and voluntary decision" to file proofs of claims waives the presumption against extraterritoriality. Opposition at 26. He contends that the law in this Circuit is clear, when a creditor files a proof of claim, it *forfeits* any right to challenge the extraterritorial application of this Court's equitable power to adjudicate the debtors' claims under the Bankruptcy Code." Id. (emphasis in original) (quoting In re Simon, 153 F.3d at 997; citing Diaz-Barba v. Kismet Acquisition, LLC, 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010); In re Interbulk, Ltd., 240 B.R. 195, 199 (Bankr. S.D.N.Y. 1999)). The Trustee contends that because the Defendants filed proofs of claims totaling $286,696,238.84, they forfeited any challenges to the Court's power to apply the Bankruptcy Code extraterritorially. Id. at 26-27. According to the Trustee, Simon is "in line" with Supreme Court precedent addressing a bankruptcy court's equitable power to "adjudicate avoidance claims as part of the claims adjustment process." Id. at 27 (citing Langenkamp v. Culp, 498 U.S. 42, 44 (1990); Katchen v. Landy, 382 U.S. 323, 333 (1996); Stern v. Marshall, 564 U.S. 462 (2011)).

**\*30**  The Trustee discounts the argument that Simon was wrongfully decided on "jurisdictional grounds" because a bankruptcy court cannot overrule binding precedent based on an argument that the precedent is wrong. Id. (citing Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001)). He asserts that the quote from Morrison that the Defendants highlight was not the Supreme Court's statement or holding, but rather the foreign defendant's assertion. Id. The Trustee contends that In re Ampal-Am. Israel Corp., 562 B.R. 601 (S.D.N.Y. 2017), is inapposite because it is based on Maxwell II, 93 F.3d 1036 (2d Cir. 1996), which expressly declined to address the presumption against extraterritoriality. Id. at 27-28 & n.14.

UL/GA/TG contend that only Congress, and not a party, may waive the presumption against extraterritoriality. Reply at 18. They assert that the Trustee cites no Code section suggesting that Congress intended avoidance statutes to extend extraterritorially if a defendant files a proof of claim or that filing a claim waives the presumption against extraterritoriality. Id. They highlight that § 501, which governs filing proofs of claims, does not hint that Congress intended to rebut the presumption. Id. They argue that Simon does not support the Trustee's position because it held that: 1) a party invoking U.S. court jurisdiction forfeits an objection to the court's power to impose sanctions for

violating a court order; and 2) sanctions imposed against a party in U.S. litigation is not extraterritorial application of the Code. Id. They argue that here the issue is whether the Court has the power to create "judge-made" waiver exceptions to "overcome the presumption that Congress did not intend to regulate pre-bankruptcy financial transactions between businesses outside the United States." Id. at 19. They assert that under Morrison, "judge-made" exceptions to extraterritoriality, regardless of whether they are labeled "waiver" or otherwise, are prohibited. Id. UL/GA/TG contend that the Trustee's expansive reading of Simon—to create a blanket exception covering claims arising under any Bankruptcy Code provision—is absurd. Id. Finally, they argue that Simon predated Morrison, and where intervening Supreme Court authority is clearly irreconcilable with earlier Ninth Circuit authority, courts should consider themselves bound by the intervening higher authority. Id. (citing Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003)).

In Simon, Hong Kong and Shanghai Banking Corporation Ltd. (HSBC), which is incorporated in Hong Kong, has offices in the United States, and frequently does business here, lent $24 million to Odyssey International Holdings, Ltd. (Odyssey), which was incorporated in the British Virgin Islands and had offices in Hong Kong. Hong Kong and Shanghai Banking Corp., Ltd. v. Simon (In re Simon), 153 F.3d 991, 994 (9th Cir. 1998). William Neil Simon (Simon), Odyssey's major shareholder who lived in Hong Kong, guaranteed the loan. Id. Shortly thereafter, and facing $200 million in debt, Simon traveled to the United States and filed a personal chapter 7 bankruptcy case. Id. Simon listed the guarantee in his schedules and HSBC filed a $37 million proof of claim for its share in a $200 million syndicated bank loan. Id. It did not file a proof of claim for Simon's guarantee of the loan nor did it object to Simon's discharge. Id. Simon received a discharge, which prohibited creditors whose debts were discharged from "instituting or continuing any action or employing any process or engaging in any act to collect" debts as personal liabilities of Simon. Id. A week later, HSBC filed an adversary proceeding, seeking declaratory judgment that: 1) the discharge did not enjoin HSBC from enforcing the guarantee in Hong Kong; 2) the discharge be modified to permit prosecution of the guarantee in Hong Kong; and 3) if HSBC chose to commence collection proceedings in Hong Kong, it would not be subject to sanctions in the United States. Id. at 994-95. The bankruptcy court granted Simon's 12(b)(6) motion to dismiss. Id. at 995. The district court affirmed, concluding that: 1) the Bankruptcy Code conferred *in rem* jurisdiction over all property of the estate,

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

wherever located and enjoining actions to preserve the court's *in rem* jurisdiction would not be an extraterritorial application of the court's equitable powers; and 2) because HSBC had "submitted to the jurisdiction of the bankruptcy court by participating in the bankruptcy," the court did not act extraterritorially by issuing the discharge injunction. Id. HSBC appealed, primarily arguing that the § 524 discharge injunction constituted an improper extraterritorial application of a statute. Id.

 *31  The Ninth Circuit began its analysis by noting that Congress has the authority to enforce its laws beyond the United States' borders and whether Congress has done so is a question of statutory construction. Id. According to the Ninth Circuit, "Congress clearly intended extraterritorial application of the Bankruptcy Code" because filing a petition creates an estate and § 541(a) provides that a bankruptcy estate is comprised of a debtor's legal and equitable property "wherever located and by whomever held." Id. at 996. The Ninth Circuit noted that the district court in which a bankruptcy case is filed has exclusive *in rem* jurisdiction over all estate property. Id.

It held that a bankruptcy court may exercise its *in rem* jurisdiction to protect estate property wherever the property is located when issuing a discharge injunction under § 524 and the district court properly determined that Simon's discharge enjoined HSBC from beginning collection against any estate property regardless of location. Id.

The Ninth Circuit noted that the more difficult question was whether a bankruptcy court could enjoin a foreign collection action against a debtor personally or regarding assets that were not part of the estate property, if the creditor was not a party to the United States bankruptcy proceeding. Id. at 996-97. According to the Ninth Circuit, it did not need to address that issue because HSBC "fully participated in the Simon bankruptcy", thus surrendering to United States jurisdiction. Id. at 997. The Circuit noted that "allowing a participating creditor to disregard bankruptcy court orders would have 'substantial effects within the United States,' " and it found that the presumption against extraterritoriality was inapplicable. Id.

HSBC argued that the fact that it filed a proof of claim was irrelevant, because it was unrelated to Simon's personal guarantee of the loan to Odyssey. Id. The Ninth Circuit disagreed, noting that:

When a creditor submits to bankruptcy court jurisdiction by filing a proof of claim ... to collect all or a portion of a debt, it assumes certain risks. ... By acceding to bankruptcy court jurisdiction so that it might recover a portion of the money it was owed [HSBC] forfeited any right it had to claim that the court lacked the power to enjoin [it] from commencing a postbankruptcy collection proceeding against the debtor. Clearly, [HSBC]'s participation in the bankruptcy subjected it to the court's discharge order pursuant to 11 U.S.C. § 524. A sanction for violating that order is not an improper extraterritorial application of United States laws.

Id. at 997.

The Ninth Circuit's conclusion in Simon, is instructive regarding the current dispute: § 541 includes all of a debtor's property regardless of location, a district court has exclusive *in rem* jurisdiction over all property of a bankruptcy estate, and a bankruptcy court may exercise its *in rem* jurisdiction to protect estate property in issuing a discharge injunction under § 524. Id. at 996. And, the discharge injunction was correctly applied to HSBC because its participation in the bankruptcy subjected it to the otherwise valid orders of the bankruptcy court. Id. at 999.

Contrary to the Trustee's urging, Simon does not mandate that the Court find that UL's and GA's filing proofs of claims waived the presumption against extraterritoriality for numerous reasons. Simon addressed the reach of § 541, which governs estate property "wherever located", and the § 524 discharge injunction. The Ninth Circuit indicated that "Congress intended the extraterritorial application of the Bankruptcy Code as it applies to property of the estate" and it was dealing with a domestic application of the Bankruptcy Code because district courts have *in rem* jurisdiction over all estate property. Simon, 153 F.3d at 996. In contrast, none of the statutes at issue, §§ 547, 548, or 550, contain such expansive language as § 524. And, as analyzed above, the conduct at issue in the Complaint did not occur domestically

2020 WL 7682136

and none of the statutes at issue apply to the extraterritorial conduct alleged in the Complaint. To the extent that Simon held that creditors, who file proofs of claims submit to the "jurisdiction" of the bankruptcy court, id. at 997, that holding is contrary to Morrison, which unequivocally stated that determining the extraterritorial reach of a statute is a merits question rather than a jurisdictional one. Morrison, 561 U.S. at 254. Further, only Congress, and not litigants, can determine the breadth of a statute. If the Court were to accept the Trustee's position, it would effectively expand the reach of §§ 547, 548 and 550, beyond what those statutes provide, which Morrison indicated, courts should not do. Morrison, 561 U.S. at 255 (indicating that a statute applies extraterritorially only if "the affirmative intention of the Congress [is] clearly expressed to give a statute extraterritorial effect" (internal quotations omitted)).

 **\*32** Because Simon is unpersuasive, so, too, is Diaz-Barba v. Kismet Acquisition, LLC, 2010 WL 2079738 (S.D. Cal. May 20, 2010), which, in dicta, cited Simon for the proposition that "when a party affirmatively invokes the jurisdiction of the bankruptcy court, the presumption against extraterritoriality does not apply to that party," and In re Interbulk, Ltd., 240 B.R. 195 (Bankr. S.D.N.Y. 1999), is distinguishable because the transactions at issue were domestic.

Finally, the Trustee's citation to Stern v. Marshall, 564 U.S. 462, 498 (2011), Katchen v. Landy, 382 U.S. 323 (1996), and Langenkamp v. Culp, 498 U.S. 42 (1990), is unavailing. None of those cases addressed or involved extraterritorial application of the Bankruptcy Code or provide support for the Trustee's position that filing a proof of claim extends a statute beyond its bounds. [33]

[33]    As analyzed above, the Court concludes that Counts I, II, IV, V, VIII, and XIII must be dismissed because §§ 547, 548, and 550 do not apply extraterritorially, the relevant transactions were foreign, and filing proofs of claims does not waive the presumption against extraterritoriality. Therefore, the Court need not address the substantive arguments regarding those counts.

### d. Count XIV – Violation of the Automatic Stay Under § 362

UL/GA/TG argue that the Complaint fails to allege how an action filed by Li Qi, through his company, TG, and Cassidy,

through his company, Asia Aviation Holdings Pte. Ltd. (Asia Aviation), in the High Court of the Republic of Singapore (Singapore Action), violated any of § 362(a)'s subsections because:

1) The Trustee does not allege the Singapore Action could have been commenced before the Petition Date or the Singapore Action was commenced to recover a claim against Zetta Singapore in violation of § 362(a)(1); and

2) There are no allegations that the Singapore Action sought to obtain or exercise control over Zetta Singapore's property, or it had any effect on Zetta Singapore, in violation of § 362(a)(3). And, the Complaint alleges that the injunction (Injunction) issued by the Republic of Singapore's High Court only had a temporary impact on certain actions by the Trustee. [34]

Motion at 45-46 & n.28 (citing Complaint ¶¶ 164, 316).

[34]    UL/GA/TG also argue that the Complaint does not allege that the Singapore Action sought to enforce a prepetition judgment in violation of § 362(a) (2); and there are no allegations that: a) any lien was created, perfected, or enforced against property of the Debtors or in furtherance of a prepetition claim in violation of §§ 362(a)(4) & (a)(5); b) TG was seeking to collect, assess, or recover a claim against the Debtors in violation of § 362(a)(6); c) TG sought to set off any debt owing to the Debtors in violation of § 362(a)(7); or d) the Singapore Action related to any proceeding before the U.S. Tax Court in violation of § 362(a)(8).

The Trustee responds that UL/GA/TG are wrong for three reasons. Opposition at 58.

First, the Trustee claims that this Court has already found that the Singapore Action "was obtained in violation of the stay and it is void," which is the law of the case. Id. (citing Sept. 29, 2017 Hrg. Tr. 44:1-8, Zetta USA Docket #138; In re Martinez, 610 B.R. 290, 296 (Bankr. N.D. Cal. 2019)). Second, according to the Trustee, § 362(a)(1) applied because the Singapore Action involved not only the bankruptcy proceedings but also the board members' prepetition conduct, that "could have been commenced before the commencement of" the Debtors' bankruptcy cases. Id. Finally, the Trustee contends that the Injunction violated § 362(a)(3) because it prevented the Debtors and the Trustee from acting, including collecting the Debtors' assets, and reduced money available

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 128 of 210

In re Zetta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

for distribution to creditors. Id. (citing In re City of San Bernardino, 558 B.R. 321, 327-28 (C.D. Cal. 2016)).

**\*33** UL/GA/TG reply that that Singapore Action did not actually enjoin any acts by the Trustee. Reply at 45. They claim that the Trustee was appointed as chapter 11 trustee on 9/29/17, and on the same day, this Court determined that the Singapore Action "doesn't have any language that appears to impact or address this Court's ability to continue adjudicating these matters, or any language that indicates that the Singapore court was seeking to impact the Court's ability to rule in these cases." Id. (citing Condon Supp. Decl. ¶ 2, Ex. A; Zetta USA Docket #120).

They argue that the Trustee's conclusory allegation, that the Debtors' estates "expended considerable attorneys' fees and expenses defending [the Singapore Action] action," is inconsistent with the Court's determination that the Injunction had no effect on the Debtors. Id. (citing Complaint ¶¶ 165, 316). According to UL/GA/TG, the rest of the Trustee's allegations are conclusory statements that the Singapore Action prevented unspecified assets from being collected, which "Cassidy misappropriated from the Debtors." Id. They contend that the Injunction did not prevent the Trustee from taking action to recover the Dragon Pearl and those efforts began in U.S. District Court for the Central District of California in September 2017, and the Trustee began proceedings in the Federal Court of Australia in October 2017 unimpeded by the Injunction. Id. at 45-46 (citing King v. New Target Investments, Ltd. et. al., 18-ap-01340-AK Docket #1 ¶¶ 4, 74). UL/GA/TG highlight that after the Injunction was discharged in July 2018, the Complaint contains no allegations of thwarted efforts to recover other assets. Id. at 46.

The Complaint alleges: 1) on 9/15/17, the Debtors filed their bankruptcy petitions, and the automatic stay went into effect; 2) on 9/18/17, at the direction of Li Qi, TG (and Asia Aviation), filed the Singapore Action against Zetta Singapore, Walter and Seagrim, seeking to enjoin Zetta Singapore's bankruptcy case; 3) on 9/20/17, the High Court of the Republic of Singapore issued the Injunction purporting to enjoin Zetta Singapore from "carrying out any further steps in and relating to the purported bankruptcy filings;" 4) commencing the Singapore Action, and obtaining the Injunction violated the automatic stay; 5) the Injunction "immediately and significantly" harmed the Debtors and their estates, because the Debtors and the Trustee were prevented from taking action to collect assets that Cassidy

misappropriated, and the Trustee spent significant time and resources vacating the Injunction; 6) the Trustee was required to retain local counsel in the Singapore Action, and although on 11/1/17, TG filed a "Notice of Discontinuance," the damage was done because the Injunction had already been entered; 7) Cassidy, through Asia Aviation, maintained the litigation; 8) through Singapore counsel, the Trustee was required to submit and respond to multiple rounds of legal proceedings, including submitting affidavits, legal briefs, and "voluminous exhibits," and participate in numerous status conferences and hearings; 9) the Injunction was not lifted until 7/12/18 when the High Court of the Republic of Singapore discharged it by consent of the parties; 10) the litigation caused substantial delay and expense to Zetta Singapore, and the Trustee expended considerable attorneys' fees and expenses, to the detriment of Zetta Singapore's estate and creditors; and 11) the Trustee is entitled to compensatory damages from TG and Li Qi personally in an amount to be proven at trial. Complaint ¶¶ 161-66, 314-17.

### 1. The Law of the Case Doctrine

**\*34** "The 'law of the case' doctrine provides that a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." In re Martinez, 610 B.R. 290, 296 (Bankr. N.D. Cal. 2019) (internal quotations omitted). For it to apply, the issue in question must have been decided either expressly or by necessary implication in a previous disposition. Id. In the bankruptcy context, "case" refers to the bankruptcy case and all adversary proceedings that arise within it. Id.

During the 9/29/17 hearing, the Court considered the "Debtors' Emergency Motion to Approve Stipulation for Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104 [Doc. No. 49]," Zetta USA Docket #51, and stated that: 1) the Injunction "doesn't have any language that appears to impact or address this Court's ability to continue adjudicating these matters, or any language that indicates the Singapore court was seeking to impact the Court's ability to rule in these cases;" and 2) "*Even if ...* the injunction could be interpreted as having been issued to try to impact this Court's ability to rule in these cases, it would not have that effect," because "[a]s the Debtors correctly argue, the purported injunction was obtained after these cases were filed," and "it was obtained in violation of the stay, and it is void." Zetta USA Docket #138 at 46-47 (emphasis added). The Trustee quotes a statement made by the Court, in dicta, during a hearing on a motion to approve

a stipulation for the appointment of a chapter 11 trustee, and the issue of whether Li Qi and TG violated the stay has not been decided for purposes of the law of the case doctrine. See In re Martinez, 610 B.R. 290, 296 (Bankr. N.D. Cal. 2019) (stating that for the law of the case doctrine to apply, the *issue in question* must have been decided either expressly or by necessary implication in a previous disposition (emphasis added)).

### 2. 11 U.S.C. § 362

The Trustee contends that the Singapore Action violated §§ 362(a)(1) and (a)(3). Opposition at 58.

### i. Section 362(a)(1)

Section 362(a)(1) provides that the filing of a petition stays "the commencement or continuation ... of a judicial, administrative, or other action or proceeding *against* the debtor that *was or could have been commenced before the commencement of the case ...* , or to recover a claim against the debtor that *arose before the commencement of the case ...*" (emphases added). If a "judicial, administrative, or other action or proceeding" against a debtor is based on a postpetition claim, such action cannot violate the automatic stay under § 362(a)(1). In re Clower, 463 B.R. 573, 578 (Bankr. N.D. Ga. 2011).

Although the Trustee contends that the Singapore Action involved "not only the bankruptcy proceedings but also board members' prepetition conduct," Opposition at 58, the Complaint does not mention any board members' prepetition conduct being at issue in the Singapore Action. Further, the Complaint alleges that on 9/18/17, TG, at Li Qi's direction, filed the Singapore Action against Zetta Singapore, Walter and Seagrim to enjoin Zetta Singapore's bankruptcy case, Complaint ¶ 315, after it had been filed on 9/15/17. Therefore, there is no allegation that the Singapore Action could have been commenced before the Petition Date and the Court finds that § 362(a)(1) is inapplicable.

### ii. Section 362(a)(3)

Section 362(a)(3) provides that the filing of a petition stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property

of the estate." Although the automatic stay does not prevent a claim from arising postpetition, § 362(a)(3) prevents the enforcement of a postpetition claim against estate property. Matter of Growth Dev. Corp., 168 B.R. 1009, 1016 (Bankr. N.D. Ga. 1994). "The language of [§ 362(a)(3)] is devoid of any distinction between prepetition and postpetition claims. So long as a creditor attempts to obtain property of the estate, the automatic stay remains in full force and effect." Id.

**\*35** The Complaint alleges that the Injunction prevented the Trustee and the Debtors from collecting assets that Cassidy misappropriated. Complaint ¶ 316. Although the Complaint's allegations are vague regarding what assets the Trustee was prevented from collecting, the Court must view the Complaint in the light most favorable to the Trustee, Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1122 (9th Cir. 2008), Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001), and the Complaint pleads that the Singapore Action was filed to exercise control over property of the estate and prevented the Debtors' and the Trustee's collection efforts. UL/GA/TG's contention—that the Trustee/Debtors began collection efforts regarding the Dragon Pearl in September 2017 and therefore, were not prevented from taking action—does not address the Complaint's allegations that the Trustee/Debtors were impeded by the Injunction.

The Complaint also details counsel's litigation efforts in the High Court of the Republic of Singapore on behalf of the Trustee, Complaint ¶¶ 161-66, and UL/GA/TG do not argue that counsel did not engage in the conduct outlined by the Trustee.

UL/GA/TG are correct that on the same day the Trustee was appointed (9/29/17), the Court stated that the Injunction "doesn't have any language that appears to impact or address this Court's ability to continue adjudicating these matters, or any language that indicates the Singapore court was seeking to impact the Court's ability to rule in these cases." Zetta USA Docket #138 at 46. But, that is irrelevant regarding whether the Singapore Action interfered with the Debtors and Trustee's collection efforts. The bulk of UL/GA/TG's argument addresses the amount of damages, not the adequacy of the Trustee's allegations. Because the Complaint pleads sufficient factual allegations that 11 U.S.C. § 362(a)(3) was violated, the Court denies the Motion regarding Count XIV.

### e. Count XV – Disallowance Under § 502

The Complaint alleges as follows: 1) § 502(d) provides that the claim of any entity from which property is recoverable

In re Zeta Jet USA, Inc., Slip Copy (2020)
2020 WL 7682136

under 11 U.S.C. §§ 542 or 550, or that is a transferee of
a transfer avoidable under 11 U.S.C. §§ 547 or 548, shall
be disallowed unless the transferee has paid the amount for
which it is liable under 11 U.S.C. §§ 542 or 550; 2) the
Defendants are entities from which property is recoverable
under 11 U.S.C. §§ 542 or 550 or transferees of transfers
which are avoidable under 11 U.S.C. §§ 547 or 548; and 3)
pursuant to 11 U.S.C. § 502(d), any and all claims of the
Defendants against the Debtors must be disallowed until such
time as the Defendants pay the Trustee the amounts required
or turn over the property that is recoverable. Complaint ¶¶
319-21.

UL/GA/TG argue that the § 502(d) remedy only applies
if the Trustee establishes an avoidable transfer or turnover
claim, and because none of his underlying counts against them
plead a plausible claim, Count XV should also be dismissed.
Motion at 46. The Trustee counters that the Complaint states
numerous viable claims, and it states a claim for disallowance.
Opposition at 59. UL/GA/TG reply that the Complaint fails
to state viable preference and fraudulent transfer claims, and
Count XV should be dismissed. Reply at 46.

Title 11 U.S.C. § 502(d) provides as follows:

> [T]he court shall disallow any claim
> of any entity from which property
> is recoverable under section 542 [or]
> 550 ... of this title or that is a transferee
> of a transfer that is avoidable under
> section ... 547 [or] 548 ... of this title. ...

See also 4 Collier on Bankruptcy ¶ 502.05[1] ("Section 502(d)
is generally operative: (1) when the trustee has secured an
order to the claimant for a turnover of property under sections
542 and 543; [and] (2) when the trustee, having successfully
avoided transfers under the sections dealing with the trustee's
avoidance powers (including sections 544, 547 and 548), may
recover under section 550."); see generally In re Plastech
Engineered Products, Inc., 394 B.R. 147, 155 (Bankr. E.D.
Mich. 2008) (stating that § 502(d) is designed to assure equal
distribution of a bankruptcy estate's assets and it does so
by restoring assets to the estate and delaying or prohibiting
payments to creditors who have not repaid an avoidable
transfer or turned over estate property).

**\*36** Here, because all of the avoidance
and recovery claims are dismissed, Count
XV is dismissed.

f. Leave to Amend

In the Motion, UL/GA/TG summarily argue that the
Complaint should be dismissed without leave to amend.
Motion at 2, 3.

The Trustee responds that in the event of dismissal, the Court
should grant leave to amend, which should be granted unless
the Court determines that the pleading could not possibly be
cured by the allegation of other facts. Opposition at 59 (citing
Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc);
Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001);
Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 983
(9th Cir. 2000)).

UL/GA/TG reply that amending the Complaint would be
futile. Reply at 46. They argue that the Trustee filed the
Complaint on the eve of the statute of limitations expiring,
after having possession of the Debtors' records and a two-
year opportunity to investigate. Id. They claim that many of
the Complaint's allegations are contradicted by documents
incorporated into the Complaint and/or by other allegations
in the Complaint. Id. They assert that the relevant documents
are known and undisputed, and in the Trustee's possession.
Id. They contend that the Trustee plead claims based on
generic facts, conclusions, and allegations that contradict
undisputed documents, and amendment would be futile. Id.
(citing Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995);
Outdoor Sys. Inc. v. City of Mesa, 997 F.2d 604, 614 (9th Cir.
1993)). They add that where the Trustee cannot not amend
without contradicting allegations in the Complaint, or without
contradicting undisputed documents previously incorporated
in the Complaint, leave to amend may be denied. Id. (citing
Reddy v. Litton Indus., Inc., 912 F.2d 291, 296-97 (9th Cir.
1990)).

Federal Rule of Bankruptcy Procedure 7015 provides that
Rule 15 of the FRCP applies to supplemental and amended
pleadings in bankruptcy cases. Rule 15(a)(2) indicates that "a
party may amend its pleading only with the opposing party's
written consent or the court's leave. The court should freely
give leave when justice so requires."

Courts have the discretion to grant or deny leave to amend a complaint. Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996). "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981). Consequently, the policy to grant leave to amend is applied with "extreme liberality." Id.

Parties seeking leave to amend have the initial burden to show a legitimate reason for seeking amendment. See Foman v. Davis, 371 U.S. 178, 182 (1962); Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 989 F. Supp. 1237, 1241 (N.D. Cal. 1997). Assuming the movant meets that burden, the burden then shifts to the party opposing amendment to show that leave to amend is not warranted. Advanced Cardiovascular Sys., Inc., 989 F. Supp. at 1241 ("Once a party seeking leave to amend has given a legitimate reason for amendment, the burden shifts to the party opposing amendment to demonstrate why leave to amend should not be granted.") (citing Genentech, Inc. v. Abbott Labs., 127 F.R.D. 529, 530-31 (N.D. Cal. 1989)). The party opposing amendment must demonstrate that the following factors warrant denial of leave to amend:

**\*37** . Bad faith;

2. Undue delay;

3. Prejudice to the opposing party; and

4. Futility of amendment.

Ditto v. McCurdy, 510 F.3d 1070, 1079 (9th Cir. 2007) (internal citations omitted); Smith v. Chrysler Corp., 938 F. Supp. 1406, 1412 (S.D. Ind. 1996) ("Defendants have the burden of showing that the amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice.") (internal citations omitted); see also Reed v. Dynamic Pet Prod., 2016 WL 4491597, at *1 (S.D. Cal. 2016).

Of the factors courts analyze when adjudicating motions for leave to amend, the potential for prejudice to the opposing party "carries the greatest weight." Id. The opposing party has the burden of establishing prejudice. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 187 (9th Cir.1987). Absent prejudice or a strong showing of any of the remaining factors, "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). "For an amendment to be futile, it must appear on its face that it is not actionable." Coble v. Derosia, 2011 WL 444961, at *4 (E.D. Cal. Feb. 8, 2011).

Because of the policy to grant leave to amend with "extreme liberality," and because there have been no previous amendments, the Court finds that it is appropriate to grant the Trustee leave to amend Counts I, II, IV, V, VIII, XIII, and XV. See Banco Safra S.A. – Cayman Islands Branch v. Samarco Mineração S.A., 2019 WL 2514056, at *2-3 (S.D.N.Y. June 18, 2019) (indicating that the defendants' motion to dismiss a previous version of the complaint based "principally" on the presumption against extraterritoriality was denied without prejudice, and the plaintiff was allowed to amend the complaint to add facts that were submitted in support of the plaintiff's opposition to the motion to dismiss; and dismissing the complaint at issue with prejudice because of the plaintiff's "repeated failures to cure" and notice from the court that it would not have another opportunity to sufficiently allege a domestic transaction).

IV. Conclusion

For the reasons stated above, the Motion is granted with leave to amend regarding Counts I, II, IV, V, VIII, XIII, and XV, and the Motion is denied regarding Count XIV. Pursuant to LBR 9021-1(b)(1)(B), UL/GA/TG must serve and lodge a proposed order via LOU within 7 days of the filing of this memorandum of decision.

**All Citations**

Slip Copy, 2020 WL 7682136

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3721477
Only the Westlaw citation is currently available.
United States Bankruptcy Court, C.D. California,
Los Angeles Division.

IN RE: ZETTA JET USA, INC. Debtor(s).
Jonathan D. King Plaintiff(s),
v.
Export Development Canada, Glove Assets
Investment Limited, Minsheng Business Aviation
Limited, Minsheng Financial Leasing Co., Ltd.,
Li Qi, Truly Great Global Limited, TVPX ARS,
Inc., in its capacity as trustee to Zetta MSN
9688 Statutory Trust dated September 20,
2016 (formed as Wyoming statutory trust),
Universal Leader Investment Limited, Wells
Fargo Bank Northwest, N.A., in its capacity as
trustee to Yuntian 3 Trust dated September
20, 2016 (formed and administered in Utah)
and its capacity as trustee of Yuntian 4 Trust
dated Septembe, Yuntian 3 Leasing Company
Designated Activity Company, Yuntian 4 Leasing
Company Designated Activity Company, Zetta MSN
9606 Statutory Trust dated September 20, 2016
(formed as Wyoming statutory trust) Defendant(s).

Case No.: 2:17-bk-21386-SK
|
Adv No: 2:19-ap-01383-SK
|
Date: 8/11/2021
|
Signed August 17, 2021

COURT'S MEMORANDUM OF DECISION ON: 1)
"MOTION TO DISMISS COUNTS I, II, VI, VII, VIII,
IX & X AND MOTION TO STRIKE COUNTS VIII &
I [SIC] OF AMENDED ADVERSARY COMPLAINT,"
DOCKET #238, FILED BY UNIVERSAL LEADER
INVESTMENT LIMITED, GLOVE ASSETS
INVESTMENT LIMITED, AND TRULY GREAT
GLOBAL LIMITED; AND 2) "MOTION TO DISMISS
COUNTS I, II, VII, VIII, AND IX OF AMENDED
ADVERSARY COMPLAINT FOR LACK OF
PERSONAL JURISDICTION, INSUFFICIENT

SERVICE OF PROCESS AND FAILURE TO STATE
A CLAIM," DOCKET #239, FILED BY LI QI

Sandra R. Klein, United States Bankruptcy Judge

**\*1** On 8/11/21 at 9:00 a.m., the Court heard a "Motion to
Dismiss Counts I, II, VI, VII, VIII, IX & X and Motion
to Strike Counts VIII & I [sic] of Amended Adversary
Complaint" (Motion), Docket #238, filed by Universal
Leader Investment Limited, Glove Assets Investment
Limited, and Truly Great Global Limited (collectively UL/
GA/TG). Appearances were as noted on the record. All parties
were given an opportunity to be heard. At the conclusion
of the 8/11/21 hearing, the Court took the Motion under
submission.

Also on calendar for 8/11/21 at 9:00 a.m. was a "Motion to
Dismiss Counts I, II, VII, VIII, and IX of Amended Adversary
Complaint for Lack of Personal Jurisdiction, Insufficient
Service of Process and Failure to State a Claim" (Li Qi
Motion), Docket #239, filed by Li Qi. The Court noted that
Li Qi is named as a defendant in five counts that are at issue
in UL/GA/TG's Motion and continued the hearing on the Li
Qi Motion to 8/18/21 at 9:00 a.m.

A copy of the Court's Memorandum of Decision regarding the
Motion and the Li Qi Motion is attached hereto.

I. Motions Before the Court

a. UL/GA/TG Motion to Dismiss
Before the Court is a "Motion to Dismiss Counts I, II, VI, VII,
VIII, IX & X and Motion to Strike Counts VIII & I [sic] of
Amended Adversary Complaint" (Motion) filed by Universal
Leader Investment Limited (UL), Glove Assets Investment
Limited (GA), and Truly Great Global Limited (TG, and
together with UL and GA, UL/GA/TG). AP Docket #238. [1] In
support of the Motion, UL/GA/TG and Li Qi filed a "Request
for Judicial Notice ..." (UL/GA/TG/LQ RJN). [2] AP Docket
#240.

[1]    All references to "Zetta USA Docket" are to the
docket in In re Zetta Jet USA, Inc., 17-bk-21386-
SK. All references to "Zetta Singapore Docket"
are to the docket in In re Zetta Jet PTE Ltd., 17-
bk-21387-SK. All references to "AP Docket" are to
the docket in King v. Yuntian 3 Leasing Company

Designated Activity Company et al., 19-ap-1383-SK.

[2]
The UL/GA/TG/LQ RJN was filed in support of UL/GA/TG's Motion and the Li Qi Motion (defined below). AP Docket #240.

On 6/3/21, Jonathan D. King (King), in his capacity as chapter 7 trustee (Trustee) of Zetta Jet USA, Inc. (Zetta USA) and Zetta Jet PTE, Ltd. (Zetta Singapore, and together with Zetta USA, Debtors), filed an "Opposition to Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, and Truly Great Global Limited's Motion to Dismiss Counts I, II, VI, VII, VIII, IX & X and Motion to Strike Counts VIII & IX of Amended Adversary Complaint" (Opposition). AP Docket #259. In support of the Opposition, the Trustee filed an "Opinion of Rosalind Phelps QC," a "Limited Objection to Requests for Judicial Notice" (Objection to UL/GA/TG/LQ RJN), an "Objection and Motion to Strike Declaration of Peter Ferrer in Support of Li Qi's Motion to Dismiss and Declaration of Harprabdeep Singh," [3] and a "Request for Judicial Notice" (Trustee RJN). AP Docket #s 259, 260, 261, 262.

[3]
The "Declaration of Harprabdeep Singh" was filed on 2/21/20 in support of UL/GA/TG's reply in support of their motion to dismiss Counts 1, 2, 4, 5, 8, 13, 14, and 15 of the original complaint, which was filed on 9/13/19. AP Docket #62-2.

*2 On 6/17/21, UL/GA/TG filed: 1) a "Reply in Support of Motion to Dismiss ... and Motion to Strike ..." (Reply); 2) a "Supplemental Declaration of Harprabdeep Singh;" 3) a "Declaration of John A. Kimbell QC;" and 4) a "Reply ... to Trustee's Limited Objection to Request for Judicial Notice ..." (Reply to RJN Objection). AP Docket #s 281, 283.

On 6/27/21, UL/GA/TG and Li Qi filed a "Response to Objection and Motion to Strike Declaration of Peter Ferrer in Support of Li Qi's Motion to Dismiss and Declaration of Harprabdeep Singh in Support of UL Defendants' Motion to Dismiss." AP Docket #294. That same day, they filed an "Objection[ ] to the ... Opinion of Rosalind Phelps QC ...." AP Docket #295.

On 8/4/21, the Trustee filed a "Reply in Support of Objection and Motion to Strike Declarations of Peter Ferrer and Harprabdeep Singh," AP Docket #308, and an "Objection

to Supplemental Declaration of Harprabdeep Singh." AP Docket #309.

b. Li Qi Motion to Dismiss
Also before the Court is a "Motion to Dismiss Counts I, II, VII, VIII, and IX of Adversary Complaint for Lack of Personal Jurisdiction, Insufficient Service of Process and Failure to State a Claim" filed by Li Qi (Li Qi Motion). AP Docket #239. In support of the Li Qi Motion, Li Qi filed a "Declaration of Li Qi" and a "Declaration of Peter Ferrer." AP Docket #239.

On 6/3/21, the Trustee filed: 1) a "Motion for Limited Jurisdictional Discovery ..." (Discovery Motion); and 2) an "Opposition to Defendant Li Qi's Motion to Dismiss Counts I, II, VII, VIII, and IX of Amended Adversary Complaint." AP Docket #s 255, 257. In support of the Discovery Motion, the Trustee filed a "Declaration of Joseph A. Roselius." AP Docket #255. In support of the Opposition to Li Qi Motion, the Trustee filed a "Declaration of Joseph A. Roselius" and a "Witness Statement of Nicholas Charles Burkill." AP Docket #257.

On 6/16/21, Li Qi filed an "Opposition to Trustee's Motion for Jurisdictional Discovery" and a "Supplemental Declaration of Peter Ferrer." AP Docket #274.

On 6/23/21, the Trustee filed: 1) a "Reply in Support of Motion for Limited Jurisdictional Discovery ... ," with a "Witness Statement of Nicholas Charles Burkill" and a "Second Witness Statement of Nicholas Charles Burkill," AP Docket #288; 2) a "Request for Judicial Notice in Support of the Trustee's Reply in Support of Motion for Limited Jurisdictional Discovery ... ," AP Docket #289; and 3) an "Objection and Motion to Strike Supplemental Declaration of Peter Ferrer in Support of Defendant Li Qi's Opposition to Trustee's Motion for Jurisdictional Discovery," AP Docket #290.

On 7/9/21, Li Qi filed a "Reply in Support of Motion to Dismiss Counts I, II, VII, VIII, and IX of Amended Adversary Complaint for Lack of Personal Jurisdiction, Insufficient Service of Process, and Failure to State a Claim." AP Docket #305.

On 8/11/21, the Court held a hearing on the: 1) Motion and 2) the Li Qi Motion. During the hearing, counsel for the Trustee and UL/GA/TG and Li Qi appeared and were given an opportunity to be heard. At the conclusion of the

2021 WL 3721477

hearing, the Court took the Motion and the Li Qi Motion under submission. Based on the argument in the pleadings and argument of counsel during the hearing, and for the reasons stated in the analysis below, the Court rules as follows: the Motion to dismiss Counts 1, 2, 6, 7, 8, 9, and 10 is granted without leave to amend. Because Li Qi is only named as a defendant in Counts 1, 2, 7, 8, and 9, all of which are being dismissed, the Court need not address the issues raised in the Li Qi Motion or the Discovery Motion.

**\*3**  This memorandum constitutes the Court's findings of facts and conclusions of law regarding the legal sufficiency of the counts at issue in the Motion.

II. Facts

a. Bankruptcy Cases
On 9/15/17, Zetta USA and Zetta Singapore filed chapter 11 petitions (collectively, Cases). Zetta USA Docket #1; Zetta Singapore Docket #1. King was appointed as the chapter 11 trustee, and after the Cases were converted, he was appointed as the chapter 7 trustee. Zetta USA Docket #s 159, 452, 458.

b. Adversary Proceeding
On 9/13/19, the Trustee filed an adversary complaint (Original Complaint) against: 1) Yuntian 3 Leasing Company Designated Activity Company f/k/a Yuntian 3 Leasing Company Limited (Yuntian 3); 2) Yuntian 4 Leasing Company Designated Activity Company f/k/a Yuntian 4 Leasing Company Limited (Yuntian 4); 3) Minsheng Financial Leasing Co., Ltd. (Minsheng Financial); 4) Minsheng Business Aviation Limited (Minsheng Business); 5) Export Development Canada (EDC); 6) UL; 7) GA; 8) TG; and 9) Li Qi (collectively, the Defendants), which alleged that Zetta Singapore was formed and run by a con artist, Geoffrey Cassidy (Cassidy), [4] who, over a two-year period, with the help of the Defendants, obtained $10 million from kickbacks, bribes and embezzlement, while saddling the Debtors with almost $500,000,000 in unsustainable debt incurred by purchasing overpriced aircraft in a down market. AP Docket #1.

[4]    Cassidy was the Debtors' Managing Director and a Director of Zetta Singapore. FAC ¶ 29.

The Original Complaint contained the following counts against the following parties:

| Count # | Type of Claim | Statute(s) | Defendant(s) | Page # |
|---|---|---|---|---|
| I | Avoidance and Recovery of Fraudulent Transfers (2015 Acquisitions) | 11 U.S.C. §§ 548, 550 | Universal Leader; Glove Assets; Li Qi | |
| II | Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7) | 11 U.S.C. §§ 548, 550 | Li Qi; Universal Leader; Glove Assets; Yuntian 3; Minsheng Financial; and Minsheng Business | |
| III | Avoidance and Recovery of Preference Transfer | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Yuntian 3 | 30 |
| IV | Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers) | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Li Qi, Universal Leader and Glove Assets | 30 |
| V | Avoidance and Recovery of Preference Transfer ($55 Million Transfer) | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Li Qi and Universal Leader | 34 |
| VI | Avoidance and Recovery of Fraudulent Transfers | 11 U.S.C. §§ 548, 550 | In the Alternative - Against Minsheng Business and Yuntian 4 | 36 |
| VII | Turnover of Property of the Bankruptcy Estate | 11 U.S.C. § 542 | | 37 |
| VIII | Avoidance and Recovery of Preference Transfers (Interest Payment Transfers) | 11 U.S.C. §§ 547, 550 | In the Alternative – Against Yuntian 4, Minsheng Business, and Minsheng Financial | 39 |
| IX | Avoidance and Recovery of Preference Transfer | 11 U.S.C. §§ 547, 550 | Universal Leader; Li Qi | 40 |
| X | Avoidance and Recovery of Preference Transfer | 11 U.S.C. §§ 547, 550 | EDC; Yuntian 4 | 41 |
| XI | Turnover of Property of the Bankruptcy Estate | 11 U.S.C. § 542 | Yuntian 4 | 42 |
| XII | Avoidance and Recovery of Preference Transfers (Legal Fees Transfers) | | In the Alternative – Against Yuntian 4, Minsheng Financial, and | 44 |

In re Zeta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

Minsheng Business 11 U.S.C. §§ 547, 550 Minsheng Business; Minsheng Financial; Yuntian 3; Yuntian 4 XIII Recharacterization of the Third Investment as Equity Interest 45 11 U.S.C. § 105(a) Universal Leader XIV Violation of the Automatic Stay 46 11 U.S.C. § 362 XV Disallowance of Claims 47 Truly Great; Li Qi 11 U.S.C. § 502(d) Minsheng Financial; Minsheng Business; Yuntian 3; Yuntian 4; Universal Leader; Glove Assets; EDC 49 50

*4 AP Docket #1.

### i. Yuntian and Minsheng Motions to Dismiss

The Court granted in part and denied in part a "Motion to Dismiss Counts II, III, VI, VII, IX, X, XI, XII, and XV of Adversary Complaint" filed by Yuntian 3 and Yuntian 4 (Yuntian MTD), and a "Motion to Dismiss Counts II, VI, VII, XI, XII, and XV of Adversary Complaint" filed by Minsheng Business (Minsheng MTD),[5] dismissing Counts 2, 3, 6, 9, 10, 11, and 12, with leave to amend those counts (Original Yuntian/Minsheng Ruling). AP Docket #s 32, 44, 175, 186.

[5]    In the Minsheng MTD, Minsheng Business, which is an affiliate of Yuntian 3 and Yuntian 4, indicated that it was represented by the same counsel as Yuntian 3 and Yuntian 4 and that each substantive argument in the Yuntian MTD applied "with full force to the Trustee's claims asserted against Minsheng," and it incorporated by reference the Yuntian MTD. Minsheng MTD at 7. Therefore, the Court analyzed the Yuntian MTD and the Minsheng MTD together. AP Docket #175 at 3 n.2.

### ii. UL/GA/TG Motion to Dismiss

The Court granted in part and denied in part a "Motion to Dismiss Counts I, II, IV, V, VIII, XIII, XIV, & XV of Adversary Complaint" filed by UL/GA/TG (Original UL/GA/TG MTD), dismissing the following counts with leave to amend those counts (Original UL/GA/TG MTD Ruling):

Count # Type of Claim Statute(s) 1 Avoidance and Recovery of Fraudulent Transfer (2015 Acquisitions) 11 U.S.C. §§ 548; 550 Defendants 2 Avoidance and Recovery of Fraudulent Transfers (Plane 6 and Plane 7) 11 U.S.C. §§ 548; 550 Li Qi, UL, GA, Yuntian 3, Minsheng Financial, and Minsheng Business UL, GA, and Li Qi 4 In the Alternative, Avoidance and Recovery of Preference Transfers (Plane 6 Loan Transfers) 11 U.S.C. §§ 547; 550 5 In the Alternative, Avoidance and Recovery of Preference Transfer ($55 Million Transfer) 11 U.S.C. §§ 547; 550 Li Qi, UL, and GA 8 Avoidance and Recovery of Preference Transfers (Interest Payment Transfers) 11 U.S.C. §§ 547; 550 Li Qi and UL 13 Recharacterization of the Third Investment as Equity Interest 11 U.S.C. § 105(a) UL and Li Qi 15 Disallowance of Claims 11 U.S.C. § 502(d) Minsheng Financial, Minsheng Business, Yuntian 3, Yuntian 4, UL, GA, UL

AP Docket #s 45, 174, 188.

### iii. EDC Motion to Dismiss

The Court granted a "Motion to Dismiss Counts IX and XV of Adversary Complaint ..." filed by EDC, dismissing Count 9 with leave to amend, and dismissing Count 15 with leave to amend if EDC filed a proof of claim. AP Docket #s 88, 173, 187.

### iv. First Amended Complaint

On 3/29/21, the Trustee filed a First Amended Complaint (FAC) and approximately two months later, he filed a redlined FAC, which contain the following counts against the following parties:

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 136 of 210

In re Zetta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

**Count # Type of Claim** Avoidance and Recovery of Fraudulent Obligations and Subsequent Transfers Made on Account of Such Obligations (Plane 6 **Statute(s)** 1 **Defendant(s)** and Plane 7 Finance Leases) **Page #** 2 Avoidance and Recovery of Fraudulent Obligations and Transfers on Account of Such Obligations (Minsheng Refinancing) 11 U.S.C. §§ 548, 550 Li Universal Leader Glove Assets Yuntian 3 Minsheng Financial Minsheng Business 11 U.S.C. §§ 548, 550 Universal Leader; Glove Assets; Li 3 Avoidance and Recovery of Fraudulent Transfers 99 4 Turnover of Property of the Bankruptcy Estate 11 U.S.C. §§ 548, 550 In the Alternative - Against Minsheng Business and Yuntian 4 103 5 Turnover of Property of the Bankruptcy Estate 11 U.S.C. § 542 111 In the Alternative – Against Yuntian 4, Minsheng Business, and Minsheng Financial 6 Recharacterization of the Third Investment as Equity Interest 11 U.S.C. § 542 113 Yuntian 4; Minsheng Financial; Minsheng Business 7 Violation of the Automatic Stay 11 U.S.C. § 105(a), 502 Universal Leader 117 8 Recharacterization of 2016 Plane 6 Lease Agreement 11 U.S.C. § 362 120 Truly Great; Li 9 Recharacterization of Yuntian 3 (Plane 7) 2016 Plane 7 Lease Agreement 11 U.S.C. § 105(a) In the Alternative – Against Minsheng Business, Yuntian 3, Li, Glove Assets, and Universal Leader 120 10 Disallowance of Claims Under 11 U.S.C. § 502(d) and Assertions of Counterclaims Under 28 U.S.C. § 157(b)(2)(C) 11 U.S.C. § 105(a) In the Alternative – Against Minsheng Business, Yuntian 3, Li, Glove Assets, and Universal Leader

122 N/A 123 Yuntian 3; Yuntian 4; Universal Leader; Glove Assets 125

  **\*5**  AP Docket #s 232, 253.

The FAC alleges the following:

 1) Cassidy was a con artist. FAC ¶¶ 74-78.

 2) On 7/15/15, Cassidy, James Seagrim (Seagrim) and Matthew Walter (Walter)[6] incorporated Zetta Singapore. Id. ¶¶ 79-84.

 3) Cassidy had actual and effective control of key functions of Zetta Singapore and drove it into an immediate financial crisis by purchasing high-priced aircraft that saddled the company with almost half a billion dollars in insurmountable debt. Id. ¶¶ 85-90.

 4) Cassidy funded a "lifestyle of the rich and famous" at the Debtors' expense by accepting bribes and kickbacks, stealing funds, and operating the Debtors as a Ponzi-like scheme. Id. ¶¶ 91-150.

 5) The Debtors were insolvent almost from the inception of Zetta Singapore in July 2015. Id. ¶¶ 151-65.

 6) Cassidy knew or was substantially certain that his actions would hinder, delay, or defraud the Debtors' creditors. Id. ¶¶ 166-73.

 7) Li Qi, through UL, provided a $50 million loan to Zetta Singapore to buy a Bombardier Global Express 6000 with manufacturer serial number (MSN) 9688 (Plane 6). The fair market value of Plane 6 was $39 million. Zetta Singapore paid for Plane 6 with an 11/24/15 $2 million transfer from UL to Bombardier, Inc.[7] and a 12/6/15 $48 million transfer from UL to Zetta Singapore, and Zetta Singapore then paid Bombardier Aerospace Corporation $46.3 million on 12/15/15 and $1 million 12/28/15. Zetta Singapore and GA documented the $48 million loan via a 12/29/15 agreement for Zetta Singapore to "lease" Plane 6 (2015 Plane 6 Lease). Id. ¶¶ 174-77, 180-83. Plane 6 was required to be registered with the Federal Aviation Agency (FAA) and operated by Zetta USA. Id. ¶ 178.

 8) Li Qi also provided a $50 million loan to Zetta Singapore to buy a Bombardier Global Express 6000 with MSN 9606 (Plane 7), which was owned by UL and was worth

In re Zetta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

$37.6 million as of November 2015. Id. ¶¶ 174-77, 204. On 12/31/15, Zetta Singapore entered into an agreement with UL to "lease" Plane 7. Id. ¶¶ 176, 204-05. Plane 7 was required to be registered with the FAA and operated by Zetta USA. Id. ¶ 178.

9) Li Qi used his companies, including UL, TG, and GA, interchangeably and as alter egos of one another and treated them as extensions of himself. Id. ¶¶ 54-64.

10) The Debtors incurred obligations regarding Planes 6 and 7 in the US. UL, GA, and the Debtors:

a. Ensured that the transactions for the 2015 Plane 6 Lease and 2015 Plane 7 Lease closed in the US to enable the Debtors to register Planes 6 and 7 with the FAA and operate them under Zetta USA's Part 135 certificate,[8] id. ¶ 178;

b. Required that Zetta Singapore confirm that it "became obliged" to GA under the 2015 Plane 6 Lease and UL under the 2015 Plane 7 Lease when it took delivery of Planes 6 and 7 at Windsor Locks, Connecticut, id. ¶ 178, 193;

c. Wanted the transactions for Planes 6 and 7 to close in Connecticut because Connecticut law exempted aircraft sales from sales and use tax, id. ¶ 178;

d. Used a US corporate trustee, Wells Fargo Bank Northwest, N.A. (Wells Fargo) to act as the principal "lessor" party and the "owner" to satisfy US citizenship requirements for FAA registration, id.;

*6 e. Used a US law firm in Oklahoma to conduct the closings and file closing documents with the FAA, id.;

f. Required that Planes 6 and 7 be maintained at a US maintenance facility, id.; and

g. Required all payments to be made to "[UL]'s bank account in New York" in US dollars, id. ¶¶ 178, 406.

11) During the summer of 2016, Cassidy engineered a refinancing of the 2015 Plane 6 Lease and 2015 Plane 7 Lease by Minsheng Business and Minsheng Financial (Minsheng Refinancing). The Minsheng Refinancing added over $10 million in incremental debt to the Debtors' balance sheet (not including $4.5 million that Cassidy took from the closing proceeds), duplicated debt on Plane 6, paid UL $55 million for Plane 7 (which was worth $35.7 million at most by this time), and provided

Minsheng Business and Minsheng Financial with $12.4 million, some of which was used for down payments on four aircraft, only one of which was ever delivered. Id. ¶¶ 229-317.

a. The Minsheng Refinancing closed in the US. Id. ¶ 11.

b. All closing payments from the Minsheng Refinancing were made into and through US bank accounts to bolster FAA registration of Planes 6 and 7. Id. ¶¶ 11, 272-74. Additional payments under the Minsheng Refinancing were "likely either made through banks that were subject to US laws or through US-based intermediary correspondent banks." Id. ¶ 11.

c. As part of the Minsheng Refinancing, Yuntian 3 (through Wells Fargo as lessor) and the Debtors (through TVPX ARS, Inc. (TVPX) as trustee and lessee) entered into: i) a 9/20/16 "Aircraft Lease Agreement" for Plane 6 (Minsheng Plane 6 Lease), and ii) a 9/20/16 "Aircraft Lease Agreement" for Plane 7 (Minsheng Plane 7 Lease). Id. ¶¶ 258-59. The Debtors and Yuntian 3 deliberately chose US-based corporate trustees to act as the principal contract parties under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease to meet FAA US citizenship requirements. Id. ¶ 275.

d. As a condition of closing under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease, TVPX simultaneously sub-leased Planes 6 and 7 to Zetta USA as sublessee and operator (Subleases). Id. ¶¶ 262-63.

e. To ensure that Zetta Singapore would be obligated to repay the amount due on Plane 6 after the Minsheng Refinancing, Wells Fargo, UL, GA, Zetta Singapore, and TVPX executed a 9/20/16 "Supplemental Agreement to the Sale and Purchase Agreements and Sale and Leaseback Purchase Clarification" (Clarification). Id. ¶ 265.

f. Yuntian 3, Minsheng Financial, EDC, and Wells Fargo required that the Debtors execute a "Deed of Guarantee and Indemnity Dated September 20, 2016" (Guarantee), which provided that the Debtors, Cassidy and Asia Aviation Company Pte. Ltd. (Asia Aviation),[9] guaranteed all of the obligations under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease. FAC ¶ 267.

In re Zetta Jet USA, Inc., Slip Copy (2021)

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 138 of 210

2021 WL 3721477

g. The Daugherty Fowler law firm was retained to act as FAA counsel to: 1) gather signature pages for the Minsheng Refinancing documents; 2) release signature pages in the closing room in Oklahoma City; and 3) file and register documents with the FAA in Oklahoma City. Id. ¶¶ 270-71.

12) In the summer of 2017, in exchange for a 6/27/17 $15 million transfer from UL to Zetta Singapore (6/27/17 Transfer), Seagrim and Walter transferred additional Zetta Singapore shares to TG. Id. ¶¶ 318-23.

*7  13) The "scheme" fell apart in mid-2017, and on 8/22/17, Cassidy and Miranda June Tang Kim Choo were removed from the board and their roles at the Debtors, and on 9/15/17, the Cases were filed. Id. ¶¶ 324-31.

14) Li Qi, via his alter egos, UL and GA, filed proofs of claims in the Cases. Id. ¶ 332.

6    Seagrim was the Debtors' Director of Operations and a Director of both Zetta Singapore and Zetta USA. FAC ¶ 31. Walter was the Debtors' Director of Sales and a Director of both Zetta Singapore and Zetta USA. Id. ¶ 32.

7    The FAC does not mention repayment of this $2 million transfer.

8    A Part 135 certificate is an "Air Carrier and Operator Certificate" issued under 14 C.F.R. Part 135 by the FAA, which is required to operate certain commercial charter flights in the US. Id. ¶ 78.

9    Asia Aviation was owned by Cassidy and his then-wife, Miranda June Tang Kim Choo, and operated a single jet on behalf of the jet's owner until it merged with Zetta Singapore. Id. ¶ 28.

### 1. UL/GA/TG Motion to Dismiss

In the Motion, UL/GA/TG move to dismiss the following counts:

1) Avoidance and Recovery of Fraudulent Obligations and Subsequent Transfers (2015 Plane 6 and 7 Leases), under 11 U.S.C. §§ 548 and 550, against UL, GA and Li Qi (Count 1);

2) Avoidance and Recovery of Fraudulent Obligations and Transfers on Account of Such Obligations (Minsheng Refinancing), under 11 U.S.C. §§ 548 and 550 against Li Qi, UL, GA, Yuntian 3, Minsheng Financial, and Minsheng Business (Count 2);

3) Recharacterization of the 6/27/17 Transfer as Equity Interest, under 11 U.S.C. §§ 105(a) and 502, against UL (Count 6);

4) Violation of the Automatic Stay, under 11 U.S.C. § 362, against TG and Li Qi (Count 7);

5) Recharacterization of Minsheng Plane 6 Lease, under 11 U.S.C. § 105(a), against Minsheng Business, Yuntian 3, Li Qi, GA, and UL (Count 8);

6) Recharacterization of Minsheng Plane 7 Lease under 11 U.S.C. § 105(a) against Minsheng Business, Yuntian 3, Li Qi, GA, and UL (Count 9); and

7) Disallowance of Claims under 11 U.S.C. § 502(d) and Assertions of Counterclaims under 28 U.S.C. § 157(b)(2)(C), against Yuntian 3, Yuntian 4, UL, and GA (Count 10).

### v. Settlement Agreement

On 6/8/21, the Court entered an order approving a "Settlement Agreement" among the Trustee, Yuntian 3, Yuntian 4, Minsheng Business, Minsheng Financial, and EDC (Settlement), which provided that:

1) Yuntian 3, Yuntian 4, Minsheng Financial, and Minsheng Business, would pay the Trustee $2,250,000 within 15 days after the entry of the Court order approving the Settlement (Effective Date), and another $2,250,000 on 1/26/22.

2) Within 15 days after the Effective Date, Yuntian 3, Yuntian 4, Minsheng Financial, and Minsheng Business would withdraw their proofs of claims filed in the Cases with prejudice.

3) Within 15 days after the Effective Date, the Trustee would dismiss with prejudice the Trustee's complaints and any amendments thereto against Yuntian 3, Yuntian 4, Minsheng Financial, Minsheng Business, and EDC, and cease pursuing the litigation against them.

In re Zetta Jet USA, Inc., Slip Copy (2021)

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 139 of 210

2021 WL 3721477

Zetta USA Docket #1469-2.

III. Legal Standards

Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP) applies in adversary proceedings and provides that a party may assert the defense of "failure to state a claim upon which relief can be granted." Fed. R. Bankr. P. 7012(b); In re Kvassay, 2014 WL 2446181, at *9 (B.A.P. 9th Cir. May 30, 2014). A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001); Student Loan Mktg. Ass'n v. Hanes, 181 F.R.D. 629, 634 (S.D. Cal. 1998). "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)).

*8 In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, and accept all well-plead factual allegations as true. Johnson, 534 F.3d at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001). The Court, however, is not bound by conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007); Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." Id. at 562 (emphasis in original) (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)).

In Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), the Supreme Court elaborated on the Twombly standard:

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." ... A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. ... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.

The allegations of a complaint, along with other materials properly before the court on a motion to dismiss, can establish an absolute bar to recovery. See Weisbuch v. Cty. of L.A., 119 F.3d 778, 783 n.1 (9th Cir. 1997) ("If the pleadings establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts."). Generally, when ruling on a Rule 12(b)(6) motion to dismiss, courts cannot consider material outside the pleadings. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018); Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001). If matters outside of the pleadings are "presented to and not excluded by the court," the motion to dismiss is converted to a motion for summary judgment under Rule 56 and all parties must be given a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are, however, two exceptions to this rule: 1) matters that the Court can take judicial notice of under Rule 201 of the Federal Rules of Evidence; and 2) the incorporation-by-reference doctrine, which treats certain documents as if they were "part of the complaint itself." Khoja, 899 F.3d at 999, 1002.

The party seeking dismissal under Rule 12(b)(6) has the burden of proof. In re Reed, 532 B.R. 82, 88 (Bankr. N.D. Ill. 2015); In re Enron Corp., 316 B.R. 434, 449 (Bankr. S.D.N.Y. 2004).

IV. Arguments and Analysis

  a. Requests for Judicial Notice

i. UL/GA/TG/LQ RJN

In the UL/GA/TG/LQ RJN, UL/GA/TG and Li Qi request that the Court take judicial notice of various documents filed in the following cases:

*9 **Case RJN #** In re Zetta Jet USA, Inc., 17-bk-21386-SK (Proof of Claim # 95-1) 1 In re Zetta Jet USA, Inc., 17-bk-21386-SK 2, 3, 4 , 5 King v.

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 140 of 210

In re Zetta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

Bombardier, 19-ap-1147-SK 6, 7, 8 King v. Jetcraft, 19-ap-1382-SK 9 10, 11, 12, 13, 14, 15, 16, King v. Yuntian, 19-ap-1383-SK 17, 18, 19, 20, 21, 22, 23 Re Zetta Jet PTE Ltd. and others, in the High Court of the Republic of Singapore, Originating Summons No 1391 of 2017 24, 25 Truly Great Global Ltd. v. Seagrim, BC694919, California Superior Court 26, 27

UL/GA/TG/LQ RJN at 3-7. [10]

[10]    UL/GA/TG and Li Qi request that the Court take judicial notice of Proof of Claim #95-1 filed in the Zetta USA case, which they describe as the "Glove Assets Investment Limited Proof of Claim." UL/GA/TG/LQ RJN at 3. Proof of Claim #95-1 in the Zetta USA case, however, was filed by American Express Bank, FSB. In the Trustee RJN, addressed below, the Trustee requests that the Court take judicial notice of Proof of Claim #95-1 in the Zetta Singapore case, filed by GA.

They also request that the Court take judicial notice of a "Confirmatory Deed of Loan," Ex. 12-B, and an "HSBC List of Correspondent Banks" (HSBC List), Ex. 28. Id.

The Trustee objects to the UL/GA/TG/LQ RJN claiming that:

1) UL/GA/TG and Li Qi do not adequately identify what they seek to have judicially noticed;

2) Many requests improperly seek judicial notice of disputed facts or conclusions contained within or drawn from public documents rather than of the existence or filing of documents themselves;

3) Several requests seek judicial notice of irrelevant, non-adjudicative documents and facts;

4) UL/GA/TG and Li Qi have not properly authenticated the HSBC List; and

5) It is unnecessary for the Court to take judicial notice of every document cited in the pleadings.

UL/GA/TG and Li Qi reply that the Court should overrule each of the Trustee's objections. Reply to RJN Objection at 3.

Under Federal Rule of Evidence (FRE) 201, the Court can take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The burden is on the party requesting judicial notice. In re James, 300 B.R. 890, 894 (Bankr. W.D. Tex. 2003) (ruling that the party requesting judicial notice has the burden of persuading the Court that the fact is "appropriate for judicial notice").

The Court can take judicial notice of Exhibits 1 through 27, which are: 1) a proof of claim filed in the Zetta USA bankruptcy case; 2) documents filed in the Zetta USA bankruptcy case; 3) documents filed in King v. CAVIC Aviation Leasing (Ireland) 22 Co. Designated Activity Company, 19-ap-1147-SK (CAVIC AP), King v. Jetcraft Corp., 19-ap-1382-SK (Jetcraft AP), or this adversary proceeding; or 4) documents filed in Re: Zetta Jet Pte Ltd. and others, in the High Court of the Republic of Singapore (High Court), or Truly Great Global Ltd. v. Seagrim, BC694919, in California Superior Court (LASC Action). The Court, however, cannot take judicial notice of any facts or argument contained in those documents. See Aceituno v. Vowell (In re Intelligent Direct Mktg.), 2015 WL 925565, at *1 (E.D. Cal. Mar. 3, 2015) (granting a request for judicial notice of proofs of claims filed in the underlying bankruptcy case because they were public records, and their authenticity was undisputed); Tuma v. Firstmark Leasing Corp. (In re Tuma), 916 F.2d 488, 491 (9th Cir. 1990) (indicating that when adjudicating issues in an adversary proceeding, judicial notice can be taken of bankruptcy records in an underlying proceeding); In re Eckert, 485 B.R. 77, 81 (Bankr. M.D. Pa. 2013) (stating that a bankruptcy judge may take judicial notice of his or her own docket, but the truth of the contents of those records is not inferred by a judge taking judicial notice of documents); Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc., 99 F.Supp.3d 1110, 1125 (C.D. Cal. 2015) (noting that courts may take judicial notice of public records, including court records from another case, but cannot take judicial notice of the veracity of arguments or facts contained in those documents); U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (indicating that courts "may take notice of proceedings in other courts, both within and without the federal judicial system").

**\*10** Exhibit 12-B, a "Confirmatory Deed of Loan" between Zetta Singapore as borrower and UL as lender, is an exhibit to

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
In re Zetta Jet USA, Inc., Slip Copy (2021)    Exhibit A -- Unpublished Cases    Page 141 of 210

2021 WL 3721477

Proof of Claim #94-2 filed on 4/6/18 in the Zetta Singapore bankruptcy case, and the Court may take judicial notice of the fact that Claim #94-2 was filed but not of any facts contained within it. See Maxtor Corp. v. Read-Rite (Thai.) Co., 2003 WL 24902406, at *9 (N.D. Cal. Dec. 4, 2003).

Finally, UL/GA/TG and Li Qi do not suggest that the HSBC List is publicly available but instead argue that it is "a document provided by HSBC for customers." UL/GA/TG/ LQ RJN at 8 (citing MAM Apparel & Textiles Ltd. v. NCL Worldwide Logistics USA, Inc., 2020 WL 4336362, at *4 n.4 (E.D.N.Y. July 28, 2020)). MAM is distinguishable because there, the court took judicial notice of a document that was publicly available on the SWIFT [11] website and not subject to dispute, whereas here, there is nothing before the Court indicating that the HSBC List is available on the SWIFT website. Therefore, the Court finds that UL/GA/TG and Li Qi have not met their burden of showing that the HSBC List is subject to judicial notice.

[11]    SWIFT, or Society Worldwide Interbank Financial Telecommunication, provides an electronic communication system by the same name for use in interbank correspondence. MAM, 2020 WL 4336362, at *2 n.3.

### ii. Trustee RJN

In the Trustee RJN, the Trustee requests that the Court take judicial notice of documents filed in the following cases:

> **Case RJN #** In re Zetta Jet USA, Inc., 17-bk-21386-SK 1, 2, 3 Truly Great Global Ltd. v. Seagrim, BC694919, California Superior Court 4, 5, 6 In re Zetta Jet PTE, Ltd., 17-bk-21387-SK (Proofs of Claim #s 94-2 and 95-1) N/A

Trustee RJN at 3-5. UL/GA/TG did not object to the Trustee RJN.

As noted above, the Court can take judicial notice of the fact that documents were filed in the Zetta USA case and in the LASC Action, as well as the fact that proofs of claims

were filed in the Zetta Singapore case. The Court cannot, however, take judicial notice of facts contained in any of those documents.

### b. Opinion and Declarations

The Court notes that the parties submitted the following opinion and declarations in support of their respective briefs regarding UL/GA/TG's Motion:

> **Declaration/Opinion** Opinion of Rosalind Phelps QC **Docket # Filed by** Supplemental Declaration of Harprabdeep Singh in Support of Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, and 259 Trustee Truly Great Global Limited Motion to Dismiss Counts I, II, VI, VII, IX & X and Motion to Strike Counts VII & IX of Amended Adversary Complaint Declaration of John A. Kimbell QC in Support of Reply Memorandum of Defendants Universal Leader Investment Limited, Glove Assets Investment Limited, 281 UL/GA/TG and Truly Great Global Limited in Support of Motion to Dismiss Counts I, II, VI, VII, VIII, IX & X and Motion to Strike Counts VIII & IX of Amended Adversary Complaint 281 UL/GA/TG

The fact that these documents were submitted by the parties does not mean that the Motion was converted into one for summary judgment. "A motion to dismiss is not automatically transformed into a motion for summary judgment simply because matters outside the pleadings are filed with" the court. If the court ignores "the supplementary materials and determines the motion under the Rule 12(b)(6) standard, no conversion occurs." Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18-19 (1st Cir. 1992); see also Swedberg v. Marotzke, 339 F.3d 1139, 1146 (9th Cir. 2003) (stating that a Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating, preferably by an explicit ruling, that it considered

In re Zetta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

those materials). Further, supplementary material, which is not considered by the Court when ruling on a Rule 12(b)(6) motion, does not become part of the record. Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008); see also Martinez v. Romero, 2011 WL 13277776, at *2 & n.3 (D.N.M. Dec. 29, 2011) (indicating that minutes of a board meeting offered by the plaintiff in opposition to a motion to dismiss were not part of the record or evidence, were not relied on by the court, and did not convert the motion to dismiss into a motion for summary judgment).

 **\*11**  The Court did not consider the opinion, declarations or objections thereto, because they were not relevant to the Court's analysis below regarding Counts 1, 2, 6, 7, 8, 9, or 10. See Marconi v. United States, 2021 WL 1293889, at *2 (N.D. Ind. Apr. 7, 2021) (indicating that while the court could consider a declaration filed in support of a motion to dismiss and convert the motion to one for summary judgment, it need not do so). [12]

[12]     Because the Court is not ruling on the substance of the Li Qi Motion, the Court need not consider any declarations, statements, opinions or objections thereto submitted regarding that motion to dismiss.

  c. Presumption Against Extraterritoriality
UL/GA/TG contend that the Bankruptcy Code provisions on which the Trustee relies—§§ 105, 502, 548 and 550—do not apply extraterritorially to the foreign transactions at issue in the Complaint, which are transfers from Zetta Singapore, a Singaporean company's Singapore account, to the Hong Kong account of UL/GA/TG, British Virgin Island (BVI) residents, with Chinese ownership. Motion at 13, 21-22. They assert that the relevant contracts are governed by the laws of Singapore, the United Kingdom and Hong Kong. Id. at 13. UL/GA/TG argue that the Trustee's new "subterfuge," seeking to avoid the obligations rather than the transfers, which the Court found were extraterritorial, does not change the fact that the transactions at issue are foreign. Id.

The Trustee responds that this adversary proceeding does not involve extraterritorial application of § 548. Opposition at 18. According to the Trustee, UL/GA/TG ignore that the obligations were incurred in the United States, arguing that: 1) signature pages were sent to and released from closing rooms in the US; 2) US corporate trusts acted as principals under the operative documents; and 3) all closing funds for the Minsheng Refinancing were wired into a US bank account and disbursed by a US closing agent to the parties. Id. (citing

FAC ¶¶ 252, 266, 270-71, 275). He highlights that Zetta Singapore was required to and did accept delivery of Planes 6 and 7 in Connecticut. Id. (citing UL/GA/TG FAC ¶ 193, Exs. B-2, C, D). The Trustee contends that virtually "all of the conditions to the effectiveness of the agreement [sic] occurred in the US," which was by design of all parties. Id. at 20. According to the Trustee, the Court's Original UL/GA/TG MTD Ruling only addressed transfers, not obligations, under § 548. Id. at 19.

UL/GA/TG reply that the Court must examine the "focus" of the avoidance statute to determine whether the FAC includes extraterritorial claims. Reply at 12. They assert that rather than applying that test, the Trustee directs attention to the location where the obligations were incurred, which the Supreme Court has rejected. Id. at 12-13 (citing Morrison v. Nat'l Austl. Bank, Ltd., 561 U.S. 247, 267 (2010)). They argue that this case involves a Singaporean company incurring obligations to transfer funds to a Hong Kong account for the benefit of BVI entities. Id. at 13. UL/GA/TG acknowledge that transfers and obligations are not the same, but they assert that the relevant question is whether § 548 has a different focus when it regulates transfers, rather than obligations. Id. at 14. They contend that it does not. Id.

The Court notes that the parties have diametrically opposing views of the allegations in the FAC. UL/GA/TG assert that the statutes which are at issue in Counts 1, 2, 6, 8, 9, and 10—§§ 105, 502, 548, and 550 of the Bankruptcy Code—do not apply extraterritorially, as the Court found in the Original UL/GA/TG MTD Ruling. Motion at 18. And, they contend that the Trustee's focus in the FAC on the Debtors' obligations, rather than their transfers of property does not change that fact. Id. at 18. In contrast, the Trustee contends that the Court need not consider or analyze whether the FAC's allegations involve foreign transfers because he is only seeking to avoid domestic obligations not transfers. Opposition at 19.

 **\*12**  The Court need not spend much time on the presumption against extraterritorial application of federal law, because that issue was addressed extensively in the Original UL/GA/TG MTD Ruling. AP Docket #174 at 10. Suffice it to say that unless there is clear congressional intent to the contrary, "federal laws will be construed to have only domestic application." RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090, 2100 (2016). There is a two-step framework for analyzing whether the presumption against extraterritoriality has been rebutted. First, courts consider whether the statute provides a clear, affirmative indication

2021 WL 3721477

that it applies extraterritorially. Id. at 2101. Second, courts examine a statute's "focus" to determine whether the case involves a domestic application. [13] Id.

[13]   During the 8/11/21 hearing, Trustee's counsel highlighted that because UL/GA/TG filed the Motion, they have the burden of demonstrating that the counts at issue fail to "state a claim upon which relief can be granted." Although it is true that a defendant who moves for dismissal under Rule 12(b)(6) has the burden of proof, a plaintiff seeking to overcome the presumption against extraterritoriality has a "heavy burden" of showing that: 1) a statute applies abroad; or 2) the case involves domestic application of a statute. See Doe v. Tapang, 2019 WL 3576995, at *7 (N.D. Cal. Aug. 6, 2019) (granting a Rule 12(b)(6) motion to dismiss RICO conspiracy claims because plaintiffs had not met their burden to overcome the presumption against extraterritoriality by establishing a domestic injury); In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 242 (Bankr. S.D.N.Y. 2017) (indicating that when ruling on motions to dismiss, the party asserting that a statute applies extraterritorially has the burden); In re Maxwell Commc'n Corp. plc, 186 B.R. 807, 819, 820 (S.D.N.Y. 1995) (indicating that the bankruptcy court did not err in granting a Rule 12(b)(6) motion because plaintiffs had not met their "heavy burden" of showing that Congress unmistakably intended § 547 to apply abroad).

i. Avoidance and Recovery of Fraudulent Obligations and Subsequent Transfers Made on Account of Such Obligations (2015 Plane 6 and 7 Leases) Under 11 U.S.C. §§ 548, and 550 (Count 1) and Avoidance and Recovery of Fraudulent Obligations and Transfers on Account of Such Obligations (Minsheng Refinancing) Under 11 U.S.C. §§ 548, and 550 (Count 2)

1. Breadth of Obligations v. Transfers in § 548

When assessing extraterritoriality, courts must first determine whether Congress intended the statutes at issue to apply extraterritorially. Here, Counts 1 and 2 are brought under §§ 548 and 550 and in the Original UL/GA/TG MTD Ruling, the Court exhaustively analyzed § 548 and determined that

Congress did not intend it to have extraterritorial effect. [14] AP Docket #174 at 13-16. Therefore, the Court's analysis will address § 548's "focus" to determine whether the FAC involves a domestic application.

[14]   Title 11 U.S.C. § 550 is a "secondary cause of action" and is implicated only after a trustee prevails under the avoidance sections of the Bankruptcy Code. In re Patts, 470 B.R. 234, 242 (Bankr. D. Mass. 2012) (internal citations omitted).

In the Original Complaint, the Trustee focused on various transfers of the Debtors' property, which the Trustee sought to avoid and the Court found were extraterritorial. AP Docket #174 at 18-40. The Trustee's focus has shifted in the FAC from transfers to obligations that the Debtors incurred and which the Trustee seeks to avoid. FAC ¶¶ 5, 8, 11-12, 19, 89, 96, 138, 147, 149, 165, 171, 178-79, 185, 187-89, 191, 193, 199, 201, 203, 206-08, 211, 213, 221, 248-49, 252, 256, 260, 265, 267, 269, 271, 274, 279, 285, 287-91, 293, 304, 307, 309, 317, 335, 337, 345-46, 348, 353, 357, 364-66, 374-76, 384-85, 394-95, 405, 407, 409, 417-18, 432-33, 435-36, 440, 445-52, 455, 457, 461-62, 465-66, 485, 490, 512, 520.

*13  UL/GA/TG contend that implicit in the Trustee's position is that a transfer has a narrower focus than an obligation, but the Trustee's position is "indefensible as a matter of basic statutory construction." Motion at 20. They highlight that in § 548, " 'obligation' appears ... in the same operative language in which 'transfer' appears," and the Court's Original UL/GA/TG MTD Ruling forecloses the Trustee's claims based on obligations. Id. at 18. According to UL/GA/TG, if the Trustee's interpretation were correct, then every case that the Court relied on in finding that the transfers at issue were extraterritorial would have been incorrectly decided because they each involved US obligations. Id. at 20. They highlight that the Trustee's spotlight on obligations rather than transfers is not new: during the 7/22/20 hearing on the Original UL/GA/TG MTD, he repeatedly asserted that the Court should examine the Debtors' obligations. Id. at 21. UL/GA/TG conclude by arguing that the obligations on which the Trustee relies were ancillary and extraneous because they are not the focus of § 548 and avoiding them would accomplish nothing. Id. at 24.

The Trustee responds that incurring an obligation precedes payment based on the obligation, obligations are determined by the place where the obligation was incurred, and here, the Debtors' obligations were "incurred in the US." Opposition

at 19. The Trustee also asserts that the Original UL/GA/TG MTD Ruling focused on transfers, not obligations, and does not foreclose Counts 1 and 2. Id. He claims that the cases cited by UL/GA/TG are inapposite because none involved an attempt to avoid an obligation. Id. at 19-20. The Trustee contends that all of the supposed "extraneous" closing steps were "conditions precedent" to the closings and made the agreements legally effective. Id. at 20. According to the Trustee, the rationale of In re Picard ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 97 (2d Cir. 2019) applies here because § 548 regulates the fraudulent transfer of property and the fraudulent incurrence of obligations, both of which may be avoided. Id. at 21.

In the Reply, UL/GA/TG highlight that the Court must look to the "focus" of a statute to determine whether the FAC contains extraterritorial claims. Reply at 12. They argue that instead of applying that test, the Trustee asks the Court to examine the location where obligations were incurred, which the Supreme Court has repeatedly rejected. Id. UL/GA/TG contend that § 548 seeks to regulate the incurrence of obligations that "unfairly deplete the debtor's estate [because] the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred." Id. at 13 (quoting Rubin v. Mfrs. Hanover Tr. Co., 661 F.2d 979, 989 (2d Cir. 1981)). They assert that the claims at issue involved extraterritorial application of § 548 because the conduct that depleted the estate was a Singaporean company's obligation to transfer funds to a Hong Kong account for the benefit of BVI entities. Id.

They note that although transfers and obligations are not the same, the Trustee's argument that transfers are distinct from obligations is unavailing because the relevant question is whether § 548 has a different focus when it regulates transfers rather than obligations. Id. at 14. They contend that the Trustee cites no authority supporting his position that § 548 applies a different focus to avoidance of obligations rather than transfers nor does he highlight any language that supports such a distinction. Id. UL/GA/TG conclude by arguing that the Trustee improperly seeks to transform Zetta Singapore's extraterritorial obligations into domestic ones by focusing on obligations of entities who were not parties to the obligations—Zetta USA, Crowe Dunlevy, Insured Aircraft Title Services, Inc. (IATS), Daugherty Fowler, as well as others. Id. at 15 & n.5.

Title 11 U.S.C. § 548(a) provides that:

(a) The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

*14 (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or become insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

To address the parties' opposing views of transfers and obligations, the Court must begin by examining the language of § 548 itself. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (noting that resolving a dispute over the meaning of a statute begins with the statute's language); Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (indicating that "our starting point must be the language employed by Congress"). If Congress' intent is clear, the Court must give effect to the unambiguously expressed intent of Congress. In re Lewis, 401 B.R. 431, 438 (Bankr. C.D. Cal. 2009) (citing Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984)). Unless otherwise defined, words will be interpreted with their ordinary, common meaning. Id. And, courts are cautioned against ascribing to one word in a statute "a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the statute." Nature v. United States, 250 F.Supp.3d 634, 640 (E.D. Cal. 2017) (citing Yates v. United States, 547 U.S. 528, 543 (2015)) (internal quotation marks omitted).

The Bankruptcy Code defines a "transfer" as "each mode, direct or indirect, absolute or conditional, voluntary or

In re Zeta Jet USA, Inc., Slip Copy (2021)

2021 WL 3721477

involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Although the Bankruptcy Code does not contain a definition of "obligation," it has been defined as "[a] formal binding agreement or acknowledgement of a liability to pay a certain amount or to do a certain thing ... a duty arising by contract." In re Asia Glob. Crossing, Ltd., 333 B.R. 199, 203 (Bankr. S.D.N.Y. 2005); see also Obligation, Black's Law Dictionary (11th ed. 2019) (defining "obligation" as a formal, binding agreement or acknowledgement of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; especially a duty arising by contract). Considering the ordinary common meaning of obligation, it is essentially a contract or promise to perform some act or do something in the future. Here, the Court finds that Congress' intent in referencing both a transfer and an obligation in § 548 is clear: avoiding a transfer means that the property transferred would not belong to the transferee and avoiding an obligation would mean that the debtor is not bound by the agreement or contract. And, based on the canon of statutory construction that cautions against courts ascribing one word in a statute a meaning that would give unintended breadth to the statute, the Court finds that it would be illogical to attribute a broader meaning to obligation than to transfer. To the extent that the Trustee advocates that the breadth of obligations should be different from and broader than the breadth of transfers in § 548, the Court disagrees.

**\*15** Although the Trustee cites In re TSIC, Inc., 428 B.R. 103, 110-11 (Bankr. D. Del. 2010), and In re Tribune Co. Fraudulent Conveyance Litigation, 2018 WL 6329139, at \*14 (Bankr. S.D.N.Y. Nov. 30, 2018) his reliance on those cases does not further his position. Neither case involved the extraterritorial application of § 548. Instead, both addressed a temporal issue that is not before this Court: when an obligation arises and specifically, when it arises in the context of employment agreements.

In TSIC, TSIC, Inc., f/k/a Sharper Image Corporation (TSIC), filed a § 548 complaint seeking to avoid a $6+ million severance payment to Richard Thalheimer (Thalheimer), its former director and CEO. In re TSIC, Inc., 428 B.R. 103, 106 (Bankr. D. Del. 2010). The court noted it needed to resolve whether Thalheimer's entitlement to the severance payment was "fixed on the date the transfer was made or when [TSIC] incurred the obligation." Id. at 109. Thalheimer argued that the obligation was incurred in 2002, when he executed an employment agreement, which specified his base salary and a severance package he would receive if terminated. Id. at

110. TSIC responded that the relevant transfer was made or incurred within the two-year look-back period because the parties executed a December 2006 settlement agreement after Thalheimer was terminated, which provided that he would receive about $6 million. Id. The court noted that although Thalheimer did not actually receive the settlement payment until 2007—when he was no longer a member of the board of directors—§ 548 addresses when transfers were made or incurred, not when they were received. Id. at 110-11. The court highlighted that the case presented the "very situation that Congress intended to remedy" when it amended § 548 to address "excessive insider payments under employment contracts that prejudice general unsecured creditors in light of the Enron and WorldCom bankruptcy cases." Id. at 110. According to the court, construing "the statute to apply only when [TSIC] made the transfer would contradict the plain meaning of the statute and undermine legislative intent," because "insiders could orchestrate the timing of the transfers, i.e., the payment of severance benefits, to occur after resignation when they are no longer insiders." Id. at 111.

Similarly, in Tribune the issue confronting the court was when an obligation in the employment context was incurred. After the Tribune Company (Tribune) suffered "deteriorating business," private-equity investor Sam Zell (Zell) and Equity Group Investments negotiated a leveraged buyout (LBO), which the Tribune's board approved in April 2007.[15] In re Tribune Co. Fraudulent Conv. Litig., 2018 WL 6329139, at \*2-3 (Bankr. S.D.N.Y. Nov. 30, 2018). Within a year, some Tribune executives (Executives) were involuntarily terminated and received severance payments under the Tribune's "Transitional Compensation Plan for Executive Employees" (Compensation Plan), which was created in 1985 and amended in July 2006. Id. at \*12. The Tribune continued experiencing financial difficulties and it, and many of its subsidiaries, filed chapter 11 bankruptcies in December 2008. Id. at \*4. In 2010, the Tribune's Official Committee of Unsecured Creditors (Committee) filed numerous civil actions against the Executives and others, seeking to claw back funds transferred during the LBO. Id. at \*4, 12. A few years later, the bankruptcy court confirmed the Tribune's reorganization plan and transferred the Committee's claims to Marc Kirschner (Kirschner), litigation trustee for the Tribune Litigation Trust. Id. at \*4.

15      A "leveraged buyout" is the "purchase of a publicly held corporation's outstanding stock by its management or outside investors, financed mainly

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 146 of 210

In re Zeta Jet USA, Inc., Slip Copy (2021)

2021 WL 3721477

with funds borrowed from investment bankers or brokers and usu[ally] secured by the corporation's assets." Buyout, Black's Law Dictionary (11th ed. 2019).

**\*16** The Executives moved to dismiss the actual and constructive fraudulent conveyance claims, asserting that Kirschner could not avoid payments they received under the Compensation Plan because the Tribune's obligations were incurred at the latest in July 2006, which was more than two years before the Tribune filed bankruptcy. Id. at \*13. Kirschner responded that the Tribune did not become liable to make any severance payments until the Executives were terminated, which was within two years before the bankruptcy filing. Id. at \*12, 13. The court noted that the Bankruptcy Code treats "debt" and "obligation" as equivalent terms and a debt or an obligation is incurred when a contract or agreement is formed, not when payment is due. Id. at \*13. According to the court, the relevant contract was formed with the Executives when they began participating in the Compensation Plan (generally on their hiring date) or the date when it was last amended (July 2006), whichever was later. Id. at \*15. Because the latest known hiring date of any Executives was September 2006—more than two years before the petition date, the court held that Kirschner's claims seeking avoidance of the Tribune's obligations under the Compensation Plan failed. Id. at \*16.

In contrast to TSIC and Tribune, this case does not involve an employment contract or address the date when an obligation might have been incurred. Instead, the issue before the Court regarding Counts 1 and 2 is whether the obligations alleged in the FAC are extraterritorial or domestic.

UL/GA/TG cite Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979 (2d Cir. 1981), to support their position that the focus of § 548 is obligations that deplete the Debtors' estate. Reply at 14. Although like the cases cited by the Trustee, Rubin did not address the extraterritorial application of § 548, it did involve a fundamental issue before the Court: what the focus of that statute is when a trustee seeks to avoid an obligation.

In Rubin, bankruptcy trustees for U.S.N., Inc. and Universal Money Order Co., Inc. (collectively USN/UMO), companies that issued money orders to persons without checking accounts, sought to recover funds and securities from Manufacturers Hanover Trust Co. (MHT). Rubin, 661 F.2d at 980. MHT was the principal banker for John Trent and Eugene Skowron (Trent/Skowron), who owned numerous

businesses, including USN/UMO and had a controlling interest in National Payroll Services Ltd. (National) and TWO Check Cashing Corp. (TWO), holding companies that owned check cashing corporations. Id. at 982. The check cashers who were sales agents for USN/UMO continuously needed cash, and beginning in 1964, Trent/Skowron caused USN to arrange for its sales agents to receive lines of credit from MHT. Id. at 983. MHT obtained a series of guarantees and cross-guarantees from various entities in the Trent/Skowron business network for the lines of credit (Guarantees). Id. at 983-84. Eventually, the Trenton/Skowron entities became financially unstable, MHT stopped extending credit to UMO check cashers, and UMO and USN filed bankruptcy. Id. at 986. Under the Guarantees, MHT seized the remaining funds in USN's and UMO's checking accounts, sold securities pledged by UMO as collateral, and applied those sums toward repayment of National's and TWO's outstanding credit lines. Id. at 986-87.

Two years later, Herbert Rubin and Eliot Lumbard, USN's and UMO's bankruptcy trustees (collectively USN/UMO Trustees), filed an avoidance and recovery action against Trent, Skowron, and MHT to recover the value of USN's/ UMO's assets that had been applied to National's and TWO's debts under the Guarantees. Id. at 987. Although the district court dismissed the USN/UMO Trustees' avoidance and recovery cause of action, the Second Circuit reversed and remanded, finding that the district court had incorrectly applied § 67(d) of the Bankruptcy Act's consideration and insolvency requirements. Id. at 987-88, 996. The Second Circuit also noted that there was a dispute regarding the date when the obligations were incurred. Id. at 989. The USN/UMO Trustees argued that USN and UMO incurred obligations as guarantors of National's and TWO's debt whenever they drew on their lines of credit. Id. at 989. According to the USN/UMO Trustees, National and TWO drew on the lines of credit in September and December 1976, and USN/UMO filed bankruptcy in January 1977, within § 67(d)'s one-year look back period. [16] Id. at 989. MHT responded that USN and UMO made the transfers and incurred the obligations in 1972 and 1975, when they executed the Guarantees. Id. at 989-90.

[16]    Before enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), the avoidance period under 11 U.S.C. §§ 548(a)(1)(A) and (B) was one year. See In re TSIC, Inc., 428 B.R. 103, 109-10 (Bankr. D. Del. 2010) (indicating that the enactment of

In re Zetta Jet USA, Inc., Slip Copy (2021)

2021 WL 3721477

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 147 of 210

BAPCPA extended the one-year look-back period for fraudulent transfers to two years).

**\*17**  The Second Circuit agreed with the USN/UMO Trustees, noting that USN/UMO incurred obligations in 1976 when National and TWO last drew on their lines of credit. Id. at 990. According to the court, whenever National and TWO borrowed under the lines of credit, they incurred repayment obligations under their financing arrangements with MHT and Trent/Skowron became contingently liable to discharge the check cashers' obligations upon default. Id. Likewise, in the event of a default, USN/UMO, as secondary guarantors, become contingently liable on those obligations. Id. Therefore, the court held that USN/UMO incurred a contingent obligation of repayment whenever National and TWO borrowed under the lines of credit, which they did within the one-year period. Id. In the analysis, the court noted that the focus of § 67 of the Bankruptcy Act, which was at issue in Rubin, was obligations that "unfairly deplete the debtor's estate if the debtor does not receive in exchange a consideration roughly equal in value to the obligation incurred." Id. at 989. [17]

[17]  Although Rubin was decided under § 67 of the Bankruptcy Act, it is for "all intents and purposes indistinguishable from § 548(a)(1)." In re Adler, Coleman Clearing Corp., 218 B.R. 689, 706-07 (Bankr. S.D.N.Y. 1998); see also Roy v. Fed. Nat'l Mortg. Ass'n, 76 B.R. 188, 190 (Bankr. N.D. Fla. 1987) (indicating that § 67(d) was the precursor of § 548 and they are indistinguishable).

Rubin is informative because it highlights that the focus of § 67 of the Bankruptcy Act, which is indistinguishable from § 548, is obligations that "unfairly deplete the debtor's estate." With Rubin in mind, the Court considers the focus of § 548 as it applies to the facts of this case.

a. The Focus of § 548

To determine whether a case involves domestic or foreign application of statutes, courts must analyze the "focus" of the relevant statutes. RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090 (2016); Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010). As the Court noted in the Original UL/GA/TG MTD Ruling, the question whether transactions are foreign or domestic depends "very heavily" on the facts of each case. AP Docket #174 at 24 (citing In re Arcapita Bank B.S.C.(c), 575 B.R. 229, 246 (Bankr. S.D.N.Y. 2017)).

UL/GA/TG contend that the obligations the Trustee seeks to avoid are obligations to make the same transfers that the Court previously found were extraterritorial. Motion at 21 (citing Docket #174 at 24). UL/GA/TG highlight that the salient aspects of the transfers were that Zetta Singapore, a Singaporean entity, transferred funds from its Singapore account to UL/GA/TG, all BVI entities, into their Hong Kong account. Id. at 21-22. They contend that because the act of transferring these funds was non-domestic, so too are the obligations/promises to make these transfers. Id. at 22. They argue that the Trustee's attempt to circumvent the Court's prior ruling by characterizing the transfers as involving US banks is unavailing because the Court previously ruled that the use of intermediary banks does not transform a foreign transaction into a domestic one. Id. And, they assert that to the extent the Trustee contends that the US banks were more than intermediaries, such an argument is belied by the payment instructions attached to the FAC, which are identical to the ones the Court relied on in the Original UL/GA/TG MTD Ruling. Id. UL/GA/TG note that even though the Trustee now focuses on obligations, he does not actually seek to avoid obligations, which were not incurred by Zetta Singapore, such as TVPX's obligation to maintain aircraft's FAA registration. Id. at 23. They highlight that "if the conduct relevant to the focus [of the statute] occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id. at 23-24 (citing RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090, 2101 (2016)).

The Trustee does not directly address the "focus" of § 548, instead arguing that the obligations he seeks to avoid were incurred entirely in the US:

**\*18**  1) Zetta USA's Part 135 certificate, which was issued by the FAA and required to operate commercial charter flights in the US, was critical to all of the financing deals. Opposition at 16 (citing FAC ¶¶ 8, 178).

2) The 2015 Plane 6 Lease and 2015 Plane 7 Lease required Planes 6 and 7 to be FAA registered and immediately subleased to Zetta USA and operated under its Part 135 certificate. Id. (citing FAC ¶¶ 178, 254, 269).

3) UL/GA/TG prepared acknowledgement of delivery certificates requiring Zetta Singapore to confirm that it "became obliged" under the 2015 Plane 6 Lease and 2015 Plane 7 Lease when it took delivery of those

2021 WL 3721477

aircraft in Windsor Locks, Connecticut. Id. at 16, 18, 20 (citing FAC ¶¶ 178, 193, Exs. B-2, C, D).

4) The 2015 Plane 6 Lease, 2015 Plane 7 Lease, and Minsheng Refinancing closed in the US. Id. at 16-17 (citing FAC ¶ 11). UL, GA, and the Debtors wanted those closings to occur in Connecticut because Connecticut law exempted aircraft sales from sales and use tax. Id. at 16-17 (citing FAC ¶ 11).

5) Yuntian 3 and the Debtors chose US corporate trusts, Wells Fargo and TVPX, to act as principals under the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease. Id. at 18 (citing FAC ¶ 275).

6) All closing payments from the Minsheng Refinancing were made into and through US bank accounts. Id. at 16, 17, 18 (citing FAC ¶¶ 11, 272-74).

7) Additional payments under the Minsheng Refinancing were "likely to be made through banks that were subject to US laws or through US-based intermediary correspondent banks." Id. at 17 (citing FAC ¶ 11).

8) The parties to the Minsheng Refinancing—the Debtors, UL, GA, Yuntian 3, Minsheng Financial, EDC, Cassidy, and Asia Aviation, FAC ¶¶ 249-68—sent their signature pages to closing agents in the US and, upon satisfaction of the closing conditions, including acceptance and delivery of Planes 6 and 7 in the US, signature pages were released and documents were filed with the FAA in Oklahoma City. Id. at 17, 18, 20 (citing FAC ¶¶ 252, 266, 269-71, 276-77).

9) Zetta USA signed the Guarantee and the Subleases in the US when it signed and delivered its signatures to a US closing room. Id. at 17, 18-19 (citing FAC ¶¶ 262-63, 266-68, 270-71).

10) Planes 6 and 7 had to be maintained at a US base. Id. at 17 (citing FAC ¶ 178).

11) UL/GA/TG required the Debtors to make payments in US dollars or to US bank accounts, which necessitated the use of US intermediary or correspondent banks. Id. at 17 (citing FAC ¶ 406).

The Trustee challenges UL/GA/TG's contention that the closing steps were "ancillary" and avoiding them would accomplish nothing. Id. at 20. He asserts that the release of signature pages in Oklahoma City had the same legal effect

as if the parties were present and signed the agreements there and virtually "all of the conditions to the effectiveness of the agreement [sic] occurred in the US," which was "by design of all of the parties to the agreements." Id. He highlights that the 2015 Plane 6 Lease and 2015 Plane 7 Lease required Zetta Singapore to confirm that it accepted delivery in Connecticut, at which point it was obligated to pay. Id. According to the Trustee, this was not just an ancillary obligation, but rather an "unequivocal confirmation" required by UL/GA/TG that Zetta Singapore incur its payment obligations in the US. Id.

**\*19** UL/GA/TG reply that the Trustee wants the Court to examine where the obligations were allegedly incurred, but the Supreme Court has repeatedly rejected attempts to substitute location-based tests for the focus test. Reply at 12-13 (citations omitted). According to UL/GA/TG, § 548 regulates the incurrence of obligations that unfairly deplete the debtor's estate, which they assert were to make lease and loan payments, not any ancillary conduct the Trustee cites. Id. at 14-15. Finally, UL/GA/TG highlight that the Trustee relies on obligations of non-parties to the transactions, such as Zetta USA, which § 548 does not govern. Id. at 15-16.

To determine the conduct that is relevant to the analysis, the Court must consider the "focus" of the avoidance and recovery provisions (§§ 548, and 550), which is the transfer or obligation that "depletes the property that would have become property of the estate." In re CIL Ltd., 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018); In re Ampal-Am. Isr. Corp., 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017) (same); In re Sherwood Invs. Overseas Ltd., Inc., 2015 WL 4486470, at *19 (Bankr. M.D. Fla. July 22, 2015), aff'd 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("Courts applying the extraterritoriality presumption to fraudulent transfers typically hold that the proper focus is the *transfers* sought to be avoided, not the parties' relationship or locus." (emphasis in original)); see also Rubin v. Mfrs. Hanover Tr. Co., 661 F.2d 979 (2d Cir. 1981) (noting that the focus of § 67 of the Bankruptcy Act was obligations that "unfairly deplete the debtor's estate").

The Trustee relies on the following to support his contention that Counts 1 and 2 involve domestic application of § 548: FAA registration and operation of Planes 6 and 7 under Zetta USA's Part 135 certificate; US closings; use of US professionals in transactions; use of corporate trustees to comply with FAA regulations; maintenance of the aircraft at a US base; payments being made in US dollars; and funds for the 2015 Plane 6 Lease, 2015 Plane 7 Lease and Minsheng Refinancing being routed through US banks.

2021 WL 3721477

Opposition at 16-20; FAC ¶¶ 8, 11, 178, 191-92, 211-12, 254, 269-70, 272-75, 347-48, 351-53, 406. Unfortunately for the Trustee, in the Original UL/GA/TG MTD Ruling, the Court considered and rejected the Trustee's contention that each of these US ties transmuted extraterritorial transactions into domestic ones.

The Trustee also mentions the following to support his position that the obligations at issue were US-based:

1) Zetta Singapore confirmed that it became "obliged" to pay GA under the 2015 Plane 6 Lease and UL under the 2015 Plane 7 Lease when it accepted delivery of the aircraft in Connecticut. FAC ¶¶ 178, 192-93, 213, 350, 355; Ex. B-2 at 10; Ex. C at 68; Ex. D at 6.

2) UL, GA, and the Debtors wanted the 2015 Plane 6 Lease and the 2015 Plane 7 Lease to close in Connecticut because Connecticut law exempted aircraft sales from sales and use tax. FAC ¶ 178.

3) The Minsheng Refinancing closed in the US, and additional payments under the Minsheng Refinancing were "likely either made through banks that were subject to US laws or through US-based intermediary correspondent banks." FAC ¶ 11.

4) Signature pages for the 2015 Plane 6 Lease and 2015 Plane 7 Lease and for the Minsheng Refinancing— including for the Subleases, Clarification, and Guarantee —were sent to closing agents in the US and, once the closing conditions were met, the signature pages were released and documents were filed with the FAA in Oklahoma City. Id. ¶¶ 192, 194, 212, 214, 252, 262-63, 266-71, 276-77, 349, 351, 354, 356.

**\*20** In Count 1, the obligations that allegedly depleted the estate were Zetta Singapore's agreeing to make the $11.9 million of transfers outlined in FAC Schedule A for Planes 6 and 7, and the $55 million transfer ($55M Transfer) to UL from the proceeds of the Minsheng Refinancing. FAC ¶¶ 451-55. The Court previously addressed the: 1) six transfers listed in Schedule A—from Zetta Singapore's account in Singapore through an HSBC account in New York for credit to UL's account in Hong Kong; [18] and 2) $55M Transfer from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's account in Hong Kong, and found them to be foreign. AP Docket #174 at 32-34; see also FAC ¶¶ 272-73 & Sch. D (showing the flow

of funds from the Minsheng Refinancing between transferors and recipients).

[18]     In the FAC, the Trustee alleges that these six transfers were sent to UL's "US bank account at HSBC Bank in New York, USA." FAC ¶¶ 195, 215 (citing FAC Exs. B-2, D). The documents on which the Trustee relies, however, contradict the Trustee's allegations that UL had a US bank account. Exs. B-2 and D show that the transfers under the 2015 Plane 6 Lease and 2015 Plane 7 Lease were sent from Zetta Singapore's HSBC account in Singapore, through an HSBC account in New York, for credit to UL's HSBC account in Hong Kong. FAC Ex. B-2 § 3.26; Ex. D § 3.26. "[W]hen an exhibit to a complaint is inconsistent with the complaint's allegations, the exhibit controls." Nguyen v. Bank of Am., NA, 563 Fed. Appx. 558, 558 (9th Cir. 2014). Further, the Court previously considered the documents on which the Trustee relies and held that the transfers were foreign. AP Docket #174 at 32. And, routing transfers through an HSBC account in New York does not affect the extraterritoriality analysis. See In re Maxwell Commc'n Corp. plc, 186 B.R. 807, 817 n.5 (S.D.N.Y. 1995) (holding that a transfer was foreign where the transfer was made from an MCC Natwest account in London to Barclays's branch in New York, through which all payments made to Barclays in dollars were routed, and the funds were then immediately credited to MCC's London Barclays account).

In Count 2, the obligations that allegedly depleted the estate were:

1) Disbursing funds from the Minsheng Refinancing, including:

a. The $55M Transfer from Minsheng Business's Hong Kong account, through IATS's New York account, to UL's Hong Kong account, FAC ¶ 466 & Sch. D; and

b. The $12.4 million transfer ($12.4M Transfer) from Minsheng Business's Hong Kong account, through IATS's New York account, to Minsheng Business's Hong Kong account, id. ¶ 466 & Sch. D;

2) Transferring $10,148,723 from Zetta Singapore's Singapore account, through an HSBC New York account, to UL's Hong Kong account, which Zetta

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
In re Zetta Jet USA, Inc., Slip Copy (2021)    Exhibit A -- Unpublished Cases    Page 150 of 210

2021 WL 3721477

Singapore was required to pay under the Clarification (Plane 6 Loan Transfers),[19] id. ¶ 466 & Sch. B; and

3) Making "rent" and goodwill transfers under the Minsheng Plane 6 Lease, Minsheng Plane 7 Lease, and the Subleases, totaling over $17.3 million, from Zetta Singapore's Singapore account to either Minsheng Business's Hong Kong account or Yuntian 3's Ireland account, id. ¶ 466 & Sch. C.

[19]    The Trustee alleges "on information and belief" that "a US Correspondent Bank was involved in" the Plane 6 Loan Transfers. FAC Sch. B. Assuming that were true, as the Court must when ruling on a Rule 12(b)(6) motion to dismiss, the use of a domestic intermediary bank account does not make a foreign transfer domestic. See In re Maxwell Commc'n Corp. plc, 186 B.R. 807, 817 n.5 (S.D.N.Y. 1995).

The Court previously considered the $55M Transfer, the $12.4M Transfer, the Plane 6 Loan Transfers, and the $17.3 million of rent and goodwill transfers in the Original UL/GA/TG MTD Ruling and the Yuntian/Minsheng MTD Ruling and held that they were extraterritorial. AP Docket #s 174 at 33-35; 175 at 32-34.

*21  None of the activity that the Trustee highlights pertains to the focus of § 548, which is the transfer or obligation that *depletes* the estate. As the Supreme Court has explained, the mere existence of domestic conduct does not mean that a statute is being applied domestically. See RJR Nabisco, Inc. v. Eur. Cmty., 136 S. Ct. 2090, 2101 (2016) (noting that if the relevant conduct occurred abroad, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in the US); Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 266 (2010) (stating that the presumption against extraterritoriality would be a "craven watchdog indeed if it retreated to its kennel" whenever some domestic activity is involved).

The Trustee contends that § 548 focuses on the initial fraudulent conduct—either a fraudulent transfer of an asset or the fraudulent incurrence of an obligation—that "depletes" the estate to the detriment of the unsecured creditors. But, the problem for the Trustee, is the obligations on which he relies, did not deplete the estate of anything. The requirements that: 1) Planes 6 and 7 be: a) FAA registered and operated under Zetta USA's Part 135 certificate; b) delivered to Connecticut for FAA registration and tax purposes; c) maintained at US

bases; 2) Zetta Singapore confirm that it became "obliged" to pay GA and UL under the 2015 Plane 6 Lease and 2015 Plane 7 Lease, respectively, when it took delivery of the aircraft in Windsor Locks, Connecticut; and 3) payments be made in US dollars, did not deplete the estate. Likewise, the occurrence of closings in the US, the use of US professionals in the Minsheng Refinancing and of US corporate trustees to meet FAA citizenship requirements, the routing of payments through US banks, and the signature pages from the Minsheng Refinancing being sent to and released from US closing rooms and filed with the FAA in Oklahoma City, do not pertain to the depletion of the estate. Finally, the FAC's allegation that additional payments under the Minsheng Refinancing were "likely either made through banks that were subject to US laws or through US-based intermediary correspondent banks," FAC ¶ 11, is vague and insufficient to demonstrate that the obligations that the Trustee seeks to avoid were domestic.

### 2. The Avoidance and Recovery of Extraterritorial Transfers Based on Domestic Obligations

UL/GA/TG contend that even if the Court were to find that the obligations at issue were domestic, the foreign transfers are extraterritorial and not recoverable under 11 U.S.C. § 550. Motion at 24. UL/GA/TG highlight that under § 550, the Trustee can only recover property "to the extent a transfer is avoided under ... § 548." Id.

The Trustee responds by noting that a general purpose of the Bankruptcy Code's avoidance provisions, including § 548, is to protect "a debtor's estate from depletion to the prejudice of the unsecured creditor." Opposition at 21 (quoting In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277)). Although the Trustee recognizes that *Picard* did not involve fraudulently incurred obligations—as are alleged in the FAC —he asserts that its rationale applies with equal force here. Id. The Trustee contends that by avoiding the obligations under the 2015 Plane 6 Lease, the 2015 Plane 7 Lease, and the Minsheng Refinancing, "which constituted the initial depletion of the estate, the counterpart provisions of [§] 548 may be invoked to avoid transfers to pursue remedial relief on account of this regulated conduct since any repayment of an avoided obligation is unquestionably not made for reasonably equivalent value and may be set aside provided the other statutory requirements are met." Id. at 21-22. The Trustee

concludes by arguing that he seeks to recover the "transfers made on account of the fraudulently incurred obligations under [§] 548 as a second step in the avoidance and recovery process." Id. at 22.

**\*22** UL/GA/TG reply that avoiding an obligation does not permit a trustee to recover property because § 550(a) only permits recovery to the extent a transfer is avoided. Id. at 16. They argue that Picard does not warrant disregarding the Bankruptcy Code. Id. at 16-17. According to UL/GA/TG, if the Trustee could avoid transfers without showing they were domestic, the presumption of extraterritoriality would be "toothless." Id. at 17. They conclude that because avoidance of transfers is prerequisite to recovery of transfers and this Court has already ruled the transfers were foreign, the mere avoidance of obligations would not permit recovery. Id.

In the context of § 550, it is important to note the distinction between avoiding a transfer and avoiding an obligation. If the Trustee were successful in avoiding a transfer, he could recover the property transferred or the value of that property under § 550. In re Asia Glob. Crossing, Ltd., 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005). In contrast, if the Trustee were successful in avoiding an obligation, the obligation would be rendered unenforceable but there would be nothing to return to the estate and § 550 would afford the Trustee no remedy. Id.; see also In re MacMenamin's Grill Ltd., 450 B.R. 414, 429 (Bankr. S.D.N.Y. 2011) (noting that if a transfer is avoided it is recoverable under § 550 but if an obligation is avoided, it reduces "dollar for dollar the claims that the estate must pay" but there is nothing to preserve or bring back into the estate); In re Lewis, 574 B.R. 536, 540 n.15 (Bankr. E.D. Pa. 2017) (indicating that when a trustee successfully avoids an obligation under § 548, the obligation is rendered unenforceable leaving no property or asset to return and if the trustee succeeded in his attempt to avoid an obligation on a loan, the obligation to repay the loan would be rendered unenforceable but the transfer of the loan proceeds would not be avoided).

Although the Trustee asserts that Picard's rationale supports his position, the Court disagrees. In Picard, Bernard L. Madoff Investment Securities LLC (Madoff Securities), a US-based entity transferred billions of dollars from its New York JP Morgan Chase account to several foreign "feeder funds,"[20] which then transferred the money to foreign investors. In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 91, 93 (2d Cir. 2019), petition for cert. denied 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277). Irving Picard

(Picard), the trustee for the liquidation of Madoff Securities, filed avoidance and recovery actions under §§ 548 and 550 against the foreign feeder funds, who moved to dismiss. Id. at 91. The bankruptcy and district courts held that the avoidance and recovery claims should be dismissed based on the presumption against extraterritoriality or international comity principals. Id. at 91, 94. Both courts reasoned that Picard could not recover property that one foreign entity received from another foreign entity. Id.

[20]   A "feeder fund" is an entity that pools money from numerous investors and then places it into a "master fund" on their behalf. Id. at 92. A "master fund," which is what Madoff Securities advertised its funds to be, pools investments from multiple feeder funds and then invests the money. Id.

The Second Circuit reversed, noting that when a trustee seeks to avoid and recover subsequently transferred property under §§ 548(a) and 550(a), the relevant transfer that must be avoided is the initial transfer. Id. at 98. The Second Circuit rejected the lower courts' test that considered the subsequent transfer, reasoning that the relevant conduct was Madoff Securities's "fraudulent *transfer* of property, not the transferees' *receipt* of property." Id. at 100 (emphasis in original). The court expressed no opinion regarding whether a domestic debtor or a transfer of property from a US bank account would be sufficient to support a finding of a domestic transfer. Id. at 99 n.9. Because Madoff Securities was a domestic entity, which transferred property from its US account to the foreign feeder funds, the court held that the transfers were domestic. Id.

**\*23** Here, the Trustee attempts to analogize the conduct that occurred in the US in Picard—the transfer of a US-based company's funds from that company's US account—to Cassidy's fraudulent conduct. Opposition at 21-22. He highlights that the FAC alleges that Cassidy fraudulently incurred obligations in the US under the 2015 Plane 6 Lease, the 2015 Plane 7 Lease and the Minsheng Refinancing. Id. at 21. Unfortunately for the Trustee, the obligations that he highlights as occurring in the US—documents sent to the US for signature, maintenance of Planes 6 and 7 at a US facility, payment in US dollars, use of US professionals and corporate trustees, and delivery of Planes 6 and 7 in Connecticut—are not analogous to the initial transfers in Picard because those obligations are not the focus of § 548 and did not deplete the estate. See WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) (explaining that the "focus" of a statute is the "object of its solicitude," which can include the

2021 WL 3721477

conduct that it "seeks to regulate" and the parties and interests it "seeks to protect" or vindicate). They were preliminary steps to the conduct that actually depleted the estate, which was the transfer of funds from:

> 1) Zetta Singapore's Singapore account through an HSBC New York account to UL's Hong Kong account;

> 2) Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's Hong Kong account;

> 3) Minsheng Business's Hong Kong account, through an IATS New York account, back to Minsheng Business's Hong Kong account; and

> 4) Zetta Singapore's Singapore account to Minsheng Business's Hong Kong account or Yuntian 3's Ireland account.

The Trustee also provides a brief analysis of *In re International Manufacturing Group, Inc.*, 2016 WL 7163588 (Bankr. E.D. Cal. Dec. 6, 2016), in arguing that upon avoidance of a fraudulently incurred obligation, which constituted the initial depletion of the estate, "the counterpart provisions of Section 548 may be invoked to avoid transfers. ..." Opposition at 21-22. The Trustee's reliance on this case is misplaced. It did not address whether obligations were extraterritorial or domestic or whether a domestic obligation to make a foreign transfer would be sufficient under § 548 to avoid a transfer based on that obligation. Further, it involved a trustee seeking to avoid obligations to invalidate security interests, which would render them void, allowing her to recover payments made on those obligations from the collateral. In contrast, here, the FAC does not allege, nor does the Trustee suggest, that he seeks to avoid obligations to invalidate security interests.

### ii. Proofs of Claims

In addition to the issues addressed above, the primary area of disagreement between the parties regarding Counts 1, 2, as well as Counts 6, 8, 9, and 10 is the impact of UL/GA/TG's filing proofs of claims (POCs). [21] The Trustee contends that because UL/GA/TG filed the POCs, they submitted themselves to the Court's jurisdiction and waived any challenges that they had to the extraterritorial application of §§ 105(a), 502, 548 and 550. Opposition at 22-26. In contrast, UL/GA/TG contend that filing the POCs subjects

them to the Court's jurisdiction to adjudicate those claims but does not transmute extraterritorial transactions into domestic ones. Reply at 17-19.

[21]    The FAC alleges that Li Qi, via his alter egos, UL and GA, filed a $35,660,808.18 unsecured claim, POC #94-2, and a $43,208,715.74 unsecured claim, POC #95-1.

UL/GA/TG highlight that in the Original UL/GA/TG MTD Ruling, the Court held that filing a proof of claim does not render an extraterritorial transaction domestic because it would "effectively expand the reach of §§ 547, 548 and 550, beyond what those statutes provide." Motion at 19 (citing AP Docket #174 at 42). The Trustee responds that Li Qi, through UL and GA, filed POCs totaling more than $72 million regarding the same obligations that UL/GA/TG assert the Court lacks power to avoid under § 548 based on extraterritoriality. Opposition at 22-23. According to the Trustee, it would be unfair for UL/GA/TG to keep transfers made under the 2015 Planes 6 and 7 Leases and to take the lion's share of funds available through the claims process without repaying $35.7 million to the estates. [22] Id. at 25-26 (citing *Off. Comm. of Unsecured Creditors v.*

[22]    According to the Trustee, UL/GA/TG fraudulently received approximately $35.7 million because Zetta Singapore paid:
> 1) $6,305,382 more than fair market value on account of obligations for Planes 6 and 7: $3,065,043 more than fair market value for Plane 6, and $3,240,339 more than fair market value for Plane 7, FAC ¶¶ 199, 218. The Trustee's calculation of the amounts alleged in the FAC differs from the Court's by $1. The FAC indicates Zetta Singapore actually paid $5,944,068 on obligations under the 2015 Plane 6 Lease and the monthly financing cost for comparable aircraft at fair market value should have been $2,879,025, resulting in excess payments of $3,065,042. FAC ¶ 199. But, $5,944,068 - $2,879,025 = $3,065,043.
> 2) $19.2 million more than fair market value for Plane 7 under the Minsheng Refinancing, FAC ¶ 286. According to the FAC, the Minsheng Refinancing resulted in UL receiving $55 million from the Debtors for Plane 7, which was worth at most $35.7

2021 WL 3721477

million. Id. ¶¶ 250, 273(a), 285-86. The Court calculates that difference as $19.3 million rather than $19.2 million.

3) $10,149,893 in duplicate financing for Plane 6, FAC Sch. B.

Opposition at 24-25.

**\*24** Hancock Park Capital II, L.P., 714 F.3d 1141, 1148 (9th Cir. 2013)). The Trustee highlights that the 6/27/17 Transfer and the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease are property of the estate under § 541, which has no extraterritorial limitations. Id. at 26 (citing In re Simon, 153 F.3d 991, 995 (9th Cir. 1998); Kismet Acquisition, LLC v. Icenhower (In re Icenhower), 757 F.3d 1044 (9th Cir. 2014)).

UL/GA/TG reply that the Court correctly held that filing proofs of claims does not transmute extraterritorial transactions into domestic ones because "only Congress, not litigants, can determine the breadth of [a] statute," and the Trustee's position would effectively expand the reach of §§ 548 and 550 "beyond what those statutes provide, which Morrison indicated, courts should not do." Reply at 17-18 (quoting AP Docket #174 at 43). UL/GA/TG contend that the Trustee incorrectly conflates the Court's jurisdiction over a case with the merits of whether a statute regulates non-domestic conduct, highlighting that:

> to ask what conduct § 10(b) ... reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case. ... It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief.

Id. at 18 (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 254 (2010) (internal quotations and citations omitted)). According to UL/GA/TG, proofs of claims establish the Court's jurisdiction to adjudicate controversies, including whether obligations are avoidable under § 548. Id. at 18. But, they contend that the Trustee cannot prevail merely by establishing subject-matter jurisdiction, he must also establish that a statute applies to his claim and the substantive elements are met. Id. They contend that whether the obligations are domestic is a merits question, separate from the Court's jurisdiction to decide a dispute. Id. They assert that the

Trustee cites cases holding that bankruptcy courts have broad jurisdiction over the claims administration process but he does not cite any case suggesting that a bankruptcy court can apply a statute to conduct outside its scope. Id. at 19. They discount the Trustee's fairness argument, noting that in the Ninth Circuit, policy considerations are insufficient to overcome the presumption against extraterritoriality. Id. (citing AP Docket #174 at 16). According to UL/GA/TG, the Trustee can pursue foreign fraudulent transfers but cannot do so under US law. Id. UL/GA/TG conclude by arguing that because the Court's "jurisdiction to resolve a dispute does not include the power to expand a statute, the Court should *exercise* its jurisdiction and dismiss the Trustee's claims on the *merits*." Id. (emphasis in original).

As an initial note, when ruling on the Original UL/TG/GA MTD, this Court rejected the Trustee's argument—that UL/GA/TG's "deliberate and voluntary decision" of filing the POCs waived the presumption against extraterritoriality. AP Docket #174 at 40-44. The Trustee again cites Katchen v. Landy, 382 U.S. 323, 329-30 (1966), and Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990), which are unavailing because neither case addressed or involved extraterritorial application of the Bankruptcy Code or provide support for the Trustee's position that filing the POCs extends §§ 548 and 550 to extraterritorial conduct. AP Docket #174 at 44. And, the Trustee's citations to Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 54 (1982), Pepper v. Litton, 308 U.S. 295, 304 n.11 (1939), and U.S. Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 216-17 (1912), which did not involve extraterritoriality issues but instead stand for the proposition that bankruptcy courts can adjudicate claims as part of the claims allowance process or in the context of fraudulent transfer or preference actions, are likewise unpersuasive.

**\*25** According to the Supreme Court, a court's jurisdiction to adjudicate a matter is separate from whether a statute regulates extraterritorial conduct. See RJR Nabisco, Inc. v. Eur. Cmty., 136 S.Ct. 2090, 2109 (2016) (differentiating between whether a federal court has jurisdiction to adjudicate a claim and whether the court has authority to recognize a cause of action under US law); Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 254 (2010) (indicating that to ask what conduct a statute reaches is a merits question, whereas subject-matter jurisdiction refers to a court's power to hear a case, which is a separate issue from whether the allegations entitle the plaintiff to relief). And, the Trustee's fairness argument does not further his position because in

2021 WL 3721477

the Ninth Circuit, policy considerations alone are insufficient to overcome the presumption against extraterritoriality. In re Bankr. Est. of Midland Euro Exch. Inc., 347 B.R. 708, 719 (Bankr. C.D. Cal. 2006) (citing Subafilms, Ltd. v. MGM-Pathe Commc'ns Co., 24 F.3d 1088, 1096 (9th Cir. 1994)).

Although the Trustee cites In re Simon, 153 F.3d 991 (9th Cir. 1998), and Kismet Acquisition, LLC v. Icenhower (In re Icenhower), 757 F.3d 1044 (9th Cir. 2014), to support his position that the 6/27/17 Transfer and the Minsheng Planes 6 and 7 Leases are property of the estate under § 541, his reliance on those cases is not persuasive. Opposition at 26. In the Original UL/GA/TG MTD Ruling, the Court extensively analyzed Simon, 153 F.3d 991 (9th Cir. 1998), explained why it was inapposite, and found that UL's and GA's filing the POCs did not waive the presumption against extraterritoriality. AP Docket #174 at 41-43.

The Trustee's reference to Kismet Acquisition, LLC v. Icenhower (In re Icenhower), 757 F.3d 1044 (9th Cir. 2014), is likewise unavailing. In Icenhower, Jerry and Donna Icenhower (Icenhowers) bought a Mexican villa (Villa). Id. at 1047. A few years later, they bought a shell company, H&G, and transferred their interest in the Villa to H&G. Id. at 1048. Then, they filed bankruptcy. Id. About six months later, H&G sold its interest in the Villa to Alejandro Diaz-Barba and Martha Barba de la Torre (Diazes). Id. The chapter 7 trustee, Gerald Davis (Davis), filed avoidance and recovery actions, alleging that H&G was the Icenhowers' alter ego and the Villa's sale to the Diazes was an unauthorized postpetition transfer. Id. Shortly thereafter, Kismet Acquisition, LLC (Kismet) bought the estate's assets and was substituted for Davis in both avoidance actions. Id. at 1048-49.

After trial, the bankruptcy court held that the transfer of H&G's interest in the Villa to the Diazes was an unauthorized postpetition transfer avoidable under § 549(a) and Kismet could recover the Villa or its value from the Diazes, as initial transferees. Id. at 1049. The district court affirmed. Id. On appeal, the Diazes argued that the bankruptcy court erred by applying US law extraterritorially. Id. at 1047, 1050-51. The Ninth Circuit disagreed, noting that "Congress intended extraterritorial application of the Bankruptcy Code [§ 549] as it applies to property of the estate." Id. at 1051 (quoting In re Simon, 153 F.3d 991, 996 (9th Cir. 1998)). Because the bankruptcy court ruled that H&G was the Icenhowers' alter ego and substantively consolidated it with their bankruptcy estate, the Ninth Circuit held that the Villa was property of the estate as of the petition date. Id.

Icenhower is readily distinguishable. Here, Counts 1 and 2 seek avoidance and recovery under §§ 548 and 550, Count 6 seeks recharacterization of the 6/27/17 Transfer as equity under § 105 and 502, Counts 8 and 9 seek recharacterization of the Minsheng Plane 6 Lease and Minsheng Plane 7 Lease as financings rather than true leases under § 105, and Count 10 seeks disallowance of claims under § 502. In contrast, Kismet involved a § 549(a) action, which governs transfers and avoidance of "property of the estate." 11 U.S.C. § 549(a). None of the statutes at issue in Counts 1, 2, 6, 8, 9, or 10 address "property of the estate."

*26 Further, although the Trustee claims that this Court has exclusive jurisdiction under § 541 to determine what is "property of the estate," neither case the Trustee cites—Official Committee of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings International, Inc.), 714 F.3d 1141 (9th Cir. 2013), nor In re Ames Department Stores, Inc., 542 B.R. 121 (Bankr. S.D.N.Y. 2015)—involved issues of extraterritoriality. Fitness Holdings addressed whether the debtor's "pre-bankruptcy transfer of funds to its sole shareholder, in repayment of a purported loan, may be a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B)" and Ames addressed whether the bankruptcy court or a state court had jurisdiction to adjudicate disputes regarding Ames Department Stores, Inc. and its affiliates. In re Fitness Holdings, 714 F.3d at 1143; In re Ames Dep't Stores, 542 B.R. at 126-27. Therefore, the Court disagrees with the Trustee's argument that UL/GA/TG's filing of POCs allows the Court to apply §§ 105(a), 502, 548 and 550 to extraterritorial conduct.

iii. Recharacterization of the 6/27/17 Transfer as Equity Interest Under 11 U.S.C. §§ 105(a) and 502 (Count 6)

UL/GA/TG argue that in Count 6—which is nearly identical to Count 13 of the Original Complaint—the Trustee seeks to recharacterize a loan from UL to Zetta Singapore as equity under 11 U.S.C. § 105(a). Motion at 26. They contend that the Court ruled that Count 13 of the Original Complaint was extraterritorial because the relevant transaction—a transfer from UL's Hong Kong account to Zetta Singapore's Singapore account and the transfer of Zetta Singapore's stock to TG—had no US involvement and § 105 does not have extraterritorial scope. Id. The Trustee responds by focusing on UL/GA/TG's filing the POCs. Opposition at 25. UL/GA/TG reply that the Trustee's claim for recharacterization in Count 6

is an extraterritorial application of § 105(a), which the Court rejected. Reply at 12, 34 (citing AP Docket #174 at 18, 36-37, 50; Original Complaint ¶¶ 308-12).

Title 11 U.S.C. § 105(a) provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title ... shall be construed to preclude the court from ... making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

The power granted to bankruptcy courts under § 105 is not limitless. Section 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." Law v. Siegel, 571 U.S. 415, 421 (2014) (internal quotation marks omitted); see also Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 403 (1st Cir. 2002) (indicating that § 105(a) "does not provide bankruptcy courts with a roving writ, much less a free hand" and it may be invoked only if an equitable remedy "is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code") (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 969 (1988)); see also In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir. 2003) (stating that § 105(a) provides bankruptcy courts with the power to exercise equity in carrying out *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing, and an exercise of § 105 power must be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective) (emphasis in original).

Here, Count 13 of the Original Complaint sought to recharacterize the 6/27/17 Transfer under 11 U.S.C. § 105(a) as an equity investment by Li Qi. Original Complaint ¶¶ 309-10. It alleged that in exchange for $15 million from UL, Walter and Seagrim agreed to transfer 20% of Zetta Singapore's outstanding shares to TG—which was also controlled and owned by Li Qi—resulting in Li Qi receiving additional equity in Zetta Singapore. Id. ¶ 311. In the Original UL/GA/TG MTD Ruling, the Court dismissed Count 13

based on the presumption against extraterritoriality and held that: 1) § 105 contains no extraterritorial reference; and 2) there were no allegations of any US involvement with the 6/27/17 Transfer. AP Docket #174 at 17-18, 36-37.

*27  Although the Court granted the Trustee leave to amend Count 13, the substance of Count 6 of the FAC is virtually identical to that of Count 13. Compare Original Complaint ¶¶ 308-12 (Count 13), with FAC ¶¶ 499-503 (Count 6). The Court recognizes that the Trustee did add a reference to 11 U.S.C. § 502 in the caption of FAC Count 6. But, citing § 502 does not alter the fact that Count 6's allegations are unchanged from those in Count 13 of the Original Complaint or that UL/GA/TG's filing the POCs does not expand § 105 to apply extraterritorially.

### iv. Recharacterization of Minsheng Plane 6 Lease Under 11 U.S.C. § 105(a) (Count 8) and Recharacterization of the Minsheng Plane 7 Lease Under 11 U.S.C. § 105(a) (Count 9)

UL/GA/TG contend that FAC Counts 8 and 9 are non-domestic for the same reasons the § 548 claims in FAC Counts 1 and 2 are non-domestic and highlight that: 1) the Court previously decided that § 105(a) does not have extraterritorial scope; 2) courts must examine the "focus" of § 105(a); and 3) the Trustee is asking the Court to "carry out" § 548, to recharacterize and avoid transfers regarding the Minsheng Plane 6 and 7 Leases. Motion at 26 (citing FAC ¶ 257). The Trustee responds that UL/GA/TG's arguments regarding his recharacterization claims are irrelevant because by filing the POCs, they submitted themselves to the Court's jurisdiction. Opposition at 25-26. UL/GA/TG reply that the Trustee conflates the Court's jurisdiction with the merits of his claims. Reply at 17-19.

Count 8, which seeks recharacterization of the Minsheng Plane 6 Lease under § 105(a), is brought against Minsheng Business, Yuntian 3, Li Qi, GA, and UL and alleges that:

1) On 9/20/16, Zetta Singapore entered into the Minsheng Plane 6 Lease. FAC ¶ 510.

2) The Minsheng Plane 6 Lease is not a true or operating lease, but a finance lease that created a security interest. Id. ¶ 511.

3) The Minsheng Plane 6 Lease was not subject to termination by TVPX (as trustee for the Debtors) after

In re Zeta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

Plane 6 was accepted for delivery. Once the Debtors had made all quarterly installments, they could exercise a $1 option to buy Plane 6 (Plane 6 Option). Id. ¶ 513.

4) Given the Plane 6 Option, Yuntian 3 did not retain any entrepreneurial risk under the Minsheng Plane 6 Lease, it did not expect to retain Plane 6, and its only expectation was to receive rent payments from the Debtors. The Debtors were at all times the actual economic owners of Plane 6, bearing the risks and benefits of ownership both before and after the Minsheng Refinancing. Id. ¶ 514.

5) The Debtors had the sole residual equity interest in Plane 6 after they completed all rental payments under the Minsheng Plane 6 Lease. Id. ¶ 515.

6) The Minsheng Plane 6 Lease should be recharacterized as a secured financing, not an operating lease. Id. ¶ 516.

Count 9, which seeks recharacterization of the Minsheng Plane 7 Lease under § 105(a), is brought against the same parties and contains virtually identical allegations as Count 8. Id. ¶¶ 517-25.

The Trustee does not dispute that the focus of § 105(a) is a court's power "to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]," nor does he argue that UL/GA/TG are wrong to suggest that in Counts 8 and 9, he is seeking to "carry out" § 548. In fact, the FAC pleads that:

> [T]he [Minsheng Planes 6 and 7 Leases] constituted secured financings between Yuntian 3 and the Debtors and, to the extent the Debtors were not already vested with ownership of Planes 6 and 7 ... vested the Debtors with economic ownership of Plane 6 and Plane 7 and also an interest in financing proceeds disbursed at closing [of the Minsheng Refinancing] ... that is subject to avoidance and recovery under Section 548 of the Bankruptcy Code.

*28  FAC ¶ 257. As noted above, § 548 does not apply extraterritoriality, and the following transfers from the

Minsheng Refinancing the Trustee seeks to avoid and recover are foreign:

1) The $55M Transfer, which was sent from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to UL's Hong Kong account.

2) The $12.4M Transfer, which was sent from Minsheng Business's Hong Kong account, through an IATS New York escrow account, to Minsheng Business's Hong Kong account.

In Counts 8 and 9, the Trustee seeks non-domestic application of § 105(a) for the purpose of avoiding and recovering transfers alleged in Counts 1 and 2 under § 548, which, as analyzed above, are dismissed based on the presumption against extraterritoriality.

UL/TG/GA also contend that Counts 8 and 9 should be dismissed or stricken because they exceed the scope of the Original UL/GA/TG MTD Ruling, in which the Court granted leave to amend regarding "Counts I, II, IV, V, VIII, XIII and XV." Motion at 46 (citing UL/GA/TG/LQ RJN Ex. 23). They contend that where leave to amend is granted to cure deficiencies in specified claims, new claims alleged for the first time in the amended pleading should be dismissed or stricken. Id. (citing Vahora v. Valley Diagnostics Lab'y, Inc. 2017 WL 2572440, at *2 (E.D. Cal. June 14, 2017)).

The Trustee responds with three arguments. He highlights that the right to amend is broad, it encompasses the right to add new causes of actions or theories, and courts in this circuit "generally allow plaintiffs to add new claims and/or parties to an amended complaint where a prior order of dismissal granted leave to amend without limitation." Opposition at 37 (citing MAO-MSO Recovery II, LLC v. Mercury Gen., 2018 WL 3357492, at *4 (C.D. Cal. May 23, 2018)). Second, he asserts that even if the amendments exceeded the scope of the Original UL/GA/TG MTD Ruling, Counts 8 and 9 should not be stricken, because courts have long disfavored Rule 12(f) motions, which are generally granted only when "necessary to discourage parties from making completely tendentious or spurious allegations" that could prejudice the opponent. Id. (citing Sapiro v. Encompass Ins., 221 F.R.D. 513, 518 (N.D. Cal. 2004)). Finally, he argues that the Court may construe the FAC or the Opposition as a motion to amend. Id. at 38 (citing Popov v. Countrywide Fin. Corp., 2009 WL 5206679, at *2 (E.D. Cal. Dec. 18, 2009)).

In re Zetta Jet USA, Inc., Slip Copy (2021)

2021 WL 3721477

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 157 of 210

UL/TG/GA reply that the Trustee's position is that any time leave to amend is granted, regardless of what a court's order may provide, he can add any claims that he seeks, which is not the law. Reply at 37 (citing Vahora v. Valley Diagnostics Lab'y Inc., 2017 WL 2572404, at *2 (E.D. Cal. June 14, 2017)). They allege that the Trustee "ignores Vahora, and the cases cited by Vahora, which this Court relied on in the Bombardier matter to strike the Trustee's claims filed in violation of a similar order." [23] Id.

[23]    UL/GA/TG do not specify when the Court struck claims in any adversary proceeding relating to the Cases, nor do they specify in which "Bombardier matter" the Court struck claims. Although they cite "Dkt. 259 at 37-38," there is no ruling at Docket #259 in this adversary proceeding or in the two other larger adversary proceedings: the Jetcraft AP and CAVIC AP. The Court interprets UL/GA/TG's reference to a "Bombardier matter" as the Trustee's "Motion to Consolidate Related Adversary Cases" (Consolidation Motion), which he filed concurrently in the Jetcraft AP and CAVIC AP. Jetcraft AP Docket #153; CAVIC AP Docket #184. The Court issued an oral ruling on the Consolidation Motion, stating that:

> [W]here leave to amend is given to cure deficiencies in certain specified claims, new claims alleged for the first time in an amended pleading should be dismissed or stricken. That's Vahora v. Valley Diagnostic Laboratory, 2017 WL 2572404, Eastern District of California (2017).

Jetcraft AP Docket #194 at 36 (transcript of the hearing on the Consolidation Motion). The Court, however, did not strike any claims when ruling on the Consolidation Motion.

**\*29**  The Trustee's first argument requires little discussion. He is correct that the right to amend is granted with extreme liberality. But, the Original UL/GA/TG MTD Ruling made clear which counts the Trustee was authorized to amend. AP Docket #174 at 50. The Trustee did not seek leave to add counts to this action nor did the Court rule on any such request. Further, the Trustee's citation to MAO-MSO Recovery II, LLC v. Mercury General, 2018 WL 3357493, at *4 (C.D. Cal. May 23, 2018) is unavailing. There, leave to amend without limitation was granted whereas here, the Court explicitly stated which counts could be amended. AP Docket #174 at 50.

Regarding striking Counts 8 and 9, under Rule 12(f), the Court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored and infrequently granted. Bakersfield Pipe & Supply, Inc. v. Cornerstone Valve, LLC, 2015 WL 4496349, at *1 (E.D. Cal. July 23, 2015). The party moving to strike allegations under Rule 12(f) bears the burden of proof. Carney v. Town of Weare, 2016 WL 320128, at *2 (D.N.H. Jan. 26, 2016); Rees v. PNC Bank, N.A., 308 F.R.D. 266, 275 (N.D. Cal. 2015). Here, the Court finds that it is more appropriate to dismiss, rather than to strike, Counts 8 and 9, which are beyond the scope of what the Court authorized in the Original UL/GA/TG MTD Ruling. As noted by the Ninth Circuit:

> Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading ... we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose.

Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 974 (9th Cir. 2010). Numerous courts have held that when an amended pleading exceeds the scope of what was authorized, additional counts should be dismissed. Doe v. Cal. Inst. of Tech., 2020 WL 8463631, at *6 (C.D. Cal. Feb. 4, 2020) (dismissing a new claim with prejudice because the plaintiff was granted leave to amend certain claims but did not seek leave to amend before adding the new claim); Villanueva v. Wells Fargo Bank, N.A., 2019 WL 1509183, at *3 (N.D. Cal. Apr. 5, 2019) (dismissing new claims because the court did not provide the plaintiff leave to amend without limitation, and the plaintiff's addition of new claims was improper); Ketab Corp. v. Mesriani & Assoc., 2015 WL 8022874, at *8 (C.D. Cal. Dec. 4, 2015) (dismissing new claims and denying leave to amend to add the new claims where previous order of dismissal only granted leave to amend to cure deficiencies in certain specified claims); DeLeon v. Wells Fargo Bank, N.A., 2010 WL 4285006, at *3, 5 (N.D. Cal. Oct. 22, 2010) (dismissing new claims brought for the first time in an amended complaint because the court had only granted

2021 WL 3721477

leave to amend certain claims, and plaintiffs were required to seek leave of the court before adding new claims).

Finally, the Trustee did not file a Rule 15 motion and it would be unfair for UL/GA/TG to have to oppose a motion that was never filed. Where a complaint is dismissed with leave to amend that is limited in scope, the plaintiff must seek leave of the court as required by Rule 15 before adding new claims or new parties. DeLeon, 2010 WL 4285006, at *3; Kennedy v. Full Tilt Poker, 2010 WL 3984749, at *1 (C.D. Cal. Oct. 12, 2010).

d. Objections to Claims and Disallowance of Claims Under 11 U.S.C. § 502 and Assertions of Counterclaims under 28 U.S.C. § 157(b)(2)(C) (Count 10)

**\*30** UL/GA/TG highlight that § 502, which is at issue in Count 10, contains no extraterritorial language. Motion at 18. They claim that § 502(d) applies to avoidable transfers but not to avoidable obligations. Id. at 47 (citing In re Asia Glob. Crossing, Ltd., 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005)). UL/GA/TG contend that the Trustee cannot state a claim under § 502(d) unless he first pleads a viable claim for avoidance and recovery, which he has not done. Id. The Trustee responds that the FAC states numerous viable claims and consequently a viable disallowance claim under § 502(d). Opposition at 43. UL/GA/TG reply that § 502(d) does not apply to avoidable obligations and they highlight that the Trustee does not argue that it does. Reply at 45.

Section 502(d) provides that:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section ... 550 ... of this title or that is a transferee of a transfer avoidable under section ... 548 ... of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section ... 550 ... of this title.

For the Trustee to prevail on Count 10, which seeks disallowance of the POCs, the Court must first find that UL/

GA/TG are liable under §§ 548 and 550. In re PennySaver USA Publ'g, LLC, 587 B.R. 445, 468 (Bankr. D. Del. 2018) (noting that disallowance under § 502(d) requires a judicial determination that a claimant is liable). As noted above, the Court is dismissing Counts 1 and 2 because they improperly seek extraterritorial application of § 548. Therefore, the Court finds that the Trustee has not adequately plead a § 502(d) claim. Id.; see also In re El-Atari, 2012 WL 404947, at *6 (Bankr. E.D. Va. Feb. 8, 2012) (concluding that because the complaint's §§ 548 and 550 claims should be dismissed, there was no basis for an objection to the defendant's claim under § 502(d) because § 502(d) is limited to a setoff of the Bankruptcy Code's turnover and avoidance claims); In re Labrum & Doak, LLP, 237 B.R. 275, 309 (Bankr. E.D. Pa. 1999) (noting that by its terms, § 502(d) is limited in its effect to claimants subject to avoidance orders under § 548).

Further, in Counts 1 and 2, the Trustee seeks to avoid *obligations*. FAC ¶¶ 444-72. Section 502(d), however, applies to avoidable transfers but does not apply to avoidable obligations. In re Asia Glob. Crossing, Ltd., 333 B.R. 199, 202-03 (Bankr. S.D.N.Y. 2005) (noting that § 502 "disallows the claim of the transferee of an avoidable transfer, but does not speak to the claim of an obligee under an avoidable obligation" because the avoided obligation is rendered unenforceable, and the underlying claim is subject to disallowance without regard to § 502(d)). Finally, the Trustee's reference to 28 U.S.C. § 157(b)(2)(C) in Count 10 is unavailing. Section 157(b)(2)(C) merely indicates that counterclaims brought by the estate against persons filing claims against the estate are "core" proceedings. It does not provide that the Court can adjudicate extraterritorial claims, which are issue in Counts 1, 2, 6, 8, 9, and 10.

e. Violation of the Automatic Stay
Under 11 U.S.C. § 362 (Count 7)

UL/GA/TG argue that Count 7 should be dismissed because § 362(k) only permits an "individual" to recover damages for violation of the automatic stay, and in the Ninth Circuit, neither a trustee nor a corporation is considered an "individual" under § 362(k). Motion at 45-46 (citations omitted). The Trustee responds that the Court previously determined that he pled sufficient facts to support a claim for violation of the automatic stay, and the law of the case doctrine bars a challenge to Count 7. Opposition at 42-43. UL/GA/TG reply that the law of the case doctrine does not apply because the Court has not entered a final judgment or been

2021 WL 3721477

divested of jurisdiction. Reply at 44. They contend that by failing to dispute that stay violation damages are unavailable to a corporate debtor, the Trustee has waived any argument to the contrary. Id. (citing Pers. Elec. Transps., Inc. v. Off. of U.S. Tr., 313 Fed.Appx. 51, 52 (9th Cir. 2009)).

**\*31** In Count 7, the Trustee seeks compensatory damages under 11 U.S.C. § 362(k)(1) against TG and Li Qi for violation of the automatic stay, alleging that a lawsuit they filed in Singapore (Singapore Action) [24] prevented the Debtors and the Trustee from collecting assets that Cassidy misappropriated, and caused the Trustee to spend time and resources seeking to vacate an injunction in the Singapore Action. FAC ¶¶ 507-08.

[24]   The FAC indicates that on 9/18/17, TG, at the direction of Li Qi (along with Asia Aviation), filed a lawsuit in the High Court, seeking to enjoin Zetta Singapore's bankruptcy case. FAC ¶ 506. Two days later, the High Court issued an injunction enjoining Zetta Singapore from "carrying out any further steps in and relating to the purported bankruptcy filings" before this Court. Id.

Title 11 U.S.C. § 362(k)(1) provides that "an individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." For purposes of § 362(k)(1), " 'individual' means an individual, and not a corporation or other artificial entity." In re Goodman, 991 F.2d 613, 619 (9th Cir. 1993); see also Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 920 F.2d 183, 184-87 (2d Cir. 1990) (holding that a bankruptcy court may impose sanctions only for violating a stay as to debtors who are natural persons). [25] A bankruptcy trustee is not an "individual" for these purposes "because any harm suffered in the form of costs and attorney's fees is actually incurred by a thing, *viz.*, the bankruptcy estate, and not by the trustee as a natural person." In re Pace, 67 F.3d 187, 193 (9th Cir. 1995).

[25]   Both Goodman and Chateaugay analyzed § 362(h). BAPCPA amended former § 362(h) and redesignated that provision as § 362(k). In re Glenn, 379 B.R. 760, 761 n.1 (N.D. Ill. 2007).

Although the Trustee contends that the law of the case doctrine applies here, that is incorrect. The law of the case doctrine only applies when the court has "previously entered a

final decree or judgment." Askins v. U.S. Dep't of Homeland Sec., 899 F.3d 1035, 1042 (9th Cir. 2018). No judgment has been entered in this case. Further, and more importantly, the law of the case doctrine provides that a court is precluded from "reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993). The law of the case doctrine applies if the issue in question was "decided either expressly or by necessary implication" in a previous disposition. Id. (citations and internal quotation marks omitted).

In the Original UL/TG/GA MTD Ruling, the Court addressed whether the Singapore Action violated §§ 362(a)(1) and (a)(3). AP Docket #174 at 46-48. The Court found that the Original Complaint pled sufficient factual allegations to withstand the Original UL/GA/TG MTD. Docket #174 at 48. Neither party briefed or addressed the Trustee's standing to bring a § 362(k) claim on behalf of the estate nor did the Court decide that issue. Therefore, the law of the case doctrine is inapplicable here. And, the Court finds that Count 7 must be dismissed because the Trustee cannot bring a § 362(k) claim for damages. [26]

[26]   During the 8/11/21 hearing, the Trustee asserted that in Count 7, which is brought against TG and Li Qi for "Violation of the Automatic Stay" under 11 U.S.C. § 362, he is seeking contempt damages under § 105 rather than damages under § 362(k). The Trustee's focus on § 105 is unpersuasive for a number of reasons. Count 7 mentions neither § 105 nor contempt, and in the Opposition, the Trustee did not reference § 105 nor contempt regarding Count 7. See Deseret Tr. Co. v. Unique Inv. Corp., 2018 WL 8110959, at *3-4 (D. Utah July 3, 2018) (noting that federal district courts around the country reject arguments raised for the first time at oral argument); Star Fabrics, Inc. v. Zappos Retail, Inc., 2013 WL 12124096, at *6 n.20 (C.D. Cal. July 19, 2013) (declining to consider an argument that was raised for the first time during a hearing because the opposing party was deprived of a meaningful opportunity to respond). Counsel for the Trustee's referencing "notice pleading" and highlighting FAC ¶ 22—which lists all of the statutes and rules at issue in the FAC—does not further his position. See Lee v. City of L.A., 250 F.3d 668, 679 (9th Cir. 2001) (noting that FRCP 8 means what it says and requires a short and plain

Case 2:19-ap-01382-SK Doc 282-1 Filed 09/07/21 Entered 09/07/21 11:44:24 Desc
Exhibit A -- Unpublished Cases Page 160 of 210

In re Zeta Jet USA, Inc., Slip Copy (2021)
2021 WL 3721477

statement that provides the defendant fair notice of the claim and the grounds upon which it rests) (citing Leatherman v. Tarrant Cty. Narcotics Intel. and Coordination Unit, 507 U.S. 163, 168 (1993)); see also Phomthevy v. WinCo Holdings, Inc., 2019 WL 3067105, at *4-5 (E.D. Cal. July 12, 2019) (dismissing a count under Rule 8 where plaintiff's opposition to a Rule 12(b)(6) motion identified Cal. Labor Code § 246.5 as the statute under which the count was brought, but the complaint itself did not); Boyd v. Fed. Home Loan Mortg. Corp., 2011 WL 13228241, at *5 (D. Haw. Aug. 10, 2011) (dismissing UCC claims for failure to comply with Rule 8 where the complaint did not provide notice to the defendants of what provision of the UCC, if any, they violated).

Finally, a party seeking civil contempt sanctions under § 105 must do so by motion rather than by including a cause of action in an adversary proceeding. See In re Matthews, 2017 WL 2821532, at *1 (Bankr. C.D. Cal. June 29, 2017) (noting that Local Bankruptcy Rule 9020-1 governs contempt proceedings for violations of court orders or directives, such as the automatic stay under 11 U.S.C. § 362 or the discharge injunction under 11 U.S.C. § 524); Loc. Bankr. R. 9020-1(a) (providing that unless otherwise ordered by the court, contempt proceedings are initiated by filing a motion and a lodged order to show cause); see also Barrientos v. Wells Fargo Bank, N.A., 633 F.3d 1186, 1191 (9th Cir. 2011) (holding that an order of contempt under § 105 to enforce a discharge injunction must be sought via motion in the bankruptcy action, not via an adversary proceeding); Enodis Corp. v. Emps. Ins. of Wausau (In re Consol. Indus. Corp.), 360 F.3d 712, 716 (7th Cir. 2004) (indicating that "an adversary proceeding is not the proper vehicle to present a contempt claim, as civil contempt is a method of enforcing a court order, not an independent cause of action"); In re Chionis, 2013 WL 6840485, at *4 (B.A.P. 9th Cir. Dec. 27, 2013) (noting that generally, "civil contempt sanctions for violation of the discharge injunction must be sought by contested matter rather than an adversary proceeding" and bankruptcy courts may dismiss a complaint seeking contempt sanctions and require the party to proceed by way of motion); Fed. R. Bankr. P. 9020 (indicating that Rule 9014,

"Contested Matters," governs a motion for order of contempt brought by a party; Fed. R. Bankr. P. 9014 (indicating that in a contested matter, relief shall be requested by motion).

### f. Leave to Amend

**\*32** UL/GA/TG do not address leave to amend in the Motion, nor does the Trustee address in the Opposition Rule 15 or whether leave to amend should be granted. [27] UL/GA/TG summarily argue in the Reply that the FAC should be dismissed against them without leave to amend. Reply at 45.

[27] The Court recognizes that the Trustee, when addressing Counts 8 and 9, contends that the Court may "construe the [FAC] or this opposition as a motion to amend." Opposition at 38. The Court declines to do so. See Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 630-31 (4th Cir. 2008) (affirming denial of a request to amend a complaint because the request was made in response to a motion to dismiss and in an objection to a magistrate judge's recommendation); Long v. Satz, 181 F.3d 1275, 1279-80 (11th Cir. 1999) (holding that the court did not abuse its discretion in denying leave to amend a complaint because the request was included in a memorandum filed in opposition to a motion to dismiss rather than as a separate motion to amend); Raiser v. City of Temecula, 2017 WL 10525953, at *4 (C.D. Cal. July 27, 2017) (indicating that for the plaintiff to assert new claims or to assert claims against new defendants, he had to do so in accordance with Rule 15(a), seeking leave in a noticed motion).

Federal Rule of Bankruptcy Procedure 7015 provides that Rule 15 of the FRCP applies to supplemental and amended pleadings in bankruptcy cases. Rule 15(a)(2) indicates that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

Courts have the discretion to grant or deny leave to amend a complaint. Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996). "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981). Consequently, the policy to grant leave to amend is

2021 WL 3721477

applied with "extreme liberality." Id. Although, if a court has previously granted leave to amend, the court's "discretion in deciding subsequent motions to amend is 'particularly broad.' " Chodos v. W. Publ'g Co., Inc., 292 F.3d 992, 1003 (9th Cir. 2002) (citing Griggs v. Pace Am. Grp., Inc., 170 F.3d 877, 879 (9th Cir. 1999)).

Parties seeking leave to amend have the initial burden to show a legitimate reason for seeking amendment. See Safeco Ins. Co. of Am. v. Sw. Eng'g, Inc., 2009 WL 10672414, at *2 (C.D. Cal. Apr. 16, 2009); Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 989 F. Supp. 1237, 1241 (N.D. Cal. 1997). Assuming the movant meets that burden, the burden then shifts to the party opposing amendment to show that leave to amend is not warranted based on:

  1) Bad faith;

  2) Undue delay;

  3) Prejudice to the opposing party;

  4) Futility of amendment; or

  5) Whether the plaintiff has previously amended the complaint.

In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 738 (9th Cir. 2013); see also Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist., 2020 WL 5775174, at *2 (C.D. Cal. July 8, 2020) (indicating that the party opposing amendment bears the burden of showing prejudice, unfair delay, bad faith, or futility of amendment). "The court has the discretion to determine whether the presence of any of these elements justifies refusal of a request to amend the pleading." Advanced Cardiovascular Sys., 989 F. Supp. at 1241.

*33 Of the factors courts analyze when adjudicating motions for leave to amend, the potential for prejudice to the opposing party "carries the greatest weight." Reed v. Dynamic Pet Prods., 2016 WL 4491597, at *1 (S.D. Cal. Jan. 5, 2016). The opposing party has the burden of establishing prejudice. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 187 (9th Cir. 1987). Absent prejudice or a strong showing of any of the remaining factors, "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). "For an amendment to be futile, it must appear on its face that it is not actionable." Coble v. Derosia, 2011 WL 444961, at *4 (E.D. Cal. Feb. 8, 2011).

In the context of a very detailed ruling that specified the deficiencies of the Original Complaint, the Court dismissed Counts 1, 2, 4, 5, 8, 13, and 15 of the Original Complaint, and granted the Trustee leave to amend those counts. AP Docket #174 at 50. As analyzed above, the FAC suffers from the same deficiencies as the Original Complaint regarding the avoidance and recovery claims in Counts 1 and 2 of the FAC and the recharacterization claim in Count 6 of the FAC, because despite the Trustee's focus on the obligations they are extraterritorial, rather than domestic, and not actionable under §§ 105 or 548. Counts 8 and 9, which were not contained in the Original Complaint are recharacterization claims brought for the purpose of avoiding and recovering transfers alleged in Counts 1 and 2 under § 548. And, Count 10's claim for disallowance depends on the Trustee avoiding the obligations in Counts 1 and 2. Finally, the Trustee lacks standing to assert Count 7, a damages claim for violation of the automatic stay, and a party seeking civil contempt sanctions under § 105 must do so by motion rather than by asserting a cause of action in an adversary proceeding.

Further, the Trustee, who has the burden of demonstrating a legitimate reason for amendment, did not set forth any reason why amendment would be warranted here. Twice, the Trustee has attempted to assert extraterritorial claims as domestic ones but he has been unsuccessful both times. The Court finds that any further amendment would be futile and would be prejudicial to UL/GA/TG, who have been required to respond to complaints that are based almost entirely on conduct that falls outside the purview of US bankruptcy laws. Therefore, the Court declines to grant leave to amend and Counts 1, 2, 6, 7, 8, 9, and 10 are dismissed with prejudice. See e.g., Bui v. Nguyen, 712 Fed. Appx. 606, 610 (9th Cir. 2017) (noting that courts have "particularly broad" discretion regarding leave to amend where a plaintiff has been previously afforded an opportunity to amend but the court must still consider undue delay, bad faith, prejudice to the opposing party or dilatory tactics); Gifford v. Hornbrook Cmty. Serv. Dist., 690 Fed. Appx. 1001, 1001-02 (9th Cir. 2017) (finding no abuse of discretion where the court dismissed a first amended complaint without leave to amend because the plaintiff had been provided with an opportunity to amend and any further amendment would be futile); Doan v. Singh, 617 Fed. Appx.

2021 WL 3721477

684, 686 (9th Cir. 2015) (holding the court did not abuse its discretion in denying leave to amend because the amended complaint suffered from the same deficiencies as the original complaint); Krantz v. Prudential Invs. Fund Mgmt. LLC, 305 F.3d 140, 144-45 (3d Cir. 2002) (finding the court did not abuse its discretion in denying leave to amend when the plaintiff was on notice of the complaint's deficiencies and failed to rectify them with the first amended complaint).

V. Conclusion

 **\*34**  For the reasons stated above, the Motion is granted, and the Court dismisses Counts 1, 2, 6, 7, 8, 9, and 10 without leave to amend. Although Li Qi filed a separate motion in which he seeks dismissal of Counts 1, 2, 7, 8, and 9, those counts are subsumed within the counts being dismissed and therefore, the Court need not rule on the substance of the Li Qi Motion (or the Discovery Motion, which relates to the substance of the Li Qi Motion).

Pursuant to LBR 9021-1(b), UL/GA/TG must lodge and serve a proposed order via LOU within seven days of the issuance of this Memorandum of Decision.

**All Citations**

Slip Copy, 2021 WL 3721477

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 31

2019 WL 6721637
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Mignon JACKSON

v.

LOEWS HOTELS, INC.

Case No. ED CV 18-827-DMG (JCx)
|
Filed 07/24/2019

**Attorneys and Law Firms**

J. Paul Gignac, Foley Bezek Behle and Curtis, Santa Barbara, CA, Justin F. Marquez, Babak Bobby Saadian, Thiago Merlini Coelho, Wilshire Law Firm, Los Angeles, CA, for Mignon Jackson.

Ann Marie Mortime, Jason Jonathan Kim, Hunton Andrews Kurth LLP, Los Angeles, CA, for Loews Hotels, Inc.

**Proceedings: IN CHAMBERS - ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [25]**

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

**I.**

**BACKGROUND**

 **\*1** This matter is before the Court on Defendant Loews Hotels, Inc.'s second Motion to Dismiss ("MTD"). [Doc. # 25.] Plaintiff filed this action on April 20, 2018 [Doc. # 1] and filed the operative Second Amended Complaint ("SAC") on January 25, 2019, after the Court granted Defendant's first Motion to Dismiss. [Doc. ## 23, 24.] Plaintiff, individually and on behalf of a putative class of similarly situated individuals, alleges the following claims against Defendant: (1) violation of California Civil Code section 1798.81.5(b); (2) violation of California Civil Code section 1798.81.5(c); (3) violation of California Civil Code section 1798.82; (4) breach of implied contract; (5) breach of the covenant of good faith and fair dealing; and (6) violation of California Business and Professions Code section 17200. FAC at ¶¶ 41-90.

The Court incorporates the relevant factual background from its previous order granting Defendant's first Motion to Dismiss. [Doc. # 23.] The Court shall address any material factual changes from the FAC to the SAC as they arise. Having considered the parties' written submissions in support of and in opposition to the MTD, the Court **GRANTS** Defendants' MTD.

**II.**

**LEGAL STANDARD**

In its previous Order, the Court set forth the applicable legal standard for motions to dismiss based on lack of subject matter jurisdiction and need not repeat it here. [Doc. # 23 at 2-3.] That standard is incorporated herein by this reference.

**III.**

**DISCUSSION**

**A. Plaintiff Lacks Standing**
The Court granted Defendant's previous Motion to Dismiss because Plaintiff failed to sufficiently allege that she suffered an Article III injury that gave rise to standing to pursue her claims. While she has alleged some new facts in her SAC and put forth a new legal theory to establish that she suffered a cognizable injury, her allegations still fall short of demonstrating that she suffered an Article III injury.

**1. Plaintiff's "Benefit of the Bargain" Theory Fails**
Plaintiff first argues that she has standing to sue because she has suffered an economic injury under the "benefit of the bargain" theory. She did not squarely raise this argument in her opposition to Defendant's previous Motion to Dismiss. Under the "benefit of the bargain" theory, courts generally recognize that plaintiffs have suffered a financial injury when they purchase a product in reliance on a false representation about the product's value, and allege that they would not have made the purchase, or would not have paid as much as they did, had they known the truth. See Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 332 (2011). Plaintiff contends that, in this context, she would not have made a hotel reservation with Defendant if she had known that "her personal information [would be] stolen by hackers." [Doc. # 26 ("Opp.") at 26.]

2019 WL 6721637

In support, she cites to several decisions that apply the "benefit of the bargain" theory to data breach cases. *See* Opp. at 4-7. But those cases involve a defendant who made a statement or representation about their data security practices upon which the plaintiff relied before handing over his personal information. *See, e.g., In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014) ("The Court finds plausible Plaintiffs['] ... allegations that they relied on Adobe's representations regarding security to their detriment."); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 967 (N.D. Cal. 2016) ("According to Plaintiffs, both the Anthem and Non-Anthem Defendants promised their members that their PII would be protected."); *Grigsby v. Valve Corp.*, 2013 WL 12310666, at *2 (W.D. Wash. Mar. 18, 2013) ("[Plaintiff] also alleges that Valve assured Plaintiff and Class Members that it would protect the personal information and private financial information that users were required to provide before purchasing content on Steam.") (internal quotations omitted); *In re LinkedIn User Privacy Litig.*, 2014 WL 1323713, at *1 (N.D. Cal. Mar. 28, 2014) ("The Privacy Policy contains a statement that '[a]ll information that you provide will be protected with industry standard protocols and technology.' "). [1]

[1] One case Plaintiff cites does not include an express mention of a defendant's security-related misrepresentation to the plaintiff. But that case, *Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1369 (S.D. Fla. 2015), comes from outside the Ninth Circuit, and relies on *Resnick v. AvMed, Inc.*, 693 F.3d 1317 (11th Cir. 2012), which does discuss the defendant's misrepresentation. *See Resnick*, 693 F.3d at 1329. Moreover, *Weinberg* discussed the implications of personal information's disclosure in the context of a claim for unjust enrichment under Florida law. Given that *Weinberg* is only minimally applicable to this case, and every other case Plaintiff cites involves a defendant's misrepresentation, *Weinberg* does not persuade the Court to diverge from the cases cited above.

**\*2** In contrast, Plaintiff does not identify any similar misrepresentation about Defendant's data security practices in her SAC. She argues that paragraph 29 contains a "promise[ ] that her PII would [be] kept safe when reserving a room or using Loew's services," but that paragraph describes no such promise. Paragraph 32(e) states that Plaintiff suffered harm because "implied in the price paid for such booking by Plaintiff and the Class Members to Defendant was the promise that some amount of the booking charge would be applied to the costs of implementing reasonable and adequate safeguards and security measures that would protect customers' PII." SAC at ¶ 32(e). Plaintiffs have identified no authority approving of a "benefit of the bargain" theory in a data breach case based on such conclusory allegations of an *implied* promise to earmark a portion of the purchase price for ensuring data safety. Indeed, case law appears to require more precise allegations and more explicit promises. *See In re Zappos.com, Inc.*, 108 F. Supp. 3d 949, 962 n.5 (D. Nev. 2015) (plaintiffs' theory of standing failed in part because they did not "allege facts showing how the price they paid for such goods incorporated some particular sum that was understood by both parties to be allocated towards the protection of customer data"), *rev'd on other grounds by In re Zappos.com, Inc.*, 888 F.3d 1020, 1027–30 & n.15 (9th Cir. 2018) (reversing the District Court's standing analysis in connection with plaintiffs' alleged risk of future identity theft and declining to address other alleged bases for standing). While Paragraph 32(e) asserts conclusorily that a portion of the price Plaintiff paid to reserve a room went to data security, it does not allege "how" the price incorporated that amount or what gave rise to Defendant's "understanding" that the room reservation price included funds for data security—it simply alleges that such funds were "implied in the price paid." SAC at ¶ 32(e).

In her Opposition, Plaintiff also refers to the Loew's Hotels' Privacy Policy, available on Defendant's website, to argue that Defendant did make affirmative representations about its customers' data security. Opp. at 21. But these assertions do not appear in the SAC, and since Defendant has mounted a facial attack to Plaintiff's standing, the Court's inquiry focuses on the pleadings, not extrinsic documents. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

Even if the Court could properly consider the Privacy Policy in resolving this motion, however, it would not save Plaintiff's claims. The Privacy Policy states that "[t]he personal information collected from users online ... is stored by Loews ... on databases protected through a combination of physical and electronic access controls, firewall technology and other reasonable security measures." *Loew's Hotels Privacy Policy*, https://www.loewshotels.com/privacy-policy at "Protecting Personal Information" (last visited April 18, 2019). It continues, however, to warn customers that "[n]evertheless, such security measures cannot prevent all

2019 WL 6721637

loss, misuse or alteration of personal information and Loews is not responsible for any damages or liabilities relating to any such incidents to the fullest extent permitted by law." *Id.* It also states that "no security system or system of transmitting data over the Internet can be guaranteed to be entirely secure. Use of the Services and related applications and transmission of data is at the user's own risk." *Id.* Courts have held that similar language is sufficient to put consumers on notice that a company's data security practices are not bulletproof. *See In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 968 (S.D. Cal. 2012) ("Before registering ... all Plaintiffs had to agree to Sony's Privacy Policy, which states that 'there is no such thing as perfect security ... we cannot ensure or warrant the security of any information transmitted to us through the [system] ....' Thus, in the presence of clear admonitory language that Sony's security was not 'perfect,' no reasonable consumer could have been deceived."). Accordingly, Plaintiff has not established that she lost the benefit of any bargain sufficient to confer Article III standing.

### 2. Plaintiff Fails to Show a Substantial Risk of Future Harm

In its Order granting Defendant's first Motion to Dismiss, the Court reasoned that Plaintiff failed to demonstrate a risk of certainly impending future harm because: (1) she pled that she closed or modified her financial accounts, neutralizing any risk of future fraud arising from the theft of her financial information, and (2) she did not establish that the non-financial information that the hackers stole gives rise to a risk of a cognizable injury. [Doc. # 23 at 4-8]. *See Clapper v. Amnesty Int'l USA*, S. Ct. 1138, 1141 (2013) (threatened or future injury must be "certainly impending to constitute injury in fact") (internal quotations omitted). Having been given leave to amend her allegations to cure these deficiencies, Plaintiff has made three principal changes to her theory. First, she simply omits from her SAC any allegations that she closed or modified her financial accounts after the data breach. *Compare* FAC at ¶ 6 *with* SAC. Second, she adds allegations that she now "continuously receives unsolicited direct marketing efforts to her email and home" as a result of the breach. SAC at ¶ 9. Third, she has abandoned her argument that hackers may have stolen her Loew's account password. She has not alleged that hackers stole any additional information beyond what she described in the FAC. *Compare* SAC at ¶ 3 *with* FAC at ¶ 3. In her Opposition, Plaintiff argues that the same precedent she cited in her Opposition to Defendant's first Motion to Dismiss

compels a different result than the Court reached in ruling on that earlier Motion. [2] Opp. at 10-13.

[2]     Defendant contends that Plaintiff "essentially asks the Court to reconsider its previous finding that Plaintiff failed to allege any 'certainly impending future harm.' " Reply at 3. To the extent that Defendant asks the Court to dismiss Plaintiff's claims on that basis, such a request, in and of itself, is not improper—though Defendant's failure to show that the Court misconstrued or ignored some relevant fact or law dooms the endeavor. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (reversing a district court's decision that it was "'precluded' from reconsidering its order dismissing the original ... claims in adjudicating the motion to dismiss the amended ... claims" because "[t]he law of the case doctrine does not preclude a court from reassessing its own legal rulings in the same case"). The Court therefore addresses the merits of Plaintiff's arguments once more.

### i. Financial Information

**\*3** Plaintiff's decision to remove her previous allegations about closing or modifying her credit card or bank accounts does not simply erase those allegations from the case. Defendant asserts that plaintiffs "cannot selectively delete allegations from a prior complaint to avoid dismissal of an amended complaint." MTD at 8 (citing three unpublished decisions standing for the proposition that courts need not accept allegations that contradict allegations in a previous complaint). The reality of the case law in this circuit, however, is more complicated. The Ninth Circuit has held that, in the context of granting leave to amend an original complaint, "leave to amend should be liberally granted, [but] the amended complaint may only allege other facts consistent with the challenged pleading." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296–97 (9th Cir. 1990). It later held, without overturning *Reddy*, that "there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations." *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007). The circuit court has not resolved this apparent inconsistency, but it has recognized (in non-binding opinions) that *Reddy* and *PAE* may be irreconcilable. *Compare Shirley v. Univ. of Idaho,*

2019 WL 6721637

*Coll. of Law*, 800 F.3d 1193, 1194 (9th Cir. 2015) (Kozinski, J., concurring) *with* *id* at 1194-95 (Canby, J. concurring).

The Court can ultimately avoid the intra-circuit confusion on this issue, however, because the SAC's allegations do not *contradict* the FAC's allegations—the SAC merely *omits* previously-pled material information that harms Plaintiff's case. These allegations are therefore more appropriately characterized as judicial admissions that Plaintiff has not cured. *See* *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (assertions in pleadings are judicial admissions unless amended); *see also* *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) (admissions in original complaints that have been "amended or withdrawn" are no longer conclusive, but are still admissions, and courts may still consider them); *Burgoon v. Narconon of N. California*, 125 F. Supp. 3d 974, 984 (N.D. Cal. 2015) ("The amendment of a pleading does not make it any the less an admission of the party") (citing *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989)).

Plaintiff asserts in her Opposition that her "accounts were not closed, but it was modified in a minor way that does not affect the risk of fraud." But this assertion does not appear in the SAC, and a plaintiff's "statements in [her] opposition brief cannot amend the Complaint." *Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044, 1050 (E.D. Cal. 2008) (*citing* *Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")).

Since Plaintiff has not overcome her prior admission that she closed or modified her accounts to mitigate the impact of the data breach, she has not established a certainly impending future injury sufficient to confer standing. Nor has she alleged any additional facts in her SAC describing any past harm or substantial risk of future harm related to her financial information. Plaintiff therefore lacks standing to sue with respect any financial information exposed in the data breach.

### ii. Non-Financial Information

With respect to the alleged theft of Plaintiff's other, non-financial information—her name, email address, phone number, and mailing address—Plaintiff mostly resurrects the arguments she made in response to Defendant's previous Motion to Dismiss by relying on cases holding that hackers' theft of sensitive information creates a risk of certainly

impending future harm. Opp. at 10-13. As discussed in the Court's prior Order, however, those cases involved the theft of certain types of sensitive information not at issue here: social security numbers, account numbers, and account passwords. *See* *In re Zappos.com, Inc.*, 888 F.3d 1020, 1023 (9th Cir. 2018), *cert. denied sub nom.* *Zappos.com, Inc. v. Stevens*, No. 18-225, 2019 WL 1318579 (U.S. Mar. 25, 2019); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140 (9th Cir. 2010). Plaintiff's cited cases also include the theft of credit and debit card information, but, as discussed above, Plaintiff's admissions indicate that she has neutralized any future threat of credit or debit card fraud by modifying or closing her accounts. *In re Zappos.com, Inc.*, 888 F.3d at 1023; *Remijas v. Neiman Marcus Grp.*, LLC, 794 F.3d 688, 689 (7th Cir. 2015).

**\*4** The *Zappos* court held that the plaintiffs alleged an Article III injury based on "the *sensitivity* of the personal information, combined with its theft." *In re Zappos.com, Inc.*, 888 F.3d at 1027 (emphasis added). Here, Plaintiff has once again failed to demonstrate that her name, phone number, email address (but not her email password), and mailing address are sensitive enough pieces of information to give rise to a certainly impending risk of future identity theft or fraud. Her claim that she has received mass mailing materials does not help her because receiving spam or mass mail does not constitute an injury. *See, e.g.,* *Peters v. St. Joseph Servs. Corp.*, 74 F. Supp. 3d 847, 857 (S.D. Tex. 2015) (no injury despite plaintiff receiving "target[ed]" physical, electronic, and telephonic "solicitations"); *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 609 (S.D.N.Y. 2009) ("The receipt of spam by itself, however, does not constitute a sufficient injury entitling [plaintiff] to compensable relief.").[3] Plaintiff argues that the theft of non-financial information, and the resulting spam mailing, can "further support [her] contention that the hackers accessed information that could be used to help commit identity fraud or identity theft." Opp. at 13 (quoting *In re Zappos.com, Inc.*, 888 F.3d at 1028). That language from *Zappos* taken in context, however, reflects the Ninth Circuit's reasoning that certain plaintiffs' allegations that hackers "took over their [email] accounts and sent advertisements" to others suggested that they, and other plaintiffs, might be at risk of identity theft or fraud. *In re Zappos.com, Inc.*, 888 F.3d at 1027-28. That reasoning makes sense. Allegations that hackers used the information they stole —namely, account passwords—to actually access accounts and take nefarious action strongly suggests that hackers could use the information they stole to do harm to other plaintiffs, even if every plaintiff's account had not yet been breached and even if the harm was not necessarily financial. But Plaintiff

2019 WL 6721637

has not alleged that any such account takeovers have taken place. Nor do her allegations suggest that hackers obtained any information that would allow them to assume Plaintiff's identity or access any of her accounts.

3
  At least one district court in this circuit has held that being forced to spend significant money fighting spam advertisements in order to protect a business is a cognizable Article III injury. *Asis Internet Servs. v. Consumerbargaingiveaways, LLC*, 622 F. Supp. 2d 935, 939 (N.D. Cal. 2009) (plaintiffs allege that they needed to spend $4,200 per month to combat spam). But Plaintiff has made no allegations that she has incurred financial injury as a result of the spam mail.

Plaintiff has thus failed to show that the alleged theft of the information she provided to Defendant can result in a risk of certainly impending future harm.

### 3. Plaintiff Fails to Establish Standing Under California's Unfair Competition Law

Plaintiff argues that, separate from her federal standing to seek monetary damages, she has standing to seek an injunction under California's Unfair Competition Law ("UCL"). Opp. at 9. She bases this contention primarily on her argument that "the theft of Plaintiff's PII creates a substantial risk of future harm." *Id.* As discussed above, however, she has not sufficiently pled that such a harm exists. To the extent that, as a matter of law, she may have UCL standing despite that shortcoming—a doubtful proposition in light of the fact that the "UCL's standing requirements appear to be more stringent than the federal standing requirements"—her arguments are unavailing. *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1348 n.31 (2009).

Plaintiffs asserting a UCL claim must "have suffered injury in fact and ... lost money or property as a result of the unfair competition." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (internal quotations omitted). Courts in this circuit have held that "theft" or "unauthorized release of personal information" does not qualify as lost money or property for purposes of determining standing under the UCL. *Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1127 (N.D. Cal. 2008), *aff'd*, 380 F. App'x 689 (9th Cir. 2010); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d at 966.[4] Since Plaintiff has not alleged that she lost money or property, she has failed to establish UCL standing.

4
  Plaintiff cites two cases holding that plaintiffs who successfully asserted a "benefit of the bargain" claim in the data breach context had standing to pursue UCL claims because those plaintiffs' payment of more than they bargained for was enough of an economic loss to qualify as lost money. Opp. at 4-5 (citing *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d at 1223-24; *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d at 985). But, as explained above, Plaintiff's "benefit of the bargain" theory is deficient.

**\*5** The Court therefore **GRANTS** Defendant's MTD as to Plaintiff's individual claims for lack of standing.

### B. Lack of Class Action Standing

Since Plaintiff has not met her burden to establish standing, her class action allegations fail as well. In a class action, named plaintiffs representing a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Gratz v. Bollinger*, 539 U.S. 244, 289 (2003). When the named plaintiff has not established standing, she may not "seek relief on behalf of [her]self or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Lierboe v. State Farm Mutual Automobile Ins. Co.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003) (holding class action must be dismissed where named plaintiff lacks standing). The Court therefore **GRANTS** Defendant's MTD as to Plaintiff's class action allegations.

### IV.

### CONCLUSION

In light of the foregoing, the Court **GRANTS** without prejudice the MTD under Rule 12(b)(1) for lack of subject matter jurisdiction, **DENIES as moot** the MTD under Rule 12(b)(6) for failure to state a claim, and **DENIES as moot** the MTD under Rule 12(b)(3) for lack of personal jurisdiction. Notwithstanding having filed three complaints, Plaintiff has failed to allege facts sufficient to survive the pleading stage. Amendment would thus be futile, and the Court **DENIES** any further leave to amend.

Jackson v. Loews Hotels, Inc., Slip Copy (2019)
2019 WL 6721637

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 6721637

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2018 WL 773497, 65 Bankr.Ct.Dec. 69

2018 WL 773497
United States Bankruptcy Court, E.D. California.

IN RE: INTERNATIONAL
MANUFACTURING GROUP, INC., Debtor.
Beverly N. McFarland, Trustee, Plaintiff,
v.
Battle Creek State Bank, Defendant.

Case No. 14−25820−D−11
|
Adv. Pro. No. 16−2082−D
|
Signed 02/07/2018

**Attorneys and Law Firms**

Christopher Daniel Sullivan, Matthew S. Sepuya, Diamond
McCarthy LLP, San Francisco, CA, for Beverly N.
McFarland, Trustee.

Matthew Bryan Learned, Melissa Robbins Coutts, McCarthy
and Holthus LLP, San Diego, CA, for Battle Creek State
Bank.

Wings Insurance, Inc., Eden Prairie, MN, pro se.

Marc A. Caraska, Marc A. Caraska, A Law Corporation,
Sacramento, CA, for International Manufacturing Group, Inc.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Robert S. Bardwil, United States Bankruptcy Court, Judge

**\*1** On November 20, 2017, defendant Battle Creek State
Bank (the "Bank") filed a motion for summary judgment
against the plaintiff, International Manufacturing Group,
Inc., a liquidating debtor ("IMG"), by and through its
plan administrator, The Beverly Group, Inc. (the "plan
administrator"), pursuant to Fed. R. Civ. P. 56, made
applicable in this proceeding by Fed. R. Bankr. P. 7056,
or in the alternative, for summary adjudication of certain
facts. The plan administrator filed opposition, the Bank filed
a reply, and the court issued a tentative ruling in advance
of the initial hearing. Pursuant to that ruling, the hearing
was continued and the parties filed supplemental briefs on
the issue of whether the alleged illegality of a particular
agreement necessarily means IMG did not receive reasonably
equivalent value in exchange for the challenged transfers. For

the following reasons, the court submits to the district court
the following findings of fact and conclusions of law, pursuant
to 28 U.S.C. § 157(c)(1), with the recommendation that the
motion be granted. [1]

[1]   In June of 2016, the Bank moved to withdraw
the reference of this adversary proceeding; the
district court denied the motion without prejudice.
The adversary proceeding is now much farther
along, the parties do not dispute that the Bank
is entitled to a jury trial, and resolution of this
motion may well be dispositive of the adversary
proceeding. For these reasons, and as the Bank has
not consented to entry of final orders or judgment
by this court, the court finds it appropriate to make
a recommendation to the district court despite that
court's suggestion that pre-trial motions might be
resolved by this court.

Summary judgment is appropriate when there exists "no
genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). The Supreme Court discussed the standards for
summary judgment in a trilogy of cases: Celotex Corp. v.
Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby,
Inc., 477 U.S. 242 (1986); and Matsushita Elec. Indus. Co.
v. Zenith Radio Corp., 475 U.S. 574 (1986). In a motion for
summary judgment, the moving party bears the initial burden
of persuasion in demonstrating that no issues of material fact
exist. Anderson, 477 U.S. at 255. A genuine issue of material
fact exists when the trier of fact could reasonably find for
the non-moving party. Id. at 248. The court may consider
pleadings, depositions, answers to interrogatories, and any
affidavits. Celotex at 323. To demonstrate the presence or
absence of a genuine dispute, a party must cite to specific
materials in the record, or submit an affidavit or declaration
by a competent witness based on personal knowledge. See
Fed. R. Civ. P. 56(c)(1), (4). Where the movant bears the
burden of persuasion as to its claim, it must point to evidence
in the record that satisfies its claim. Anderson, 477 U.S. at
252. Once the moving party has met its initial burden, the
non-moving party must show specific facts demonstrating the
existence of genuine issues of fact for trial. Id. at 256.

**\*2** By its complaint, the plan administrator seeks to avoid
and recover, pursuant to California law, as permitted by §
544(b) of the Bankruptcy Code, certain pre-petition payments
made by IMG to the Bank as actual and/or constructive
fraudulent transfers. The Bank's motion is based on "good

2018 WL 773497, 65 Bankr.Ct.Dec. 69

faith" and "for value" defenses. That is, as to the actual fraudulent transfer claims, the Bank contends it took the payments in good faith and for a reasonably equivalent value given to IMG, and therefore, that the payments are not avoidable. See Cal. Civ. Code § 3439.08(a). As to the constructive fraudulent transfer claims, the Bank contends its evidence demonstrates the plan administrator will be unable to make a prima facie case that the payments were made without IMG receiving a reasonably equivalent value for them, and therefore, that they are not avoidable. See Cal. Civ. Code § 3439.04(a)(2).

In September of 2008, five and a half years before IMG's bankruptcy case was filed, the Bank made a $1,200,000 loan to an individual named Larry Carter and an LLC of which he was the manager, N9FX, LLC ("N9FX"). The loan was secured by a security interest in an airplane owned by Carter or N9FX. Carter testifies in support of the motion that he and IMG's principal, Deepal Wannakuwatte, agreed that Carter would loan IMG the $1,200,000 Carter was borrowing from the Bank and IMG would make the monthly payments on the airplane loan directly to the Bank. Wannakuwatte executed, as president and CEO of IMG, a promissory note for $1,200,000 in favor of Carter, which stated, "Monthly payments in the amount of $9,486.59 will be made to the airplane loan." Declaration of Larry Carter, DN 127, Ex. 3. That was the exact amount of the monthly payment Carter was to make on the Bank loan. The Bank's Loan Transaction History Summary Inquiry shows IMG made the payments regularly and on time and the plan administrator does not dispute that. [2]

[2]
The Bank loan, by its terms, would have been all due and payable on September 2, 2013. In 2011, an individual named Jerry Nelson purchased Carter's sole member interest in N9FX (and therefore in the airplane), and the balance due on the Bank loan, $1,147,325, was paid off with the sale proceeds. See Declaration of Gerald C. "Jerry" Nelson, filed April 12, 2017, in connection with the motion designated DC No. BJ–1. By this adversary proceeding, the plan administrator seeks to avoid and recover the monthly payments IMG paid the Bank, a total of $246,650. As it was not made by IMG, the balloon payment is not in issue.

As to both the actual and constructive fraudulent transfer claims, the Bank contends IMG received reasonably equivalent value for its monthly payments to the Bank because those payments reduced the amount due from IMG

to Carter under the IMG/Carter promissory note. In other words, they were payments on an antecedent debt, which generally fall within the definition of "value" under California fraudulent transfer law. "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied...." Cal. Civ. Code § 3439.03. Although the antecedent debt owing by IMG was to someone—Larry Carter—other than the recipient of the monthly payments—the Bank, the payments resulted in an indirect benefit to IMG in the form of the partial satisfaction of its debt to Carter —in amounts corresponding to the amounts of the monthly payments IMG made to the Bank.

"It is well settled that 'reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule.' " Frontier Bank v. Brown (In re Northern Merch., Inc.), 371 F.3d 1056, 1058 (9th Cir. 2004) (citation omitted). Thus, for example, the shareholders of a company that already owed money to a bank signed a promissory note to the bank for a second loan, the proceeds of which were paid directly to the company which, in turn, granted the bank a security interest in its assets to secure the second loan. Later, when the company's bankruptcy trustee sought to avoid the security interest as a fraudulent transfer, the Ninth Circuit held:

> **\*3** Although Debtor was not a party to the October loan, it clearly received a benefit from that loan. In fact, [the bank] deposited the $ 150,000 proceeds of the October Loan directly into Debtor's checking account. Because Debtor benefitted from the October Loan in the amount of $ 150,000, its grant of a security interest to [the bank] to secure Shareholder[s'] indebtedness on that loan, which totaled $ 150,000, resulted in no net loss to Debtor's estate nor the funds available to the unsecured creditors. To hold otherwise would result in an unintended $ 150,000 wind-fall to Debtor's estate. Accordingly, Debtor received reasonably equivalent value in exchange for the security interest it granted to [the bank].

In re International Manufacturing Group, Inc., Slip Copy (2018)
2018 WL 773497, 65 Bankr.Ct.Dec. 69

Id. at 1059.

The plan administrator contends, however, that because IMG was actually the front for a sizeable Ponzi scheme, and because the plan administrator claims to have established or to be able to establish that Carter was deeply involved in that scheme, the agreement between them—the IMG/Carter promissory note—was an illegal contract, and therefore, void and unenforceable as between Carter and IMG. Therefore, Carter could not have enforced the note as against IMG and when IMG made the monthly payments to the Bank pursuant to the note, IMG was not satisfying a valid antecedent debt owed to Carter. Accordingly, IMG received nothing of value in exchange, notwithstanding that IMG, not Carter, received the consideration for the payments—the $1.2 million proceeds of the Bank loan. The argument is based on the doctrine that the courts will not enforce an illegal contract. [3]

[3]    "It is well established that no recovery can be had by either party to a contract having for its object the violation of law. The courts refuse to aid either party, not out of regard for his adversary but because of public policy. Where it appears that a contract has for its object the violation of law, the court should sua sponte deny any relief to either party." Smith v. California Thorn Cordage, Inc., 129 Cal. App. 93, 99–100 (1933) (citation omitted).

The plan administrator frames the issue as follows:

Here, Battle Creek is attempting to retain the benefits of fraudulent transfers made by IMG in furtherance of its illegal enterprise and pursuant to a contract that is illegal under Ninth Circuit law [later citing Donell v. Kowell, 533 F.3d 762 (no pin cite) (9th Cir. 2008) ]. The contract between IMG and Carter is the "groundwork" for Battle Creek's claim that the payments were made for reasonably equivalent value. Battle Creek elected to rely on the validity of whatever transaction existed between IMG and Carter when it accepted payments from IMG without evaluating the payor,

without conducting any underwriting regarding the payor, and without examining the underlying transaction. Allowing Battle Creek to retain the payments made by IMG here effectively insulates the contract between IMG and Carter despite the disputed facts raised in the opposition as to Carter's right to enforce the illegal contract or recover based on rescission. IMG received no genuine, legitimate, tangible value from paying money to Battle Creek. It only deepened the problems and losses to creditors from facilitating the Ponzi scheme.

Plan Administrator's Supplemental Memorandum, filed January 17, 2018, at 4:10–20. The court does not agree.

First, the determination of reasonably equivalent value "must be made as of the time of the transfer" (Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP), 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009), citing BFP v. Resolution Trust Corp., 511 U.S. 531, 546 (1994)), whereas the plan administrator has not focused its analysis on the time period in which IMG made the monthly payments. In fact, most of the documents filed by the plan administrator as exhibits in support of its Ponzi scheme argument are dated after April of 2011, when the Bank loan was paid off in full.

*4  Second, the plan administrator has cited no authority for the proposition that the doctrine of unenforceability of illegal contracts is or should be applied against one who was not a party to the illegal contract and who committed no wrongdoing himself. [4] In other words, the plan administrator has cited no case applying the doctrine of unenforceability of illegal contracts to defeat a "for value" defense to a fraudulent transfer action, and in fact, cases involving Ponzi schemes have rejected the plan administrator's position.

[4]    As indicated above, the plan administrator has attempted to inject alleged wrongdoing on the part of the Bank into the analysis. As quoted above, the plan administrator maintains that "Battle Creek elected to rely on the validity of whatever

transaction existed between IMG and Carter when it accepted payments from IMG without evaluating the payor, without conducting any underwriting regarding the payor, and without examining the underlying transaction." This argument is more appropriately considered on the issue of the Bank's good faith, discussed below. For present purposes, it is enough to say there was no wrongdoing on the part of the Bank in the formation or execution of the allegedly illegal contract—the IMG/Carter promissory note.

In Image Masters, Inc. v. Chase Home Fin., 489 B.R. 375 (E.D. Pa. 2013), the debtor, operating what turned out to be a $65 million Ponzi scheme, sold wrap-around mortgages to homeowners, who then made their total monthly mortgage payments to the debtor, who, in turn, contractually promised to make the monthly payments on the underlying first mortgages. When the scheme collapsed, the trustee sued the holders of the first mortgages to recover the monthly payments that had been made by the debtor on behalf of the homeowners. The bankruptcy court granted the mortgage holders' Rule 12(b)(6) motion, holding the trustee had failed to plausibly state a claim that the transfers were made without reasonably equivalent value to the debtor. In re Image Masters, Inc., 421 B.R. 164, 177–80 (Bankr. E.D. Pa. 2009).

The district court affirmed, holding that each monthly payment made by the debtor to a first mortgage holder resulted in a dollar-for-dollar reduction in the debtor's liability to the homeowner. Image Masters, Inc., 489 B.R. at 389. "Thus, there was no depletion to Image Masters' estate as a result of this transaction because the payment to the lender was matched by an equivalent reduction in Image Masters' obligation to the homeowner. From the perspective of estate preservation, the transaction was a wash." Id. at 390. The fact that the debtor was a Ponzi scheme did not change the analysis. Id. "The proper focus of the reasonably equivalent value inquiry is the specific transaction sought to be avoided, not the transfer's collateral effects on the welfare of a debtor's business." Id. Finally, the court found that

the practical implications of the Trustee's approach—that is, focusing on the overall effect on a debtor's business rather than the specific transaction—would render constructively fraudulent all transfers made by a Ponzi scheme debtor within

the statutory time period. This does not comport with the relevant statutory language, nor the cases within this circuit, which intimate that transfers made by Ponzi scheme debtors may confer reasonably equivalent value.

Image Masters, Inc., 489 B.R. at 390. [5], [6]

[5]    Simply because a debtor conducts its business fraudulently does not make every single payment by the debtor subject to avoidance. If so, every vendor supplying goods to the debtor would receive an avoidable fraudulent transfer when the debtor paid the vendor's invoice. Every employee, even lower-level custodial and clerical employees, would be required to return their wages, regardless of the work they performed. Landlords would have to return rent payments, even if the debtor actually occupied the leased premises. None conducting business with a debtor operating a Ponzi scheme could prevent the avoidance of payments they received from the debtor, regardless of the extent of the transferee's knowledge or culpability or the actual services provided. The law does not require this result.

Cuthill v. Greenmark, LLC (In re World Entm't, Inc.), 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002).

[6]    The Ninth Circuit has also held that transfers by Ponzi scheme debtors to their investors may confer reasonably equivalent value, in the form of satisfaction of the investors' restitution claims. See In re United Energy Corp., 944 F.2d 589, 595 (9th Cir. 1991).

**\*5**    The trustee in Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortg. Inv. Corp.), 256 B.R. 664 (Bankr. S.D.N.Y. 2000), aff'd Balaber–Strauss v. Lawrence, 264 B.R. 303, 308 (S.D.N.Y. 2001), made an argument very similar to the plan administrator's argument in the present case. She brought 61 adversary proceedings to avoid and recover commissions paid by the debtors to the brokers who originated mortgages and solicited investments in the debtors' businesses, which turned out to be a Ponzi scheme. The trustee did not assert the brokers had any knowledge of the Ponzi scheme or that they had themselves acted wrongfully in any way. Rather, she claimed the Ponzi scheme

2018 WL 773497, 65 Bankr.Ct.Dec. 69

"was fueled and perpetuated by the Brokers' activities in soliciting investors. In providing a substantial portion of Churchill's actual revenues and in fostering the appearance of legitimate business operations, the Debtors' mortgage origination activities played an essential role in the Ponzi scheme." 256 B.R. at 667. Thus, the trustee's position was that the commissions paid by the debtors to the brokers, "although reasonably equivalent in value to the services provided in a marketplace sense, were constructively fraudulent simply because the commissions were paid by an entity engaged in a Ponzi scheme." Id. at 674. [7] The court phrased the issue this way:

> May the Brokers be held liable to repay commissions, which they earned in good faith and in fair exchange for services actually rendered, merely because the Debtors' management was independently engaged in a fraudulent enterprise? Stated differently, may the Brokers' services, as a matter of law, be deemed of no value to the Debtors because the Debtors' operation as a Ponzi scheme was facilitated or prolonged by the funds received by the Debtors through those services?

Id. at 675. The court's answer was no.

[7] Although the trustee apparently did not use the term "illegal" contract, her argument was the same as the plan administrator's here.

The court concluded, "The statutes are quite clear. The focus of the inquiry in both [state and federal law] is the specific transaction the trustee seeks to avoid, i.e., the quid pro quo exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business." 256 B.R. at 678. Emphasizing the purpose of the fraudulent transfer statutes—"to preserve the assets of the estate" (id.), the court concluded that "the analysis which must be used to determine value is a commercial equation which looks to the actual transaction between the debtor and the transferee, and the Court must measure 'what was given and received' in that transaction." Id. at 679.

The court cited Merrill v. Allen (In re Universal Clearing House Company), 60 B.R. 985 (D. Utah 1986), in which the court rejected the trustee's position that "because the [brokers'] services deepened the debtors' insolvency and furthered a fraudulent [Ponzi] scheme, the services were 'without legally cognizable value.' " Churchill, 256 B.R. at 679, quoting Universal Clearing House, 60 B.R. at 998. The Universal Clearing House court, as in Churchill, held that the reasonably equivalent value analysis "should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." 60 B.R. at 1000. Thus, the court held the services of the debtors' sales agents constituted value for the payments they received. Id.

> The fatal legal flaw in [the trustee's position], as a matter of fraudulent conveyance analysis, is that it focuses not on a comparison of the values of the mutual consideration actually exchanged in the transaction between the Broker and the Debtor, but on the value, or more accurately stated, the supposed significance or consequence of the Broker–Debtor transaction in the context of the Debtors' whole Ponzi scheme. But the statutes and case law do not call for the court to assess the impact of an alleged fraudulent transfer in a debtor's overall business. The statutes require an evaluation of the specific consideration exchanged by the debtor and the transferee in the specific transaction which the trustee seeks to avoid, and if the transfer is equivalent in value, it is not subject to avoidance under the law.

*6 Churchill, 256 B.R. at 680. Thus, the Churchill court held:

> Fraudulent conveyance law is grounded in equity and is designed to enable a trustee or creditors to avoid a transfer in a transaction where

2018 WL 773497, 65 Bankr.Ct.Dec. 69

the transferee received more from the debtor than the debtor received from the transferee. The remedy of avoidance seeks to rectify the disparity between that which the transferee gave and that which the transferee got in the transaction. It is this disparity that makes it equitable to require the transferee to repay the excess in value of what he received over what he gave up in the transaction. [¶] In this case there was no disparity between the commissions and the value of the Brokers' services. Equity, and the law, would be ill–served by granting relief on these complaints.

*Churchill*, 256 B.R. at 682.

In the present case, the Bank gave consideration, in the form of a $1.2 million loan, the proceeds of which were immediately received by IMG, and IMG gave consideration in the form of the monthly payments on the loan. Thus, as a matter of economic reality, and as a matter of the net worth of IMG's estate, IMG received reasonably equivalent value in exchange for the payments. The plan administrator has cited no authority for the proposition that the injection of Carter into the transaction as, in essence, an intermediary for the $1.2 million, should change the outcome.[8] Further, viewing the IMG/Carter promissory note as an arguably illegal contract for the purpose of negating the value of the $1.2 million IMG received would not serve the policies underlying the illegal contract doctrine.

[8]     Under the plan administrator's theory, Carter's presence as a party to the IMG/Carter promissory note makes all the difference. That is, the plan administrator argues that if the note was an illegal contract, Carter would have had against IMG not only no breach of contract claim but also no claim for restitution. The Bank's exhibits reveal, however, that IMG knew in advance that Carter would be borrowing the $1.2 million and would then turn around and loan it to IMG. "Deepal, Here is the loan offer on the airplane and I think it looks as good as any other....Shall I take the loan? Larry." Bank's Ex. 4. Arguably, the Bank,

having been induced to make the loan to Carter by IMG's promise, through Carter, to make the monthly payments, would have had a direct claim against IMG for restitution if IMG had not made the payments. Thus, when IMG made the payments to the Bank, it was arguably reducing its own obligation to the Bank for restitution.

"The [doctrine] is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; [fn] and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). Here, the court is not resolving a dispute between two wrongdoers; in fact, as discussed below, the court finds the Bank has made a showing it acted in good faith and the plan administrator has not demonstrated there is a disputed issue of material fact on that point. Thus, the court, in granting the Bank's motion, would not be granting relief to an admitted wrongdoer. And granting this motion would not deter illegality in that neither party to the allegedly illegal agreement—neither Carter nor IMG, when they arranged for IMG to make the payments, considered the impact on the Bank as the possible recipient of fraudulent transfers years after the monthly payments were made. Nor are parties to future contracts likely to consider such matters.

*7  In short, the plan administrator's argument is a stretch too far. Application of the illegal contract doctrine would punish an innocent party for the alleged illegality of two other parties by depriving it of an otherwise valid "for value" defense as to the monthly payments IMG made on the $1.2 million it received. Concomitantly, applying the rule here would result in a windfall to the estate in that IMG received and retained the $1.2 million and the estate would also recover the monthly payments IMG made in exchange for the use of those monies. The court concludes the Bank has met its initial burden of persuasion in demonstrating that there are no triable issues of material fact as to whether IMG received reasonably equivalent value in exchange for the monthly payments it made to the Bank; that is, the Bank has made a showing sufficient for summary judgment IMG did receive such value. Despite the opportunity for further briefing, the plan administrator has not shown specific facts demonstrating the existence of genuine issues of fact for trial.

As for the good faith issue, the court finds the Bank has satisfied its initial burden of persuasion in demonstrating that no genuine issues of material fact exist. The person who has

**In re International Manufacturing Group, Inc., Slip Copy (2018)**
2018 WL 773497, 65 Bankr.Ct.Dec. 69

been the Bank's president since 1993 testifies the Bank knew nothing about IMG or Wannakuwatte at the time it made the loan; that the Bank does not unilaterally decide where to send account statements; that in this case, at Carter's request, the statements were addressed to N9FX and Carter and sent in care of JTS Communities, Inc; that between October of 2008 and April of 2011, the Bank received the monthly payments and was paid off in April of 2011; that at no time between those dates did the Bank know of IMG's and Wannakuwatte's fraud, or have knowledge of any facts that would suggest the payments the Bank was receiving from IMG were made with the intent to defraud its creditors, or have knowledge of any facts that would have suggested IMG was insolvent at the time it made the payments, or receive any information suggesting there was any suspicious activity on the part of IMG. The Bank's president concludes: "There was nothing unusual about the way Battle Creek received the payments on the fully secured Loan with Carter. In my experience, there are numerous situations where a payment from a third party is entirely acceptable. Having received no calls from anyone, no documentary evidence indicating that there was an issue, we did not suspect that any issues existed as to the payments received from IMG." Declaration of Roger Brestel, DN 128, ¶ 15.

The plan administrator's only argument in opposition is that the single fact that the loan payments were made by someone (IMG) other than the Bank's obligor (Carter/N9FX) was enough of a red flag to put the Bank on inquiry notice that something suspicious, and possibly fraudulent, was going on. Thus, the plan administrator states, "Battle Creek's files are devoid of any information regarding why it was receiving payments on its note from a third party not obligated on the debt" and

> the mere receipt by a financial institution of payments on a loan from a third party not obligated on the debt is a red flag warranting inquiry by the bank, since on its face, without any information or investigation into the basis for the third party to be making the payments, the payments appear to be gifts by the payor that would be subject to avoidance as fraudulent transfers unless (a) based on an investigation into the underlying relationship of the

parties and transactions between them, the party making the payments is somehow receiving reasonable value in exchange for the transfers, or (b) an investigation into the financial status of the payor shows that entity, IMG, was fully solvent and could legitimately donate its assets for the benefit of Carter.

Plaintiff's Opp., DN 132, at 18:21–19:6.

The plan administrator has cited a single case for this proposition. In that case, Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.), 250 B.R. 776 (Bankr. S.D. Fla. 2000), the bank made a loan to a company it knew had no assets and it knew the company the money was actually going to was maxed out on its line of credit with and subject to borrowing restrictions by a group of other banks. The bank's senior vice president knew the real borrower's inability to incur additional debt was the only reason the "paper company" was used as the bank's nominal borrower. In other words, there was a lot more in the nature of red flags than a bank receiving payments from someone other than its named borrower.

**\*8** In short, the court is not persuaded that the mere receipt of regular and timely monthly payments from someone other than a bank's borrower is, in and of itself, sufficient to put the bank on inquiry notice of something irregular going on with the payor. Further, the plan administrator has not suggested there are additional facts it might present showing there were any other red flags that should have put the Bank on inquiry notice. [9] Thus, in response to the Bank's prima facie case as to its good faith defense, the plan administrator has failed to show specific facts demonstrating that there are genuine issues of fact for trial.

[9]    The discovery bar date and the deadline to disclose experts have passed.

For the reasons stated, the court submits these findings of fact and conclusions of law to the district court with the recommendation that the Bank's motion be granted and that judgment be entered in favor of the Bank and against the plan administrator.

In re International Manufacturing Group, Inc., Slip Copy (2018)
2018 WL 773497, 65 Bankr.Ct.Dec. 69

**All Citations**

Slip Copy, 2018 WL 773497, 65 Bankr.Ct.Dec. 69

---

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by    In re Southern Home and Ranch Supply, Inc.,
Bankr.N.D.Ga.,    December 20, 2013

2011 WL 4621741
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. Iowa.

In re AGRIPROCESSORS, INC., Debtor.

Joseph E. Sarachek, in his capacity
as Chapter 7 Trustee, Plaintiff,

v.

The Right Place Inc., Defendant.

Bankruptcy No. 08−2751.
|
Adversary No. 10−09123.
|
Sept. 30, 2011.

**Attorneys and Law Firms**

Dan Childers, Desiree A. Withers, Elderkin & Pirnie, PLC,
Paula L. Roby, Cedar Rapids, IA, for Plaintiff.

Christopher C. Fry, O'Connor & Thomas, P.C., Dubuque, IA,
Kurt F. Gwynne, Wilmington, DE, for Defendant.

## ORDER RE: MOTION TO DISMISS COMPLAINT

THAD J. COLLINS, U.S. Chief Bankruptcy Judge.

**\*1** This matter came before the Court in a telephonic hearing
on the Motion to Dismiss of Defendant The Right Place Inc.
Defendant was represented by Christopher C. Fry, Kurt F.
Gwynne, and Timothy Reiley. Trustee was represented by
Dan Childers. The Court requested post-hearing briefing and
took the matter under advisement. This is a core proceeding
under 28 U.S.C. § 157(b)(2)(F) and (H).

## STATEMENT OF THE CASE

Trustee discovered several payments Debtor made to
Defendant within two years of Debtor's petition filing date.
Trustee filed the Complaint to avoid the respective payments
as fraudulent transfers, or alternatively, preferences under

the Bankruptcy Code. Defendant moves to dismiss Trustee's
Complaint for failure to state a plausible claim. Defendant
argues Trustee failed to state a plausible claim under the
standards of Ashcroft v. Iqbal, ── U.S. ──, 129 S.Ct. 1937
(2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544
(2007).

After reviewing the record and hearing the parties' arguments,
the Court finds Trustee has failed to plead a plausible case.
The Court, however, exercises its discretion to allow Trustee
to amend his pleading instead of dismissing the case.

## PLEADINGS AND FACTUAL ALLEGATIONS

Debtor owned and operated one of the nation's largest kosher
meatpacking and food-processing facilities in Postville, Iowa.
On November 4, 2008, Debtor filed a Chapter 11 petition in
the Bankruptcy Court for the Eastern District of New York.
Debtor's bankruptcy petition and accompanying documents
recited that its financial difficulties resulted from a raid
conducted by U.S. Immigration and Customs Enforcement.
A total of 389 workers at the Postville facility were arrested.
The raid led to numerous federal criminal charges, including
a high-profile case against Debtor's President, Sholom
Rubashkin. Debtor's Petition also stated it had over 200
creditors and assets and liabilities in excess of $50,000,000.

The court eventually approved the appointment of Joseph
E. Sarachek as the Chapter 11 trustee. The court concluded
that appointing a trustee was necessary in part "for
cause, including fraud, dishonesty, incompetence, or gross
mismanagement of the affairs of the debtor by current
management" under § 1104(a)(1). After hearings in a later
proceeding, the court transferred the case to this Court on
December 15, 2008. This Court eventually converted the case
to a Chapter 7 bankruptcy. The U.S. Trustee for this region
retained Mr. Sarachek as the Chapter 7 trustee.

Trustee filed approximately 150 adversary proceedings in the
bankruptcy case. In numerous hearings and filings with the
Court, Trustee has noted the many challenges and difficulties
investigating the claims, most resulting from the raid and
subsequent proceedings. Key people were incarcerated and/
or were unwilling to talk. Documents were difficult to locate
and to understand without the availability and cooperation of
many key plant employees.

In re Agriprocessors, Inc., Not Reported in B.R. (2011)
2011 WL 4621741

 **\*2** One of the adversaries Trustee filed was the two-count Complaint here. Trustee seeks transfers made by Debtor to Defendant from May 18, 2007 through April 30, 2008. The transfers totaled $256,884.00. Trustee seeks recovery of all the payments as fraudulent conveyances under § 548 (Count I), or alternatively, recovery of some of the payments as preferential transfers to an insider under § 547(b) (Count II). With regard to the preference claim in Count II, Trustee alleged that Defendant was an insider at the time each transfer was made "because [Defendant] is a related entity of the Debtor."

Defendant moves to dismiss the Complaint. Under *Iqbal* and *Twombly*, Defendant alleges Trustee failed to state any plausible factual allegations in Count I that indicate Debtor received less than a reasonably equivalent value for the payments as required by § 548(a)(1)(B)(i). Defendant also argues that Trustee failed to adequately plead Debtor was insolvent during the periods prescribed by § 548(a)(1)(B)(ii) (I).

Defendant argues Count II should be dismissed because Trustee failed to allege a plausible factual basis for his preference claims under § 547(b). In particular, Defendant argues that Trustee makes only conclusory statements insufficient to plead Defendant was an "insider" under § 547(b)(4)(B). Defendant also again argues that Trustee makes only conclusory statements insufficient to establish Debtor's insolvency at the time of the transfers—a prerequisite to recover under § 547(b)(3).

Trustee resists Defendant's Motion to Dismiss. Trustee argues that the claims in both Counts meet the pleading standards of *Twombly* and *Iqbal*. Trustee also argues Defendant misunderstood the facts and context of the claims made in the Complaint. Trustee emphasizes his long-term involvement with this case and his understanding of its factual context. Trustee also points to his unanswered inquiries to the Defendant regarding value it provided in exchange for the alleged transfers. Trustee essentially argues Defendant had those facts and chose not to share them with Trustee. Trustee argues these factors should be taken into account when reviewing the Defendant's arguments about deficiencies in the Complaint. Trustee also asks this Court to grant him leave to amend, in the event this Court finds Trustee's claims were not adequately pleaded. Defendant resists Trustee's request for leave to amend the Complaint.

### CONCLUSIONS OF LAW

#### A. Motion to Dismiss Standard

The Bankruptcy Rules follow the standards of the Federal Rules of Civil Procedure on grounds for dismissal and requirements for pleading. Bankruptcy Rule 7012 specifically notes: "Rule 12(b)-(i) F.R.Civ.P. applies in adversary proceedings." Defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."

In order to determine whether a complaint states a "claim upon which relief can be granted," courts first look to what a party is required to plead. *Twombly,* 550 U.S. at 554–55. Again, Bankruptcy Rule 7008(a) provides: "Rule 8 F.R.Civ.P. applies in adversary proceedings." Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." For many years, the settled standard for evaluating motions to dismiss was provided in *Conley v. Gibson,* 355 U.S. 41 (1957). In *Conley,* the Supreme Court stated that a case should be dismissed for failure to state a claim only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46 (citations omitted).

 **\*3** The standard for ruling on a motion to dismiss under the Federal Rules has received new attention from the Supreme Court in recent terms. "To survive a motion to dismiss, a complaint must contain **sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.**' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555) (emphasis added). "Because the Supreme Court's decisions were based on interpretation of Rule 8, they govern pleadings 'in all civil actions and proceedings in the United States District Courts.' " Bensinger, Bill D. *Context is King—Twombly, Iqbal and the Art of Pleading in Bankruptcy,* 19 J. Bankr.L. & Prac. 669 (2010) (citing *Iqbal,* 129 S.Ct. at 1953).

The Supreme Court now applies a two-pronged approach in evaluating a motion to dismiss. First, the Court identifies "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 129 S.Ct. at 1950. Second, to the extent that the complaint contains factual allegations, the Court assumes the truth of those facts and determines whether they plausibly give rise to an entitlement to relief. *Id.*

In re Agriprocessors, Inc., Not Reported in B.R. (2011)
2011 WL 4621741

By establishing this plausibility standard, the Supreme Court sought to reduce the potential for discovery abuse that could follow an insufficient pleading. *Twombly,* 550 U.S. at 559. The Court was concerned in part that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings." *Id.* The Court emphasized that Rule 8 notice pleading does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 129 S.Ct. at 1950. The Court thus rejected the "careful case management" argument that an insufficient pleading would simply be weeded out early in the discovery process. *Iqbal,* 129 S.Ct. at 1953. Nevertheless, the Court noted that "[d]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal,* 129 S.Ct. at 1940 (citing *Twombly,* 550 U.S. at 556).

## B. Pleading Standards Where
## Bankruptcy Trustee is the Plaintiff

In cases decided both before and after *Iqbal* and *Twombly,* courts have given more leeway in pleading where the bankruptcy trustee is the plaintiff. "For claims brought by a bankruptcy trustee, courts take a more liberal view when examining allegations of actual fraud ... in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *In re Dreier LLP,* No. 09–15051(SMB), 2011 WL 2412581, at *10 (Bankr.S.D.N.Y. June 16, 2011) (citations omitted), *but see In re NE 40 Partners, Ltd. P'ship,* 440 B.R. 124, 128 (Bankr.N.D.Tex.2010) (noting that the Fifth Circuit does not give bankruptcy trustees such leeway in alleging actual fraud). "In a bankruptcy case where the trustee or a third party outsider to the fraudulent transaction is pleading the fraud on secondhand knowledge for the benefit of the estate and all of its creditors, greater liberality is generally afforded in the pleading of fraud than in a civil suit." *In re Ahead by a Length, Inc.,* 100 B.R. 157, 166 (Bankr.S.D.N.Y.1989) (citations omitted). Courts have allowed a trustee to allege fraud based on information and belief if the facts are "peculiarly within the opposing party's knowledge." *In re Dreier* at *11 (citing *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974) (quotations omitted).

**\*4** In the above cases, the court analyzed actual fraudulent transfer pleadings under the heightened standards of Rule 9. While this is not an actual fraud case that falls under Rule 9, the principles in those cases do have some application here. *Iqbal* and *Twombly* require more factual detail in Rule 8 notice pleading; thus, the trustee now must plead in greater detail while still, in many cases, being forced to rely on secondhand information. As a result, when considering the Motion to Dismiss, Trustee's status is a necessary part of the context in which this Court evaluates the facial plausibility of the Complaint.

## C. Factual Allegations Required
## to Establish Pleaded Claims

In order to determine whether the Complaint satisfies the *Twombly* and *Iqbal* requirements, this Court must evaluate whether the factual assertions in Trustee's Complaint "plausibly" establish an entitlement to relief. To do so, the Court must first identify the legal standards Trustee must meet in alleging facts to support a plausible claim, while giving due consideration to context.

### 1. Fraudulent Conveyances

Count I of Trustee's Complaint seeks to recover fraudulent transfers under § 548(a)(1), which provides:

The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with **actual intent to hinder, delay, or defraud** any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) **received less than a reasonably equivalent value** in exchange for such transfer or obligation; and

(ii)(I) **was insolvent on the date that such transfer was made** or such obligation was incurred, or became insolvent as a result of such transfer or obligation; ...

11 U.S.C. § 548(a)(1) (emphasis added).

Section 548(a) of the Bankruptcy Code allows a trustee to avoid transfers that are incurred by either actual fraud (§ 548(a)(1)(A)) or constructive fraud (§ 548(a)(1)(B)). Under § 548(a)(1)(A), a trustee may avoid any transfer made within two years before the petition filing date if the debtor made the transfer with "actual intent to hinder, delay, or defraud" the creditor. Under § 548(a)(1)(B), a trustee may avoid any transfer made within two years before the petition filing date if debtor received "less than a reasonably equivalent value in exchange for the transfer," and debtor was, or became, insolvent at the time of the transfer. Trustee alleges only constructive fraud, asserting Debtor's payments "were in exchange for less than a reasonably equivalent value" and at the time of the transfers debtor was insolvent under § 548(a)(1)(B)(ii)(I). *Complaint* at ¶ 9 and ¶ 10.

**\*5** When a plaintiff alleges actual fraud, Fed.R.Civ.P. 9(b) requires that plaintiff "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Most courts conclude, however, that Rule 9(b) is inapplicable to pleading constructively fraudulent transfers under § 548(a)(1)(B) because intent or deceit is not an element of constructive fraud. *See, e.g., Picard v. Cohmad Securities Corp. (In re Bernard L. Madoff Inv. Secs. LLC),* No. 09–1305, 2011 WL 3274077, at *10 (Bankr.S.D.N.Y. Aug. 1, 2011) (finding "courts consistently hold that claims of constructive fraud do not need to meet the heightened pleading requirements of Fed.R.Civ.P. 9(b)") (citation omitted); *SB Liquidation Trust v. Preferred Bank (In re Syntax–Brillian Corp.),* No. 10–51389, 2011 WL 3101809, at * 7 (Bankr.D.Del. July 25, 2011) ("Constructive fraudulent transfer claims are specifically governed by Federal Rule of Civil Procedure 8 rather than by the heightened Rule 9(b) pleading standard"); *In re Anderson,* No. 10–50757, 2010 WL 4959948, at *4 (Bankr.E.D.Tenn. Dec. 1, 2010) (citing *Gold v. Winget (In re NM Holdings Co.),* 407 B.R. 232, 259 (Bankr.E.D.Mich.2009)) ("When 'fraud' is alleged solely because a debtor transferred property while it was insolvent, the transferee is not accused of an act of fraud or deception ....") (citation omitted); *State Bank & Trust Co. v. Spaeth (In re Motorwerks, Inc.),* 371 B.R. 281, 295 (Bankr.S.D.Ohio 2007) (indicating the more stringent requirements of Rule 9(b) do not apply); *Astro Liquidating Trust v. Xantrex Tech., Inc.,* 335 B.R. 309, 333 (Bankr.D.Del.2005) (finding Rule 8(a)(2)'s notice pleading standard governs claims for constructively

fraudulent transfers, not Rule 9(b)'s heightened pleading standard)). Accordingly, this Court reviews the constructively fraudulent transfers under Rule 8(a) and the standards for minimum pleading in *Iqbal* and *Twombly. In re Caremerica, Inc.,* 409 B.R. 737, 755 (Bankr.E.D.N.C. July 28, 2009).

Under *Iqbal* and *Twombly,* Trustee's claim for constructively fraudulent transfers must allege sufficient facts that plausibly show: (i) a transfer within the applicable time period, (ii) a lack of reasonably equivalent value (or fair consideration), and (iii) debtor's insolvency during the relevant time period. *In re Charys Holding Co.,* 443 B.R. 628, 636 (Bankr .D.Del.2010). A mere recitation of the three legal elements is inadequate to establish a plausible factual basis. *Caremerica,* 409 B.R. at 745. Defendant here claims Trustee failed to sufficiently plead all three elements.

### a. Element One—Transfer Made Within Two–Year Period

The first element Trustee must sufficiently plead is the debtor made a transfer to defendant within two years before the petition filing date. 11 U.S.C. § 548(a)(1)(B). To adequately plead this element Trustee needs to recite sufficient factual information, including the date of the transfer, the amount of the transfer, the name of the transferor, and the name of the transferee. *Charys,* 443 B.R. at 636 (finding the complaint adequate because it listed transaction dates and amounts between the debtor and transferee that took place within the two years preceding the petition date).

### b. Element Two—Reasonably Equivalent Value

**\*6** On the second element of his constructive fraud case, a trustee must allege facts that plausibly show the debtor received "less than a reasonably equivalent value in exchange for such transfer[s]." 11 U.S.C. § 548(a)(1)(B)(i). The term "reasonably equivalent value" is not defined in the Bankruptcy Code. Accordingly, "reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process." *Charys,* 443 B.R. at 638. A complaint, however, must do more than just summarily state there was "less than a reasonably equivalent value in exchange." *See id.* The trustee must describe the consideration and why the value of such consideration was less than the amount transferred. *Caremerica,* 409 B.R. at 756.

Where, as here, the allegation is that there was no consideration, courts are split on whether a simple recitation of that allegation is sufficient. *Compare In re Image Masters,*

*Inc.,* 421 B.R. 164, 179 (Bankr.E.D.Pa.2009) (finding the complaint to contain only a "bald legal conclusion" when stating, "[Defendant] received no value whatsoever in exchange for the Transfers alleged in this case let alone reasonably equivalent value ....") *with In re Innovative Commc'n Corp.,* No. 09–3007, 2010 WL 3069489, at *3 n. 4 (Bankr.D.V.I. June 18, 2010) (finding plaintiff's complaint adequate when it stated, "The Defendant did not provide any *consideration* to [Plaintiff] in exchange for the Transfers.") (emphasis added).

**c. Element Three—Insolvency**

To satisfy the third element of a constructively fraudulent transfer, a trustee must allege facts that plausibly show that at the time of the transfers, Debtor was insolvent. 11 U.S.C. § 548(a)(1)(B)(ii)(I). The Bankruptcy Code specifically defines insolvency. As it pertains to an "entity other than a partnership and a municipality," that entity is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title." 11 U.S.C. § 101(32)(A).

Again, a trustee's complaint cannot merely make a conclusory statement that a debtor was insolvent. *In re Gluth Bros. Const., Inc.,* 424 B.R. 368 (Bankr.N.D.Ill.2009). A complaint must contain enough factual information to plausibly show the debtor's liabilities exceeded assets at the time of the transfers. *In re Saba Enters., Inc.,* 421 B.R. 626, 646 (Bankr.S.D.N.Y.2009); *Anderson* 2010 WL 4959948, at *3 (citing *Joseph v. Frank (In re Troll Commc'ns, LLC),* 385 B.R. 110, 123–24 (Bankr.D.Del.2008) (finding insolvency adequately pleaded where the complaint alleged facts showing that debtor's liabilities exceeded their assets as of the date of the transfer)); *See also Charys,* 443 B.R. at 636 (providing balance sheet information that did not reflect insolvency, but further alleged that the intangible goodwill entry was rendered valueless by independent contractors and that the tangible net assets were overvalued at the time of the transfers).

**2. Preferential Transfers**

*7 Count II of Trustee's Complaint alleges that to the extent the payments occurred within one year of the date of filing, they were preferential transfers to an "insider" under § 547(b). The elements of a preferential transfer are:

(1) debtor transferred an interest of the debtor in property,

(2) to or for the benefit of a creditor, (3) for or on the account of an antecedent debt, (4) made while the debtor was **insolvent,** (5) made within 90 days, or **within one year if the creditor was an insider,** (6) that enabled the creditor to receive more than it would under Chapter 7.

11 U.S.C. § 547(b) (emphasis added); *Sarachek v. Chitrik,* No. 10–09058 slip op. at 3–4 (Bankr.N.D.Iowa July 22, 2011); *Caremerica,* 2009 WL 2253225, at *2–5; *In re AmerLink, Ltd.,* No. 09–01055–8–JRL, 2011 WL 864953, at *2 (Bankr.E.D.N.C. Mar. 11, 2011). Defendant argues that Trustee failed to allege sufficient plausible facts to show Debtor was insolvent or Defendant was an insider.

**a. Insolvency at the Time of the Alleged Preferential Transfers**

The Bankruptcy Code presumes a debtor was insolvent at the time it allegedly made preferential transfers within the 90–day prepetition window. 11 U.S.C. § 547(f). However, the Bankruptcy Code does not provide an insolvency presumption for alleged preferential transfers to insiders—those occurring between 90 days and one year before filing. *See generally* 11 U.S.C. § 547. The trustee must therefore plead facts to support a plausible claim that the debtor was insolvent when the transfer was allegedly made to the insider. *Caremerica,* 409 B.R. at 752. The trustee bears the burden of proving the debtor was insolvent at the time of the alleged preferential transfers. 11 U.S.C. § 547(g). Again, to raise a plausible basis for the claim, Trustee must allege more than simply the legal element that Debtor was insolvent at the relevant time. Trustee must provide the factual basis for the allegation described above.

**b. Transfers to an Insider**

The Trustee may avoid an interest of the debtor in property "between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an **insider."** 11 U.S.C. § 547(b)(4)(B) (emphasis added). The term "insider" is defined in § 101(31). When the debtor is a corporation, an "insider" includes:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

*In re Agriprocessors, Inc., Not Reported in B.R. (2011)*

2011 WL 4621741

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor. [1]

[1]    "The term 'relative' means individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." 11 U.S.C. § 101(45).

11 U.S.C. § 101(31)(B). The definition is not limiting because Congress used the word "includes." *In re Enter. Acquisition Partners, Inc.,* 319 B.R. 626, 631 (B.A.P. 9th Cir.2004). Thus, in addition to those insiders listed in the statutory definition—known as per se insiders—there are also "insiders" that have a "sufficiently close relationship with the debtor that ... conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *Id.* (citation omitted).

 **\*8**    To satisfy the definition of per se insider or other insiders, the trustee must provide enough factual details in the complaint to show that the alleged relationship is plausibly that of an "insider ." *AmerLink,* 2011 WL 864953, at \*2 (finding the complaint adequate because it stated that "the companies are owned and/or controlled by Spoor, who is an insider of the debtor himself, as he chaired the Board of Directors of the debtor."); *Caremerica,* 409 B.R. at 752–53; *Angell v. Day (In re Caremerica, Inc.),* 415 B.R. 200, 205 (Bankr.E.D.N.C.2009). Again, a complaint's allegation that the defendants "are insiders as the term is defined in § 101(31) and used in § 547(b)" is conclusory and insufficient without supporting facts. *Caremerica,* 415 B.R. at 205.

### D. Leave to Amend

Trustee has requested leave to amend his Complaint if the Court finds the Complaint deficient. Under Bankruptcy Rule 7015, amendments should be freely allowed when justice so requires. Fed. R. Bankr.P. 7015(a)(2); *see also Olsen v. Paulsen (In re Paulsen),* No. 08–30044, 2008 WL 4442520 at \*2 (Bankr.N.D.Iowa 2008). Courts should liberally grant leave to amend a pleading unless a compelling reason, such as prejudice to an opposing party, exists. *See Forman v. Davis,* 371 U.S. 178, 182 (1962).

The decision on a request to amend is left to the discretion of the trial court. *Wisdom v. First Midwest Bank of Poplar Bluff,* 167 F.3d 402, 409 (8th Cir.1999). "A court abuses its discretion when it denies a motion to amend a complaint unless there exists undue delay, bad faith, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of amendment." *Popoalii v. Correctional Med. Servs.,* 512 F.3d 488, 497 (8th Cir.2008). Courts "generally prefer to decide claims on their merits instead of on their pleadings." *Wisdom,* 167 F.3d at 409 (citations omitted). "[P]arties should usually be given at least one chance to amend their complaint." *Id.* (citation omitted).

Federal Rule of Civil Procedure 15(c), applicable in bankruptcy adversary proceedings under Fed. R. Bankr.P. 7015, allows relation back of a claim or defense asserted in an amended pleading if the claim or defense "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c). "Rule 15(c) is based on the concept that a party who is notified of litigation concerning a given transaction or occurrence has been given all the notice that statutes of limitation are intended to afford." *Plubell v. Merck & Co., Inc.,* 434 F.3d 1070, 1072 (8th Cir.2006). "The determination of whether an amended pleading should be allowed and whether it relates back to the date of the original pleading are matters within the sound discretion of the trial court." *Shea v. Esensten,* 208 F.3d 712, 720 (8th Cir.2000) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330 (1971)).

### ANALYSIS

#### A. Count I: Fraudulent Transfers

 **\*9**    Defendant argues Trustee's Complaint fails to plead all three elements of a constructively fraudulent transfer claim under § 548(a)(1)(B). The Court holds that, with respect to the third element, Trustee has failed to allege sufficient facts to support a plausible claim that Debtor was insolvent at the time of the alleged transfers.

In Exhibit A attached to the Complaint, Trustee attempted to satisfy the first element by providing wire transfer dates and amounts. The Complaint alleges that all transactions were made by Debtor to Defendant. Thus, Trustee has alleged sufficient facts to plausibly show that transfers were made within the two years prior to the petition filing date. *Charys,* 443 B.R. at 636.

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 183 of 210

In re Agriprocessors, Inc., Not Reported in B.R. (2011)

2011 WL 4621741

On the second element, Trustee alleged in his Complaint that "Trustee is not aware of any value provided to the Debtor from the Defendant in exchange for the payments, and therefore, the Trustee reasonably concludes that the transfers were in exchange for less than a reasonably equivalent value." *Complaint* at ¶ 9. This Court agrees with other courts which have concluded that a trustee's allegation that debtor received nothing in exchange for the alleged transfers is sufficient factual support for this element. *See Anderson,* 2010 WL 4959948, at *3; see also In re Life Fund 5.1 LLC,* 2010 WL 2650024, at *6 (Bankr.N.D. Ill. June 30, 2010) ("Because the complaint alleges no value, it necessarily alleges the absence of reasonably equivalent value."). The Court draws an inference that Trustee cannot find any money or other consideration that the Debtor received in exchange for making the alleged transfers. In other words, when Trustee alleges Debtor received nothing from the defendant in exchange for an alleged fraudulent transfer, it is entirely plausible that Debtor received less than reasonably equivalent value in exchange for that alleged transfer. *Anderson,* 2010 WL 4959948, at *3. Trustee's factual allegation of no value is sufficient to support a plausible claim that Debtor received "less than reasonably equivalent value" in exchange for the alleged fraudulent transfers. As such, this allegation meets the minimum pleading requirements of *Iqbal* and *Twombly.*

On the third element, the Complaint alleges: "Debtor was insolvent at all times during the two-year period before the Petition Date." This allegation is a mere recitation of the statutory element and insufficient under the law. Trustee "simply alleges insolvency, without any factual support for this conclusion that would demonstrate plausibility." *Anderson,* 2010 WL 4959948, at *3. In *Anderson,* the court went on to cite the definition of insolvency in § 102(32) (A) and compare it with a case finding that insolvency had been adequately pleaded where the complaint "alleged facts showing that debtors' liabilities exceeded their assets as of the date of the transfer." *Id.* (citing In re Troll Commc'ns, 385 B.R. at 123–24). The absence of plausible facts to support insolvency at the relevant time fails the standards of *Iqbal* and *Twombly.*

### B. Count II: Preferential Transfers

**\*10**  As with Trustee's allegation of fraudulent transfers, Trustee failed to sufficiently plead that the alleged preferential transfers "were made while the debtor was insolvent."

11 U.S.C. § 547(b)(3). The insolvency presumption does not apply outside of the 90–day prepetition window. *See generally* 11 U.S.C. § 547. As noted on Count I, Trustee has failed to plead facts that plausibly show that Debtor was insolvent at the time Debtor allegedly made the preferential transfers.

The Trustee pleads Defendant is an "insider" and that the transactions that occurred between 90 days and one year before filing could be avoided. 11 U.S.C. § 547(b). In the Complaint, Trustee stated only that Defendant is "an insider because it is a related entity of the Debtor." *Complaint* ¶ 14. This statement is conclusory and insufficient without supporting facts. *In re Caremerica,* 409 B.R. at 756; In re NetBank, Inc.,* 424 B.R. 568, 571–72 (Bankr.M.D.Fla.2010). Trustee must plead facts that support a plausible claim that Defendant either is a statutory insider as defined in § 101(31) (B), or that Defendant is a non-statutory insider. *See Amerlink,* 2011 WL 864953, at *4 ("This court has found it sufficient to allege that transferees were insiders as a result of their control of the debtor or status as 'managing agents' of the debtor.") (citing *Caremerica,* 409 B .R. at 753). To adequately plead that a party is a non-statutory insider, "[i]t is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship [between the debtor and creditor] and ... anything other than closeness to suggest that any transactions were not conducted at arm's length.' " In re KCMVNO, Inc.,* No. 10–50730(BLS), 2010 WL 4064832, at *4 (Bankr.D.Del. Oct. 15, 2010) (quoting *Schubert v. Lucent Techs. (In re Winstar Comm'ns., Inc.),* 554 F .3d 382, 396–97 (3d Cir.2009)). Trustee failed to plead such facts. Even applying a deferential standard to bankruptcy trustee pleading, and reviewing this Complaint in context of the difficult environment Trustee has faced, the Court concludes Trustee thus failed to adequately plead both constructive fraud under § 548 and preferential transfers under § 547(b).

### C. Leave to Amend

Trustee has asked the Court to exercise its discretion and grant Trustee's request to amend the Complaint. The Court concludes the Trustee should be allowed to amend. Defendant will not be unfairly prejudiced, Trustee has acted in good faith in filing the original Complaint, and it does not appear that Trustee's request to amend the Complaint would be futile. The Court thus finds no compelling reason to deny Trustee's request to amend. Instead, the Court follows well-established

2011 WL 4621741

precedent noting: "Parties should usually be given at least one chance to amend their complaint." *Wisdom,* 167 F.3d at 409.

Defendant argues that amendment should be denied where Trustee failed to attach an amended pleading or specifically explain what amendments would be made. In support of that assertion, Defendant cites two cases affirming the district court's decision finding no abuse of discretion. *Ginsburg v. InBev NV/SA,* 623 F.3d 1229, 1236 (8th Cir.2010); *Pet Quarters, Inc. v. Depository Trust and Clearing Corp.,* 559 F.3d 772,782 (8th Cir.2009). These cases do not, however, establish a hard and fast rule requiring denial of amendment. The Eighth Circuit has, to the contrary, held that a plaintiff's failure to file a formal motion with proper attachments describing the amendment to be made "is not necessarily fatal as long as they show a willingness to amend the complaint." *Wisdom,* 167 F.3d at 409 (cited case omitted). Plaintiff has shown sufficient willingness to amend here.

**\*11** For these reasons, the Trustee is given leave to amend his Complaint.

**WHEREFORE,** Defendant's Motion to Dismiss Complaint to Avoid Fraudulent Conveyances and Preferential Transfers is DENIED.

**FURTHER,** this Court grants Trustee's request to amend his claims against the Defendant according to the pleading standards adopted by the Court in this order.

**FURTHER,** Trustee shall have 30 days from the date of this order in which to file an amended complaint. Once Trustee has filed his amended complaint, the Defendant will have 21 days in which to answer.

**All Citations**

Not Reported in B.R., 2011 WL 4621741

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 214206
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

SEA STAR LINE, LLC, a limited
liability company, Plaintiff,
v.
EMERALD EQUIPMENT LEASING,
INC., a corporation, Defendant.

No. Civ.A.05–245–JJF.
|
Jan. 26, 2006.

**Attorneys and Law Firms**

Kathleen M. Miller, of Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware, Charles C. Robinson, of Garvey Schubert Barer, Seattle, Washington, Timothy J. Armstrong, of Armstrong & Mejer, P.A ., Coral Gables, Florida, for Plaintiff, of counsel.

Bradford J. Sandler, and Jonathan M. Stemerman, of Adelman Lavine Gold and Levin, A Professional Corporation, Wilmington, Delaware, Gary M. Schildhorn, and Alan I. Moldoff, of Adelman Lavine Gold and Levin, A Professional Corporation, Philadelphia, Pennsylvania, for Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.

 **\*1** Pending before the Court is a Motion To Dismiss Emerald Equipment Leasing, Inc.'s Counterclaim (D.I.56) filed by Plaintiff, Sea Star Line, LLC ("Sea Star"). For the reasons discussed, Sea Star's Motion To Dismiss will be granted with respect to Count I of the Counterclaim to the extent it alleges a breach of the E–Mail Agreement, Count II pertaining to quantum meruit, Count III alleging turnover to the extent that rent is sought, and Counts V through VIII alleging tort claims for failure to plead in accordance with the requirements of Federal Rule of Civil Procedure 9(b). The Motion To Dismiss will be denied in all other respects. Emerald Equipment Leasing, Inc. will be granted leave to file an Amended Counterclaim.

BACKGROUND

On March 1, 2004, Sea Star filed a Complaint against Defendant, Emerald Equipment Leasing, Inc. ("Emerald"), in the United States District Court for the Middle District of Florida seeking declaratory judgment as to the parties' rights and liabilities under an Equipment Rental Agreement dated September 28, 2002 (the "Equipment Rental Agreement"). Sea Star also asserted claims for breach of other maritime contracts and for money owed as a result of goods delivered and services provided to Emerald.

Emerald is a debtor-in-possession in a pending Chapter 11 case in the United States Bankruptcy Court for the District of Delaware. Unaware of the action Sea Star filed in the Middle District of Florida, Emerald filed an adversary proceeding against Sea Star in the United States Bankruptcy Court for the District of Delaware on March 17, 2004. In the adversary proceeding, Emerald asserted claims against Sea Star based on the Equipment Rental Agreement for (1) post-petition account receivable/breach of lease, (2) post-petition quantum meruit, (3) turnover/conversion, and (4) accounting. Sea Star moved to dismiss, stay or abate the adversary proceeding.

The Bankruptcy Court held a hearing on May 27, 2004, and concluded that Emerald's adversary proceeding was a non-core proceeding and that the Bankruptcy Court had "related to" jurisdiction over the action. D.I. 59 at All. However, the Bankruptcy Court acknowledged that under 28 U.S.C. § 959, concomitant jurisdiction existed with the federal district court, because a party doing business with a debtor-in-possession has the right to file suit regarding that dispute in any jurisdiction. *Id.* For purposes of its decision, the Bankruptcy Court assumed that the Florida District Court had jurisdiction, and the Bankruptcy Court applied the "first filed rule" to conclude that the adversary proceeding should be dismissed. *Id.* at A12. However, the Bankruptcy Court's dismissal was without prejudice so that "if the Florida Court determines that it doesn't have jurisdiction or its action should be dismissed, the debtor is free to file here." *Id.* at A13.

In the meantime, in the Florida action, Emerald had moved to dismiss the Complaint, to transfer venue or to abstain. Emerald disputed the Florida District Court's jurisdiction on the grounds that a declaratory judgment was inappropriately sought by Sea Star because the Equipment Rental Agreement had been terminated. The Florida District Court concluded that this case should be transferred to Delaware, primarily

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    1

2006 WL 214206

because Sea Star's Complaint references proceedings that took place in the Delaware Bankruptcy Court, the Delaware Bankruptcy Court was familiar with the parties, and Emerald is a debtor undergoing reorganization in the Delaware Bankruptcy Court. D.I. 59 at A18–19.

**\*2** On April 25, 2005, Emerald filed an Answer, Affirmative Defenses and Counterclaim in this action. D.I. 53. Emerald admits jurisdiction under 28 U.S.C. § 1333 (admiralty jurisdiction), but denies federal jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulations) and 1367 (supplemental jurisdiction). Emerald asserts a Counterclaim against Sea Star alleging eight causes of action: (1) post-petition account receivable/breach of lease, (2) post-petition quantum meruit, (3) turnover, (4) accounting, (5) fraud, (6) constructive fraud, (7) fraudulent concealment, and (8) negligent misrepresentation/breach of fiduciary duty. Emerald contends that the Court has jurisdiction over its counterclaims pursuant to 28 U.S.C. § 1334 (original jurisdiction of bankruptcy cases in the district court) and 157 (referral to bankruptcy court of cases arising under or related to a case under Title 11) and 11 U .S.C. § 542 (turnover of property to the estate). Emerald also contends that this action is a "core" proceeding that should be heard and determined by the Bankruptcy Court under 28 U.S.C. § 157(b)(2)(A),(C), (E) and (O).[1] D.I. 53, Counterclaim at ¶ 1.

[1]   Core proceedings include, but are not limited to:
(A) matters concerning the administration of the estate;
(C) counterclaims by the estate against persons filing claims against the estate;
(E) orders to turn over property of the estate;
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims....
28 U.S.C. § 157(b)(2)(A), (C), (E) and (O).

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) governs Sea Star's Motion To Dismiss Emerald's Counterclaim. The purpose of a motion to dismiss is to test the sufficiency of a complaint, or in this case, a counterclaim, and not to resolve disputed facts or decide the merits of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993). When considering a motion to dismiss, a

court must accept as true all allegations in the counterclaim and must draw all reasonable factual inferences in the light most favorable to the non-moving party. Neitzke v. Williams, 490 U.S. 319, 326 (1989); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir.1994). The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." Kost, 1 F.3d at 183. Dismissal is only appropriate when it appears beyond doubt that the movant can prove no set of facts in support of its claims entitling it to relief. Conley v. Gibson, 355 U.S. 41, 45 (1957). The burden of demonstrating that the counterclaim fails to state a claim upon which relief may be granted rests on the movant. Young v. West Coast Industrial Relations Assoc., Inc., 763 F.Supp. 64, 67 (D.Del.1991) (citations omitted).

As a general matter, a court may not consider matters outside the pleadings when adjudicating a motion to dismiss. However, a court may consider "document [s] integral to or explicitly relied upon" in the pleadings without converting a motion to dismiss to a motion for summary judgment. In re Rockefeller Center Properties, Inc. Securities Litigation, 184 F.3d 280, 287 (3d Cir.1999).

DISCUSSION

As a threshold matter, Emerald appears to raise a jurisdictional issue. Specifically, Emerald contends that this case implicates the "core" jurisdiction of the Bankruptcy Court and that this case should be referred to the Bankruptcy Court under the Bankruptcy Court's "related to" jurisdiction under 28 U.S.C. § 1334. D.I. 66 at X (discussing core jurisdiction) & n. 6 (requesting referral to the Bankruptcy Court). Emerald contends that its counterclaim is a "core" matter, because it is a "counterclaim by the estate against persons filing claims against the estate" under 28 U.S.C. § 157(b)(2)(C).

**\*3** In response, Sea Star contends that the Court should not refer this case to the Bankruptcy Court under its "related to" jurisdiction because Sea Star did not consent to that jurisdiction. In addition, Sea Star contends that the Bankruptcy Court already concluded that this matter was "non-core" when it dismissed Emerald's adversary proceeding, and in any event, Sea Star has not filed a proof of claim against Emerald, and therefore, core jurisdiction under 28 U.S.C. § 157(b)(2)(C) is not implicated.

Sea Star Line, LLC v. Emerald Equipment Leasing, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 214206

A proceeding is a core proceeding, if it invokes a substantive right provided by Title 11 or is a proceeding, which by its nature, could only arise in the context of a bankruptcy case. *Halper v. Halper,* 164 F.3d 830, 836 (3d Cir.1999). The Bankruptcy Court has already concluded that similar claims alleged by Emerald in the context of its adversary proceeding were "non-core." However, Emerald contends that the Bankruptcy Court's decision should not be considered the law of the case, because that decision was made in a different procedural context. Specifically, Emerald contends that the Bankruptcy Court was only dealing with claims made by Emerald against Sea Star based on post-petition activities when it addressed Emerald's adversary proceeding. In contrast, Emerald contends that this case now involves claims asserted by Sea Star against the Emerald estate, and therefore, the proceeding is core under Section 157(b)(2)(C). However, Emerald has not advanced any case law supporting its assertion that its Counterclaim is core.

In considering the question of core jurisdiction under Section 157(b)(2)(C), it appears to the Court that the case law involves situations in which the debtor has filed a counterclaim in response to a proof of claim filed by a creditor. Sea Star has not filed a proof of claim against Emerald in the Bankruptcy Court, and therefore, the Court is not persuaded that Section 157(b)(2)(C) is applicable here. In addition, the Court notes that the exercise of "related to" jurisdiction is not mandated in this case, particularly where, as here, Sea Star has not consented to such jurisdiction. 28 U.S.C. § 157(c)(2), (d). [2] However, the Court does have subject matter jurisdiction over this action, because it arises in connection with a maritime contract over which this Court has admiralty jurisdiction. Indeed, the parties agree that the exercise of the Court's jurisdiction is appropriate under 28 U.S.C. § 1333. D.I. 53, Counterclaim at ¶ 1; D.I. 57 at 1, 6. Accordingly, the Court declines to refer this case to the Bankruptcy Court as requested by Emerald in Footnote 6 of its Answering Brief.

[2]     In pertinent part, 28 U.S.C. § 157(c)(2) and (d) provides:

     (c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after

reviewing de novo those matters to which any party has timely and specifically objected.

     (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

     (d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

I. Whether Emerald's Counterclaims Based On Contract Law State A Claim Upon Which Relief May Be Granted

   A. *Emerald's Counterclaim for Breach of Contract*

In Count I of its Counterclaim, Emerald alleges that Sea Star breached its obligations under two agreements: (1) the E–Mail Agreement, and (2) the Equipment Rental Agreement. Emerald contends that Sea Start failed to pay Emerald rent due for the use of the equipment and for the loss incurred as a result of damage, theft, destruction or other loss of the equipment. Emerald contends that its Counterclaim appropriately refers to breach of the E–Mail Agreement, because the parties operated under the E–Mail Agreement for more than five months while the formal Equipment Rental Agreement was being finalized. To the extent Sea Star seeks dismissal of its Counterclaim based on the E–Mail Agreement, Emerald contends that such a claim is premature, because there has been no factual development regarding whether the parties intended the Equipment Rental Agreement to supersede and cancel the E–Mail Agreement.

 **\*4** Sea Star contends that dismissal of Emerald's Counterclaim as it applies to the E–Mail Agreement is appropriate in light of the Integration Clause contained in the Equipment Rental Agreement. Although executed on July 31, 2002, the Equipment Rental Agreement indicates that it "cover[s] equipment in use at various times commencing April 29, 2002." A40. The E–Mail Agreement did not

2006 WL 214206

commence until May 2, 2002, and thus, Sea Star contends that the Equipment Rental Agreement supersedes the E–Mail Agreement. Sea Star also contends that extrinsic evidence is not required to determine the parties' intent, because the Equipment Rental Agreement is clear, and therefore, parol evidence is inadmissible.

The parties appear to agree that Maryland law governs the contracts at issue. D.I. 57 at 8; D.I. 66 at n. 7. In determining whether a contract is ambiguous, Maryland law uses an "objective interpretation of contracts." *Calomiris v. Woods, 727 A.2d 358, 363 (Md.1999).* Under this view, a written contract is ambiguous if it is susceptible to more than one meaning when it is read by a reasonably prudent person. *Id.* The determination of whether language is susceptible to more than one meaning includes a consideration of " 'the character of the contract, its purpose and the fact and circumstances of the parties at the time of execution." ' *Id.* (citations omitted). The test for whether the contract is plain and unambiguous is "not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (citations omitted). Prior evidence of the parties' intentions and negotiations is not admissible; however, the court may consider the context of the transaction or the custom of the trade in determining whether an ambiguity exists. *Id.*

In its Counterclaim, Emerald makes the following allegations regarding the E–Mail Agreement:

9.... [O]n or about May 1, 2002, Sea Star and Emerald entered into an agreement (the "E–Mail Agreement" attached hereto as Exhibit "A"), whereby Sea Star agreed to lease Emerald equipment previously leased by Emerald to NPR.

10. The E–Mail Agreement was effective as of May 1, 2002 and was applicable to any cargo worthy Emerald equipment, which Sea Star dispatched out of any port terminal or inland depot for customer use at agreed upon per diems (the "Emerald Equipment").

11. Sea Star used the Emerald Equipment pursuant to the E–Mail Agreement for a number of months, *before the leasing arrangement was more formally documented in a written agreement executed by Sea Star and Emerald in the later part of September, 2002* (the "Equipment Rental Agreement" attached hereto as Exhibit "B").

D.I. 53, Counterclaim at ¶ 9–11 (emphasis added).

Reviewing Emerald's allegations in light of the terms of the Equipment Rental Agreement which is attached to the pleadings, the Court concludes that Emerald has failed to state a claim for breach of the E–Mail Agreement. The Equipment Rental Agreement "cover[s] equipment in use at various times commencing April 29, 2002." D.I. 53, Exh. B at introductory paragraph. It also contains an Integration Clause which states that "[t]his Agreement contains the entire agreement between the parties and subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound." *Id.,* Exh. B at ¶ 15(a). Based on this language, the Court concludes that a reasonable person reading the Equipment Rental Agreement would not find any ambiguity in its terms. The Equipment Rental Agreement covers the period for which the E–Mail Agreement had applied, and as Emerald acknowledges, the Equipment Rental Agreement constituted the parties more formal documentation of the earlier E–Mail Agreement. *Id.* at ¶ 11.

 **\*5** Emerald contends that extrinsic evidence is required to determine the parties' intent as to whether the Equipment Rental Agreement was meant to supersede the E–Mail Agreement, because the Equipment Rental Agreement does not expressly reference the E–Mail Agreement. Relying on *Bradney v. Sakelson, 473 A.2d 189, 199 (Pa.Super.1984)* and *Franz Tractor Co. v. J.I. Case Co., 566 So.2d 524 (Fla.App. 2 Dist.1990),* Emerald contends that factual discovery is needed because the doctrine of integration turns on the parties' intentions. In the Court's view, however, both *Bradney* and *Franz* are distinguishable from the circumstances in this case. As the court in *Bradney* noted, the termination agreement at issue did not contain an integration clause, did not encompass the same obligations and did not involve the same parties that were bound by the oral agreement. *473 A.2d at 192.* In light of these circumstances, the *Bradney* court concluded that they could not discern any intention by the parties that the oral contract be merged into the termination agreement. *Id.*

Similarly, in *Franz Tractor Co.,* the court concluded that a modification contract was not merged into the dealer contract, because references in the modification to the dealer contract demonstrated that the parties intended the two agreements to remain separate. In addition, the modification expressly provided that it was to "supplement" the dealer contract. *566 So.2d at 526.*

Sea Star Line, LLC v. Emerald Equipment Leasing, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 214206

In this case, the Court concludes that extrinsic evidence is not required to illuminate the meaning of the Equipment Rental Agreement because it is not ambiguous when viewed from the standpoint of a reasonable person. Unlike the circumstances in *Bradney* and *Franz,* the Equipment Rental Agreement here covers the same subject matter as the E–Mail Agreement for the same time period that the E–Mail Agreement had been in effect. As Emerald acknowledges in its Counterclaim, the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement that had existed previously under the E–Mail Agreement. Further, the Equipment Rental Agreement has an Integration Clause expressing the parties' intent that the Equipment Rental Agreement be "the entire agreement between the parties." *See e.g., ARB (American Research Bureau), Inc. v. E–Systems, Inc.,* 663 F.2d 189 (D.C.Cir.1980) (applying Maryland law and concluding that written contract was intended to be exclusive statement of the parties' agreement based primarily on presence of an integration clause). In these circumstances, the Court concludes that extrinsic evidence is not required to determine the meaning of the Equipment Rental Agreement, and Emerald cannot maintain its Counterclaim to the extent that it alleges a breach of the E–Mail Agreement because the E–Mail Agreement was subsumed by the Equipment Rental Agreement entered into by the parties. *Calomiris,* 727 A.2d at 361–362 (recognizing that "[u]nder the parol evidence rule, a written agreement 'discharges prior agreements' thereby rendering legally inoperative communications and negotiations leading up to the written contract.") (quoting *Restatement (Second) of Contracts* § 213 (1979)). Accordingly, the Court will grant Sea Star's motion to the extent that it seeks dismissal of Emerald's claim alleging breach of the E–Mail Agreement. [3]

[3] Emerald also directs the Court to two Delaware cases for the proposition that "a new contract relating to the subject matter of a former agreement does not destroy the obligations of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intend that the new contract supersede the old contract entirely." D.I. 66 at 2 (citing *Lee Builders, Inc. v. Wells,* 92 A.2d 710, 715 (Del. Ch.1952); *Jefferson Island Salt Min. Co. v. Empire Box Corp.,* 23 A.2d 106 (Del.Super.1941)). However, Delaware law does not govern the contract at issue here.

**B.** *Emerald's Counterclaim For Quantum Meruit*

**\*6** In Count II of its Counterclaim, Emerald alleges a claim for post-petition quantum meruit. Emerald alleges that Sea Star has used Emerald's property and has failed to compensate Emerald for that use resulting in harm to Emerald and actual material gain to the benefit of Sea Star. Emerald seeks damages under the theory of quantum meruit, to the extent that Sea Star's use of Emerald's equipment occurred during any period not covered by the written lease agreement. Thus, Emerald contends that its quantum meruit claim is properly pled in the alternative to its contract claim.

Sea Star contends that dismissal of Emerald's quantum meruit claim is warranted. Sea Star contends that Count II is not properly pled in the alternative to Count I, because it expressly "incorporates" the paragraphs of Count I, "as fully as if set forth herein in their entirety." D.I. 53, Counterclaim at ¶ 22. Sea Star further contends that quantum meruit does not apply for matters covered by a written contract, and Emerald has failed to allege any time period for which the Equipment Rental Agreement would not have applied.

Under Maryland law, quantum meruit is not available "when there is an express contract dealing specifically with the services rendered." *See e.g., First Nat'l Bank v. Burton, Parsons & Co.,* 470 A.2d 822, 829 (Md.Ct.Spec.App.1984). Emerald contends that an action for quantum meruit may appropriately lie if Sea Star contends that it is not liable to Emerald for compensation under the written agreement. However, Maryland courts have rejected the use of quantum meruit in such circumstances. As the Court in *Mass Transit Admin. v. Granite Constr. Co.,* 471 A.2d 1121, 1126 (Md.Ct.Spec.App.1984) stated:

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. *Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their*

Sea Star Line, LLC v. Emerald Equipment Leasing, Inc., Not Reported in F.Supp.2d (2006)
2006 WL 214206

*expectations. In desperation, they turn
to quasi-contract for recovery. This the
law will not allow.*

(emphasis added).

In this case, Emerald has pled the existence of a written contract governing its claims, and the contract contains an integration clause. *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.,* 747 A.2d 600, 607–608 (Md.2000); *see also Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611, 620 (Del. Ch.2005) (recognizing that dismissal of quantum meruit claim is appropriate where it is clear from face of complaint that written contract exists and controls). Accordingly, the Court will dismiss Count II of the Complaint alleging recovery under the theory of quantum meruit.

### C. Emerald's Counterclaim For Turnover

**\*7** In Count III of its Counterclaim, Emerald alleges a claim for turnover pursuant to 11 U.S.C. § 342. In its briefing, Emerald alleges that its reference to Section 342 is a typographical error, and that the appropriate reference should be to 11 U.S.C. § 542. Emerald contends that Section 542 permits it to seek the return of the equipment or the value of the equipment, and therefore, it has appropriately alleged a claim for turnover.

Sea Star contends that dismissal of Count III is warranted, because Count III alleging turnover is essentially a rephrasing of Count I's breach of contract allegations. Specifically, Sea Star contends that Emerald does not demand turnover of the equipment, but only "damages equaling unpaid rent, and the value of the equipment together with interest and costs of suit."

In its Counterclaim, Emerald does not specify under which paragraph of Section 542 it is seeking relief. However, in its briefing it asserts Section 542(a). It appears to the Court, that two paragraphs of Section 542 may be applicable, paragraph (a) and paragraph (b). In full, 11 U.S.C. § 542(a) and (b) provides:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title,

shall deliver to the trustee, and account for, such property *or the value of such property,* unless such property is of inconsequential value or benefit to the estate.

(b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debts to, or on the order of the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

(emphasis added).

To the extent Emerald seeks rent in its claim for turnover, the Court concludes that Emerald fails to state a claim for turnover. Under Section 542(b), turnover is required for amounts that are "matured, payable on demand, or payable on order." Active disputes over the amount owed take an action outside the realm of a turnover action. *See J.T. Moran Fin. Corp. v. American Consol. Fin. Corp.,* 124 B.R. 931, 938 (S.D.N.Y.1991) ("Where as here, the court must resolve whether or not the debt claimed is due, the action to collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction of the bankruptcy court."); *In re Teligent, Inc.,* 325 B.R. 134, 137–138 (Bankr.S .D.N.Y.2005) (recognizing that turnover provisions cannot be used to liquidate contract disputes or demand assets whose title is in dispute and collecting cases). Rather, the action is simply a claim for breach of contract. *In re National Audit Defense Network,* 332 B.R. 896 (Bankr.D.Nev.2005) ("Settled and controlling law holds that the presence of an active dispute over the amount owed takes the action out of the turnover area; one cannot shortcut a breach of contract action with a turnover demand."). In this case, it appears to the Court that the rental amount is in dispute, and therefore, the Court concludes that a turnover action is not properly sustained as to the rental amounts.

**\*8** However, Emerald also alleges that Sea Star has failed to return numerous chassis, gen sets and containers under the Equipment Rental Agreement. The Equipment Rental Agreement does not give Sea Star any title, ownership or property rights in this equipment, and pursuant to paragraph 10 of the Equipment Rental Agreement, Sea Star is required to redeliver the equipment to certain locations identified in the contract or agreed to by the parties. The Court understands Sea Star to base its motion to dismiss this claim on the sole fact that Emerald seeks the value of the Equipment rather than the return of the Equipment itself.

2006 WL 214206

However, the Equipment Rental Agreement provides that if the equipment is not returned within 60 days, Emerald may elect to treat the Equipment at a loss and seek the value of the equipment, together with all accrued rental charges. Further, it appears that Section 542(a) permits Sea Star to seek the value of the equipment, and not just the return of the equipment, in a turnover action. In light of the express language of both the applicable contract and Section 542(a), Sea Star has not explained why dismissal of this Count is warranted. Accordingly, the Court concludes at this juncture, that Emerald has pled a claim for turnover to the extent that it seeks the value of certain property belonging to Emerald which Sea Star is alleged to have failed to return.

D. *Emerald's Counterclaim For An Accounting*

In Count IV of its Counterclaim, Emerald seeks an accounting of all Sea Star's usage of Emerald's equipment. Emerald contends that an accounting is a proper remedy regardless of whether this action is an action at law or equity, because the accounts are complex and Sea Star had a fiduciary relationship with Emerald as a result of Sea Star's obligation to produce self-billing reports.

Sea Star seeks dismissal of this claim contending that the equitable relief of an accounting is not appropriate because there is an adequate remedy at law for Emerald, namely the recovery of money damages. Because Emerald's counterclaim seeks damages for breach of contract, and such damages are an adequate remedy at law, Sea Star contends that the Court lacks equity jurisdiction to award an accounting.

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is ... the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478 (1962). Whether equitable jurisdiction should be exercised is a decision committed to the sound discretion of the Court. 1 Am.Jur.2d, Accounts and Accounting § 54 (1994 & Supp.2002).

Actions for an accounting are not available when the amount in question is readily ascertainable; however, such an action may be maintained when the facts create a reasonable doubt as to whether an adequate remedy at law may be obtained. *Id.* Equitable jurisdiction for an accounting is typically invoked in three circumstances: "(1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts, or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery." *Id.* An action for

accounting may also be appropriate when there are allegations of fraud. *Id.*

**\*9** At this juncture, Emerald has alleged that Sea Star had an obligation to produce self-billing reports which created an independent fiduciary relationship. Emerald has also alleged that Sea Star has used over 5,000 pieces of Emerald equipment and that the information regarding Sea Star's use of this equipment is only within the knowledge of Sea Star. Given the complexities alleged by Emerald as a result of Sea Star's self-billing, the apparent need for discovery, and the allegations of fraud and a fiduciary relationship, all of which must be taken as true at this juncture, the Court declines to dismiss Emerald's claim for an accounting.

II. Whether Emerald's Counterclaims Based On Tort Law State A Claim Upon Which Relief May Be Granted

In Counts V through VIII of its Counterclaim, Emerald alleges fraud (Count V),[4] constructive fraud (Count VI), fraudulent concealment (Count VII), and negligent misrepresentation/breach of fiduciary duty (Count VIII). Sea Star contends that these claims should be dismissed, because Emerald's tort claims do not exist independently, but instead are woven into the contract. Sea Star contends that the economic loss doctrine prohibits Emerald from recovering in tort, because its economic losses flow only from Sea Star's alleged breaches of a contract. Sea Star also contends that, even if Emerald's tort claims withstand dismissal under the economic loss doctrine, the allegations of fraud are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and therefore, dismissal of Emerald's tort claims is warranted.

[4]       The Counterclaim refers to the fraud count as Count IV, but this appears to be an error. Given the sequence of the other counts asserted, the fraud count should be labeled Count V.

In response, Emerald contends that the Equipment Rental Agreement is silent as to Sea Star's obligations to create self-billing reports. Emerald further contends that it was not notified when Sea Star began using a piece of Emerald Equipment and no receipt or document was required to be executed in order for Sea Star to begin using that equipment. Because Emerald was relying on Sea Star's honesty to report its usage of equipment, Emerald contends that the circumstances were rife with the opportunity for fraud. Emerald contends that Sea Star took advantage of this self-billing to under-report its usage of Emerald's equipment.

Sea Star Line, LLC v. Emerald Equipment Leasing, Inc., Not Reported in F.Supp.2d (2006)

2006 WL 214206

Emerald also contends that this self-billing arrangement resulted in a fiduciary relationship between the parties created based on the "relationship of inequality" between the parties. Specifically, Emerald contends that it placed particular reliance and confidence in Sea Star to report its usage accurately.

As for Sea Star's arguments under Rule 9(b), Emerald contends that its counterclaim is properly pled. However, Emerald contends that, to the extent the Court concludes that further particularity is required, Emerald should have the opportunity to amend its Counterclaim.[5]

[5]    As a threshold matter, the parties have not specifically alleged which state's substantive law applies to Emerald's tort claims. Sea Star alleges that the claims are non-maritime, and therefore, Delaware's conflict of law rules apply to determine which state's substantive law applies. Although Sea Star identifies the "most significant relationship test" as the appropriate test, it is unclear which state Sea Star alleges has the most significant relationship to the occurrences and the parties. In a footnote, Emerald alleges that federal common law should apply, because courts sitting in admiralty strive for uniformity. In the alternative, Emerald identifies Delaware choice of law rules and contends that the law of the place of injury would apply, because this is a diversity action. However, it is also unclear which state Emerald alleges as the specific place of injury.

In the Court's view, the choice of law issue is not sufficiently briefed for the Court to make a final decision as to which law applies to the tort claims in this case. The parties cite case law from Florida, Virginia, Iowa, Georgia, Delaware and New Jersey. Accordingly, at this juncture, the Court will work within the confines of the law that has been presented in the briefing to make a determination as to whether Emerald's claims can withstand a motion to dismiss.

A. *Whether Emerald Has Pled Torts Existing Independently From The Contract*
Stated generally, the economic loss doctrine prohibits a party from recovering in tort economic losses, the entitlement of which, flows only from a contract. *Werwinski v. Ford Motor Company,* 286 F.3d 661, 671 (3d Cir.2002) (predicting how the Pennsylvania Supreme Court would rule on the viability

of the economic loss doctrine). It appears to the Court that the formulation of the economic loss doctrine varies depending on which state law applies. For example, under Delaware law, the economic loss doctrine " 'prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature." ' *Pinkert v. Olivieri,* 2001 WL 641737, *5 n. 6 (D.Del. May 24, 2001) (quoting *Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992)). However, Delaware courts have also recognized that "where an action is based entirely on a breach of the terms of a contract between the parties and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." *Id.* at *5 (dismissing fraud claims where plaintiff alleged that defendants knowingly misrepresented the nature of their work each time they submitted an application and certification for payment where duty to submit these periodic payment applications existed solely by reason of construction contract and defendant had not violated any common law duty independent of the construction contract).

**\*10** Exceptions to the economic loss doctrine have also been recognized where the claim arises independently from the contract. *See e.g., HTP, Ltd. v. Lineas Aereas Constarricenses, S.A.,* 685 So.2d 1238, 1239 (Fla.1996). Further, in the case of allegations of fraud resulting from circumstances involving self-billing type reports, courts in other jurisdictions have permitted such claims to proceed in tort. *See e.g., Insteel Indus., Inc. v. Costanza Contracting Co., Inc.,* 276 F.Supp.2d 479, 484–486 (E.D.Va.2003) (allowing claim based on false invoices to proceed in tort as a fraud claim where duty to submit invoice stemmed from contract, but contract did not require sworn and truthful statements in the invoices); *F/V Robins Nest, Inc. v. Atlantic Marine Diesel, Inc.,* 1994 WL 594592, *10 (D.N.J. Oct. 24, 1994) (allowing fraud claim to proceed where vessel owner had to rely on integrity of shipyard to honestly report parts and labor used and work actually performed, contract had no specific price term, and shipyard had wide latitude in carrying out repairs).

Reviewing the circumstances alleged in this case in light of the case law cited by the parties, the Court concludes that dismissal of Emerald's fraud claims is not appropriate at this juncture. As Emerald points out, the Equipment Rental Agreement makes no provisions for self-billing. Rather, under the Equipment Rental Agreement, the lease term begins on the date when the equipment is delivered to the Lessee and ends when the equipment is returned pursuant to section

2006 WL 214206

10. Emerald has alleged, however, that the equipment was already in place at the time Sea Star purchased the assets of NPR, Inc. Emerald has further alleged that Sea Star's usage was determined by self-billing and that Emerald relied on Sea Star to accurately report its usage. Emerald has also alleged that Sea Star intentionally under-reported its usage of Emerald's equipment. At this juncture, the Court concludes that Emerald has pled sufficient facts to establish distinct torts arising independently of the contractual obligations such that the claims are not definitively barred by the economic loss doctrine. Accordingly, the Court will deny Sea Star's Motion To Dismiss Emerald's tort claims on this ground.

B. *Whether Emerald Has Satisfied The Pleading Requirements Under Rule 9(b)*

Sea Star contends that Emerald has failed to plead its fraud charges with particularity as required by Rule 9(b). With respect to the self-billing allegations which form the basis of its fraud claim, Emerald has pled that (1) in order to ascertain rental payments due for equipment, Sea Star provided Emerald with monthly self-billing reports; and (2) "upon later investigation, Emerald discovered that the 'self-billing reports' prepared by Sea Star were grossly understated, failing, *inter alia,* to account for numerous pieces of Emerald Equipment which Sea Star has been using without paying rental charges to Emerald and failing to pay the appropriate amounts for usage of equipment contained in the 'self-billing reports.' " D.I. 53, Counterclaim at ¶ 14, 15. Emerald has not pled any specific dates of the alleged fraud and to the extent Emerald is aware from the further investigation it

alleges it conducted in its Counterclaim, Emerald has not disclosed which invoices were defective or which pieces of equipment were implicated. In these circumstances, the Court concludes that additional facts are required to establish the pleading requirements of Rule 9(b), if those facts are within Emerald's knowledge. To the extent that some or all of this information is within Sea Star's exclusive control, Emerald should reflect that allegation in any amended pleadings it submits. Accordingly, the Court will dismiss Emerald's fraud claims, Counts V through VIII, with leave to amend to more particularly state the allegations relevant to Emerald's fraud claims.

CONCLUSION

**\*11** For the reasons discussed, Emerald's Motion To Dismiss will be granted as it pertains to (1) Count I, to the extent Count I alleges a breach of the E–Mail Agreement, (2) Count II alleging quantum meruit, (3) Count III alleging turnover to the extent that rent is sought, and (4) Counts V through VIII alleging tort claims for failure to satisfy the pleading requirements under Rule 9(b). In all other respects, the Motion To Dismiss will be denied. Emerald will be granted leave to file an Amended Counterclaim.

An appropriate Order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 214206

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

Reversed by  In re Blue Earth, Inc.,   9th Cir.,   December 21, 2020

2019 WL 4929933
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States Bankruptcy Appellate
Panel of the Ninth Circuit.

IN RE: BLUE EARTH, INC., Debtor.
Bradley D. Sharp, Chapter 11
Liquidation Trustee, Appellant,
v.
Intracoastal Capital, LLC; Anson
Investments Master Fund LLP, Appellees.

BAP No. NC-18-1232-BSTa
|
Bk. No. 3:16-bk-30296-DM
|
Adv. No. 3:17-ap-03063-DM
|
Argued and Submitted on June
20, 2019 at Sacramento, California
|
Filed – October 2, 2019

Appeal from the United States Bankruptcy Court for the Northern District of California, Honorable Dennis Montali, Bankruptcy Judge, Presiding

**Attorneys and Law Firms**

Howard Troy Romero of Romero Park P.S. argued for appellant Bradley D. Sharp, Chapter 11 Liquidation Trustee;

Michael Benz of Chapman and Cutler LLP argued for Appellee Anson Investments Master Fund, LLP;

Scott Mendeloff of Greenberg Traurig, LLP argued for Appellee Intracoastal Capital, LLC.

Before: BRAND, SPRAKER and TAYLOR, Bankruptcy Judges.

**MEMORANDUM** [*]

[*]     This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, see Fed. R. App. P. 32.1, it has no precedential value, see 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

**\*1** Bradley D. Sharp appeals (1) an order granting appellees' motions to dismiss his first amended complaint to avoid and recover alleged constructive fraudulent transfers [1] to appellees, and (2) an order denying reconsideration of that decision. Although we agree that Sharp's first amended complaint failed to plead plausible claims against appellees, we believe that the bankruptcy court should have granted him leave to amend. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND.

[1]     Sharp also alleged claims for actual fraudulent transfer, which the bankruptcy court also dismissed. He does not appeal that ruling.

**I. FACTUAL BACKGROUND
AND PROCEDURAL HISTORY**

**A. Background of the parties and the alleged fraudulent transfers**

Blue Earth, Inc. ("BEI") was a provider of alternative and renewable energy solutions for small and medium-sized commercial facilities. BEI filed a chapter 11 [2] bankruptcy case on March 21, 2016. Sharp ("Trustee") is the trustee of the litigation trust that was established to investigate and prosecute causes of action for the benefit of the litigation trust beneficiaries.

[2]     Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

The following facts are as alleged by Trustee. During an expansion period for BEI, the company was in constant need of cash infusions to fund its operations and the operations of its subsidiaries until the entities could develop projects and become profitable. BEI raised the necessary capital through a combination of equity sales and loans. By October

In re Blue Earth, Inc., Slip Copy (2019)
2019 WL 4929933

2015, BEI's financial outlook was bleak. The company was borrowing funds from its officers and directors to meet basic obligations, such as payroll.

To raise capital to avoid a default on a secured loan that could have precipitated BEI's bankruptcy, BEI turned to one of its shareholders, Intracoastal Capital, LLC ("Intracoastal"), and a new investor, Anson Investments Master Fund, LLP ("Anson"). On October 16, 2015, BEI entered into Securities Purchase Agreements with Intracoastal and Anson (the "SPAs"). In exchange for $2,000,000 from each investor, each investor would receive 4,000,000 shares of BEI common stock, 6-month warrants to purchase an additional 4,000,000 common stock shares for $0.50 per share, and five-and-a-half year warrants to purchase an additional 4,000,000 common stock shares for $0.83 per share. Intracoastal's and Anson's respective $2,000,000 investments closed on October 20, 2015.

Just days after the SPAs closed, BEI, Intracoastal and Anson agreed to undo the transactions. On October 27, 2015, Intracoastal and Anson each executed an "Exchange Agreement" with BEI, which effectively reversed the SPAs. In exchange for the return of the 4,000,000 shares and warrants Intracoastal received, BEI paid Intracoastal $2,000,000, plus an additional $200,000, $10,000 in legal fees, and a five-year warrant to purchase 1,500,000 shares at $0.55 per share. In exchange for the return of the shares (less a small amount it had already sold) and warrants Anson received, BEI paid Anson $2,003,419, plus a five-year warrant to purchase 1,500,000 shares at $0.55 per share. These "Exchange Agreement" transfers are the basis of Trustee's claims against Intracoastal and Anson.

*2  By the time of the Exchange Agreements, BEI had already spent the $4,000,000 it raised through the SPAs on existing debts. Thus, to finance the stock repurchase, BEI had to borrow $4,900,000 from Jackson Investment Group, LLC ("JIG"), one of BEI's largest shareholders and a senior lender. The loan was evidenced by a 9% Senior Secured Note due in two months on December 23, 2015. BEI filed for bankruptcy five months after the Exchange Agreements.

**B. Trustee's original complaint and the motions to dismiss**

In his original complaint against Intracoastal and Anson (together, "Defendants"), Trustee alleged that the Exchange Agreements constituted constructive fraudulent transfers under § 548(a)(1)(B). He sought to avoid the transfers and

recover $2,210,000 from Intracoastal and $2,003,419 from Anson, the amounts Defendants received from BEI under the Exchange Agreements, plus pre- and post-judgment interest.

Defendants moved to dismiss Trustee's original complaint, arguing that Trustee's insolvency allegations were conclusory and contradicted public information and BEI's own statements concerning its solvency at the time of the Exchange Agreements. Specifically, BEI had represented in the Exchange Agreements that it was financially healthy, and BEI's Form 10-Q dated September 30, 2015, just weeks before the Exchange Agreements, reflected that BEI had nearly $80,000,000 in assets over liabilities (e.g., assets of nearly $100,000,000 versus liabilities of just over $21,000,000). Lastly, Defendants argued that Trustee conceded BEI was solvent at the time, because he alleged that BEI was able to secure a loan from JIG for the purpose of funding the transfers.

In opposition, Trustee argued that even if he could not establish insolvency under § 548(a)(1)(B)(ii)(I), he could still prevail on his claim if BEI was (a) engaged in business or a transaction for which any property remaining with it was unreasonably small, or (b) if BEI intended to incur or believed that it would incur debts beyond its ability to pay as they matured. § 548(a)(1)(B)(ii)(II), (III). Trustee requested leave to amend the complaint if additional facts were necessary.

The bankruptcy court held two hearings on the motions to dismiss the original complaint. At the first hearing, the court indicated that Trustee had sufficiently pled BEI's insolvency. By the second hearing, the court had reconsidered and told him that ¶¶ 41-43 of the complaint were insufficient for pleading the three alternative grounds for establishing insolvency under § 548(a)(1)(B)(ii)(I)-(III); they simply parroted the statutory language. Ultimately, the court granted the motions to dismiss with leave to amend:

> THE COURT: Mr. Powell, I'm going to stick with that [ruling]. I think with my thinking that insolvent, do you mean balance sheet insolvent? Do you mean cash flow insolvency? You know, were they -- were their revenues such that they couldn't pay their debts as they become due and, again, just state it. You can't just restate the definition. I do think for you to file the complaint

and state that BEI was insolvent, you
have to have some basis, and I don't
think it's a high bar here.....

Hr'g Tr. (Mar. 26, 2018) 8:1-9.

## C. Trustee's first amended complaint and the motions to dismiss

Trustee then filed his first amended complaint ("FAC"). To bolster his allegation that BEI was insolvent at the time of the Exchange Agreements, Trustee added the following:

¶ 38. At the time of the Transfers, BEI suffered from unmanageable indebtedness. But for the funds it received pursuant to the October 16 SPAs, it would have defaulted on a secured loan that would have necessitated it immediately filing for bankruptcy protection;

**\*3** ¶ 39. BEI did not have sufficient funds to continue developing its works in progress. Such projects were needed to finally generate income streams for the company;

¶ 40. On October 15, the day before the SPAs were finalized, BEI had a monthly 'burn rate' of $900,000, an amount that had to be raised monthly to meet its debts. This was a 50% increase in the 'burn rate' since September;

¶ 42. As a result of the Transfers, BEI was left without meaningful cash reserves to pay its debts as they became due, and the Exchange Agreements ultimately contributed significantly to BEI declaring bankruptcy;

¶ 43. Apart from being cash-flow insolvent, BEI was also balance sheet insolvent at the time of the Transfers or became insolvent as a result thereof. Despite the company's disclosures during the relevant timeframe, its financial statements contained various accounting errors that resulted in a grossly overstated value of the company's assets. For example, BEI accounted for non-binding letters of intent on unfunded renewable energy projects as assets worth millions of dollars;

¶ 44. BEI proceeded with the Exchange Agreements with knowledge of the company's serious financial problems and of the prejudice to creditors caused by trading $4 million in cash for over $5 million in debt;

¶ 53. As noted above, BEI was insolvent at the time of the Transfers or became insolvent as a result thereof. It no

longer had the ability to pay debts as they came due and the value of its liabilities exceeded its actual assets;

¶ 54. The Transfers also left BEI with an unreasonably small amount of capital with which to engage in its business. It had to turn to its existing shareholders and creditors for funds to keep the company on life support. After a few unsuccessful months without capital needed to engage in business BEI filed for bankruptcy;

¶ 55. At the time of the Transfers, BEI was engaged in business or was about to engage in business for which any property remaining with BEI was an unreasonably small amount of capital. Indeed, one of its primary investment models was to fund capital-intensive renewable energy systems. Such projects required significant sources of construction and project financing, and BEI had an unreasonably small amount of property to engage in its business;

¶ 56. At the time of the Transfers, BEI intended to incur, or believed it would incur, debts that would be beyond BEI's ability to pay as such debts matured. After all, it transferred nearly all its cash assets to Anson and Intracoastal pursuant to the Exchange Agreements while knowing that it would continue incurring debts in operation of its business that would [be] beyond its ability to pay.

Defendants moved to dismiss the FAC, arguing that it too failed to state plausible constructive fraudulent transfer claims. Defendants argued that Trustee's allegations of BEI's cash-poor condition were conclusory and did not differentiate BEI's circumstances and cash position at the time of the Exchange Agreements from any other point in time in its existence. Further, they argued that the FAC contained no facts to support the allegation that BEI had no access to cash at the time of the Exchange Agreements. To the contrary, Defendants maintained that BEI's ability to obtain cash was demonstrated by a subsequent loan from JIG in December 2015 — BEI obtained $2,000,000 in additional financing, got an extension on the $4,900,000 million loan to repurchase the stock from Defendants, and paid JIG a 3% transaction fee. BEI also continued to make timely interest payments on the JIG loans until late February 2016.

**\*4** Next, Defendants argued that the FAC was silent as to BEI's assets and liabilities; there was no factual allegation that BEI's liabilities exceeded its assets or any allegation as to BEI's assets other than cash. In addition, Trustee failed to allege any facts to support his conclusory allegation that BEI's

financial statements contained "accounting errors" which inflated the value of its assets; he cited vaguely to only the alleged improper inclusion of non-binding letters of intent involving "millions of dollars" among the company's assets. Defendants opposed any further leave to amend.

In opposition, Trustee maintained that he had sufficiently pleaded insolvency, which he argued the court said was a "low bar" for pleading purposes. Trustee argued that BEI was both balance sheet and cash flow insolvent at the time of the transfers. He further argued that BEI's access to credit after executing the Exchange Agreements was a factual determination that could not be made on a Civil Rule 12(b)(6) motion. Trustee requested leave to amend should the court determine that any additional factual allegations were required.

The bankruptcy court orally granted the motions to dismiss. The court opined that Trustee's allegation of "accounting errors" that resulted in an alleged overstatement of assets was insufficient for pleading "balance sheet insolvency". It also found that Trustee failed to plead "cash flow insolvency" because the FAC conceded the point; he acknowledged that BEI remained in business for several months after the Exchange Agreements. The court denied leave to amend on futility grounds.

**D. Trustee's motion to reconsider**
Trustee moved to alter or amend the orders dismissing the FAC ("Motion to Reconsider"). He argued that the bankruptcy court erred by improperly inferring that BEI was not or could not have been insolvent at the time of the Exchange Agreements based on public filings and that BEI did not file for bankruptcy until a few months after the Exchange Agreements.

Trustee argued that the court also erred by determining that the FAC failed to state a plausible claim for balance sheet insolvency under § 548(a)(1)(B)(ii)(I). However, even if it did, Trustee argued that it was error to dismiss his claim under the alternative grounds for insolvency in subparts (II) and (III) without determining if he stated a plausible claim. Trustee argued that the FAC's allegations regarding BEI's struggles to pay its debt, lack of funding to continue developing works in progress, lack of income streams, and generally dire financial situation around the time of the Exchange Agreements were sufficient to plausibly show it engaged in a business for which any of its remaining property was an unreasonably small

amount of capital, and that it intended to incur or believed it would incur debts beyond its ability to repay.

Lastly, Trustee argued that dismissing the FAC without leave to amend was a manifest error of law and amounted to a finding that BEI was solvent. If given the opportunity to amend, Trustee contended that he could "plead a long list of additional allegations in support of the claim," such as: "specific facts regarding BEI's balance sheet insolvency (e.g., financial data) and lack of access to capital; more specific allegations regarding its _actual_ existing assets; and more specific allegations regarding BEI's overstatement of the company's value on its disclosures due to accounting errors and likely fraudulent filings, the facts of which are still being investigated."

In opposition, Defendants argued that the court properly concluded that the self-contradictory allegations in the FAC foreclosed a plausible theory of insolvency on a cash flow basis, and that the FAC contained too few factual allegations to support the conclusory assertion that BEI was balance sheet insolvent.

**\*5** After a hearing, the bankruptcy court entered an order denying the Motion to Reconsider. Because Trustee had not explained to the court why the FAC did not reference the sham balance sheet and sham audit he was now asserting, it concluded that "no matter how one approaches it," Trustee's allegations of insolvency were "simply not plausible." The court opined that to grant yet another amendment of the complaint would unfairly burden Defendants who twice had to challenge the sufficiency of the complaints. This timely appeal followed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err when it granted Defendants' motions to dismiss the FAC?

2. Did the bankruptcy court abuse its discretion when it denied Trustee leave to amend?

3. Did the bankruptcy court abuse its discretion in denying the Motion to Reconsider?

## IV. STANDARDS OF REVIEW

We review de novo the bankruptcy court's dismissal for failure to state a claim under Civil Rule 12(b)(6), and we review the denial of leave to amend a complaint for abuse of discretion. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017).

Denial of a motion to amend or alter judgment under Civil Rule 59(e) is reviewed for an abuse of discretion. *Dixon v. Wallowa Cty.*, 336 F.3d 1013, 1022 (9th Cir. 2003). A bankruptcy court abuses its discretion if it applies the wrong legal standard, or misapplies the correct legal standard, or if its factual findings are clearly erroneous. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 (9th Cir. 2009) (en banc)).

## V. DISCUSSION

### A. Civil Rules 8 and 12

Civil Rule 8(a) (applicable here by Rule 7008) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim ... is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

A motion to dismiss for failure to state a claim under Civil Rule 12(b)(6) (applicable here by Rule 7012) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Although we must accept as true all well-pleaded facts, we do not need to accept as true conclusory statements, statements of law, and unwarranted inferences cast as factual allegations. *Twombly*, 550 U.S. at 555-57; *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986) (a court need not assume the truth of legal conclusions cast in the form of factual allegations). While Civil Rule 8(a) does not require detailed factual allegations, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, it is inappropriate to assume that the plaintiff can prove facts that it has not alleged or that the defendants have violated the laws in ways that have not been alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 526 (1983).

### B. The bankruptcy court did not err in granting the motions to dismiss the FAC.

#### 1. Section 548 and insolvency

**\*6** To plead plausible constructive fraudulent transfers claims against Defendants, Trustee had to allege facts to support the following four elements: (1) a transfer of BEI's interest in property; (2) the transfer was made or incurred within two years before the date of the bankruptcy petition; (3) BEI received less than reasonably equivalent value in exchange for the transfer; and (4) one of three alternatives:

(I) that BEI was insolvent on the date the transfer was made or became insolvent as a result of the transfer;

(ii) that BEI was engaged in business for which any property remaining was an unreasonably small capital; or

(iii) that BEI intended to incur or believed it would incur debts beyond its ability to pay as such debts matured.

§ 548(a)(1)(B)(i)(ii)(I)-(III). The bankruptcy court dismissed the FAC on the grounds that Trustee failed to plausibly allege insolvency.

#### a. Balance Sheet Test

A debtor is insolvent when its debts exceed its assets — the "traditional bankruptcy balance sheet test." *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir. 1989). This test is codified at § 101(32)(A), which defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation[.]" Thus, for purposes of § 548(a)(1)(B)(ii)

2019 WL 4929933

(I), insolvency is determined using a "balance sheet test." *In re Koubourlis*, 869 F.2d at 1321. A trustee's constructively-fraudulent transfer complaint must contain enough factual information to plausibly show the debtor's liabilities exceeded assets at the time of the transfers. *Spradlin v. Monday Coal, LLC (In re Licking River Mining, LLC)*, 571 B.R. 241, 244 (Bankr. E.D. Ky. 2017).

Trustee contends that he pleaded sufficient facts in the FAC to establish BEI's balance sheet insolvency, and that the bankruptcy court should have accepted these allegations as true, drawn all inferences in his favor, and denied the motions to dismiss. Instead, he argues, the court found that it was implausible that BEI was insolvent even with knowledge of fabricated financial statements. By denying leave to amend, argues Trustee, the court ruled as a matter of law that BEI could not plausibly have been insolvent at the time of the Exchange Agreements regardless of what additional facts he could plead regarding the fraudulent financials.

Contrary to Trustee's contention, the bankruptcy court did not "find" that BEI was solvent despite the alleged fabricated financial statements; the court simply determined that the FAC failed to make a plausible case for balance sheet insolvency. In reviewing the relevant paragraphs in the FAC, the first sentence of ¶ 43 and all of ¶ 53 are either recitations of the statutory elements under § 548(a)(1)(B)(ii)(I) or conclusory statements regarding BEI's insolvency that the Supreme Court has instructed "will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). While the remaining portion of ¶ 43 is more specific, the FAC did not identify which non-binding letters of intent on which energy projects were overstated in BEI's September 30, 2015 Form 10-Q (balance sheet), or the amount of the alleged overstatement. We see no error here. The FAC failed to articulate **any** amounts for BEI's assets and liabilities or allege that the overstated assets caused BEI's liabilities to exceed its assets. *See Harlan Cty. Mining, LLC v. Wrigley's 7–711, Inc. (In re Licking River Mining, LLC)*, 572 B.R. 830, 844 (Bankr. E.D. Ky. 2017) (while complaint alleged financial difficulties and identified prepetition debts, it failed to "comparably allege the value of Debtors' assets to demonstrate Debtors' insolvency.").

### b. Adequate Capital Test

**\*7** Under this test, also known as the "unreasonably small capital" test, Trustee had to plead facts supporting the allegation that at the time of the transfers BEI was engaged in or about to engage in business that would leave it with an unreasonably small capital. § 548(a)(1)(B)(ii)(II). This test denotes a financial condition short of equitable or "cash flow" insolvency. *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992); *AWTR Liquidation Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 312-13 (Bankr. C.D. Cal. 2016); *Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*,126 B.R. 370, 407 (Bankr. D. Mass. 1991) (unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually). It is "aimed at transferees that leave the transferor technically solvent but doomed to fail." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody*, 971 F.2d at 1070 & n.22).

In determining unreasonably small capital, courts generally examine cash flow to determine whether it was "reasonably foreseeable" that the transfer at issue would lead to the debtor's "inability to generate enough cash flow to sustain operations." *Moody*, 971 F.2d at 1070; 5 COLLIER ON BANKRUPTCY ¶ 548.05[3][b] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2012) (plaintiff must show debtor's inability to generate enough cash to sustain operations). In a business setting, the aggregate amount of capital "should include ... all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Moody*, 971 F.2d at 1072 n.24 (quoting Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L. Rev. 469, 496 (1988) (citing cases)).

Before the bankruptcy court, Trustee equated cash flow insolvency with a showing under both subparts (II) and (III) of § 548(a)(1)(B)(ii). He did the same in his opening brief on appeal. In his reply, Trustee argues that the bankruptcy court considered only subpart (I) in its ruling. [3] Trustee's argument is confusing, but he appears to argue that the court failed to consider all his allegations supporting a claim under subparts (II) and (III) before dismissing the FAC. The court's finding that the FAC failed to establish cash flow insolvency appears to be directed at both subparts (II) and (III), although this is not entirely clear; the court said nothing about unreasonably small capital. While this confusion may

be a basis for granting leave to amend, we conclude that the FAC did not adequately plead that the Exchange Agreements left BEI with an unreasonably small capital.

3 This is part of the reason why Intracoastal filed a motion to strike Trustee's reply brief and alternatively requested leave to file a sur-reply. We DENY the motion to strike and GRANT leave to file the sur-reply.

Trustee alleged ¶¶ 39, 54, and 55 to establish unreasonably small capital. However, he also alleged:

> ¶ 18. Nevertheless, BEI found two investors to provide the desperately needed cash influx to keep the company afloat for the immediate future;

> ***8** ¶ 29. Therefore, in order to finance BEI's repurchase of its BBLU shares and other securities under the Exchange Agreements, BEI had to borrow $4.9 million from [JIG], one of BEI's largest shareholders and a senior lender.

The bankruptcy court considered that BEI was able to obtain cash after the Exchange Agreements by infusions from its officers and by financing from JIG. Trustee argues that it was improper for the court to "speculate" about JIG's "hypothetical" willingness to continue to loan BEI money and that BEI allegedly made some interest payments to JIG for some of its existing debts. The bankruptcy court never said that it considered in its ruling BEI's interest payments made to JIG on the $4,900,000 million loan which funded the Exchange Agreements. What it did rely on, however, and rightfully so, was Trustee's contradictory statements in the FAC that, after the Exchange Agreements, BEI was able "to turn to its existing shareholders and creditors for funds to keep the company on life support." Thus, the court did not need to speculate about JIG's willingness to loan BEI funds after the Exchange Agreements or consider any extrinsic evidence as Trustee contends it did; the FAC admitted that BEI had access to capital as of, and after, October 27, 2015.[4]

4 While the court could consider Trustee's contradictory allegations in dismissing the FAC, we note that the October 2015 loan was a short term loan from JIG —one of BEI's largest shareholders and senior lender. One can imagine a scenario where it is possible that the loan was not indicative of BEI's ability to obtain funds to remain in business. However, it is just that, a possibility, and that is not the pleading standard. Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

BEI's ability to obtain cash through either cash infusions from officers or by loans from creditors were allegations that the court could consider. *Moody*, 971 F.2d at 1072 n.24 (capital includes new equity infusions and cash from secured loans). "The ability to borrow money has considerable value in the commercial world." *Id.* at 1072-73. And, contrary to Trustee's argument, the court could also consider the allegation that BEI remained in business for five months after the Exchange Agreements. "Generally, 'courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction[.]'" *Burtch v. Opus LLC (In re Opus East LLC)*, 698 F. App'x. 711, 715 (3d Cir. 2017) (quoting *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002)) (citing *Moody*, 971 F.2d at 1074) (no unreasonably small capital where creditors were paid for twelve months after transaction); *In re Operations NY LLC*, 490 B.R. at 98 (dismissing claims for inadequate capital insolvency where transferor had assets and continued operations for ten months after the challenged transactions); *MFS/Sun Life Tr.–High*, 910 F. Supp. at 944 (company was viable for eight months after LBO); *Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.)*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988) (creditors paid for ten months); *Credit Managers Ass'n of S. Cal. v. Fed. Co.*, 629 F. Supp. 175, 184 (C.D. Cal. 1985) (twelve months).

***9** In addition, the FAC failed to allege anything about BEI's financial projections at the time of the transfers or allege that they were unreasonable. Central to a determination of whether a transaction leaves a company with unreasonably small capital is "whether the parties' projections" used in facilitating the transaction were "reasonable." *Moody*, 971 F.2d at 1073. Finally, and something the FAC actually concedes, BEI was still attracting sophisticated investors such as Defendants at the time of the transfers, which contradicts a claim of unreasonably small capital. *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55, 111 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) (in addition to looking at management's projections, courts also look to views of the sophisticated investors involved in the transaction); *Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *11 & n.19 (S.D.N.Y. Aug. 22, 2005) (finding it significant that "sophisticated investors with the most intimate knowledge of [the debtor's] business

plan and capitalization had confidence in the company's future and certainly did not think that the company was 'undercapitalized'" because it makes "no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

### c. Cash Flow Test

Under the "cash flow" or "equitable" insolvency test, Trustee had to plead facts supporting the allegation that at the time of the transfers BEI intended to incur or believed that it would incur debts beyond its ability to pay as they came due. § 548(a)(1)(B)(ii)(III). "This part of the statute protects future creditors from a debtor who transfers assets with the intent to hide them or impair the debtor's ability to pay debts as they arise or with the belief that inability to pay debts would likely result." *WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001).

This prong is satisfied "if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured." *Id.* at 415; *see EBC I., Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del. 2008), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) (same). "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." 5 COLLIER ON BANKRUPTCY at ¶ 548.05[3][c] (citing cases).

Arguably, if Trustee failed to adequately plead unreasonably small capital, then he also failed to plead cash flow/equitable insolvency. In addition to what he alleged for unreasonably small capital, Trustee alleged ¶¶ 41, 44, and 56 to establish cash flow insolvency. However, he also alleged:

¶ 15. During its expansion period, BEI was in constant need of cash infusions to fund its own operations and the operations of its subsidiaries until the entities could develop projects and become profitable;

¶ 16. BEI raised capital to fund its expansion and operations through a combination of equity sales and loans;

¶ 28. At the time the Exchange Agreements were executed, the funds gained by BEI pursuant to the October 16 SPAs had been expended in order to avoid a default on a secured debt owed by BEI that could have precipitated BEI's bankruptcy.

First, the FAC failed to allege any "facts" relating to BEI's intent to incur debt that it believed it would be unable to pay. Paragraph 56 is essentially a recitation of the statutory elements under § 548(a)(1)(B)(ii)(III). And ¶ 44 is simply incorrect, as the bankruptcy court pointed out. BEI did not "trade" $4,000,000 in cash for over $5,000,000 in debt. As Trustee also asserted in FAC, the $4,000,000 BEI raised from the SPAs had already been spent. In the Exchange Agreements, BEI took on debt to purchase equity.

**\*10** Second, the FAC's allegations regarding BEI's ability to pay its future debts is deficient for the same reason that the allegations of unreasonably small capital failed. Paragraphs 16 and 28 of the FAC concede the point that BEI was able to pay its debts as they became due with cash infusions from its officers, by selling equity to investors, and by obtaining loans from creditors.

### 2. Conclusion

Accordingly, because the FAC failed to plead plausible claims for constructive fraudulent transfer against Defendants, the bankruptcy court did not err in granting the motions to dismiss and dismissing the FAC. However, as we discuss below, the bankruptcy court abused its discretion in denying leave to amend.

### C. The bankruptcy court abused its discretion when it denied Trustee leave to amend.

Civil Rule 15(a), applicable here by Rule 7015, provides that leave to amend should be "freely" granted "when justice so requires." We consider five factors to assess whether the trial court properly granted or denied leave to amend pleadings: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended the complaint. [5] *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). The Ninth Circuit has consistently held that a trial court abuses its discretion in denying leave to amend unless the court "'determines that the pleading could not possibly be cured by the allegation of other facts,'" *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    8

Case 2:19-ap-01382-SK    Doc 282-1    Filed 09/07/21    Entered 09/07/21 11:44:24    Desc
Exhibit A -- Unpublished Cases    Page 202 of 210

In re Blue Earth, Inc., Slip Copy (2019)
2019 WL 4929933

(9th Cir. 2000) (en banc)), or "if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies," *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). An amendment is futile when it is clear that amendment would not have remedied the complaint's factual deficiencies. *See Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007).

5      Bad faith and undue delay are not at issue here.

Although the bankruptcy court expressed its reluctance to deny Trustee leave to amend given the extremely lenient standard, it ultimately concluded that amendment would be futile. It later noted in its ruling on the Motion to Reconsider that another amendment would "unfairly burden" Defendants. Assuming we even need to consider this later ruling, we interpret the court's "unfairly burden" finding as a finding of prejudice. While "the consideration of prejudice to the opposing party carries the greatest weight," *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003), not any prejudice will do; the prejudice must be "undue," *Foman v. Davis*, 371 U.S. 178, 182 (1962). The party opposing leave to amend bears the burden of establishing undue prejudice. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).

We agree with the bankruptcy court's assessment that the FAC was deficient. Nevertheless, the record suggests that, if given leave to amend, Trustee could plausibly allege that BEI's financial condition was not as represented at the time of the Exchange Agreements given the allegation of fraudulent financial statements, and that the Exchange Agreements left BEI with unreasonably small capital given the allegation that BEI had to then turn to shareholders and creditors to keep the company on life support. Amendment is especially appropriate in this case, because the bankruptcy court and the parties mixed the concepts of the three distinct grounds upon which a plaintiff can establish insolvency under § 548(a)(1)(B)(ii)(I)-(III), reducing them to only "balance sheet" and "cash flow" insolvency. The court's "prejudice" finding appears to be based solely on its belief that amendment would be futile, a finding which we reject. In any case, Defendants did not meet their burden to establish "undue" prejudice and we do not perceive such. Finally, that Trustee has already

amended his complaint once does not amount to "several opportunities to amend [his] complaint" and "repeated[ ] fail[ure] to cure deficiencies." *See Telesaurus VPC, LLC*, 623 F.3d at 1003.

*11      Accordingly, we conclude that the bankruptcy court did not appropriately exercise its discretion by denying Trustee leave to amend; his allegations were not frivolous, he endeavored to comply with the court's instruction for amending, and, most importantly, it appears that he had a reasonable chance of successfully stating a claim against Defendants if given another opportunity.

**D. Trustee waived his appeal of the reconsideration order.**
Under Civil Rule 59(e), applicable here by Rule 9023, the bankruptcy court may reconsider a previous order or judgment, but only if: (1) it is presented with newly discovered evidence that was not available at the time of the original hearing; (2) it committed clear error or made an initial decision that was manifestly unjust; or (3) there is an intervening change in controlling law. *Fadel v. DCB United LLC (In re Fadel)*, 492 B.R. 1, 18 (9th Cir. BAP 2013).

Even though Trustee appealed the order denying his Motion to Reconsider, he did not provide any argument on the issue in his opening brief. He did argue the issue in his reply brief. Nonetheless, an appellate court in this circuit "will not review issues which are not argued specifically and distinctly in a party's opening brief." *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010). As a result, any argument on this issue has been waived.

## VI. CONCLUSION

For the reasons stated above, we AFFIRM in part, REVERSE in part, and REMAND to allow Trustee an opportunity to amend his complaint.

**All Citations**

Slip Copy, 2019 WL 4929933

2013 WL 12124306
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

U.S. BANK NATIONAL ASSOCIATION,
Litigation Trustee of the Idearc
Inc. et al. Litigation Trust, Plaintiff,
v.
VERIZON COMMUNICATIONS
INC., et al., Defendants.

CIVIL ACTION NO. 3:10-CV-1842-G
|
Signed 06/18/2013

**Attorneys and Law Firms**

Patrick D. Keating, Keating PLLC, David R. Taubenfeld, Philip McCall Bridwell, Robin E. Phelan, Werner A. Powers, Micah Ethan Skidmore, Haynes & Boone LLP, Douglas J. Buncher, John D. Gaither, Seymour Roberts, Jr., Neligan Foley LLP, Nicholas A. Foley, Dallas, TX, Charles M. Gearing, Hanshaw Kennedy, LLP, Frisco, TX, for Plaintiff.

T. Ray Guy, Weil Gotshal & Manges LLP, Paige Holden Montgomery, Sidley Austin LLP, J. Robert Arnett, II, E. Leon Carter, Carter Scholer Arnett Hamada & Mockler, PLLC, Dallas, TX, Alfredo Perez, Weil Gotshal & Manges LLP, John B. Strasburger, Winston & Strawn LLP, Houston, TX, David Lawrence Schwarz, Joseph S. Hall, Reid M. Figel, Scott H. Angstreich, Steven F. Benz, Kellogg Huber Hansen Todd Evans & Figel PLLC, Washington, DC, Philip D. Anker, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Defendants.

**CONCLUSIONS OF LAW**

A. JOE FISH, Senior United States District Judge

*1 On January 22, 2013, the court found, based on extensive evidence presented at a bench trial, that the value of Idearc, Inc. ("Idearc") on November 17, 2006 was at least $12 billion and that it was therefore solvent. *See* Memorandum of Decision ("Decision") of January 22, 2013 at 2, 22 (docket entry 646). On the same date the court ordered the plaintiff in this case to show cause why, in light of this finding, judgment for the defendants should not be entered on the

plaintiff's claims not previously disposed of. *See* Order of January 22, 2013 ("Show Cause Order") (docket entry 647). Upon consideration of the briefing and motions submitted in response to that order, the court concludes, for the reasons stated below, that judgment for the defendants should be entered on all of the plaintiff's remaining claims [1] in this case. In addition, the plaintiff's motion for entry of judgment on admissions and stipulated facts (docket entry 649) is denied.

[1]     A complete and accurate list of these claims may be found in the court's show cause order. *See* Show Cause Order at 2.

I. RULE 52(c)

"[When] a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue," FED. R. CIV. P. 52(c) authorizes the court to enter judgment "on a claim ... that, under the controlling law, can be maintained ... only with a favorable finding on that issue." FED. R. CIV. P. 52(c). The plaintiff has been fully heard on the issues of Idearc's value and solvency. The court has found against the plaintiff on those issues. *See* Decision at 2, 22. For the reasons set forth below, none of the plaintiff's claims can be maintained without a favorable finding on Idearc's value and solvency. Entry of judgment against the plaintiff on all remaining claims is therefore appropriate. [2]

[2]     For a brief introduction to the nature of this action, the parties, and the relevant facts, *see* Decision at 2-6.

II. FRAUDULENT TRANSFER

A. Constructive Fraudulent Transfer

Because the plaintiff did not address the viability of its constructive fraudulent transfer claims in its response to the court's order to show cause, it has effectively conceded that these claims fail. *See generally* Plaintiff's Brief Pursuant to Order to Show Cause ("Brief") (docket entry 648) and Plaintiff's Reply in Support of its Response to Order to Show Cause ("Reply") (docket entry 656).

The constructive fraudulent transfer claims [3] obviously fail on the merits, however, in light of the court's findings as

to Idearc's value and solvency. This is because those claims require the plaintiff to prove that Idearc was insolvent on the date of the spinoff and that it did not receive reasonably equivalent value for the cash and debt it transferred to Verizon in connection with the spinoff. *See* TEX. BUS. & COM. CODE § 24.005(a)(2) [4] and 24.006. [5]

[3]

In Counts 5 and 6 of its amended complaint, the plaintiff singles out as fraudulent transfers specific transactions associated with the overall spinoff. *See* Plaintiff's Amended Complaint and Jury Demand ("Complaint") ¶¶ 49-68 (docket entry 216); *see also* Memorandum Opinion and Order of September 14, 2012 at 30-32 (docket entry 523). The court sees no reason to consider these transactions separately from the entire spinoff taken as a whole. However, even if the counts and the transactions at issue in them were considered separately, they would fail for the same reasons that Counts 1 and 2 fail. The court's valuation finding implies that the entities at issue (Idearc Media Corp. and Idearc Information Services) were solvent and received reasonably equivalent value (for purposes of constructive fraudulent transfer), and there are not sufficient badges of fraud as would indicate the transfers were made with "actual intent to hinder, delay, or defraud" (for purposes of actual fraudulent transfer).

[4]

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... without receiving a reasonably equivalent value in exchange for the transfer or obligation."

[5]

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

**\*2** In the context of a spinoff, the court has already noted that there is no effective difference between the insolvency

analysis and the reasonably equivalent value analysis. *See* Memorandum Opinion and Order of September 14, 2012 ("SJ Opinion") at 15 n.3 (docket entry 523), citing *VFB LLC v. Campbell Soup Company*, 482 F.3d 624, 636 (3d Cir. 2007). Because Idearc had a total enterprise value of at least $12 billion on the date of the spinoff, it was both solvent [6] and received reasonably equivalent value [7] for the $9.1 billion in cash and debt it transferred to Verizon.

[6]

"A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." TEX. BUS. & COM. CODE § 24.003(a). It is undisputed that Idearc's debts totaled approximately $9.1 billion on November 17, 2006, the date of the spinoff. *See*, *e.g.*, SJ Opinion at 15. Given the court's finding that Idearc's total enterprise value was at least $12 billion on November 17, 2006, Idearc clearly met Texas law's test for solvency at that time.

[7]

"[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.' " See *VFB*, 482 F.3d at 631, quoting *In re Fruehauf Trailer Corporation*, 444 F.3d 203, 213 (3d Cir. 2006).

Judgment will therefore be entered for the defendants on the plaintiff's remaining constructive fraudulent transfer claims.

B. Actual Fraudulent Transfer

To sustain its claim that the transfers Verizon caused Idearc to make in connection with the spinoff were actual fraudulent transfers, the plaintiff must show that Verizon Communications Inc., GTE Corporation, Verizon Financial Services LLC ("Verizon") or John Diercksen ("Diercksen") (collectively, the "defendants") caused those transfers to be made "with actual intent to hinder, delay, or defraud any creditor" of Idearc. TEX. BUS. & COM. CODE § 24.005(a)(1).

The plaintiff argues that Idearc's value and solvency are immaterial to a determination of Verizon or Diercksen's intent in connection with the transactions consummating the spinoff. *See* Brief at 16. It cites a number of decisions that have held a solvency finding immaterial to particular actual fraudulent transfer claims. *Id.* at 17-18. There are two problems for the plaintiff, however. First, it has not presented specific

U.S. Bank National Association v. Verizon Communications Inc., Not Reported in Fed...

2013 WL 12124306

direct evidence of the defendants' fraudulent intent, nor has it pointed to any such evidence that it may yet present. See, *e.g.*, *id.* at 17-18. Second, the weight of any circumstantial evidence of the defendants' intent the plaintiff has presented, or has noted remains to be presented, is negated by virtue of the court's valuation finding.

Direct evidence of fraudulent intent is, of course, always difficult to obtain. See, *e.g.*, *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 312 (Tex. App.—El Paso 2009, mandamus denied). Other than general allegations, the plaintiff has pointed to no such specific evidence in the many briefs it has submitted in this case. Neither has the plaintiff in the briefing presently before the court pointed to any specific direct evidence (*e.g.*, testimony, communications that reveal the state of mind of Verizon officers, *etc.*) of the defendants' fraudulent intent with regard to the spinoff transactions.[8] The plaintiff is therefore left to rely on circumstantial evidence of the defendants' fraudulent intent, *i.e.*, the so-called "badges of fraud." *See* TEX. BUS. & COM. CODE § 24.005(b)(1)-(11).

[8]    The court will not consider at this late stage of the litigation the plaintiff's generic assertions that Idearc "acted with intent" to hinder, delay, or defraud. *See*, *e.g.*, Brief at 18. If the plaintiff cannot now, after voluminous discovery, point to specific examples of direct evidence of the defendants' fraudulent intent which remain to be presented, the court has no confidence that the plaintiff will uncover any at some indeterminate time in the future.

 **\*3**  The plaintiff has elsewhere argued that it has evidence of five of the eleven badges of fraud. *See* Brief in Support of Plaintiff's Omnibus Response in Opposition to Defendants' Motions for Summary Judgment ("Summary Judgment Response") at 77 (docket entry 430). The finding that Idearc was worth at least $12 billion, though, negates two of those badges, reasonably equivalent value and solvency. *See above* at 4 n.6-7; *see also* TEX. BUS. & COM. CODE § 24.005(b)(8)-(9). A third, concealment, is negated by virtue of the court's findings that a plethora of material information relating to the spinoff was actually disclosed to the market. *See* Decision at 41-58; *see also* TEX. BUS. & COM. CODE § 24.005(b)(3). The only two badges of fraud that remain, transfer to an insider and transfer shortly before a substantial debt was incurred, *see* TEX. BUS. & COM. CODE § 24.005(b)(1) and (10), are plainly insufficient, standing alone, to support a finding that the defendants acted in the spinoff

with actual intent to hinder, delay, or defraud its creditors. This is because these two "badges" are features of every spinoff transaction that involves debt. Moreover, case law suggests that the presence of so few badges, in such a context, is insufficient as a matter of law to support a finding of actual intent to hinder, delay, or defraud. See, *e.g.*, *Texas Custom Pools, Inc.*, 293 S.W.3d at 313-14; *MFS/Sun Life-Trust High Yield Series v. Van Dusen Airport Services Company*, 910 F. Supp. 913, 935 (S.D. N.Y. 1995). The court concludes that the presence of these two badges alone (transfer to an insider and transfer shortly after a substantial debt was incurred), in the context of a spinoff transaction such as this one, is insufficient as a matter of law to support a conclusion that the defendants actually intended to hinder, delay, or defraud Idearc's creditors.

For these reasons, the court's valuation findings are dispositive with respect to the plaintiff's actual fraudulent transfer claims, and the court concludes that judgment is properly entered for the defendants on those claims.

### III. BREACH OF FIDUCIARY DUTY

#### A. Breach of Fiduciary Duty: John Diercksen

The court has already found, in connection with its consideration of the motions for summary judgment, that Idearc was Verizon's wholly-owned subsidiary. *See* SJ Opinion at 26-27. The court declines to reconsider that ruling at this stage of the case, especially in view of the fact that the plaintiff has never requested such reconsideration. The court agrees with the defendants that this prior finding puts this case squarely within the rule, articulated in *Anadarko Petroleum Corporation v. Panhandle Eastern Corporation*, 545 A.2d 1171, 1174 (Del. 1988), that a corporate parent owes its wholly-owned subsidiary no fiduciary duties, other than a duty not to take actions that cause it to be unable to meet its legal obligations. In addition, the director of a wholly-owned subsidiary (here, Diercksen) owes the subsidiary only the duty to manage it in the best interests of the corporate parent, so long as this does not "render the subsidiary unable to meet its legal obligations." See *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 200-01, 203 (Del. Ch. 2006), *aff'd*, 931 A.2d 438 (Del. 2007) (table); *see also* Defendants' Joint Consolidated Response to Plaintiff's Response to Order to Show Cause ("Response") at 6-7 (docket entry 651). Since Idearc was solvent on the date of the spinoff, it cannot be argued plausibly that

U.S. Bank National Association v. Verizon Communications Inc., Not Reported in Fed...
2013 WL 12124306

Verizon or Diercksen caused it to be unable to meet its legal obligations.[9] While the plaintiff has pointed to a number of titillating allegations concerning Verizon and Diercksen's conduct in connection with the spinoff, *see*, *e.g.*, Brief at 14-16 and Reply at 3-9, none of these allegations can be said to have *caused* Idearc to be unable to meet legal obligations. *See also* SJ Opinion at 25. Therefore, neither Diercksen nor Verizon owed Idearc any other fiduciary duties. For this reason alone, the plaintiff cannot prevail on its breach of fiduciary duty claim against Diercksen.

[9]    It is clear that the *Trenwick* court focused exclusively on solvency, when considering whether a corporate subsidiary was rendered "unable to meet its legal obligations" by the transaction at issue in the case (the corporate parent causing its subsidiary to take on more debt). See *Trenwick*, 906 A.2d at 203-04.

That is not the only reason this claim fails, however. It is elementary that a plaintiff seeking compensatory damages must show damage "logically and reasonably related to the harm" for which compensation is sought. See, *e.g.*, *In re J.P. Morgan Chase & Company Shareholder Litigation*, 906 A.2d 766, 774 (Del. 2006). The problem for the plaintiff in this case is that, despite making numerous references to Diercksen's allegedly unsavory conduct in connection with the spinoff, *see above* at 8-9, the plaintiff has not demonstrated to this court that it has a coherent notion of how these unsavory actions are, in light of the solvency finding, logically or reasonably related to the $9 billion damage award it seeks.

**\*4**  In its post-trial briefing, the only references the plaintiff makes to damage to Idearc connected to the Counts 3 and 4 breach of fiduciary claims are found on pages 14-16 of its response to the show cause order. *See* Brief at 14-16. There, the plaintiff recites the basic elements of breach of fiduciary duty claims, before it asserts that "Diercksen breached his duties of care and loyalty by ... acting unilaterally to authorize the Spin-off and declare the dividend paid to Verizon" and "Verizon ... had knowledge that Idearc's board was not fully constituted, that Diercksen's purported board actions were ineffective, and that, as a result, the Spin-off and related transfers were never properly authorized, damaging Idearc in at least the amount of the unauthorized transfers." *Id.* at 14.

What the plaintiff does not say is how Diercksen's alleged breaches or Verizon's supposed knowledge could possibly have damaged Idearc's creditors (particularly in so great

an amount) in light of the court's valuation and solvency findings. Whatever corporate procedural missteps may have occurred preceding the spinoff, and whatever alleged "scheming" accompanied these missteps, the fact remains that as of November 17, 2006, Idearc's creditors were left with an entity that had assets worth well in excess of what would be required to protect their interests.

### B. Aiding and Abetting Breach of Fiduciary Duty: Verizon

In light of the fact that Diercksen is entitled to judgment on the plaintiff's claim against him for breach of fiduciary duty, there is no breach of duty remaining in this case for Verizon to have "aided and abetted." Thus, the Verizon defendants are also entitled to judgment on the plaintiff's claim against them for aiding and abetting Diercksen's alleged breaches of fiduciary duty.

### IV. UNLAWFUL DIVIDEND

In its summary judgment opinion of September 14, 2012, the court observed that the plaintiff's "unlawful dividend claim will fail" if "Idearc had sufficient surplus[10] at the time of the spin-off to declare the dividend."[11] *See* SJ Opinion at 48. The plaintiff attempts to resist the force of this observation by focusing the court's attention on a number of alleged formal missteps associated with the dividend's declaration and payment.[12] *See* Brief at 3-10. What is unclear to the court, upon review of this briefing, is how the plaintiff arrives at the conclusion that these missteps warrant any remedy, let alone the outsized remedy it seeks in connection with them. *See* Plaintiff's Amended Complaint ("Complaint") ¶ 78 (docket entry 216) ("Verizon is likewise liable to the Trust for the full amount of the unlawful dividends.")

[10]    Surplus is, as the court noted in that context, "the excess of net assets over the par value of the corporation's issued stock." *Klang v. Smith's Food and Drug Centers, Inc.*, 702 A.2d 150, 153 (Del. 1997); *see also* 8 DEL. C. § 154. "Net assets means the amount by which total assets exceed total liabilities." *Id.* § 154. In this case, the par value of each share of Idearc stock was one cent. Brief in Support of Defendants' Response to Plaintiff's Motion for Partial Summary Judgment ("Defendants' Response to Plaintiff's

First Motion") at 14 (docket entry 363). Because Idearc issued more than 146 million shares, the total par value of Idearc's stock was approximately $1.46 million.

11    The court has found that Idearc's total enterprise value on the date of the spinoff was at least $12 billion. Decision at 2. This finding implies that Idearc plainly had assets in excess of its total liabilities, which totaled $9.1 billion, at the time of the spinoff. Idearc therefore had sufficient surplus to pay a dividend.

12    The only transaction that remains a part of the plaintiff's unlawful dividend claim is Idearc's issuance of $7.1 billion in debt to Verizon. *See* SJ Opinion at 41.

**\*5** The plaintiff first argues that the dividend was illegal, because a duly constituted board never declared it. Brief at 3-5. As authority for this proposition the plaintiff cites a Southern District of New York case that neither cites any Delaware case law nor is square with the facts of this case. *Id.* at 3-4. In *Pereira v. Cogan*, 294 B.R. 449 (S.D. N.Y. 2003), *vacated and remanded*, 413 F.3d 330 (2d Cir. 2005), *cert. denied*, 547 U.S. 1147 (2006), the court found a dividend illegal on two grounds. The first was that the corporation issuing the dividend was insolvent at the time of the transaction, contrary to the situation here. *Pereira*, 294 B.R. at 540. The second reason the court gave was that the dividends were not declared by the Board in accord with section 170 of title 8 of the Delaware Code. *Id.*; *see also* 8 Del. C. § 170. The *Pereira* court gives no indication whether this second reason would have supported a finding of an "illegal" dividend, if the corporation had been solvent. Nor does it indicate what remedy it would have considered appropriate in such an instance. Nor finally does that court speculate on who might have standing to press such a claim. In fact, this court has been unable to find any case in which a court found, in favor of creditors, that a solvent corporation's dividend was illegal solely because of a technical violation of § 170.

The plaintiff next argues that the dividend was illegal, because it was "declared" on October 31, 2006, before the transfers in connection with the spinoff were effected, and thus before Idearc actually had any surplus with which to declare a dividend. Brief at 5-6. In support of its argument, the plaintiff cites 8 Del. C. § 170's statement that "the directors of every corporation ... may declare and pay dividends upon the shares of its capital stock ... out of its surplus ... or ... out of its net

profits." The plaintiff also relies on a statement in *Vogtman v. Merchants' Mortgage and Credit Company*, 178 A. 99, 20 Del. Ch. 364 (1935), that "[in] deciding whether a dividend was rightfully made, the transaction must be viewed as of the time when it was declared." *Id.* at 370.

The plaintiff's rigid interpretation of the statute is undermined by a careful reading of *Vogtman*, by the lack of further case law supporting it, and by common sense. The defendants rightly argue that the *Vogtman* case does not come close to standing for the proposition that the plaintiff cites it for. *See* Response at 18. The defendants point out that the court "focused on whether the dividend had been paid out of surplus," noting accurately that "the *Vogtman* court repeatedly discussed the date the dividend was paid ... and did not even note the date on which the dividend was declared." *Id.* Multiple times the *Vogtman* court relied on evidence of the corporation's net assets on December 31, 1932, the day prior to the dividend's payment. *Vogtman*, 20 Del. Ch at 370-72. Nowhere did it discuss the value of the corporation's net assets on the date the dividend was declared. The plaintiff has thus cited no relevant authority for the rigid view that a corporation must have the requisite surplus on the date the dividend is declared. Moreover, the plaintiff's strained interpretation of the statute would lead to absurd results; that interpretation would make it exceedingly difficult for any corporation to accomplish a spinoff without running afoul of the statutory scheme.

The plaintiff's third argument is that the dividend was illegal because Idearc's board never acted to determine if a surplus existed. Brief at 6-8. The plaintiff's argument is undermined by case law and policy considerations. In its summary judgment opinion, the court quoted the statements in *Klang v. Smith's Food and Drug Centers, Inc.*, 702 A.2d 150, 152, 156 (Del. 1997), that "perfection in [the] process [of revaluing assets] is not required," and that "[a] mistake in documenting [a] surplus will not negate the substance of the action, which complies with the statutory scheme." *See* SJ Opinion at 48. The plaintiff correctly notes that the "statutory scheme" at issue in *Klang* was the Delaware Code's section 160 scheme for redemption of stock, which does not explicitly require board participation. Brief at 7-8; *see also* 8 Del. C. § 160. It argues that sections 170-173 set up a different statutory scheme, which does require such participation. *Id.* at 8; *see also* 8 Del. C. § 170-173.

**\*6** The plaintiff, however, conveniently ignores the *Klang* court's policy discussion, which was the key to its holding

that "perfection" in the asset revaluation process was not required to validly accomplish the stock redemption at issue in that case. The *Klang* court observed that "[i]t is helpful to recall the purpose behind Section 160. The General Assembly enacted the statute to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation." *Klang*, 702 A.2d at 154. While the *Klang* court was discussing section 160, there can be no doubt that the purpose (at least as to a corporation's creditors) driving the section 170 and 173 statutory scheme governing payment of dividends is the same. *See* SJ Opinion at 37. The dividend here did not so "drain" Idearc of assets that its creditors were inadequately protected. Indeed, in the absence of a showing that there was inadequate surplus (or no net profits) with which to declare a dividend, this court doubts whether the trustee of a litigation trust representing creditors of a bankrupt corporation has standing to complain of other imperfections in the process of such dividend's payment.

Moreover, an overly rigid reading of the statutory scheme seems inappropriate in the spinoff context. The court has already accepted the plaintiff's argument that such an approach to the definition of the term "dividend" is inappropriate. *See* SJ Opinion at 39-40. In this court's opinion, what is crucial is that Verizon's management team (even if they themselves did not consider the spinoff transactions a technical "dividend") made reasonable efforts to ascertain what Idearc's value would be on the date of the spinoff. The court has documented some of these efforts in its Memorandum of Decision. *See* Decision at 34-41 and 58-61. The result of these estimations would have revealed, had management considered the question, that Idearc would have sufficient surplus with which to declare a "dividend" on the date of the spinoff. In light of the court's valuation finding, Verizon's pre-spin valuation estimations were not only reasonably performed but were reasonably accurate as well.

In any case, the ruling the plaintiff seeks here could have potentially breathtaking consequences, in that it could theoretically allow creditors in cases of bankruptcies that are not even plausibly connected to (or caused by) a prior spinoff to recover the full amount of any debt or cash transferred in that spinoff, because of any minor noncompliance with Section 170 or 173's requirements. [13] This court refuses to sanction such a sweeping elevation of form over substance.

[13]    Indeed, a holding in accord with what the plaintiff seeks could have such grave consequences even if a bankruptcy were not in view.

Because the court has found that Idearc had adequate surplus on the date of the spinoff with which to pay a dividend, the defendants are entitled to judgment on the plaintiff's unlawful dividend claim.

## V. PROMOTER LIABILITY

The court has previously ruled that no reasonable fact finder could conclude that Idearc was not Verizon's wholly owned subsidiary. *See* SJ Opinion at 26-27. The effect of this ruling is to place this case squarely within the holdings articulated in both *Anadarko*, *see above* at 8, and *Westlake Vinyls, Inc. v. Goodrich Corporation*, 518 F. Supp. 2d 918, 939 (W.D. Ky. 2007) ("The weight of authority holds that a parent corporation owes no fiduciary duties to its wholly-owned subsidiary."). Since the court has found that Idearc was solvent, Verizon and Diercksen owed it no fiduciary duties that would give rise to a claim of promoter liability. For this reason alone, judgment should be entered for the defendants on the plaintiff's promoter liability claim.

In conjunction with its response to the court's show cause order of January 22, 2013, the plaintiff filed an unsolicited motion for judgment, citing Rule 52(c) as the primary authority for this motion. *See generally* Motion and Brief for Entry of Judgment ("Motion") (docket entry 649). This motion attempts to bolster the plaintiff's promoter liability claim. *Id.* at 7, 12. Rule 52(c) permits judgment on partial findings against a party only where the court "finds against the party" on a dispositive issue. FED. R. CIV. P. 52(c). The court did not find against the Verizon defendants on any dispositive issue in its Memorandum of Decision. *See generally* Decision. More specifically, the court most certainly did not find against the Verizon defendants on the issue of Idearc's value, *see* Decision at 1, despite the plaintiff's absurd philosophical waxing on the indeterminate nature of the court's valuation finding. *See* Motion at 2. The plaintiff's motion for judgment is therefore denied. [14]

[14]    The plaintiff attempts to rescue the motion by requesting that the court consider it a summary judgment motion. *See* Motion at 2. The court declines this invitation, since the plaintiff has already filed two summary judgment motions, *see*

docket entries 332 and 378. In the absence of leave to file multiple motions, the local rules permit only one summary judgment motion, *see* LR 56.2(b). The plaintiff has not requested leave to file a third summary judgment motion.

**\*7** Moreover, the plaintiff attempts to incorporate the substance of this motion for judgment into its response to the court's show-cause order and its reply in support of this response. *See* Brief at 11 and Reply at 9. This amounts to an attempt on the part of the plaintiff to file oversized briefs without first obtaining leave from the court. Incredibly, the plaintiff has the audacity to complain about the Northern District of Texas's general briefing page limits without ever having requested leave from the court to file briefs exceeding those limits. *See* Reply at 3. The court has shown itself perfectly willing in this case to allow the parties both to supplement the record and to submit argument in excess of what the local rules typically permit. *See generally* 3:10-CV-1842-G docket sheet. Where a party does not first seek leave, however, the court will not permit blatant violations of its local rules. For this reason, the court declines to consider any argument the plaintiff attempts to incorporate from the motion for judgment or the reply supporting the motion for judgment (docket entries 649 and 655) into the response and reply to the show cause order.

With respect to promoter liability, the plaintiff continues to press the notion that, as of the date of the spinoff, Idearc was not Verizon's wholly-owned subsidiary. *See* Brief at 11-15 and Reply at 6-7. The court agrees with the defendants that this exercise is, in substance, a request for the court to reconsider its holding in its summary judgment opinion of September 14, 2012. *See* Response at 12-15. All the evidence the plaintiff attempts to put on in support of this (re)argument, *see*, *e.g.*, Motion at 15, is evidence that was available to the plaintiff on the multiple motions to dismiss and for summary judgment. The plaintiff has cited no intervening change in the law binding on this court governing promoter liability, or ownership of subsidiaries, since the various motions to dismiss and for summary judgment were filed. The court therefore declines to reconsider its earlier holding that no reasonable fact finder could conclude that Idearc was not Verizon's wholly-owned subsidiary. SJ Opinion at 26-27.

Even if the court were to reconsider this holding, however, the court would still conclude that entry of judgment for the defendants on the plaintiff's promoter liability claim is appropriate at this time. The problem for the plaintiff with respect to this claim, as with its breach of fiduciary duty claim

against Diercksen, is that the plaintiff cannot show, in light of the court's solvency finding, how Idearc or its creditors were damaged by the specific actions the plaintiff names in the complaint, the motions for summary judgment, the responses to the motions for summary judgment, the proposed findings of fact and conclusions of law, and the joint pretrial order.

This is precisely why the promoter liability claim the plaintiff presses in its post-trial briefing relies on an entirely different theory, and refers to a different set of facts, than what appeared in the complaint. The plaintiff's promoter liability claim has, at least until the post-trial briefing, been quite specifically a claim for breach of fiduciary duty, *see* Complaint ¶ 111. [15] The core allegations of the plaintiff's promoter liability claim, as set forth in the amended complaint, have been that Diercksen and Verizon schemed in the "promotion" of Idearc to accomplish an (allegedly fraudulent) tax-free, debt-for-debt exchange, which would relieve Verizon of a significant debt burden and load Idearc with debt it was unable to support. *Id.* ¶¶ 82-90. As a result, the plaintiff claimed, Diercksen and Verizon are liable for the allegedly unsustainable debt with which they saddled Idearc. *Id.* ¶¶ 113-14.

[15]
In this claim the plaintiff seeks to recover compensatory damages, which, as outlined above in section III. A., would require a showing of damage logically related to the alleged breach of duty.

The fatal flaw in this theory, in light of the court's finding about Idearc's solvency, is that, in fact, the late-2006, post-spinoff Idearc was not "saddled" with unsupportable debt. Subsequent events —including the Great Recession —intervened, and Idearc later became unable to support its debt. However, in light of the court's solvency finding, these intervening events do not implicate Verizon and Diercksen, and they sever any causal link between Verizon and Diercksen's actions and Idearc's bankruptcy. The plaintiff has not even attempted to show, with any degree of specificity or detail, how —in light of Idearc's solvency —there could be any damage to Idearc's creditors that is logically and reasonably related to the specific breaches of fiduciary duty (*i.e.*, the actions in furtherance of the "tax scheme," *see* Complaint ¶ 83) that have, from the time of the amended complaint, formed the core of the promoter liability claim. [16]

[16]
As already noted, it is obvious that the theory underlying the plaintiff's promoter liability claim has undergone a metamorphosis in the plaintiff's

U.S. Bank National Association v. Verizon Communications Inc., Not Reported in Fed....

2013 WL 12124306

response to the court's show cause order. Now for the first time the plaintiff includes, specifically in relation to this claim, bare allegations that Verizon: (1) caused Idearc to enter illegal contracts; (2) caused Idearc to falsify record documents; (3) failed to stop Idearc from incurring debt; and (4) filed for bankruptcy protection, among others. *See* Brief at 12. As far as the court has been able to determine, these allegations were never connected to the promoter liability claim in (1) the joint pretrial order filed by the parties (docket entry 572); (2) the plaintiff's proposed findings of fact and conclusions of law (which were addressed not simply to Phase I of the trial but to all issues remaining to be tried in the case) (docket entry 543); (3) the plaintiff's two summary judgment motions (docket entries 332 and 378); or (4) the plaintiff's responses to the defendant's motions for summary judgment and motions to dismiss (especially docket entry 430). The court does not consider itself bound to allow the plaintiff to continue expending huge volumes of energy, time and money in pursuit of a claim that, after nearly three years of litigation, still does not appear to have a coherent theory underlying it. Nor is the court required to consider a novel theory raised this late in the litigation. See *Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."); see also *O'Hara v.*

*General Motors Corporation*, 2006 WL 1094427 (N.D. Tex. Apr. 25, 2006) (Fish, C.J.) (refusing to consider legal theories raised for the first time in a plaintiff's response to a motion for summary judgment), *rev'd in part on other grounds*, 508 F.3d 753 (5th Cir. 2007).

**\*8** For all the foregoing reasons, the defendants are entitled to judgment on the plaintiff's promoter liability claim.

## VI. ALTER EGO

Because the court has concluded that the plaintiff cannot prevail on its other claims in this case, judgment for the defendants will also be entered on the plaintiff's alter ego "claim." *See* SJ Opinion at 51 and Show Cause Order at 2 n.*.

## VII. CONCLUSION

For the reasons stated above, the plaintiff's motion for entry of judgment (docket entry 649) is **DENIED**. Judgment will be entered for the defendants in accordance with these conclusions.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12124306

---

End of Document    © 2021 Thomson Reuters. No claim to original U.S. Government Works.