1   PILLSBURY WINTHROP SHAW PITTMAN LLP
    Matthew S. Walker (California Bar Number 101470)
2   12255 El Camino Real, Suite 300
    San Diego, Ca 92130-4088
3   Telephone:    858.509.4000
    Facsimile:    858.509.4010
4
    Eric Fishman (admitted *pro hac vice*)
5   Andrew M. Troop (admitted *pro hac vice*)
    Carolina A. Fornos (admitted *pro hac vice*)
6   31 West 52nd Street
    New York, NY 10019-6131
7   Telephone:    212.858.1000
    Facsimile:    212.858.1500
8
    *Attorneys for Bombardier Aerospace Corporation,*
9   *Bombardier Inc., and Learjet, Inc.*

10              IN THE UNITED STATES BANKRUPTCY COURT
           CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION
11

12   **IN RE:**                                  )   Lead Case No.: 2:17-bk-21386-SK
                                                 )
13   ZETTA JET USA, INC., a California corporation,  )   Jointly administered with:
                                                 )   2:17-bk-21387-SK
14          Debtor and Debtor in Possession.     )   (Zetta Jet PTE Ltd.,
                                                 )   a Singaporean corporation)
15                                               )
     **IN RE:**                                  )   CHAPTER 7 CASES
16                                               )
     ZETTA JET PTE Ltd., a Singaporean corporation,  )   ADV. PRO. NO. 2:19 AP 01382-SK
17                                               )
            Debtor and Debtor in Possession.     )
18                                               )   **DEFENDANTS BOMBARDIER**
                                                 )   **AEROSPACE CORPORATION,**
19   JONATHAN D. KING, solely in his capacity    )   **BOMBARDIER INC. AND LEARJET,**
     as Chapter 7 Trustee of Zetta Jet USA, Inc. and  )   **INC.'S NOTICE OF MOTION AND**
20   Zetta Jet PTE, Ltd.,                        )   **MOTION TO DISMISS COUNTS 1-3,**
                                                 )   **6-7, 12-20, 25, 31-32 OF FIRST**
21          Plaintiff,                           )   **AMENDED ADVERSARY**
                                                 )   **COMPLAINT**
22      v.                                       )
                                                 )   Date:      TBD
23   JETCRAFT CORPORATION, JETCRAFT             )   Time:      TBD
     GLOBAL, INC., JETCOAST 5000-5 LLC, ORION   )   Place:     Courtroom 1575
24   AIRCRAFT HOLDINGS LTD., JETCRAFT ASIA      )              255 East Temple Street
     LIMITED, FK GROUP LTD, FK PARTNERS         )              Los Angeles, CA 90012
25   LIMITED, JAHID FAZAL-KARIM,                )   Judge:     Hon. Sandra R. Klein
     BOMBARDIER AEROSPACE CORPORATION,          )
26   BOMBARDIER, INC., and LEARJET, INC.        )
                                                 )
27          Defendants.                          )

28

---

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

1  **TO THE HONORABLE SANDRA R. KLEIN, UNITED STATES BANKRUPTCY JUDGE,**

2  **AND TO PLAINTIFF'S COUNSEL OF RECORD:**

3      **PLEASE TAKE NOTICE** that, by this "Motion," Defendants Bombardier Aerospace

4  Corporation, Bombardier Inc. and Learjet, Inc. will and hereby do move the Court to dismiss, with

5  prejudice and without leave to amend, Counts 1-3, 6-7, 12-20, 25, 31-32 of the first amended complaint

6  filed in the above-captioned adversary proceeding, all of the Counts asserted against them, for failure

7  to state a claim upon which relief can be granted, because the first amended complaint insufficiently

8  pleads the facts necessary to plausibly state claims for relief for aiding and abetting breach of fiduciary

9  duty, civil conspiracy, violation of California Business & Professions Code § 17200, fraudulent

10  misrepresentation, fraudulent concealment, fraudulent transfer, avoidance of preference transfer,

11  violation of automatic stay, and disallowance of claims. Moreover, because the alleged wrongdoing

12  of their agent, Geoff Cassidy, is imputed to the debtors Zetta Jet PTE Ltd. ("Zetta PTE") and Zetta Jet

13  USA Inc. ("Zetta USA," together with Zetta PTE, the "Debtors"), Counts 1-3, 6-7 are barred by the *in*

14  *pari delicto* doctrine.

15      **PLEASE TAKE FURTHER NOTICE** that this Motion is being brought under Federal Rules

16  of Civil Procedure 12(b)(6), 8(a) and 9(b), as made applicable by Federal Rules of Bankruptcy Procedure

17  7012, 7008 and 7009, and is based on the accompanying memorandum of points and authorities, the

18  Court's files in this adversary proceeding and the related Chapter 7 jointly-administered cases, and such

19  other evidence and argument as may properly come before this Court at any hearing.

20      **PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1, the Trustee's response

21  to this Motion shall be filed and served 14 days before the hearing scheduled in this matter, to be

22  determined during the Court's scheduled September 15, 2021 status hearing.

23      **WHEREFORE**, Defendants respectfully request that the Court enter an order (i) granting the

24  Motion, (ii) dismissing, without leave to amend, Counts 1-3, 6-7, 12-20, 25, 31-32 of the First

25  Amended Complaint for failure to state a claim, and (iii) granting any and all other relief the Court

26  deems just and necessary.

27

28

---

**BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

4810-6253-4901

1

2  Dated: September 7, 2021

3

4

5  By:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PILLSBURY WINTHROP SHAW
PITTMAN LLP

*/s/ Andrew M. Troop*

ERIC FISHMAN (admitted *pro hac vice*)
ANDREW TROOP (admitted *pro hac vice*)
CAROLINA FORNOS (admitted *pro hac vice*)
MATTHEW WALKER

*Attorneys for Bombardier Aerospace
Corporation, Bombardier Inc. and Learjet,
Inc.*

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION.................................................................................................1

II.  SUMMARY OF ALLEGATIONS IN THE FIRST AMENDED COMPLAINT ....................3

    A.  The Zetta Business Plan.............................................................................3

    B.  The Six BAC Sales to Zetta.........................................................................4

        1.  The CAVIC Transactions (Planes 2-5).................................................4

        2.  The Bombardier Purchase Orders (Planes 8-9)...................................7

    C.  The Aircraft Purchased or Leased by Zetta from Non-Bombardier Entities ....................7

        1.  The First and Second Element Transactions (Planes 1 and 10-11)...........................7

        2.  The Li/Minsheng Transactions (Planes 6-7).....................................10

        3.  The Challenger Transactions (Planes 12-15).....................................11

        4.  The Falconwing Transactions (Plane 16)..........................................11

    D.  The Zetta Bankruptcy and the Adversary Proceeding......................................12

III.  ARGUMENT...................................................................................................14

    A.  Pleading Standards....................................................................................14

    B.  New York Law Applies to the Trustee's Tort Claims........................................15

    C.  Count 1 Fails to State a Claim for Aiding and Abetting Fiduciary Breach....................17

        1.  Giving Five Sports Tickets to the "Zetta Team" is Insufficient...............................17

        2.  Discussing Sea-Doos is Insufficient ................................................19

        3.  Improper Payments Made to Cassidy Cannot Be Attributed to BAC or BI...............21

    D.  Count 2 Fails to State a Claim for Conspiracy...............................................25

    E.  Count 3 Fails to State a Claim Under California Business and Professions Code § 17200 and California Penal Code § 641.3 ........................27

    F.  Count 6 Fails to State a Claim for Fraudulent Misrepresentation..................................30

    G.  Count 7 Fails to State a Claim for Fraudulent Concealment..................................31

    H.  The *In Pari Delicto* Doctrine Bars All the Tort Claims (Counts 1-3 and 6-7)................33

    I.  Dismissal of the Bankruptcy Claims in Counts 14-15 and 31-32 is Required Because the Trustee Cannot Join Indispensable Parties.................................34

    J.  The Trustee's Bankruptcy Claims Fail as a Matter of Law....................................36

        1.  Because the Alleged Preferential and Fraudulent Transfers Originated Outside the U.S., Counts 12-17, 31-32 (the Fraudulent Transfer Claims) and Counts 18-19 (the Preference Claims) Must be Dismissed..................................36

        2.  The FAC Fails to Sufficiently Plead Fraudulent Transfer Claims ..........................36

            i.  Constructive fraudulent transfer is insufficiently pled (Counts 13, 15, 17, 32)..................................36

                a.  The Trustee fails to allege a transfer of an interest in property of the Debtors (Counts 15 and 32) ........................37

                b.  The Trustee fails to allege sufficiently a lack of reasonably equivalent value (Counts 13 and 17)..................................38

i

4810-6253-4901

ii.  The Trustee fails to plead actual fraudulent transfer (Counts 12, 14, 16,
31).............................................................................................................40

3.  The Preference Claims Should Be Dismissed (Counts 18, 19)................................43

i.  The payments were made in the ordinary course (Counts 18 and 19)................44

ii.  The contemporaneous exchange defense is a basis for dismissal (Count
19)..........................................................................................................44

4.  The Section 502(d) claim must be dismissed (Count 25).......................................45

5.  The stay violation claim must be dismissed (Count 20)..........................................45

IV.  CONCLUSION.................................................................................................................45

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

Cases

4

*1058 Corp. v. Ergas*,
    571 N.Y.S.2d 706 (1st Dep't 1991).........................................................................................22

*1230 Park Assocs., LLC v N. Source, LLC*,
    48 AD 3d 355 (1st Dept 2008)..........................................................................................23, 24

*ABF Cap. Corp., a Del. Corp. v. Osley*,
    414 F.3d 1061 (9th Cir. 2005).................................................................................................15

*In re Acequia, Inc.*,
    34 F.3d 800 (9th Cir. 1994) ..............................................................................................41, 43

*In re Agric. Research & Tech. Grp.*,
    916 F.2d 528 (9th Cir. 1990) ...................................................................................................41

*In re Ahaza Sys., Inc.*,
    482 F.3d 1118 (9th Cir. 2007)..................................................................................................44

*In re Ampal-Am. Israel Corp.*,
    562 B.R. 601 (Bankr. S.D.N.Y. 2017)......................................................................................36

*ARB, Inc. v. Luz Const., Inc.*,
    972 F.2d 1336 (9th Cir. 1992) .................................................................................................17

*ASARCO, LLC v. Union Pac. R.R. Co.*,
    765 F.3d 999 (9th Cir. 2014) ...................................................................................................42

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................................14

*Askins v. U.S. Dep't of Homeland Sec.*,
    899 F.3d 1035 (9th Cir. 2018)..................................................................................................21

*Asplund v. Selected Invs. in Fin. Equities, Inc.*,
    86 Cal. App. 4th 26 (1st Dist. 2000).........................................................................................22

*Ayco Co., L.P. v. Becker*,
    No. 1:10-CV-0834, 2011 WL 3651027 (N.D.N.Y. Aug. 18, 2011).........................................24

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995) .......................................................................................................30

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

*Barnett v. Cigna Healthcare*,
217 F. App'x 620 (9th Cir. 2007)......................................................................21

*Baron v. Galasso*,
83 A.D.3d 626 (2d Dep't 2011)..........................................................................17

*Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*,
No. 14-CV-6640-FPG, 2016 WL 2622013 (W.D.N.Y. May 5, 2016).......................16

*Bd. of Managers of the 411 E. 53rd Str. Condo. v. Perlbinder*,
Nos. 654039/2013, 650603/2014, 2016 WL 1597761 (Sup. Ct. N.Y. Cty. Apr. 21,
2016), *rev'd on other grounds*, 151 A.D.3d 523 (1st Dep't 2017)....................22, 23

*Begier v. IRS*,
496 U.S. 53 (1990).............................................................................................37

*BNP Paribas Mortg. Corp. v. Bank of Am.*, N.A.,
866 F. Supp. 2d 257 (S.D.N.Y. 2012)...............................................................22

*In re Brobeck, Phleger & Harrison LLP*,
408 B.R. 318 (Bankr. N.D. Cal. 2009)........................................................37, 40, 41

*Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*,
6 F.3d 1119 (5th Cir. 1993)..............................................................................38

*Butto v. Collecto Inc.*,
802 F. Supp. 2d 443 (E.D.N.Y. 2011)...............................................................22

*Cal. Dump Truck Owners Ass'n v. Nichols*,
924 F. Supp. 2d 1126 (E.D. Cal. 2012), *aff'd*, 778 F.3d 1119 (9th Cir. 2015),
*withdrawn from bound volume, and aff'd*, 784 F.3d 500 (9th Cir. 2015)...................35

*Cayanan v. Citi Holdings, Inc.*,
928 F. Supp. 2d 1182 (S.D. Cal. 2013)..............................................................15

*In re Chateaugay Corp.*,
920 F.2d 183 (2d Cir. 1990)..............................................................................45

*In re Cil*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018).................................................................36

*Congress Fin. Corp. v. John Morrell & Co.*,
790 F. Supp. 459 (S.D.N.Y. 1992).....................................................................32

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*,
412 F. Supp. 2d 1059 (E.D. Cal. 2006) (Virginia choice of law)............................28

*Cortez v. Purcolator Air Filtration Prods.*,
96 Cal. Rptr. 2d 518 (2000)..............................................................................27

iv

*Coscarelli v. ESquared Hosp. LLC*,
   364 F. Supp. 3d 207 (S.D.N.Y. 2019) ................................................................28

*Crystallex Int'l Corp. v. Petróleos de Venez, S.A.*,
   879 F.3d 79 (3d Cir. 2018) ................................................................................37

*Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*,
   276 F.3d 1150 (9th Cir. 2002) ...........................................................................34

*De Sole v. Knoedler Gallery, LLC*,
   974 F. Supp. 2d 274 (S.D.N.Y. 2013) ...............................................................31

*Deschutes River All. v. Portland Gen. Elec. Co.*,
   1 F.4th 1153 (9th Cir. 2021) .............................................................................35

*Economist's Advoc., LLC v. Cognitive Arts Corp.*,
   No. 01 Civ. 9468, 2004 WL 728874 (S.D.N.Y. Apr. 6, 2004) ..........................22

*In re Empire Land, LLC*,
   No. 6:08-bk-14592-MH, 2016 WL 1371278 (Bankr. C.D. Cal. Apr. 4, 2016) ..........................43

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ..................................................................43

*Fisk v. Letterman*,
   424 F. Supp. 2d 670 (S.D.N.Y. 2006) ...............................................................25

*In re Fitness Holdings Int'l, Inc.*,
   660 F. App'x 546 (9th Cir. 2016) ......................................................................14

*Ford v. Unity Hosp.*,
   32 N.Y.2d 464 (1973) ........................................................................................24

*Fortner v. Super. Ct.*,
   159 Cal. Rptr. 3d 128 (2013) ............................................................................29

*In re Fundamental Long Term Care, Inc.*,
   873 F.3d 1325 (11th Cir. 2017) .........................................................................23

*In re GGW Brands, LLC*,
   504 B.R. 577 (Bankr. C.D. Cal. 2013) ..............................................................43

*In re Goodman*,
   991 F.2d 613 (9th Cir. 1993) .............................................................................45

*Grede v. UBS Sec., LLC*,
   303 F. Supp. 3d 638 (N.D. Ill. 2018) ................................................................41

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

*Green Hills Software, Inc. v. Safeguard Scis. & SPC Priv. Equity Partners*,
    33 F. App'x 893 (9th Cir. 2002)........................................................................30

*Greene v. Hellman*,
    433 N.Y.S.2d 75 (1980) .............................................................................24

*In re Heddings Lumber & Bldg. Supply, Inc.*,
    228 B.R. 727 (B.A.P. 9th Cir. 1998)..........................................................37

*Hernandez v. Select Portfolio, Inc.*,
    No. CV 15-01896 MMM (AJWx), 2015 WL 3914741 (C.D. Cal. June 25, 2015)....................39

*Highland Cap. Mgmt. LP v. Schneider*,
    607 F.3d 322 (2d Cir. 2010) ......................................................................24

*Huey v. Honeywell, Inc.*,
    82 F.3d 327 (9th Cir. 1996) .........................................................................3

In *re United Energy Corp.*,
    944 F.2d 589 (9th Cir. 1991) .....................................................................41

*Jackson v. Fischer*,
    931 F. Supp. 2d 1049 (N.D. Cal. 2013)......................................................22

*Jana v. West 129th St. Realty. Corp.*,
    22 A.D.3d 274 (1st Dep't 2005)..................................................................31

*Kaufman v. Cohen*,
    307 A.D.2d 113 (1st Dep't 2003)................................................................17

*In re Kaypro*,
    218 F.3d 1070 (9th Cir. 2000).....................................................................44

*King v. Bumble Trading, Inc.*,
    393 F. Supp. 3d 856 (N.D. Cal. 2019).........................................................15

*King v. Cavic Aviation Leasing (Ireland) 22 Co. Designated Activity Company.*,
    *Case No. 2:19-ap-01147-SK*..........................................................................1

*King v. Yuntian 3 Leasing Company Designated Activity Company*,
    Case No. 2:19-ap-01383-SK, Dkt. 175 .................................................. 1, 11

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ................................................................................33

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996) .........................................................................16

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

*In re LLS Am., LLC,*
   Bankr. No. 09-06194-PCW11, 2013 WL 3305393 (Bankr. E.D. Wash. July 1,
   2013) ........................................................................................................................................42

*Lomayaktewa v. Hathaway,*
   520 F.2d 1324 (9th Cir. 1975) ................................................................................................34

*Louis v. Jerome,*
   No. CV 15-3094, 2016 WL 4532115 (E.D.N.Y. Aug. 29, 2016) ...........................................24

*Louisiana-Pacific Corp., v. ASARCO, Inc.,*
   5 F.3d 431 (9th Cir. 1993) ......................................................................................................35

*Lutz v. Glendale Union High Sch.,*
   403 F.3d 1061 (9th Cir. 2005) ..................................................................................................3

*Makah Indian Tribe v. Verity,*
   910 F.2d 555 (9th Cir. 1990) ..................................................................................................36

*McVicar v. Goodman Glob., Inc.,*
   1 F. Supp. 3d 1044 (C.D. Cal. 2014) ......................................................................................31

*Medimatch, Inc. v. Lucent Techs., Inc.,*
   120 F.Supp.2d 842 (N.D. Cal.2000) ......................................................................................28

*In re Metromedia Fiber Network, Inc.,*
   2005 WL 3789133 (Bankr. S.D.N.Y. Dec. 20, 2005) .............................................................44

*In re Miller,*
   292 B.R. 409 (B.A.P. 9th Cir. 2003) ......................................................................................15

*In re Morris Commc'ns NC, Inc.,*
   914 F.2d 458 (4th Cir. 1990) ............................................................................................38, 39

*In re Nat'l Audit Def. Network (In re NADN),*
   367 B.R. 207 (Bankr. D. Nev. 2017) ......................................................................................41

*New Greenwich Litig. Tr. v. Citco Fund Servs. (Europe) B.V.,*
   145 A.D.3d 17 (1st Dep't 2016) .............................................................................................33

*Odin Shipping Ltd. v. Drive Ocean V MV,*
   221 F.3d 1348, at *1 (9th Cir. 2000) ......................................................................................15

*In re OmniVision Techs., Inc. Sec. Litig.,*
   937 F. Supp. 2d 1090 (N.D. Cal. 2013) ..................................................................................39

*In re Ozark Rest. Equip. Co.,*
   850 F.2d 342 (8th Cir. 1988) ..................................................................................................40

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

*In re Pace*,
   67 F.3d 187 (9th Cir. 1995) ............................................................45

*Paiute-Shoshone Indians of Bishop Cmty v. City of Los Angeles*,
   637 F.3d 993 (9th Cir. 2011) ..........................................................35

*E.E.O.C. v. Peabody W. Coal Co.*,
   610 F.3d 1070 (9th Cir. 2010) .........................................................34

*In re Picard*,
   *ex rel. Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 98 (2d Cir. 2019), *petition for cert. denied* 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277) ...................................36

*In re Pringle*,
   495 B.R. 447 (B.A.P. 9th Cir. 2013) .................................................38

*In re Rezulin Prod. Liab. Litig.*,
   392 F. Supp. 2d 597 (S.D.N.Y. 2005) ......................................... 21, 22

*In re Roca*,
   404 B.R. 531 (Bankr. D. Ariz. 2009) .......................................... 40, 41

*In re Rollaguard Sec., LLC*,
   591 B.R. 895 (Bankr. S.D. Fla. 2018) ..............................................41

*RPost Holdings, Inc. v. Trustifi Corp.*,
   No. CV 11-2118 PSG, 2011 WL 4802372 (C.D. Cal. Oct. 11, 2011) .......................14

*Sanchez v. Aviva Life & Annuity Co.*,
   No. CIV. S-09-1454 FCD/DAD, 2009 WL 10694223, at *4 (E.D. Cal. Nov. 18, 2009) ............................................................14

*Screen Cap. Int'l Corp. v. Library Asset Acquisition Co., Ltd.*,
   510 B.R. 248 (C.D. Cal. 2014) .......................................................39

*In re Sentinel Mgmt. Grp.*,
   728 F.3d 660 (7th Cir. 2013) ..........................................................41

*In re SMTC Mfg. of Tex.*,
   421 B.R. 251 (Bankr. W.D. Tex 2009) .............................................43

*Spinelli v. NFL*,
   96 F. Supp. 3d 81 (S.D.N.Y. 2015) .................................................22

*Spletstoser v. United States*,
   No. CV 19-10076-MWF(AGRx), 2020 WL 6586308 (C.D. Cal. Oct. 22, 2020) ..........................4

*Strawn v. Morris Polich & Purdy, LLP*,
   30 Cal. App. 5th 1087 (1st Dist. 2019) ....................................... 25, 26

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

*Sullivan v. Oracle Corp.*,
    127 Cal. Rptr. 3d 185 (2011)......................................................................................27, 28

*Sunnyside Dev. Co. LLC v. Cambridge Display Tech. Ltd.*,
    No. C 08-01780 MHP, 2008 WL 4450328 (N.D. Cal. Sept. 29, 2008).....................................39

*Terminix Co. v. Contractors' State License Bd.*,
    84 Cal. App. 2d 167 (2d Dist. 1948) .......................................................................24

*Terpin v. AT&T Mobility, LLC*,
    No. 2:18-cv-06975-ODW, 2019 WL 3254218 (C.D. Cal. July 19, 2019).................................28

*Thai Chee Ken and others (Liquidators of Pan-Electric Industries Ltd) v. Banque
    Paribas* [1993].................................................................................38

*Transnat'l Mgmt. Sys. II, LLC v. Carcione*,
    No. 14-CV-2151 (KBF), 2016 WL 7077040 (S.D.N.Y. Dec. 5, 2016)....................................32

*Tufano v. One Toms Point Lane Corp.*,
    64 F. Supp. 2d 119 (E.D.N.Y. 1999), *aff'd sub nom. Tufano v. One Toms Point
    Lane Corp., Bd. of Dirs.*, 229 F.3d 1136 (2d Cir. 2000) ...........................................25

*In re Verestar, Inc.*,
    343 B.R. 444 (Bankr. S.D.N.Y. 2006).....................................................25

*W. Geophysical Co. of Am. v. Bolt Assocs., Inc.*,
    440 F.2d 765 (2d Cir. 1971) ...............................................................3

*Wallack v. Idexx Labs., Inc.*,
    No. 11CV2996-GPC (KSC), 2014 WL 1455872 (S.D. Cal. Apr. 14, 2014) ............................25

*In re Wheeler*,
    444 B.R. 598 (Bankr. D. Idaho 2011).....................................................40

*Wisdom v. Easton Diamond Sports*,
    LLC, No. CV 18-4078 DSF, 2018 WL 6264994 (C.D. Cal. Oct. 9, 2018) .............................28

*Zumpano v. Quinn*,
    6 N.Y.3d 666 (2006) ....................................................................32

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

1

<u>Statutes and Codes</u>

United States Code
    Title 11, Section 362(k)................................................................................3
    Title 11, Section  362(k)(1)......................................................................45
    Title 11, Section 547.................................................................................36
    Title 11, Section 547(c)(1).......................................................................44
    Title 11, Section 547(c)(2).......................................................................44
    Title 11, Section 548.................................................................................36
    Title 11, Section 548(a)(1)..........................................................36, 37, 40
    Title 11, Section 550.................................................................................36
    Title 28, Section 157(e)..............................................................................3

California Business and Professions Code
    Section 17200...........................................................................................27

California Penal Code
    Section 27.................................................................................................29
    Section 641.3......................................................................................27, 29
    Section 777...............................................................................................29
    Section 778...............................................................................................29
    Section 778a.............................................................................................29

New York Uniform Commercial Code
    Section 2-174............................................................................................16

<u>Rules and Regulations</u>

Federal Rules of Civil Procedure
    Rule 8......................................................................................................39
    Rule 9(b)....................................................................................1, 14, 39
    Rule 12(b)(6)............................................................................................43
    Rule 12(b)(7).....................................................................................34, 35
    Rule 19(b).........................................................................................34, 35

Federal Rules of Bankruptcy
    Rule 2004.................................................................................................12

<u>Other Authorities</u>

5 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 547.04[1] (16th ed.
    2013)................................................................................................44, 45

Restatement (Second) of Agency
    Section 1(1)..............................................................................................22

Restatement (Second) of Conflict of Laws
    Section 187...............................................................................................15

x

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Even after having had sixteen months, and the benefit of the Court's dismissal decisions as a road map, the Trustee has still failed to state plausible claims against BI, BAC or LI.[1]

He has alleged nothing new in the FAC to now make plausible the allegation that everybody – aircraft lessors, aircraft finance companies, investors, and shareholders experienced in charter operations – was duped into supporting the purchase of wildly overpriced aircraft.  To be sure, the Trustee now references an undisclosed "expert report" that purports to say aircraft sold for $50 million were only worth $37 million, but the cloaked details about the report fail to meet the requirements of Rule 9(b), and its difficult-to-believe conclusions flatly contradict other pricing allegations in the FAC: an exhibit shows the 2015 list price for Global 6000s as $63 million; the Zetta business plan (incorporated by reference) assumed pricing of $50 million; and sophisticated third-party leasing companies are alleged to have bought the aircraft for $50 million.  Contradictory allegations like these are inherently implausible and thus cannot support any tort or constructive fraudulent transfer claims.

The FAC likewise adds nothing to cause the Court to revisit its conclusions about BAC/BI's direct conduct.  The allegations that BAC/BI gave the "Zetta team" (not just Cassidy) sports tickets or openly discussed (but did not give) two jet skis are still insufficient to plead anything wrongful, and the allegations that these acts caused Zetta to purchase aircraft are still conclusory.  The Trustee tries

---

[1] All capitalized terms are as defined in the First Amended Complaint ("FAC"), except as otherwise noted.  "Zetta" refers to the Debtors.  "BI" refers to Bombardier, Inc.  "BAC" refers to Bombardier Aerospace Corporation, and both collectively, "Bombardier."  "LI" refers to Learjet, Inc.  All emphasis has been added, unless otherwise noted.  All references to the docket in this adversary proceeding are cited as "Dkt."; all references to the docket in the adversary proceeding styled *King v. Cavic Aviation Leasing (Ireland) 22 Co. Designated Activity Company*, Case No. 2:19-ap-01147-SK ("Cavic Proceeding"), are cited as "Cavic Proceeding Dkt."; and all references to the docket in the Zetta main chapter 7 case, No. 2:17-bk-21386-SK, are cited as "Bankruptcy Case Dkt."  The Trustee's original complaint filed in this action is cited as "Compl."  The Court's Orders granting Bombardier, Jetcraft, and the FK Entities' respective Motions to Dismiss the Adversary Complaint (Dkts. 107-109) are cited as "BBD MTD Order," "Jetcraft MTD Order," and "FK MTD Order," respectively.  The Court's Memorandum of Decision granting Cavic's Motion to Dismiss the Cavic Proceeding (Cavic Proceeding Dkt. 157-1) is cited as "Cavic MTD Order."  The Court's July 29, 2020 Memorandum of Decision in the proceeding styled *King v. Yuntian 3 Leasing Company Designated Activity Company*, Case No. 2:19-ap-01383-SK ("Yuntian Proceeding"), Dkt. 175, is cited as "Yuntian MTD Order," and the Court's August 17, 2021 Memorandum of Decision in the Yuntian Proceeding is cited as "Yuntian Second MTD Order."

1

1    to plead around the causation defect by now saying these acts induced Cassidy to breach his fiduciary

2    duties by *not* canceling contracts.  But this, too, is implausible: Cassidy had no fiduciary duty to *breach*

3    contracts – particularly ones assigned to third parties.

4          What the FAC *does* add – the transaction documents – now make clear that the payments said

5    to be made by Jetcraft in the Element Transactions cannot be attributed to BAC/BI.  The representative

6    agreements between BAC/BI and Fazal-Karim expressly disclaim any agency relationship, which

7    defeats the *actual* authority claims.  And the sales agreements with Zetta expressly state that Fazal-

8    Karim had no authority to bind BAC/BI, which defeats the *apparent* authority claims.  The transaction

9    documents and some of the new FAC allegations also now shed light on that which was murky in the

10    original Complaint: when Fazal-Karim acted as an outside sales representative for BAC/BI and

11    participated in negotiations, it was with sales of aircraft that BAC/BI owned, *not* sales of aircraft that

12    Jetcraft owned and sold for its own account out of its own inventory (as in the Element Transactions).

13    Jetcraft – the entity said to have made the payments – *is not even alleged to be a BAC/BI agent.*

14          There is simply nothing here tying BAC/BI to anything actionable, but even if there was, the

15    tort claims would fail.  For the facts pled show that Cassidy never "totally abandoned" Zetta.  His

16    alleged acts are in each instance coupled with raising capital for Zetta's business or expanding the

17    fleet to raise the Debtors' profile.  As such, Cassidy's wrongdoing must be imputed to the Debtors

18    themselves who are *in pari delicto* with the defendants and thus estopped from pursuing their claims.

19          Also missing here is anything new to cause the Court to change its prior conclusion that the

20    CAVIC transactions cannot be recharacterized under English law as financings and that the Trustee

21    cannot claw-back payments that CAVIC made.  The same reasoning applies to payments made by

22    Glove Assets in its capacity as an equipment lessor.  Those payments were never part of the estate.

23    What is more, these recharacterization claims are doomed from the start: the equipment lessors are

24    indispensable parties who cannot now be joined because of the Trustee's own litigation tactics.

25          The Trustee has also failed to add allegations necessary to protect his preference and fraudulent

26    transfer claims from dismissal: they were and remain "extraterritorial," and his preference claims are

27    also subject to valid defenses.  He also has pled nothing new to support his claim that Cassidy intended

28

1   to hinder, delay, or defraud creditors in purchasing revenue-generating aircraft. The "Ponzi-like" label

2   still does not fit; the badges of fraud are still not pled. And the Trustee's stay violation claim fails

3   because the Trustee lacks standing even to bring it. 11 U.S.C. § 362(k).

4        The FAC should now be dismissed, with leave to replead denied. The Trustee has had the

5   benefit of exhaustive discovery and two opportunities to try to state a plausible claim against BAC

6   and BI. It cannot be done because no matter how many times the Trustee labels something

7   "fraudulent" (more than 100 times in this pleading), he cannot convert BAC/BI's ordinary course

8   aircraft sales and business activities into something wrongful and cannot attribute to them payments

9   made in transactions now shown to have nothing to do with them.[2]

10  **II.    SUMMARY OF ALLEGATIONS IN THE FIRST AMENDED COMPLAINT**

11      **A.    The Zetta Business Plan**

12       Zetta PTE was a luxury business aircraft charter company organized on July 15, 2015, by

13  Geoffrey Cassidy ("Cassidy"), James Seagrim ("Seagrim"), and Matthew Walter ("Walter"), each of

14  whom owned a one-third interest. FAC ¶ 21. Seagrim and Walter had "significant operational

15  experience running a charter airline" and owned a successful private jet charter company (Advanced

16  Air Management) that catered to "high net worth individuals, celebrities and corporate clients in the

17  US and Europe." *Id.* ¶¶ 77-78.

18       Although omitted from the FAC, the original Complaint alleged that Zetta's business plan was

19  to acquire or lease a fleet of aircraft to service "wealthy Chinese clientele who wanted to fly on brand

20  new *Bombardier Global 5000s and 6000s*." Compl. ¶ 66.[3] Zetta's business plan was built on rapid

21

22  ---
    [2] Although the Trustee failed to assert a jury demand in his original complaint and previously
23  consented to a bench trial pursuant to 28 U.S.C. § 157(e), the Trustee now asserts a jury demand in
    the FAC. Having previously consented to a bench trial, the Trustee cannot now withdraw that consent
24  and has waived any right to a jury trial. *See Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1066
    (9th Cir. 2005) ("The authorities are clear that when a party has waived the right to a jury trial with
25  respect to the original complaint and answer by failing to make a timely demand, amendments of the
    pleadings that do not change the issues do not revive this right.") (quoting *W. Geophysical Co. of Am.
26  v. Bolt Assocs., Inc.*, 440 F.2d 765, 769 (2d Cir. 1971)).
    [3] As will be seen, the Trustee removed many of the factual allegations in the original Complaint that
27  were unhelpful to his position. These omitted allegations may still be considered in ruling on a motion
    to dismiss. *See Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996) (admissions in original
28  complaints that have been "amended or withdrawn" are no longer conclusive, but are still admissions,

3

expansion and prepared with the assistance of Ardent Business Advisory PTE Ltd.  Fishman Decl. Ex.

L.[4]  The plan assumed aircraft purchase prices for Global 6000s of $50 million (*Id.* at 35) – ███

███████████████████████████████████.  *See* FAC ¶ 344.  At the time, the list price for Global

6000s was $63.6 million.  FAC Ex. 9 (stating five Global 6000s had a 2015 list price of $318 million

or $63.6 million per aircraft).  The FAC implausibly alleges that in purchasing only Bombardier

aircraft pursuant to, and at prices consistent with, Zetta's own business plan, and for significantly less

than list price, Cassidy nonetheless breached his fiduciary duties.  *See, e.g.,* FAC ¶ 346.

      The Zetta business plan anticipated revenues being generated by the sale of both on-demand

services and block hours.  *Id.* at 5, 12, 20, 26-27, 32, 36.  "Block hours" are "pre-paid hours for a jet

charter at a fixed price."  FAC ¶ 101.  Although central to the business plan, the FAC alleges that

selling block hours was a "Ponzi-like scheme."  *Id.* ¶ 427.  The business plan was shared widely with

sophisticated investors in Zetta and well-known equipment lessors (*id.* ¶ 409); none are alleged to have

raised any concerns about its assumptions, namely, having a Bombardier-only fleet, the pricing of the

aircraft, the sale of block hours, or the financial projections.

      **B.**     **The Six BAC Sales to Zetta**

          *1.*     ***The CAVIC Transactions (Planes 2-5)***

      <u>The CAVIC Aircraft Purchase Agreements ("APAs")</u>.  Of the sixteen aircraft at issue, only six

involved aircraft sold by BAC to Zetta PTE.  Four of those sales occurred on December 10, 2015, when

BAC and Zetta PTE executed four APAs for four Global 6000s (identified as "Planes 2-5" or the "CAVIC

Transactions" in the FAC).  FAC ¶ 135.  These aircraft were priced between ████████████████

████, less than list price and consistent with the business plan.  *Id.* ¶ 344.  Included in the purchase price

were various upgrades, including, *inter alia*, difference training for five pilots (*i.e.,* training as to how the

---

and courts may still consider them);  *Spletstoser v. United States*, No. CV 19-10076-MWF(AGRx),
2020 WL 6586308, at *8 (C.D. Cal. Oct. 22, 2020) ("The Court agrees with Defendant that in certain
circumstances, the Court may consider a plaintiff's previously-pled allegations in ruling on a motion
to dismiss" and considering certain facts in prior complaint but omitted from amended complaint).

[4] The Fishman Declaration has attached to it documents, like the Zetta business plan, expressly referred
to in the FAC and thus, properly considered by the Court in deciding this motion to dismiss.  *See*
BAC/BI/Learjets's Request for Judicial Notice and Incorporation by Reference ("RJN").

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

1  Global 6000 differs from predecessor models), emergency training for flight attendants, discounts on

2  aircraft parts and supplemental pilot training, and the option for Zetta to enroll each aircraft in a preferred

3  maintenance program on favorable terms.  *See* FAC Sch. 2 Exs. 2-24, 2-31, 2-40, 2-53, 2-82, 2-88 §§ 2.1,

4  13.1-13.4.  There are no allegations in the FAC that Seagrim and Walter did not know all the terms of the

5  CAVIC Transactions or did not approve of them.

6      <u>The Agency Disclaimers.</u>  Jahid Fazal-Karim ("Fazal-Karim") served as Bombardier's outside

7  sales representative for the sale of Planes 2-5.  FAC ¶ 148.  The FAC discusses at length the Seller

8  Representative Agreement between Bombardier and Fazal-Karim (*e.g., id.* ¶ 394(a)-(g)), but omits the

9  provision discussing the limits of their relationship:

10      It is intended by the parties that Representative is an independent contractor and not an

11  agent of Bombardier, and neither Representative nor any of its associates, partners, employees or representatives is authorized, expressly or impliedly, to bind Bombardier

12  in any manner whatsoever with respect to third parties.

13  Fishman Decl. Ex. M; *see also* Exs. E-H.  Likewise, each of the four APAs signed by Zetta specifically

14  advises that Fazal-Karim did not have authority to act for or bind Bombardier: "Representative

15  Disclosure:  Jahid Fazal-Karim has no authority and will not have any authority to make any

16  representations or warranties on behalf of Seller or to legally bind Seller under a contract for the sale

17  of the subject Aircraft."  FAC, Sch. 2 Exs. 2-24, 2-31, 2-40, 2-53, 2-82, 2-88 § 14 (the "Agency

18  Disclaimer").  This disclaimer, too, is omitted from the FAC.

19      Instead of addressing the actual contract language, Zetta broadly alleges that any agency

20  disclaimers in the governing contracts should be ignored (FAC ¶ 389) and that Fazal-Karim should be

21  treated as Bombardier's agent on the CAVIC Transactions because he advertised himself and FK

22  Group as Bombardier's exclusive sales "representative" (not agent) in Southeast Asia, was involved

23  in negotiating the CAVIC Transactions, earned a commission on the CAVIC Transactions, and was

24  subject to Bombardier training and ethics policies.  *Id.* ¶¶ 390-99.  Critically for purposes here, the

25  only persons and entities alleged to be agents of Bombardier are Fazal-Karim and FK Group (*id.* ¶¶

26  387-99), <u>not</u> Jetcraft or Jetcoast or Orion (the entities alleged to have made improper payments).  *See,*

27  *e.g., id.* ¶ 241 (alleging "Fazal-Karim agreed to cause <u>Jetcraft</u> to pay Cassidy a $500,000 bribe"); *id.*

28

1    ¶ 271 (same with respect to the second payment).

2        The APA Assignments and Leases.  Following execution of the APAs, Zetta PTE assigned

3    certain rights and obligations under the four APAs to CAVIC statutory trusts established by AVIC.

4    *Id*. ¶¶ 61, 137.  In particular, on May 24, 2016, with respect to Plane 2, Zetta PTE assigned to a CAVIC

5    statutory trust (ZJ6000-1 Trust): (a) "full title [to the Aircraft] under the warranty bill of sale," (b)

6    Zetta PTE's "obligation to make all payments under the [Plane 2 APA]," (c) Zetta PTE's "right to

7    accept Delivery of the Aircraft and take title to the Aircraft," and (d) ***any and all rights of Assignor***

8    ***[Zetta PTE] to compel performance of the terms of the [Plane 2 APA]*** by Bombardier corresponding

9    to the rights assigned," which would include the right to compel Bombardier to return payments in

10   various circumstances pursuant to Section 9.2 of the APA.  Fishman Decl. Ex. I ¶ 1.

11       The assignment further provides that, "in the event Bombardier shall reimburse part or all of the

12   Purchase Price (as this term is defined in the [APA]) as a result of termination of the Agreement or

13   otherwise, Assignor and Assignee agree that ***Bombardier shall return all such reimbursement to***

14   ***Assignee [the CAVIC statutory trust]***, and Bombardier shall thereafter be released of any claim Assignor

15   or Assignee may assert to any entitlement to such reimbursement." *Id*. ¶ 6.

16       Substantively identical assignments were made from Zetta PTE to CAVIC statutory trusts on

17   September 22, 2016 (Plane 3), March 28, 2017 (Plane 4), and March 31, 2017 (Plane 5) (collectively,

18   the "APA Assignments").  *See* FAC Sch. 2 Ex. 2-70; Fishman Decl. Exs. J-K.[5]  The assignments for

19   Plane 4 and 5 further provide: "Assignor hereby absolutely assigns, conveys and transfers to Assignee

20   all of Assignor's rights, title, interests, liabilities and obligations under the Agreement, including,

21   without limitation, i) the benefits of the advance payments already made by the Assignor in respect of

22   the Aircraft. . . ."  Fishman Decl., Exs. J-K ¶ 1.  Thus, following the execution of the APA

23   Assignments, only CAVIC had the right to enforce the APAs and compel reimbursement of payments,

24   and any such reimbursements had to be paid to CAVIC (including payments Zetta made).

25

26   _____

27   [5] Although the APA Assignment for Plane 5 is attached to the FAC as Schedule 2 Ex. 2-70, the other
     APA Assignments for Planes 2-4 are omitted.  The APA Assignments for Plane 2-4 are incorporated

28   by reference and may be considered in connection with this Motion to Dismiss. *See* RJN.

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

In accordance with the obligations that CAVIC assumed, CAVIC thereafter made payments to BAC in the aggregate amount of $120.36 million for the four aircraft. FAC ¶ 143.  Additionally, the CAVIC statutory trusts, as owners of Planes 2-4 (Plane 5 was never delivered), then entered long-term leases for these Aircraft with Zetta. *Id.* ¶ 137.

### 2.    The Bombardier Purchase Orders (Planes 8-9)

The only other Aircraft that Bombardier sold to Zetta PTE are Planes 8-9 (also Global 6000s) pursuant to two APAs dated February 2016. *Id.* ¶ 176.  The Trustee advances no claims with respect to these aircraft.  While Zetta PTE made one payment of $2.4 million to BAC for Planes 8 and 9 on June 30, 2016, that amount was "later transferred to Plane 4 on March 24, 2017." *Id.* ¶¶ 143, 686, 698. The FAC identifies no other payments to Bombardier in connection with Planes 8 and 9.  There are no allegations in the FAC that Seagrim and Walter did not know all the terms of the Bombardier Purchase Orders or did not approve of them.  The Trustee does not include Planes 8 and 9 in its chart purporting to show a contract price-market price differential. *Id.* ¶ 344.

### C.    The Aircraft Purchased or Leased by Zetta from Non-Bombardier Entities

### 1.    The First and Second Element Transactions (Planes 1 and 10-11)

<u>Jetcraft.</u>  According to the FAC, Fazal-Karim had different aviation-related businesses: "Fazal Karim is Bombardier's sales agent and also runs a private luxury jet broker, Jetcraft." FAC ¶ 6.  "Jetcraft provides aircraft sales, leasing, acquisition and trade services." *Id.* ¶ 47.  It buys and sells "new and pre-owned aircraft and provides consulting, fleet planning and contract services." *Id.*  The principal conduct about which the Trustee complains relates to actions allegedly taken by Jetcraft in connection with Jetcraft's sales of aircraft from its own inventory (<u>not</u> conduct undertaken by Fazal-Karim or FK Group when acting as an outside sales representative selling aircraft from Bombardier's inventory).

<u>Plane 1 and the First Alleged Improper Payment.</u>  Jetcraft purchased Plane 1, a Global 5000, from BAC on September 28, 2015. FAC Sch. 2 Ex. 2-1.  Months later, on December 5, 2015, Jetcraft entered into a purchase agreement with Zetta PTE for Plane 1, which transaction closed on December 30, 2015, with financing provided to Zetta PTE by Element Aviation. FAC ¶¶ 119-20.  Bombardier was not involved in this transaction: it did not sell Plane 1 to Zetta PTE; Bombardier was not a party

1   to the Plane 1 APA, FAC Sch. 2 Ex. 2-1; and no payments are alleged to have been made to

2   Bombardier by Zetta in connection with this transaction.

3         The FAC alleges that in "November 2015, Fazal-Karim agreed to cause Jetcraft to pay Cassidy

4   a $500,000 bribe (the 'First Kickback') fraudulently disguised to look like it was a part of the purchase

5   price of Plane 1." FAC ¶ 241. The FAC, using hedged language, says that the "First Kickback was

6   not *appropriately* disclosed to the Debtors' other disinterested directors." *Id*. ¶ 259. Every single

7   allegation about this payment – *every one* – concerns Jetcraft and its officers; not one mentions BI or

8   BAC. *See, e.g., Id.* ¶ 252 (alleging Anderson, the president of Jetcraft, sent Fazal-Karim, as chairman

9   of Jetcraft, a spreadsheet referencing a $500,000 payment "payable by Jetcraft"); *id*. ¶ 253 (alleging

10  Anderson of Jetcraft emailed Larue of Element Aviation a spreadsheet showing the payment – no copy

11  to Bombardier); *id*. ¶ 255 (alleging Behrand, the CFO of Jetcraft, emailed Fazal-Karim and Anderson

12  about the third-party fee of $500,000 that "Jetcraft accrued"); *id*. ¶ 256-57 (alleging Cassidy emailed

13  Fazal-Karim an invoice for "support services" and that only "Fazal-Karim, Jetcraft Corp., Jetcoast and

14  Jetcraft Global were aware that Cassidy provided no services related to Plane 1" – no reference to

15  anyone at Bombardier or BAC); *id*. ¶ 258 (alleging "Behrand [the Jetcraft CFO] sent a $500,000 wire

16  from Jetcraft Global's bank account"). After receiving thousands of documents in discovery, the

17  Trustee cannot identify even a fragment of a document or communication indicating that BI or BAC

18  was involved with or knew anything about this payment.

19        So, the Trustee tries, for the first time in the FAC, to insinuate that the Plane 1 sale by Jetcraft

20  was "linked" to sales by BAC of Planes 2-6 (Planes 2-5 were sold by BAC to Zetta PTE and assigned

21  by Zetta PTE to CAVIC as discussed above; Plane 6 was sold by BAC to Li Qi as discussed below).

22  *See, e.g., Id.* ¶ 238 (referencing "combined transactions involving Planes 1-6"); *id.* ¶ 396 (alleging

23  "Fazal-Karim negotiated the terms of the combined transactions for Planes 1-6"). The conclusory

24  assertion that Plane 1 was "combined" with Planes 2-6 is inconsistent with the transaction

25  documentation and specific allegations in the FAC:

26      &bull;  There was a separate letter of intent between Zetta PTE and Element for Plane 1 (*id*. ¶
27          119) and between Zetta PTE and BAC for Planes 2-6 (*id*. ¶ 247);

28

- Plane 1 involved the sale of a Global 5000, whereas Planes 2-6 involved the sale of Global 6000s (*id*. ¶¶ 118, 133);

- Plane 1 was financed by Element, whereas Planes 2-5 involved equipment leases pursuant to which CAVIC acquired the Aircraft from BAC and leased them to Zetta PTE (*id*. ¶ 108);

- And, as noted, neither BI nor BAC was even party to or involved with the Plane 1 sale to Zetta.

Plane 10 and the Second Alleged Improper Payment.  On August 30, 2016, Zetta purchased what the Trustee terms "Plane 10" from Orion, a Jetcraft affiliate, which, in turn, "initially purchased Plane 10 in December 2015 from an unrelated third party [*i.e.*, *not* Bombardier] in a deal financed by Element." *Id*. ¶ 183.   Bombardier did not sell Plane 10 to Zetta PTE; Bombardier was not a party to the Plane 10 APA; and no payments are alleged to have been made to Bombardier by Zetta in connection with Plane 10.  Indeed, Bombardier is *two owners removed* from this transaction.

As with Plane 1, the FAC alleges that in "August 2016, Fazal-Karim agreed to have Jetcraft pay Cassidy a $500,000 bribe (the 'Second Kickback') fraudulently disguised to look like it was a part of the purchase price of Plane 10." *Id*. ¶ 271.  According to the FAC, only "Fazal-Karim, Jetcraft Corp., Jetcraft Global, and Orion knew that the Second Kickback had no legitimate purpose" (*id*. ¶ 286); no mention is made of BI or BAC.  Again, all the allegations concerning this second payment concern conduct by Jetcraft (*see id*. ¶¶ 271-286); not one mentions BI/BAC or its personnel.

For the first time, the FAC tries to link this second payment to Bombardier by saying it was made as an inducement to Zetta to, *inter alia*, "acquire Planes 12-15 in the Challenger Transactions, and to accept delivery of Plane 3 and others rather than cancel the contracts as Cassidy expressly threatened to do." *Id*. ¶ 271.  But other than this conclusory assertion, there are no alleged *facts* linking the second payment by Jetcraft to the Challenger Transactions.  The Trustee did not even think to link them in the original Complaint.  And there are no facts alleged supporting either the notion that Zetta had a cancelation right under the APAs (it did not) or that Cassidy *could* cancel the earlier CAVIC Transactions (he could not because Zetta's rights under the APAs were assigned to CAVIC).

Plane 11.  Zetta PTE leased Plane 11 from Element.  According to the FAC, Plane 11 was negotiated as part of the Plane 10 transaction.  *Id*. ¶ 192.  Bombardier did not sell Plane 11 to Zetta

9

4810-6253-4901

PTE; Bombardier was not a party to the Plane 11 APA; and no payments are alleged to have been made to Bombardier by Zetta in connection with Plane 11.  As with all the other aircraft, the Trustee alleges that Element leased Plane 11 to Zetta at above market rates.  *See id.* ¶ 344.

## 2.    *The Li/Minsheng Transactions (Planes 6-7)*

In the summer of 2015, Li Qi, through his entity Universal Leader Investment Limited ("Universal Leader"), purchased an aircraft from an unidentified seller and hired Zetta PTE to operate and charter it.  *Id.* ¶ 151.  Although labeled "Plane 7," this was the first aircraft in Zetta's fleet.  In December 2015, Zetta entered an equipment lease with Universal Leader.  *Id.* ¶ 157.  Bombardier was not involved in either the sale of Plane 7 to Universal Leader or the subsequent lease.

In December 2015, Glove Assets (another Li Qi-controlled entity) purchased Plane 6 from BAC and simultaneously leased the Aircraft to Zetta PTE.  *Id.* ¶ 153. There are no allegations of improper payments in connection with Plane 6.  The Trustee, however, attempts to link Plane 6 to Plane 1 by alleging that, "at the same time Cassidy and Fazal-Karim were negotiating letters of intent relating to Plane 1, Cassidy and Fazal-Karim were also negotiating letters of intent to purchase five to six additional Global 6000s directly from Bombardier" including Plane 6 acquired by Glove Assets. *Id.* ¶ 150.  The conclusory allegation that Plane 1 and Plane 6 are "combined" transactions (just like the conclusory allegation discussed above that Plane 1 and Planes 2-5 are combined) is inconsistent with the allegations showing these transactions involved different aircraft types (Plane 1 was a Global 5000, Plane 6 was a Global 6000); different sellers (Jetcraft for Plane 1, BAC for Plane 6); different buyers (Zetta PTE for Plane 1, Glove Assets for Plane 6); different letters of intent with different parties (Zetta PTE and Element for Plane 1, Zetta PTE and BAC for Planes 2-6); and different structures (a direct purchase for Plane 1 financed by Element, an equipment lease for Plane 6 from Glove Assets).  Indeed, apart from a passing mention by Fazal-Karim to Yubin Yu of Bombardier that Zetta "signed the term sheet with element" for Plane 1 (*id.* ¶ 248), the FAC does not have a single fact tying Plane 6 to Plane 1 or indicating that Plane 1 was sold by or for the benefit of BI or BAC.

As with every transaction, regardless of the seller or lessor, the Trustee alleges that Zetta paid more than the Trustee thinks was appropriate in leasing Planes 6 and 7 from the Li entities: "Both the

2015 Plane 6 Finance Lease and the 2015 Plane 7 Finance Lease contained significantly above-market returns for Li and his entities." *Id.* ¶ 171. These lease agreements "contained onerous terms that were extremely unfavorable to the Debtors and their estates," says the Trustee, including payment terms "well above market." *Id.* ¶ 411. But these leases have nothing to do with BI or BAC.

### 3. The Challenger Transactions (Planes 12-15)

The FAC alleges that "Cassidy executed four additional APAs for Planes 12-15 on September 22, 2016" (*id.* ¶ 321) and Schedule 1 to the FAC lists Zetta PTE as the buyer of these aircraft (four Challengers). This is incorrect. While the Trustee attached nearly all APAs for the aircraft at issue, the Trustee omitted the APAs for the Challenger Transactions, which are between BAC and Yuntian 4 Leasing Company Limited ("Yuntian"), an affiliate of Minsheng. These APAs are attached to the Fishman Declaration at Exhibits E-H. The FAC also alleges that "Cassidy also caused Zetta PTE to use $12.4 million of the closing proceeds [from the Minsheng Refinancing] to make initial payments on purchase agreements for Planes 12-15." FAC ¶ 220. This, too, is belied by facts of which the Court may take judicial notice: Minsheng (not Zetta PTE) made the Challenger Transaction payments. *See* Yuntian Proceeding, Compl. (Dkt. 1) ¶ 106 ("Of the proceeds disbursed at closing . . . $12.4 million went to Minsheng to pay fees and down payments and deposits of four Bombardier Challenger aircraft.").

There are no allegations of wrongdoing by Bombardier with respect to Planes 12-15. There are likewise no allegations that Seagrim or Walter did not understand and approve the terms of these transactions. Indeed, the FAC alleges that Seagrim and Walter authorized the Challenger Transactions even *after* Cassidy told them in June 2016 that Zetta only had "breathing room of 1.5 months." FAC ¶¶ 200; 473. Planes 13-15 are not alleged in the FAC to be overvalued. *Id.* ¶ 344.

### 4. The Falconwing Transactions (Plane 16)

Zetta PTE purchased Plane 16 from Falconwing Limited ("Falconwing") in August 2017. *Id.* ¶¶ 228, 230. Bombardier is not alleged to have had any involvement with this transaction: Bombardier did not sell Plane 16 to Zetta PTE; Bombardier was not a party to the Plane 16 APA; and no payments are alleged to have been made to Bombardier by Zetta in connection with Plane 16.

4810-6253-4901

1

**D.      The Zetta Bankruptcy and the Adversary Proceeding**

2

On September 15, 2017, the Debtors commenced these bankruptcy proceedings (*id.* ¶ 365)

3

and, after exhaustive Rule 2004 discovery, the Trustee filed this adversary proceeding alleging that

4

"the Debtors never had enough operating income to pay off trade creditors or the debt service on the

5

planes." *Id.* ¶ 10.   The Trustee says that Zetta could not meet its obligations because (i) Cassidy

6

embezzled funds from Zetta PTE (*e.g., id.* ¶ 9) and (ii) Cassidy accepted bribes, which, in turn, induced

7

him to purchase overpriced aircraft that Zetta could not afford (*e.g., id.* ¶ 1).   The Trustee does not

8

allege that Bombardier has any responsibility for Cassidy's alleged embezzlement.   The Trustee does,

9

however, allege that Bombardier is liable for supposedly paying kickbacks.

10

In particular, the Trustee alleges that Bombardier "knew of and agreed to the kickbacks that

11

Fazal-Karim had Jetcraft Global pay to Cassidy."  *Id.* ¶ 7.   But as detailed above, there are no *facts*

12

alleged to support that conclusory allegation.   Just the opposite: the FAC alleges that only "Fazal-

13

Karim, Jetcraft Corp., Jetcraft Global, and Orion" knew of the improper payments.  *Id.* ¶¶ 257, 286.

14

The Trustee also alleges that Bombardier "worked in concert with Fazal-Karim by paying bribes

15

directly to Cassidy," namely, by giving the Zetta team a grand total of five sports tickets for business

16

entertainment and by offering to provide him two jet skis (*e.g., id.* ¶¶ 7, 305) – which jet skis

17

Bombardier ultimately never provided or paid for (*id.* ¶ 335).   These allegations are substantially

18

identical to those already found by the Court to be deficient and not to support a claim.   BBD MTD

19

Order at 11-12, 16-20, 29-30.

20

The only new allegations in the FAC relating to alleged bribes are vague allegations about

21

Fazal-Karim having a "corrupt relationship" with Khadar Mattar of Bombardier.   The Trustee says

22

that "[b]eginning no later than March 18, 2015, Fazal-Karim and Mattar entered into a corrupt

23

relationship that involved illicit, improper, and undisclosed payments between Fazal-Karim and

24

Mattar relating to Zetta aircraft transactions" (FAC ¶ 290) – even though Zetta did not even exist until

25

four months later (July 15, 2015) (*id.* ¶ 81).   The Trustee bases this charge on a spreadsheet that, he

26

says, "on its face, documents and purports to reconcile a flow of payments between Fazal-Karim and

27

Mattar."  *Id.* ¶ 292 (referencing Ex. 10).   But the chart does not name or reference any individuals

28

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

1  whatsoever and the Trustee sets forth no facts supporting his conclusion that the chart reflects

2  payments between Fazal-Karim and Mattar (or anybody else).

3         The Trustee speculates that the amounts on the spreadsheet related to "commissions or other funds

4  that Fazal-Karim received on transactions." FAC ¶ 294. The chart, however, does not reference

5  "commissions" and the FAC concedes that the "amounts in the Spreadsheet do not match the commissions

6  that Fazal-Karim or the other Fazal-Karim Defendants received from Bombardier." *Id*. The Trustee

7  concludes by alleging, "whether the Spreadsheet shows payments from Fazal-Karim to Mattar or vice

8  versa, in either event the payments are improper." *Id*. But the Trustee sets forth no facts supporting this

9  conclusion, and most importantly, the Trustee nowhere ties his speculation about improper payments

10  between Fazal-Karim and Mattar, on the one hand, with anything that happened to Zetta, on the other hand.

11         According to the Trustee, the alleged payments made to Cassidy by Jetcraft (together with the

12  Bombardier-provided sports tickets and Bombardier's discussion of jet skis) caused Zetta (a) to

13  purchase only Bombardier aircraft and not engage in a competitive procurement process (*e.g., id*. ¶

14  92) (even though the Trustee has also alleged that having a Bombardier-only fleet was the business

15  plan from the inception); (b) to purchase more aircraft than Zetta needed (*e.g., id*. ¶ 91) (even though

16  the FAC nowhere alleges that Seagrim and Walter were unaware of the number of aircraft purchased);

17  (c) to purchase aircraft at or close to their asking price (*e.g., id*. ¶ 92) (even though an exhibit to the

18  FAC shows the 2015 list price for Global 6000s was $13 million per plane *higher* than the amounts

19  paid); (d) to pay above-market prices (*e.g., id*. ¶ 344) (even though the prices were exactly in line with

20  the Zetta business plan referenced throughout the FAC and approved by Seagrim and Cassidy, and

21  even though three sophisticated equipment finance companies agreed to acquire the aircraft at such

22  pricing); and (e) not to cancel the four CAVIC Transactions (*e.g., id*. ¶ 7) (even though the right to

23  exercise remedies under the APAs was assigned to CAVIC and even though the APAs do not have a

24  termination for convenience provision).

25         The Trustee now alleges that he can pursue myriad claims against BAC/BI/LI because

26  "Cassidy totally abandoned the Debtors' interests and acted entirely for his own purpose." *Id*. ¶ 405.

27  But the FAC and original Complaint contradict that allegation: Cassidy used "investor, financier and

28

<hr>

13

**BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

1    customer funds" to keep "Zetta" afloat. *Id.* ¶ 10. Funds raised from the sale of block hours were used

2    to obtain "immediate cash to pay for [Zetta's] obligations," and the other directors knew it. *Id.* ¶¶ 100,

3    429. Cassidy used "12.6 million [of $17.7 million received from Minsheng] . . . to make initial

4    payments on four Bombardier Challenger 650 planes." *Id.* ¶ 204. And, even when he took bribes to

5    buy more planes, he also sought to "raise[] the Debtor's profile . . . in the rarified world of private jet

6    enthusiasts" by expanding the fleet. Compl. ¶ 91.[6] Indeed, the FAC concedes that Cassidy intended

7    to "grow and operate the Debtors' business." *Id.* ¶¶ 402, 645.

8    **III.    ARGUMENT**

9        **A.    Pleading Standards**

10        "To survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true,

11    to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.,* 660 F. App'x

12    546, 547 (9th Cir. 2016) (omitting quotes and citations). Where conduct is equally consistent with

13    innocent behavior, a complaint does not state a plausible claim. *Ashcroft v. Iqbal,* 556 U.S. 662, 679

14    (2009); *see also Sanchez v. Aviva Life & Annuity Co.,* No. CIV. S-09-1454 FCD/DAD, 2009 WL

15    10694223, at \*4 (E.D. Cal. Nov. 18, 2009) (dismissing claim that company paid "kickbacks" and aided

16    Ponzi scheme where payments were "equally consistent with an obvious alternative explanation" that

17    company "simply loaned or advanced operating funds to its sales agent") (omitting quotes).

18        All claims grounded in fraud must not only be plausible but pled with particularity. Fed. R.

19    Civ. P. 9(b); BBD MTD Order at 4. "The fact that Plaintiff is proceeding under an agency theory does

20    not absolve Plaintiff of the Rule 9(b)'s requirement to explain [the principal's] role in the false

21    statements." *Id.* at 15 (citing *RPost Holdings, Inc. v. Trustifi Corp.,* No. CV 11-2118 PSG (SHx), 2011

22    WL 4802372, at \*4 (C.D. Cal. Oct. 11, 2011)). Here, the entire pleading is based on an alleged course

23    of fraudulent conduct – as FAC Paragraph 1 says, "This is a case about rampant fraud, bribery, and

24    corruption – and thus *all* the tort and fraudulent transfer claims must be stated with particularity. *See,*

25    *e.g.,* Count 2 (conspiracy "to defraud the Debtors"); Count 3 (defendants "engaged in fraudulent

26

27    _____

[6] These Complaint allegations were conveniently omitted from the FAC but may still be considered
28    here. *See supra,* n.2.

1  conduct"); Count 6 (claim for fraudulent misrepresentation); Count 7 (claim for fraudulent

2  concealment); Counts 12-17 and 31-32 (claims for fraudulent transfers).

3  **B.    New York Law Applies to the Trustee's Tort Claims**

4  "In the Ninth Circuit, federal common law choice of law rules apply in bankruptcy cases."

5  CAVIC MTD Order at 14 (quoting *In re Miller*, 292 B.R. 409, 413 (B.A.P. 9th Cir. 2003).   Under

6  federal choice-of-law rules, federal law determines the *enforceability* of a choice-of-law clause and

7  the state law selected in the clause determines its *scope*.  *Odin Shipping Ltd. v. Drive Ocean V MV*,

8  221 F.3d 1348, at *1 (9th Cir. 2000).

9  <u>Enforceability.</u>  "Federal common law applies § 187 of the Restatement (Second) of Conflict

10 of Laws to determine the enforceability of contractual choice of law provisions." CAVIC MTD Order

11 at 14.   Restatement § 187(1) states: "The law of the state chosen by the parties to govern their

12 contractual rights and duties will be applied if the particular issue is one which the parties could have

13 resolved by an explicit provision in their agreement directed to that issue." It is well-settled that

14 "Restatement section 187 . . . reflects a strong policy favoring enforcement of [choice-of-law]

15 provisions." *ABF Cap. Corp., a Del. Corp. v. Osley,* 414 F.3d 1061, 1065 (9th Cir. 2005) (omitting

16 quotes and citations). "Where the making of a contract is not in dispute, the law chosen by the parties

17 need not have any reasonable relationship to the creation or performance of the contract.   Such a

18 relationship is necessary under Restatement § 187 only when the parties seek to specify choice-of-law

19 governing issues concerning formation or validity of the contract."  CAVIC MTD Order at 14.

20 A reasonable relationship to the laws of a selected forum exists where a company has an

21 interest in "identifying a single body of law" to govern its multi-jurisdictional transactions.  *King v.*

22 *Bumble Trading, Inc.,* 393 F. Supp. 3d 856, 865 (N.D. Cal. 2019) (holding that reasonable basis existed

23 for New York choice-of-law provision in mobile application operator's terms of service where

24 application's users were spread across jurisdictions); *Cayanan v. Citi Holdings, Inc.,* 928 F. Supp. 2d

25 1182, 1195 (S.D. Cal. 2013) (holding there was reasonable basis for Nevada law in agreement based

26 on defendant's "wide reach across the United States").   The reasonable relationship standard, this

27 Court has explained, "is a minimal standard [because] rarely, if ever, will parties choose a law without

28

**BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

4810-6253-4901

1  good reason." CAVIC MTD Order at 18 ("[T]here was a reasonable basis for the choice of English

2  law because the parties to the transactions are from all around the world").

3      Here, the Trustee is not challenging the formation of the APAs: he does not seek rescission of

4  the contracts and he demands, among other things, damages measured by "the difference between the

5  amount that the Debtors paid for the Planes and the amounts the Planes were actually worth" (FAC ¶

6  569) – a contract damages measure.  *See, e.g.,* N.Y.U.C.C. §2-174.  But even if the Trustee claims to

7  be challenging contract formation, a reasonable relationship to New York exists because Bombardier

8  – "an international company [that] does business in many countries around the world" (FAC, Ex. 11

9  at p. 7) – had an interest in having a single body of law govern its contracts with Zetta.  That is why

10  each contract involving BAC or BI – the APAs, the APA Assignments, Zetta's Promissory Note (FAC

11  ¶ 488) and the related Affidavit of Confession of Judgment (FAC, Ex. 13), and the Settlement

12  Agreement (FAC ¶ 495, Ex. 14) – chooses New York law.  The New York choice-of law provision

13  should thus be enforced.

14      <u>Scope.</u>  Under New York law, "in order for a choice-of-law provision to apply to claims for

15  tort arising incident to the contract, the express language of the provision must be 'sufficiently broad'

16  as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640,

17  645 (2d Cir. 1996); *see also Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.,* No. 14-CV-6640-FPG,

18  2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016) (finding provision stating "this Agreement and all

19  claims related to it, its execution or the performance of the parties under it, shall be construed and

20  governed in all respects according to the laws of the State of New York" to include tort claims).

21      Here, the choice-of-law provision in each BAC APA is broad:

22  This Agreement including the formation, performance, termination and/or
    enforcement and the parties' relationship in connection therewith, together with any
23  related claims arising under common law or statute, whether sounding in contract,
    tort or otherwise shall be governed, construed and enforced in all respects in
24  accordance with the law of the State of New York U.S.A., excluding the State of
    New York's conflicts of law provisions.
25
26  FAC, Sch. 2 Exs. 2-24, 2-31, 2-40, 2-53, 2-82, 2-88 § 4.4.  Because this clause governs "the parties'

27  relationship," including contract "formation" and "claims . . . sounding in contract, tort or otherwise,"

28

4810-6253-4901

1    New York law should be applied to each of Trustee's tort claims.[7]

2    **C.    Count 1 Fails to State a Claim for Aiding and Abetting Fiduciary Breach**

3    The Trustee's lead claim is that BAC and BI aided and abetted Cassidy in breaching fiduciary

4    duties by giving him undisclosed financial incentives.[8]  To state a claim for aiding and abetting a

5    breach of fiduciary duty, a claimant must plead that: (1) a fiduciary breached his duties; (2) the

6    defendant knowingly induced or participated in such breach; and (3) the beneficiary of such duties

7    thereby suffered damages.  *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003).

8    Actual knowledge of the fiduciary breach (not constructive knowledge) is required.  *Baron v.*

9    *Galasso*, 83 A.D.3d 626, 629 (2d Dep't 2011).  To knowingly induce or participate in a fiduciary

10   breach, the defendant must provide "substantial assistance" to the fiduciary.  *Id.* "Substantial

11   assistance" requires an "affirmative act on the defendant's part; 'mere inaction' can constitute

12   substantial assistance 'only if the defendant owes a fiduciary duty directly to the plaintiff.'" *Id.*

13   (quoting *Kaufman,* 307 A.D.2d at 126).[9]

14   *1.    Giving Five Sports Tickets to the "Zetta Team" is Insufficient*

15   The only allegation in Count 1 that addresses direct actions by BI or BAC is Paragraph 560,

16   which says: "Bombardier aided and abetted Cassidy's breaches of fiduciary duty and corrupted the

17   fiduciary relationship between Cassidy and the Debtors by giving Cassidy the F1 tickets and offering

18   Cassidy the Sea-Doos as part of a quid pro quo to ensure Cassidy would take delivery of the Planes

19   rather than cancel the transactions, as well as cause the Debtors to enter into additional transactions."

20   The Court has already determined these allegations to be insufficient.  BBD MTD Order 16-18.  It

21

22   _____

[7] As a practical matter, the laws of New York and California are substantively the same with respect

23   to the tort issues in this case, except as they bear upon (i) whether California's commercial bribery
     statute applies and (ii) the application of the *in pari delicto* doctrine.  Accordingly, we cite in the text

24   to New York authorities and, as warranted, cite in the footnotes to parallel California authorities.
     While Zetta USA is not party to the APAs, Bombardier never dealt with Zetta USA and Zetta USA
     has no cognizable claims against it.

25   [8] To the extent that the Trustee's claims are based on Cassidy breaching fiduciary duties by purchasing

26   overpriced planes, the allegations are insufficient for the reasons set forth in section III(J)(2)(i)(b) -
     *The Trustee fails to allege sufficient a lack of reasonably equivalent value (Counts 13 and 17).*

27   [9] California law is the same. *See ARB, Inc. v. Luz Const., Inc.*, 972 F.2d 1336 (9th Cir. 1992)
     ("Substantial assistance requires an affirmative act; a mere failure to disclose cannot be the basis for

28   liability unless the party failing to disclose owes a fiduciary or statutory duty of disclosure.").

4810-6253-4901

1    should do so again here.

2        First, this claim fails to state with specificity that Cassidy breached his duties because it does not

3    detail whether the other shareholders knew of the tickets or attended the event.  Indeed, the FAC suggests

4    that they *did* know, alleging that "the tickets were for the Zetta *team*" (FAC ¶ 313), not Cassidy himself.

5    Likewise, the FAC is vague in specifying who was on the email chains in which Cassidy threatened to

6    cancel orders unless given tickets.  FAC paragraphs 307-8 and 310 each references a threat copied to

7    "Fazal-Karim, Yu, *and others.*"  *Id.* Which others?  Cassidy could not breach his fiduciary duties to his

8    fellow shareholders if they knew of the tickets themselves and did not object.  The failure to allege that

9    the tickets were hidden defeats the fiduciary breach claim.

10       Conversely, what the FAC *does* allege shows that Cassidy did *not* breach any duties in accepting

11   tickets. The FAC says it was wrongful for Cassidy to buy only Bombardier aircraft, but that was the

12   business plan from the start.  It alleges Cassidy was induced to buy too many planes, but each purchase

13   was approved by the other shareholders. It alleges the $50 million price was too high, but that was the

14   price point the shareholders agreed upon in the business plan.  An officer cannot breach duties to other

15   shareholders by carrying out their agreed upon plan.

16       Second, the FAC fails to allege that BAC/BI "knowingly" tried to induce a breach because it

17   fails to distinguish the tickets from ordinary business entertainment.  The FAC generically alleges that

18   "Bombardier did not provide the F1 tickets as reasonable and legitimate client entertainment, but rather

19   as a commercial bribe in direct response to Cassidy's demand for a quid pro quo."  FAC ¶ 314.  But

20   this is just a conclusion.  The FAC does not contain facts moving the claim that BAC/BI knowingly

21   sought to induce a breach by giving a client sports tickets from merely "possible" to "plausible."

22       Third, the FAC also fails to plead causation.  In considering the original Complaint, the Court

23   identified two such problems: (i) the alleged gifts came eight months *after* execution of the supposedly

24   tainted contracts (BBD MTD Order at 16) and (ii) the mere fact that the sports tickets were "temporally

25   proximate" to the subsequent Challenger Transactions is not sufficient to show causation because BAC

26   was in the business of selling Challengers and Zetta was in the business of buying and operating them

27   – hence the sales were equally consistent with ordinary business.  *Id.* at 16-17.  There are no facts pled

28

---

18

**BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

4810-6253-4901

1    linking the tickets and the Challenger Transactions.

2         To address these causation problems, the FAC now emphasizes that BAC/BI provided tickets

3    so that Cassidy would not "refuse to take delivery of Plane 3 and cancel the purchases agreements for

4    4, 5, 8 and 9." FAC ¶ 311; *see also id.* ¶ 313 ("Mattar acquiesced, and with intent to influence Cassidy

5    not to cancel the contracts, directed that the tickets were for the Zetta team").  The gravamen of the

6    F1 allegations is now that Cassidy breached fiduciary duties by not exercising cancelation rights.

7         But Zetta PTE *had* no cancelation rights.  The APAs set forth Zetta PTE's exclusive rights and

8    remedies (Exs. E-H at Art. 4.1) and they provided that Zetta PTE could terminate only if BAC

9    defaulted (*id.* at 9.2).  Zetta did not have a termination-for-convenience right.  What is more, with

10   respect to the CAVIC Transactions, Zetta assigned the right to exercise remedies to CAVIC and,

11   thereafter, CAVIC alone had the right receive any refunds of pre-delivery payments.  *See* FAC Sch. 2

12   Ex. 2-70; Fishman Decl. Exs. I-K. The FAC thus alleges that BAC and BI caused Cassidy to violate

13   fiduciary duties by inducing him (a) *not* to breach the APAs and (b) *not* to usurp rights and remedies

14   that had been assigned.  Officers and directors of a company, of course, do not have fiduciary duties

15   to breach their company's contracts and to attempt to exercise rights that have been assigned.

16   Moreover, the alleged facts belie any plausible economic incentive for Zetta PTE to cancel, as

17   cancellation would not result in the return of any monies to it.  (CAVIC would receive any refunds on

18   Planes 4 and 5; and the only small payment that had been made on Planes 8 and 9 had been assigned

19   to Plane 4.  *See supra* Section II.B.2). The allegations in the FAC do not cure the legal defects

20   previously identified by the Court because Cassidy could not be induced to violate *non-existent* duties.

21        **2.    *Discussing Sea-Doos is Insufficient***

22        The Court previously also found the Sea-Doo allegations insufficient to support an aiding and

23   abetting claim.  BAC and BI were not directly liable, the Court held, because the Complaint made

24   clear that "Bombardier did not actually agree to pay for the Sea-Doos." BBD MTD Order at 20.  And

25   BAC and BI could not be indirectly liable because the Complaint did not allege that "Fazal-Karim

26   acted on behalf of Bombardier . . . regarding the Sea-Doos." *Id.* at 12.

27        The FAC has the same defects and thus fails for the same reasons – and the following four:

28

---

**BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

4810-6253-4901

1  <u>First</u>, the FAC does not allege what duty Cassidy broke in causing Zetta PTE to acquire the Sea-Doos

2  or in asking Fazal-Karim and BAC/BI to pay for them.  The FAC does not allege that Cassidy was

3  hiding this purchase.  To the contrary, it says that Cassidy worked with Phillip Crevier, "a consultant

4  paid by Zetta PTE," in arranging it (FAC ¶ 316); that "Zetta PTE purchased the Sea-Doos" (*id*. ¶ 320)

5  (rather than Cassidy buying them with stolen funds); and that "Benjamin Ng (Zetta PTE, Accounts)"

6  prepared an invoice seeking reimbursement from Jetcraft Corp. (*id*. ¶ 319).

7          The FAC alleges, moreover, that this openly discussed transaction was structured to "appear

8  to be a legitimate purchase by the Debtors." FAC ¶ 318.  What, then, makes the Trustee think it was

9  not?  Do deluxe aircraft charter companies sponsor seaside events for their wealthy clientele?  The

10  FAC does not say, and for good reason.  Everything here is equally consistent with permitted business.

11  That Cassidy sought an offsetting concession from Zetta PTE vendors is not a fiduciary breach; just

12  the opposite, it is action that advances Zetta PTE's interest.  The lack of clarity about what these Sea-

13  Doos were for, together with the absence of allegations that such Sea-Doo purchases were hidden,

14  cause these allegations to fail as a matter of law.

15          <u>Second</u>, the FAC also fails to include allegations showing that BAC or BI gave "substantial

16  assistance" to Cassidy.  Bombardier is not alleged to have provided the Sea-Doos; not alleged to have

17  reimbursed Zetta PTE for them; and not alleged to have compensated Fazal-Karim for them.  The FAC

18  says that Mattar discussed with Fazal-Karim and Cassidy having Jetcraft pay for the Sea-Doos (FAC

19  ¶ 318) but makes clear that no such agreement was reached.  *See id*. ¶ 335 (stating that Fazal-Karim

20  rejected the Zetta PTE invoice for the Sea-Doos and said, "Jetski has nothing to do with Jetcraft").  As

21  the Court previously held, inaction does not constitute "substantial assistance" as a matter of law.

22          <u>Third,</u> the FAC lacks any allegations establishing that anyone at BAC or BI had actual

23  knowledge that Cassidy, in seeking vendor support for Zetta PTE's purchase of the Sea-Doos, was

24  doing anything improper.  As noted, the FAC alleges that "the transaction would appear to be a

25  legitimate purchase by the Debtors." *Id*. ¶ 318.

26          <u>Finally,</u> the Sea-Doos have the same causation problems as the F1 tickets:  Discussions about

27  them occurred eight months after the CAVIC Transactions. The link to the Challenger Transactions is

28

20

1    conclusory.  And the allegation that BAC and BI caused Cassidy *not* to breach the APAs and the APA

2    Assignments does not state a claim, as shown above, for inducing a fiduciary breach.

3       **3.**  ***Improper Payments Made to Cassidy Cannot Be Attributed to BAC or BI***

4       Finally, Count 1 alleges that BAC/BI, though Fazal-Karim, induced a breach in making two

5    payments to Cassidy.  In its earlier decision, the Court held that "Fazal-Karim holding himself out as

6    Bombardier's representative on the FK Group website, Bombardier being aware of the website, Fazal-

7    Karim representing Bombardier in negotiations, and Bombardier employees working 'hand-in-hand'

8    with Fazal-Karim 'as their representative,' support the conclusion that Fazal-Karim had actual authority

9    to act on behalf of Bombardier."  BBD MTD Order at 10.  In the alternative, the Court found the same

10   facts, accepted as true, to "weigh in favor of an ostensible-authority finding." *Id*. at 13.

11      Bombardier respectfully submits that the Court should not adhere to this ruling in evaluating

12   the agency allegations in the FAC.  <u>First,</u> on the earlier motion, the Court did not have the benefit of

13   either the Seller-Representative Agreements or the APAs, each of which has language pertinent to the

14   agency analysis.  *See* BBD MTD Order at 5 (declining to consider contract quotes because the Court

15   was not provided with copies of the contracts).  <u>Second</u>, while the Court broadly found the allegations

16   sufficient to establish that Fazal-Karim was an agent of BAC or BI, it did not evaluate whether Fazal-

17   Karim acted as an agent in *each* aircraft transaction.[10]  As shown below, the allegations in the FAC,

18   including the contracts incorporated by reference and now properly before the Court, make plain that

19   the two payments at issue – wired by Jetcraft Global in the Element Transactions – cannot be attributed

20   to BAC or BI.

21    <u>No Actual Agency</u>.  Actual "[a]gency is the fiduciary relation which results from the

22   manifestation of consent by one person to another that the other shall act on his behalf and subject to

23   his control, and consent by the other so to act." *In re Rezulin Prod. Liab. Litig*., 392 F. Supp. 2d 597,

24

---

25   [10] A court is not bound by the law of the case doctrine when, as here, it is presented with new
     information.  *See Barnett v. Cigna Healthcare*, 217 F. App'x 620, 622 (9th Cir. 2007) ("In the first
26   appeal, this court had before it only the basic contract, and did not examine the tenure agreement. . . .
     As our prior opinion did not fully consider the effect of the tenure policy on the contract, it is not the
27   law of the case").  Further, the "law of the case doctrine only applies when the court has 'previously
     entered a final decree or judgment.'" Yuntian Second MTD Order at 38 (quoting *Askins v. U.S. Dep't
28   of Homeland Sec*., 899 F.3d 1035, 1042 (9th Cir. 2018)).  No final judgment has been entered here.

**BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT**

4810-6253-4901

607 (S.D.N.Y. 2005) (quoting Restatement (Second) of Agency § 1(1)).[11] "Courts have repeatedly found no fiduciary duty between the parties where the Agreement contains a clear and unambiguous disclaimer of a fiduciary relationship." *BNP Paribas Mortg. Corp. v. Bank of Am.*, N.A., 866 F. Supp. 2d 257, 269 (S.D.N.Y. 2012) (omitting quotes and citations); *Butto v. Collecto Inc.*, 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011) (holding that debt collector was not agent of carrier given "express disavowal of an agency relationship" in agreements and denying argument that the "practical functioning of [debt collector's] relationship with AT&T and Verizon" overrode agency disclaimer); *Spinelli v. NFL*, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015) (enforcing disclaimer that "[n]either the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other party.").[12]

Authority of a service provider to participate in negotiations does not by itself give the provider authority to bind the principal. "[P]arties routinely allow brokers, attorneys, or other third parties to negotiate deals without granting the negotiators the authority to bind them." *Economist's Advoc., LLC v. Cognitive Arts Corp.,* No. 01 Civ. 9468, 2004 WL 728874, at *6 (S.D.N.Y. Apr. 6, 2004); *see also 1058 Corp. v. Ergas,* 571 N.Y.S.2d 706, 708 (1st Dep't 1991) (broker authorized to negotiate deal held not to have authority to close deals without client's approval).

That an individual acts as an agent in one transaction does not, of course, mean that the individual acts as an agent in a different transaction. *See, e.g., Bd. of Managers of the 411 E. 53rd Str. Condo. v. Perlbinder*, Nos. 654039/2013, 650603/2014, 2016 WL 1597761, at *2–3 (Sup. Ct. N.Y. Cty. Apr. 21, 2016), *rev'd on other grounds*, 151 A.D.3d 523 (1st Dep't 2017) (dismissing aiding and abetting claim where individual that previously acted as agent was not acting as agent in transaction

---

[11] California law is the same. To allege agency, the plaintiff "must allege that the agent . . . holds power to alter the legal relations between the principal and third persons . . .; that the agent is a fiduciary with respect to matters within the scope of the agency; and that the principal has the right to control the conduct of the agent with respect to matters entrusted to him." *Jackson v. Fischer*, 931 F. Supp. 2d 1049, 1061 (N.D. Cal. 2013).

[12] *Accord Asplund v. Selected Invs. in Fin. Equities*, *Inc.*, 86 Cal. App. 4th 26, 29, 49 (1st Dist. 2000) (holding that, in light of "limitations set forth in the sales representatives agreement," broker-dealer was not liable for the frauds perpetuated by its registered representative because "the registered representative [was] not an employee of the brokerdealer, ha[d] no actual or apparent authority to sell the investment at issue, and the broker had no notice of and did not in any way benefit from the transaction").

that constituted breach of fiduciary duty); *In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325, 1341–42 (11th Cir. 2017) (dismissing aiding and abetting breach of fiduciary duty claim against defendant, because, while purported agents "may have sometimes functioned as [defendant's] agent, lawyer, or fiduciary in other contexts, the Complaint does not allege that they operated in this capacity for purposes of the 2006 Transaction.").  Here, the FAC fails to allege that BAC or BI granted Fazal Karim actual authority to take binding actions on their behalf in selling aircraft for two reasons:

First, the Representative Agreements with Fazal-Karim contain an express agency disclaimer: "It is intended by the parties that Representative is an independent contractor and not an agent of Bombardier, and neither Representative nor any of its associates, partners, employees or representatives is authorized, expressly or impliedly, to bind Bombardier in any manner whatsoever with respect to third parties."  Fishman Decl. Ex. M.  Thus, BI and BAC did not grant Fazal-Karim actual authority to take any binding actions on their behalf.

Second, regardless of whether BAC/BI and Fazal-Karim had an agency relationship when Fazal-Karim sold aircraft *for BAC or BI*, Fazal-Karim's work in selling aircraft *for Jetcraft* is plainly outside of any such relationship.  There are no allegations in the FAC that BAC or BI had the ability to control Fazal-Karim when he sold Planes 1 and 10 out of Jetcraft's inventory.  Control is the essence of an actual agency relationship. And there are no allegations that BAC or BI controlled the payments made by Jetcraft Global; neither BI nor BAC is alleged to have a relationship with Jetcraft Global.

The FAC now makes the conclusory assertion that (a) Plane 1 (a Global 5000 sold by Jetcraft to Zetta) should be lumped with Planes 2-5 (Global 6000s sold by BAC to Zetta, and assigned to CAVIC) and Plane 6 (a Global 6000 sold by BAC to Glove Assets) and (b) Plane 10 (a Global 6000 sold by Orion to Zetta) should be linked to Planes 12-15 (Challenger aircraft sold by BAC to Yuntian). But there are no *facts* supporting these newly asserted conclusions.

No Ostensible Authority.  BAC and BI likewise cannot be liable for aiding and abetting a fiduciary breached based on Fazal-Karim having apparent authority to bind them.  "Apparent authority must be based on words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction; an agent cannot,

1  though his own acts, cloak himself with apparent authority." *1230 Park Assocs., LLC v N. Source,*

2  *LLC*, 48 AD 3d 355, 355-56 (1st Dept 2008). The "[k]ey to the creation of apparent authority is that

3  the third person, accepting the appearance of authority as true, ***has relied upon it***." *Greene v. Hellman*,

4  433 N.Y.S.2d 75, 80 (1980).[13]

5      "A party cannot claim that an agent acted with apparent authority when it knew, or should have

6  known, that the agent was exceeding the scope of its authority.'" *Highland Cap. Mgmt. LP v. Schneider*,

7  607 F.3d 322, 328 (2d Cir. 2010) (citations omitted) (holding that agent, who had authority to negotiate

8  on behalf of principal, did not have apparent authority to bind the principal to a contract for the sale of

9  promissory notes because a letter agreement "expressly advised" that the agent was not "authorized to

10 enter an agreement without [the principal's] specific assent to its terms").[14]

11     Here, the FAC fails to allege facts supporting a claim that Fazal-Karim was BAC/BI's apparent

12 agent when he caused Jetcraft Global to wire two payments to Cassidy.  <u>First</u>, the FAC does not

13 anywhere allege that Zetta PTE believed that Fazal-Karim acting as BAC/BI's agent in connection

14 with Planes 1 and 10. This failure by itself defeats any claim based on apparent agency.

15     <u>Second,</u> Zetta could not have relied on Fazal-Karim having authority because, in each

16 transaction Zetta entered with BAC, BAC expressly stated that Fazal-Karim had no such authority and

17 Zetta agreed, to wit: "<u>Representative Disclosure</u>: "Buyer understand that Jahid Fazal-Karim may be

18 appointed as a sales representative of Seller in connection with this transaction.  Whether or not said

19 appointment is finally approved by Seller, ***Jahid Fazal-Karim has no authority*** and will not have any

---

[13] *See also Louis v. Jerome*, No. CV 15-3094, 2016 WL 4532115, at *5 (E.D.N.Y. Aug. 29, 2016) (granting motion to dismiss, and finding no apparent authority where "Plaintiff does not allege that she relied on some belief that [the alleged principal] was behind the offer or that she would not have proceeded if she'd believed otherwise"); *Ayco Co., L.P. v. Becker*, No. 1:10-CV-0834 (GTS/RFT), 2011 WL 3651027, at *8 (N.D.N.Y. Aug. 18, 2011) ("Defendant has failed to establish how he actually relied on the misrepresentation (i.e., signed the Form U–4 Agreement *because* he believed that Mercer was Plaintiff's agent)") (emphasis in original); *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 472–73 (1973) (internal citations omitted) ("the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentations of the agent because of some misleading conduct on the part of the principal—not the agent").

[14] California law is to the same effect. It is a "fundamental principle of the law of agency, that if a third person has notice of a limitation upon an agent's authority, he cannot hold the principal responsible for a transaction with an agent in violation of such limitation." *Terminix Co. v. Contractors' State License Bd.*, 84 Cal. App. 2d 167, 171 (2d Dist. 1948).

24

authority to make any representations or warranties on behalf of Seller or to legally bind Seller under a contract for the sale of the subject Aircraft." FAC Sch. 2 Exs. 2-24, 2-31, 2-40, 2-53, 2-82, 2-88 § 14. Whether or not Fazal-Karim participated in negotiations or received a commission on transactions, Zetta knew and agreed that Fazal-Karim could not take binding actions on BAC's behalf, which defeats any apparent agency claim as a matter of law.

Because the FAC and incorporated documents show that BAC and BI did not give Fazal-Karim actual or apparent authority to act for them, they cannot be liable for the payments allegedly made by Fazal-Karim in connection with Jetcraft's sale of Plane 1 and 10.

### D.    Count 2 Fails to State a Claim for Conspiracy

For civil conspiracy, "plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Fisk v. Letterman,* 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006).[15]

"It is basic conspiracy law that a corporation cannot conspire with its agents or employees acting within the scope of their employment—or, more precisely, that since a corporation can only act through its agents, a claim that the agents collectively agreed to take some unlawful action in the name and on behalf of the corporation is simply another way of saying that the corporation acted unlawfully and therefore does not satisfy the basic requirements of a conspiracy." *Tufano v. One Toms Point Lane Corp.*, 64 F. Supp. 2d 119, 133 (E.D.N.Y. 1999), *aff'd sub nom. Tufano v. One Toms Point Lane Corp., Bd. of Dirs.*, 229 F.3d 1136 (2d Cir. 2000); *see also In re Verestar, Inc.*, 343 B.R. 444, 483 (Bankr. S.D.N.Y. 2006) ("The doctrine of intra-corporate conspiracy. . . . provides that (i) a corporation cannot conspire with its own directors, officers or agents; (ii) officers, directors and agents of a corporation cannot conspire among themselves; and (iii) a parent corporation cannot conspire with its subsidiary or agents of its subsidiary.").[16]

---

[15] The elements for conspiracy under California law are substantially similar. *See* BBD MTD Order at 26-27.
[16]    California law is the same.  *See Wallack v. Idexx Labs., Inc.*, No. 11CV2996-GPC (KSC), 2014 WL 1455872, at *9 (S.D. Cal. Apr. 14, 2014) ("Therefore, as employees of Idexx, Wright, and Walter, and Idexx cannot form a civil conspiracy."); *Strawn v. Morris Polich & Purdy, LLP*, 30 Cal. App. 5th

The FAC alleges that the Defendants entered a conspiracy "to pay Cassidy bribes and kickbacks to induce Cassidy to cause the Debtors to purchase aircraft from Jetcraft and Bombardier." FAC ¶ 574. Allegedly, BAC and BI "agreed to participate in the conspiracy through its agent Fazal-Karim. Bombardier also agreed to pay Cassidy bribes directly so that he would continue to purchase and take delivery of Bombardier aircraft and not cancel existing APAs." *Id*. at ¶ 576. These allegations fail to state a conspiracy claim for at least three reasons:

<u>First</u>, the FAC fails to allege an illicit agreement amongst the Defendants because it relies upon an intra-corporate conspiracy, namely, an agreement between the Fazal-Karim Defendants, on the one hand, and BAC or BI, on the other hand, that was reached "through [Bombardier's] agent Fazal-Karim." *Id*. An agent cannot reach an agreement by simultaneously acting for himself and his principal.

<u>Second</u>, even if the pleading had been drafted otherwise to allege that Fazal-Karim was acting as an independent contractor, it would still fail to allege that the Defendants all had a common plan to bribe Cassidy. BAC or BI providing sports tickets to its client and Fazal-Karim making payments on transactions not involving BAC or BI are entirely consistent with unilateral (rather than coordinated) behavior. And while BAC/BI are alleged to have conferred with Fazal-Karim about Jetcraft paying for two Sea-Doos, the FAC makes plain that they did *not* reach agreement: in one email snippet, Mattar said that Jetcraft would reimburse Zetta PTE for the Sea-Doos (FAC ¶ 318) and in another snippet, Fazal-Karim said that Jetcraft did <u>not</u> agree to reimburse Zetta PTE (FAC ¶ 335). Further, as noted above, the suggestion of "combined transactions" are entirely conclusory. *See supra* Section II.C.1.

The FAC also tries to imply a common plan by alleging that the Spreadsheet (FAC Ex. 10) shows an exchange of payments between Fazal-Karim and Mattar. But as set forth in the Facts (*supra* Section II.C.1.), nothing on the Spreadsheet even references Fazal-Karim and Mattar or suggests that it records payments between the two. And even if it did, nothing in the FAC links payments between Fazal-Karim and Mattar, on the one hand, with payments to Cassidy, on the other.

With similar liberties, the FAC also alleges that, "Through his participation in the misconduct

---

1087, 1101 (1st Dist. 2019) ("as agents and employees of the defendant insurers, they cannot be held accountable on a theory of conspiracy.").

1   described above, and in particular the inclusion of information regarding Planes 1 and 6 in the

2   Spreadsheet along with the fact that Mattar was involved in the negotiation of the combined deals for

3   Planes 1-6, Mattar was aware of at least one wrongful and improper payment in connection with Planes

4   1 and 6 that was not disclosed to the Debtors." FAC ¶ 295. But the Spreadsheet was sent to Mattar

5   on April 16, 2017 (*id.* ¶ 291) – more than one year *after* the alleged payment on March 28, 2016 (*id.*

6   ¶ 258). And, in any event, nothing in the Spreadsheet even references the alleged $500,000 payment

7   or that any monies were paid to Cassidy. *See id.* Ex. 10.

8       The FAC must allege an agreement between each of the co-conspirators to bribe Cassidy.

9   Instead, it relies on (a) conduct that is equally consistent with uniliteral behavior, (b) conclusory

10  assertions of "combined transactions," and (c) gross distortions of the Spreadsheet.

11      Third, the conspiracy count fails for lack of specificity. It broadly alleges that ten of the eleven

12  defendants conspired together but does not have any allegations that BAC or BI ever interacted with

13  Jetcraft Global, Jetcoast, Jetcraft Asia, Orion, of FK Partners (or Fazal-Karim when acting on their

14  behalf). In dismissing the original Complaint, the Court ground its decision, in part, on improper

15  lumping of the Defendants. *See* BBD MTD Order at 8-9. The FAC does the same thing.

16      Fourth, Count 2 also fails because it does not allege an overt act in furtherance of the conspiracy

17  by BAC or BI. As earlier shown, the FAC fails adequately to plead that BAC or BI paid a bribe in

18  providing sports tickets or discussing Sea-Doos. BAC/BI are not alleged to have done anything else.

19  **E.    Count 3 Fails to State a Claim Under California Business and Professions Code §
20          17200 and California Penal Code § 641.3**

21      The FAC alleges that BAC and BI are liable under California's unfair competition law, the

22  California Business & Professions Code §17200 (the "UCL"), for paying commercial bribes and

23  making misrepresentations about and/or concealing such bribes. The UCL bars businesses from

24  engaging in "any unlawful, unfair or fraudulent business act or practice." A UCL action allows for

25  restitution of ill-gotten gains; it does not allow for other damages. *Cortez v. Purcolator Air Filtration*

26  *Prods.*, 96 Cal. Rptr. 2d 518, 522 n.4 (2000).

27      The "presumption against extraterritorial application" of California's statutory law applies in

28  "full force" to UCL claims. *Sullivan v. Oracle Corp.*, 127 Cal. Rptr. 3d 185, 198 (2011). A non-

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

resident UCL claimant must allege facts showing either that (1) its injury has occurred in California

or (2) the defendant's conduct occurred in California.  *Wisdom v. Easton Diamond Sports,* LLC, No.

CV 18-4078 DSF (SSx), 2018 WL 6264994, at *4 (C.D. Cal. Oct. 9, 2018).  A resident asserting a

UCL claim cannot rely upon its "residence alone . . . to bring claims under the UCL … where the

injuries occur outside of California." *Terpin v. AT&T Mobility, LLC,* No. 2:18-cv-06975-ODW (KSx),

2019 WL 3254218, at *6 (C.D. Cal. July 19, 2019).  And where, as here, a UCL claim is based on

breach of a predicate statute, a complaint must also allege facts sufficient to show that the violation of

the predicate statue has the requisite nexus to California.  *See Sullivan*, 127 Cal. Rptr. 3d at 199

(holding UCL claim based on violation of Fair Labor Standards Act could not be maintained where

there were no facts establishing that failure to pay overtime wages occurred in California).

Count 3 fails to state a UCL claim for the same reasons that the other tort claims fail.  Insofar

as the claim is based on violation of the commercial bribery statute, the FAC fails to allege that the F1

Tickets and Sea-Doo discussions were bribes; and the payments by Jetcraft cannot be imputed to BAC

or BI.  *See supra* Sections III.C.1-3.  Insofar as the claim is based on fraud or concealment, the FAC

fails to specify any misrepresentations by BAC or BI or facts sufficient to give rise to a duty of

disclosure.  *See infra* Sections III.F-G.  Without any predicate acts, there can be no UCL violation.

The UCL claim also fails for reasons specific to each of the Debtors:

<u>Zetta PTE.</u>  Zetta PTE cannot assert any UCL claims against <u>BAC</u> because the parties agreed in

the APAs that New York law would govern their relationship.  It is well-settled that a "valid choice-of-law

provision selecting another state's law is grounds to dismiss a claim under California's UCL."  *Cont'l

Airlines, Inc. v. Mundo Travel Corp.,* 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) (Virginia choice of

law); *Medimatch, Inc. v. Lucent Techs., Inc.,* 120 F.Supp.2d 842, 861–62 (N.D. Cal.2000) (dismissing

UCL claim where contract had New Jersey choice-of-law clause); *Coscarelli v. ESquared Hosp. LLC*, 364

F. Supp. 3d 207, 221 (S.D.N.Y. 2019) (same, New York choice of law).

And Zetta PTE cannot assert a UCL claim against <u>BI</u> because that would require extra-territorial

application of the UCL.  There are no allegations in the FAC that Zetta PTE, based in Singapore, suffered

any economic loss in California.  And there are no allegations that BI committed any tortious acts in

California.  As the Court previously found: "The allegations the Trustee highlights do not indicate that any transactions took place in California, or that any agreements [by Zetta PTE] were executed in California. . . . [T]he Trustee represented the Debtors, not Seagrim and Walter.  The fact that Seagrim and Walter live in California is insufficient to find that the conduct occurred here, especially because they represented only 40% of the Zetta PTE board." FK MTD Order at 33.

Additionally, insofar as the UCL claim is premised on breach of Cal. Penal Code § 641.3 (commercial bribery), it likewise fails to satisfy its jurisdictional requirements.  Under the California Penal Code, prosecutions should be in the county where the crime was committed.  *Fortner v. Super. Ct.,* 159 Cal. Rptr. 3d 128, 131 (2013) (citing Cal. Penal Code § 777).  The only exceptions are (1) if part of an offense was committed in California; (2) if an offense was commenced in another jurisdiction but "consummated" in California; or (3) if a more then *de minimis* preparatory act in California "culminates" in an offense in another jurisdiction.  *Id.* (citing Cal. Penal Code §§ 27, 778, 778a).  A court must dismiss a cause of action where California lacks the requisite territorial connection to the crime.  *Fortner,* 159 Cal. Rptr. 3d at 131.  Here, the Trustee does not allege that any conduct regarding the F-1 Tickets, the Sea-Doos, or the purported bribe payments occurred in California.  As no alleged offense, part of any offense, or preparatory conduct culminating in an offense, occurred in California, the California Penal Law claim fails, which, in turn, bars the UCL claim to the extent predicated on it.

Zetta USA.  Zetta USA cannot state a UCL claim against BAC or BI based on violation of the California commercial bribery statute for the same reason set forth above: the alleged bribery did not occur in California.  Zetta USA also cannot state a UCL claim based on false representations in the Plane 1 and 10 APAs that no fees were to be paid to third parties (or based on the concealment of such fees) because Zetta USA was not party to the Plane 1 and 10 transactions (*see* FAC, Sched 2) and, as such, could not rely on those transaction documents.

Finally, the UCL claim also fails as a matter of law because it seeks restitution of payments made in the CAVIC Transactions.  Under each of the CAVIC APA Assignments, however, all rights to compel performance or receive refunds were assigned to CAVIC.  CAVIC alone has the right to

1  receive any refunds due to "termination . . . _or otherwise_." _See_ FAC Sch. 2 Ex. 2-70; Fishman Decl.

2  Ex. I-K at ¶ 6.

3      **F.    Count 6 Fails to State a Claim for Fraudulent Misrepresentation**

4      A claim for fraudulent misrepresentation requires allegations that: "(1) the defendant made a

5  material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the

6  plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of

7  such reliance." _Banque Arabe et Internationale D'Investissement v.  Md. Nat'l Bank,_ 57 F.3d 146,

8  153 (2d Cir. 1995).[17]  The claim here fails because it does not allege a false statement.

9      The FAC identifies just one statement made to Zetta PTE to support its fraudulent

10  misrepresentation claim: "███████████████████████████████████████████████

11  ████████████  Section 12.2.6 of each APA includes a representation and warranty that '██████

12  ███████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████'  These representations were false when

14  made." FAC ¶¶ 608-09.  The Trustee further alleges that "Jetcraft Corp., Jetcraft Global, Jetcoast,

15  Orion, and Fazal-Karim knew that these representations were false when made" (_id._ ¶ 612) and that

16  "BI and BAC are also liable for the actions of Fazal-Karim, who was their agent." _Id._ ¶ 623.  Neither

17  BAC nor BI is alleged itself to have made a misrepresentation.

18      Count 3 fails because, as previously shown, Fazal-Karim was _not_ BAC's or BI's agent –

19  especially in connection with the Element Transactions, which did not involve BAC or BI.  _See supra_

20  Section III.C.3. Indeed, the agency allegations here are particularly attenuated because the

21  misrepresentation was allegedly made by _Jetcraft_ in its APAs, and Jetcraft is nowhere said to have been

22  BAC's or BI's agent.

23      Were that not enough, the FAC does not even identify a representation made by Jetcraft (or

24  Fazal-Karim) of any sort.  The representation at issue is a _buyer_ (not seller) representation – one made

25

26  [17] The elements for a fraudulent misrepresentation claim under California law are the same. _See Green Hills Software, Inc. v. Safeguard Scis. & SPC Priv. Equity Partners_, 33 F. App'x 893, 895 (9th Cir.

27  2002) (fraudulent misrepresentation requires a showing of: "(1) misrepresentation by way of a false representation, concealment or non-disclosure; (2) knowledge of falsity; (3) intent to defraud; (4)

28  justifiable reliance; and (5) resulting damage").

1  by Zetta PTE.  It says: "███████████████████████████████"  Further, what

2  the Buyer said was, in fact, true: Zetta PTE did not enter into ██████████████

3  ██████████████████████████████  The theory of the FAC is that an agreement was

4  reached to pay "kickbacks" (not commissions).  The FAC recognizes that "the kickbacks were not

5  "████████████.'"  FAC ¶ 612.  Thus, the statement by Zetta PTE that ██████████████

6  ██████  was, in fact, correct.

7          This fraudulent misrepresentation claim should thus be dismissed because it is based on (a) a

8  true statement, (b) made by Zetta PTE, (c) in a contract with Jetcraft, which is nowhere alleged to be

9  BAC's or BI's agent.

10         **G.     Count 7 Fails to State a Claim for Fraudulent Concealment**

11         The Trustee's fraudulent concealment claim – that BAC and BI should not only be liable for

12  allegedly paying bribes, but also for not confessing to them – also fails as a matter of law.  A fraudulent

13  concealment claim requires a showing of: "(1) a duty to disclose material facts; (2) knowledge of

14  material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose;

15  (4) scienter; (5) reliance; and (6) damages."  *De Sole v. Knoedler Gallery, LLC,* 974 F. Supp. 2d 274,

16  314 (S.D.N.Y. 2013) (omitting citations).[18]  "It is well established that, absent a fiduciary relationship

17  between the parties, a duty to disclose arises only under the "'special facts' doctrine where one party's

18  superior knowledge of essential facts renders a transaction without disclosure inherently unfair."  *Jana*

19  *v. West 129th St. Realty. Corp.*, 22 A.D.3d 274, 277 (1st Dep't 2005) (omitting quotes and citations).

20  "The special facts doctrine . . . requires satisfaction of a two-prong test: that the material fact was

21  information peculiarly within the knowledge of [defendant], and that the information was not such

22  that could have been discovered by [plaintiff] through the exercise of ordinary intelligence."  *Id.* at

23  278 (omitting quotes and citations).

24         Count 7 fails to allege facts demonstrating that BAC/BI had a duty of disclosure.  While

25  ────────────────────

26  [18] The elements for a fraudulent concealment claim under California law are the same. *See McVicar*
    *v. Goodman Glob., Inc.*, 1 F. Supp. 3d 1044, 1058-59 (C.D. Cal. 2014) ("To state a claim for fraudulent
27  concealment, a plaintiff must allege: (1) a misrepresentation (false representation, concealment, or
    nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.,* to induce reliance; (4)
28  justifiable reliance; and (5) resulting damage.") (omitting quotes and citations).

4810-6253-4901

1   commercial parties have a duty not to pay bribes, there is no separate duty to report those bribes.  Were

2   the law otherwise, every tort involving nondisclosure of information (fraudulent omissions,

3   conversion, commercial bribes, etc.) would also give rise to an independent tort of fraudulent

4   concealment.  That is not the law.  *See, e.g., Zumpano v. Quinn*, 6 N.Y.3d 666, 674-75 (2006) ("It is

5   not enough that plaintiffs alleged defendants were aware of the abuse and remained silent. . . . Conduct

6   like this might be morally questionable in any defendant . . . but it is not fraudulent concealment as a

7   matter of law.  A wrongdoer is not legally obliged to make a public confession . . . .").

8           But even if the FAC were otherwise drafted, Count 7 would still fail.  The FAC nowhere alleges

9   that BAC/BI had a fiduciary relationship with Zetta PTE.  Nor could it.  "[P]arties to a commercial

10  contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so

11  agree."  *Transnat'l Mgmt. Sys. II, LLC v. Carcione,* No. 14-CV-2151 (KBF), 2016 WL 7077040, at *3

12  (S.D.N.Y. Dec. 5, 2016) (omitting citations).

13          Nor does the FAC plead facts supporting the special facts doctrine.  As noted above, the F1

14  tickets were provided to the "Zetta team" and the Sea-Doos were *discussions* with Zetta PTE –

15  reflecting no information particularly within the knowledge of BI/BAC.  Likewise, with respect to the

16  two payments, the FAC makes plain that this information was not peculiarly within BAC/BI's

17  knowledge.  For example, on January 18, 2016, Element circulated an analysis reflecting third-party

18  fees of $500,000 on the Plane 1 transaction.  FAC ¶¶ 254; 269.  Similarly, in February 2017, in

19  connection with the Plane 10 transaction, "Jetcraft or Fazal-Karim disclosed [to Element] that Cassidy

20  was the payee of the Second Kickback."  *Id.* ¶ 288.  These allegations are inconsistent with only BAC

21  or BI having information about the payments (Element had it too) and with Zetta PTE not being able

22  to learn of these of payments through ordinary diligence (as Element did).  *See, e.g., Congress Fin.*

23  *Corp. v. John Morrell & Co.*, 790 F. Supp. 459, 474 (S.D.N.Y. 1992) (buyer of corporate assets could

24  not rely on special facts doctrine to assert claim against seller's finance company for failing to disclose

25  overstated inventory where buyer had "unrestricted access to all [seller's] books . . . but failed to

26  exercise diligence to discover the allegedly omitted information").

27          Because facts are not alleged demonstrating that BAC or BI had a duty of disclosure, the

28

1    fraudulent concealment claim fails as a matter of law.

2    **H.    The *In Pari Delicto* Doctrine Bars All the Tort Claims (Counts 1-3 and 6-7)**

3    Finally, even if the FAC had set forth facts sufficient to state a claim, the Trustee would still

4    be estopped from pursuing any of them under New York's *in pari delicto* doctrine. "When corporate

5    officers carry out the everyday activities central to any company's operation and well-being—such

6    as . . . accessing capital markets . . . and entering into contracts—their conduct falls within the scope

7    of their corporate authority." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465-66 (2010). When

8    wrongdoing of a corporate officer is imputed to a company, the company may not assert claims against

9    a third party also involved in that wrongdoing because it is in equal fault or *in pari delicto*. "The

10   doctrine of *in pari delicto* mandates that the courts will not intercede to resolve a dispute between two

11   wrongdoers." *Id.* at 464 (emphasis added) (holding that trustee could not assert claims against Refco's

12   outside professionals because Refco insiders participated in accounting fraud); *New Greenwich Litig.*

13   *Tr. v. Citco Fund Servs. (Europe) B.V.,* 145 A.D.3d 17, 24 (1st Dep't 2016) (dismissing all claims

14   under the *in pari delicto* doctrine because the bankruptcy trustee "stood in the funds' shoes" and the

15   "derivative complaints in these actions pleaded extensive wrongdoing on the part of the funds'

16   management" including taking "hefty management fees" for little work).

17   The New York Court of Appeals teaches that wrongdoing by an officer will be imputed to a

18   company, except in the "most narrow" of circumstances where an officer has "totally abandoned his

19   principal's interests and [is] acting entirely for his own or another's purposes." *Kirschner*, 15 N.Y.3d

20   at 466 (emphasis omitted). The doctrine cannot be invoked "merely because [the officer] has a conflict

21   of interest or because he is not acting primarily for his principal." *Id.* at 466. "So long as the corporate

22   wrongdoer's fraudulent conduct enables the business to survive – ***to attract investors and customers***

23   ***and raise funds for corporate purposes*** – this test is not met." *Id.* 468 ("Even where the insiders'

24   fraud can be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders

25   'totally abandoned' the company" if such wrongdoing was done in part for the company).

26   Both the FAC and original Complaint make plain that, even when Cassidy acted unethically,

27   he never "totally abandoned" the Debtors by, for example, working solely for a competitor that he

28
BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

owned.  Rather, all the alleged wrongdoing involved growing Zetta and raising capital:

- While Cassidy supposedly took commercial bribes in exchange for acquiring more aircraft, he also expanded the fleet in order to "raise[] the Debtor's profile . . . in the rarified world of private jet enthusiasts" and to "increase[] the Debtors' short-term revenue" to pay down debt. Compl. ¶ 91.

- While Cassidy allegedly engaged in a "Ponzi-like scheme in which he sold 'block hours,'" he simultaneously did so as a means of "extracting immediate cash to pay for obligations" of Zetta (FAC ¶ 101) and he specifically told Seagrim and Walter what he was doing (*id.* ¶ 429). Cassidy and Seagrim are not alleged to have objected.

- While Cassidy purportedly refinanced Planes 6 and 7 with Minsheng to allow him to take funds from the refinancing (*id.* ¶200), he also refinanced those aircraft because "Zetta PTE was unable to pay the debt service on the finance leases for Planes 6 and 7" (*id.* ¶ 201) and the refinancing also enabled him to use "$12.4 million to make initial payments on four Bombardier Challenger 650 planes" (*id.* ¶ 204).

- While Cassidy failed to conduct a "competitive procurement process, or request proposals from Bombardier's competitors" (*id.* ¶ 92), he also did so to advance Zetta PTE's business plan, which was to acquire or lease a fleet of aircraft to service "wealthy Chinese clientele who wanted to fly on brand new Bombardier Global 5000s and 6000s." Compl. ¶ 66.

This is not a case of a rogue employee totally abandoning his employer.  The FAC makes plain that, even when engaged in wrongdoing, Cassidy often acted with the other shareholders' knowledge and support and always in a manner intended to increase Zetta's cash flow and expand the fleet at price points consistent with those set forth in the business plan and approved by the other directors. Under these circumstances, Zetta is *in pari delicto* with the Defendants it sues – and is therefore barred from pursuing Counts 1-3 and 6-7.

I.    **Dismissal of the Bankruptcy Claims in Counts 14-15 and 31-32 is Required Because the Trustee Cannot Join Indispensable Parties**

"No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are *indispensable.*"  *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1082 (9th Cir. 2010) (citing *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975)); *see also Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) (holding that "a party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract").  Because Counts 14, 15, 31, and 32 require the recharacterization of leases

1  with CAVIC (Planes 2-5) and Glove Assets (Plane 6), and because CAVIC and Glove Assets are not

2  and cannot be joined in this action, these Counts must be dismissed under Rules 12(b)(7) and 19(b).

3       This Court previously held that CAVIC is necessary to the Trustee's recharacterization efforts

4  for Planes 2-5 because "[a]ny finding that the CAVIC Transactions involved disguised financings, as

5  the Trustee alleges, would undoubtedly impact CAVIC's rights under whatever agreements they may

6  have had with the Debtors (and with BAC). . . . [and] [r]ecovery by the Trustee of funds paid by

7  CAVIC to BAC directly would undoubtedly have a 'direct and immediate' impact on CAVIC's

8  rights."  BBD MTD Order at 38.  The same is true for Glove Assets; the Court cannot recharacterize

9  the lease for Plane 6 without affecting its rights.

10       Furthermore, the Court has denied the Trustee's attempts to add CAVIC and Glove Assets as

11  defendants here because (a) his fraudulent transfer claims are time-barred and (b) his failure to include

12  CAVIC and Glove Assets as defendants in the original Complaint was not a mistake.  These factors,

13  among others, made it improper to permit the Trustee to amend the original Complaint to add either as

14  a party.  *See* BBD Motion to Amend Order (Dkt. 241) at 37-47 and cases cited therein.

15       Under these circumstances, it is both not "feasible" for either CAVIC or Glove Assets to be

16  joined in this adversary proceeding, and the action cannot proceed "in equity and good conscience"

17  without them.  *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021);

18  FRCP 19(b).  It would be inequitable to permit these Counts to proceed without CAVIC and Glove

19  Assets because their rights may be impaired; and it would be inequitable for BAC and BI to have to

20  defend these transactions since they are not party to them and were not involved in their drafting.

21  Proceeding without these parties would also unjustly reward the Trustee's intended but flawed

22  litigation strategy.[19]  This is "a dilemma of [the Trustee's] own making," *Paiute-Shoshone Indians of*

23  *Bishop Cmty v. City of Los Angeles*, 637 F.3d 993, 1000 (9th Cir. 2011), which now necessitates

24  dismissal of Counts 14, 15, 31, and 32.[20]

25

26  [19] "[T]he Trustee named CAVIC as a defendant in the CAVIC AP, which was filed on 5/21/19.  Here, 'there was no mistake of identity, but rather a conscious choice of whom to sue.'"  BBD Motion to Amend

27  Order at 39 (citing *Louisiana-Pacific Corp., v. ASARCO, Inc.*, 5 F.3d 431, 434 (9th Cir. 1993)).

28  [20]  *See also Cal. Dump Truck Owners Ass'n v. Nichols*, 924 F. Supp. 2d 1126, 1149 (E.D. Cal. 2012), *aff'd*, 778 F.3d 1119 (9th Cir. 2015), *withdrawn from bound volume, and aff'd*, 784 F.3d 500 (9th Cir.

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

**J.**    **The Trustee's Bankruptcy Claims Fail as a Matter of Law**

> **1.**    **Because the Alleged Preferential and Fraudulent Transfers Originated Outside the U.S., Counts 12-17, 31-32 (the Fraudulent Transfer Claims) and Counts 18-19 (the Preference Claims) Must be Dismissed**

The FAC alleges that the fraudulent and preferential transfers identified in Counts 12-19 and 31-32 originated from Zetta PTE's Singapore bank account.  Schedule 4, FAC ¶¶ 775, 786.  This Court has held, however, that transfers originating outside the United States are "extraterritorial" and cannot be recovered because the focus of the Bankruptcy Code's avoidance provisions is on the initial transfer, that is, whether it was made from the United States.   This is true even where the transfer is sent to a U.S. bank account.   *See* Yuntian MTD Order at 33 ("the location of [the] account [to which the transfer was sent] is irrelevant because the 'focus' of the avoidance and recovery provisions (§§ 547, 548, and 550) is 'the initial transfer that depletes the property that would have become property of the estate'"); and Yuntian MTD Order at 33-35 (citing *In re Cil*, 582 B.R. 46, 93 (Bankr. S.D.N.Y. 2018); *see also In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017); *In re Picard, ex rel. Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 98 (2d Cir. 2019), *petition for cert. denied* 2020 WL 2814770 (U.S. June 1, 2020) (No. 19-277)).   Accordingly, because all the challenged transfers originated outside the United States, all Counts based on those transfers must be dismissed.

> **2.**    **The FAC Fails to Sufficiently Plead Fraudulent Transfer Claims**

>> **i.**    **Constructive fraudulent transfer is insufficiently pled (Counts 13, 15, 17, 32)**

To survive a motion to dismiss a § 548(a)(1)(B) constructive fraudulent transfer claim, a trustee must allege, with particularity, sufficient facts from which the Court can plausibly conclude *each* of the following: (1) there was a transfer of an interest in the debtor's property; (2) the transfer occurred within the two years before the debtor's petition was filed; (3) the debtor received less than reasonably equivalent value in exchange for the transfer; and (4) the debtor either: (a) was insolvent on the date of the transfer or became insolvent because of the transfer; (b) was engaged in business or a transaction, or

---

2015) ("'[L]ack of an alternative forum does not automatically prevent dismissal of a suit.' This is especially true where [as here] the plaintiff [Trustee] at one time had an alternative forum for resolution of its claims, but failed to utilize it.") (citing *Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990)).

4810-6253-4901

was about to engage in business or a transaction, for which any property remaining was an unreasonably small capital; or (c) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.  BBD MTD Order at 35 (citing *In re Heddings Lumber & Bldg. Supply, Inc.*, 228 B.R. 727, 729 (B.A.P. 9th Cir. 1998); *In re Brobeck, Phleger & Harrison LLP*, 408 B.R. 318, 340-41 (Bankr. N.D. Cal. 2009)).  Because the FAC fails to allege sufficient facts to conclude that the transfers were of the Debtors' interest in property or any transfer was for less than reasonably equivalent value, Counts 13, 15, 17 and 32 must be dismissed.

> a.   The Trustee fails to allege a transfer of an interest in property of the Debtors (Counts 15 and 32)

The Trustee must plausibly plead a transfer of an interest *in the debtor's property*.  11 U.S.C. § 548(a)(1).  The debtor's property is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS*, 496 U.S. 53, 58 (1990).  Property of a non-debtor is not property of the estate.  *See Crystallex Int'l Corp. v. Petróleos de Venez, S.A.*, 879 F.3d 79, 81 (3d Cir. 2018) (a transfer of property or interest held "by a non-debtor cannot be a 'fraudulent transfer'").  To avoid this conclusion here, the Trustee alleges that the Plane 2-6 Leases should be recharacterized as financings hoping to recover amounts paid by the *lessors* for the aircraft.

In Count 15, the Trustee asserts that the $120.36 million paid to BAC by CAVIC should be avoided because the Plane 2, 3, 4 and 5 Leases are not true or operating leases, but finance leases (FAC ¶ 738), and finance leases vested Zetta with a property interest in these planes (*id.* ¶ 743).  This effort fails because, as the Court has already held, the leases for Planes 2-5 cannot be recharacterized.  CAVIC MTD Order at 20.  The Trustee has not alleged any new or different facts from the relevant allegations previously (and unsuccessfully) asserted against CAVIC.  Because the leases for Planes 2-5 cannot be recharacterized, Zetta had no interest in the $120.36 million paid to BAC by CAVIC.  Without an interest, there was no transfer of Zetta's interest in property.  Count 15 must be dismissed.

The same holds true for Count 32 relating to Plane 6.  The Trustee alleges that the Plane 6 Lease was not a "true" or "operating" lease.  FAC ¶¶ 815-16.  He contends that the "transaction provided the Debtors with a vested economic ownership interest in Plane 6" (*id.* ¶ 817) and seeks to

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

avoid $47.3 million transferred to BAC from funds provided by Universal Leader.[21]  But, recharacterization is not available to the Trustee where the Plane 6 lease "includes a Singapore choice-of-law provision." FAC ¶ 552.  Under Singapore law, just like under English law, recharacterization is not an available remedy.  *See e.g., Thai Chee Ken and others (Liquidators of Pan-Electric Industries Ltd) v. Banque Paribas* [1993] 2 SLR 609 [at ¶¶ 12, 13] (under Singapore law, courts respect the form of contract chosen by the parties even if other legal forms might achieve the same economic results).  Count 32 must also be dismissed.

> b.    <u>The Trustee fails to allege sufficiently a lack of reasonably equivalent value (Counts 13 and 17)</u>

Although the Bankruptcy Code does not define "reasonably equivalent value," the concept is straightforward: "a party receives reasonably equivalent value . . . if it gets roughly the value it gave." BBD MTD Order at 35 (citing *In re Pringle*, 495 B.R. 447, 463 (B.A.P. 9th Cir. 2013)).  The test is applied at the time of the transfer, and allegations that property acquired did not generate sufficient income to fund the debtor's liabilities are not relevant.  *See Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993) (test applied "as of the time the investment was made"); *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("The critical time is when the transfer is 'made.'  Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given").

The Trustee seeks to avoid transfers allegedly made from Zetta PTE to BAC in the amount of $30,954,168 for Planes 2-5 (Count 13) and $47.3 million for Plane 6 (Count 17) because, he asserts, (i) the planes did not generate income equal to purchase price or debt service, FAC ¶¶ 699,767, (ii) the purchase prices were significantly higher than market prices for similar planes, *id.* ¶¶ 700, 768, and (iii) the purchase prices exceed the prices Zetta should have paid to obtain a "conservative" rate of

---

[21]  The Trustee alleges that Zetta PTE made these payments using Universal Leader loan proceeds after entering into a finance lease arrangement with Glove Assets, FAC, ¶¶ 152-153.  Glove Assets and Universal Leader are both Li Qi entities.  In this context, where Glove Assets was the owner of Plane 6 and Universal Leader (a related entity) provided the funds that went to BAC, Zetta PTE was acting as a conduit for the payment from Universal Leader to BAC so that (a) Glove Assets would own Plane 6 and (b) Zetta would lease it.  The fact that the lease pre-dated the funding confirms that this is the only plausible inference from the facts alleged in the FAC and that Zetta did not have any control over the Universal Leader funds paid to BAC.

4810-6253-4901

1    return.  Each of these efforts fails to allege particular facts from which an exchange for less than

2    reasonably equivalent value can be inferred.[22]

3        <u>First</u>, allegations that acquired property ultimately fails to produce sufficient income are irrelevant to

4    determining the value of the property at the time of transfer.  *Morris Commc'ns.*, 914 F.2d at 466.

5        <u>Second</u>, the Trustee's reliance on an undisclosed and undetailed "expert report" to derive

6    aircraft prices in some cases *more than $20 million* lower than the actual contract prices (FAC ¶¶ 344-

7    45) wholly fails to satisfy Rule 9(b).  Expert opinion in a complaint must identify the expert, the

8    expert's qualifications, the expert's relationship to the Debtors and the Trustee, the sources relied upon

9    by the expert and the processes used in the expert's analysis for the expert's conclusions to state facts

10   in support of a legally sufficient claim.  *See In re OmniVision Techs., Inc. Sec. Litig.,* 937 F. Supp. 2d

11   1090, 1107–08 (N.D. Cal. 2013).  The FAC entirely fails to identify the qualifications and relationship

12   of the expert to the Debtors or the Trustee, and only superficially references the methodology used by

13   the "expert."  This lack of even rudimentary detail is fatal to the Trustee's renewed attempts to allege

14   that the Debtors did not receive reasonably equivalent value.

15       So, too, is the fact that the pricing allegations in the FAC are contradictory.  "Contradictory

16   allegations . . . are inherently implausible, and fail to comply with Rule 8, Twombly, and Iqbal."

17   *Hernandez v. Select Portfolio, Inc.*, No. CV 15-01896 MMM (AJWx), 2015 WL 3914741, at *10

18   (C.D. Cal. June 25, 2015).  Here, at one and the same time, the FAC and the documents it incorporates

19   allege that Global 6000s had a value of about $37 million (according to the "expert") (FAC ¶ 344); a

20   list price of $63 million (FAC, Ex. 9); an assumed purchase price of $50 million in the Zetta business

21   plan (Fishman Decl. Ex. L at 35); and an actual purchase price of $50 million (FAC ¶ 344) in sales to

22   sophisticated equipment lessors in transactions approved not only by Cassidy, but also his experienced

23   partners in the aviation business, Seagrim and Walter.

24       The  Trustee  cannot  rely  on  valuation  opinions  from  an  undisclosed  "expert"  to  make

25

26   ───────────────
[22] Constructive fraud claims must be pled with Rule 9(b) particularity.  *See* Jetcraft MTD Order at 4
27   ("[the Trustee] acknowledges that Rule 9(b) applies"); *see also Sunnyside Dev. Co. LLC v. Cambridge
     Display Tech. Ltd.*, No. C 08-01780 MHP, 2008 WL 4450328, at *8 (N.D. Cal. Sept. 29, 2008); *Screen
28   Cap. Int'l Corp. v. Library Asset Acquisition Co., Ltd.*, 510 B.R. 248, 257 (C.D. Cal. 2014) (same).

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

implausible allegations about the aircraft values in an effort to allege a lack of reasonably equivalent value.

Third, the Trustee's reliance on "expert analysis from the perspective of the value provided to the Debtors' estates," FAC ¶ 345 – an analysis of the theoretical purchase price the Debtors could have paid for Planes 1-4, 6-7, and 10-11 to generate a conservative 10% internal rate of return, a so-called "estate value" approach, is misplaced. An internal rate of return is not indicative of the reasonable market value of the Bombardier aircraft, which is tested objectively. The Trustee's "estate value" analysis is subjective – based on whether the debtor was efficient or competent in operating its business. Courts, therefore, have rejected a subjective approach when evaluating market value. As the Eighth Circuit has explained:

> [S]uppose two debtors file bankruptcy petitions on the same day. Debtor A is a highly efficient wholesaler capable of making a reasonable profit with a ten percent markup. Debtor B, however, is not nearly as efficient and requires a thirty percent markup in order to survive. If both A and B sell the same product in the same marketplace, it would make little sense for the reasonably equivalent value of the products to be so different.

*In re Ozark Rest. Equip. Co.*, 850 F.2d 342, 345 (8th Cir. 1988).

Finally, whatever the FAC alleges about the market value of Planes 2-6, it is indisputable that their value exponentially exceeded the cash transferred by Zetta for those planes. In exchange for transfers to BAC totaling approximately $79 million (the amounts subject to the constructive fraud counts), Zetta got significant contractual rights to planes worth more than $270 million (FAC ¶ 344).

**ii.    The Trustee fails to plead actual fraudulent transfer (Counts 12, 14, 16, 31)**

To sustain a § 548(a)(1)(A) actual fraudulent transfer claim, a trustee must allege with particularity that there was a transfer of the debtor's interest in property, within two years before the petition was filed, made with the actual intent to hinder, delay or defraud creditors. Jetcraft MTD Order at 5 (citing *In re Wheeler*, 444 B.R. 598, 605 (Bankr. D. Idaho 2011); *In re Brobeck*, 408 B.R. at 338-39; *In re Roca*, 404 B.R. 531, 538 (Bankr. D. Ariz. 2009)). Intent to defraud can be pled based on: (1) the "mere existence of a Ponzi scheme"; (2) in some jurisdictions, a debtor's knowledge that the "natural consequences" of its acts would be to hinder, delay, or defraud creditors; or (3) "indicia

1  or badges of fraud."  Jetcraft MTD Order at 5 (citing *In re Agric. Research & Tech. Grp.*, 916 F.2d

2  528, 536 (9th Cir. 1990) (stating that "the mere existence of a Ponzi scheme . . .  has been found to

3  fulfill the requirement of actual intent on the part of the debtor"); *In re Sentinel Mgmt. Grp.,* 728 F.3d

4  660, 667 (7th Cir. 2013) (setting forth the "natural consequences" theory); *In re Acequia, Inc.*, 34 F.3d

5  800, 805-06 (9th Cir. 1994) (badges of fraud)).

6          "Just because a debtor is involved in a fraudulent scheme does not mean that every transfer

7  made by that debtor is made with fraudulent intent. . . .  To prosecute a claim based on actual intent to

8  hinder, delay, or defraud a creditor, the plaintiff must show that the alleged fraudulent intent is related

9  to the transfers sought to be avoided." *In re Rollaguard Sec., LLC,* 591 B.R. 895, 918 (Bankr. S.D.

10  Fla. 2018); *see also Grede v. UBS Sec., LLC*, 303 F. Supp. 3d 638, 671 (N.D. Ill. 2018) ("[G]eneral

11  schemes are not sufficient: the Trustee is required to prove that the transfer itself was made with

12  fraudulent intent.").

13          Here, the FAC does not come close to pleading facts showing that when Zetta acquired

14  revenue-generating aircraft to grow and operate the business, it was really intending to hinder, delay

15  or defraud creditors.

16          *There was no "Ponzi-like" scheme.* Rehashing allegations and claims that did not survive

17  Defendants' motion to dismiss the original Complaint, BBD MTD Order at 30-32, the Trustee again

18  strains to characterize Zetta as a "Ponzi-like" scheme.  A "Ponzi scheme" generally consists of

19  "funneling proceeds received from new investors to previous investors in the guise of profits from the

20  alleged business venture, thereby cultivating an illusion that a legitimate profit-making business

21  opportunity exists and inducing further investment."  BBD MTD Order at 31 (citing In *re United*

22  *Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991)).  In a real Ponzi scheme, the transfer to earlier

23  investors can be assumed for pleading purposes to be a fraud on later investors because the later

24  investor's capital is not going to the profit-generating enterprise that they were tricked into believing

25  existed.  *See* BBD MTD Order at 31 (citing *In re Nat'l Audit Def. Network (In re NADN)*, 367 B.R.

26  207 (Bankr. D. Nev. 2017); *In re LLS Am., LLC,* Bankr. No. 09-06194-PCW11, 2013 WL 3305393

27  (Bankr. E.D. Wash. July 1, 2013)).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The FAC does not come close to pleading a Ponzi scheme.  Zetta effectively had only one investor – Li Qi.  Funds were not received from new investors to funnel to Li Qi in the "guise of profits." Zetta PTE used charter revenues to pay company obligations (FAC ¶ 94) and build Zetta's fleet of Bombardier aircraft (*id.* ¶ 176).  And when Zetta made purchase price payments to BAC, it was not secreting assets or just shuffling money around; it was acquiring extremely valuable assets to use in the operation of its business.[23]  The Trustee keeps trying to twist these facts into a "Ponzi scheme," but they have nothing to do with one.

*The "natural consequences" theory fails*.  Equally implausible are the "natural consequences" allegations in the FAC: "Cassidy knew at the time he entered into and closed on the transactions and at the time of each of the transfers that the transactions would waste the financial resources of the Debtors to the detriment of creditors; that there was no economic justification for the transactions because there was no realistic possibility that the transactions would ever be profitable for the Debtors and thus would ultimately harm creditors; and that the transactions were undertaken to enrich himself at the expense of creditors." FAC ¶¶ 688, 722, 757, 820.  These allegations are nothing but assertion. The FAC does not allege any facts to support a plausible inference that Cassidy knew that acquiring aircraft had no "economic justification" and that Zetta "would [n]ever be profitable."  And it fails to eliminate the much more plausible inference: that he was, in fact, trying to grow the company.  It is simply not plausible that Cassidy should have known that Zetta's failure was a "natural consequence" of purchasing aircraft from BAC when nobody else – not Zetta's other board members, not Zetta's lenders and lessors, and not Zetta's investors – thought that to be the case. The effort here to allege actual intent through a natural consequences theory is contrived.

*The "badges of fraud" are not sufficiently pled*.  The FAC also fails to sufficiently or with

---

[23] There also are no allegations in the FAC, like there were in *NADN*, that (1) Cassidy took "most of" the incoming money from investors for himself or to perpetrate a scam; (2) Zetta sold "illegal or worthless" services or products to "gullible" customers; and (3) Zetta used "high-pressure sales tactics and overblown advertising," *see* 367 B.R. at 214, or as in *LLS Am.* that:(1) Zetta promised a high rate of return to new investors; (2) Zetta had numerous related entities with multiple confusing and unjustifiable intercompany transfers;  (3) Zetta commingled funds and transferred them indiscriminately with little to no documentation; (4) Zetta paid its sole investor bonuses or commissions; or (5) Zetta regularly rolled over promissory notes. *See* 2013 WL 3305393, at *9-10.

particularity allege badges of fraud.  In the Ninth Circuit, the badges of fraud include: (1) a transfer made in the face of actual or threatened litigation; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) post-transfer retention by the debtor of the property involved in a putative transfer.  *In re Acequia*, 34 F.3d at 806; *see also In re Empire Land, LLC*, No. 6:08-bk-14592-MH, 2016 WL 1371278, at *4 (Bankr. C.D. Cal. Apr. 4, 2016) (citing same factors); *In re GGW Brands, LLC*, 504 B.R. 577, 607-08 (Bankr. C.D. Cal. 2013) (same). Insolvency alone does not support a fraud presumption.  *See e.g.*, *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009); *In re SMTC Mfg. of Tex.*, 421 B.R. 251, 316 (Bankr. W.D. Tex 2009) ("Because the Trustee proved only two badges of fraud – transfers to insiders and insolvency. . . the Court finds he failed to provide sufficient circumstantial evidence that those transfers were made with actual intent to. . . defraud the Debtor's creditors").

Here, the Trustee does not allege that any of the transfers sought to be recovered from BAC and BI were made in the face of actual or threatened litigation.  There are no allegations that Zetta retained a post-transfer interest in any moneys it or CAVIC, Minsheng (Yuntian), or Universal Leader paid to BAC.  To the contrary, the assignments to CAVIC, Minsheng and Universal Leader were absolute, giving them all rights in any moneys Zetta or they paid for the aircraft.  *See supra* Section II.B.1.  The Trustee likewise does not allege that the transfers were to insiders or affiliates of an insider such that they implicate a "special relationship" between Cassidy/Zetta and BAC/BI.  And the transfers did not involve all or substantially all the Debtors' property; the Debtors received valuable aircraft in exchange for the purchase money paid.

Because the FAC wants for almost all the badges of fraud, no inference of scienter can be drawn.

### 3.     The Preference Claims Should Be Dismissed (Counts 18, 19)

Dismissal of a preference claim under Rule 12(b)(6) based on an affirmative defense is proper if there is, like here, an obvious bar to securing relief on the face of the complaint.  CAVIC MTD Order at 60 (citing *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

4810-6253-4901

### i.    The payments were made in the ordinary course (Counts 18 and 19)

11 U.S.C. § 547(c)(2)—the ordinary course defense—provides that the trustee may not avoid an otherwise preferential payment if the debt was incurred in the ordinary course of business of the debtor and the transferee and consistent with ordinary terms.  There is no doubt from the face of the FAC that the debts identified in Counts 18 and 19 were incurred in the ordinary course of Bombardier's and Zetta's respective businesses.  Bombardier manufactures, sells, and maintains aircraft; Zetta acquired and operated them.  The $3,262,834 payment (the subject of Count 18) was owed by Zetta in connection with its purchase of Plane 4; the ████████ payment (the subject of Count 19) was owed by Zetta after resolution of a dispute concerning amounts due for repairs and parts provided by BAC and BI in the ordinary course for Plane 12.

Similarly, the payments were made consistent with terms.  Even accepting as true that the $3,262,834 in Count 18 was paid after its due date, it was paid shortly after that due date.  FAC Ex. 13.  The amount paid in Count 19 also was paid close to terms.  FAC Ex. 14.  And even if the promissory note and agreement pursuant to which certain payments were made altered pre-existing contractual terms, they were still made in the ordinary course.  *See In re Kaypro*, 218 F.3d 1070, 1073 (9th Cir. 2000) (holding that payments made pursuant to a restructuring agreement are not *per se* outside the ordinary course of business); *see also In re Metromedia Fiber Network, Inc.*, 2005 WL 3789133 (Bankr. S.D.N.Y. Dec. 20, 2005); and *In re Ahaza Sys., Inc.*, 482 F.3d 1118 (9th Cir. 2007) (repayment of debt under a settlement agreement can be within the "ordinary course of business" exception even for the first transaction between the parties).  Because the underlying factual allegations surrounding these payments are easily gleaned from the allegations in the FAC, Counts 18 and 19 should be dismissed for failing to state a claim.

### ii.    The contemporaneous exchange defense is a basis for dismissal (Count 19)

Under section 547(c)(1), a transfer that would otherwise be considered preferential is insulated from attack as a contemporaneous exchange if: (1) the preference defendant extended new value to the debtor; (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor

---

44

1  to be contemporaneous; and (3) the exchange was in fact substantially contemporaneous.  5 Alan N.

2  Resnick & Henry J. Sommer, Collier on Bankruptcy § 547.04[1] (16th ed. 2013).

3       In Count 19, the Trustee seeks to avoid a transfer in the amount of ███████ from Zetta PTE

4  "to Learjet for the benefit of BI and BAC" under a settlement agreement dated June 21, 2017, FAC ¶

5  495-96.  The Trustee alleges that, under the settlement agreement, the Debtors were required to pay

6  BAC and BI the amount of ███████ on or before June 30, 2017, and Zetta PTE made the transfer

7  to LI on July 3, 2017, 74 days before the petition date, in payment of the antecedent debt, *id.* ¶¶ 495,

8  406.  Together with Exhibit 14 of the FAC (the settlement agreement at issue), the FAC reflects that

9  the payment by Zetta Jet and the new issuance by BAC and BI of credit notes and memoranda were

10  intended by the parties to be part of the bargained-for consideration for the settlement exchanged

11  substantially contemporaneously.  Count 19, therefore, should be dismissed.

12       **4.**     ***The Section 502(d) claim must be dismissed (Count 25)***

13       Because the Section 502(d) claim rests on the failure of Defendants to return a not-yet proven

14  avoided transfer, and each avoidance count of the FAC should be dismissed for the reasons set forth

15  above, the section 502(d) claims should also be dismissed.  BBD MTD Order at 40.

16       **5.**     ***The stay violation claim must be dismissed (Count 20)***

17       In Count 20, the Trustee seeks damages against BAC for violating the automatic stay because

18  BAC (1) exercised an unauthorized setoff, *id.* ¶ 798, and (2) refused to perform under a Smart Parts

19  Agreement, *id.* ¶ 799.  Even if the allegations were true, which they are not, Count 20 must be

20  dismissed because the Trustee lacks standing to recover damages for a stay violation.  *See* Yuntian

21  MTD Order at 37-38.  Simply put, the Trustee is not "an *individual* injured by any willful violation of

22  a stay" entitled to "actual damages . . . and, in appropriate circumstances, . . . punitive damages" under

23  the statute.  11 U.S.C. § 362(k)(1); *In re Pace*, 67 F.3d 187, 193 (9th Cir. 1995); *In re Goodman*, 991

24  F.2d 613, 619 (9th Cir. 1993); *In re Chateaugay Corp.*, 920 F.2d 183, 184-87 (2d Cir. 1990).

25  **IV.**    **CONCLUSION**

26       **WHEREFORE**, BAC/BI/LI respectfully request that the Court dismiss with prejudice as

27  against them Counts 1-3, 6-7, 12-20, 25, 31-32 of the FAC.

28

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

1 | Dated: September 7, 2021

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:     */s/ Andrew M. Troop*

Matthew S. Walker (CA Bar 101470)
12255 El Camino Real, Suite 300
San Diego, CA 92130-4088
Telephone:    858.509.4000
Facsimile:    858.509.4010

Eric Fishman (admitted *pro hac vice*)
Andrew M. Troop (admitted *pro hac vice*)
Carolina A. Fornos (admitted *pro hac vice*)
31 West 52nd Street
New York, NY 10019-6131
Telephone:    212.858.1000
Facsimile:    212.858.1500

*Attorneys for Bombardier Aerospace Corporation, Bombardier Inc. and Learjet, Inc.*

BOMBARDIER'S MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT

4810-6253-4901

# PROOF OF SERVICE OF DOCUMENT
## *In re: Zetta Jet USA, Inc.*, ADV. PRO. NO. 2:19 AP 01382-SK

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **501 West Broadway, Suite 1100, San Diego, California 92101.**

A true and correct copy of the foregoing document entitled (*specify*): **(1) Defendants Bombardier Aerospace Corporation, Bombardier Inc. and Learjet, Inc.'s Notice of Motion and Motion to Dismiss Counts 1-3, 6-7, 12-20, 25, 31-32 of First Amended Adversary Complaint; (2) Request for Judicial Notice and Incorporation by Reference in Support of Motion to Dismiss First Amended Adversary Complaint Filed by Bombardier Aerospace Corporation, Bombardier Inc., and Learjet, Inc.; (3) Declaration of Eric Fishman in Support of Motion to Dismiss First Amended Adversary Complaint; and Appendix of Unpublished Opinions Cited in Defendants' Motion to Dismiss First Amended Adversary Complaint** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On September 7, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

> Kristina S Azlin     kristina.azlin@hklaw.com, ericka.mendez@hklaw.com
> Brian K Condon      Brian.Condon@arnoldporter.com
> Aaron S Craig      acraig@kslaw.com, mtunson@kslaw.com;eripley@kslaw.com;mciatti@kslaw.com
> John K Lyons      john.lyons@us.dlapiper.com, john-lyons-7790@ecf.pacerpro.com
> Andrew Troop      andrew.troop@pillsburylaw.com
> United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
> Matthew S Walker      matthew.walker@pillsburylaw.com, renee.evans@pillsburylaw.com, docket@pillsburylaw.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) September 7, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**
(state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) September 7, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| September 7, 2021 | Renee Evans | */s/ Renee Evans* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**